UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-10370PBS

BARBARA CORDI-ALLEN AND
JOHN ALLEN,
Plaintiffs,

VS.

JOSEPH R. CONLON, ARTHUR F. HUTLIN, NORMAN H. POPE, KEITH S. ALTHAUS, and MARINNA MATRICARDI as they are Members and collectively the TRURO ZONING BOARD OF APPEALS and THE TOWN OF TRURO, MASSACHUSETTS, AND BROOKE NEWMAN,
Defendants

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The defendants, Joseph R. Conlon, Arthur F. Hutlin, Norman H. Pope, Keith S. Althaus, and Marinna Matricardi as they are members and collectively the Truro Zoning Board of Appeals and the Town of Truro move for summary judgment in their favor on all counts of the complaint asserted against them. See Fed. R. Civ. P. 56.

As grounds, the defendants state that the plaintiffs' claims are time-barred and that the plaintiffs have otherwise failed to establish those claims. As such, the defendants are entitled to judgment as a matter of law on all counts of the plaintiffs' complaint. In support of their motion, the defendants rely upon and incorporate by this reference the following as if fully set out herein:

1. **Exhibit 1:** Plaintiffs' Complaint;

2. **Exhibit 2:** Affidavit of Patricia Pajaron, Conservation Agent For the Defendant Town of Truro, with attachments;

3. **Exhibit 3:** Deposition of John Allen;

4. **Exhibit 4:** Deposition of Barbara Cordi Allen;

5. **Exhibit 5**: Plaintiffs' Appeal of Denial of Request for Enforcement;

6. **Exhibit 6**: Decision of the Zoning Board of Appeals dated 1/19/05;

7. **Exhibit 7**: Plaintiffs' Answers to Interrogatories;

8. **Exhibit 8:** "Subdivision Plan of Land in Truro made for John C. Worthington";

9. **Exhibit 9**: real estate advertisement;

10. **Exhibit 10**: December 11, 1992 letter from the Board of Selectmen to David B. Lajoie;

11. **Exhibit 11**: Town's Board of Health Minutes from June 4, 1997;[1]

12. **Exhibit 13**: Affidavit of Nicholas Brown;

13. **Exhibit 14**: letters from the plaintiffs to the Town, dated October 20, 1996 and November 4, 1996;

14. **Exhibit 15**: April 7, 1997 letter from FELCO, Inc. to the Truro Board of Health;

15. **Exhibit 16**: Town's Board of Health Minutes from June 11, 1997;

16. **Exhibit 17**: July 26, 1999 letter from the Department of Environmental Protection, without enclosures;

18. **Exhibit 18**: June 2000 cover letter from the Department of Environmental Protection to the plaintiffs, without enclosures;

19. **Exhibit 19**: June 19, 2000 letter from Town Counsel to the Department of Environmental Protection, without enclosures;

20. **Exhibit 20**: Affidavit of Roland W. Breault, Truro Town Administrator, with attachments;

21. **Exhibit 21**: excerpt from current version the Zoning Bylaws;

22. **Exhibit 22**: excerpt from the Zoning Bylaws as of April 1999;

23. The accompanying memorandum of law.

**Wherefore**, the defendants request that summary judgment enter in their favor on all counts of the complaint against them.

**REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 7.1(E) of the Local Rules for the United States District Court for the District of Massachusetts, the defendants request that they be afforded the opportunity to present oral argument on the issues outlined in this Motion.

Respectfully submitted,
The Defendants,
By their attorneys,

/s/ Deborah I. Ecker
Deborah Ecker, BB0#554623
Deidre Brennan Regan, BBO #552432
**BRODY, HARDOON, PERKINS & KESTEN, LLP**
One Exeter Plaza, 12th Floor
Boston, MA 02116
(617) 880-7100

Dated: May 26, 2006

---

[1] In numbering the exhibits, number 12 was overlooked and thus the omission to a an "Exhibit 12" is intentional.

SUPERIOR COURT
BARNSTABLE SS
FILED FEB 08 2005
[signature] Clerk

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.

SUPERIOR COURT
CIVIL ACTION NO. ~~04~~ 05-80

6040A000002/08/05CIVIL ENTR 240.0
6040A000002/08/05SURCHARGE 15.0
6040A000002/08/05SECC 20.0
6040A000002/08/05SUMMONS 5.0

Barbara Cordi-Allen and John Allen

Plaintiffs

v.

Joseph R. Conlon, Arthur F. Hultin, Norman H. Pope, Keith S. Althaus, and Marinna Matricardi as They are Members And Are Collectively the Truro Zoning Board of Appeals, Brooke Newman, and the Town of Truro, Massachusetts

Defendants

**COMPLAINT**

This action involves an appeal by Plaintiff Barbara Cordi-Allen of a decision of the Town of Truro Zoning Board of Appeals denying Ms. Cordi-Allen's request for revocation of a building permit and enforcement of the Town of Truro's Zoning Bylaw against the Defendant Brooke Newman. In addition, Plaintiff John Allen and Barbara Cordi-Allen (collectively the "Allens") also seek a judgment that the Town of Truro acted improperly and beyond its statutory and constitutional authority in taking certain land of the Allens in the Pamet Harbor area of Truro and have violated the Allens due process and equal protection rights in a concerted effort by the Boards, Commissions, and other agencies of the Town of prevent the Allens from developing in their waterfront property.

## JURISDICTION

2.    This court has jurisdiction pursuant to M.G.L. ch. 40A, Sec. 17, M.G.L. ch. 212, Sec. 4; M.G.L. ch. 214, Sec. 1; M.G.L. ch. 231A, Sec. 1; M.G.L. ch. 79, Sec. 14, 28 U.S.C. 1983, and M.G. L. c. 12, §§ 11H, 11I..

## PARTIES

3.    Plaintiff, Barbara Cordi-Allen, is a person and has an address of 143 Ardsley Road, Longmeadow, Massachusetts 01106.

4.    Plaintiff John Allen is a person and has an address of 143 Ardsley Road, Longmeadow, Massachusetts 01106.

5.    The Defendant Joseph R. Conlon, is a person with an address of 408 Route 6, Truro, Massachusetts and a member of the Truro Zoning Board of Appeals.

6.    The Defendant Arthur F. Hultin is a person with an address of 11 Lawrence Way, Truro, Massachusetts and a member of the Truro Zoning Board of Appeals.

7.    The Defendant Norman H. Pope is a person with an address of 5 Collins Road, Truro, Massachusetts and a member of the Truro Zoning Board of Appeals.

8.    The Defendant Keith S. Althaus, is a person with an address of 46 Shore Road, Truro, Massachusetts and a member of the Truro Zoning Board of Appeals.

9.    The Defendant Marinna Matricardi is a person with an address of 24 Fisherman's Road, Truro, Massachusetts and a member of the Truro Zoning Board of

Appeals.

10. The Defendant Town of Truro is a body politic and corporate with a town form of government and has an address of Town Hall Road, Truro, Massachusetts.

11. The Defendant Brooke Newman has an address of 273 Roaring Fork Drive, Aspen, Colorado 81611

## FACTS

12. In March, 1996, the Allens purchased a waterfront property on Pamet Harbor adjacent to the Pamet Harbor Yacht Club with an address of 5 Yacht Club Road, Truro, Massachusetts (the "Property").

13. The Property was improved with a single family dwelling.

14. The Allens also applied to the Department of Environmental Protection ("DEP") for an M.G.L. ch. 91 license to maintain and extend a pier at the Property in 1996.

15. The notice of the application was published in November, 1996, and letters were sent by the Town administrator and the Harbormaster of Pamet Harbor requesting that the M.G.L. ch. 91 license be denied and/or that a public hearing be held.

16. Within a month, the harbormaster "blew the whistle" on Chairman of the Pamet Harbor Commission who was also a member of the Pamet Harbor Yacht Club alleging

that : (i) the Chairman pressured the Town Administrator to write the letter after the harbormaster originally refused to do so; and (ii) the harbormaster signed a similar matter in "a moment of weakness" when he believed that he would not obtain a raise if he refused to write a letter in opposition.

17.     When these allegations were revealed, the Town of Truro selectman refused to accept the resignations of Pamet Harbor Commission members and went so far as to criticize the harbormaster for his actions.

18.     In April, 1997, the Allens requested variances from the Truro Board of Health for the construction of a new septic system on the Property which was denied by the Board of Health.

19.     Concurrently, the Allens had filed a two notices of intent with the Truro Conservation Commission in 1996, to obtain an order of conditions to construct: (i) the septic system and a larger house on the property; and (ii) a pier which reached to navigable water at mean low water on their property.

20.     The Town of Truro Conservation Commission refused to take any action on either notice of intent.

21.     In October, 1997, the Town Administrator issued a memorandum to all town boards warning the Boards to be cautious in dealing with the Allens.

22.     The letter stated that he would not speak with the Allens without witnesses present and stated that the Boards should act similarly.

23.    The letter also directed the Boards and Commisisons in contravention to public records laws to not release information to the Allens or their attorneys and required that any from the Allens request be handled by the Town's attorneys.

24.    In 1998, Defendant Brooke Newman purchased 3 Yacht Club Road which was adjacent to the Property.

25.    In May, 1998, the Truro Conservation Commission issued an order of conditions allowing Ms. Newman to relocate and expand her home at 3 Yacht Club Road which showed a limited amount of "fill" being place on the property and raising the maximum elevation of the land near the home to elevation 12.0 NGVD and no placement of rocks, construction of a fence, or planting or trees..

26.    In August, 1998, the Conservation Commission approved one and possibly two revised plans for the Defendant Newman which showed a different location for the home and a replacement septic system.

27.    Again, only a limited amount of "fill" was to be brought to the property primarily adjacent to the dwelling and in no case higher than elevation 12.0 NGVD and no placement of rocks, construction of a fence, or planting or trees..

28.    On or about October 28, 1998, the Building Department of the Town of Truro issued a building permit for construction on Brooke Newman's property at 3 Yacht Club Road without requiring Ms. Newman to obtain a special permit or a variance.

29. The permit was based upon a plan that required the use of "breakaway panels" to meet flood zone requirements.

30. In late February, 1999, the Conservation Commission approved a revised plan for the Newman home which raised the exit pipe for the septic system to a height of 12.8 feet.

31. Again, only a limited amount of "fill" was to be brought to the property primarily adjacent to the dwelling and in no case higher than elevation 12.0 NGVD and no placement of rocks, construction of a fence, or planting or trees.

32. After approval of the revised plan in late February, 1999, construction began on Ms. Newman's home at 3 Yacht Club Road.

33. The construction, however, was not completed in compliance with approved plans in areas subject to Commission jurisdiction as: (i) the foundation did not have breakaway panels; (ii) fill was brought on to the property to at least elevation 13.5 to cover the outlet to the septic tank from the home; (iii) large rocks were brought onto the property which were not shown on any plan; (iv) a fence was constructed; (v) an overhanging roof was constructed; and (vi) while Newman had informed the Conservation Commission that she would only plant "native grasses", Ms. Newman planted numerous trees and shrubbery.

34. Recognizing the Conservation Commission and Board of Health acted nearly immediately on any application of Ms. Newman, but such Boards simply failed to act when the Allens submitted applications, the Allens requested that the Department of

Environmental Protection ("DEP") issue Superseding Orders of Conditions for the Allens proposed house, septic system, and pier in November, 1998.

35. The Southeast Regional Office of DEP accepted the Allens request to consider the issuance of a Superseding Order of Conditions in January, 1999.

36. An on-site meeting was held by DEP in early, 1999 to "evaluate" the Allens project in 1999.

37. At the on-site meeting, DEP and members of the Truro Conservation Commission observed individuals excavating and repairing the septic system for the adjacent Pamet Harbor Yacht Club.

38. No permits were obtained for such work, but no enforcement action was initiated against teh Yacht Club.

39. DEP staff and the Truro Conservation Commission observed the conditions on the adjacent Newman property including that the property had only a few shrubs and beach grass present.

40. In 1999, the Barnstable Superior Court ruled that the Truro Board of Health acted arbitrarily and capriciously when it failed to act on the Allens septic variance application within 45 days of receipt and then attempted to deny that application after expiration of the 45 day time period to act in M.G.L. ch. 11, Sec. 31E.

41. Having obtained their variances, the Allens applied in June, 1999, for DEP

approval of the variance to construct a system without a "reserve area" as required by DEP regulations.

42.    The plan submitted by the Allens to DEP contained the same wetland resource areas (coastal bank and land subject to coastal storm flowage) in the same locations as were found by DEP in 1993 when it rejected a contention by the Truro Conservation Commission that the Property contained a "coastal dune."

43.    On January 18, 2000, by letter from Elizabeth Kouloheras, the Southeast Regional Office of DEP issued a variance to construct the septic system proposed by the Allens.

44.    No party appealed DEP's decision to issue the variance.

45.    On June 8, 2000, by letter from Elizabeth Kouloheras, the Southeast Regional Office of DEP issued two superseding orders of conditions authorizing the Allens' house, septic system and pier.

46.    The DEP concluded that the Property did not contain a "coastal dune" and authorized the construction of septic system on it.

47.    In June, 2000, the Town of Truro and the Pamet Harbor Yacht Club requested an adjudicatory hearing on the two Superseding Ordes of Conditions issued by DEP alleging that the Allens' property contains a "coastal dune."

48.    In November, 2000, a prehearing conference was scheduled for the appeals of

the superseding orders of conditions.

49.    At this time, Brooke Newman filed a motion to intervene in the proceeding which was ultimately granted and alleged that there existed a "coastal dune" on both the Property and her adjacent property.

50.    The allegation was somewhat perplexing as Ms. Newman never showed a coastal dune on any of her filings with the Truro Conservation nor does the development of her property comply with the performance standards for "coastal dunes"

51.    From 1996 to this time period, numerous meetings were held with DEP and the U.S. Army Corps of Engineers regarding the M.G.L. ch. 91 license application and a related permit application for the Allens' proposed pier extension.

52.    At these meetings, DEP informed the Army Corps that it intended to issue the M.G.L. ch. 91 permit to the Allens.

53.    Notwithstanding these statements, the DEP issued a notice of denial of the M.G.L. ch. 91 license to the Allens on November 30, 2000, for which the Allens requested an adjudicatory hearing before DEP.

54.    In early 2001, the Health Agent of the Town of Truro insisted that the Allens modify the DEP septic variance because the building and landscaping on the Superseding Order of Conditions plan differed from that in the DEP septic variance.

55. In response, the Allens requested that the DEP variance be modified to incorporate the building and landscaping changes and DEP issued an amended variance in April, 2001.

56. The Plaintiff Town of Truro then filed an M.G.L. ch. 30A, Sec. 14 appeal in Barnstable County Superior Court (No. 01-347) challenging this decision.

57. Contemporaneously, Brooke Newman filed a similar appeal in Suffolk County Superior Court (No. 01-2419F).

58. In October, 2001, the Allens wrote to the Truro Harbormaster with a copy to Town Counsel, which complained that boats were being moored on town authorized moorings on the Allens tidal flats (*i.e.*, land owned by the Allens between mean high and mean low water).

59. In late January, 2002, the Allens learned that the Town of Truro intended to take the tidal flats on their property and adjacent land owners by eminent domain.

60. The purpose of this action was to prevent the Allens from constructing their proposed pier and to eliminate their complaints regarding the Town using the flats for moorings and was done to benfit the Pamet Harbor Yacht Club.

61. The Order of Taking was recorded in the Barnstable Registry of Deeds on February 15, 2002.

62. The Allens were offered a payment of $2,500 for the land which was the lowest

of any property owners and approximately ten percent of the amounts paid to their residential neighbors including Ms. Newman.

63.    The purported reason for the lesser payment was that the Allens retained an easement in the location of an existing dilapidated pier which only reaches the water during less than one quarter of the tidal cycle and serves no purpose other than as a viewing platform.

64.    In April and May of 2002, Town Counsel wrote to the Allens and stated that the Allens probably required a variance from the zoning bylaw to expand their home or, at a minimum, a special permit, even though no neighbors had been required to do so for their expansions.

65.    In April, 2003, the Town of Truro filed a motion to remand its Barnstable Superior Court action on the DEP septic variance modification arguing that the Property contains a septic system located within a "coastal dune" even though its Boards have never applied coastal dune standards to any property in the area

66.    That motion was denied as it was unsupported by affidavits.

67.    In early, 2004, the Town renewed its motion to remand (which remains pending) arguing that the Allens misled regulatory authorities in not showing a "coastal dune" on the Property when in fact the Allens showed wetland resources that had been approved by DEP in 1993 when the DEP rejected the Truro Conservation Commissions' argument that the Property contained a "coastal dune."

68.    In May, 2004, the Allens requested that the Conservation Commission initiate enforcement against Brooke Newman for failure to comply with the terms of her order of conditions and failing to comply with "coastal dune" performance standards which the Commission wished to have applied to the adjacent Allen Property.

69.    The information submitted to the Commission during 2004 demonstrated that Ms. Newman: (i) placed more than two feet of additional fill on her property which was not shown in any plan; (ii) planted trees and constructed a fence which were not shown on her plans and were inconsistent with the representation that only "native grasses" would be planted in her notices of intent; (iii) placed large boulders onto the property; and (iv) took other actions which did not comply with coastal dune performance standards even though Ms. Newman has alleged that her property and Ms. Cordi-Allens contain a "coastal dune."

70.    Even though these actions were wholly inconsistent with the plan approved for Ms. Newman's property, the Commission voted to issue a certificate of compliance that the work performed by Ms. Newman was in "substantial compliance" with her approved plans.

71.    With respect to the allegations regarding "coastal dunes," the Commission stated that they would not apply coastal dune standards to the Newman property.

72.    In July, 2004, the Pamet Harbor Yacht Club constructed, among other things, a stairway across the beach and installed propane gas tanks in the flood plain without obtaining Truro Conservation Commission approval.

73.    No enforcement action has been taken against the Yacht Club for such actions.

74.    The Pamet Yacht Club has been serving food at its premises in the Summer and Fall of 2004 without obtaining the proper food service permits.

75.    Such information is widely known and has been published in the Cape Cod Times, but no enforcement action has been taken.

76.    In July, 2004, the Allens requested authority to install floats off of the "viewing platform" in pier easement area.

77.    Town counsel responded that such licenses would not be issued as the Town owned the tidelands in which they would be located.

78.    However, the Town of Truro has licensed for at least two years floats of the Pamet Harbor Yacht Club which extend beyond their easement.

79.    By letter dated July 26, 2004, Barbara Cordi-Allen requested that the Building Commissioner revoke the building permit issued to Brooke Newman as she had not obtained a special permit or variance.

80.    The request cited letters to the Allens' counsel from town counsel stating that the Allens required a variance or special permit.

81.    The Building Commissioner failed to respond within the statutorily required 14 day period.

82.    Finally, after numerous telephone calls to town counsel, the Building Commissioner issued a letter on October 19, 2004, denying the request and essentially stating that his predecessor must have found that a special permit or variance was not required.

83.    On October 27, 2004, Barbara Cordi-Allen filed an appeal of that decision with the Truro Zoning Board of Appeals and filed a notice with the Barnstable County Registry of Deeds on the following day.

84.    Even though the Building Commissioner waited nearly three months to respond, town counsel quickly informed the Truro Zoning Board of Appeals that the appeal was untimely because the appeal had not been filed in Superior Court by October 28, 2004, citing a case that does not even address the issue of whether a timely filed administrative proceeding may continue.

85.    The Truro Zoning Board of Appeals held a public hearing in December, 2004, and again on January 10, 2005.

86.    On January 19, 2005, a decision was filed with the Truro Town Clerk denying Ms. Cordi-Allen's appeal. (copy attached as Exhibit One).

87.    The decision simply holds without findings that the Building Commissioner acted properly in issuing the building permit and that the appeal was untimely.

88.    Plaintiff Barbara Cordi-Allen is aggrieved by the decision of the Truro Zoning

Board of Appeals.

**COUNT I**

**Appeal of Zoning Board of Appeals Decision**

**M.G.L. ch. 40a, Sec. 17**

89. Plaintiff Barbara Cordi-Allen repeats the allegations in paragraphs 1 through 88 set forth above and further alleges as follows.

90. The Zoning Board of Appeals' decision was not supported by the facts or law.

91. The issuance of the building permit to Brooke Newman without a variance or special permit exceeded the authority of the Building Commissioner.

92. The Zoning Board of Appeals' decision was arbitrary and capricious, constituted an error of law, constituted an abuse of discretion, exceeded the authority of the Commission, was against the weight of evidence presented at the public hearing, and was otherwise unlawful.

WHEREFORE, Barbara Cordi-Allen requests that this court enter judgment as follows:

a. That the decision of the Zoning Board of Appeals was:

   i. in excess of the Commission's authority or jurisdiction,

   ii. based upon error of law,

   iii. made upon unlawful procedure, and/or

   iv. is unsupported by factual evidence.

b. Issue an Order:

   i. reversing the decision,

ii.    requiring that the Zoning Board of Appeals enforce the Zoning Bylaw against Ms. Newman;

c.    Provide such other relief as this court deems meet and just under the circumstances.

## COUNT II

## Federal Civil Rights -- 28 U.S.C. 1983

93.    Plaintiffs John Allen and Barbara Cordi-Allen repeat the allegations in paragraphs 1 through 92 set forth above and further allege as follows.

94.    Barbara Cordi-Allen is an American citizen of Lebanese descent.

95.    John Allen is Ms. Cordi-Allens' husband.

96.    The Allens have been discriminated against due to Ms. Allens' national origin in that the Town of Truro has applied differing standards to the applications for regulatory permits to the Allens than they have applied to others of non-Lebanese descent resulting in a violation of the equal protection and due process rights of the Allens.

97.    The actions of the Town of Truro have been irrational and wholly arbitrary resulting in a violation of the equal protection and due process rights of the Allens.

98.    The actions of the Town of Truro and its various boards are intentional and occur under color of state law.

99.    The Allens have been unable to develop the Property to the extent allowed by

law and have lost their full use and enjoyment of the Property and have been required to incur attorneys fees and other costs resulting in damages in excess of $5,000,000.00.

99.    The actions of the Town of Truro have been intentional discrimination and are intended to protect the interests of the Pamet Harbor Yacht Club and its members who include many of the most influential citizens of Truro.

100.    Such actions entitle the Allens to punitive damages and the Allens request that such damages be allowed in an amount up to three times the actual damages of the Allens.

101.    The actions of the Town of Truro have resulted in a temporary taking of the Allens property.

102.    The Town of Truro and its Boards have violated the civil rights of Allens protected by the United States Constitution.

103.    Defendant Town of Truro is liable for the damages incurred by the Plaintiffs caused by its and its Boards' or Commissions' violation of the Allens' civil rights.

WHEREFORE, Allens requests that this court enter judgment that:

      a.    The actions of the Defendant Truro and its Boards and Commissions violated federal protected civil rights of the Allens;

      b.    The Allens are entitled to compensatory and punitive damages of

at least 20 million dollars;

c. Award attorneys fees to the Allens as provided in 28 U.S.C. 1983; and

d. Providing such other relief as this court deems meet and just under the circumstances.

## COUNT III

## State Civil Rights -- M.G. L. c. 12, §§ 11H, 11I

104. Plaintiffs John Allen and Barbara Cordi-Allen repeat the allegations in paragraphs 1 through 104 set forth above and further alleges as follows.

105. Barbara Cordi-Allen is an American citizen of Lebanese descent.

106. John Allen is Ms. Cordi-Allens' husband.

107. The Allens have been discriminated against due to Ms. Allens' national origin in that the Town of Truro has applied differing standards to the applications for regulatory permits to the Allens than they have applied to others of non-Lebanese descent resulting in a violation of the equal protection and due process rights of the Allens.

108. The actions of the Town of Truro have been irrational and wholly arbitrary resulting in a violation of the equal protection and due process rights of the Allens.

109. The Plaintiffs attempts to exercise the rights have been interfered with by the Town of Truro and that interference has been through the use of threats, coercion and

intimidation.

110.   The Allens have been unable to develop the Property to the extent allowed by law and have lost their full use and enjoyment of the Property and have been required to incur attorneys fees and other costs resulting in damages in excess of $5,000,000.00.

111.   The actions of the Town of Truro have been intentional discrimination and are intended to protect the interests of the Pamet Harbor Yacht Club and its members who include many of the most influential citizens of Truro.

112.   Such actions entitle the Allens to punitive damages and the Allens request that such damages be allowed in an amount up to three times the actual damages of the Allens.

113.   The actions of the Town of Truro have resulted in a temporary taking of the Allens property.

114.   The Town of Truro and its Boards have violated the civil rights of Allens protected by the Massachusetts Constitution.

115.   Defendant Town of Truro is liable for the damages incurred by the Plaintiffs caused by its and its Boards' or Commissions' violation of the Allens' civil rights.

WHEREFORE, Allens requests that this court enter judgment that:

   a.    The actions of the Defendant Truro and its Boards and

Commissions violated state protected civil rights of the Allens;

b. The Allens are entitled to compensatory and punitive damages of at least 20 million dollars;

c. Award attorneys fees to the Allens as provided in M.G.L. ch. 12, Sec. 11H, and 11I; and

d. Providing such other relief as this court deems meet and just under the circumstances.

## COUNT IV

## Reversal of Eminent Domain

116. Plaintiffs John Allen and Barbara Cordi-Allen repeat the allegations in paragraphs 1 through 115 set forth above and further alleges as follows.

117. The Allens "flats" and tideland property was taken in violation of the United States and Massachusetts Constitution.

118. The taking by eminent domain did not serve a public purpose, but rather was undertaken to transfer control over those flats and tidelands for the private use of the Pamet Harbor Yacht Club.

WHEREFORE, Allens requests that this court enter judgment that:

a. That the eminent domain taking was:

i. in violation of constitutional provisions,

ii.    in excess of the Commission's authority or jurisdiction,

iii.    based upon error of law,

iv.    made upon unlawful procedure, and/or

v.    is unsupported by factual evidence.

b.    Issue an Order reversing the eminent domain taking of the Allens tidelands; and

c.    Provide such other relief as this court deems meet and just under the circumstances.

## Count V - Declaratory Judgment

119.    Plaintiffs repeat the allegations in paragraphs 1 through 118 set forth above and further allege as follows.

120.    There exists a controversy between the Plaintiffs and the Defendant Town of Truro regarding the Property and whether the Town violated the Allens constitutionally protected rights.

121.    The Plaintiffs seek a declaration that the Town of Truro and its Boards and Commissions have violated the constitutionally protected rights:

WHEREFORE, Allens requests that this court enter judgment that:

a.    the Town of Truro and its Boards and Commissions have violated the constitutionally protected rights of the Allens; and/or

b.    for such other declaratory relief as may be necessary to protect such rights.

Respectfully Submitted,

Paul Revere, III
(BBO #636200)
Law Offices of Paul Revere, III
226 River View Lane
Centerville, Massachusetts 02630
(508) 778-7126

Dated: February 8, 2005

# EXHIBIT ONE

# DECISION OF THE BOARD OF APPEALS OF TRURO, MASSACHUSETTS

Property Owner(s) and/or **Applicant(s):** Barbara Cordi-Allen, (by agt/atty Paul Revere, III)

Property Location: 3 Yacht Club Rd.

Atlas Sheet: 50 Parcel: 20 (Ref. 2004-014ZBA) Hearing Date: Monday, January 10, 2005 (as continued from the Meeting of Monday, December 6, 2004.)

| | | | | |
|---|---|---|---|---|
| Special Permit | ☐ | Vote: 5 | Approve | ☒ |
| Variance | ☐ | 0 | Disapprove | ☐ |
| Building Commissioner Decision | ☐ | | Abstain | ☐ |
| Other | ☒ | | | |

(Unanimous vote on Motion to Deny the application)

**Motion (Conlon; 2nd Pope):** I hereby Move to Deny the application of Barbara Cordi-Allen, appealing the decision of the Building Commissioner dated October 19, 2004 upholding the issuance of a building permit on October 28, 1998 for property owned by Brooke Newman, Located at 3 Yacht Club Rd (Atlas Sheet 50, Parcel 20)[2004-014/ZBA], on the following grounds:

1) The Building Commissioner was fully authorized to issue the building permit to Ms. Newman pursuant to the provisions of Section VIII-B.2 of the former Truro Zoning Bylaws because Ms. Newman's project involved the alteration of a pre-existing, non-conforming structure and Section VIII-B.2 authorized the Building Inspector to approve and issue a building permit for a proposed repair, reconstruction, alteration or structural change of a pre-existing, non-conforming single-family structure if the Building Commissioner determines that the proposal will not be "substantially more detrimental to its neighborhood than the existing nonconforming structure and will not increase the nature or extent of the nonconformity;"

2) The appeal is untimely pursuant to the provisions of General Laws, Chapter 40A, Section 7 because the subject building permit was issued and the land improved over six (6) years ago, and therefore, the issue presently on appeal, namely whether the Building Commissioner acted within his authority on October 28, 1998, is now time-barred and moot.

I hereby certify this as a true and accurate record of the Board of Appeals.

[signature] January 19, 2005

Signature Date

Received, Office of the Town Clerk:

[signature] January 19, 2005

Signature Date

---

I hereby certify that this decision was filed with the Office of the Town Clerk on ______________ and 20 (twenty) days have elapsed since the date of filing, and no appeal has been filed.

______________________ ______________________

Signature Date

NOTE: Any person aggrieved by a decision of the Zoning Board of Appeals may appeal to the Superior or Land Court by bringing action within twenty days after the decision has been filed with the Town Clerk of Truro. (Massachusetts General Laws, Chapter 40A, Section 17.)

A COPY OF THIS DECISION MUST BE FILED WITH THE REGISTER OF DEEDS OF BARNSTABLE COUNTY BY THE APPLICANT

SUPERIOR COURT
BARNSTABLE SS
FILED FEB 2 4 2005
Clerk

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss. SUPERIOR COURT
CIVIL ACTION NO. 05-80

Barbara Cordi-Allen and John Allen

Plaintiffs

v.

Joseph R. Conlon, Arthur F. Hultin, Norman H. Pope, Keith S. Althaus, and Marinna Matricardi as They are Members And Are Collectively the Truro Zoning Board of Appeals, Brooke Newman, and the Town of Truro, Massachusetts

Defendants

**PROOF OF SERVICE AFFIDAVIT**
**OF PAUL REVERE, III**
**(M.G.L. ch. 40A, Sec. 17)**

1. I, Paul Revere, III, Esq., make this affidavit based upon my personal knowledge and, if sworn as a witness, I can testify to the facts stated herein.

2. On February 8, 2005, I filed the complaint in the above captioned matter on behalf of Barbara Cordi-Allen with the Clerk of the Barnstable Superior Court by hand delivery challenging a decision of the Zoning Board of Appeals of Truro in Count I..

3. In accordance with M.G.L. ch. 40A, Sec. 17, I also delivered a notice of appeal and a copy of the complaint by hand delivery to the Town Clerk for the Town of Truro on February 8, 2005.

4. A date stamped copy of the notice of appeal is attached as Exhibit One.

5. In accordance with M.G.L. ch. 40A, Sec. 17, I sent a summons, tracking order, notice of appeal, civil action cover sheet, and a copy of the complaint in this matter to each individual defendant member of the Truro Zoning Board of Appeals and teh Defendant Brooke Newman by certified mail.

6. Copies of the certified mail receipts are attached as Exhibit Two.

Signed under pains and penalties of perjury.

Paul Revere, III
(BBO #636200)
Law Offices of Paul Revere, III
226 River View Lane
Centerville, Massachusetts 02630
(508) 778-7126

Date: February 18, 2005

EXHIBIT ONE

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.

SUPERIOR COURT
CIVIL ACTION NO. ~~04~~ 05-80

| | |
|---|---|
| Barbara Cordi-Allen and John Allen | ) |
| Plaintiffs | ) |
| v. | ) |
| Joseph R. Conlon, Arthur F. Hultin, Norman H. Pope, Keith S. Althaus, and Marinna Matricardi as They are Members And Are Collectively the Truro Zoning Board of Appeals, Brooke Newman, and the Town of Truro, Massachusetts | ) |
| Defendants | ) |

## NOTICE OF APPEAL

The Plaintiff in the above captioned matter hereby gives notice pursuant to M.G.L. ch. 40A, Sec. 17, to the Town Clerk of the Town of Truro that a complaint was filed seeking review of a January 19, 2005, decision of the Truro Zoning Board of Appeals and that such complaint was filed on February 8, 2005. A copy of said complaint is attached.

Respectfully Submitted,

[signature]

Paul Revere, III
(BBO #636200)
Law Offices of Paul Revere, III
226 River View Lane
Centerville, Massachusetts 02630
(508) 778-7126

Dated: February 8, 2005

Office of Town Clerk
Treasurer – Tax Collector
FEB - 8 2005
@ 3:33 PM
Received TOWN OF TRURO
By

EXHIBIT TWO



U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com®
OFFICIAL USE
ASPEN, CO 81611

7003 3110 0000 5874 3327

| | |
|---|---|
| Postage | $ 1.52 |
| Certified Fee | 2.30 |
| Return Reciept Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 3.82 |

UNIT ID: 0601
Postmark Here
HYANNIS MA 02601 USPS
Clerk: BTPRPO
02/18/05

Sent To Brooke Newman
Street, Apt. No.; or PO Box No. 273 Roaring Forke Dr.
City, State, ZIP+4 Aspen, CO 81611

PS Form 3800, June 2002 See Reverse for Instructions

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com®
OFFICIAL USE
TRURO, MA 02666

7003 3110 0000 5874 3273

| | |
|---|---|
| Postage | $ 1.29 |
| Certified Fee | 2.30 |
| Return Reciept Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 3.59 |

UNIT ID: 0601
Postmark Here
HYANNIS MA 02601 USPS
Clerk: BTPRPO
02/18/05

Sent To Joseph R. Cowlow
Street, Apt. No.; or PO Box No. 408 Route 6
City, State, ZIP+4 Truro, MA 02666

PS Form 3800, June 2002 See Reverse for Instructions

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com®
OFFICIAL USE
TRURO, MA 02666

7003 3110 0000 5874 3280

| | |
|---|---|
| Postage | $ 1.52 |
| Certified Fee | 2.30 |
| Return Reciept Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 3.82 |

UNIT ID: 0601
Postmark Here
HYANNIS MA 02601 FEB 18 2005 USPS
Clerk: DGF1D0
02/18/05

Sent To Arthur F. Hultin
Street, Apt. No.; or PO Box No. 11 Lawrence Way
City, State, ZIP+4 Truro, MA 02666

PS Form 3800, June 2002 See Reverse for Instructions

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com®
OFFICIAL USE
TRURO, MA 02666

7003 3110 0000 5874

| | |
|---|---|
| Postage | $ 1.52 |
| Certified Fee | 2.30 |
| Return Reciept Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 3.82 |

UNIT ID: 0601
Postmark Here
Clerk: DGF1D0
02/18/05

Sent To Norman H. Pope
Street, Apt. No.; or PO Box No. 5 Collins Rd.
City, State, ZIP+4 Truro, MA 02666

PS Form 3800, June 2002 See Reverse for Instructions

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com®
OFFICIAL USE
TRURO, MA 02666

7003 3110 0000 5874 3303

| | |
|---|---|
| Postage | $ 1.52 |
| Certified Fee | 2.30 |
| Return Reciept Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 3.82 |

UNIT ID: 0601
Postmark Here
HYANNIS MA FEB 18 2005 USPS
Clerk: DGF1D0
02/18/05

Sent To Keith S. Althaus
Street, Apt. No.; or PO Box No. 46 Shore Rd.
City, State, ZIP+4 Truro, MA 02666

PS Form 3800, June 2002 See Reverse for Instructions

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com®
OFFICIAL USE
TRURO, MA 02666

7003 3110 0000 5874 3310

| | |
|---|---|
| Postage | $ 1.52 |
| Certified Fee | 2.30 |
| Return Reciept Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 3.82 |

UNIT ID: 0601
Postmark Here
HYANNIS MA 02601 FEB 18 2005 USPS
Clerk: DGF1D0
02/18/05

Sent To Marion Matricardi
Street, Apt. No.; or PO Box No. 24 Fisherman's Rd.
City, State, ZIP+4 Truro, MA 02666

PS Form 3800, June 2002 See Reverse for Instructions



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE
2005 FEB 24 P 3:34
U.S. DISTRICT COURT
DISTRICT OF MASS.

Civil Action No.
05-80

SUPERIOR COURT
BARNSTABLE SS
FILED FEB 25 2005
Clerk

BARBARA CORDI-ALLEN AND JOHN ALLEN
Plaintiffs,

v.

JOSEPH R. CONLON, ARTHUR F. HUTLIN, NORMAN H. POPE, KEITH S. ALTHAUS and MARINNA MATRICARDI as they are members and are collectively the TRURO ZONING BOARD OF APPEALS, BROOKE NEWMAN, and the TOWN OF TRURO, MASSACHUSETTS
Defendants,

05-10370 PBS

**DEFENDANTS' NOTICE OF REMOVAL OF ACTION FROM STATE COURT**

Pursuant to 28 U.S.C. §1441(b) and 1446, Defendants petition for removal of this action to the United States District Court for the District of Massachusetts. As grounds therefore, the Defendants state as follows:

1. On or about February 8, 2005, the Plaintiffs filed this suit in the Barnstable Superior Court, Civil Action No.: BACV2005-00080.

2. On or about February 8, 2005 the Plaintiffs' Complaint was served upon the Defendant Town of Truro, Massachusetts. Attached as Exhibit A is a copy of the Plaintiffs' Complaint which was served upon the Defendant Town of Truro, Massachusetts.

3. In their Complaint, the Plaintiffs allege [42] U.S.C. §1983 provides a cause of action in this matter because Ms. Cordi-Allen has been discriminated against because she is of Lebanese descent and because of her national origin the Defendant Town of Truro has "applied differing standards to the applications for regulatory permits to the Allens than they have

applied to others of non-Lebanese descent resulting in a violation of the

equal protection and due process rights of the Allens."

4.    Because this matter is an action arising under federal law of which this

Court has original jurisdiction, as authorized by 28 U.S.C. §1331, it is

subject to removal under 28 U.S.C. §1441(b).

5.    This Notice of Removal is being filed within the time period required by

law, 28 U.S.C. §1446(b).

Respectfully submitted,
The Defendants,
Joseph R. Conlon, Arthur F. Hultin, Norman
H. Pope, Keith S. Althaus and Marinna
Matricardi as they are members and are
collectively the Truro Zoning Board of
Appeals, and the Town of Truro,
Massachusetts
By their attorneys,

Leonard H. Kesten, BBO# 542042
Deborah I. Ecker, BBO# 554623
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza, 12th Floor
Boston, MA 02116
(617) 880-7100

DATED: February 24, 2005

Respectfully submitted,
The Defendants,
Joseph R. Conlon, Arthur F. Hutlin, Norman H. Pope, Keith S. Althaus and Marina Matricardi as they are Members and Collectively the Truro Zoning Board of Appeals and the Town of Truro, Massachusetts
By their attorneys,

Leonard H. Kesten, BBO# 542042
Deborah I. Ecker, BBO# 554623
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza, 12th Floor
Boston, MA 02116
(617) 880-7100

DATED: February 25, 2005

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-10370PBS

BARBARA CORDI-ALLEN AND
JOHN ALLEN,
Plaintiffs,

VS.

JOSEPH R. CONLON, ARTHUR F. HUTLIN, NORMAN H. POPE, KEITH S. ALTHAUS, And MARINNA MATRICARDI as they are Members and collectively the TRURO ZONING BOARD OF APPEALS AND THE TOWN OF TRURO, MASSACHUSETTS, AND BROOKE NEWMAN,
Defendants

**AFFIDAVIT OF PATRICIA PAJARON, CONSERVATION AGENT FOR THE DEFEANDANT TOWN OF TRURO**

Now comes Patricia Pajaron, Conservation Agent for the Town of Truro, and upon oath does depose and state the following:

1. My name is Patricia Pajaron; I am an adult; I am presently employed by the Town of Truro as its Health and Conservation Agent; as Health and Conservation Agent, part of my duties include serving as Keeper of the Records for the Truro Conservation Commission;

2. Attached hereto as Exhibit A is a true and accurate copy of the Site Plan for the Perry property located at 37 Corn Hill Road in Truro, Massachusetts, last revised May 2, 2006; this Site Plan reflects the following information:

   a. the property is located on Barrier Beach TR-3 and is located within 100' of a tidal creek that is a tributary of the Pamet River known locally as the "Little Pamet;"

b.    the Perry's proposal as shown on the Site Plan includes the construction of a single family, one bedroom dwelling; its footprint is approximately 810 s.f. in area and the structure is proposed to be constructed approximately 78' from the edge of the creek at its closest location;

c.    a dirt road lies between the proposed construction and the creek;

d.    the flood elevation for this property is Elevation 11';

e.    the construction is proposed to be elevated on a wood piling foundation, with a top of piling finished elevation of 12.0', leaving a minimum of 2' between the bottom of the dwelling and the landform below;

3.    this Site Plan was approved by the Commission at its hearing on May 1, 2006 and construction on the Perry residence has not yet begun on locus;

4.    Attached hereto as Exhibit B are photographs which accurately depicts the Perry property as of the date they were taken, May 23, 2006; the top set of photos depict Corn Hill Road on the far right (the paved road), with the area of proposed construction in the middle and the cartpath labeled "Dirt Road" on the plan shown on the far left; the bottom set of photos depict the "Dirt Road" on the left, the area labeled "Former Railroad R.O.W." on the plan in the center, and the "Tidal Creek" on the right; the area of proposed construction is shown to the far right on the bottom set of photographs;

5.    attached hereto as Exhibit C is a true and accurate copy of the Site Plan for the Sexton Property located at 41 Ryder Beach Road in Truro, Massachusetts, last revised October 26, 1999 and approved by the Commission on November 17, 1999; the Site Plan shows the following information:

a.    the Sexton property abuts Cape Cod Bay; the Site Plan reflects Mean High Water at elevation 6.4', a bottom of bank elevation at approximately 11' - 12', and a top of bank elevation at between 20' and 22'; the ground elevation in the area of the proposed construction is shown on the Site Plan as varying between 22' and 26';

b.    the Sexton proposal included new construction in the form of an approximately 980 s.f. addition to their pre-existing dwelling and a 2 car garage, which structures were to be constructed well over 100' from Mean High Water (approximately 120' at its closest location) and approximately 70' from the top of bank shown on the Plan;

    c.       notes on the Site Plan indicate that the proposed addition and garage are to be constructed on "piers or piles;"

    6.       The Sexton construction was completed and a Certificate of Compliance issued by the Commission on June 6, 2005 ;

    7.       Attached hereto as Exhibit D is a photograph which accurately depicts the Sexton property as of the date it was taken, May 23, 2006; the photograph depicts the completed Sexton dwelling on the far right, with a staircase leading to the beach; Cape Cod Bay appears to the far left of the photograph;

    8.       Attached hereto as Exhibit E is a true and accurate copy of a Site plan for the Brooke Newman property located at 3 Yacht Club Road in Truro, Massachusetts, last revised February 23, 1999 and approved by the Commission at its hearing on March 4, 1999 ;

    9.       The Newman property abuts the Plaintiff's property; the Site Plan shows the following information:

    a.       the Newman proposal shown on the plan includes the re-location of a pre-existing, two bedroom dwelling, a proposed 90 square foot addition, and an upgraded, Title 5 septic system;

    b.       the dwelling is proposed to be located approximately 183' from Mean High Water and 162' from the top of bank shown on the Site Plan; the proposed leaching component for the septic system is located over 225' from Mean High Water;

    c.       the structure is proposed on a crawl space foundation designed to meet building code requirements for construction in a flood zone; the plan indicates that the flood zone for this property is identified as elevation 12' and the house is shown to be constructed between elevation 10' and 12';

    10.      The construction shown on the approved Site Plan has been completed and a Certificate of Compliance issued on November 4, 2004;

    11.      Attached hereto as Exhibit F is a true and accurate copy of a Site and Sewage Plan with a final revision date of March 20, 2004, for the Landis property located at 80 Depot Road, Truro, Massachusetts;

12.    the Landis property abuts the Newman property; the Site Plan was approved by the

Commission at its meeting on April 12, 2004, and depicts the following information:

   a.    The plan indicates that the proposal included an addition to an existing dwelling
         approximately 800 s.f. in area and the installation a sewer line to an existing Title 5
         septic system;

   b.    the addition was proposed to be located approximately 190' from Mean High Water;

   c.    the foundation for the house was proposed to be elevated on pilings and in compliance
         with building code requirements for construction in a flood plain;

   d.    the flood zone elevation for this property is at elevation 12'; the house was proposed to
         be constructed at a ground elevation of 12';

13.    upon information and belief, construction on the Landis residence is substantially

complete and the Commission has not yet issued a Certificate of Compliance;

14.    attached hereto as Exhibit G is a true and accurate copy of the Site and Sewage Plan for

the Plaintiff's property located at 5 Yacht Club Road in Truro, Massachusetts;

15.    the Plaintiffs' property abuts the Newman property and the Site Plan depicts the

following information:

   a.    The Plaintiffs propose to construct a new, 1512 s.f. single family dwelling, with a new
         attached garage of approximately 1750 s.f. in area, a second dwelling 640 s.f. in area, and
         an inground pool of 450 s.f. in area, together with surrounding decks, a proposed
         driveway, and an upgraded, Title 5 septic system;

   b.    All construction is proposed on solid foundations, including a concrete retaining wall
         for the septic system; the total square footage of new construction (including both
         dwelling units, the garage and pool) is shown as being approximately 4352 s.f. in area;
         scaling off the plan, the total area of disturbance within the limit of work line is
         estimated at 20,000 s.f. in area on the 24,473 s.f. lot;

   c.    Construction is proposed to take place within approximately 20' of MHW on the plan at
         its closest location and within 3' of the top of Coastal Bank that is depicted on the plan;
         the leaching component is proposed to be located just over 115' from MHW;

   d.    The flood elevation for this property is at elevation 12' and construction is proposed
         between elevation 8' and 10';

e.  The Site Plan also shows the Plaintiffs' existing 20' x 20' (400 s.f.) cottage on the property;

16.  The Commission never reviewed this plan because the Plaintiffs submitted it to the Department of Environmental Protection for approval and not the Commission;

17.  Upon information and belief, this proposal is presently pending review in an administrative proceeding before the Department of Environmental Protection and, as such, the project has not yet been constructed;

18.  Attached hereto as Exhibit H is a photograph which accurately depicts the properties owned by Landis, Newman and the Plaintiffs; the photograph was taken in September of 2005 from the Town Landing located just North of these properties and it was taken at low tide; the Landis property is shown to the far left of the photograph and it shows the completed addition constructed on pilings; the Newman property is in the middle, showing the completed, two-story renovated dwelling; the Plaintiffs' existing 20' x 20' cottage and pier are shown to the right of the photograph; behind the Plaintiffs' cottage is the Pamet Harbor Yacht Club; the photograph depicts a wrack-line of seaweed in the area where Mean High Water was approximately located at the time the photograph was taken;

Signed under the pains and penalties of perjury on this 24th day of May, 2006.

Patricia Pajaron,
Truro Health/Conservation Agent

COMMONWEALTH OF MASSACHUSETTS

Barnstable, ss. May 24, 2006

On this 24th day of May, 2006, before me, the undersigned notary public, personally appeared Patricia Pajaron, who is known to me personally to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of her knowledge and belief.

Notary Public: Michael Flores
My Commission Expires: 10/17/08

**DESIGN:** 1 BEDROOM PROPOSED

A DEED RESTRICTION LIMITING THE HOUSE TO 1-BEDROOM WILL BE REQUIRED

THE SYSTEM HAS BEEN SIZED FOR A MINIMUM FLOW OF 220 GALLONS PER DAY

PERC RATE: < 2 MIN/IN.

FLOW RATE: 110 GAL./BEDROOM (2) =220 G/D

SEPTIC TANK: (220)2=440 G/D

REQ'D SEPTIC TANK SIZE: USE 1500 GALLON

ABSORPTION AREA DESIGN:

SIDEWALL: 2(19'+10')2 = 116 S.F. (0.74) = 86 GPD

BOTTOM: (19)(10) = 190 S.F.(0.74) = 141 GPD

TOTAL: (19)(10) = 306 S.F.(0.74) = 227 GPD

INSTALL: 19'x10'x2' SOIL ABSORPTION SYSTEM WITH (2) 500 GALLON LEACHING DRYWELLS SURROUNDED BY 3/4" TO 1-1/2" DOUBLE WASHED STONE

**DEEP OBSERVATION HOLE LOG**

TEST DATE: MARCH 29, 2005

TEST BY: CHRIS WICKSON - CERTIFIED SOIL EVALUATOR
PAT PAJARON - AGENT FOR BOARD OF HEALTH

PERC RATE: < 2 MINUTES PER INCH IN MEDIUM SAND

TESTHOLE #1: ELEVATION = 11.5'

| DEPTH | ELEVATION | HORIZON | TEXTURE |
|---|---|---|---|
| 0"-60" | 11.5'-6.5' | FILL | WINDBLOWN SAND |
| 60"-120" | 6.5'-1.5' | C | MEDIUM SAND |
| | | | |
| | | | |

GROUNDWATER ELEVATION NOT DETERMINED IN THIS TESTHOLE

TESTHOLE #2: ELEVATION = 9.6'

| DEPTH | ELEVATION | HORIZON | TEXTURE |
|---|---|---|---|
| 0"-40" | 9.6'-6.3' | FILL | WINDBLOWN SAND |
| 40"-96" | 6.3'-1.6' | C1 | MEDIUM SAND |
| 96"-108" | 1.6'-0.6' | O | PEAT |
| 108"-120" | 0.6'-(-0.4') | C2 | MEDIUM SAND |

GROUNDWATER OBSERVED: ELEVATON = 2.3'

ADJUSTED GROUNDWATER: ELEVATION = 3.6'

INDEX WELL: TSW-89, ZONE A, READ FEB. 2005
LEVEL = 11.3
ADJUSTMENT FACTOR = 1.3'

**INNOVATIVE/ALTERNATIVE TREATMENT SYSTEM NOTES:**

**DOSING PUMP SPECIFICATIONS:**

**GENERAL NOTES:**

EXHIBIT
B

SITE DEVELOPMENT
WALKWAY DEVELOPMENT
PLAN REFERENCE:
KEY MAP
PROPOSED 3' WIDE BEACH ACCESS STAIRS
PROPOSED WALKWAY
OPEN PORCH
GREEN AREA
COURTYARD
UNIT OF WORK
FLAG POLE
EDGE OF EXISTING PAVEMENT
COBBLESTONE APRON
NOTES:
FOR PATIO DETAILS SEE LANDSCAPE PLAN.
UNIT OF WORK LINE TO BE STAKED WITH SILT FENCE WHERE APPROPRIATE PRIOR TO CONSTRUCTION.
ALL DISTURBED AREAS TO BE REVEGETATED IN CONFORMANCE WITH LANDSCAPE PLAN PREPARED BY S. G. HOFER DESIGN - LANDSCAPE ARCHITECTS.
NEW DRIVEWAY AND COURTYARD AREAS TO BE CONCRETE PAVERS ON STABILIZED BASE.
EXISTING BRICK WALKWAYS TO BE REPLACED WITH STONE PAVERS ON PERVIOUS BASE.
GARDEN WALLS TO BE OF TREATED WOOD.
CATCH BASIN TO BE INSTALLED AT BASE OF DRIVE TO RECHARGE DRIVEWAY RUN OFF.
ALL ROOF RUN OFF TO BE COLLECTED AND RECHARGED DIRECTLY TO THE GROUND.
PROFILE A-A
WALKWAY SECTION B-B
NOT TO SCALE
STAIRS SECTION C-C
NOT TO SCALE
NOTES:
POSTS TO BE HAND DUG.
TIMBER TO BE PRESSURE TREATED.
ALL METAL TO BE GALVANIZED.
NO EQUIPMENT ON BANK OR BEACH.
DRIVEWAY SECTION 1-1
PLAN
SITE DEVELOPMENT PLAN
SEXTON FAMILY NOMINEE TRUST
COASTAL ENGINEERING COMPANY, INC.
PROFESSIONAL ENGINEERS & LAND SURVEYORS
260 CRANBERRY HIGHWAY
ORLEANS, MASS. 02653
(508) 255-6511
SP-1
000064
EXHIBIT C

EXHIBIT
D

CONSTRUCTION NOTES
1. EXISTING DWELLING TO BE RELOCATED AND REMODELLED AS SHOWN.
2. RELOCATED DWELLING TO BE CONSTRUCTED ON FLOODPROOF FOUNDATION PER BUILDING CODE REQUIREMENTS FOR CONSTRUCTION WITHIN COASTAL FLOODPLAIN.
3. NEW FOUNDATION TO BE CRAWL SPACE. SEE SEPARATE DRAWINGS.
4. ALL BUILDING DEBRIS TO BE REMOVED FROM SITE.
5. ALL DISTURBED AREAS TO BE REVEGETATED WITH NATIVE GRASSES UPON WORK COMPLETION.
6. PROPOSED TOP OF NEW FOUNDATION HEIGHT = EL. 14.0'.
7. WATER SUPPLY LINES FROM LOCUS WELL (WHICH SERVES LOCUS DWELLING AND PARCEL 19 DWELLING) TO BE RELOCATED 10' MIN. FROM ALL SEWAGE COMPONENTS.
8. EXCAVATE ALL UNSUITABLE SOIL 5' AROUND LEACH AREA DOWN TO MEDIUM SAND AND REPLACE WITH CLEAN MEDIUM SAND.
9. WORK LIMIT TO BE STAKED SILT FENCE.
10. INSTALL 40 MIL POLYVINYL FLASHING OR EQUIV. AS FLOW BARRIER AS SHOWN IN LEACH AREA DETAIL FROM EL 11.8' DOWN TO EL. 9.8'.
11. EXCAVATE EXISTING SEWAGE AND UNSUITABLE SOIL AND REPLACE WITH CLEAN MEDIUM SAND.
NOTE: THIS PLAN REQUIRES CONSERVATION COMMISSION APPROVAL
NOTE: THIS PROPERTY IS RESTRICTED TO A TWO BEDROOM DESIGN FLOW PER DEED RESTRICTION RECORDED AT BARNSTABLE REGISTRY OF DEEDS
LOCUS
(NO SCALE)
ROUTE 6A
PAMET HARBOR
LOCUS
DEPOT ROAD
YACHT CLUB ROAD
DISTRIBUTION LINES
D-BOX
FLOW BARRIER SEE C.N.#10
5' EXCAVATION SEE C.N.#8
LEACH FIELD
45'
1.7' TYP.
5'
10'
LEACH AREA DETAIL
NO SCALE
APPROX. LOCATION
LEGEND
EXISTING SEPTIC
EXISTING WELL
PROPOSED WELL
EXISTING CONTOUR
PROPOSED CONTOUR
WATER LINE
TEST HOLE
EXISTING SEPTIC TANK (REMOVE)
"D" BOX
EXISTING PUMP CHAMBER (REMOVE)
PROPOSED SEPTIC TANK
BENCHMARK
TOP OF CONCRETE BOUND
EL. 11.8' NGVD
100' FROM WELL
100' FROM LOCUS WELL
PCL. 19
DWELL.
PROPOSED SEE C.N.#7
APPROX. LOCATION
TO LOCUS WELL SEE C.N.#7
PROPOSED LEACH AREA (SEE DETAIL)
A=73.00'
R=1866.83'
43.60'
13'
20'
10'
RESERVE
RELOCATED DWELLING
PORCH
EXISTING DWELLING
PROPOSED ADDITION
DIRT PARKING AREA
80.37'
44.00'
26'
31'
100.00'
EXISTING LEACH AREA (REMOVE)
WORK LIMIT
107.00'
80.00'
YACHT CLUB ROAD
WAY
LOT B
23,446± SF.
0.54± AC.
100' BUFFER ZONE
200'±
80'±
TOP OF BANK
ABOUT MEAN HIGH WATER
PAMET HARBOR
FLOOD ZONE A4
EL. 12.0'
PCL. 21
B
B
Jane Crowley 3/23/99
SITE & SEWAGE PLAN
LOCUS: 3 YACHT CLUB ROAD
TRURO, MA
PREPARED FOR: BROOKE NEWMAN
0273 ROARING FORK DRIVE
ASPEN, CO 81611
REFERENCE: ASSR'S MAP 50 PARCEL 20
SCALE : 1" = 30'
DATE : 06-17-98
2-23-99 NO PUMP
8-25-98
8-11-98
EXHIBIT
E
COMMONWEALTH OF MASSACHUSETTS
DAVID B. LAJOIE
No. 4838
REGISTERED SANITARIAN
FELCO, INC.
ENGINEERING – LAND SURVEYING
P.O.BOX 1366 ORLEANS, MA 02653
ALL WELLS NOT SHOWN EXCEED 200' FROM LOCUS SEWAGE.
VERIFY ZONING AND UTILITY SETBACK DIMENSIONS PRIOR TO CONSTRUCTION.

EL 14.0' TOP OF FOUNDATION
OUT
EL 12.8'
10'

SEPTIC TANK
DESIGN LOADING H-10
FINAL GRADE
EL 14.5'±
ACCESS PORT
INSTALL GAS BAFFLE @ OUTLET TEE
IN
OUT
EL 12.60'
EL 12.35'
1,500 GALLON
EL 8.10'

EXTEND INLET TEE 10" (MIN) BELOW FLOW LINE.
EXTEND OUTLET TEE BELOW FLOW LINE PER TITLE 5 310 CMR 15.227 (6)
PROVIDE 20" MANHOLES OVER CENTER OF TANK, INLET, AND OUTLET WITH READILY REMOVABLE IMPERMEABLE COVERS.
INSTALL ACCESS PORT OVER INLET AND OUTLET W/PRECAST CONCRETE (OR EQUIV.) WATERTIGHT RISER WITHIN 6" (MIN) OF FINAL GRADE.

20'±

"D" BOX
DESIGN LOADING H-10
ACCESS PORT
IN
OUT
EL 12.12'
EL 11.95'

WHEN SYSTEM IS DOSED OR SLOPE OF INLET PIPE EXCEEDS 0.08'/FT INSTALL INLET TEE CUT-OFF ONE INCH ABOVE OUTLET INVERT.
INSTALL OUTLET LEVEL TWO FEET MINIMUM.
PROVIDE A MINIMUM SUMP OF 6" BELOW OUTLET INVERT.
INSTALL ACCESS PORT OVER "D" BOX W/PRECAST CONCRETE (OR EQUIV.) WATERTIGHT RISER WITHIN 6" (MIN) OF FINAL GRADE.

7'±

LEACH FIELD
FINAL GRADE
EL 13.15'±
2" OF 1/8" - 1/2" WASHED STONE
4" PERFORATED PVC PIPE (SCH 40)
IN
EL 11.83'
EFFECTIVE DEPTH
3/4" -1 1/2" WASHED STONE
EL 11.1'
0.5'
45.0' LENGTH
PROVIDE A SLOPE OF 0.005/FT SLOPE IN DISTRIBUTION LINES
5.2'
GROUND WATER OBS. EL. 4.6' ADJ. EL. 5.9'

COMMONWEALTH OF MASSACHUSETTS
DAVID B. LAJOIE No. 1038
REGISTERED SANITARIAN

## SECTION VIEW – SEPTIC SYSTEM COMPONENTS (N. T. S.)

## DEEP OBSERVATION HOLE LOG

1. EL 10.1' DATE: 2-18-97 TEST BY J. ELLIS WITNESS HEALTH DEPT.

| DEPTH | LOWEST ELEVATION | HORIZON | TEXTURE | STRUCTURE | MOTTLING | CONSISTENCE |
|---|---|---|---|---|---|---|
| 0.0' 0.8' | 9.5' | A | LOAMY SAND | NO | NO | LOOSE |
| 1.3' | 9.0' | B | LOAMY SAND | NO | NO | LOOSE |
| WATER @ 5.5' 7.0' | 4.6' 3.3' | C | COARSE SAND PERC @ 2.5' <2 MIN/IN | NO | NO | LOOSE |

2. EL 10.1' DATE: 2-18-97 TEST BY J. ELLIS WITNESS HEALTH DEPT.

| DEPTH | LOWEST ELEVATION | HORIZON | TEXTURE | STRUCTURE | MOTTLING | CONSISTENCE |
|---|---|---|---|---|---|---|
| 0.0' 1.0' | 9.1' | A | LOAMY SAND | NO | NO | LOOSE |
| 1.3' | 9.1' | B | LOAMY SAND | NO | NO | LOOSE |
| WATER @ 5.5' 7.5' | 4.6' 2.6' | C | COARSE SAND | NO | NO | LOOSE |

## GENERAL NOTES

1. ALL CONTRACTORS AND/OR INSTALLERS ARE RESPONSIBLE FOR PROVIDING AND MAINTAINING A SAFE WORK AREA.
2. CONTRACTORS AND/OR INSTALLERS: VERIFY ALL UTILITY LOCATIONS PRIOR TO CONSTRUCTION.
3. CONTRACTORS AND/OR INSTALLERS: VERIFY ALL WASTE LINE LOCATIONS PRIOR TO CONSTRUCTION.
4. CONSTRUCTION DETAILS TO BE IN ACCORDANCE WITH STATE SANITARY CODE 310 CMR 15.000 AND TOWN BOARD OF HEALTH REQUIREMENTS.
5. ELEVATION DATUM IS FROM ☐ U.S.G.S. QUAD. MAP. ☒ N.G.V.D.
6. MUNICIPAL WATER IS AVAILABLE ☐ YES ☒ NO
7. ANY ALTERATIONS TO DESIGN MUST BE APPROVED BY FELCO, INC. AND TOWN BOARD OF HEALTH.
8. ALL EXISTING SEWAGE TO BE PUMPED AND FILLED WITH CLEAN MEDIUM SAND.
9. SEPTIC TANKS, DOSING CHAMBERS, GREASE TRAPS, AND DISTRIBUTION BOXES SHALL BE INSTALLED WATERTIGHT.
10. WHEN SEPTIC TANK, DOSING CHAMBERS, GREASE TRAPS, AND DISTRIBUTION BOXES ARE PLACED IN FILL, PROVIDE A LEVEL STABLE BASE WHICH HAS BEEN MECHANICALLY COMPACTED. VIRGIN GROUND WITH A 6" CRUSHED STONE BASE IS OTHERWISE ADEQUATE.
11. GROUND COVER OVER SEPTIC SYSTEM COMPONENTS SHALL NOT EXCEED 36".
12. WHEREVER SEWER LINES MUST CROSS WATER SUPPLY LINES, BOTH PIPES SHALL BE CONSTRUCTED OF CLASS 150 PRESSURE PIPE OR EQUIV. AND SHALL BE PRESSURE TESTED TO ASSURE WATERTIGHTNESS.

## DESIGN

FLOW DETERMINATION [2] BEDROOM DWELLING

GARBAGE GRINDER ☒ NO ☐ YES

FLOW RATE = [220] GAL/DAY

SEPTIC TANK SIZING:

[220] x 2.0 = [440] GAL/DAY

USE: 1,500 GAL

LEACHING FACILITY CALCULATIONS:

PERCOLATION RATE IS < [5] MIN/INCH [I] CLASS

BOTTOM (S.F.) = [450] x [0.74] = [333] GAL/DAY

USE: (1) 45' X 10' LEACH FIELD W/ 0.5' EFFECTIVE DEPTH

RESERVE AREA:
= 30' LONG x 15'WIDE = 450 SF.

## CONSTRUCTION NOTES

SEE SHEET #1

FELCO, INC.
ENGINEERING – LAND SURVEYING

| JOB No : 97062 | NAME : NEWMAN |
|---|---|
| DATE : 7-27-98 | SHEET 2 OF 2 |

## CONSTRUCTION NOTES

1. WORK LIMIT TO BE STAKED SILT FENCE.
2. ALL DISTURBED AREAS TO BE REVEGETATED WITH AMERICAN BEACH GRASS UPON WORK COMPLETION.
3. ROOF RUNOFF TO BE CONTROLLED BY GUTTERS TO DRYWELLS OR STONE DRAINS. INSTALL ALL DRYWELLS 10' MIN. FROM SEPTIC TANK AND 25' MIN. FROM LEACH AREA.
4. VEHICLE ACCESS AND MATERIAL STORAGE TO BE IN EXISTING DRIVE AREA.
5. PROPOSED FOUNDATION TO BE CONSTRUCTED ON PILINGS AND PER BUILDING CODE REQUIREMENTS FOR CONSTRUCTION WITHIN FLOODPLAIN 780 CMR 3107.
6. ALL WATER SUPPLY LINES TO BE RELOCATED AS NECESSARY TO BE 10' MIN. FROM SEWAGE COMPONENTS.

EL. 14.1 TOP OF FOUNDATION – ADDITION
EL. 12.7 BOTTOM OF SILL – EXISTING DWELLING
EL. 12.0'
EL. 11.4'
OUT
12'±
EL. 12.1'±
FINAL GRADE
EXISTING SEPTIC TANK
DESIGN LOADING H-10
ACCESS PORT
IN
OUT
EL. 10.2'±
1,500 GALLON

**SECTION VIEW – SEPTIC SYSTEM COMPONENTS** (N. T. S.)

NOTES: THIS PLAN REQUIRES CONSERVATION COMMISSION APPROVAL.

SEWAGE CONNECTION FROM PROPOSED ADDITION TO EXISTING SEPTIC SYSTEM TO CONFORM WITH 310 CMR 15.000 AND TOWN BOARD OF HEALTH REGULATIONS.

SEE FELCO REFERENCE PLAN #00209 DATED REVISED 5-4-2001 FOR ADDITIONAL SITE DETAILS.

DUNE DELINEATION DONE BY HAMLYN CONSULTING.

SEE ARCHITECT PLANS BY KRUEGER ASSOCIATES, INC. FOR ADDITIONAL SITE DETAILS.

DEPOT ROAD
YACHT CLUB ROAD
PCL. 18
PCL. 22
PCL. 20
PARKING LOT
263'±
LOCUS WELL
PROP. PORCH TYP.
DIRT DRIVE
A=149.52'
R=1868.83'
18.5'
27'
5'
6'
24'
24'
26'
PROPOSED ADDITION
14'
PROP. DECK
EXISTING DWELLING
30'
80.00'
100.00'
100' FROM DUNE
TOP OF SLOPE
LOT A
22,773± SF.
0.52± AC.
157'±
FLOOD ZONE A4
EL. 12'
#1 #2 #3 #4 #5
ABOUT MEAN HIGH WATER
PAMET HARBOR
BENCHMARK
STAKE & TACK FOUND
EL. 8.2' NGVD

## LOCUS

(NO SCALE)

LOCUS
PAMET HARBOR
DEPOT ROAD
YACHT CLUB ROAD
ROUTE 6
OLD COUNTY ROAD

## LEGEND

EXISTING WELL
EXISTING CONTOUR
EXISTING SEPTIC TANK
EXISTING PUMP CHAMBER
UTILITY POLE
DUNE FLAG
SOIL TEST BORING
WORK LIMIT

RECEIVED MARCH 26 2004 TRURO CONSERV COMM

## SITE & SEWAGE PLAN

LOCUS: 80 DEPOT ROAD
TRURO, MA

PREPARED FOR: SARAH LANDIS
18 LANCASTER STREET
CAMBRIDGE, MA 02140

REFERENCE: ASSR'S MAP 50 PARCEL 19

SCALE : 1" = 30' DATE : 1-8-2004
SHEET No. 1 OF 1 JOB No. 00209

| REVISIONS |
|---|
| 3-20-2004 PILE FDN./C.N.#5 |
| 2-2-2004 DUNE DELINEATION |

EXHIBIT F

DAVID B. LAJOIE No. 4038
COMMONWEALTH OF MASSACHUSETTS REGISTERED SANITARIAN

FELCO, INC.
ENGINEERING – LAND SURVEYING
P.O.BOX 1366 ORLEANS, MA 02653
(508) 255-8141 (FAX) 255-2954

NOTE: THIS PLAN REQUIRES CONSERVATION COMMISSION APPROVAL
FLOOD ZONE A4 EL 12
5' EXCAVATION SEE C.N. #2
CONCRETE RETAINING WALL
D-BOX
DISTRIBUTION LINES
LEACH FIELD
FLOW BARRIER SEE C.N. #5
LEACH AREA DETAIL
NO SCALE
PROPOSED LANDSCAPED BERM 14' WIDE X 3' HIGH (EL. 11.0' MAX.) PLANTED WITH TREE SPECIES SUCH AS JAPANESE BLACK PINE OR AMERICAN ARBOR-VITAE 8' OC. (100± CU. YDS. OF FILL)
PCL. 20
100' REF.
LOT C
24,437± S.F. 0.56± AC.
WORK LIMIT
PROPOSED DECK
PROPOSED DWELLING T.O.FDN. EL. 12.0'
PORCH
GARAGE
PROP. DRIVE
POOL
EXISTING DWELLING
EXIST. DECK
EXISTING PIER
PAMET HARBOR
APPROX. MEAN HIGH WATER
COASTAL BEACH
BOTTOM OF BANK
TOP OF BANK
EXISTING LEACH AREA (REMOVE)
WAY
APPROX. TRAVEL AREA
PROPOSED LEACH AREA (SEE DETAIL)
100'± TO LOCUS WELL
TO DEPOT ROAD AND YACHT CLUB ROAD
ADDITIONAL PLANTINGS
PCL. 37
EXISTING SHED TO BE RELOCATED
BENCHMARK TOP OF CONCRETE BOUND EL. 9.55' N.G.V.D.
SEE WATER LINE & WELL EASEMENT PER DEED BOOK 8632 PG. 227 RECORDED IN THE BARNSTABLE COUNTY REGISTRY OF DEEDS.
DWELLING TO BE ELEVATED, RELOCATED AS SHOWN, AND BECOME AN ACCESSORY BUILDING ON FOUNDATION SEE BUILDING PLAN BY J.P. KELLEY DATED NOVEMBER 1999
TOP OF WALL EL. 13.0'
EL. 13.2'
FINAL GRADE EL. 10.7'
EL. 8.17'
CONCRETE WALL DETAIL
NO SCALE
NOTES: COAT BOTH SIDES OF CONCRETE WALL WITH WATERPROOF SEALANT EXCEPT WHERE EXPOSED.
LINE INTERIOR WALL WITH 4 MIL POLY.
USE 3000 PSI CONCRETE THROUGHOUT
BACKFILL CONCRETE WALL AS NECESSARY TO INSURE 30" MIN. COVER FROM BOTTOM OF FOOTING
LOCUS
(NO SCALE)
PAMET HARBOR
LOCUS
DEPOT ROAD
MILL HILL ROAD
YACHT CLUB ROAD
OLD COUNTY ROAD
LEGEND
EXISTING SEPTIC
EXISTING WELL
PROPOSED WELL
EXISTING CONTOUR
PROPOSED CONTOUR
WATER LINE
TEST HOLE
SEPTIC TANK
"D" BOX
PUMP CHAMBER
COMMONWEALTH OF MASSACHUSETTS JOHN McELWEE No. 33602 PROFESSIONAL LAND SURVEYOR
COMMONWEALTH OF MASSACHUSETTS DAVID B. LAJOIE No. 1038 REGISTERED SANITARIAN
VARIANCE REQUESTS
1. 5' FROM LEACH AREA TO PROPERTY LINE (PCL. 20) 310 CMR 15.211
2. 8' FROM LEACH AREA TO PROPERTY LINE (STREET)
3. 8' FROM LEACH AREA TO RETAINING WALL 310 CMR 15.255(2g)
4. NO RESERVE 310 CMR 15.248
ALL WELLS NOT SHOWN EXCEED 200' FROM LOCUS SEWAGE.
VERIFY ZONING AND UTILITY SETBACK DIMENSIONS PRIOR TO CONSTRUCTION.
FELCO, INC.
ENGINEERING — LAND SURVEYING
P.O.BOX 1366 ORLEANS, MA 02653
SITE & SEWAGE PLAN
LOCUS: 5 YACHT CLUB ROAD
TRURO, MA
PREPARED FOR: JOHN ALLEN
146 PLEASANTVIEW AVENUE
LONGMEADOW, MA 01106
REFERENCE: ASSR'S MAP 50 PARCEL 21
SCALE : 1" = 30' DATE : 9-11-96
12-20-99 BLDG./POOL
11-25-99 EX.DWELL./PLANTS
8-9-99 3 BR/VAR.
5-14-98
5-1-97
3-31-97
EXHIBIT
G

## DEEP OBSERVATION HOLE LOG

1. EL. 8.7' DATE: 5-1-97 TEST BY: JASON ELLIS WITNESS: TRURO BOH

| DEPTH | LOWEST ELEVATION | HORIZON | TEXTURE | STRUCTURE | MOTTLING | CONSISTENCE |
|---|---|---|---|---|---|---|
| 0.0'<br>1.0' | 7.7' | A | LOAMY SAND | NO | NO | LOOSE |
| WATER @ 4.3'<br>6.5' | 4.4'<br>2.2' | C | PERC @ 1.5' <2 MIN/IN<br>MEDIUM SAND | NO | NO | LOOSE |

2. EL. 9.15' DATE: 5-1-97 TEST BY: JASON ELLIS WITNESS: TRURO BOH

| DEPTH | LOWEST ELEVATION | HORIZON | TEXTURE | STRUCTURE | MOTTLING | CONSISTENCE |
|---|---|---|---|---|---|---|
| 0.0'<br>1.0' | 8.15' | A | LOAMY SAND | NO | NO | LOOSE |
| WATER @ 4.75'<br>6.0' | 4.4'<br>3.15' | C | PERC RATE <2 MIN/IN<br>MEDIUM SAND | NO | NO | LOOSE |

## GENERAL NOTES

1. ALL CONTRACTORS AND/OR INSTALLERS ARE RESPONSIBLE FOR PROVIDING AND MAINTAINING A SAFE WORK AREA.
2. CONTRACTORS AND/OR INSTALLERS: VERIFY ALL UTILITY LOCATIONS PRIOR TO CONSTRUCTION.
3. CONTRACTORS AND/OR INSTALLERS: VERIFY ALL WASTE LINE LOCATIONS PRIOR TO CONSTRUCTION.
4. CONSTRUCTION DETAILS TO BE IN ACCORDANCE WITH STATE SANITARY CODE 310 CMR 15.000 AND TOWN BOARD OF HEALTH REQUIREMENTS.
5. ELEVATION DATUM IS FROM ☐ U.S.G.S. QUAD. MAP. ☒ N.G.V.D.
6. MUNICIPAL WATER IS AVAILABLE ☐ YES ☒ NO
7. ANY ALTERATIONS TO DESIGN MUST BE APPROVED BY FELCO, INC. AND TOWN BOARD OF HEALTH.
8. ALL EXISTING SEWAGE TO BE PUMPED AND FILLED WITH CLEAN MEDIUM SAND.
9. SEPTIC TANKS, DOSING CHAMBERS, GREASE TRAPS, AND DISTRIBUTION BOXES SHALL BE INSTALLED WATERTIGHT.
10. WHEN SEPTIC TANK, DOSING CHAMBERS, GREASE TRAPS, AND DISTRIBUTION BOXES ARE PLACED IN FILL, PROVIDE A LEVEL STABLE BASE WHICH HAS BEEN MECHANICALLY COMPACTED. VIRGIN GROUND WITH A 6" CRUSHED STONE BASE IS OTHERWISE ADEQUATE.
11. GROUND COVER OVER SEPTIC SYSTEM COMPONENTS SHALL NOT EXCEED 36".

## DESIGN

FLOW DETERMINATION 3 BEDROOM DWELLING

GARBAGE GRINDER ☒ NO ☐ YES

FLOW RATE = 330 GAL/DAY

SEPTIC TANK SIZING:

330 x 2.0 = 660 GAL/DAY

USE: 1,500 GAL (EXISTING)

LEACHING FACILITY CALCULATIONS:

PERCOLATION RATE IS < 5 MIN/INCH I CLASS

BOTTOM (S.F.) = 479 x 0.74 = 354 GAL/DAY

USE: 36.5' LONG X 26.7' WIDE LEACH FIELD

AS SHOWN = 479± S.F.

W/ 0.5' EFFECTIVE DEPTH

## CONSTRUCTION NOTES

1. WORK LIMIT TO BE STAKED SILT FENCE.
2. EXCAVATE ALL UNSUITABLE SOIL 5' AROUND LEACH AREA DOWN TO MEDIUM SAND AND REPLACE WITH CLEAN MEDIUM SAND.
3. EXCAVATE EXISTING SEWAGE AND UNSUITABLE SOIL AND REPLACE WITH CLEAN MEDIUM SAND.
4. FELCO TO STAKE LEACH AREA FOR INSTALLATION.
5. INSTALL 40 MIL POLYVINYL FLASHING OR EQUIV. AS FLOW BARRIER AROUND ENTIRE LEACH AREA FROM EL 12.0' DOWN TO EL 8.0'
6. ALL DISTURBED AREAS TO BE REVEGETATED WITH NATIVE GRASSES UPON WORK COMPLETION.
7. ALL FOUNDATIONS TO BE CONSTRUCTED PER BUILDING CODE REQUIREMENTS FOR CONSTRUCTION IN FLOODPLAIN. SEE ALSO SEPARATE DRAWINGS.
8. ALL WASTE LINES TO BE CHANGED AS NECESSARY TO EXIT AT LOCATION AND ELEVATION SHOWN.
9. INSTALL SEPTIC TANK AND PUMP CHAMBER WATERPROOF AND WATERTIGHT.
10. PROPOSED POOL TO BE ABOVE GROUND TYPE INSTALLED PER MANUFACTURER SPECIFICATIONS AND PER BUILDING CODE REQUIREMENTS. SIZE MUST CONFORM TO APPLICABLE REQUIREMENTS.

FELCO, INC.
ENGINEERING – LAND SURVEYING

| JOB No : 96378 | NAME : ALLEN |
|---|---|
| DATE : 9-10-96 | SHEET 2 OF 2 |

8-9-99 12-20-99

EXHIBIT
H

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 05-10370PBS

* * * * * * * * * * * * * * * * * * *

BARBARA CORDI-ALLEN AND JOHN ALLEN, Plaintiffs,

vs.

JOSEPH R. CONLON, ARTHUR F. HUTLIN, NORMAN H. POPE, KEITH S. ALTHAUS, And MARINNA MATRICARDI as they are Members and collectively the TRURO ZONING BOARD OF APPEALS AND THE TOWN OF TRURO, MASSACHUSETTS, AND BROOKE NEWMAN, Defendants.

* * * * * * * * * * * * * * * * * * *

DEPOSITION OF JOHN E. ALLEN, a witness called on behalf of the Defendants pursuant to the Massachusetts Rules of Civil Procedure before Jo Anne M. Shields, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Brody, Hardoon, Perkins & Kesten, LLP, One Exeter Plaza, Boston, Massachusetts, on Friday, March 31, 2006, commencing at 1:45 p.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
Telephone (617) 742-6900

APPEARANCES:

PAUL REVERE, III, ESQUIRE
LAW OFFICES OF PAUL REVERE, III
226 River View Lane
Centerville, Massachusetts 02632
(508) 778-7126
for the Plaintiffs

DEBORAH I. ECKER, ESQUIRE
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, Massachusetts 02116
(617) 880-7100
for the Defendants, Joseph R. Conlon, Arthur F. Hutlin, Norman H. Pope, Keith S. Althaus, and Marinna Matricardi as they are Members and collectively the Truro Zoning Board of Appeals and the Town of Truro, Massachusetts

JULIE PRUITT BARRY, ESQUIRE
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210-2831
(617) 439-2831
for the Defendant, Brooke Newman

ALSO PRESENT:
Barbara Cordi-Allen

INDEX

| Deposition of: | Direct | Cross |
|---|---|---|
| JOHN E. ALLEN | | |
| By Ms. Barry | 4 | |
| By Ms. Ecker | | 25 |

EXHIBITS

| No. | | Page |
|---|---|---|
| 12 | Re-notice of Deposition | 4 |
| 13 | Defendant Brooke Newman's Request for Production of Documents | 9 |

PROCEEDINGS

(Re-notice of Deposition marked as Allen Exhibit No. 12.)

STIPULATIONS

It is stipulated by and between counsel for the respective parties that the deposition transcript is to be read and signed by the deponent under the pains and penalties of perjury; and that the sealing and filing thereof are waived; and that all objections, except as to form, and motions to strike are reserved to the time of trial.

* * *

JOHN E. ALLEN, a witness called for examination by counsel for the Defendants, having been satisfactorily identified by the production of his driver's license and having been duly sworn, testified as follows:

* * *

DIRECT EXAMINATION

BY MS. BARRY:

Q. Good afternoon, Mr. Allen.
A. Hi.
Q. My name is Julie Barry. I represent the

defendant Brooke Newman in this matter. I would like to just ask -- to give you some instructions concerning your deposition today that might help you get through it. I would ask that you listen to the question, answer the question. If you will wait till I'm done asking before you speak, that will help the stenographer. She's taking down both the question and the answer.

If you would -- if you need to take a break for any reason or need to speak to your attorney, feel free to ask. I would ask that if there's a question pending that you answer the pending question before we take a break. And if you have any difficulty understanding the question, please let me know. If I ask a question and you answer it, I'll assume that you understand it.

MS. BARRY: I assume we'll use the same stipulations as --

MR. REVERE: The same stipulations and just -- I haven't gotten a copy of it. But they -- we're going to try to get it signed by --

MS. ECKER: Well, we have to wait for the second copy as well.

MR. REVERE: Okay.

MS. ECKER: So after you get that, if you could get it signed by the 14th. And, actually, off the record.

(A brief discussion was held off the record.)

MS. BARRY: Okay. So then we'll stipulate that, the deposition transcript, you will read. You'll have an opportunity to read and make changes if necessary and sign by April 14th.

MR. REVERE: Okay.

MS. BARRY: I've marked as Exhibit 1, just for recordkeeping purposes -- sorry -- Allen Exhibit 12 -- your re-notice of deposition.

Q. Can you state your name and address for the record, Mr. Allen?
A. It's John Allen, 143 Ardsley Road, Longmeadow.
Q. And are you employed, Mr. Allen?
A. Yes.
Q. And where are you employed?
A. U.S. Postal Service.
Q. And how long have you been with the U.S. Postal

Service?
A. Twenty-two years.
Q. Okay. And did you graduate high school, Mr. Allen?
A. Yes.
Q. And where was that?
A. Chicopee High.
Q. Okay. And did you go on to any education after high school?
A. Yes.
Q. And where was that?
A. I got my bachelor's degree from Western New England College.
Q. Western New England?
A. Uh-huh.

MS. ECKER: You're going to have to speak up.

Q. And what was your bachelor's in?
A. Business administration.
Q. And what is your position at the Postal Service?
A. Mail processor, clerk.
Q. And what office do you work at?
A. Pardon?

Q. What office or where is your --
A. It's --
Q. -- work located? Where is it --
A. Oh, it's --
Q. -- the location where you work?
A. Let's see. It's in Springfield, Mass. It's on Fiberloid Street.
Q. Okay. Did you do anything to prepare for today's deposition other than meet with your attorney?
A. No, not really.
Q. Did you read any documents or look at anything?
A. No.
Q. Okay. Other than your attorney, did you speak with anyone about your deposition today?
A. No. Just -- no, not really.
Q. Okay. Have you been deposed before, Mr. Allen?
A. Yes.
Q. And do you remember how many times?
A. Just once before.
Q. Okay. And what was that in connection with?
A. That was in connection with a lawsuit against an elevator company.
Q. Was that the personal injury lawsuit concerning

your wife's injuries?
A. Yes.
Q. Okay. Do you have an engineering license, a surveying license, or an appraiser's license, Mr. Allen?
A. Do I?
Q. Uh-huh.
A. No.
Q. Now, you filed a Su- -- a Complaint in Superior Court which has since been moved to Federal District Court, appealing, among other things, the decision of the Zoning Board of Appeals' decision to uphold the decision of the building commissioner to uphold the issuance of a building permit to pro- -- for property owned by the defendant Brooke Newman at 3 Yacht Club Road. Is that correct? Do you understand that?
A. Yes.
Q. Okay. Did you do anything to assist your -- strike that.
MS. BARRY: Okay. Mark this as the next exhibit.
(Defendant Brooke Newman's Request for

Production of Documents marked as Allen Exhibit No. 13.)
(A brief discussion was held off the record.)
Q. I'm handing you what's been marked as Exhibit 13 and ask you if you would just look at that and tell me if you've seen it before.
A. I don't recall this.
Q. You don't recall seeing that?
A. No.
Q. Okay. Just let me ask you a couple of questions concerning that document. What it is, it's defendant Brooke Newman's first request for production of documents. Did you do anything to assist your attorney or -- or Ms. Cordi-Allen in pulling together any documents that might have been responsive to those requests?
A. Any documents? No.
Q. Okay. Did you -- would you have any documents in your possession, custody, or control concerning this lawsuit or Ms. Newman's property that you would not have already turned over to your attorney or -- or to

Ms. Cordi-Allen?
A. I don't -- I don't have any. No.
Q. Do you use e-mail, Mr. Allen?
A. I don't.
Q. Okay. So you don't use e-mail at your home or office?
A. No.
Q. Okay. I'm going to show you another exhibit, Mr. Allen -- this is marked Cordi-Allen Exhibit 4 -- and ask if you would look at that and tell me if you recognize it.
(Pause.)
A. I vaguely, you know, might have seen it before.
Q. Okay. Do you recall if you wrote that document, Mr. Allen?
A. I might have done this with my wife.
Q. Okay. Do you -- can you explain to me what was the basis of your complaint -- strike that. This letter dated September 20th, 1998 that is Exhibit -- Cordi-Allen Exhibit 4 is a letter to the building in- -- inspector of the Town of Truro in which you have requested that a building permit not be issued to Ms. Newman for certain modifications to her property at 3

Yacht Club Road. Is that correct?
A. Yes.
Q. Do you, as you sit here today, recall or have an understanding of the basis of your complaint to the building inspector concerning the building permit being sought by Ms. Newman?
A. We just wanted to make sure that -- that the right procedures were taking place.
Q. And when you say "the right procedures," are you talking about the Town's procedures in issuing building permits?
A. Yes.
Q. Do you recall whether you received a response from the building inspector to your letter?
A. I don't remember.
Q. I'm sorry. You don't recall?
A. I don't recall.
Q. I can represent to you, Mr. Allen, that you did not appeal or take any further action at that time concerning the building inspector's issuance of a building permit to Ms. Newman for the proposed modifications to 3 Yacht Club Road. Why is that?
(Pause.)

Page 13

A. I'm not really sure.
Q. You're not sure why you took no further action at the time?
A. Right.
Q. Do you recall whether you were represented by counsel at the time?
A. I believe we weren't.
Q. At the time you wrote this letter in 1998, Mr. Allen, did you have concerns that the proposed modifications to Ms. Newman's structure at 3 Yacht Club Road would somehow impact your property?
A. I think we were just, basically, concerned that -- that procedures were put in place that were fair to all, that if any construction was done that the law -- you know, that it was -- it would follow the legal means.
Q. Did you have a concern at the time, Mr. Allen, that the proposed modifications would harm your property or the structure located on your property?
A. Not that it would harm our property.
Q. Now, let me draw your attention to the Complaint at issue, this laws- -- this

Page 14

particular lawsuit. And part of this lawsuit, you understand, concerns your appeal of the Zoning Board of Appeals' decision upholding the issuance of -- of that building permit back in 1998. Correct?
A. (Witness indicates).
Q. You have to answer --
A. Oh.
Q. -- verbally.
A. Yes.
Q. Okay. What are your objections to the building permit that was granted to Ms. Newman in 1998 for the modifications to the structure at 3 Yacht Club Drive (sic)?
A. What are our objections?
Q. What are your objections? I've already asked Ms. Cordi-Allen. And I'd like to know, what are your objections?
(Pause.)
A. Well, I would say, for one thing, the -- she was able to get a full basement.
Q. Okay. Do you have an understanding of wheth- --
MR. REVERE: Can we go off the record for a

Page 15

second here? Yeah.
(A brief discussion was held off the record.)
Q. Okay. So you had an objection that she was able to get a full basement?
A. Or concrete foundation.
Q. Okay. As opposed to pilings? Is that -- is that my --
A. Right.
Q. -- understanding? What other objections do you have?
A. Well, I don't think she has a permit for a well.
Q. And what do you base that on? Why -- why do you think that she doesn't have a permit for her well?
A. We've researched it.
Q. And what research have you done?
A. Resear- -- researched with the Town.
Q. Researched town records?
A. Right.
Q. Okay. Anything else?
A. The -- the plantings that were brought in and the amount of fill.

Page 16

Q. And what was your objection to the plantings that were brought in and the amount of fill?
A. I don't think she received any kind of okay to do that.
Q. And by "okay," you mean permits?
A. Right.
Q. Okay. Anything else?
A. That's all I can recall.
Q. Now, you testified earlier that it wasn't your concern or you weren't concerned when you wrote the letter to the building inspector in 1998 that -- that the modifications to Ms. Newman's property would harm your property or the structure located on the pro- -- on your property.
Moving forward to today, do you have any concerns that the modifications made to Ms. Newman's structure on her property have somehow harmed your property or your structure on your property?
A. No. I don't think they've harmed the property.
Q. They have not harmed your property?
A. Right.
Q. Can you tell me why you waited six years to

bring an enforcement action with the building inspector asking to have Ms. Newman's building permit revoked?

(Pause.)

A. I would say that we've been through so much, that things come up and it's ongoing. There's always something.

Q. Let me see if I can understand what you're saying. When you say you've been through so much, are you talking about your experiences in seeking permits for your property?

A. (Witness indicates).

Q. You have to --

A. Yes.

Q. -- answer.

A. Yes.

Q. What else do you mean by the "been through so much, that things come up and it's ongoing"?

A. Well, if we're -- if we're going to be held to a certain -- where we have to abide by certain regulations, we just think that it should be the same for everyone. So -- so it's an ongoing . . .

Q. Did you believe, back in 1998 when you wrote or

corresponded with the building inspector concerning Ms. Newman's building permit, that you were, at that time, being treated differently in connection with permitting for your own property?

A. I think we've been treated differently right from -- right from the start.

Q. And when you say "right from the start," can you just tell me, are you talking about since 1996 when you purchased the property?

A. Right. Right. I mean, the first thing we found out about was that they were going to charge us $2,100 for our floats, whereas they were going to charge the yacht club like $300. So right from that -- right from that time on, it seemed like ev- -- everything that we attempted to do was being objected to.

Q. Do you have any other objections to the Board of Appeals' decision upholding the building permit granted to Ms. Newman for the modifications to the structure at 3 Yacht Club Road?

A. Do I have any objections?

Q. Any other objections other than what you've

already told me today.

A. I don't know if the fence is on her property. It just seems to go along the road.

Q. Anything else?

A. I guess that's it.

Q. I'm going to show you Ex- -- what is Exhibit -- Cordi-Allen Exhibit 7 and ask you to just quickly look at it, please. You don't have to read it. But if you would turn to the last page and let me know if that's your signature there.

A. Yes. Yes.

Q. Okay. And do you recall seeing that document and si- -- previously and signing it then?

A. Possibly. Yes.

Q. Okay. That is your signature though?

A. Yeah.

Q. Okay. And we're going to have you sign it now so that we have an original. Because it appears as though the signature that's attached to the exhibit now is -- is a facsimile copy, and we'd like to have --

A. Okay.

Q. -- the original.

A. Sign it here?

MS. ECKER: On the --

THE WITNESS: What's that?

MS. ECKER: -- page before is the signature, a place for your signature.

MS. BARRY: This is off the record, please.

(A brief discussion was held off the record.)

Q. Now, in -- I'm not going to have you read this to save time, Mr. -- Mr. Allen. But I -- I can represent to you that, in the response to Question No. 5 of those interrogatories, you allege that Ms. Newman is of the Jewish faith; and this is in connection with the claims that you have received disparate treatment. What's the basis for your understanding or belief that Ms. Newman is of the Jewish faith?

A. I don't really know if she is of the Jewish faith.

Q. Do you know or recall if you have had an appraisal, a real estate appraisal, done of your property since the time that you've bought it and now?

MS. BARRY: Sorry. I need to stop.

(Off the record due to incoming cell phone call.)

MS. BARRY: Back on. Yeah. Can you read it back.

(Question read back.)

Q. And let --

A. Yes.

MS. BARRY: Thank you.

Q. And let me clarify. When I say "property," I mean your Truro property at 5 Yacht Club Road.

A. Yes. I believe we have.

Q. Do you recall when that was done?

A. Let's see. Sometime in 200- -- sometime in 2005.

Q. 2005. Do you recall who did -- who did the appraisal?

A. No. I don't. I don't remember.

Q. And do you recall what the outcome of the appraisal was?

A. No.

MS. BARRY: That's not me.

MR. REVERE: Yes. Off the record.

(Off the record due to incoming cell phone call.)

A. I -- I don't recall what it was. No, not exactly.

(A brief discussion was held off the record.)

MS. BARRY: You know what? I just want to clarify -- on the record, please. I want to clarify something with you, Paul. Because, last week, you had indicated -- or on the 17th when we had Ms. Cordi-Allen's deposition -- that there was not going to be an appraisal done in this case or there wasn't an appraisal done. Now, the appraisal that Mr. Allen has referred to today, I know it's not listed in your disclosure.

MR. REVERE: I --

MS. BARRY: Are you intending --

MR. REVERE: I was not even aware --

MS. BARRY: -- on using that?

MR. REVERE: -- of any appraisal until a minute ago --

MS. BARRY: Okay. All right.

MR. REVERE: -- okay, from my standpoint.

MS. BARRY: All right. So you're not intending on using this as evidence in this

case?

MR. REVERE: We're still off the record. Right?

MS. BARRY: No. We're on the record.

MS. ECKER: No. We're on the record.

MR. REVERE: We're on the record. Okay. Let's go off the record for a second just relevant to that.

(A brief discussion was held off the record.)

MS. BARRY: So I -- I -- I understand then, after a dis- -- off-the-record discussion, that the appraisal that was performed was not in connection with or related to this litigation and may have been requested for other litigation ongoing in Barnstable Superior Court or may have been used for purposes of refinancing.

But, otherwise, it's my understanding, based on testimony today and the dis- -- and Ms. Cordi-Allen's previous testimony as well as your Rule 26 disclosure, that you are not relying on an expert appraisal or an expert appraiser as a -- as an expert witness in this

case.

MR. REVERE: That is correct.

MS. BARRY: Okay.

MR. REVERE: I have not retained one at this time, reserving all appropriate rights if I was to do so in the future.

Q. Okay. And I believe that you just testified, Mr. Allen, that you didn't recall what the outcome of that appraisal was; is that correct?

A. That's correct.

Q. Okay. Do you still have a copy of that appraisal in your possession?

A. I don't know.

Q. Do you recall yourself what the purpose of the appraisal was -- was for?

A. Possibly, for a refinance.

Q. Okay. Now, just to finish up then, have you told me all of your objections to the Board of Appeals' decision upholding the building permit of Ms. Newman 's?

A. Uh-huh.

Q. Is that yes?

A. I -- would you repeat that?

Q. Have you told me all of your objections to the

Board of Ap- -- Appeals' decision upholding the building permit issued to Ms. Newman for the modifications to the property at 3 Yacht Club Road?
A. I believe so.
MS. BARRY: Okay. Then, pending receipt of the items we discussed earlier and other discovery that we discussed at Ms. Cordi-Allen's deposition --
MR. REVERE: Right.
MS. BARRY: I am going to suspend.

CROSS-EXAMINATION

BY MS. ECKER:
Q. Good afternoon.
MS. ECKER: Are you going to leave?
MS. BARRY: I'm going to leave.
(A brief discussion was held off the record.)
(Brief recess taken.)
BY MS. ECKER:
Q. Good afternoon, Mr. Allen. My name's Deborah Ecker, as you know. You were here this morning at your wife's deposition. Correct?
A. Yes.

Q. Okay. You have filed a Complaint against the Town of Truro and the members of the Zoning Board of Appeals, alleging that they have discriminated against you and your wife because your wife is Lebanese. Correct?
A. Yes.
Q. Do you have any evidence of any of the Zoning Board members that you have named as defendants in this case have said anything or written anything concerning your wife's being Lebanese?
A. Do I have any evidence?
Q. Yes.
A. No.
Q. And you are not Lebanese yourself. Correct?
A. Right.
Q. Why do you believe that the decisions that have been made by the Town and the Zoning Board of Appeals are based on the fact that your wife is Lebanese?
A. I think that we feel as though we're being treated differently as far as -- as far as when we go for permits and as far as whatever is done in the Pamet. We seem to be held to a different --

Q. I'm sorry. Are you done your answer? Yeah. Just --
A. A different interpretation of the law, I guess.
Q. Okay. And why do you believe that's because your wife is Lebanese?
A. I'm not really sure if that's the case or not.
Q. Are you aware of whether any of the Zoning Board of Appeals members that are listed as defendants in this case -- and they appear in the caption of -- of Exhibit 7 -- are you aware if any of them are Jewish?
A. I wouldn't know.
Q. And taking a look at what is marked as Exhibit 7, the answers to interrogatories, did you assist in the preparation of those answers? Or were those answered by your wife?
A. It's been a while since I've seen these.
Q. What is the basis for the statement or the answer that's contained in Answer 5 that you believe the ma- -- majority of the board members in the town of Truro are Jewish?
A. What was the question again?
Q. What's the basis for your statement in Answer No. 5 that the majority of the board members in

the town of Truro -- the Conservation Commission, the Zoning Board of Appeals, the Harbor Commission; and I believe the Board of Selectmen are listed -- what's your basis for saying that the majority of the members are Jewish?
A. I think that just -- I'm not really sure that they -- that they are Jewish.
Q. Do you have any evidence that any of the members of the Board of Selectmen, over the years, the Conservation Commission, Harbor Commission, and the Zon- -- I think I asked you already about the Zoning Board of Appeals and the Board of Health -- that any of them took into account your wife's national origin when they made decisions concerning your property?
A. It's something we don't really know for sure.
Q. Do you have any evidence or any circumstantial evidence of any type that any of those board members in the Town of Truro took into account your wife's ethnicity or national origin in -- when they made their decisions concerning the applications for construction on your property?
A. Only that they seem to have acted

inconsistently with -- with -- with other projects --
Q. Do you know if ever --
A. -- in Truro.
Q. Sorry. Do you know if any Lebanese homeowners in Truro have been allowed to make renovations to their property or to construct on their property?
A. Do we know of any other Lebanese --
Q. Yes.
A. -- people? I don't recall any other -- any other Lebanese -- other Lebanese people that we know of in Truro.
Q. Which properties in the town of Truro do you believe your property is similarly situated to who have been allowed to perform construction work on their property?
A. The Sexton property.
Q. And are the Sextons Jewish?
A. Pardon?
Q. Are the Sextons Jewi- -- Jewish?
A. Oh, I don't know.
Q. Any other property?
A. The Perrys.

Q. Do you know, are the Perrys Jewish?
A. I don't know.
Q. You don't know?
A. I don't know.
Q. Do you know if the Perrys' structure on their property is as close to the water as your property?
A. Is it as close?
Q. Yes.
A. Probably not.
Q. And what about the Sextons' property, do you know if the structure on their property is as close to the water as your structure?
A. I would say -- I would say, close.
Q. And is the Sextons' property located on the Pamet Harbor?
A. No. It's not on the Pamet Harbor.
Q. Is there any property on the Pamet Harbor that you believe is similarly situated to yours that have been allowed to construct on the property?
A. Well, Brooke Newman and Sandra (sic) Landis.
Q. And would you agree with me that Ms. Newman's structure on her property is a hundred`-foot setback from the water line?

A. It's probably over a hundred foot.
Q. And would you agree with me that Ms. Landis' structure on her property is a hundred-feet or more setback from the water line?
A. It could be. Yeah.
Q. And the proposal and now the construction on Ms. Newman's property, would you agree with me that's smaller than the proposal that you and your wife have for the construction on your property?
A. Yes.
Q. The same with Ms. Landis, would you agree that Ms. Landis' proposal for a construction on the property is smaller than what you and your wife propose to build on your property?
A. Yes. Probably, it is.
Q. Were you present when your wife was speaking with Mr. Brown about the purchase of the property?
A. Probably. Yeah.
Q. Did you ask Mr. Brown at all regarding any restrictions for the con- -- renovation of structures on the property prior to your purchase of it?

A. I don't recall specifically what was said.
Q. Do you recall anything Mr. Brown said about the potential for development on the property prior to your purchase of that property?
A. I remember talking about the dock and how the floats were there and how we would be able to add the floats onto the pier. As far as the house goes, I understood we could put in a three-bedroom septic.
Q. And who told you prior to your purchase of the house that you would be able to put in a three-bedroom septic?
A. I think it was talked about. But I -- as far as somebody telling us specifically, I don't recall specifically.
Q. Did anybody from the Town or a member of the town boards tell you that you would be able to put in a three-bedroom septic system prior to your purchase of the house?
A. Prior to the purchase of the house?
Q. Yes.
A. I don't recall.
Q. Prior to your purchase of the property, did you do any research to determine whether you would

be able to install a septic system with the capacity for three bedrooms?
A. Prior to the purchase, no.
Q. Prior to the purchase of the property, did you do any research or anything to determine whether you would be able to expand the size of the structure on your property?
A. Did we do any research prior to the purchase? No.
Q. Did anyone --
A. We --
Q. I'm sorry.
A. We assumed that it was because of the size of the foot- -- of -- of the land that was involved; we assumed that we'd be able to build.
Q. Did anyone tell you that you would be able to build, that the -- that the -- the lot was buildable prior to your purchase of the house?
A. Did they -- I don't remember anybody saying that it wasn't buildable.
Q. But no one told you that it was buildable?
A. Specifically, I mean, we were dealing with -- what's his name?

Q. Nick Brown?
A. Nick Brown. I just remember that we felt as though we -- we would be able to, with our con- -- with our conversations with Nick Brown, that it would be something we would be able to add on to the house.
Q. And what specifically did Mr. Brown say to you that made you believe that you'd be able to add on to the house prior to your purchase of the house?
A. What did he say to us --
Q. Yes.
A. -- specifically? I don't recall specifically. I just remember it being talked about as far as adding on.
Q. Okay. What did -- what's your recollection of how big Mr. Brown told you you could expand a structure on the house prior to your purchase of it?
A. The understanding that I came away with was that we could have a three-bedroom septic. And, from there, I assumed that we'd be able to build a three-bedroom house.
Q. And that was based on your conversation with

Nick Brown, who was the realtor for the property. Correct?
A. I think so. I -- we might have spoken with other people, but I don't -- I mean, he was the -- I believe he was the listing -- I don't know if he was the listing agent or not.
Q. When you learned that the Town was going to object to your installing a three-bedroom septic and building a three-bedroom home on the property, did you go to Nick Brown and -- and question why he had made that representation to you at the time of the sale?
(Pause.)
MR. REVERE: Would you like the question repeated?
THE WITNESS: Sure.
Q. After you found out that the Town was going to -- that's all right -- going to object to your installing a three-bedroom septic system with the capacity for three bedrooms and constructing an addition to your home for three bedrooms, did you go to Mr. Brown and question why he had made the representations to you at the time of the sale that you would be able to

do that?
A. I think there was the question -- I don't know if Nick Brown brought it up or -- I think, right from the start, we liked the house. So as far as -- as far as putting an addition on at that time, it wasn't a priority for us. The priority was, we wanted to buy the house 'cause we liked the location; we liked everything about it. So . . .
MR. REVERE: The question --
Q. Did you ever --
MR. REVERE: -- involved --
Q. -- discuss --
MR. REVERE: -- Nick Brown.
Q. Let me -- let me --
MR. REVERE: Yeah --
Q. Did you ever dis- --
MR. REVERE: -- please.
Q. Did you ever discuss, after the pur- -- after you purchased the house, did you ever have a discussion with Nick Brown about the Town's refusal to give you permits to construct a three-bedroom home on the site?
A. We must have. But I don't -- I don't remember

talking with him.
Q. Did you ever threaten to sue Nick Brown? Or have you sued Nick Brown?
A. No. As fas as I know, we haven't.
Q. Okay. The letters that have been written to the Town and the various town boards since '96 to the present, most of them contain a typed signature line of you and your wife. Are those letters mostly written by your wife? Or do you participate in the drafting of the letters?
A. I've participated in drafting some of them, not all of them. But I help her out.
Q. Do you allege that anyone on the Board of Selectmen has discriminated against you and your wife?
A. Do we allege that?
Q. Are you alleging that? Let me put it another way. Do you believe that any member of the Board of Selectmen for the Town of Truro has discriminated against you and your wife in any actions that they have taken?
A. Well, we feel -- we feel as though anything that we attempt to do -- permitting, any kind of legal issues -- that we've run up against a

brick wall.
Q. I understand you and your wife keep -- you're speaking in generalities. I need to know specifically if you believe that any members, either past or present, on the Board of Selectmen for the Town of Truro have specifically discriminated against you in any decisions that they've made concerning your property.
A. Well, we feel we have been.
Q. And I'm trying to find the basis for your belief. Other than denial of permits for the construction of your property, do you have any evidence that any of the members of the Board of Selectmen hold any malice towards you or your wife or ill will?
A. It's something I really -- I really don't know for sure.
Q. Have you ever heard any of the members of the Board of Selectmen say anything bad about you or your wife?
A. Well, there was the one time -- I don't know if it was something bad; but they -- they were talking about us as -- saying that we -- look

at what the Allens fell into, or look at what the Allens have or something like that.
Q. Okay. And who said that?
A. I think it was -- specifically, I don't know. It was, I think, a group of people from maybe the -- I'm not really sure.
Q. What about the Conservation Commission, do you know of any specific member or do you believe any specific member holds any malice or ill will towards you in rendering their decisions concerning applications for your property?
A. I can't really say for sure.
Q. The same question for Board of Health. Do you know if any members of the Board of Health have any -- hold any malice or ill will towards you? Or do you believe that they do when they've made their decisions concerning applications for your property?
A. I think that all -- it seems that all the decisions end up going against us.
Q. And is it your testimony that the decisions that have gone against you have been because the members of the boards or the town employees don't like you or, rather, that they have a

different belief as to what's permissible in your property?
A. I can't really say for sure.
Q. Do you have any evidence that any of the town employees or members of any of the town boards have based their decision on anything other than their belief that there was a one-bedroom restriction placed on your property prior to your purchase of it?
A. Can you state that again?
Q. Sure. Do you have any evidence that any town employee or member of the town boards for the Town of Truro have made decisions concerning your property based on the fact that they don't like you?
A. Do I have any evidence?
Q. Yes.
A. No.
Q. Rather, do you have any evidence that any of the town employees or the members of the boards of the Town of Truro have based their decisions concerning your property on anything other than the fact that they have a different view as to what's permissible for the use of your

property?
A. Well, when it comes to other -- when it comes to others doing what they want down there, they -- they seem to be able to do what they want down there except for when it -- for when it comes to John and Barbara.
Q. Okay. And those others you're referring to are Ms. Newman and Ms. Landis?
A. Yeah. And, also, the Sexton property and the Perrys.
Q. Is the Perry property located on Pamet Harbor?
A. Is it --
Q. Located on --
A. It's located on Corn Hill, which is just outside of Pamet Harbor.
Q. What about the Sexton property, what area of town is that located in?
A. That's -- that's just a little bit south of -- of Pamet Harbor on a dune.
Q. Do you know if the Sexton property's in a flood plain at all?
A. I would assume it is.
Q. What about the Perrys' property?
A. Also.

Q. And when the Sextons purchased their property, do you know if there was a one-bedroom restriction placed on it?
A. I don't know.
Q. And what about the Perrys?
A. I don't know.
Q. Do you know any property -- other property owner in the town of Truro who's had a one-bedroom restriction placed on their property who have been allowed to construct a home larger than one bedroom?
A. I don't know.
Q. Prior to purchasing the property, did you hire anyone, you or your wife, to look into whether your property contained wetlands or a riverfront area that would hinder your ability to build on the property?
A. Before getting -- buying the property? We had -- we were familiar with the property because we spent time in the Pamet. So when we saw that it was for sale, that was the -- the main thing was just -- the important thing was that we buy the property. And we weren't concerned with any kind of . . .

Q. So you didn't hire -- hire anyone to evaluate the property for you to determine --
A. Right.
Q. -- whether it was buildable or not?
A. We kind of knew it was a valuable property --
Q. How did you know?
A. -- what we liked.
Q. Okay. Other than it being what you liked, how did you know it had value?
A. It was right on the water, and it had a dock.
Q. And as you sat here today, that -- what -- the piece of it that you called a pier versus the dock is still in existence. Correct?
A. The pier is there. Yeah.
Q. And that pier was in existence when you purchased the property. Correct?
A. Right.
Q. And there's been no extension to that pier. Correct?
A. Right.
Q. Did anyone, prior to your purchase of the property, tell you you'd be allowed to extend the pier to become a dock?
A. I believe, Nick Brown.

Q. Did he show you any documentation that you'd be allowed to do that?
A. I know there were some old pictures of the place when it wa- -- used to be a -- it used to be a sailing school. I think it was a sailing school. And they had pictures of the dock as it goes out -- as it went out into the harbor with floats.
Q. Was that dock longer than the pier that you have today?
A. Right. Yes.
Q. Did you ask anybody in the Town if you would be allowed to extend the pier prior to your purchase of the property?
A. I think we talked it over with Nick Brown.
Q. Okay. Anyone other than Nick?
A. I don't recall.
Q. How long did Nick tell you the extension could be?
A. I seem to recall like seven floats. Seven floats. Each float is probably about 10 feet.
Q. Those are your --
A. That's my recollection, with a T on the end.
Q. So it's your testimony that, prior to

purchasing the property, Nick Brown, the realtor, represented to you that you would be able to extend the pier by 70 feet and put a T at the end?
A. Right.
Q. After you found out that you could not, did you approach Nick Brown and ask him why he represented that to you if that's not, in fact, the case?
A. I think we -- we wanted the property, no matter what. If there was a problem as far as the -- the length of the dock, we felt that, considering the history of that particular house that we didn't see -- we didn't see where there would be a problem.
Q. Well, you didn't ask anybody prior to the purchase. Correct?
A. No. I think only we talked with Nick Brown, I'm sure.
Q. Okay. And Nick Brown was a realtor. Correct? He wasn't talking to you as a member of the town boards?
A. At the time, we might have -- I don't -- he -- it might have become known to -- to us that he

was also on one of the boards --
Q. Did Nick Brown --
A. -- in the town.
Q. -- ever tell you that he was a member of the board prior to your purchase of the property and that he was representing himself to you in the statements he was making to you as a representative of the Town?
A. I don't -- I don't recall that. No.
Q. Did you have any involvement in discussions with the Army Corps of Engineers since you've purchased the property?
A. Have we?
Q. Yes. Have you? Not your wife. I know what your wife's involvement was.
A. Only -- I'm sure I have.
Q. Do you believe that the Army Corps of Engineers has discriminated against you in their decisions concerning your property?
A. Well, all I remember is that we seem to have had the permits in place for a dock. And then, all of a sudden, things went about-face.
Q. Do you think the Army Corps of Engineers had anything to do with that or discriminated

against you in their decisions?
A. I don't know why they would okay something and then go back on it.
Q. Do you believe that anything that the Town of Truro did caused the Army Corps to change their position?
A. I really don't know.
Q. Okay. What about the Department of Pub- -- of Environmental Protection, do you believe that the Department or any of its employees have discriminated against you in their decisions concerning your property?
A. Again, I just -- I just think that the inconsis- -- inconsistencies shown to us as compared to others down there, down at the Pamet.
Q. And you're -- the inconsistencies of the Department of Environmental Protection?
A. Rulings that . . .
Q. I'm sorry. Did you -- are you done?
A. Yeah.
Q. Okay. All right. Do you know any other stra- -- any other property owner in Pamet Harbor who has been allowed to install a

pool?
A. In Pamet Harbor?
Q. Yes.
A. Right in the harbor, I'd -- not so far.
Q. Do you know anybody else that you believe their property is similarly situated to your own who has been allowed to install a pool in the town of Truro?
A. Well, I believe that the Perrys -- I believe they're going to be putting in a pool.
Q. What about the Sextons?
A. I don't really know if they're doing a pool or not.
Q. Okay. So you believe that your property is similarly situated to the Perrys?
A. I would say they're situated a little differently.
Q. How are they different?
A. Well, they're in a -- I believe they're in a dune, kind of a . . .
Q. Anything else?
A. They seem to be on a higher plain -- it's a dune -- whereas we're at more of a kind of a flat area.

Q. Okay. Do you know if there was a structure on the Perrys' property prior to their purchase of it?
A. I don't know. I wouldn't know.
Q. Do you know anyone else in the Pamet Harbor who's been allowed to construct a garage?
A. A garage?
Q. Uh-huh.
A. Not that I can recall.
Q. Do you know any similar -- similarly situated properties to yours that have been allowed to construct a garage?
A. Again, the Sexton property. I know they -- I'm pretty sure they have, at least, a two-car garage.
Q. Do you believe that the --
A. The --
Q. I'm sorry.
A. Go ahead.
Q. Do you believe the Sextons' property is similarly situated to your own?
A. I believe they're, actually, in more of a precarious position than our house is.
Q. Okay. How so?

A. They're on a coastal -- it's -- as far as I know, it's a dune. Because they originally just constructed it with a concrete foundation. And the Town -- they had to change it and put in piers, I'm pretty sure, because they're right in on it, right into a dune. And, at high tide, I think the water would come right up to their -- just about right up to their -- right up to the dwelling.
Q. So the Town made them change the construction plan for their property, correct, the Sextons?
A. I believe so. I believe it was -- I believe they had to put piers in.
Q. Is the Sexton property on a higher elevation than your property?
A. As compared to where it is according to where the water is?
Q. Yes.
A. Or as --
Q. Well, your --
A. -- according to where our house is?
Q. According to where your house is.
A. Oh they -- they're on a -- they're situated higher, I believe.

Q. When did you first learn that there had been a one-bedroom restriction placed on your property by the Town (sic) of Selectmen in 1992?
A. While we were in the process of buying the house.
Q. And who told you that?
A. What's that?
Q. Was that before you actually closed on the house that you learned that?
A. That we knew that there was a?
Q. One-bedroom restriction.
A. I don't recall. I just -- just remember that we were focused on the property itself as it stood, as it was, with the dwelling that was on it. And that was -- I mean, we liked the house. That was -- our main concern was -- was just purchasing the property. We were going to -- we were going to buy it if the -- if the price was right.
Q. Do you recall how you learned that there was a one-bedroom restriction on the property?
A. There was another realtor. I don't know if they had brought it -- brought the fact up or if it was Nick Brown.

Q. And you don't remember when that fact was brought up?
A. For me, the main thing was the house and the property. So that's what I -- that's what I concentrated on as far as when we were talking with the -- with the realtors.
Q. When did you first learn there was a one-bedroom restriction on the house?
A. I'm not really sure if it was before or after.
Q. What was your understanding when you purchased the house as to the capacity of the septic system?
A. I understood that we could have a three-bedroom septic system.
Q. What was the capacity of the septic system when you purchased the house?
A. I believe it was a three-bedroom.
Q. You believe that when you purchased the house, a three-bedroom septic system was already installed?
A. Right.
Q. Who told you that?
A. It wasn't installed when we bought it, but it would be installed when we closed on it.

Page 53

Q. Was there a septic sys- -- system installed when you purchased the house that was bigger --
A. Yes.
Q. -- than a one-bedroom?
A. That was what?
Q. Bigger than a one-bedroom-capacity septic system.
A. Right. When we went to close on the house, it -- the septic -- they were supposed to have that all hooked up; and it -- and it didn't. They didn't have it hooked up.
Q. What was the capacity of the septic system that was there that wasn't hooked up when you purchased the house?
A. I understood that when we purchased the house, we'd have a Title V for a three-bedroom.
Q. Okay. Who told you that?
A. That's just my understanding, ma'am.
Q. Did anyone show you any documentation whatsoever that you had a -- a septic system compliant with Title V for a three-bedroom home when you purchased the house?
A. It's just my recollection of -- of what went on back then.

Page 54

Q. Do you have any documentation to support your recollection?
A. I don't know. I'd have to research it.
Q. At some point in time, you learned there was a one-bedroom restriction. Correct?
A. I remember it was talked about.
Q. Okay. And who was it talked about with?
A. It might have been talked about with Nick Brown. There was also another realtor involved.
Q. Okay. And --
A. So . . .
Q. And when it was talked about, did you ask why there was a three-bedroom septic system installed if you had a one-bedroom restriction?
(Pause.)
Q. Do you recall at all?
A. No.
Q. Okay. When -- when did you first speak with Mr. LaJoie about drafting plans for a septic system?
A. I would say, probably within, say, six months of after we purchased the house.
Q. Did you speak with anyone prior to your

Page 55

purchase of the house about drafting plans to install a larger septic system other than Mr. LaJoie?
A. I don't recall.
Q. Did Mr. LaJoie ever discuss with you the one-bedroom restriction placed on your property in 1992?
A. I don't recall.
Q. After you learned that there was a one-bedroom restriction on the property, did you discuss with Mr. LaJoie at all the fact that he was present in '92 when the restriction was placed on the property?
A. Could you repeat that?
Q. Sure. When you learned that there was a be- -- a one-bedroom restriction on the property, did you discuss at all with Mr. LaJoie his being present at the time the one-bedroom restriction was placed on the property by the Board of Selectmen in 1992?
A. I don't remember.
Q. Do you remember discussing with anyone else other than Nick Brown and this realtor and your attorneys, of course, this one-bedroom

Page 56

restriction?
A. At some point either before or after the purchase of the house, we might have talked with Dave LaJoie --
Q. And if --
A. -- from Felco.
Q. And if you had known that there was a one-bedroom restriction on the property prior to your purchase of it, would you have purchased the property anyway?
A. Would we have?
Q. Yes.
A. Yeah.
Q. Okay.
MR. REVERE: One second. Off the record.
(A brief discussion was held off the record.)
Q. Do you have --
MR. REVERE: Okay. We're back on the record.
Q. Did you write any letters to any state agencies claiming that you and your wife were being discriminated against and requesting that the State investigate?

A. Did I write any letters?
Q. Yes.
A. I might have helped my wife write some letters.
Q. Did you contact the attorney general's office concerning your investigation into your property and the treatment by the Town of Truro?
A. I believe that was my wife.
Q. Did you contact the Ethics Commission at all concerning un- -- alleged ethical (sic) behavior by anyone in the town of Truro?
A. Say that again.
Q. Did you contact the Ethics Commission to discuss the Town of Truro's treatment of you or your wife concerning your property?
A. I just -- I talked with my wife about that.
Q. Okay. I don't want to know what you talked about with your wife. I just want to know if you talked to anybody from the State.
A. I ha- -- I haven't. No.
Q. Okay. Do you believe that the prior town manager, Mr. Breault, has discriminated against you or your wife in decisions made concerning your property? Him specifically?

A. I think -- I believe he had an agenda to stop us from getting the permits we needed or going forward with improving our property.
Q. And what is the basis for your belief that Mr. Breault had an agenda?
(Pause.)
A. I think, just the fact that all the rulings went against us when it -- when it came to trying to get permits.
Q. Do you have any evidence that Mr. Breault was involved or a voting member of any of the town boards who voted to deny your permit applications?
A. Are we aware of what?
Q. Do you have any evidence that Mr. Breault, the town manager -- and I might be pronouncing it incorrectly -- was involved at all or had a vote in denying any of your permits for your property?
A. I think he had influence.
Q. Okay. And how did he exert that influence o- -- over the ZBA, the Zoning Board?
A. Just the fact that he's the town manager.
Q. Do you have any evidence that anyone influenced

Mr. Breault in any unethical manner concerning decisions on your property?
A. I can't say for sure.
Q. Well, do you have any si- -- do you have any --
A. Evidence?
Q. -- even circumstantial --
A. No.
Q. -- evidence?
A. No.
Q. Are you aware that town counsel, Zisson & Veara, either Sar- -- Sarah Turano-Flores or Mr. Veara, has been advising the Town concerning applications you and your wife have made for the property since 1996?
A. Are we aware that they were coun- -- counsel?
Q. Yes.
A. Yes.
Q. Okay. Do you believe that town counsel has discriminated against you in any of the opinions that they have given the Town concerning your property?
A. Again, I -- I just feel as though anything that we -- anything that we attempt to do legally as far as permitting or getting our property to

where we'd like it, we're just being . . .
Q. I'm asking specifically about town counsel. Do you believe town counsel holds any malice or ill will towards you or your wife?
A. I don't know.
Q. Do you believe that town counsel has been unduly influenced in the rendering of their opinions to the Town concerning the construction on your property?
A. I don't know.
Q. Do you have any evidence that they have been -- that town counsel has given other than their independent opinion to the Town?
A. Only in their denials of -- of our going forward with our property.
Q. Do you believe that any of town counsel's opinions to the Town are based on the fact that your wife is Lebanese?
A. I don't know.
Q. Do you believe that any decisions rendered by town counsel to Jewish property owners is based on the fact that they're Jewish?
A. I don't know.
Q. Have you ever heard town counsel say anything

concerning your wife's national origin --
A. No.
Q. -- or ethnicity?
A. No.
Q. So other than -- well, strike that. Do you believe that the denial of your permit applications is based on anything other than the fact that the town boards or town counsel just disagree with your position as to whether you should be permitted to build on your property?
A. Say that again.
Q. Sure. Do you believe that the Tow- -- any town employees of the Town of Truro, the boards who have rendered decisions concerning your property, and town counsel who has given the Town opinions as to your applications for construction on your property are based on anything other than a disagreement between you and the Town as to what is allowable and what is allowed to be constructed on your property?
A. I believe it's -- a lot of it's because it's John and Barbara.
Q. And what is the basis for that belief? Any --

any specific facts you can point me to --
A. Yeah. We've been --
Q. -- that they specifically render their decisions because you're John and Barbara Cordi-Allen?
A. Yes. Because we've owned the property since '96. We've not been able to do anything since that time.
Q. And your belief is that the one-bedroom restriction's not relevant to the Town's decision to deny your applications?
(Pause.)
A. I don't believe that the one-bedroom restriction is the reason that we're being -- that our permits are being rejected.
Q. Do you have any evidence that anyone who has voted on your permits or the town counsel who has rendered opinions to the Town concerning your permit applications holds any malice or ill will towards you other than the fact that the permits have been denied?
A. There was that one instance where someone from the Town, either a selectman or someone, had said, Look at what the Allens fell into.
Q. And by that, what did he mean? Do you know?

A. I don't know. Maybe there might have been jealousy there.
Q. That you purchased the property and he didn't?
A. (Witness indicates).
Q. Do you know who that individ- -- you have to say yes.
A. Oh. Yes. Yes.
Q. Do you know who that individual is who said that?
A. I don't. I don't know who it is.
Q. Were you present when he said that?
A. I'm not sure if I was present. I remember that being said. It might have been repeated to me.
Q. Any other comments that you've heard, any statement to support your -- any ill will or malice on the part of any board members who have rendered decisions concerning your property?
A. That's all I can think of right now.
MS. ECKER: Okay. I don't have any other questions.
MR. REVERE: Okay.
(Whereupon the deposition was suspended at 3:30 p.m.)

SIGNATURE PAGE

I, JOHN E. ALLEN, do hereby certify that I have read the foregoing transcript of my testimony, and I further certify that said transcript is a true and accurate record of said testimony.

Dated at , this day of , 2006.

JOHN E. ALLEN

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF NORFOLK, ss.

I, Jo Anne M. Shields, a Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that JOHN E. ALLEN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true and accurate record, to the best of my knowledge, skills and ability, of the testimony given by such witness.

I further certify that I am not related to any of the parties in this matter by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 21st day of April, 2006.

Notary Public

My Commission expires:
September 29, 2006.

ERRATA SHEET

CHANGES TO THE DEPOSITION OF JOHN E. ALLEN

INSTRUCTIONS TO WITNESS: 1) Please note any desired corrections to your testimony by page and line number. 2) Enter text as it appears in the transcript. 3) Enter text as it should appear.

PAGE LINE CORRECTION

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10370PBS

* * * * * * * * * * * * * * * * * * * *

BARBARA CORDI-ALLEN AND JOHN ALLEN, Plaintiffs,

vs.

JOSEPH R. CONLON, ARTHUR F. HUTLIN, NORMAN H. POPE, KEITH S. ALTHAUS, And MARINNA MATRICARDI as they are Members and collectively the TRURO ZONING BOARD OF APPEALS AND THE TOWN OF TRURO, MASSACHUSETTS, AND BROOKE NEWMAN, Defendants.

* * * * * * * * * * * * * * * * * * * *

**DEPOSITION OF BARBARA CORDI-ALLEN**, a witness called on behalf of the Defendants pursuant to the Massachusetts Rules of Civil Procedure before Jo Anne M. Shields, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Brody, Hardoon, Perkins & Kesten, LLP, One Exeter Plaza, Boston, Massachusetts, on Friday, March 17, 2006, commencing at 10:40 a.m.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**
One State Street
Boston, Massachusetts 02109
Telephone (617) 742-6900

**APPEARANCES:**

**PAUL REVERE, III, ESQUIRE**
**LAW OFFICES OF PAUL REVERE, III**
226 River View Lane
Centerville, Massachusetts 02632
(508) 778-7126
for the Plaintiffs

**DEBORAH I. ECKER, ESQUIRE**
**BRODY, HARDOON, PERKINS & KESTEN, LLP**
One Exeter Plaza
Boston, Massachusetts 02116
(617) 880-7100
for the Defendants, Joseph R. Conlon, Arthur F. Hutlin, Norman H. Pope, Keith S. Althaus, and Marinna Matricardi as they are Members and collectively the Truro Zoning Board of Appeals and the Town of Truro, Massachusetts

**JULIE PRUITT BARRY, ESQUIRE**
**NUTTER, McCLENNEN & FISH, LLP**
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210-2831
(617) 439-2831
for the Defendant, Brooke Newman

**ALSO PRESENT:**

Sarah A. Turano-Flores, Attorney At Law
Town Counsel for the Town of Truro

INDEX

| Deposition of: | Direct | Cross |
|---|---|---|
| BARBARA CORDI-ALLEN | | |
| By Ms. Barry | 4 | |
| By Ms. Ecker | | 81 |

EXHIBITS

| No. | | Page |
|---|---|---|
| 1 | Notice of deposition | 4 |
| 2 | Document entitled "Defendant Brooke Newman's First Request to Barbara Cordi-Allen for Production of Documents" | 11 |
| 3 | Document entitled "Plaintiffs John Allen and Barbara Cordi-Allen's Response to Defendant Newman's Document Request" | 12 |
| 4 | Letter to Steve Williams from Mr. and Mrs. John Allen dated 9/20/98 | 18 |
| 5 | Aerial photograph | 23 |
| 6 | Letter to Paul Revere from Thomas J. Wingard Jr. dated 10/19/04 | 58 |
| 7 | Plaintiffs' Answers to Defendants' First Set of Interrogatories | 145 |

PROCEEDINGS

**BARBARA M. CORDI-ALLEN**, a witness called for examination by counsel for the Defendants, having been satisfactorily identified by the production of her driver's license and having been duly sworn, testified as follows:

* * *

DIRECT EXAMINATION

BY MS. BARRY:

Q. Good morning, Ms. Cordi-Allen. My name is Julie Barry. I'm an attorney for Brooke Newman in this case.

A. Uh-huh.

MS. BARRY: I'd like to have this marked as Exhibit 1, please.

(Notice of deposition marked as Cordi-Allen Exhibit No. 1.)

Q. Just before we get started, I'd like to give you a few guidelines about your deposition today. I'll be asking questions, you'll be answering them, and the court reporter will be taking down your answers. So I would ask that you wait until I finish the question --

A. Okay.
Q. -- and I will wait until you finish your answer so that we won't be speaking over one another.
A. Uh-huh.
Q. If you would answer verbally please, as she can't or won't be looking at you to know whether you were nodding or shaking your head. So verbal answers only. If you need to take a break at any time, please feel free to ask. The only request that I make in that regard is that if there's a question pending that you answer the question before we break.
If you have any problems understanding the question that I'm asking you, please let me know; and I'll try to rephrase it. If you answer it, I'll assume that you understand the question.
I'd suggest that we just agree to the usual stipulations.
MS. ECKER: That's fine.
MS. BARRY: All objections reserved, except as to form, including motions to strike.
MS. ECKER: That's fine.
MS. BARRY: And 30 days to read and sign.

We'll waive the notary.
MS. ECKER: Fine.
MR. REVERE: Yeah.
MS. BARRY: Okay.
MR. REVERE: Actually, you have to have your summary judgment motion by the 21st.
MS. ECKER: Correct.
MS. BARRY: Yeah. So we may want to bump it up. If you can do it in -- by the end of the month, that would be great.
MS. ECKER: Well, she has to be able to get us a transcript.
MR. REVERE: Right.
MS. BARRY: What kind of time are you looking at for a transcript?
COURT REPORTER: It's usually a two-week turnaround time. But if you need it earlier, just let me know.
MS. ECKER: That's fine.
MR. REVERE: Okay.
MS. ECKER: So --
MR. REVERE: Well, let's --
MS. ECKER: -- how about if she gets me a signed transcript by April 7th?

MR. REVERE: The 7th. Okay. That -- assuming we get it. Yeah. I just -- you know, you need to -- I -- I don't expect there are going to be significant changes. But, in any event --
MS. BARRY: Okay.
MR. REVERE: -- you know.
MS. BARRY: If we agree to April 7th, then we'll go from there.
MR. REVERE: Yeah. I mean --
MS. BARRY: Okay.
MR. REVERE: -- I'd love to make it difficult for you and say 30 days, it isn't there. But . . .
MS. BARRY: That's not your style. Just --
MR. REVERE: No. It isn't mine either. Okay.
MS. BARRY: Okay.
Q. Can you state your name and address for the record, please?
A. Barbara Cordi-Allen, 143 Ardsley Road, Longmeadow, Mass.
Q. And how long have you lived at 143 Ards- -- Ardsley Road?

A. Six years.
Q. And do you own the property there?
A. Yes.
Q. And the property at issue in this case in Truro, 5 Yacht Club Road, do you own that property?
A. Yes.
Q. Is that in your name and your husband's name? Or is it under a trust or some other form of ownership?
A. It's under both our names.
Q. Okay. Are you employed --
A. No.
Q. -- Ms. Cordi-Allen? And have you been deposed before?
A. Yes.
Q. And can you tell me how many times?
A. I think, once.
Q. Okay. And what was that in connection with?
A. Oh, or maybe it was once or twice. For my leg injury.
Q. Okay. And was that a lawsuit in which you were the plaintiff?
A. Yes.

Q. Okay. Has that case since been resolved?
A. No.
Q. Okay. Do you know or have an understanding of where that case is -- has been filed? Is it in State Court or Federal --
A. Federal.
Q. -- Court? Federal Court. In Massachusetts?
A. Yes.
Q. Okay.
A. Uh-huh.
Q. Okay. What did you do to prepare for your deposition today?
A. I just went over the interrogatories.
Q. Okay. Did you review any documents other than the interrogatories?
A. No.
Q. Did you bring any documents with you today?
A. Just the -- the interrogatories.
Q. And when you say "the interrogatories," are you referring to your answers to the --
A. Yes.
Q. -- interrogatories?
A. Uh-huh. Yes. And I brought a letter to give to Sarah, because the Town does no respond. So

now they can't say they didn't get it.
MR. REVERE: Okay. No. In fact, that was -- sorry to interrupt you, she just handed me a letter. I think she had forgotten that she -- then she --
THE WITNESS: Yeah. I did give --
MR. REVERE: -- realized it. So -- so I don't know. I haven't even read it. So . . .
Q. Okay. I'm going to put that aside and go on. Did you speak to anyone today about your deposition other than your attorney, Mr. Revere?
A. No.
Q. Ms. Cordi-Allen, you filed a Complaint in Superior Court, which has been since removed to Federal District Court, appealing, among other things, a decision of the Zoning Board of Appeals upholding the decision of the building commissioner over the building commissioner's issuance of a building permit to a property owned by Ms. Brooke Newman at 3 Yacht Club Road; is that correct?
A. I believe so.
Q. Okay. And Mr. Revere represents you --
A. Uh-huh.

Q. -- today?
A. Yes.
Q. Are you aware that we've requested, through your attorney, Mr. Revere, that you produce documents concerning this matter?
A. I don't -- he has everything I have. So I -- I don't know if --
Q. Okay.
A. You mean, additional stuff?
Q. Yeah. Let me ask you. Let me show you a document, and it may help to --
A. Okay.
Q. -- clarify.
MS. BARRY: Can you mark that as the next exhibit.
(Document entitled "Defendant Brooke Newman's First Request to Barbara Cordi-Allen for Production of Documents" marked as Cordi-Allen Exhibit No. 2.)
Q. I've handed you a document that's been marked Exhibit -- Cordi-Allen Exhibit 2 and ask if you've seen that document before.
A. I don't -- I don't remember it.
Q. Okay. So it's fair to say you haven't seen it

before; is that correct?
A. I just don't remember it.
MS. BARRY: Okay. Can you mark this as the next exhibit, please.
(Document entitled "Plaintiffs John Allen and Barbara Cordi-Allen's Response to Defendant Newman's Document Request" marked as Cordi-Allen Exhibit No. 3.)
Q. You've been handed a document that's marked Cordi-Allen Exhibit 3. I'd ask if you would look at that, take your time, and let me know if you've seen that before.
A. I don't remember.
Q. You don't remember having seen it? Or you don't --
A. Yeah.
Q. -- remember?
A. I don't remember seeing it.
Q. Okay. Exhibit 3 is a -- a document entitled "Plaintiffs John Allen and Barbara Cordi-Allen's Response to Defendant Newman's Document Request." Did you assist your attorney in looking for documents that were responsive to these requests?

A. No.
Q. If I understand from your previous answer, you have given your files concerning this matter and other town matters, I assume, to your attorney, Mr. --
A. Yes.
Q. -- Revere; is --
A. Uh-huh.
Q. -- that correct?
A. Yes.
Q. Is it fair to say that Mr. Revere now has all of your files and other documents pertaining to this matter?
A. He -- well, he should have, pretty much, everything. I -- there could be stragglers here or there. But I gave him just about everything.
Q. Before you gave your documents and your files to Mr. Revere, how would you ordinarily have kept these documents?
A. They were with another lawyer.
Q. Oh, okay. And who was that lawyer?
A. Greg McGregor.
Q. Okay. Did Attorney McGregor then transmit the

files to your current attorney, Mr. Revere?
A. No.
Q. He transmitted them to you, and then you --
A. Yes.
Q. -- transmitted them to --
A. Yes.
Q. -- Mr. Revere?
A. I believe so. Yes.
Q. Okay. As part of Exhibit 3, your attorney, Mr. Revere, has produced to us a number of documents that purport to be responsive to the quest- -- requests that we've made. Do you recall whether you saw the documents? I'm not going to mark these as an exhibit. I'll have you look through them and ask if you recall assisting or otherwise seeing those documents before they were produced to me.
A. I haven't seen all of these.
Q. Okay.
A. That -- I don't --
Q. Okay. Let me take that back. It's my understanding that these documents are copies of documents that are from your files that have been given to your attorney.

MS. BARRY: And I just would like to note for the record, Paul, that I don't think this production complies with Rule 34 because this isn't how they're kept in the ordinary course of business. And there's not indication on these documents as to what they're responsive to pertinent to the request. So I'd ask that -- if this response could be supplemented. I'm assuming you kept a copy of these for yourself. And if you could --
MR. REVERE: Yes.
MS. BARRY: -- identify for me which of these documents responds to which of the requests in the document requests, that would be helpful.
MR. REVERE: Okay. I believe that --
MS. BARRY: There's no -- there's no -- there's no, like, tabs that say, you know, Question 1, Question 2, Question 3. So I don't know. It's just documents. And I -- and I have seen your production to the Town, and I know she had --
MR. REVERE: The ordinary course.
MS. BARRY: Yeah. So I know this is not

the ordinary course. So I would just --
MR. REVERE: Okay.
MS. BARRY: -- ask that if you would please provide me with the designation as to what these documents respond -- what particular questions they respond to, that would be very helpful.
MR. REVERE: Okay. And I think I kept a copy of --
MS. BARRY: If you --
MR. REVERE: -- exactly what I sent you.
MS. BARRY: If you didn't, let me know; and I'll arrange --
MR. REVERE: Okay.
MS. BARRY: -- to have copies sent.
MR. REVERE: It'll just take me a minute to look at them.
MS. BARRY: Okay.
MR. REVERE: But --
MS. BARRY: Okay.
Q. Do you use e-mail at home or work, Ms. Cordi-Allen?
A. I don't work.
Q. Okay. Sorry. That's correct. You've already

told me that. Do you use e-mail at home?
A. Sometimes.
Q. Okay. Did you provide or otherwise do anything to search through your e-mail or computer files for documents that concern your lawsuit against the Town and Brooke Newman?
A. When?
Q. At any time since this lawsuit has been filed, have you provided copies of your e-mails to your attorney?
A. I believe everything I had went to Greg McGregor, which went to Paul Revere.
Q. Okay. We would ask that if you would make a search of your e-mail and if your attorney could let us know what search -- what you've done to make sure that any responsive documents contained in your e-mail or computer files have also been produced as part of the production that you've made.
MR. REVERE: Can we go off the record for just a second?
MS. BARRY: Sure.
(A brief discussion was held off the record.)

MS. BARRY: We have discussed the review and research concerning what e-mails and what search was done of Ms. Cordi-Allen's e-mail for responsive documents and have agreed that Attorney Revere will provide to me and Ms. Ecker confirmation of what search was undertaken and whether there are any other e-mails that were not produced that -- that are not somehow privileged, that they will be subsequently produced by March 31st.
Can we mark this as the next exhibit.
(Letter to Steve Williams from Mr. and Mrs. John Allen dated 9/20/98 marked as Cordi-Allen Exhibit No. 4.)
Q. Ms. Cordi-Allen, you've been handed a document that's been marked Cordi-Allen Exhibit 4. I'd ask if you could look at that and let me know if you recognize it.
A. Yeah. Uh-huh.
Q. And what do you recognize that to be?
A. A letter to the building inspector.
Q. And what does that letter concern?
A. Brooke Newman's building permit.
Q. And the date on that letter is? I'm sorry. I

don't have a copy in front of me.
A. September 20th, 1998.
Q. September 20th, 1998. And is it fair to say that that's a letter complaining about a building permit being -- or a building permit sought by or being issued to Ms. Newman for her property at 3 Yacht Club Road?
A. I have to read it.
Q. Okay. Take your time.
(Pause.)
A. Yes. Okay.
MS. BARRY: Can you read back the question, please.
(Question read back.)
Q. So is it fair to say that that letter concerns the building permit that was being sought by Ms. Newman?
A. Yes.
Q. And is it fair to say that you objected to a building permit being sought by Ms. Newman or issued by the building inspector?
A. Based on a contradiction of the ruling of the Board of Health.
Q. Okay. I understand that there may be -- that

you have reasons. But I'm just trying to ans- -- have you answer my question. Is it fair to say that -- that -- that you had an objection to a building permit being --
A. Yes.
Q. -- issued to Ms. Newman for the property --
A. Uh-huh.
Q. -- at 3 Yacht --
A. Yes.
Q. -- Club Road? Now, the documents that I've received in response to the document request, this letter, September 20th, 1998, is the latest -- the letter with the latest date concerning this building permit being issued to Ms. Newman. Do you recall if you wrote any letters in or about that time after September 20th, 1998 to the building inspector?
A. I don't remember.
Q. Okay. Did you appeal the building inspector's issuance of the permit -- building permit to Ms. Newman in or about 1998?
A. Could you repeat that?
Q. Did you appeal the building inspector's issuance of the building permit to Ms. Newman

in or about 1998? Did you file an appeal in 1998 of the building permit?
A. No.
Q. Why not?
A. We waited for a response for -- from the building inspector and my attorney, Bill Thomas, who -- God rest his soul -- has passed away. And he was dealing with the matter. Maybe he did. I don't remember.
Q. Okay.
A. He may have. I -- I know there was something in court. But . . .
Q. It's fair to say you didn't appeal the issuance of the building permit to the Board of Appeals in 1998; is that correct?
A. If -- if it was done, it was done through my attorney. And I don't remember.
Q. Okay.
A. But I -- I personally didn't file any --
Q. Okay.
A. -- that I know of.
Q. Okay. Do you recall getting a response from the building inspector to your letter?
A. No.

Q. You don't recall? Or you didn't get one?
A. I don't believe I got one.
Q. You're seeking to expand your existing cottage at 5 Yacht Club Road, as well as build a -- a two-story addition on the property; is that correct?
A. Yes.
Q. Okay. And -- and your property is adjacent to Ms. Newman's; is that correct?
A. Yes.
Q. Okay. Have you sought a building permit yet for the proposed expansion --
A. Yes.
Q. -- and the new structure? You have sought a building permit?
A. Uh-huh.
Q. When did you file for a building permit?
A. 1996.
Q. Have you sought for zo- -- have you sought zoning relief from the Board of Appeals for the proposed expansion and new structure?
A. Don't need to.
Q. My question is, have you sought zoning relief from the Board of Appeals for the proposed

project on your property?
A. Have we? Not to my knowledge.
Q. Okay.
MS. BARRY: Can you mark that as the next exhibit.
(Aerial photograph marked as Cordi-Allen Exhibit No. 5.)
Q. Now, in the letter that's Exhibit 4 to the building inspector dated September 20th, 1998, can you just look at that and let me know if you've alleged that there's any impact to your property as a result of the building permit being issued to Ms. Newman?
A. Yes.
Q. What have you alleged in that letter that says there's an impact to your property?
A. That it's in the flood zone and that her property's in the flood zone and that the well is supposed to be on site. And according to what's been said by Brooke Newman, any water that we use, which is hundreds and hundreds of yards away from her well, would affect the water sup- -- her water supply.
Q. But what I'm asking you -- I -- I understand

you have those issues -- but what I'm asking --
A. Uh-huh.
Q. -- you specifically is, concerning that letter, what impacts to your property at 5 Yacht Club Road result from the issuance of a building permit to Ms. Newman? A building permit.
A. The violations of the Board of Health.
Q. How -- but this -- we're talking about the building permit. Is it your understanding the building permit is issued by the building commissioner?
A. No, not solely.
Q. Okay. Let me go back to my question then, because it's really very narrow. I'm talking about the letter that is in front of you at Exhibit 4, and I'm asking that you confine your response to that. Based -- is there anything in that letter that alleges that there is an impact to your property at 5 Yacht Club Road as a result of the building permit requested by Brooke Newman or to be issued by the Board -- by the building inspector?
A. The impact here is --
Q. Is it in the letter, please?

A. Yes. Yes. The consistency.
Q. And when you say "consistency," what are you re- --
A. In decisions.
Q. Okay. Let's -- let's not talk over each other. When you say "consistency," you mean, the consistency in the decisions of the town officials? Is that what you're referring to?
A. Yeah.
Q. Okay. All right. And so, again, I'm going to ask you, what is the impact to your physical property as a result of the building permit being issued to Brooke Newman as alleged in that letter? Please show me where.
(Pause.)
A. I -- I don't know if I'm really targeting what you're saying. But it's here that she's in a flood zone. That's an impact on our property.
Q. Okay. Let's take that then. How is that an impact on your property?
A. Being in a flood zone?
Q. How is it an impact on your property that her property is -- if -- if -- is, as you've --
A. 'Cause it --

Q. -- alleged -- please let me finish -- in a flood zone?
A. According to what has been said by Brooke Newman, the water cannot flow properly because, in her case, it's supposed to be up on pilings.
Q. Okay.
A. It is not. It's a --
Q. I'm going to stop you there --
A. -- full foundation.
Q. -- because that's going way far afield. I'm going to give you an opportunity to tell me -- let you tell me all of your objections to Ms. Newman's modifications that were allowed by that building permit. But that's not what I'm after right now. All I'm really trying to get at is that you don't allege any specific impacts to your property as a result of the building permit in that letter, Exhibit 4, dated Septemeber 1998; is that correct?
A. I wouldn't say that's correct.
Q. Okay.
A. I think there's some.
Q. All right. Then we'll agree to disagree.
MR. REVERE: Can we just have a second?

Focus on the question. She's only asking you about the letter. If it's not in the letter -- just focus on the question. Okay.
Q. That's fine. I'm not trying to --
MR. REVERE: Yeah.
Q. -- trip you up.
MR. REVERE: No. Yeah. She -- just focus on what she's saying.
THE WITNESS: Uh-huh.
MR. REVERE: Okay?
Q. I'm going to show you what has been marked as Exhibit 5. I can represent to you that this was a document that was produced in the documents to the Town from your attorney --
A. Uh-huh.
Q. -- and ask if you can look at that and tell me if you recognize it.
A. Yes.
Q. What do you recognize that to be?
A. That was something the Army Corps of Engineers did.
Q. Is it an aerial photograph done by the Army Corps of Engineers?
A. Yes.

Q. Okay. Now, if you look at this aerial, can -- is your property and the structure thereon depicted in this photograph?
A. Yes.
Q. Can you point to me where that is?
A. Okay.
(The witness complies.)
Q. So you're indicating just to the left of the red line that appears to be drawn adjacent to a dock structure --
A. Yes.
Q. -- is that correct? And can you also identify for me, what is the structure immediately across? This looks like a small path from your structure.
A. The yacht club.
Q. That's the yacht club.
A. Excuse me one second. I want to see something.
MR. REVERE: Talk to her.
THE WITNESS: No. I know. But I wanted you to see something.
MR. REVERE: Yeah.
THE WITNESS: Okay.
Q. Do you have something you want to add to

that --
MR. REVERE: No.
Q. -- answer?
MR. REVERE: Just . . .
Q. Okay. If you would please show me on this Exhibit 5 where Brooke Newman's house is located.
A. This is it.
Q. Okay. And you've pointed --
MR. REVERE: Could we -- I can get you another copy of that if you've got a problem. I -- 'cause I think it would be better if she marked it, you know, circled, you know, put a letter --
THE WITNESS: Oh --
MR. REVERE: -- you know, pointing.
THE WITNESS: -- he's saying for me to label it, I guess.
MS. BARRY: Yeah. No. That's fine. I understand.
MR. REVERE: Okay.
MS. BARRY: I mean, my questions are really, in this --
MR. REVERE: Okay.

MS. BARRY: -- for -- for purposes of this, so general that I don't really think that's --
MR. REVERE: Okay.
MS. BARRY: -- even necessary. If -- if it appear -- if you think that it is -- and I don't -- I mean --
MR. REVERE: Okay. If you can understand.
MS. BARRY: You don't need to be taking all this down. Let's go off the record.
(A brief discussion was held off the record.)
MS. BARRY: Now, please go back on.
Q. All right. So on Exhibit 5, you have drawn a red circle around your structure. And if you would put a CA next to it.
(The witness complies.)
Q. And you have also drawn a red circle around the structure that you have identified as Brooke Newman's house --
A. Yes.
Q. -- at 3 Yacht Club Road.
A. Yes.
Q. And you have drawn a -- or written "BN" next to that circle; is that correct?

A. Yes.
Q. Okay. Now, it's fair to say, isn't it, that your property is closer to the water than Ms. Newman's?
A. Yes.
Q. Okay. And your property has a dock. It looks like an existing dock structure extending from some point on your property out to -- it looks like a tidal flat; is that correct?
A. Yes.
Q. And can you tell me, what is the red line that's drawn at the end of the dock and then extending out to the water depicted on this photo?
A. That was the previous permitted dock and -- by the DEP and also permitted by the Town of Truro for -- for us --
Q. So --
A. -- in 1996.
Q. Okay. So this -- this depicts what would have been a proposed dock extension; is that correct?
A. Not proposed. It was approved.
Q. I understand. But this -- there's not,

actual,y a dock --
A. Well --
Q. -- extension --
A. -- there are --
Q. -- there?
A. -- floats. There are floats.
Q. Okay.
A. So you . . .
Q. Okay.
A. And . . .
Q. Okay. Now, this is the question I told you that I -- that I intended to ask you. What are your objections to the building permit that was granted to Ms. Newman for the modifications to her dwelling at 3 Yacht Club Drive?
A. What are they?
Q. Uh-huh.
A. She does not have proper permits --
Q. Let me --
A. -- for what she built.
Q. Let me stop --
A. They're not --
Q. -- you there. And we'll --
A. Okay.

33

Q. -- take it one by one. She doesn't have proper permits.
A. Right.
Q. What permits do you allege that she needs?
A. Proper location. The house is supposed to be on pilings. She's brought in fill, which will definitely cause problems for flooding. She's brought in plantings. None of this was on her order of intent.
Q. Let me just -- let me stop you there, 'cause I just want to make sure that you're understanding my question.
A. Uh-huh.
Q. I'm talking about the building permit.
A. It's all part of getting a building permit.
Q. Okay.
A. You have to get those approvals first.
Q. Okay. So what permits are you suggesting that she needed that she didn't get?
A. She didn't get proper building permits as, like I said, site location. She altered her plans. And the Conservation approvals are missing for what she has. They don't coincide. What she has is different than what she was issued.

34

Q. Can you clarify what you just said?
A. Yeah.
Q. What she has is --
A. She --
Q. -- different --
A. Right.
Q. -- from what?
A. She has -- from Conservation Commission, she has no approval for trees or fill. And you cannot bring in either in that area. She does not have her house, which is, according to her, in a flood zone, in an environment that would require her house be put on pilings. And she has a full basement. You can't have a full basement from what we've been told. So . . .
Q. And when you say "from what we've been told," told by who?
A. By Brooke Newman, her attorneys, and town officials.
Q. In connection with her house or your proposed --
A. Oh, with our --
Q. -- structure?
A. -- with ours. But, also, that hers, in looking at her permits, they're not -- they're not accurate for what she has.

35

Q. What permits are you referring to again? Are you referring to the building permit, Ms. Cordi-Allen?
A. Bo- -- both the building permits and the Conservation Commission permits. She's put a fence up on property that's not hers.
Q. Now, regarding the fence, are you talking about a Conservation Commission permit or the building permit?
A. Both.
Q. Was the fence a part of the building permit that was issued to Ms. Newman that you are objecting to?
A. The location.
Q. I'm -- let me -- let me backtrack and make sure you understand. I'm trying to confine my questions here to this lawsuit.
A. Uh-huh.
Q. Do you understand that you have appealed the Zoning Board's upholding of the building commissioner's issuance of a building permit to Ms. Newman in 1998?

36

A. Yes.
Q. Okay. I'm talking about the building permit. So I would like to know what objections you have to the building permit issued to Ms. Newman for modifications to her property.
A. You have to go --
Q. The building permit.
A. Yeah. But to go through -- to get a building permit, you have to have other permits. It's not one permit. It's --
Q. What do you base that on?
A. What do I base it on?
Q. Uh-huh.
A. Truro's regulations that they've told us. So I would assume that they're for everybody.
Q. So you're basing your analogy of the requirements for Ms. Newman's property and the modifications to the structure thereon based on the requirements for the structure that you proposed to develop at 5 Yacht Club Road?
A. Yes. And the -- the town regulations.
Q. The town regulations pertaining to the development of your property?
A. No. Of any property supposedly down there and

also DEP regulations.
Q. Okay. You understand this is not a lawsuit concerning DEP.
A. You have to have the proper permits. And Conservation Commission's supposed to grant proper permits according to DEP regulations, and they're missing.
Q. Okay. Anything else?
A. Board of Health regulations.
Q. What -- and what specifically about the Board of Health regulations?
A. She has no permit for her well either from Conservation Commission nor from the Board of Health.
Q. What do you base that statement on?
A. The Board of Health, my discussions with the Board of Health.
Q. Is it your understanding that the building inspector has to confirm with other town officials that any necessary permits have been obtained before he issues a building permit?
A. That they're supposed to? Is that --
MS. BARRY: Read back --
A. -- what you're asking?

MS. BARRY: -- the question.
A. Yeah.
(Question read back.)
A. I can't answer that. I -- I would assume that, but I can't say that that's what they do do.
Q. So you don't know?
A. Right.
Q. Do you have any other objections to the building permit that was granted to Ms. Newman for the modifications to her dwelling at 3 Yacht Club Road?
A. The setbacks.
Q. What about --
A. I --
Q. -- the setbacks?
A. Property lines.
Q. What -- could you please --
A. I don't --
Q. -- tell me in more detail what you're saying? Because I don't --
A. If her --
Q. -- understand.
A. -- house is properly located, it meets the regulations for setbacks for her house, her

septic. Her well is now off-property.
Q. What do you base that on?
A. I saw it.
Q. You saw what?
A. Her well off-property. And the location of the house in terms of property lines, it looks very close.
Q. It looks very close. Do you have a survey or something else upon which you based your --
A. We've had --
Q. -- statement?
A. -- the property surveyed, and people down there have removed the stakes umpteen times. So . . .
Q. Excuse me. Let me make sure that I understand you. You've had Ms. Newman's property surveyed?
A. My property.
Q. Do you have any basis for your statement, other than your belief that it looks pretty close, that Ms. Newman's structure does not comply with the setbacks?
A. I have not measured her property. But her placing her fence in the middle of Yacht Club Road shows that she wants people to see or

think she owns more property. And --
Q. That's not really what I've asked you though. What I've asked is whether you have a basis for your statement that Ms. Newman's structure does not comply with the setback other than your belief.
A. Well, I have not measured it. But . . .
Q. So have you --
A. I have not.
Q. -- hired -- have you hired a surveyor or any other expert to measure Ms. Newman's property?
A. Not yet. Not yet.
Q. Are you intending to hire someone in connection with this lawsuit?
A. We may. We may.
Q. Now, I need to know. The purpose of this deposition --
A. I have not --
Q. -- Ms. Cordi-Allen --
A. -- discussed that with my attorney.
Q. Well, I -- if you -- I need to know. The question is, do you have an intent to retain a -- a surveyor or other expert to survey the structure at 3 Yacht Club Road to determine

whether it complies with setbacks?
A. We may.
Q. Do --
MR. REVERE: Can we go off the record?
MS. BARRY: Yes, please.
(A brief discussion was held off the record.)
MR. REVERE: Back on the record.
MS. BARRY: Okay. Thank you.
MR. REVERE: If you want that on the record, we can put that on the record.
MS. BARRY: We'd like to note for the record that Ms. -- Mr. Revere has confirmed that there is no intent to hire a surveyor to survey Ms. Newman's property, which is in accordance with not only the Rule 26 disclosure that was previously made by the plaintiffs in this matter, but also with the interrogatory answers that were provided to the Town.
Q. Okay. Do you have any other objections to the building permit that was granted to Ms. Newman for modifications of the dwelling at 3 Yacht Club Road?
A. Okay. Consistent treatment.

Q. When you say "consistent treatment," what do you mean?
A. The way one gets their building permits for one person should be consistent for everybody.
Q. And you're specifically speaking about the way that Ms. Newman got her building permits com- -- and the treatment compared to the treatment that you claim that you have received?
A. Exactly. Uh-huh.
Q. Okay. Anything else?
A. The only other thing is the encroachment on my property.
Q. What encroachment are you referring to?
A. She's been trespassing on my property.
Q. Okay. That's a different issue. Do you understand that there is a le- -- that the term "encroachment" has legal significance?
A. No. I thought that just meant coming, you know, on people's property.
Q. Okay. That's -- that's an issue that I'm going to get to later.
A. Okay.
Q. Right now, I'm just trying to determine --

you're not -- you're not suggesting right now, are you, that Ms. Newman's structure encroaches on your property? And I'm talking specifically --
A. The house?
Q. -- about the house.
A. No. No.
Q. It's fair to say, isn't it, that Ms. Newman's house, prior to the modifications, did not block your view of the water; is that correct?
A. The water in front of me?
Q. Uh-huh.
A. No.
Q. Okay. And is it fair to say that after the house was -- the modifications were made to the house under the building permit that it doesn't block your view to the water?
A. Well, there's water back there. But I never even considered that. That's not part of my concern.
Q. Okay. So you don't --
A. But there's water all the way around.
Q. Okay. So -- but your -- your problem with the modifications made to Ms. Newman's structure

are not based on any interference with your view from your property?
A. Exactly.
Q. Okay. This question is slightly different.
A. Uh-huh.
Q. It still goes to the building permit and the upholding of that permit by the Board of Appeal decision. And I would like to know, how have your property rights or legal interest been harmed as a result of that decision by the Board of Appeals to uphold the issuance of the building inspector's building permit to Ms. Newman for the modifications to the structure at 3 Yacht Club Road?
A. I believe the Town dragged it out.
Q. When you say that, what do you mean? The Town dragged what out?
A. Responding to my attorney, they took ex- -- extensive time to review her lack of proper permits.
Q. And when you say "extensive time to review," who -- who are you talking about particularly in the town? And what are you specifically referring to?

A. I know my attorney wrote a letter to the Town of Truro; and he wrote about the problems with her not having proper permits and bringing in fill, et cetera, trees, the -- her fence not on her property, house not sited where it was supposed to be, not elevated.
Q. Okay.
A. And he did not get a response in a timely manner.
Q. What else? How else have your property rights or legal interest been impacted by the decision of the Board of Appeals upholding the building inspector's issuance of a building permit to Ms. Newman?
A. I sure as heck can't get away with what she's gotten away with.
Q. What do you mean by that?
A. It's taken 11 years so far or ten years so far. She just went in, built; and that was it. And . . .
Q. How is that an impact from the Board of Appeals' decision upholding the building inspector's issuance of a building permit to Ms. Newman?

A. They still had -- they are fighting us. The Town of Truro's fighting us. Yet when people have violated regulations, they've done nothing in terms of the enforcement.
Q. Let me see if I can be more clear because I'm afraid you -- do you --
A. You know, I'm on a lot of medication too. So that's why I kind of go off, just so you know.
Q. Are you on --
A. So sometimes, you have to --
Q. -- medication today?
A. Yeah. I didn't know if you knew that.
Q. No.
A. So sometimes, you have to make sure I focus because --
Q. Okay.
A. -- I do, you know, go off, obviously.
Q. Let me just give you a little explanation --
A. Uh-huh.
Q. -- that may help you. This --
MS. ECKER: Excuse me. Could I just interrupt you?
MS. BARRY: Yes, please.
MS. ECKER: I'm very sorry. Are you on any

medication today that would affect your ability to testify?
THE WITNESS: No.
MS. ECKER: Okay.
THE WITNESS: I can -- I just go off. So if I do, like, she's been patient. But if I don't answer exactly, she's brought -- had to bring me back.
MS. ECKER: Does the medication --
THE WITNESS: So . . .
MS. ECKER: -- affect your ability to tell the truth?
THE WITNESS: No, not at all.
MS. ECKER: Does the medication affect your ability to recall facts that occurred as regards to this lawsuit and your property?
THE WITNESS: No.
MS. ECKER: Okay.
MS. BARRY: Okay. Thank you.
THE WITNESS: It's just that, sometimes, my -- I think, you know, too wide.
MS. BARRY: I understand.
BY MS. BARRY:
Q. So let me -- let me ask you something -- or let

me give you some information that may help you focus. You understand that the Complaint that you filed is against the Board of Appeals and Ms. Newman, but that only one count of your Complaint, specifically your zoning appeal against the Zoning Board of Appeals' decision, actually concerns my questioning here today and that this -- the deposition will later move to questions by Ms. Ecker concerning the other counts in the Complaint that you have alleged against the Town.
So by way of helping you focus --
A. Right.
Q. -- I'm specifically interested in your zoning appeal, your appeal of the Board of Appeals' decision.
A. Uh-huh.
Q. And there will be time for you to, at -- at some point later, testify as to the treatment that you believe that you've received from the Town in other areas. Okay? And if that just helps you to focus a little bit.
So right now, I'm really trying to focus on how it is that Ms. Newman's modifications to

her property and the Zoning Board of Appeals upholding the building permit allowing those, how has that affected your property or your legal rights other than the -- the disparate treatment that you're alleging? Take that out of the equation altogether.
Is there any other impact?
A. There's been a financial impact. It's depreciated the value of our property immensely.
Q. Okay. Let me stop you right there. What's the basis for your statement that it's depreciated the value of your property?
A. Well, if the hou- -- if that property is built upon, it's quite more valuable.
Q. Okay. So again, I'm -- I'm concerned that we're -- we're confusing things. The va- -- you're saying that if your property is built on, it's much more valuable?
A. Exactly.
Q. Okay.
A. Uh-huh.
Q. Are you alleging that the modifications made to Ms. Newman under the building per- -- permit

have impacted the value of your property?
A. Has her enlarging her house impacted the value of my property? Only that the elevation, her having a full foundation -- a full basement; the trees will cause erosion to my property.
Q. Okay. Well, I'm specifically asking you about allegations of an impact to the value of your property. Do you have any basis for your -- for believing that there will -- that there will be an impact to the value of your property as a result of the modifications made to the structure at 3 --
A. Yes.
Q. -- Yacht Club Road? What is the basis for that?
A. The erosion --
Q. I understand --
A. -- problem.
Q. -- that you believe that there may be an erosion --
A. Right.
Q. -- problem. What is that based on?
A. Speaking with my geologist, we've spoken about it.

Q. You've spoken with your geologist --
A. Uh-huh.
Q. -- who is?
A. Peter Rosen.
Q. And you've spoken to him specifically about an erosion problem resulting from the modifications to Ms. Newman's property at 3 Yacht Club Road?
A. Yes.
Q. And what has he told you in that regard?
A. In that environment, she should have had the house on pilings.
Q. Okay. Let me stop you there. I don't want to go back through that. I understand.
A. Okay.
Q. I understand what you're thinking in that regard. You've already given me that answer. I'm specifically concerned with the impact to the value, the dollar value, of your property. Is Mr. Rosen a real estate appraiser?
A. No.
Q. Do you -- have you hired a real estate appraiser?
A. No.

Q. Have you had your property appraised to determine whether there has been a before and after impact to the value of your property from 1998 to the present?
A. No.
Q. Do you intend to hire an appraiser?
A. I have not discussed that, made plans for it.
Q. You have not made plans --
A. No.
Q. -- for hiring an appraiser? Okay. Have you spoken --
A. For -- for -- for this part. For your part. Right?
Q. Specifically -- yes. Specifically as pertains to --
A. To you.
Q. -- an impact in the -- to the value of your property from Ms. --
A. From hers.
Q. -- Newman's modifications.
A. That's what I thought. For your part. Okay.
Q. Have you spoken to any other person or obtained knowledge from anyone else concerning whether there is an impact to the dollar value of your

property as a result of the modifications made to Ms. Newman's structure at 3 Yacht Club Road?
A. I've spoken with Jim Mahala previously, DEP.
Q. Okay. Is Jim Mahala an appraiser?
A. No. He works at DEP.
Q. Okay. So he doesn't have any expertise in appraising property?
A. No. But there's a risk of my house flooding.
Q. Okay. I understand that you -- you have expressed concerns about the structure and the -- the flood zone and your concerns about erosion. I understand that. I'm specifically targeting the impact to the property value. Okay.
What other impacts to your property rights or legal interest are you claiming have resulted from the Board of Appeals' decision upholding the building inspector's issuance of a building permit for the modifications to the structure at 3 Yacht Club Road?
A. I think I covered ev- -- mo- -- there may be more, but I think I covered most of them. The on- -- there's only one more regarding her -- about her mooring.

Q. Okay. Is the mooring connected to the building permit for the structure -- modifications to the structure at 3 Yacht Club Road? In other words, the building commissioner didn't issue --
A. No.
Q. -- Ms. Newman --
A. No.
Q. -- a mooring.
A. No.
Q. Correct?
A. Nobody did.
MR. REVERE: Can we go off the record for a second?
MS. BARRY: Uh-huh.
(A brief discussion was held off the record.)
MS. ECKER: Why don't we take a quick break.
MS. BARRY: Okay.
(Brief recess taken.)
BY MS. BARRY:
Q. Ms. Cordi-Allen, can you -- have you told me all of your claims as to how your property

rights or legal interests have been harmed by the Board of Appeals' decision upholding the issuance of a building permit to Ms. Newman to modify the residence at 3 Yacht Club Road?
A. Are you waiting? Are you just waiting for me to say something?
Q. I'm waiting for you to answer the question.
A. Oh. I -- I thought you were just summarizing.
Q. No.
MS. BARRY: Would you read the question back, please.
(Portion of question read back.)
A. There may be more. But to the -- right now, that's the most I can recall.
Q. Okay. Have you told me all of your objections to the Board of Appeals' decision upholding the building permit issued to Brooke Newman for the modifications to the structure at 3 Yacht Club Road?
A. I don't think we discussed everything.
Q. I need -- this is as much for your benefit and convenience more than mine. But this deposition is the time for you to state for the record what those objections are and what your

allegations are concerning any harm to your legal or property interest as a result of the Board of Appeals' decision. So take a moment to think about it if you wish. But I need to know at this time.
A. At this time, I believe the Board of Appeals dragged out -- well, it was dragged out by -- town officials did not send in a response to my attorney in a timely manner so that the Board of Appeals -- I believe it was them that said it wasn't -- that my attorney didn't file in the right time frame, whereas, since he did, it was the Town that intentionally dragged it out so that a date would be missed that they arbitrarily picked.
And it wasn't necessarily -- their decision is not necessarily true. It's what they want people to believe as -- in reference to the time frame. I understand there's a dispute as to if it was when she applied versus when she started building. But our paperwork was filed. It was Truro that dragged it out. But . . .
Q. Do you understand that the Board of Appeals' decision is upholding the building inspector --

inspector's decision regarding your request that the building permit issued to Ms. Newman be revoked?
A. Yes.
Q. Okay. And do you understand that the Board of Appeals upheld the building inspector's decision that the building permit issued to Ms. Newman was lawfully issued and that he declined your request --
A. Because of --
Q. -- to revoke it?
A. I believe that was because of the time frame.
Q. Is that your only -- is -- do you believe that's the only reason why he upheld the building permit was because of alleged statut- -- missing of a statutory deadline for filing an appeal?
A. Again, there are issues with different standards for different people. And the standards of getting appropriate permits or approvals through various boards is inconsistent with the way people are treated in Truro. And the documents are -- obviously, are not lined up where they should be. And that's

why we have a case.
MS. BARRY: Can you mark that as the next exhibit.
(Letter to Paul Revere from Thomas J. Wingard Jr. dated 10/19/04 marked as Cordi-Allen Exhibit No. 6.)
Q. I'm going to hand you what's been marked as Exhibit 6 and ask if you can look at it and let me know if you recognize it. Do you recognize that?
A. No.
Q. Okay. I can represent to you that Exhibit 6 is a letter from the building commissioner to your attorney regarding the request for enforcement and a revocation of Ms. Newman's building permit. And I would direct your attention to the last two paragraphs of that letter and ask if you would read those for the record, please.
A. "Mr. Williams determined, as is deduced by the issuance of the building permit, that Ms. Newman's proposal was not 'substantially more detrimental to its neighborhood' and 'will not increase the nature or extent of the nonconformity.'

"Mr. Williams was acting within his authority under the bylaw and, therefore, the permit was issued lawfully."
Q. Okay. It doesn't indicate in those last two paragraphs or, indeed, the letter, if you want to read it, that you had -- that your filing was -- or request for enforcement was late, does it?
A. Not in this specific letter.
Q. Okay. Thank you. What letter are you remembering that that --
A. It was discussions that my attorney and I had spoken about.
Q. Okay. And I don't --
A. And I --
Q. Stop. I don't want to know any --
A. Right.
Q. -- communications between you and your counsel.
A. Well, that's what I was going to say.
Q. Okay.
A. I don't think I can say anything.
Q. Okay. All right.
A. But I think there were letters. I don't know.
Q. Okay. Have you told me today all of your

concerns or objections to the Board of Appeals' decision concerning the building permit and its upholding the building permit issued to Ms. Newman for the modifications to the structure of 3 Yacht Club Road?
A. Yeah. No. No. I haven't.
Q. Okay.
A. I have --
Q. What other concerns do you have --
A. Mr. --
Q. -- or objections?
A. I have concerns regarding Mr. Williams issuing building permits to Ms. Newman and his qualifications. And --
Q. Okay. And Mr. Williams is who?
A. He was the building inspector at the time.
Q. Okay. And can you relate for me, please, how those objections about Mr. Williams' qualifications are related to the decision of the Board of Appeals upholding the issuance of a building permit to Ms. Newman?
A. Mr. Williams has proven that he's very lax in terms of his doing his job, specifically in buying our property. He approved our septic

system, signed off on it that it was done and la-da-da. It was never done. And we went to closing, and we had it tested or inspected. There was no pump; there was no electricity. Yet it was approved.

So I can't say that I res- -- I can -- I can't say that he operates within the regulations. And I think he was booted out by the Town because of problems with the Town. And I think he and Ms. Newman were personal friends, from what I've been told.

Q. Who told you that Mr. Williams and Ms. Newman were personal --
A. Various town- --
Q. -- friends?
A. Various townspeople.
Q. Uh-huh. Can you tell me who they are?
A. No. I can't. I -- you know, just people talking.
Q. Can you tell me where they said that?
A. No. I don't remember.
Q. Can you tell me when they said that?
A. Over the years. I mean, people say things; and you just hear things here and there. And I'm

like, Hm.
Q. Can you tell me what the context was of the conversation in which this would have -- this topic would have come up as to the friendship between or alleged friendship between Ms. Newman and Mr. Williams?
A. I know people in town were concerned on how she built, the way she built and got her permits rather quickly; and we're struggling getting ours. And not everybody in Truro is pleased with the way that they're treating us. In fact, people throughout the state wonder what's going on, you know.
Q. Who are the people throughout the state that you're referring to?
A. People that go down there. They'll say, How did they build, and you can't build? And how did they get this, and you can't? Even people who have done work in prepar- -- that have worked on Brooke Newman's house as well as ours.
Q. Who are you speaking of specifically?
A. The man that drew up the plans for her house as well as for our proposed house.

Q. Who is that?
A. Oh, gosh. The last name is, it's Mr. Kelly. And I believe, Felco Engineering; they were concerned, you know, why we're going through all that we're going through.
Q. Okay.
A. And --
Q. Again, I want to redirect your --
A. Uh-huh.
Q. -- attention back to the Complaint concerning the Board of Appeals' decision concerning the building permit -- upholding of the building permit issued to Ms. Newman and not concerning your property. Do you have any other objections to that decision by the Board of Appeals upholding the building permit?
A. I don't feel that they're treating us equally. And I don't feel that they are following Truro's regulations the way they should be, as well as the State's requirements.
Q. What State requirements are you --
A. DEP.
Q. I'm confused. Are you saying that DEP is treating you differently?

A. No. The -- yeah. Well, DEP is. Yes. They are, definitely. But what I'm saying is that she had regulations that she had to have in place to meet DEP regulations, and she did not --
Q. Okay.
A. -- either, through --
Q. So this is --
A. -- Conservation.
Q. -- going back to the objections that --
A. But all of that --
Q. -- you've told me about.
A. -- would have been part of the appeals.
Q. Okay.
A. Yes.
Q. Let me ask you -- I just need to remind you that we want to not talk over one another, 'cause her fingers are going to fall off. So you're -- the -- you're -- what you're referring to in your last answer was the objections you've discussed previously in today's deposition concerning Conservation Commission approvals and DEP approvals --
A. Right.

65

Q. -- is that correct? And have you told me everything today about how the decision of the Board of Appeals upholding Ms. Newman's building permit to modify the structure at 3 Yacht Club Road impacts your property rights or your legal interests?
A. I think it's basically in conclusion. If they could approve hers, then the -- there's absolutely no reason that we shouldn't have built in 1997.
Q. Okay.
A. And I don't know if this is part of it. But you mentioned views. And I understand that from DEP that views cannot be part of this. Yet when she bought the property after we did -- we were the original owners down there -- she was told that we were building; we had plans on building.
And she was also told -- and she made plans for her -- the location of her house, knowing we were building. And that was through the man that designed her house. He told us that. He told me that.
Q. And she made plans for the no- -- location.

66

When you say "she made plans for the location," are you talking about the change in the location, the turning of the --
A. Yes.
Q. -- building?
A. Exactly.
Q. And it was her plan to orient the house away from your structure?
A. No. I wouldn't say that.
Q. How would you --
A. Just to --
Q. -- describe it?
A. -- see -- to see about views. I think there was lo- -- you know, located. I don't know how --
Q. Views from?
A. -- it was specifically, you know. But she just knew that her view was not going to be what it is when she bought the property. So she moved the house.
Q. I understand. So her view would be obstructed --
A. Right.
Q. -- by your proposed dwelling --

67

A. Exactly.
Q. -- and the modifications and the new structure that you wanted to develop on your property?
A. Exactly.
Q. And so, as -- as you understand it from the person who designed her building --
A. Right.
Q. -- she re-oriented the --
A. And -- and Felco also.
Q. That she -- let me finish -- re-oriented the location of her building --
A. Right.
Q. -- so that her property -- the view from her property would not be impacted as a result of the proposed structure to be developed on your property. Right?
A. That there would be the possibility of her getting a view.
Q. Okay.
A. I mean, it's not going to be the same view.
Q. Okay.
A. We know that. A full view.
Q. And how does that impact your property rights or your legal interest that Ms. Newman wanted

68

to turn the structure so that she would still have a view in the event that your property was allowed to be developed as you proposed?
A. Well, obviously, this is all about views. And views cannot be part of . . .
Q. Well, we're not talking a- -- no. I'm talking --
A. So that's my legal right. She's bringing a lawsuit and trying to stop us from building because of her view.
Q. Okay. But we're talking about the lawsuit here today. And what I'm trying -- I'm trying to determine from your answers what impacts you're claiming to your property as a result of the Board of Appeals' decision.
If I understand correctly, you have just testified that Ms. Newman wanted to change the orientation of her structure because she was concerned that your proposed expansion and new development at your property would obstruct her view; is that correct?
A. Yes.
Q. Is that what you've just testified?
A. Uh-huh.

Q. Okay. So how would her wanting to orient her structure so that she might still have a view, assuming your structure were allowed, how does that impact your property rights or your legal interest?
A. She is objecting to us building to protect her views.
Q. I understand that that's your position.
MS. REVERE: All right. But she's asking you, what about the building permit hurt your property? That's all you need to care about. Is that -- that a fair --
MS. BARRY: Yes.
A. Yeah. Still don't -- we don't have a building permit.
Q. No. Ms. Newman's building permit, how did that --
MR. REVERE: What about --
Q. -- impact you?
MR. REVERE: -- the building permit?
Q. What I'm saying is, if -- if she turned her house --
A. Right.
Q. -- from where it was, how does that impact your

property?
A. Only if she's met proper setbacks and elevations and all that.
Q. Okay. But it doesn't specifically impact your property in particular. Correct?
A. The foundation, et cetera, that we've already talked about, from what I've been told, will affect our property.
Q. Oh, you're referring now --
A. From D- -- DEP has said that also.
Q. Okay.
A. Actually, Brooke Newman's even said that.
Q. Okay. So you're referring now to the erosion issue?
A. Exactly.
Q. Okay.
A. Uh-huh.
Q. But other than the erosion issue, is there any other impact from the turning of her house to your property?
A. Not that I could think of right now.
Q. Okay. You mentioned earlier about a trespass.
A. Uh-huh.
Q. And is it correct that you filed notice of

trespass against Ms. Newman last summer?
A. Yes. I did.
Q. And what was that in connection with?
A. Taking my barrels, my trash.
Q. Okay. Can you elaborate a bit? Because I'm -- I'm not familiar with your property. And so I don't really understand what you're talking about.
A. She was moving my barrels, removing them, moving them. We'd find them -- once, somebody brought my husband over to the woods by the yacht club and said, Is this your barrel? And we got told -- we were told by people staying at our house that the barrels were being moved, and she was moving them. And we were told by the trash removal people as well. And not only that, she's walking on our property; and it's private property.
Q. What is your basis for --
A. We've seen her.
Q. -- saying that she's walking on your property?
A. We've seen her.
Q. And where specifically on your property is she walking?

A. From her house, to get to the water.
Q. Can you show me on this Exhibit 5 -- and you can use this pen, please, to draw where Ms. Newman is allegedly walking over your property.
A. You can see it right here, the path. The -- our property goes in front of here; it goes out this way --
Q. Uh-huh.
A. -- and then down.
Q. Uh-huh.
A. And she's cutting through.
Q. So you're alleging that this path right here -- this line -- thin --
A. Uh-huh.
Q. -- thin line here --
A. Yes.
Q. -- down to the beach is where Ms. Newman is walking --
A. Yes.
Q. -- to --
A. Uh-huh. Well, it's not -- yes. Yes. The house is moved. Or is this the addition now?
Q. I don't know. It's your document.

A. What's the date on this?
Q. I don't believe there is one.
A. It's here.
Q. Oh.
A. '90. But it's cut off. I think that was before --
Q. Okay.
A. -- I think. So -- but, still, there -- she's walking to -- on the path. You could see the path. She's also planting trees on our property --
Q. Okay.
A. -- down here.
Q. Let me just -- let me just redirect you now.
A. Okay.
Q. Are you, when -- I'm still talking about the trespassing notice that you filed.
A. That's trespassing when you're planting on --
Q. I understand. I'm just trying to determine the notice of trespass that you filed against Ms. --
A. Right.
Q. -- Newman last year. So right now, that was based on her alleged moving of trash barrels --

A. Trash barrels.
Q. -- her --
A. She's walking on our property.
Q. Right. Let me just summarize for you. This'll make it easier. She's cross- -- you're alleging she's crossing over your property to reach the beach and has planted trees on your property?
A. Yes.
Q. Okay. Can you draw a line for me that, roughly, approximates where your property line goes to on Exhibit 5?
A. Oh, okay. It's something like this.
Q. Okay. Is that -- marking your pen might be better, actually.
A. I don't -- as I say, I --
Q. Here's -- let me --
A. You don't have the plot plan?
Q. I'm sure that I do at some point.
A. Okay.
Q. But I'm just interested in where you believe your property line is.
A. It goes in front of here. So -- and then it angles down. And then, I think she has like 25

or so -- so feet somewhere around here.
Q. Ms. Newman --
A. She has --
Q. -- has some --
A. Yeah.
Q. -- some property on the beach?
A. Yeah.
Q. Okay.
A. But we have 172-feet frontage; and she has just maybe 25, 30 feet. I don't -- it's small --
Q. Okay.
A. -- in comparison to ours. And there are trees all -- evergreens that are being planted and dying and on our property, and they're not mine.
Q. Okay. Is there any other basis for your trespassing complaint against Ms. Newman that was filed last summer?
A. Those are the three.
Q. Okay. You've asserted in your answers to the Town's interrogatories that Mrs. -- Ms. Newman is Jewish. What's the basis for your understanding or belief that Ms. Newman is Jewish?

A. We were told that.
Q. By who?
A. Townspeople.
Q. Can you be more specific?
A. Just, we know a lot of people in the town. People are talking.
Q. Uh-huh.
A. People that are staying at our house.
Q. How would people staying at your house know whether Ms. Newman is Jewish?
A. Talking with her. Actually, even our -- the kids were talking. Her son met my daughter at the beach. I know they were hanging out, as the kids say. Even my -- my previous lawyer had said something about it.
Q. Your previous lawyer --
A. Uh-huh.
Q. -- being?
A. Bill Henchy.
Q. Do you rent your house in the summers?
A. Yes. Somewhat.
Q. Did you rent it last summer?
A. Part of the summer.
Q. What about the summer of 2004?

A. Yes. Part of it.
Q. What about the summer of 2003?
A. Yes. Uh-huh.
Q. What about the summer of 2002?
A. Yes.
Q. What about the summer of 2001?
A. Yes.
Q. What about the summer of 2000, did you rent your house then?
A. 2000. I believe so.
Q. And what about the summer of 1999?
A. I-- that's going back too far. I may have, for, you know -- I mean, we use it somewhat. I'm disabled. I can't be alone. So I don't stay there that much now --
Q. When did --
A. -- alone.
Q. -- you purchase your house?
A. '96.
Q. Is it fair to say that you've rented the property during the summer for -- for part or all of the summer for most of the time since you've owned the property?
A. In the summer?

Q. Yeah.
A. Yeah.
Q. Yes.
A. Yes.
Q. Ms. Cordi-Allen, I can represent to you that you did not file an appeal to the Board of Appeals in 1998 when the building permit was issued to Ms. Newman to make the modifications to her property. Why didn't you appeal in 1998?
A. That was -- my attorney, Bill Thomas, was handling it then. I --
Q. Okay. I just --
A. I don't -- he's gone. I -- he's passed away. So you'd have a -- I don't know what or why he did or didn't do what he did do.
Q. Why did you file the appeal of the building permit issued to Ms. Newman and the Board -- strike that. Why did you file the Board of Appeals' decision upholding Ms. Newman's permit in 2004?
A. Because there were inconsistencies we found.
Q. Is it fair to say you filed the appeal of Ms. Newman's building permit, sought

enforcement of that building permit, requested that the building permit be rescinded, and then appealed the Board of Appeals' decision because Ms. Newman had appealed the variances that were granted to you by DEP?
A. I would say that it was because we were being told we had to have certain things done, and it was okay for her to do things a different way. And there was no consistency in the way we were being treated.
Q. And how far back has that inconsistent treatment been going on, are you claiming?
A. Well, it's obvious from Conser- -- when she went to Conservation Commission or Board of Health or whatever. Like I said, she has -- now she put in her third well; and she's complaining about, if we build, we're going to use more water. Our well's no- -- nowhere near her well, but she's had three wells that have failed within the past few years.
Q. Okay.
A. And . . .
Q. So it's fair to say that you're claiming that you've received inconsistent treatment since,

at least, 1998?
A. Yes.

MS. BARRY: Okay. Let me just look through my notes quickly, and I think I'm done. All right. At this point, I'm going to suspend Ms. Cordi-Allen's deposition pending receipt of the few things that I requested earlier concerning what was done to search e-mail and as well as a designation of the documents that were produced so that I can have an understanding of what documents are responsive to each particular document request.

And I would also request and reiterate the request in the request for production of documents that a privilege log be produced. I understand that certain documents have not been produced claiming a privilege. And I think it's quite clear that a privilege log is allowed -- under the Federal Rules of Civil Procedure that a request for a privilege log is allowed. And I would request that that be produced as well.

I don't know if anybody else has any questions.

MS. ECKER: Nothing. Let's go off the record.

(A brief discussion was held off the record.)

CROSS-EXAMINATION

BY MS. ECKER:

Q. Good afternoon, Ms. Cordi-Allen. My name is Deborah Ecker, and I represent the Town and the Town defendants in this case that you've brought. Just to go over a little bit some of your background, you had testified that you and your husband currently live in Springfield, Massachusetts?
A. No. Longmeadow.
Q. Longmeadow. Being from the east, it's all the same. And you've lived there for six years. Correct?
A. At this house. Yes.
Q. At this house.
A. Yeah.
Q. Have you had any work performed on the house that you currently reside in?
A. Fixed up the bathroom.
Q. Was there a need to get any permits from the

Town of Longmeadow in order to do any --
A. Yeah.
Q. -- work --
A. Uh-huh.
Q. Let me just finish.
A. Oh.
Q. I -- I -- I know it's really difficult, but I have to finish --
A. Okay.
Q. -- my question. Was there a need for you to get any permits from the Town of Longmeadow in order to perform renovation work on your current residence?
A. Yes.
Q. Okay. What permits were required?
A. An electrical and plumbing permit.
Q. Did you have any difficulty getting those --
A. No.
Q. -- permits? Prior to your living at your current residence, where were you residing?
A. In Longmeadow.
Q. Okay. And what was your address?
A. 146 Pleasantview Avenue.
Q. How long did you live at that property?

A. Gosh. '86 to 2000. Fourteen years.
Q. And during the period of time that you lived at that prior residence, did you have to obtain any type of permits from the Town of Longmeadow to perform any type of work to your property?
A. I believe so. Yeah.
Q. What permits did you have to obtain?
A. In order to put a skylight in the family room.
Q. Anything else?
A. I think that was it.
Q. Other than those two properties in Longmeadow and the property that we're here to discuss today, have you or your husband owned any other properties?
A. We've owned like an -- in Truro, Town Hall Road.
Q. And what -- what address do you -- what other property --
A. It's Lot --
Q. Do you have any -- let me just fini- -- what other property did you own in Truro?
A. Okay. Town -- on Town Hall Road, it was Lot 2. Now it's called 10. Now they put a number on it.

Q. Do you still own that property?
A. Yes.
Q. When did you purchase that property?
A. In 1985.
Q. Is there a structure on that property?
A. Yes.
Q. Have you done any renovation work to the property that is now -- I'm sorry -- 10 Town Hall Road?
A. Yes. A deck.
Q. Did you have to obtain any type of permit from the Town of Truro in order to perform the renovation work at the 10 Town Hall Road property?
A. I believe that he pulled a permit for the deck.
Q. And when you say "he," who do you mean?
A. The guy doing it.
Q. The guy, what --
A. The contractor.
Q. Okay. And that would be the contractor working in your behalf?
A. Yeah. Uh-huh. I believe -- I -- I think he's the one that did it. Or maybe my husb- -- I don't really -- it was so long ago, I don't

really remember. But I -- I'm pretty sure that they pulled one. But I can't say who pulled it.
Q. And the Town of Truro issued a permit to you for the renovation work or the deck work --
A. Right.
Q. -- at -- I have to finish my question -- at 10 Hall (sic) Road in Truro?
A. Yes.
Q. Do you know who the building inspector was at the time that that permit was issued?
A. I think it was C. Williams.
Q. Did you have any difficulty obtaining a permit from Mr. Williams or anyone in the Town of Truro in order to perform the deck work at the 10 Hall Street -- Town Hall Street -- Road property?
A. No, not that I recall. I don't -- I don't think so.
Q. Any other properties that you and your husband have owned other than the two in Longmeadow and the two properties in Truro?
A. When we first got married, we owned a house on Sheffield Avenue in Longmeadow.

Q. How long did you own that property?
A. I think we bought it in -- I forget what year -- '79.
Q. Did you perform any renovation on that first property that required your obtaining any permits from --
A. Permit.
Q. -- the Town of Longmeadow?
A. I don't think so. I -- that was so long ago, I don't really remember.
Q. For the -- your property located at 10 Town Hall Road in --
A. Right.
Q. -- Truro, have you filed applications for any permits with the Town of Truro that have not been granted for that specific property?
A. We were going to maybe put a garage on the property, and we haven't gone anywhere with that yet. We started a process, but we haven't finished it.
Q. When you say you started the process, did you -- anything in the process that you started involving the Town?
A. Yes.

Q. Okay. And what was that? What was the town involvement?
A. I think we -- we had the plans drawn up to put on the property. And they said for us to locate it where it was going to be. And then they got more and more -- first, they told us one thing. And then it was, you know, no; now you better -- they didn't want the drawing the way it was; they wanted it a different way. And we prioritized, and we're focusing in now on this. And I don't know that we're going to keep the other property.
Q. Can you --
A. I'm not sure what we're doing. So we -- we haven't finished building the garage or -- that's like on hold.
Q. When you say they told you they wanted the drawing another way, who is "they"?
A. Building inspector.
Q. And who was the building inspector who told you that?
A. I don't know his name. They -- he's there now. Tom some- -- I think. I don't know his last name.

Q. Okay. And is that recently that he told you he needed to have the --
A. Maybe --
Q. -- drawings -- I have to finish.
A. Oh.
Q. Sorry. I know it's tough, but it's hard -- it's hard for the stenographer. Is that recently that the build- -- current building inspector told you that you needed to revise the drawings for the garage?
A. Maybe two years ago.
Q. And since he told you to make revisions, you haven't submitted anything else to --
A. No.
Q. -- the Town? And that project's on hold?
A. Right.
Q. You testified earlier that you have a lawsuit that is currently pending in Federal Court other than the one that we're here to discuss today. Correct?
A. Yes.
Q. What -- and you're the plaintiff in that lawsuit?
A. Yes.

Q. Who is the defendant?
A. R. Bartley Halloran.
Q. I'm sorry?
A. R. Bartley Halloran.
Q. Okay. And who is R. Bartley Halloran?
A. He was the lawyer that I had for my leg.
Q. It's a legal malpractice suit that you filed against him?
A. Breach of contract.
Q. And what are you alleging in that lawsuit, very briefly?
A. It was discovered that he did not disclose that he was working for my employer and United Technologies at the same time that he was representing me.
Q. What is the name of your employer?
A. It was the City of Hartford.
Q. What is the -- I'm sorry -- R.N. Technologies?
A. United Technologies.
Q. United Technologies. So he didn't disclose that he was working for United Technologies?
A. Right.
Q. But your employer was the City of Springfield?
A. Hartford.

Q. Hartford. And that case is currently pending?
A. Yes.
Q. And is Mr. Revere --
A. Yes.
Q. -- the attorney -- I just have to finish --
A. I'm sorry.
Q. -- the attorney in --
A. Yes.
Q. -- that case? And is it filed in the Boston District -- the Western District?
A. Yes.
MR. REVERE: It -- it was removed. It was filed in the State Court. It was removed.
MS. ECKER: That's fine. I just -- I --
MR. REVERE: Okay. I just thought we'd -- since you said, where was it filed, I'm like, you know what? It wasn't filed there. It was removed.
MS. ECKER: Okay.
Q. Other than the lawsuit that's currently pending and -- and the lawsuit we're here to discuss today, have you been a party to any other lawsuits, either plaintiff or defendant?
A. Oh, for my injury.

Q. And --
A. Again, it was United Technologies and the City of Hartford. Well, actually, he didn't even bring anything against the City of Hartford. It was United Technologies.
Q. Okay. So you were a plaintiff in a lawsuit, and the defendants were United Technologies?
A. Right. Delta Elevator, specifically.
Q. And when was that lawsuit filed?
A. When I got hurt, in '97.
Q. And has that lawsuit since been resolved?
A. Yes.
Q. Was it settled, or did it go to trial?
A. No. It -- we were told we had to settle it.
Q. Who told you you had to settle it?
A. Mr. Halloran.
Q. Okay. I don't want to know what your attorney --
MR. REVERE: Yeah.
Q. -- said to you.
A. Yeah.
MR. REVERE: Those are matters of record in that case. So I don't think that's a problem.
MS. ECKER: Okay.

MR. REVERE: Okay. I don't want to interrupt. But you -- you've asked questions about lawsuits. The Town of Truro -- and it's mentioned in the Complaint -- and Brooke Newman have other related lawsuits.
MS. ECKER: That's fine.
MR. REVERE: Okay.
MS. ECKER: I meant other than the ones that --
MR. REVERE: Right. Okay.
MS. ECKER: -- refer --
MR. REVERE: Just make sure that's clear. And I don't want Barbara to suddenly come back and then --
MS. ECKER: Yeah. No. Thank you very much. I appreciate that.
Q. Where was your lawsuit filed against United Technologies? Was it in Massachus- --
MR. REVERE: Hartford.
Q. It was in Connecticut?
A. Uh-huh. Yes.
Q. Was it at the State Court in Connecticut?
A. I have no idea.
Q. And what were your allegations against United

Technologies in that lawsuit?
A. The elevator was malfunctioning and wasn't operating properly. If . . .
Q. Okay. Why don't you tell me what happened at -- at the time of the accident that was the subject of that lawsuit filed in Hartford, Connecticut.
A. I was crushed in the elevator shaft.
Q. And you were working at the time?
A. Yes.
Q. Was it in a building owned by your employer?
A. Yes.
Q. Did you receive workers' compensation?
A. Yes.
Q. Did you have to go to a hearing in order to receive the workers' compensation?
A. Yes.
Q. Who was the workers' compensation insurance carrier?
A. It was self-insured: City of Hartford.
Q. Do you recall how many hearings you had to go to in order to receive workers' comp?
A. No.
Q. Okay. At some point in time, did you --

A. I think -- wait -- excuse me. I want --
MR. REVERE: You're straightening that out. Because the City of Hartford was insured by --
THE WITNESS: No. They were not. They're self-insured.
MR. REVERE: I thought they were insured by Travelers.
THE WITNESS: No.
MR. REVERE: Okay.
THE WITNESS: No.
MR. REVERE: Sorry. I was about to -- I didn't want --
MS. ECKER: That's fine.
MR. REVERE: -- you to go on and have that come out later.
Q. At some point in time, did you receive a lump-sum payment from --
A. No.
Q. Never. Okay. You stopped receiving workers' compensation benefits --
A. Yes.
Q. -- at some point in time?
A. Yes.
Q. Okay. And when had you stopped receiving

workers' compensation benefits as a result --
A. I received them for one year --
Q. So --
A. -- about.
Q. So from '97 to '98?
A. Some- -- yes. About.
Q. And that was from the City of Hartford?
A. Yes. It was part of my contract.
Q. That you were to receive workers' compensation benefits if you were injured?
A. Yes.
Q. And why did the payments cease in 1998? Were you no longer disabled as a result of the accident?
A. There was a third-party lawsuit against United Technologies.
Q. So you filed a third-party lawsuit against United Technologies?
A. Yes.
Q. And it's your understanding that that affected the City of Hartford's paying you workers' compensation benefits?
A. I don't know if I can say too much because of -- of our suit.

MR. REVERE: Can -- can we go off the record for a second?
(A brief discussion was held off the record.)
Q. My -- my question's simple. At some point in time, you stopped receiving workers's compensation --
A. Yes.
Q. -- benefits. Correct?
MR. REVERE: Okay.
Q. And that was approximately one year after the accident. Correct?
A. Yes.
Q. And at the time you stopped receiving workers' compensation benefits, was there a decision by the Workers' Compensation Board that you were no longer disabled as a result --
A. No.
Q. -- of the accident?
A. Actually, it -- here's this -- the problem. And it became quite obvious what was going on, and Paul put together the pieces. It took seven or eight years to get a hearing.
Q. And so is it your testimony that, during that

seven or eight years, you were not paid workers' --
A. Right.
Q. -- compensation --
A. Exactly.
Q. -- benefits; and you should have been?
A. I wasn't granted a hearing even for se- -- for that length of time.
Q. Okay. And why do you --
A. Yeah. It was seven or eight years.
Q. Okay. And you believe that -- why do you believe that the State of Connecticut who -- didn't grant you a hearing for seven or eight years on your workers' compensation issues?
A. Mr. Halloran was the one handling that. And he didn't -- he was supposed to be getting dates and things like that. And it was obvious that it was just being dragged out for whatever reasons. But he --
Q. When he --
A. -- was the one that made the de- -- that -- that was supposed to get me in. And I kept asking him, When is the hearing? When is the hearing? When is the hearing? And it took

seven years to have a hearing.
Q. At the time that you stopped receiving workers' compensation benefits --
A. Right.
Q. -- as a result of your accident in 1997, did you receive a letter from the State of Connecticut Workers' Compensation Board or anyone telling you that your benefits had ceased?
A. I believe you get rated for your injury, and then they pay you so many weeks. That's how Connecticut is. And at the end of those amount of weeks, then your benefits stop until you -- unless you contest it or whatever you do, go to a -- a hearing.
Q. Did anyone from either -- and you -- you believe that the City of Hartford's self-insured. Correct?
A. I know it is.
Q. Do they have a company that administers their workers' compensation --
A. Travelers --
Q. -- benefits?
A. -- does.

Q. So Travelers is a third-party administrator, correct, for the Town of Hartford?
A. If that's what you call it. I don't . . .
Q. At some point in time, did you receive a letter from Travelers telling you that your workers' compensation benefits had ceased?
A. I don't remember. I may have.
Q. At some point in time, did Travelers request that you be re-evaluated in order to receive additional workers' compensation benefits?
A. I think, when I went for a formal hearing finally, I think I did then.
Q. Okay. So is it your testimony that, prior to the seven or eight years after the accident when you got a hearing --
A. Right.
Q. -- in Connecticut for workers' compensation, Travelers had not asked you to go to any physician for evaluation to determine whether you were still disabled as a result of the accident?
A. I remember going for the formal hearing for them.
Q. And that was seven or eight years later?

A. Yeah. 'Cause I hadn't had a hearing with them for them to say anything.
MR. REVERE: Look, Barb, you have to focus on the question. She asked you, did Travelers -- or in the workers's compensation process, were you required to go to physicians?
A. I did, for the formal hearing, when it -- once it started. But that was like seven or so years ago.
Q. And never before that time?
A. No, not that I recall.
Q. When your workers' compensation benefits ceased after the year, did you provide Travelers or anybody with notes from your physician that you continued to be disabled?
A. I didn't. I don't know what my lawyer did.
Q. At the time of the accident in 1997 --
A. Yeah.
Q. -- what was your injury?
A. My left foot was totally crushed. The top of my foot now is at the bottom. It's dropped. And my whole left side is in severe, severe pain. I have RSD. My back was injured and my cervical disk.

Q. And that's all -- all those things you just told me are a result of the 1997 --
A. Yes.
Q. -- accident? And did you have any surgery as a result of the 1997 --
A. Yes.
Q. I just have to finish my question; I know it's hard -- as a result of the 1997 accident?
A. Yes.
Q. What surgery did you have performed?
A. Total reconstruction of my foot.
Q. Any other surgery?
A. I had 11 pins and wires removed at various times.
Q. And -- okay. When --
A. Total of three.
Q. When's the last time you've had surgery as a result of the 1997 accident?
A. In 1997.
Q. And when you got your hearing finally in '97 -- seven or eight years after --
A. Right.
Q. -- your workers' compensation benefits ceased, what was the decision of the Board regarding

your benefits?
A. That I wasn't totally, permanently disabled.
Q. Did the Connecticut Workers' Compensation Board -- and I don't know the formal name of it --
MR. REVERE: I think you're right.
A. That's what --
Q. -- Connecticut Worker's Compensation Board, did they find that you had any type of disability seven or eight years later when they issued their decision?
A. Yes.
Q. Okay. And what did they find?
A. Can you repeat that?
Q. When the Connecticut Workers' Comp- -- after the hearing held by the Connecticut Workers' Compensation --
A. Right.
Q. -- Board to determine whether you were still disabled and should be receiving workers' compensation benefits, a decision was issued. Correct?
A. Yes.
Q. And, in that decision, do you recall the

percentage of -- that they found that you were disabled, if at all?
A. Oh, no. That wasn't then. Initially, they said I was, I think, 50 percent.
Q. Okay. And when the new decision came out -- initially, when you first were injured. Correct?
A. Right.
Q. Okay. When you were first injured in '97, they found that you were 50-percent disabled?
A. Right.
Q. Okay. At some point in time, there was a hearing --
A. Right.
Q. -- seven or eight years later.
A. Uh-huh.
Q. Correct?
A. Uh-huh. Yes.
Q. What was the finding of the Board?
A. That I wasn't totally and permanently disabled.
Q. Did they give you any percentage?
A. No.
Q. Did they determine that you could work at all?
A. Maybe.

Q. You just don't recall?
MR. REVERE: We --
A. I --
MR. REVERE: We can get you a copy of --
MS. ECKER: Okay.
MR. REVERE: -- the decision.
MS. ECKER: That would be --
MR. REVERE: Yeah. I was letting you ask 'cause that might be a reason. But if it's beyond that, we can give you a copy of it. And the decision found that she had working --
THE WITNESS: Like --
MR. REVERE: It -- let's go off --
MS. ECKER: Well, just get me --
MR. REVERE: -- the record.
MS. ECKER: -- a cop- -- forget it. Just --
MR. REVERE: Let's go off --
MS. ECKER: -- get -- no, no, no. Just get me --
MR. REVERE: We'll get you --
MS. ECKER: -- a copy.
MR. REVERE: -- a copy.
MS. ECKER: I want to move on. Let me --

just get me a copy.
MR. REVERE: I'll -- I'll explain workers' comp a little and how it went when we're --
MS. ECKER: That's fine.
MR. REVERE: -- we take a break.
MS. ECKER: That's fine.
Q. What was your job for the City of Hartford?
A. I taught.
Q. Okay. Oh, you were a schoolteacher?
A. Yeah.
Q. What grade did you teach?
A. It -- it varied. It was nine through twelve though.
Q. After the accident, did you ever try to return to work?
A. Did I try?
Q. Yes.
A. I was not able to work.
Q. Did anyone tell you that you were not able to work?
A. Yes.
Q. Who told you that?
A. All of my doctors.
Q. Has anyone told you since 2000 that you're not

able to teach as a result of the accident in '97?
A. All of my doctors.
Q. Who are your doctors who have told you that?
A. Dr. Pierangelo, Dr. Kruger, Dr. Berson. I went to the No. 1 doctor in the country for RSD after the hearing.
Q. After the workers' compensation hearing?
A. Yes. And he said I definitely -- what happened, in a nutshell, they sent me to a doctor to see if I had RSD in my leg. He looked at the X-rays on my back. My back is not my leg.
Q. And when you say "he looked," who is that? What doctor was that?
A. I don't know his name. He's on Bloom- -- on Cottage Grove Avenue. That's all I remember. Cottage Grove Avenue in Bloomfield. I don't remember his name. I just went there. And then my lawyer said, Barb --
Q. I don't want to know what your lawyer said.
A. No. He just said for me to go to another doctor. So I went to the No. 1 doctor in the country recommended by the RSD Association.

And he said, You definitely have RSD.
Q. And who --
A. And --
Q. -- was that doctor?
A. Kirk- -- Kirkpatrick.
Q. Where is he located?
A. Florida, Tampa. And he said that I'm disabled. So . . .
Q. And are you receiving long-term disability benefits?
A. Now? Yes.
Q. Okay. And who is the long-term --
A. Oh, the State. Okay. I'm sorry. The State doctors totally disabled me.
Q. Okay. And who is the -- that's the City of Hart- --
A. The -- the Retir- -- the State of Connecticut --
Q. Is that --
A. -- Teachers Retirement, they disabled me --
Q. Was that the --
A. -- from teaching.
Q. Is that the Retirement Board?
A. Yes.

Q. For the State of Hartford?
A. No. State of Connecticut.
Q. State of Connecticut. City of Hartford?
A. No. State of Connecticut.
Q. Okay. And where are they located?
A. I don't know. Hartford somewhere --
Q. Have you --
A. -- I think.
Q. -- applied for Social Security disability --
A. No.
Q. -- benefits?
A. Don't qualify.
Q. Because you have a state pension. Correct?
A. Yes. Uh-huh.
Q. And what is the disability?
A. The worst part right now is the RSD, reflexive sympathetic dystrophy.
Q. And what does that keep you from doing?
A. Keep me from doing?
Q. Yes.
A. Living.
Q. Well, what --
A. Pain.
Q. What specifically can you not do because of

your RSD?
A. I -- well, what I do do is, I, primarily, lay down most of the day. I'm off my foot. Doing anything is extremely painful.
Q. Do you have any plans for treatment of the RSD in the future?
A. Oh, I've been going.
Q. Okay. And what do they do for you for treatment?
A. Medication.
Q. And that's the medication you're currently on today?
A. Yes.
Q. What medication is that?
A. A DURAGESIC patch and Hydrocodone.
Q. Hydrocortisone?
A. No. Hydrocodone.
Q. Okay. Any other medications you're taking today?
A. No.
Q. How often --
A. Wait a minute now. Well, no, I -- not today, no.
Q. Okay. Are there any other medications that you

take on a regular basis?
A. Sometimes, I take, if I get a migraine, Imitrex. And then I take Fosamax. And that's it, I believe. I think that's it. But they had to increase almost a hundred percent my -- the patch. The doctor just did because --
Q. And that's Dr. --
A. -- the pain is so severe. I also see a doctor at Brigham and Women's --
Q. Who's --
A. -- for --
Q. Who's that?
A. Michna.
Q. I see you came here today with a cane. How long have you been using a cane?
A. Well, was it -- well, when I got off of crutches. 'Cause I stumble a lot. That's my -- if I'm walking, all of a sudden, I go -- I lose like my balance.
Q. Following the accident, you were on crutches. Correct?
A. Yes.
Q. How long were you --
A. In a wheelchair.

Q. How long were you on cru- --
A. A year.
Q. I have to finish my question.
A. Oh, I thought you did.
Q. How long were you on crutches following the '97 accident?
A. About a year.
Q. And then you went to a wheel- --
A. And off and on. Excuse me. I've gone back and forth on them though.
Q. And how long were -- have you been in a wheel- -- were you in a wheelchair following the accident?
A. I still go in -- I still use a wheelchair like for distance. I can't walk very far 'cause I just don't have the stamina. I'll just freeze. I stop walking. And the pain gets -- it's just unbelievable pain, like . . .
Q. What's the furthest amount you can walk?
A. Oh, I don't -- I've never measured it. But I don't like walk walk. You know, people walk around the block and things like that. I don't do that. The more I'm on my leg, the worse the pain. Like walking from the parking lot here,

I am scared of what tonight's going to be.
Q. How often do you use the cane during the week?
A. When I'm out of the house if I'm out of the house.
Q. So you --
A. I don't use it in the house 'cause I've got, you know, counters that I can grab onto.
Q. So you never walk unassisted?
A. Sometimes, I do. But, usually, if I'm out, if I -- you know, if I'm not like with my husband to hold onto for balance. It's, primarily, like balance that -- you know, a security thing so I don't fall and stumble and . . .
Q. Your house in Longmeadow, is it a ranch house?
A. No.
Q. Okay. You have stairs in the house?
A. Yes.
Q. And you're able to walk the stairs?
A. Well, not good. We're going to be moving. We're going to have to build a ranch or else put an elevator in.
Q. Okay. Any other lawsuits? Did you ever fi- -- sue Travelers at all for workers' compensation benefits or anything else?

A. You can't. No. You can't sue your employer. That's what I was told.
Q. I'm talking about Travelers. Have you ever sued them, Travelers Insurance Company?
A. You couldn't sue them. I had to -- I could not sue the City of Hartford.
MR. REVERE: Barb -- yeah.
A. I --
MR. REVERE: Just --
Q. I understand. I underst- --
MR. REVERE: -- stick to the -- it's a yes or no question.
Q. Travelers Ins- --
MR. REVERE: It's yes or no.
Q. Travelers Insurance Company, did you ever sue Travelers Insurance Company? I'm not talking about the City of Hartford.
MR. REVERE: No.
A. I don't think so. Right.
Q. Did you ever threaten to sue them that you're aware of?
A. Sue Travelers?
Q. Yes.
A. They weren't -- you couldn't sue your

employer --
Q. Okay. So you don't --
A. -- or --
Q. You don't recall threatening to sue Travelers Insurance Company. Correct?
A. Not that I know of.
Q. Any other lawsuits --
A. I don't know that my lawyer was -- I doubt that he would be; because he was, basically, working for them.
Q. Any other lawsuits that you've been a party to other than what you've told me about today or anything dealing with your property down in Truro?
A. I can't think of any.
Q. Have you ever sued any of your neighbors?
A. My neighbors?
Q. Yes.
A. No.
Q. Okay. Have you ever gotten involved in any or objected to any building permits -- other than Ms. Newman -- building permits or applications that any of your neighbors have --
A. Oh, no.

Q. -- applied for?
A. No.
Q. You have filed a lawsuit --
MS. ECKER: What?
MR. REVERE: I -- well, I just was -- let's go off the record for a second.
(A brief discussion was held off the record.)
Q. You have filed a lawsuit against the Town and the Zoning Board of Appeal you're -- that we're here to discuss today. Correct?
A. Yes.
Q. And, in that lawsuit, you claim that you have --
A. I understand. That's okay. I just --
Q. That's fine. In that lawsuit, you claim that you have been discriminated against by the Town of Truro and the Zoning Board of Appeals because you are Lebanese. Correct?
A. Yes.
Q. You claim that you have been discriminated against by the Town of Truro and the Zoning Board of Appeals because of your national origin due to the fact that many of the members

of the town boards are Jewish. Correct?
A. Yes.
Q. What members of the town boards are you claiming are Jewish that have discriminated against you?
A. Conservation Commission, No. 1.
Q. Which members of the Conservation Commission are Jewish that have discriminated against you?
A. I've been told that most of all of the boards are compiled of Jewish members.
Q. I'm asking you specifically -- and we'll go board by board --
A. Uh-huh.
Q. -- which members of the Conservation Commission --
A. I'd have to see -- okay. Go ahead.
Q. -- for the town of Truro -- well, let me -- let me break it up. Which members of the Conservation Commission of the Town of Truro are you claiming actually discriminated against you because you are Lebanese?
A. I would say, in whole, the whole entire board and . . .
Q. And what's the basis of your saying --

A. What's the basis?
Q. -- that all -- let me finish -- that all the individual members of the Conservation Commission in the town of Truro discriminated against you because you are Lebanese?
A. For what basis?
Q. What's your basis for saying that?
A. As soon as I apply for something, I get denied. Yet if Brooke Newman or the yacht club and others want something, bingo, different standards. You know, Barbara wants something; stop her dead in her tracks.
Q. And you believe --
A. And I've had --
Q. It's your allegation that that is because you are Lebanese?
A. Everybody likes me. That's the only reason. I -- I have absolutely no problem with people.
Q. Which specific member of the Conservation Commission in the town of Truro are you claiming is Jewish and discriminated against you because you are Lebanese?
A. Which one specifically?
Q. Yes.

A. Let me speak to my lawyer.
Q. No. I ne- -- I need you --
MR. REVERE: No.
Q. -- to answer the question.
MR. REVERE: I --
Q. I need you to --
MR. REVERE: Until you an- --
Q. -- answer the pending question.
MR. REVERE: -- answer the question. Yeah.
A. No. 1, I would say, Mr. Bednarek.
Q. And is it your contention that Mr. Bednarek is Jewish?
A. I've been told he was.
Q. Who told you that?
A. People in town. Just, you know --
Q. And --
A. -- people you run into.
Q. And what is your basis for claiming that he has discriminated against you because you're Lebanese?
A. Different strokes for different folks. And, like I said before, standards are applied differently. And there is absolutely no reason whatsoever that differs one person's property

from another that I'm being treated the same as, specifically, Brooke Newman. And she goes for a permit. Fine. She goes -- doesn't do things properly. Fine. She does what she wants. Fine.
The yacht club, heaven forbid that they get a permit. They have -- now they've got a well. Now they have a septic system. Yeah. We have documentation they have a cess- -- that they had a cesspool.
Q. Let me -- let me -- let me -- I -- I'm focused on a very specific question. You allege that Mr. Bednarek --
A. Yeah.
Q. -- has discriminated against you because you were Lebanese.
A. Yes.
Q. Him personally. What is the basis for your claiming that Mr. Bednarek has discriminated against you?
A. I would say that the proof of the discrimination, whether -- okay. If all of a sudden -- okay. I had a permit for my floats by the Conservation Commission. Everything was

fine. Same floats that are on my property that I bought the house with are still there. They gave me the floats. Then I get charged $2,100 for my floats if I were to use them. The yacht club next door, $300. Conservation Commission, Harbor Commission.
I can't -- the Town of Truro decides that they're going to say -- and get together with Brooke Newman -- I'm going to interfere with navigation. At the end of my pier -- it's not a dock now, which I bought it as a dock. And at the end of the dock, Brook Newman's mooring's there.
Q. All right. I'm -- you --
A. And the --
Q. -- we're going --
A. -- Conservation Com- --
Q. -- we're going astray.
A. Wait a minute. Conservation Commission, you're supposed to supposedly -- they say, oh, you're going to dig up -- if you put in your floats or your dock, you're going to dig up shellfish; you're going to dig up whatever; you're going to kill fish.

But, on the other hand, when they drop moorings in the same spot for other people, they don't kill any vegetation, any shellfish. When they dredge, there is no harm to the shellfish or whatever. And that's Conservation Commission --
Q. Ms. --
A. -- just --
MR. REVERE: Yeah. All right.
Q. -- Ms. Cordi-Allen, let me -- let me --
MR. REVERE: She's asking you about --
A. Very --
MR. REVERE: -- your Lebanese descent. What --
THE WITNESS: That's what I'm saying.
MR. REVERE: -- support- -- no. But what --
THE WITNESS: They just --
MR. REVERE: Li- -- listen to her question.
Q. Let -- let me -- let me --
MR. REVERE: Okay?
Q. Let me ask it another way.
A. Uh-huh.
Q. Have you heard any town employee or any member

of a town board ever say anything about your Lebanese descent?
A. Have I heard them? No.
Q. Has anyone told you any comments that have been made about you by any member of a town board or any town employee because you are Lebanese?
A. I have heard a lot of racial comments in Truro.
Q. Against you?
A. Against minorities, period. And --
Q. Who has -- who has specifically made a comment that you have heard that is racial in nature in the town of Truro?
A. When I invited my students to my house, to use my house, I was told by people in -- down at the harbor, I wouldn't do that if I were you. I've had the water shut off in my house when my students were at my house.
Q. I'm ask- -- I'm asking you for a specific -- you testified that the Town of Truro --
A. Right.
Q. -- has made racial comments. Correct?
A. Yes.
Q. Who specifically in the town of Truro made a racial comment? It's a very focused --

A. Yeah.
Q. -- question.
A. And I'm telling you what's -- what's been happening. And I told -- when I was down in the harbor, I told the harbormaster. And I said, there are going to be some kids coming down. I'm letting them use my house. And he goes to me, he goes, I wouldn't do that with -- if I were you. The yacht club's not going to be too happy with that. And I'm like, okay.
Q. Let me ask you another way. What racial comment are you alleging anyone in the town of Truro has made -- racial comment?
A. That I should not allow my students, which are a hundred-percent African American, at my house.
Q. And --
A. And I have --
Q. Has anyone who -- well, let me ask you this.
A. Uh-huh.
Q. Have you heard anybody in the town of Truro say specifically that you should not have your students, because they are African American, use your house?

A. Yes.
Q. Who specifically said that?
A. The harbormaster told me that.
Q. Okay. And which harbormaster's that?
A. Ron Roderick.
Q. So is it your testimony that Mr. Roderick made a racial comment?
A. Yes.
Q. And that Mr. Roderick's comments discriminated against you?
A. It discriminated against any minority.
Q. Okay. Now, let me ask you another question. Have you heard any town employee or member of a town board make any racial comment, slur, innuendo against you specifically?
A. No.
Q. Have you heard any town employee, member of a town board say any specific comment about Lebanese individuals that was offensive or derogatory?
A. No.
Q. So when you say that the Town --
A. Uh-huh.
Q. -- and the member of the boards have

125

discriminated against you because you are Lebanese --
A. Uh-huh.
Q. -- since they haven't made any comments about your being Lebanese, what is the basis for your claiming that they have discriminated against you because of your national origin?
A. As I said, the inconsistencies in the treatment and flip-flopping all of a sudden.
Q. Is it your contention that any town -- whoop -- any member of a town board who disagrees with you is discriminating against you because you're Lebanese?
A. It's my contention that I'm not giving -- getting my permits -- and other people get theirs -- because of discrimination. Definitely.
Q. I'm asking you now specifically -- because you can't just say because of discrimination --
A. Right.
Q. -- specifically what you base your belief on that you're not getting your permits because you're Lebanese. And so I'm asking you specifically, who in the town is discriminating

126

against you? And what is the basis for your claim that that individual is discriminating against you because you're Lebanese?
A. I would say that the boards are, because they will not give me -- and they meet behind their closed doors; they get on their phones. Brooke Newman can do what she wants. Others do what they want. There was a problem -- for example, my house that I own now, okay, when the previous owners owned it, they were told by DEP one thing -- that it's not in a dune twice.
Q. Was the previous owner Jewish?
A. Yes. Yes.
Q. And did the Town deny the previous owner any permits, in your opinion, because they were Jewish?
A. Did they deny?
Q. Yes.
A. No. They got --
Q. Did the Town --
A. -- their permits.
Q. They got their permits?
A. Yes.
Q. And you believe that they got their permits

127

because they were Jewish; and you didn't because you're Lebanese. Correct?
A. Yes.
Q. So I'm asking you which specific individual -- or let me strike that. I'm asking what evidence you have that the reason that your permits were denied was because you were Lebanese.
A. Because of the inconsistencies in the way people are treated. Different peoples (sic) are treated differently in Truro.
Q. Is it your testimony --
A. And I'm talking about me versus others.
Q. Is it your testimony that because the boards disagreed with you, it must be because you're Lebanese and not because they had a good basis for disagreeing with you?
A. Yes.
Q. And which members of the Zoning Board of Appeals are you claiming are Jewish?
A. I would say that the -- I don't remember their names.
Q. Well, let me show you the --
A. Okay. Let me -- let me say this to you. It's

128

the inconsistencies of the Town of Truro tog- --
Q. You keep --
A. -- together, okay, in how people are treated. And there is absolutely, okay, no reason the yacht club --
Q. I don't want -- we -- no. Let me -- I'm asking you a very focused question, and I want you to focus on this question. You have filed a discrimination lawsuit --
A. Yes.
Q. -- against the Town of Truro and the members of the Town of Truro Zoning Board of -- of Appeals --
A. Uh-huh.
Q. -- alleging that they have discriminated against you and made their decisions regarding your permit applications because you are Lebanese --
A. Uh-huh.
Q. -- and because they're Jewish, some members. And so what I'm trying to focus you on -- because --
A. And that --

Q. -- this is the basis for your --
A. Uh-huh.
Q. -- lawsuit that you have --
A. Uh-huh.
Q. -- brought -- is what evidence you have that any specific member is Jewish and evidence that any specific member made their decision in denying your permit applications because you were Lebanese.
A. I would say, the entire committees. And not only do people -- and it's evident now that people not only are Jewish, but other people, they just don't plain like anybody from the Middle East; and you see that all over TV, all over the newspaper, whatever. I have lived in Truro for -- let's see -- 21 years we've had a house in Truro. Not until we went before any of these boards was there ever a problem with anybody in Truro ever.
It wasn't until Brooke Newman walked in and decided that was the way things are going to be. She's going to get what she wants. She's going to use whatever. She's going to use her contacts, whatever, and get people to turn on

us. And you know what? There is absolutely no person that we don't get along with.
However, the yacht club members, Brooke Newman have gotten away with holy murder because of their connections, their contacts, whatever, with peoples (sic) of the various boards. And we -- my husband and I, our kids, we don't bother anybody. You learn, first of all, you're supposed to get along with your neighbors.
Yet they've gotten people on their committees to flip-flop, go against us, try to make us lo- -- I've read the newspaper. People have been threatened in town that they better go against us. For example, the harbormaster --
Q. Wait, wait.
A. -- was told by the Harbor Commission that he had to go --
Q. All right.
A. -- against us.
Q. We're -- we're going to -- we're getting far astray --
MR. REVERE: Yeah.
Q. -- on the question. Let -- let me --

MR. REVERE: Barb -- Barb --
Q. Let me ask you -- let me ask you one question first.
A. Right.
Q. Okay. You allege that it's because of Ms. Newman when she came to town. Isn't it true that one of your permits was denied before Ms. Newman purchased her property?
A. We were approved for a dock and --
Q. Just focus --
A. Wait a minute.
Q. -- on the question.
A. I'm thinking.
MR. REVERE: She asked you a question, Barb.
THE WITNESS: I know. But I'm thinking, Paul.
MR. REVERE: If you -- if you don't know the answer at the moment, that -- that's --
THE WITNESS: Paul --
MR. REVERE: -- a fine --
THE WITNESS: -- I'm thinking --
MR. REVERE: Okay.
THE WITNESS: -- out loud.

MR. REVERE: But just listen to her question --
A. We put in --
MR. REVERE: -- and answer the question.
THE WITNESS: I am. I'm trying to.
A. We put in for a dock in 1996. We were permitted. In 1997 is when I got hurt. And that's when Warren was threatened; the harbormaster was threatened. So in 1997 is when we started getting basic threats that -- or people were threatened that they better go against us.
Q. And you believe --
A. I was told that by the person himself, and it was in the newspaper.
Q. Who was that person?
A. Warren Roderick.
Q. And is it your allegation that that's because Ms. Newman told him to go against you?
A. The yacht club.
Q. Okay. But did --
A. It was the yacht club.
Q. Did Ms. Newman have anything to do with that?
A. At that time, no, not that I know of. But she

has joined in on that.
Q. Do you know anyone that Ms. Newman has threatened that if they didn't go along with you -- with Ms. Newman, there would be some repercussions?
A. I don't talk to her at all. So I just --
Q. Do you have any information that Ms. Newman has threatened anyone concerning going along with you and your property?
A. I know from the newspapers, from what I've read, that the harbormaster was.
Q. By Ms. Newman?
A. No.
Q. I'm focusing on Ms. Newman.
A. No. That's all -- that's what I'm telling you, is what I know is what I read in the newspapers. And what I read in the newspapers was that the harbormaster was told that he had to go against us.
Q. Have you ever talked to that harbormaster about that allegation?
A. Yes. I did.
Q. And do you know why the harbormaster is no longer the harbormaster of the town of Truro?

A. I -- I think there was something -- I'm not positive. But I think there was something about hours that he worked.
Q. I -- I'm going to focus again on your discrimination claim because --
A. Uh-huh.
Q. -- you have brought it.
A. Uh-huh.
Q. So I need to know what evidence you have that any specific member of the Town of Truro Board of Appeals who you have sued -- and that would include Joseph Conlon, Arthur Hutlin, Norman Pope, Keith Althaus, and Marinna Matricardi -- any of those members of the Zoning Board of Appeal Jewish that you're aware of?
A. Do I know who i- -- who is? No.
Q. Are you alleging that any of them are Jewish?
A. I don't know who they are.
Q. Okay. Are you alleging that any of the members of the Zoning Board of Appeals denied your appeal of the building inspector's denial of your application to revoke Ms. Newman's building permit because you are Lebanese?
A. I would say that I was -- in -- I don't know

how familiar you are with Truro. But Truro is, basically, run by the yacht club --
Q. Okay.
A. -- in that -- okay.
Q. I understand that's your allegation.
MR. REVERE: Listen --
Q. Right now, I am fo- --
MR. REVERE: -- to her question.
Q. I am focusing on, you have alleged in your Complaint --
A. But it's two-fold. What I'm saying to you is --
Q. No. But --
A. -- it's not just Brooke Newman.
Q. You have not filed a lawsuit against the yacht club. Correct? This lawsuit is not against the yacht club. Correct?
A. They're a party --
Q. I'll show you a --
A. -- to it.
Q. No. They're not. I'll show you a caption, and I'll represent to you --
A. Wait a minute. Wait a minute. Let me put my glasses on. Okay.

Q. Okay. You have sued, in this case, it is *Barbara Cordi-Allen* --
A. Right.
Q. -- *and John Allen versus John R. Conlon* --
A. Uh-huh.
Q. -- *Arthur F. Hutlin* --
A. Right.
Q. -- *or Hutlin, Norman* --
A. Those are the Zoning Board.
Q. Zoning -- *Norman H. Pope* --
A. Uh-huh.
Q. -- *Keith Salthaus* --
A. Uh-huh.
Q. -- *Marinna Matricardi* --
A. Uh-huh.
Q. -- *as they are Members of the Town of Truro Zoning Board of Appeals and the Town of Truro.*
A. Uh-huh.
Q. And you have alleged that the Town and these individuals have discriminated against you --
A. Uh-huh.
Q. -- because you were Lebanese.
A. Uh-huh.
Q. And I am asking you, do you have any evidence

that any of the members of the Zoning Board of Appeals took the fact that you were Lebanese into account when they made the decision to deny your appeal of the building inspector's denial of your application to revoke Ms. Newman's --
A. Do I have any proof?
Q. -- building permit? Any evidence.
A. Any --
Q. Any evidence.
A. Only the evidence that people who are Jewish get permits like that. And I have not gotten mine.
Q. Which specific individual, other than Ms. Newman, who is Jewish --
A. Right.
Q. -- got an application just like that?
A. Well, the yacht club, for -- and whi- -- which is --
Q. What member --
A. -- composed -- the yacht club and their board or whatever you call it. I don't even know the men's name. But they've been here, represented the yacht club.

Q. Are they Jewish?
A. Yes. Yes.
Q. Who specifically at the yacht club's Jewish?
A. The majority of members are.
Q. Give me a specific individual at the yacht club who --
A. Well, they were --
Q. -- you believe is --
A. -- at the --
Q. -- Jewish.
A. -- meetings. They were the lawyers for them. And I don't know their names.
Q. So is it your allegation that the lawyers for the yacht club are Jewish or that the members of --
A. Both.
Q. -- the yacht club are --
A. Both.
Q. What specific member of the yacht club's Jewish?
A. I can't tell you his name. But I told you he was the lawyer representing them at DEP. But he's the member. He's an old man. And the thing is, with the yacht club, they do what the

members want.
And their only attack on me -- when I bought that property, I was told, They're having a belly dancing party next door. They're going to have dah-dah; and it's $40 a person if you want to go. And I'm like, What do I want to go there for, you know, and spend $200.
Q. We're getting --
A. Wait.
Q. -- far afield.
A. No.
Q. I'm asking you --
A. But this is how they --
Q. No.
A. -- found out who --
Q. Ms. Cordi- --
A. -- I was.
Q. Ms. Cordi-Allen, I need to know -- and this is a very specific question --
A. Uh-huh.
Q. -- do you have absolutely any evidence, any evidence that any member that you have sued of the Zoning Board of Appeals or the Town of

Truro took into account that you were Lebanese when they made their decision to --
A. Yeah.
Q. -- deny your appeal of the building inspector's denial of your application to revoke Ms. Newman's building permit?
A. In that, as I was saying, the yacht club, basically, controls the town of Truro. And it's their members that want to attack, and they have the power and the purse strings to attack whomever they want. Yet the Town takes no enforcement whatsoever on them when they blatantly lie to the Town, when they don't get their permits for a septic, when they put propane gas tanks out there.
And they, in concert with Ms. Newman, get away with total murder. Yet here I am. And the only difference is that I'm a minority. That's the only difference. They get everything. We're in the same environment, and I get shit on.
Q. Do you know if any member or any resident of the town of Truro who owns property who is Lebanese has been granted a building permit or

any type of permit from the town?
A. No. I don't.
Q. Do you know if there are other Lebanese individuals who live in the town of Truro?
A. No. I don't.
Q. Do you know if there are any Lebanese individuals who work for the Town of Truro?
A. No. I don't.
Q. Do you know if there are Lebanese individuals who have made decisions concerning your property?
A. No. I don't.
Q. Do you know if there are any Lebanese individuals who advise -- have advised the Town as to what to do with your property?
A. No. I don't.
Q. And you can't tell me a specific individual in the yacht club who is Jewish other than the lawyer who --
A. It --
Q. -- represented them?
A. It's in the DEP listing of names. So that's where you could find it.
Q. Have you heard any anti-Lebanese comments at

all within the town of Truro?
A. You hear people talking if you go uptown into different places, you know, about Arabs and this and that. And, frankly, I myself am a private person. And so is my husband and my family. And as far as going out of my way --
Q. Have you heard any comments specifically about people being Lebanese in your town?
A. People being Lebanese?
Q. Yes.
A. No.
Q. Have you heard any anti- -- specific anti-Lebanese comments made in the town of Truro?
A. Specific. I just -- you hear comments about Arabs and Middle Eastern people. I mean, but --
Q. Who specifically makes those --
A. Just --
Q. -- comments?
A. -- people. People.
Q. Can you tell me any specific individual who is on a board of the Town of Truro or is employed by the Town of Truro who has made an anti-Arab

comment?
A. I don't talk to them.
Q. So you haven't heard any employee of the Town of Truro or any member of a board of the Town of Truro make any negative Arab comments. Correct?
A. I don't talk with them. I'm --
Q. It's a specific --
A. We're very private. No. What I'm saying to you, Miss, is that we are very private; we mind our business. Okay. But it's the actions.
Q. I'm asking you a specific question. Have you heard --
A. Uh-huh.
Q. -- any member of a board in the town of Truro or an employee of the Town of Truro make any anti-Arab or anti-Lebanese comments?
A. No, not that I . . .
Q. And is your husband Lebanese?
A. No.
Q. And were you born in Lebanon?
A. No.
Q. Are you a hundred-percent Lebanese?
A. No.

Q. What percentage are you?
A. Fifty.
Q. Okay. And what's your other nationality?
A. Italian.
Q. And are you a Christian Lebanese or a Muslim Lebanese?
A. I'm Christian, but I'm open- -- open-minded.
Q. Is your background -- is your family's background as a Christian Lebanese or a Muslim Leb- -- Lebanese when they came over from Lebanon?
A. Most of my family is Catholic.
Q. Okay. So they were Christian?
A. Catholic.
Q. You understand that there was a -- there's a split in Lebanon between the Muslims and the Christians?
A. Uh-huh.
Q. Okay. And your family is part of the Christian sect?
A. The Catholic sect. Yeah.
Q. The Catholics. Okay.
MS. ECKER: Okay. Why don't we --
A. Actually, we're from the House of David. My --

my -- my family is. So . . .

MS. ECKER: Okay. Why don't we take a break. It's 1:30. I don't know what you're -- how you're doing.

MR. REVERE: I think we should make it shorter.

MS. ECKER: Yeah. Why don't we do -- yeah.

MR. REVERE: Half an hour?

MS. ECKER: Half an hour's fine.

(Luncheon recess taken.)

BY MS. ECKER:

(Plaintiffs' Answers to Defendants' First Set of Interrogatories marked as Cordi-Allen Exhibit No. 7.)

Q. Ms. Cordi-Allen, just to remind you, you're still under oath. Do you --
A. Uh-huh.
Q. -- understand that? Okay. Are you aware if any of the members of the Zoning Board of Appeal in the town of Truro who you have sued are aware that you're Lebanese?
A. I'm -- I'm sure people have talked. You know, you hear things like when you're around town or at the beach and there. So -- but do I -- did

I tell anybody?
Q. Yes.
A. The yacht club knows. And --
Q. I see. How do you know that the yacht club knows that you're Lebanese?
A. Because, when we bought our property, they had -- I don't know -- some party there. And they said that if we wanted to come, it was like it would have cost about $200. And they were going to have like Middle Eastern food. And I'm like, No. You know, I'm not spending that kind of money. I have that food all the time. It didn't really thrill me. So --
Q. Did you --
A. -- at that point, they knew. But --
Q. Did you tell anyone at the yacht club that you were Lebanese?
A. When they mentioned, yeah, about, you know, if we wanted to go over there.
Q. Who did you tell at the yacht club that you were Lebanese?
A. Nick Brown was the person.
Q. Okay.
A. He sold us the house.

Q. Do you have any information that any of the members of the Board -- of the Board of Appeals for the Town of Truro knew that you were Lebanese prior to your filing this lawsuit?
A. Prior? Prior to us going down to the harbor, we had no problems with anybody in town. So I wouldn't know.
Q. Okay. So you don't know of any information which would lead you to believe that any of the Zoning Board of Appeal members who you have sued know that you're -- knew that you were Lebanese at the time they made their decision?
A. Do I know that?
Q. Yes.
A. I have no doubt that people have been talking about it. So 99.9 percent, I would say that they did. But do I approve of it? No.
Q. Did you --
A. I can't tell you that you told them, you know, that type of thing.
Q. Prior to this lawsuit though. I've only been involved since this lawsuit.
A. No, no, no.
Q. Yeah.

A. I'm not saying you --
Q. Yeah.
A. -- specifically. I meant you in general, you know, sent --
Q. But you didn't tell them. Correct?
A. I don't talk with them --
Q. Okay.
A. -- to be honest.
Q. What -- what about the Board of Health, do you know if any members of the Board of Health knew that you were Lebanese at the time they made decisions regarding the applications you filed for your property?
A. The Board of Health. I'm thinking. They changed so much, the Board of Health. I can't answer. I can't tell you specifically. I think the person that -- Con- -- I was saying Conservation Commission. I've been there. Can I ask her a question?
Q. No. This is your testimony.
A. I just wanted to ask her who was -- who was who on the Commission.
Q. No. She can't testify. She's just --
A. I think it wa- -- I'm not sure if the -- the

chair -- chairman -- there's one guy with a beard, and I'm not sure if he's -- and I don't remember if he's Bednarek or Irwin.
Q. Do you have any --
A. So --
Q. Do you have any infor- --
A. -- it was the chairman that I'm thinking of that would, more so, have guided people. But . . .
Q. Do you have any information that that individual knew that you were Lebanese?
A. Like I said, the yacht club, I'm sure, told people. I -- because they're the ones I knew. And as soon as that happened, everything started turning against us.
Q. Do you know -- do you have any information that -- that -- well, let me strike that. Do you have any proof though that they actually knew you were Lebanese other than you think the yacht club might have told them?
A. I know people in town know that I am. You know, it's a small town. It's a very small town. So there are people -- because we've been there 20 years, people know that -- you

know, what we -- what we are from being there. And, you know, people talk.
I mean, I don't -- I can't control people's phone calls, that type of thing. So I don't -- I don't know about private conversations. But did they say it at a meeting? I haven't heard it, you know, straight out at a meeting. But --
Q. Have you told any members of any boards in the town of Truro that you are Lebanese?
A. Members of the boards. No. But I will -- but I don't know if I should -- when I'm at -- and I've been at many meetings with Paul. I'll tell you, as soon as -- and we've seen it. So many people, they just, boo, fly through. And I don't know what their problem is with me.
But -- and we've been in meetings where one Jewish person after another after another gets their permits. No problem whatsoever. As soon as -- this other guy that owned our property, you know -- and then, all of a sudden, you know, he wasn't in a dune; but, all of a sudden, Barbara is, after -- it -- it's just -- it stinks. And it stinks that it's come to

this.
Q. Other than Brooke Newman and the individual who owned her property before you --
A. Uh-huh.
Q. -- what other Jewish individuals in town have gotten permits that you're aware of that you claim --
A. Oh --
Q. -- is discriminatory?
A. -- we just were at meetings, Conservation Commission meetings, primarily, with my lawyer. And we've seen people just go right through. And, you know, it's --
Q. And which one --
A. -- like, well --
Q. -- of those individuals are Jewish?
A. Many of them were.
Q. Do you know of any --
A. Yeah.
Q. -- specific Jewish individual?
A. We just were seeing -- you know, just seeing this and like, you know, made comments between ourselves.
Q. How do you know the individual applicant was

Jewish?
A. People in town would tell you. And if you said, you know, it's funny; but so-and-so and so-and-so and so-and-so went through. And they're like -- you know, people talk.
Q. As you sit here today, can you tell me --
A. Uh-huh.
Q. -- other than Ms. Newman and your prior property --
A. Yeah.
Q. -- owner -- of any specific Jewish individual who is a property owner in town who has received a permit from the Zoning Board of Appeals in the last five years?
A. I think Sandra -- our -- our other new neighbor, Sandra, just got permits. No problem whatsoever. And I don't know anything about her. I don't even know who she -- you know.
Q. Do you know if she's Jewish?
A. I don't know. I don't know her.
Q. Do you know if she's Lebanese?
A. I don't know. I don't know her. And I forgot who -- somebody in town. I was thinking about it. Like, I'm really wiped out now. I just

took another pain pill. But --
Q. Does your taking the pain medication affect your ability --
A. Right now --
Q. -- to testify?
A. -- well, I'm just -- I'm wi- -- it's -- after two hours? I mean, I'm -- I'm in -- it's harder for me. Time goes on. But --
Q. Well, I have to be --
A. I'm just --
Q. -- clear about this.
A. -- very tired --
Q. I have to be --
A. -- very tired.
Q. -- clear about this on the record. Are you able to testify truthfully while you're on your pain medication?
A. Oh, I don't lie. But I get -- I'm -- right now, I'm like losing it. I'm not focusing as much as I should be. But --
Q. Are you able to recall facts regarding your lawsuit since you've just taken your pain medication?
A. Yeah. Yeah. Depending like what --

THE WITNESS: Were you going to say something?
MR. REVERE: I -- I thought you were done.
THE WITNESS: Oh.
MR. REVERE: Can we go off the record for just a second?
MS. ECKER: Yes.
(A brief discussion was held off the record.)
MS. ECKER: Back on the record.
Q. Does the pain medication that you took at lunch affect your ability to testify with clarification?
A. Some clarification, I would say. You know, I might ha- -- if I think about something longer, the more it will come back to me. It may -- I guess, the finer details, I may have to recall. A lot of things I can. But, like, if you ask me more details, then I may forget. But then I may remember.
MS. ECKER: Off the record.
(A brief discussion was held off the record.)
MS. ECKER: And, actually, this can be on

the record. I don't feel comfortable going forward if she is telling me that she is not going to be able to remember the details, given that what I am asking her is the specifics of the allegations --
THE WITNESS: Yeah.
MS. ECKER: -- contained in the lawsuit.
MR. REVERE: No. I -- I fully understand.
MS. ECKER: And that -- and that concerns me.
MR. REVERE: I -- I was concerned --
THE WITNESS: That's the way I --
MR. REVERE: Are we on the record?
THE WITNESS: See, they just --
MS. ECKER: Yes. We are.
MR. REVERE: I mean, it doesn't matter to me if you don't want --
MS. ECKER: We are on the record. Because I --
MR. REVERE: I was concerned that the nature of whether Barb's response was -- is it because of the medication; or is that what, you know --
THE WITNESS: Yesterday, they --

MR. REVERE: -- normally --
THE WITNESS: -- increased --
MR. REVERE: -- the way people recall.
THE WITNESS: Yeah. But --
MR. REVERE: Okay? And if she could clarify. If it's -- if it's because of the medication, I -- I --
THE WITNESS: I think --
MR. REVERE: -- completely agree with you. If it's normally recall --
THE WITNESS: Yeah. You know, yesterday, they increased my medicine on -- like by a hundred percent.
Q. So do you --
A. So I think that --
Q. Do you feel --
A. -- until it's in my system more, I think I'd be better --
Q. Okay. Let me just ask you a specific question. Do you feel that the medication you have taken has affected your ability to testify this --
A. I think --
Q. -- afternoon?
A. -- I'm too far all -- I think I'm too far all

around the place, to be honest with you.
Q. Okay. And --
A. I guess you probably can tell that too.
Q. Yeah. You seem a little bit spacier this afternoon.
A. Yeah. But it's a combination of -- you know, this morning, I was too. I wasn't happy the way --
Q. Well, it's not --
A. I -- I don't feel like I -- I'm as sharp as I should be. And I think I made you guys --
Q. Do you think that's bec- --
A. -- drag things. You know what I mean?
Q. Do you think that's because of the medication or just your ability to recall in general?
A. I think -- well, this patch that I'm on -- can we go off the record, please?
Q. Just keep it --
A. I just wanted to say --
Q. -- on the record just so we know.
A. Okay. This patch that I'm on, I mean, I -- I was taking like 50 milligrams like it's supposed to be every three days. And now I'm on 75 every two days. And, hopefully, I wasn't

supposed to supplement it with more pain medicine. And I -- I dragged it out till I -- I'm in -- I was in so much pain I had no choice but to take more.
But it's new, the strength. So I think that's throwing my body off a lot -- a lot more today than, you know, once you get adjusted to it.
Q. And you took more of that at lunch or did something more at lunch?
A. I just took one like, you know, a little while ago. I took a pill, a pain pill. But . . .
Q. Okay. What kind of pain pill did you take?
A. Hydrocodone. So that's my pri- -- I'm in a lot of pain with this dystrophy. That's what it is, you know. And . . .
Q. I understand the pain part. I just have --
A. Yeah.
Q. -- to determine your ability to testify.
MR. REVERE: Do you want to --
THE WITNESS: Do you want to try it and then see?
MS. ECKER: No.
MR. REVERE: No. Do you want to take a

minute to think about it or ask her a few questions to give you an idea that it had nothing to do with the matter?
MS. ECKER: I actually -- let me -- off the record.
(A brief discussion was held off the record.)
(Brief recess taken.)
BY MS. ECKER:
Q. You -- you've told me that the medication you've taken at lunch has affected your ability to --
A. I --
Q. -- testify --
A. -- think so.
Q. Let me just fin- -- I just --
A. Oh.
Q. -- has affected your ability to testify this afternoon. Correct?
A. Yes.
Q. Okay. And, because of that, I'm going to suspend the deposition. 'Cause I want you to be able to testify, obviously, in a clear, thorough, truthful manner. And I believe that

we have rescheduled then --
A. For two weeks.
Q. -- for March 31st. So we will begin with you and then have your husband --
A. Okay.
Q. -- testify after that, once I check --
A. That's fine.
Q. -- with co-counsel.
MR. REVERE: Okay. And do we want to reschedule for 9 a.m., an hour earlier, given that we're losing --
MS. ECKER: That would be fine, actually --
MR. REVERE: I think that's --?
MS. ECKER: -- if that works for you.
(Whereupon the deposition was suspended at 2:48 p.m.)

*****

**SIGNATURE PAGE**

I, BARBARA CORDI-ALLEN, do hereby certify that I have read the foregoing transcript of my testimony, and I further certify that said transcript is a true and accurate record of said testimony.

Dated at ____________________, this ____ day of _______________, 2006.

_________________________
BARBARA CORDI-ALLEN

**C E R T I F I C A T E**

**COMMONWEALTH OF MASSACHUSETTS**
**COUNTY OF NORFOLK, ss.**

I, Jo Anne M. Shields, a Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that BARBARA CORDI-ALLEN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true and accurate record, to the best of my knowledge, skills and ability, of the testimony given by such witness.

I further certify that I am not related to any of the parties in this matter by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 28th day of March, 2006.

_________________________
Notary Public

My Commission expires:

**ERRATA SHEET**

CHANGES TO THE DEPOSITION OF
BARBARA CORDI-ALLEN

INSTRUCTIONS TO WITNESS: 1) Please note any desired corrections to your testimony by page and line number. 2) Enter text as it appears in the transcript. 3) Enter text as it should appear.

| PAGE | LINE | CORRECTION |
| --- | --- | --- |

VOLUME

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10370PBS

* * * * * * * * * * * * * * * * * * * *

BARBARA CORDI-ALLEN AND JOHN ALLEN, )
Plaintiffs, )
)
vs. )
)
JOSEPH R. CONLON, ARTHUR F. HUTLIN, )
NORMAN H. POPE, KEITH S. ALTHAUS, )
And MARINNA MATRICARDI as they are )
Members and collectively the TRURO )
ZONING BOARD OF APPEALS AND THE )
TOWN OF TRURO, MASSACHUSETTS, AND )
BROOKE NEWMAN, )
Defendants. )

* * * * * * * * * * * * * * * * * * * *

CONTINUED DEPOSITION OF BARBARA CORDI-ALLEN, a witness called on behalf of the Defendants pursuant to the Massachusetts Rules of Civil Procedure before Jo Anne M. Shields, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Brody, Hardoon, Perkins & Kesten, LLP, One Exeter Plaza, Boston, Massachusetts, on Friday, March 31, 2006, commencing at 9:33 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
Telephone (617) 742-6900

APPEARANCES:

PAUL REVERE, III, ESQUIRE
LAW OFFICES OF PAUL REVERE, III
226 River View Lane
Centerville, Massachusetts 02632
(508) 778-7126
for the Plaintiffs

DEBORAH I. ECKER, ESQUIRE
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, Massachusetts 02116
(617) 880-7100
for the Defendants, Joseph R. Conlon, Arthur F. Hutlin, Norman H. Pope, Keith S. Althaus, and Marinna Matricardi as they are Members and collectively the Truro Zoning Board of Appeals and the Town of Truro, Massachusetts

ALSO PRESENT:

John Allen

INDEX

| Deposition of: | Direct | Cross |
|---|---|---|
| BARBARA CORDI-ALLEN | | |
| By Ms. Ecker | 167 | |

EXHIBITS

| No. | | Page |
|---|---|---|
| 8 | Answers to interrogatories | 169 |
| 9 | Subdivision Plan of land in Truro | 200 |
| 10 | Plot Plan | 203 |
| 11 | Advertisement | 252 |

STIPULATIONS

It is stipulated by and between counsel for the respective parties that the deposition transcript is to be read and signed by the deponent under the pains and penalties of perjury; and that the sealing and filing thereof are waived; and that all objections, except as to form, and motions to strike are reserved to the time of trial.

* * *

CROSS-EXAMINATION

BY MS. ECKER:

Q. Ms. Cordi-Allen --

A. Yeah. Hi.

Q. Hi. Do you recall that you're still under oath here today?

A. Yeah.

Q. Okay. And remember to speak up. It's particularly important because I have the fan that is loud. Have you taken any medication this morning that would affect your ability to testify?

A. I've taken pain medicine again. But I changed it.

Q. Do you believe that the medication you've taken this morning would affect your ability to testify here today?
A. No. I -- because I -- I changed it because the last one I was on, obviously, it affected me so mu- -- I slept -- when I left here, I fell asleep in the car; and I slept to two o'clock the next day. And I was throwing up. And then it was just too strong. So --
Q. Okay.
A. -- I --
Q. So you --
A. I --
Q. -- believe you --
A. I took a lower dosage.
Q. Okay. So you can believe you can testify here truthfully and completely?
A. Yeah.
Q. She can't take down the nodding of the heads, if you recall. All right. I am going to show you -- and I've been carrying them around all morning, and now I can't -- here we go -- a document and ask you to look at it and ask if you recognize it.

A. The interrogatories. Yes.
MS. ECKER: Okay. Let me have it marked as Exhibit 8. If you can hand it to the stenographer so she can mark it.
(Answers to interrogatories marked as Cordi-Allen Exhibit No. 8.)
(A brief discussion was held off the record.)
MS. ECKER: Back on the record.
Q. I've shown you what's been marked as Exhibit 8. And you recognize these as your answers to interrogatories. Correct?
A. Yes.
Q. Okay. And if you could turn to the very last page, is that a copy of your signature?
A. Yes.
Q. And when you signed those, you read and reviewed the answers. Correct?
A. I believe so. Yes.
Q. Okay. And if I could, it says "Original signature to follow"; and I never received an original signature. So if you could sign --
A. Which page? This one or the previous?
Q. The previous one.

(The witness complies.)
Q. And if you would turn to Interrogatory No. 5 and your answer in Exhibit No. 8, do you see that?
A. Wait a minute. This is --
Q. I think -- no. That's my copy. Let's see. Okay. Now, look at No. 5 --
MR. REVERE: Yeah. No. 5.
Q. -- now that they're in the right order.
MR. REVERE: Let's switch to 5 here.
Q. And the interrogatory asks you to "State in detail the basis for your claim that the Town of Truro discriminated against you due to your national origin." And you responded. Correct?
A. Yeah.
Q. Okay. And, in your answer, you say that you are a Lebanese American. Correct?
A. Yes.
Q. And that that is known to many within the community of the town of Truro. Correct?
A. Yes.
Q. Okay. Who specifically who is employed by the Town of Truro do you believe is -- was aware that you were Lebanese at the time you filed

your applications?
A. The -- the selectmen, Conservation Commission --
Q. Which specific --
A. -- the Harbor --
Q. -- individuals?
A. -- Commission. Dr. Irwin is on Conservation. The Harbor Commission.
Q. Who specifically on the Harbor Commission do you believe was aware you were Lebanese?
A. I forget the names now. I forget their names.
Q. Okay. You continue to say --
A. Uh-huh.
Q. -- in your answer, "The Middle Eastern states of Lebanon and Israel have had significant disputes over the last 30 years with Israel -- with the Israeli Army occupying parts of Lebanon for years. Politics in Israel are dominated by members of the Jewish faith." How do you believe the politics between Lebanon and Israel affected your -- the decisions made by the Town of Truro regarding your property?
A. Both abutters have been annexing my property, be it the -- or, actually, all three of them

Page 172

now: the Town, Brooke Newman, and the yacht club. They refused to go back to their property lines.

Q. How do you believe the politics in Lebanon and Israel affected in any way the decisions made by the Town of Truro regarding your property?

A. They're patterning themselves after exactly what's been going on, annexing of properties, not respecting their own property lines.

Q. And are you saying that that's similar to what the Israelis are doing in Lebanon?

A. Sure. They've gone into Lebanon.

Q. And you think that because the Israelis have gone into Lebanon, your property -- the abutters to your property have encroached on your property?

A. Doing the same thing.

Q. Do you have any -- have any statements ever been made to you by anyone who was on a board of the Town of Truro or is an employee of the Town of Truro regarding the relationship between Israel and Lebanon?

A. It's their actions.

Q. Has anyone made any specific comments to you

Page 173

concerning the politics of Lebanon and Israel?

A. No.

Q. Has anyone made any specific comments to you regarding your answers to the -- as being Lebanese?

A. No.

Q. Is it your belief that all Jews would discriminate against Lebanese?

A. All?

Q. Yes.

A. No.

Q. Okay. Which Jews that are on a board of the Town of Truro or employed by the Town of Truro do you believe discriminated against you because you are Lebanese?

A. That's it. The selectmen.

Q. And which specific individual?

A. Most of the boards are composed of peoples (sic) who are treating us totally differently than everybody else.

Q. But Ms. --

A. And --

Q. Ms. Cordi-Allen, your claim is that you've been discriminated against because you are Lebanese.

Page 174

Correct?

A. Yes.

Q. Okay. What evidence do you have that any of the decisions made by members of the boards of the Town of Truro, an employee of the Town of Truro were based on the fact that you were Lebanese?

A. We've lived in the town for 21 years, had absolutely no problems until we went down there. And when we bought the property, people started talking.

Q. Who started talking?

A. The Harbor Commission people.

Q. Which specific individual on the Harbor Commission began talking when you purchased the property?

A. There was one -- somebody -- I think it was a woman -- and one of the selectmen.

Q. And what did they say?

A. Oh. Look what the Allens fell into. And our property that we had bought, nobody realized that we had been living in the town for years and years before that. We got our permit for our floats. We were charged seven times --

Page 175

Q. Ms. Cordi-Allen, I'm asking you a specific question. Listen to my question. Have -- well, you claim that the Town of Truro and the members of its board have discriminated against you --

A. Uh-huh.

Q. -- in making decisions concerning your property because you are Lebanese. Correct?

A. Yes.

Q. And I'm asking you specifically what evidence you have that the decisions made by specific board members concerning your property were based on the fact that you are Lebanese versus based on some other reason that they might have had to make those decisions. What specific evidence do you have?

A. When we went for permits, as I said, we were granted our permits, but charged seven times that as the yacht club. We have been told by --

Q. Let me stop you there.

A. -- the town counsel --

Q. Let me --

A. Yeah.

Page 176

Q. -- let me stop you there. The yacht club. Why do you believe the yacht club was granted permits and not you? Because you were Lebanese?
A. Definitely.
Q. And why would they grant -- was the yacht club Jewish?
A. Yes. Most of them are. Many of them are.
Q. Who?
A. Who? There are people that were at the previous meetings at DEP who were. Their names are in your documents. I don't know their names. But they were --
Q. Do you have any evidence that they were granted their permits because they were Jewish versus for another rea- -- other than another reason?
A. If you're in the same location and you're -- you've been established in town, you're in the same -- what's the word -- like habitat, whatever, you know, affecting everything. And the only difference between you and your abutters is because you're one thing; they're something else. And that's the only difference; 'cause --

Page 177

Q. You don't think --
A. -- they're granted, without any problems, their permits. When we go to the same boards, we're told we have to go through certain procedures. Yet people like Brooke Newman, no, walk.
Q. Do you know if Brooke Newman's actually Jewish?
A. I've been told she has -- she is.
Q. Who told you that?
A. People who know her, people who have been --
Q. Specifically, who told you Brooke Newman's Jewish?
A. Townspeople.
Q. And you can't tell me a specific individual?
A. I just hear things that, when I got to Jams uptown, people that know the family.
Q. Other than her surname, do you have any evidence that she's Jewish?
A. I've been told by somebody that she does have religious -- Jewish religious things in her house.

MR. REVERE: Can we go off the record for just a second?

MS. ECKER: No. I want to continue this line --

Page 178

MR. REVERE: Okay. Well, I --

MS. ECKER: -- of questioning.

MR. REVERE: -- I could object that they were asked and answered in the previous deposition. But since -- but since we had problems in the previous deposition, I didn't --

MS. ECKER: Well, you really can't --

MR. REVERE: Okay.

MS. ECKER: -- because I never got an answer.

MR. REVERE: Okay.

MS. ECKER: It's a --

MR. REVERE: No.

MS. ECKER: -- very serious --

MR. REVERE: No, no.

MS. ECKER: -- claim she's bringing.

MR. REVERE: Oh, I -- I know. No. I'm just saying -- I'm just a little concerned that she answered the question. I know what she answered in the previous deposition.

MS. ECKER: As do I.

MR. REVERE: Okay. And I know what she has said now. And they are slightly different.

Page 179

But given the reason the previous deposition was cancelled, I'm giving you lots of leeway. But I just want to note at the moment, as we're talking about this, that I'm aware these -- these are questions, some of which were previously answered. Let's just --

MS. ECKER: I know.

MR. REVERE: -- go on.

MS. ECKER: Let's --

MR. REVERE: Okay.

MS. ECKER: -- continue, Paul. I --

MR. REVERE: Yeah.

MS. ECKER: -- note your -- I note your objection. I disagree.

MR. REVERE: Yeah. Well, I just -- I don't think it's any reason to stop. I just think that --

MS. ECKER: I note your objection.

MR. REVERE: Okay.

Q. Are you aware that town counsel, who was here at the last day of your deposition, Sarah -- Sarah Turano-Flores, has been giving the Town advice concerning your property over the years?
A. I don't know that she was working there when we

Page 180

bought the property. I don't know how long she's been there.
Q. Have you ever seen letters written by either Ms. Turano-Flores or her law firm concerning your property to the Town?
A. Yes.
Q. Okay. And you're aware that she has been advising the Town concerning applications and other requests you've made regarding your property over the years?
A. At some times.
Q. Okay. Do you believe that Ms. Flores is biased against you because the decisions or the opinions she's given the Town because you are Lebanese?
A. I believe she's been told.
Q. That you're Lebanese?
A. I believe -- okay. What I know is that the town manager has told the committees not to even talk to us, be it Zoning, Conservation Commission, the Harbor Commission, the harbormaster. They were told by the town manager not to even talk to us. And that's documented.

Page 181

Q. Listen to my question. Do you believe that Ms. Turano-Flores has discriminated against you in the recommendations or opinions she's given to the Town concerning your property because you are Lebanese?
A. Has she? I think -- I -- I think she's done what they told her to do.
Q. So you think she hasn't given independent advice to the Town?
A. She's probably worked to -- to do what their wishes are -- were.
Q. What's your evidence of that?
A. Inconsistencies in treatment of peoples.
Q. By Ms. Turano-Flores?
A. I would say, if she's the one that's legally responsible for the documents on that, there is, definitely, inconsistencies.
Q. And you believe that she's been inconsistent because of your national origin?
A. I think she's told what to do.
Q. By whom?
A. By whoever's paying her.
Q. So you believe that the Town has told her the legal opinions to give them?

Page 182

A. The direction.
Q. Okay. And who do you believe has told her that?
A. Well, people who run the purse strings of the town.
Q. Which are who?
A. The yacht club.
Q. Okay. So who specifically at the yacht club do you believe that's told Ms. Turano-Flores the directions her legal opinion should -- should take?
A. They run the purse strings of the town. They sit on -- the selectmen. They sit on the Zoning Board. They sit on the Harbor Commission. They run the town manager, as was in the newspaper.
Q. Who specifically on the yacht club -- or from the yacht club do you -- have you testifying -- has talked to Ms. Turano-Flores and directed her legal opinions that she has given to the Town?
A. They -- they do it through their boards, through the boards of the town.
Q. I know. Who -- who does it? I need

Page 183

individuals.
A. Who does it? Oh, Nick Brown, for one --
Q. Okay.
A. -- and whoever else is there. He was president of the Harbor Commission. And . . .
Q. So you believe Nick -- Nick Brown has told Ms. Turano-Flores the direction to take in this matter or the -- regar- -- concern- -- decisions concerning your property?
A. I -- I wouldn't doubt that he, the yacht club members, and the other people that he's affiliated with and members of the yacht club who are on the various other committees express what they want to the town manager, who, I believe, is the one who contacts the lawyer. So it's like an indirect process of getting what you want done. And if you don't do what they want, you don't get a raise; or you will lose your job.
Q. So do you believe that Ms. Turano-Flores has simply done what the Town has asked her to do?
A. Yes.
Q. And that she hasn't rendered independent legal advice to the Town?

A. It's not consistent. So I would say it's not --
Q. Do you believe --
A. -- it's not consistent.
Q. And do you believe that Ms. Turano-Flores, in giving the advice to the Town concerning your property, has discriminated against you?
A. Has she? Since there are inconsistencies, yes.
Q. Do you think she's discriminated against you because you're Lebanese?
A. She's done it because of what the Town wants her to do.
Q. Okay. Continuing on in your answer to Interrogatory No. 5 --
A. Uh-huh.
Q. -- you say, "It is Ms. Cordi-Allen's contention that within the town of Truro a significant, if not controlling, number of members of the Conservation Commission, Zoning Board of Appeals, and town government are members of the Jewish religion and that they apply different standards for non-Jews than for Jews." So so far, you've told me Nick Brown. Do you believe Mr. Brown is Jewish?

A. No.
Q. What members of the -- what controlling number of members of the Conservation Commission do you believe are Jewish?
A. The -- the chairman. And I'm sure there are other people there. I don't even know who's -- the names of the people. But . . .
Q. How do you know they're Jewish?
A. Their names --
Q. Okay. So --
A. -- usually reflect it.
Q. Okay. So you go by the person's surname to determine whether they're Jewish?
A. That's usually one. And then people will tell you which would in- -- you know, they would know if they go to their -- it's a small town. They know if they go to the local churches or not or . . .
Q. Is there a synagogue in town?
A. No.
Q. Do you have any evidence that any of the members of the Conservation Commission took your national origin into account when they made decisions concerning your property?

A. Just their inconsistencies.
Q. No comments by any of them about your national origin?
A. Not to my face.
Q. Okay. No written documentation from any of them that you're aware of that they took your national origin into account?
A. No.
Q. So it's only that they made a different decision on -- for -- for your property versus somebody else's?
A. Yes.
Q. Okay. So is it your contention that any negative decision that was made concerning your property or any denial of any application must be because you're Lebanese?
A. It's -- being that we're taxpayers, there is no reason that we would be treated differently, being in the same dune that everybody else -- the Town has said everybody down there is in a dune. The whole area, the Town has declared dune. But only us -- only the Cordi-Allens.
And I've been raised 99 percent of my life as a hundred-percent Lebanese person. My

father died when I was a kid. So I was raised by my mother. And the only difference being that we were all in the same environment. And I'm treated differently.
You know, if -- if it was because you lived down in the Harbor area, then everybody should have been treated different. But there should have been a consistent, different treatment. And that's not what occurred. It's only occurred for me. And they always say Barbara Cordi-Allen. My husband owns the property as well. But everybody is like, there she is.
Q. Is your husband Lebanese?
A. No.
Q. Do you know any members of the Board of -- on the Zoning Board of Appeals who are Jewish?
A. I don't know who's on it --
Q. Are you aware whether any --
A. -- right now.
Q. Are you aware whether any members of the Zoning Board of Appeal who denied your appeal of the building inspector's decision not to revoke Ms. Newman's building permit were Jewish?
A. It's what the Town tells them to do.

Q. That's -- my question is, do you know whether any members of the Zoning Board of Appeals who denied your appeal requesting that the building inspector's decision not to revoke Ms. Newman's building permit were Jewish?
A. I've been told that the boards were, basically, all run by Jewish people from various people. And --
Q. Well, let's flip to the cap- --
A. -- to say the specific --
Q. Let's flip to the caption on the first page. 'Cause you have sued the individual members of the Zoning Board of Appeals.
A. Uh-huh.
Q. And there are Joseph Conlon --
A. Uh-huh.
Q. -- Arthur Hutlin, Norman H. Pope, Keith Althaus, and Marinna Matricardi. Do you know if any of those individuals are Jewish?
A. No. I don't know them.
Q. Do you have any evidence that any of those individuals that you have sued as members of the Zoning Board of Appeals took your national origin into account when they denied your

appeal?
A. Again, the people who sit on those committees are told what to do.
Q. Let's start with Mr. --
A. And --
Q. -- Mr. Conlon. Who told Mr. Conlon what to do as regards the appe- -- your appeal that was before him?
A. Who told him?
Q. Yes.
A. The -- like I said, the Pamet Yacht Club members -- and it's known in town -- sit on the boards. They have -- it's -- it's a small town. And it's known that what they want, they get.
Q. Are any of the individuals that you have sued as members of the Zoning Board of Appeals -- Mr. Conlon, Mr. Hutlin, Mr. Pope, Mr. Althaus, and Ms. Matricardi -- members of the yacht club?
A. I don't know.
Q. Do you have any evidence that anyone from the yacht club in- -- in- -- influenced the vote of any of those individuals that you've sued?

A. Only that they have -- the Pamet Yacht Club members have been told that we own half the harbor; we're going across the harbor; we're stopping the yacht club from navigation. And, with that, they've gotten their members to band together to go against us. And none of that was true. And they have gone to the boards to stop us.
Q. Do you have any evidence -- I'm asking you a very specific question -- any evidence that any of these individuals that you've sued -- Mr. Conlon, Mr. Hutlin, and Mr. Pope, Mr. Althaus, and Ms. Matricardi -- were influenced in any way by members of the Pamet Yacht Club when they were reviewing your application on appealing the building inspector's denial of your request to revoke Ms. Newman's building permit?
A. The inconsistent treatments --
Q. Which --
A. -- like I said.
Q. Which individual? I'm just -- each individual votes; you understand that. Correct? Mr. Conlon --

A. Usual- -- usually, in most towns, whoever is the chairman, people follow. So you only -- you don't necessarily need to call all of them. You could talk to one of them, two of them, whatever. But you can get -- I'll -- I'll give you a specific example --
Q. No. I really --
A. -- if you want.
Q. -- I want -- no. I want to stick -- I have a very specific question. You have filed a lawsuit against these members of the Zoning Board of Appeals --
A. Uh-huh.
Q. -- claiming that they discriminated against you when they denied your request to overturn the building inspector's decision not to revoke Ms. Newman's building permit. And I'm asking you, do you have any evidence that Mr. Conlon's vote -- and he voted on this. Correct? He voted on your a- -- your appeal?
A. According to this, these are the people that did.
Q. Okay. Do you have any evidence that Mr. Conlon was influenced in any way by any member of the

Page 192

yacht club when casting his vote?
A. Just the inconsistent actions and nonenforcement of Truro's determinations.
Q. Do you have any evidence that Mr. Hutlin was influenced in any way?
A. Again, the inconsistencies and their disregard for Truro's determination of the environment and improper permits and inconsistent . . .
Q. Do you have any evidence that anyone from the yacht club spoke to the individuals that you have sued concerning your appeal?
A. Based on behaviors. Or when the fees were installed on us for our floats being seven times that of the yacht club.
Q. I'm focusing specifically on the decisions --
A. That --
Q. -- made by the --
A. I'm --
Q. -- Zoning Board.
A. -- answering the question.
Q. Okay.
A. Based on the performance of the Harbor Commission to charge us seven times that of the yacht club because they all sat on the

Page 193

committee. And they -- we were told -- in fact, I was told by the harbor commissioner that the yacht club controls what's going on and that our floats -- they charged us $2,100; and the yacht club was $300 for the same floats.
In fact, they didn't even have a permit or a license for their float system; and we had gone through the process. Yet we get slapped. Nothing happens to anybody else down there. Just total inconsistent dealings. The Truro Zoning Board of Appeals did not go through the proper process. They did not review the documents. They did not review that this is a dune as determined by the Town of Truro.
Fill was brought in on Ms. Newman's property. Plantings were brought in. A full basement was put in. And it's a dune. But -- and she probably is not -- doesn't even have a setback. She has a three-bedroom septic. She has a two-bedroom restriction. But everything's fine and hunky-dory for Brooke Newman. But the Allens, forget them.
Q. I'm focusing specifically on the Zoning Board

Page 194

of Appeals. Any evidence that you have that any of the individuals that you have sued spoke with anybody from the yacht club concerning how to vote on your appeal?
A. Just the inconsistent treatments and being told that the yacht club controls the Town.
Q. So you have no evidence that any statements were made by members of the yacht club to the Zoning Board of Appeals directing them how to vote?
A. No.
Q. Going back to your answer to No. 5, is it your understanding that the members of the various boards -- the Zoning Board of Appeals, the Conservation Commission, the Harbor Commission -- changed over periods of time?
A. They do change. Yes.
Q. And is it your contention that, regardless of the makeup of those boards since you've owned the property, all the members of those boards have discriminated against you because you're Lebanese?
A. I think -- I've been told people are afraid to stand up and say anything in town because of

Page 195

what would happen to them.
Q. And who told you that?
A. Various townspeople said, We can't even go to meetings; because if we open up our mouth, we'll get harassed by the police department.
Q. Who told you that?
A. A family, they were doing work on our house. Joseph's Trash.
Q. And does Mr. Trash live in Truro?
A. No, no, no. Joseph's Trash Removal. That's -- that's what --
Q. Oh, trash removal?
A. -- they do. That's a company. Yes.
Q. And they've told you that if they attended meetings, they would be harassed by the police department?
A. Yes.
Q. If they attended meetings in your favor. Is that your testimony?
A. They would not go. They said, We can't go because we will be harassed.
Q. Do you know if they've ever been harassed by the Truro Police Department?
A. I believe they have been.

Page 196

Q. Okay. Have -- when have they been harassed by the Truro Police Department?
A. I -- I don't know. But I do know that they said that they will get harassed; they'll get tickets. And it's happened. So . . .
Q. Do you have any -- well, strike that. Have you ever been harassed by anybody in the Truro Police Department?
A. I don't bother with them. So I've had no real dealings with them outside of calling them when we found drugs when we bought the property down there and getting a "no trespass" order because our trash was being taken and --
Q. Your trash --
A. -- moved --
Q. -- was being taken? Or your trash cans were being taken?
A. The trash cans, the trash in the trash cans. The whole thing, with the trash in it, was being taken.
Q. Who do you -- who do you believe was taking your trash?
A. Brooke Newman.
Q. Why do you believe Brooke Newman was taking

Page 197

your trash?
A. People in -- in our house told us. And --
Q. Why would she want your trash?
A. She said that it was not on our -- it was not on our property, that she owned the property; or it was a street or something --
Q. So she moved the --
A. -- the dr- -- the driveway.
Q. She moved your trash cans. Correct?
A. We found -- we found trash out in the yacht club's woods. So it wasn't -- it was taken.
Q. And you believe that Ms. Newman took the trash from your trash cans and spread it in the woods behind the yacht club?
A. It wound up over there. They came over and told us. They said, This is your trash over here. And --
Q. Do you have any --
A. -- the contents of that came from our property.
Q. Do you have any evidence that Brooke Newman took your trash and spread it in the woods behind the yacht club?
A. Just from her behavior of taking our trash. No one else has touched our trash but her.

Page 198

Q. Did you file a Complaint against Ms. Newman?
A. Yes.
Q. And what happened to that Complaint?
A. She has a "do not trespass" order.
Q. When you say the yacht club and Brooke Newman have encroached on your -- annexed your property --
A. Uh-huh.
Q. -- have you brought a lawsuit against them for annexing your property?
A. My lawyer has sent letters, and my past lawyers have sent letters to them to remove the fences. And they have not done so.
Q. Have you had your property surveyed?
A. Yes.
Q. And do you have a copy of that survey?
A. It should be in the files.
Q. Okay. And does that survey show that, in fact, Ms. Newman is encroa- -- has --
A. Yes.
Q. -- annexed your property?
A. Yes. In fact, the property pins are there now. They're -- it's staked off now.
Q. And does Ms. Newman agree with you that she's

Page 199

annexed your property?
A. My lawyers that found -- the one that found it --
Q. Okay.
A. -- and brought it out at a -- a site visit said, Who's that? Whose are those? And he said, This is a property line when they marked it off. And he saw that the fence was not on her property line; it was in the driveway.
Q. Has she agreed to move it?
A. No. Of course not.
Q. Because she doesn't agree that she's on your property.
A. No.
Q. Correct?
A. No. Right.
Q. So she doesn't agree with you. It's your contention that she's annexed the property. Correct?
A. It's everybody's contention. The -- the --
Q. But Brooke Newman. Right?
A. Everybody, her lawyers included, agree that it's not on her property.
Q. How has the yacht club annexed your property?

Page 200

A. They have a fence 4 feet on our property, and they've removed our property marker.
Q. Have you brought a Complaint against them?
A. Yeah.
Q. Okay. And is that pending?
A. A letter's been sent, and they've done nothing about it.
Q. Has it been filed in court, the Complaint?
THE WITNESS: I don't know if you did. Did you, Paul?
Q. That's all right. I'll ask him at another time. Ms. Cordi- --
A. I think that's part of the --
MR. REVERE: Yeah. Off -- off the record.
(A brief discussion was held off the record.)
MS. ECKER: I'm going to mark another document.
(Subdivision Plan of land in Truro marked as Cordi-Allen Exhibit No. 9.)
Q. I'm going to ask you --
MS. ECKER: It's Exhibit 9?
COURT REPORTER: Yes.
Q. I'm going to ask you to look at what's been

Page 201

marked as Exhibit 9 and ask if you recognize it.
A. It's a 1972 plan.
Q. And is that the plot plan for the properties where your house is located, Ms. Newman's, and Ms. Landis?
A. It's 35 years old.
Q. You don't recognize --
A. There's more -- there's -- I don't know if this is accurate. There are more up-to-date ones.
Q. Looking at what's been marked as Exhibit 9, did you purchase the parcel that is represented as C --
A. Yes.
Q. -- on this? Okay. And are you aware whether Ms. Newman's property is what's marked as Exhibit -- as B on this plan?
A. Yes.
Q. And Ms. Landis is Exhi- -- is Parcel A. Correct?
A. Yes. Uh-huh.
Q. Okay. Looking at this property, which -- this plan that's marked as Exhibit 9, would you agree with me that your -- the structure on

Page 202

your property is closer to the harbor?
A. Yes.
Q. Okay. And Ms. Newman's structure is -- is much further back from your -- your -- from the water. Correct?
A. Not that much further.
Q. Would you agree that there's a hundred-foot buffer between Ms. Newman's property and the water line?
A. Yes.
MR. REVERE: Can -- can we go off the record --
MS. ECKER: No.
MR. REVERE: -- for a second?
MS. ECKER: We can't.
MR. REVERE: Okay.
MS. ECKER: I'm -- Paul, let me finish with this line of questioning. I don't want any speeches by you.
MR. REVERE: No. No, no, no, no. You -- you're going down a number of questions that border on --
MS. ECKER: They're --
MR. REVERE: -- opinion expert testimony.

Page 203

And I just wanted to clarify whether you consider that or -- an objection to form.
MS. ECKER: It is not an objection to form.
MR. REVERE: Okay. At least, if you considered it such --
MS. ECKER: It's not.
MR. REVERE: Okay. I -- I think you can ask her questions about knowing her properties. Just if we --
MS. ECKER: Yes.
MR. REVERE: -- get into expert, she should know about her property in many -- okay. That's all.
Q. Does Ms. Landis' structure have a hundred-foot buffer from the water line?
A. Yes.
Q. Okay. And yours does not. Correct?
A. Right. Oh, I don't -- wait a minute. Mine's close.
MS. ECKER: I'm going to mark another exhibit.
(Plot Plan marked as Cordi-Allen Exhibit No. 10.)
Q. Ms. Cordi-Allen, I'm going to show you what's

Page 204

been marked as Exhibit 10 and ask if you recognize that document.
A. Yes.
Q. Okay. And is that the proposed changes you seek to make to your property?
A. Yes.
Q. How -- when you purchased the property, what square footage was the structure on the property?
A. Four- or five-hundred feet.
Q. And in the proposed changes that appear in Exhibit 10, what is the additional amount of square footage you seek to add to your property?
A. I don't know. I haven't figured it out.
Q. Do you know how --
A. I haven't calculated it.
Q. Do you know how large the structure is that you wish to add to the property?
A. The dimensions.
Q. Okay. What are the dimensions?
A. Forty-two by thirty-six.
Q. And you don't know what that square footage is?
A. Let's see. It's about 2,800 feet, square feet,

Page 205

for the house.
Q. And in looking at this that's been marked as Exhibit 10, you seek to install an in-ground pool on the property?
A. No.
Q. Not anymore? Or was that an aboveground pool?
A. Aboveground.
Q. And do you seek to install an underground garage?
A. No.
Q. Okay. Is it a garage that is attached to the structure?
A. Yes.
Q. And when you say aboveground, do you mean that no concrete would need to be poured for the pool?
A. I'm not an installer. I don't know how they install pools. But I -- there was not going to be -- I wasn't digging -- you know, you dig for an in-ground pool 10 feet or whatever. We're not going to do that. It would be on the deck.
Q. So the pool that is depicted in Exhibit 10 would be on a deck structure?
A. Uh-huh.

Page 206

Q. And on the -- what's Ex- -- is Exhibit 10, there was an original structure. Correct? And you wish to construct an additional structure, correct, a proposed dwelling?
A. Yes.
Q. Okay. So the completion of -- if you were allowed to go ahead and complete the construction, there would be two structures on your property now. Correct?
A. One's considered, again, accessory building. One's a house.
Q. And the house would be what? The original structure or the new --
A. No.
Q. -- structure?
A. This is -- this is where we are going to live permanently.
Q. And that is the proposed dwelling as marked --
A. Right.
Q. -- on Exhibit 10. Correct?
A. Correct.
Q. And that structure does not exist today. Correct?
A. Right.

Page 207

Q. And that structure consists of approximately how many square feet? Do you know?
A. I think it's about 2,800 square feet.
Q. Do you know anyone else in the town of Truro who has been allowed to build a 21-square-foot (sic) home this close to the water line?
A. Oh, yes.
Q. Who else?
A. The Perrys have; actually, theirs is maybe 7,000 square foot. The Sextons have --
Q. Your proposed is what? 20,000 square feet?
A. No.
Q. 2,000?
A. This is about 2,800.
Q. And where is -- okay. Where is the Perrys' house located?
A. Of the beach -- on the beach.
Q. Is it on the beach?
A. Yeah.
Q. And what's their setback from the water line?
A. I don't know.
Q. Do you know if the Perrys' home is located in a flood plain?
A. Yes.

Page 208

Q. Okay. Who told you that?
A. The whole environment is.
Q. Has anyone told you that the Perrys' house is located in a flood plain?
A. Yes.
Q. Who?
A. Townspeople.
Q. Anyone --
A. And I'm not sure if it was the -- I'm not sure if Felco said something. And I -- I shouldn't even -- I can't mention their name. I'm not sure if they also said it. But their abutters have their houses on pilings. Theirs is not.
Q. Do you know when the Perrys' home was constructed?
A. Oh, it's still being done.
Q. And do you know what the setback is?
A. No. I don't. I think --
Q. Do you know if they had to go to the Conservation Commission to get approval?
A. I don't think they did.
Q. Do you know if they had to go to the Zoning Board of Appeals to get approval?
A. No. I don't think they did.

Page 209

Q. Do you know if they had to go to the Board of Health to get approval?
A. I don't think they did. I don't -- I don't really remember. But I have -- I think I have the documents somewhere.
Q. And they had to get a building permit. Correct?
A. I would assume.
Q. Do you know if the Perrys are Jewish?
A. No. They're not.
Q. Okay. Anybody else in town that you're aware of who was allowed to build a 21-square-foot (sic) home close to the water?
MR. REVERE: Do you mean 2,100?
Q. 2,100 square feet.
A. Yeah.
MR. REVERE: Okay.
A. Zawaduk. He's behind us.
Q. You have to -- what's the name?
A. Z-a-w-a-d-u-k. He's behind us. His is like about 4,000 square feet.
Q. And when you say he's behind you, he's further back from the water?
A. Yes.

Page 210

Q. Any properties you -- well, let me ask you this: You claim that you have been treated differently from properties similarly situated to your own. Correct?
A. Yes.
Q. What properties are you claiming are similarly situated to your own that received approval to construct when you did not?
A. Well, the Sexton property is definitely on a dune where, in a wind, they're going to fall in the water. They're -- they're on top of the water. They just built a 7,000-square-foot house, at least.
Q. Where's the Sexton property?
A. Facing the water to the left. And all those -- those homes there, all the ones -- yeah. Facing out to the bay to the left, Nick Brown's house and all those there, they are huge. And I had the square footage of all those. They're quite large. And a little bit further down is the Sextons' property. And I know that's in the documents. And that's -- it was in the paper. It's over 7,000 square feet.
Q. And is it your contention that those properties

Page 211

are similarly situated to yours?
A. I think -- similar? I think they're more dangerous. They're on a dune. Mine, DEP has twice said, is not a dune.
Q. And that's still pending before the DEP. Correct?
A. No. DEP has determined twice already that it is not a dune.
Q. And you recently had a hearing. So I'm not even going to go into the DEP issue. That's still pending. Are those pro- -- those properties that you just told me about, are they as close to the water as your property?
A. If not closer.
Q. Which prop- -- which property that you just told me about is closer to the water than yours?
A. The Sextons.
Q. Okay. And is it your --
A. The water comes right up to it.
Q. And is it your contention that the Sextons' residence, the structure on their property, is clo- -- as close to the water as yours?
A. The water comes right up to the end of the --

Page 212

the -- the dune. So . . .
Q. Is that yes?
A. If that's where the property line is, yes.
Q. Not where the property line is. I'm talking about the structure on the property. Is the structure that the Sextons are building or built on their property as close to the water as the structure located on your property?
A. Yes.
Q. Anybody else's residence you're claiming is similarly situated to yours?
A. Everybody along Cape Cod Bay.
Q. In the town --
A. Nick Brown.
Q. -- of Truro?
A. In the town of Truro. Nick Brown's property and the ones facing the -- the bay. When you go out the harbor, right on the left -- I forgot the name of the street; Great Hollows (sic) Road or something like that -- all of those houses there are on a dune. And they're closer to the water than we are.
And we were on -- at the time, we were on a river. And I applied before the Rivers Act,

Page 213

and I was grandfathered. I applied before the Rivers Act for -- to build a three-bedroom, and we were grandfathered.
Q. Who told you you were grandfathered?
A. The Conservation Commission --
Q. So the --
A. -- and DEP.
Q. All right.
A. DEP.
Q. So the Conservation Commission for the Town of Truro agreed with you, correct, that you were grandfathered?
A. And then they said to me, well, you still -- you still have to go through the provisions of -- I think, at a later meeting, they said, You -- you still have to go through because -- the provisions of the Rivers Act. And I'm like, We already applied before.
And it was -- Jim Mahala was the one. That's who it was. He said, You're grandfathered; you applied before the Rivers Act. And even if you applied after the Rivers Act, that doesn't prevent somebody from building within a hundred feet or whatever it

Page 214

is of -- of the thing -- of the river.
Q. 'Cause the Conservation Commission enforces other regulations and acts other than the Rivers Act. Correct?
A. Well, they're supposed to.
Q. Right. So you had to go through other processes, correct, to get conservation approval other than just simply being approved for the Rivers Act. Correct?
A. I think once you -- I'm not an authority on the Rivers Act and Conservation Commission. But having applied before the Rivers Act, we have to go by DEP regulations of building in the environment. And there are no consistencies. Nobody else down there does, to put it bluntly.
Q. You believe that nobody else has had to comply with the Rivers Act down in the town of Truro?
A. Brooke Newman sure didn't. And neither did Sandra (sic) Landis until we mentioned it, that she's in a dune. And then they made her add on. But they were letting her permit go right through.
Q. And Ms. -- and Ms. Landis built her structure on pilings. Correct?

Page 215

A. After Paul objected to her being granted the permit unless it was treated as a dune. Because it -- 'cause we were being treated as a dune. And he -- he requested that we -- everybody be treated the same down there.
But Brooke Newman, she has a full basement. And her house is supposed to be on pilings and whatever. And, of course, nothing happens. Zoning, building inspector could care less, Con. Comm. And she did not build before the Rivers Act nor apply before the Rivers Act. She didn't even own the property then.
Q. Do you believe that your house is similarly situated to Ms. Newman's house?
A. We're all in the same flood plain. It's all been flooded. Everybody's.
Q. Has Ms. Newman or -- I think it's now constructed -- did she add on the same amount of square footage as you seek to add to your property?
A. My property is a much larger buildable area than hers. And the same with Sandra (sic) Landis. But both have built the largest structure possible within the sub acts.

Q. The proposed additions of Ms. Landis and Ms. Newman were smaller than the proposed addition that you had in your plan that's marked as Exhibit 10. Correct?
A. They built according to their setbacks. So whatever their setbacks they said allowed, that's what they built. They couldn't build bigger than what they had because they don't own property that's buildable. They own the path; it's like a pork chop. And you can't build on that land.
Q. So the structures they proposed were smaller than yours. Correct?
A. I don't know what Sandra (sic) Landis is. But . . .
Q. Brooke Newman's was smaller than your -- the -- what you proposed in Exhibit 10. Correct?
A. Her property's smaller than mine.
Q. I'm just asking you. It's a -- it's yes --
A. Yeah.
Q. -- or no. Yes, it's a smaller --
A. Uh-huh.
Q. -- proposal. Correct?
A. Yeah.

Q. Is -- when you say that your property's buildable, who told you that your property's buildable?
A. Who?
Q. Yes.
A. DEP.
Q. Okay. And what portion of your property did DEP tell you was buildable?
A. Right there. My plan.
Q. Okay. So is it your contention that DEP told you that you could construct what's depicted in Exhibit 10?
A. Yes.
Q. When?
A. When we drew up the plans.
Q. Okay. Who at DEP told you you could build the structures, including the pool and the garage and --
A. Jim.
Q. -- everything that -- and everything that's depicted --
A. Jim Mahala.
Q. -- in Exhibit 10?
A. In fact, he's the one that aided me. And Brian

Dudley.
Q. And did Mr. Mahas (sic) and Mr. Dudley testify on your behalf at the DEP hearing that just occurred this -- I believe, this fall? Correct?
A. No.
Q. Why not?
A. I don't know what made them flip.
Q. They no longer agree with you, correct, that this -- that what appears in Exhibit 10 is buildable?
A. No. I -- I can't say that.
Q. Have you spoken with them about it, what made them flip?
A. I haven't asked them. No. I'm not going to.
Q. But it's your understanding now that they don't agree with you that you can construct what's depicted in Exhibit 10. Correct?
A. I -- if it's a dune, it has to be built on pilings. This here is on a breakaway foundation, and I think that's what the -- the problem is now. It's not that it can't be built. It's how the foundation is going to be built. Because you can build. Obviously, the

Sextons built a 7,000-square-foot house in a coastal dune on pilings. So this is not 7,000 square feet; and it's not in a dune.
Q. So you believe that the Sextons' property -- and I just want to be clear on this -- is similarly situated to your own?
A. Similar? I think it's very dangerously situated. Mine is not.
Q. Okay.
A. Theirs is on a dune where it's ready to fall in.
Q. Did you object to the construction of the Sextons' property?
A. No.
Q. You had -- did you own -- you had lived in Truro or had spent your summers there prior to purchasing this property.
A. Right.
Q. Correct?
A. Uh-huh.
Q. And were you looking to purchase a home?
A. We've gone down the harbor every time we were down there, and it was our favorite spot. And it was always our dream to own down there.

Page 220

Q. And when did you first become aware that this property was for sale?
A. Maybe 1993 --
Q. And when --
A. -- '92, somewhere around there.
Q. And when did you actually purchase it?
A. Well, actually, we went under contract back then; and it took until 1996 to close on it.
Q. So you went under contract to purchase the property when? In '93?
A. Yeah. '92 or '93, somewhere back there.
Q. Do you have a copy of that contract?
A. No. I don't.
Q. And who was the contract with?
A. Tom Brown.
Q. And why did it take so --
A. I couldn't think of his first -- I couldn't think of his first name.
Q. Why did it take so long to close?
A. They were in the process of getting the permits for the well and septic. So we just said, Well, you know, we're not interested right now. And they kept calling us to see if we were interested. And we went down there in, I think

Page 221

it was '9- -- the spring of '95; and the house was all done. It was completely remodeled. It had the septic and well in. Yeah.
The yacht club was telling everybody that it had none. And that was per the harbormaster. And other people in town told us the same. And --
Q. That -- that the house didn't have a septic and well?
A. Right. Right.
Q. And this was prior to your purchasing it?
A. Right. And we found out that it -- it did, in fact. What the harbormaster said, Barb, that house does have a septic and well; but the yacht club's telling everybody it does not. And --
Q. And the harbormaster at the time was who?
A. Warren Roderick. So --
Q. And did he --
A. -- I don't know --
Q. -- tell you --
A. -- if it wasn't completed because -- or what. But --
Q. Well, you were already under contract, you

Page 222

testified?
A. We -- we pulled it. Yes. We were. And then we went back under another contract -- we had two contracts on that -- in the spring of '95. And --
Q. Why didn't the first --
A. -- the house had to be finished.
Q. Why didn't the first contract go through?
A. We were waiting for them to get the septic and the -- the well installed.
Q. And when they did --
A. And they didn't have it, right, you know. So I wasn't going to tie my money up with them right -- you know. It's like, when you get it, call us.
Q. Okay. And then they called you. Do you know if the house was listed for some period of time prior to their calling you to purchase it?
A. I don't know what happened in the meantime.
Q. When they called you in '95 and said the house was ready, did you ask --
A. No. They didn't call us. We went down there.
Q. Okay.
A. Yeah. Then we saw it.

Page 223

Q. Okay. And you called them?
A. We went up -- we went to Brown Real Estate and put it under contract.
Q. When you went to Brown Real Estate, did you ask them about the septic and well permits?
A. I know the house hadn't been finished yet. There was some work that still needed to be done on it. But it was supposed to be done --
Q. Did you ask --
A. -- you know, within a short frame.
Q. Did you ask them anything about the septic or well permits?
A. I knew they had water, and I wasn't sure about the septic. I think that they were -- I don't really remember if it was completely done at that time or supposedly done at that time. But it had been supposedly finished when we went to close. You know, it could have been being -- like the loose ends like, I guess you could say, being tied up at that point.
And then, when we went to close on the property, we paid for an inspection, a house inspection. And it was found that the septic was never even done.

Page 224

Q. So the yacht -- the yacht club members were right that it didn't have a septic?
A. Well, in some ways. Well, it had a permit. It was permitted. So it was done. The Town permitted it. It passed -- it passed the Board of Health. The Board of Health inspected it.
Q. Okay. Did you have a conversation with Mr. Brown or anyone at Brown Realty about the property prior to your ent- -- entering into a purchase and sale agreement for it?
A. Well, they knew we wanted it. We were interested in it. And --
Q. Did you --
A. -- we -- we went inside and looked at it. And, you know, we were very happy with it.
Q. Did you ask them any questions about the house at all, the permitting process for the house? Anything?
A. Yes. Nick Brown said to us, I -- I will clean up the property for you, leave the floats there. You're grandfathered for your dock. So they're still there now. So he -- he did clean up the debris from the building, you know, the construction debris; but he did leave that.

Page 225

And there was a boat there that was falling apart. So I told him to get rid of that.
And they said, at the time, there was a one-bedroom septic in place. If -- we could add on with that septic as much as we wanted. If you wanted to build on -- add on a 5,000-square-foot house, you could do it. But with the septic that was there, it -- it could only be one bedroom; but it didn't matter how big. That was it.
Q. Okay. And Nick Brown told you all of that?
A. Uh-huh. Yes.
Q. Nick Brown told you you could add 5,000 square feet to the house if you didn't add another --
A. It was --
Q. -- bedroom?
A. -- he and -- and I -- it was his office, the realtors there. And he --
Q. Did you have a lawyer who represented you in the purchase and sale of the property?
A. I had my lawyer at home do the paperwork on it.
Q. Did you ever ask anyone in the Town if you could add on to that property prior to your purchase of it?

Page 226

A. No.
Q. Did anyone from the Town of Truro ever represent to you or any members of boards that you would be able to add on to the property that you purchased?
A. Well, the ad.
Q. The advertisement wasn't put in there by the Town of Truro. Correct?
A. It was put in by Brown.
Q. My question is, did anybody from the Town of Truro, any member of the boards of the Town of Truro, ever --
A. Well, Nick Brown is on the boards of Truro.
Q. Mr. Brown was the realtor. Correct?
A. Yes. But he's also on the boards.
Q. What board?
A. What boards?
Q. What --
A. The Harbor Commission.
Q. At the time --
A. He was on the Planning Board. Yeah.
Q. Okay. And as a member of the Planning Board, did Nick -- Nick Brown say to you, you can add on 5,000 square feet to this house? And was

Page 227

that in his capacity as a realtor?
A. It was through his knowledge as whatever position he had, I would say, you know. You can't separate the two. I -- he's one person, and he has different hats.
Q. Anyone else from the Town of Truro ever tell you you'd be able to add on to this structure that's located on the property when you purchased it?
A. I don't recall.
Q. And you were aware that there was -- at the time you purchased it, you were aware there was septic for one bedroom. Correct?
A. Right.
Q. Prior to your purchase of it, did you ever ask anybody from the Town or research whether you'd be able to enlarge that septic system?
A. Prior to our buying it or after?
Q. Prior.
A. No.
Q. When you purchased the property, do you have -- did you have plans to renovate and enlarge it?
A. Yes.
Q. And you did nothing to check prior to your

Page 228

purchase of it whether you'd be able to enlarge the house?
A. No.
Q. And you weren't aware -- or let me ask you this: Were you aware that there was a one-bedroom restriction placed on your house prior to your purchase of the house?
A. No. No. I think my lawyer, Bill Thomas, was handling that when we started having problems with the Town. And I think he did some research and said that there was nothing at the Registry of Deeds or something recorded.
Q. Did you have --
A. That's the best I remember.
Q. Do you know whether it was required that the one-bedroom restriction that had been placed on your house be recorded at --
A. Yes.
Q. -- the Registry?
A. It was. Yes.
Q. Other than your lawyer, how do you know that?
A. How do I know it? I'm not a lawyer. But my lawyer --
Q. Don't tell me what your lawyer told you. Okay.

Page 229

Has anyone from the Town told you that, at the time the one-bedroom restriction was placed on your property, it was not required that it be filed with the Registry of Deeds?
A. That they didn't have to record -- record it?
Q. Yeah.
A. You have to record everything. Nobody said anything about that to me.
Q. Did you ever go to Town Hall prior to purchasing the property to see if there were any restrictions on the property?
A. No.
Q. And prior to purchasing this property, had you looked at other similar situated properties in the town of Truro to purchase?
A. Yeah.
Q. And which other properties did you look at? Do you remember?
A. Sandra (sic) Landis's property.
Q. Okay. And what was the purchase price of Ms. Landis' property?
A. It was years later. It was 200 something-thousand.
Q. I'm talking about prior to your purchasing this

Page 230

particular --
A. Oh, prior?
Q. Yeah.
A. Oh, no. That was afterwards. No. I'm sorry. I misunderstood.
Q. How did you determine that it was a reasonable price for this property that you were paying?
A. Well, I figured it was the most beautiful site I've ever seen. And an oil painting, it would cost you more than that.
Q. So you didn't --
A. And it was just -- you know, I don't know if you've been down there; but it's just drop-dead gorgeous.
Q. Did you look at any comparable sales to determine the price to purchase the property?
A. At that point, I know it was, basically, a buyer's market at that time.
Q. It's really -- did you look at any comparable --
A. No.
Q. -- sales?
A. I'm saying, I just think -- you know, it was a buyer's market. And I think everything, even

Page 231

at that time, Corn Hill was like $80,000 a lot right on the water. So, you know, we knew the prices. And I think that was like, basically, a fair price for what it was.
Q. And a fair price for the -- the one- --
A. The lot.
Q. The lot.
A. Yeah. You were, basically, buying the lot.
Q. And did anyone represent to you from the Town of Truro or any members of the Town of Truro boards that your lot was buildable?
A. Actually, Conservation Commission. I got this here.
Q. Exhibit 10?
A. The Rivers Act, I applied for the Rivers Act. And I'm not sure if that was through the Conservation Commission or what. But I went -- I did get a form from somebody to build at that point.
Q. Was that prior to your purchase of --
A. No.
Q. -- the property?
A. After.
Q. Okay. I'm talking about prior to the purchase

Page 232

of your property. Did anyone from the Town of Truro or any of the boards of the Town of Truro represent to you that this property was buildable?
A. I didn't talk to anybody about it outside of Nick Brown, who was on the Zoning, Planning Board, everything.
Q. And didn't Nick Brown represent to you that he could get you zoning approval to build a structure on that property?
A. Did he say he could?
Q. Yes.
A. I understand he told -- I mean, I didn't ask him for his assistance. I just went through the process myself.
Q. Okay. So he never told you that he could get you Zoning Board of Appeal approval for construction on the property, did he?
A. I never asked him about it or talked to him about it.
Q. And the advertisement for the property said a one-bedroom addition. Correct? It was --
A. Yes.
Q. And what is depicted in Exhibit 10, your

Page 233

proposed construction, is more than adding one bedroom. Correct?
A. Well, it's after Bill Thomas went to court; and the Court said that it was arbitrary and capricious on the Town and that it can be a three- -- it could be built as a three-bedroom. The Tow- -- the -- the Court did -- made the de- -- I don't know which court, Superior Court or whatever. It was -- the court he went to made that decision. And --
Q. And is that the Barnstable Court you're talking about?
A. I -- I think so. I don't --
Q. And do you know, has that Court decided to grant your permit because the Town missed the deadline or because the Town's decision was arbitrary and capricious?
A. Their dec- -- their decision was arbitrary and capricious.
Q. And is it your understanding that then that had to go through DEP, correct, because -- correct?
A. Yes.
Q. Okay. And what is depicted in Exhibit 10 is more than a one-bedroom addition. Correct?

Page 234

A. This is after Bill Thomas won in court. Yes.
Q. Okay. When you purchased the property and the advertisement said a one-bedroom addition is possible, did you have any expectation that you would be able to add on more than one bedroom?
A. It just seemed strange because nothing else was a one-bedroom down there. No one else had a one-bedroom.
Q. Did Nick --
A. So I -- I just, you know, had my --
Q. Your hope was that you could add on more than one bedroom. Correct?
A. Well, I knew the -- the septic system would have had to be changed. It had -- because what was there was for a one-bedroom. So, you know, if you wanted to do differently, you had to change your septic. You couldn't go with what was there. You know, if you didn't want to get -- go through the Board of Health and all that, you could add on and make a huge one-bedroom --
Q. Did Nick Brown --
A. -- with what was there.
Q. Did Nick Brown or anybody else from his real

Page 235

estate firm ever represent to you that you'd be able to construct more than a one-bedroom addition on the property?
A. Again, it was -- the septic system that was in place was only for a one-bedroom. So . . .
Q. Prior to purchasing the property, did you hire an engineer to determine whether a bigger septic system --
A. No.
Q. -- complied with -- I have to finish -- complied with Title V could be installed on that property?
A. No.

MS. ECKER: Okay. Can we take a quick break?

MR. REVERE: Sure.

(Brief recess taken.)

BY MS. ECKER:

MS. ECKER: Back on the record.

Q. Ms. Cordi-Allen, have you, other than this appeal that you've filed of Brooke -- Brooke Newman's building permit, have you filed any other applications with the Zoning Board of Appeals?

Page 236

A. Not that I know of.
Q. So other than this decision that's the subject of your lawsuit here, have they done anything else concerning your property -- they being the Zoning Board of Appeals -- made any decisions?
A. Regarding --
Q. Your property.
A. -- our property? We've been told through town counsel or the -- I think -- I think it was town counsel. I -- my lawyer told us that -- and we know Brooke Newman never went to the Zoning Board. She didn't need a special permit. But now they're saying that we need a special permit. So I don't know if that's what you're talking about or what. But that came out of Zoning --
Q. Have you ever --
A. -- I believe.
Q. Have you ever had any applications pending before the Zoning Board of Appeals other than your appeal of Ms. Newman's building permit?
A. Not -- I don't recall that we've gone in front of them for this. That's . . .
Q. Are you aware whether the Zoning Board of

Page 237

Appeals has made any decisions concerning your property other than reviewing your appeal of Ms. Newman's building permit?
A. We've been told that we have to get a special permit from the Zoning Board of Appeals.
Q. And town counsel has told you that. Right?
A. Yes.
Q. Do you know if the Zoning Board voted or made any decision concerning the fact that you would need or not need the special permit?
A. I'm not sure if they're the ones that told her. I believe they di- -- I believe they did. But I wasn't part of that conversation.
Q. Who told you that the Zoning Board of Appeals told town counsel that you would need to get a special permit for your property?
A. I was told by my lawyer that --
Q. No. I don't want to know what --
MR. REVERE: Yeah.
Q. -- your lawyer said.
A. Oh.
Q. I want to know if you have any evidence that anyone from the Zoning Board of Appeals told town counsel, other than what your lawyer has

Page 238

told you, to tell you that your property needed a special permit prior to construction.
A. Okay. What's said between my lawyer verbally --
Q. It's not -- right.
A. -- of that and in writing doesn't count. Right?
Q. Correct.
A. Okay. Then, not to my knowledge.
Q. Okay. And do you know whether it was simply town counsel's advice to the Town that you would need a special permit rather than any of the board members telling her that you needed to get a special permit prior to construction?
A. I would -- I -- I guess -- I don't know. I haven't heard. But there -- if town -- town counsel being a lawyer should be consistent. Otherwise, you're opening yourself up for problems. And --
Q. And you -- you believe Ms. Turano-Flores is not consistent?
A. There -- there are inconsistencies that are evident between Brooke Newman and myself. So -- by the town. So she's part of the town;

Page 239

the town's part of the town.
Q. Do you believe that the building inspector or any of the building inspectors since you've owned the property who are employed by the Town of Truro have discriminated against you?
A. Again, through -- yes. Through inconsistencies of treatment --
Q. Okay. And which --
A. -- and requirements.
Q. Which building inspector?
A. Well, let's see who was the building -- Steve Williams was before. Corsanzo (sic), Corsano, Corsanzo (sic), C-o-r- -- I think it was s-a-n-o -- he was -- he was in position that was -- he was there, I believe, at the time. Right. And Steve Williams. This new one, I don't even know his name: Tom something or another. But he's just carrying on what the other two have done.
Q. And what decisions made by Mr. Williams do you believe are inconsistent?
A. The Town has said --
Q. I'm talking about -- not the Town. I'm talking about Mr. Williams --

Page 240

A. Right.
Q. -- specifically.
A. I'm talking exactly about him. The Town has determined that that whole area is a dune. Okay. There are certain standards for houses in dunes. His friend Brooke Newman got all the permits for a house that was supposedly on one -- the Town is saying is a dune, yet does not meet the performance standards of a dune. Yet for us, we're told that you're in a dune; and you can't do what you're doing.
Q. And this is Mr. Williams who has said this to you?
A. And Corsanzo (sic).
Q. I'm focusing on Mr. Williams right now.
A. Okay.
Q. Okay? Is it your understanding that Mr. Williams gave Brooke Newman a building permit?
A. Yes.
Q. And he would not give you a building permit; is that correct?
A. Yes.
Q. And is it your contention that the decisions

Page 241

are inconsistent because the property is located on a dune; both properties are located on a dune?
A. Yes.
Q. And how do you know Mr. Williams is friends of Brooke Newman's?
A. Numerous people in town have said it just in passing that they're friends.
Q. Have you ever seen them together socially?
A. I, pretty much, stay in our own house. I --
Q. So no?
A. -- mind my business. So no. It's just when people who know them, whatever, you know, have told me, you know.
Q. Okay. Who are these people?
A. Just townspeople. You know, you go to the center; you go to Jams; you go in a restaurant. You know --
Q. Any individual --
A. -- nobody that, you know --
Q. Any individual you can identify for me?
A. I can't think of anybody specifically right now.
Q. Okay. And what about Mr. Corsanzo, the second

Page 242

building inspector --
A. Yes.
Q. -- did he issue a building --
MR. REVERE: Corsano.
Q. Cors- -- whatever.
A. Corsano.
Q. Did he issue a building permit to Ms. Newman?
A. I believe Steve Williams was the one that issued the permit.
Q. So how has Mr. Corsano been inconsistent in his decisions?
A. That our house has different standards because we're in a dune.
Q. Different standards from who?
A. From Brooke Newman's and other -- you know. And what that property is. They're saying -- like, again, the Town's saying -- the Town has determined, through their geologist, that that whole area is a dune. DEP had said twice that time that we were not in a dune. Brooke Newman's house has violations going up the kazoo. Nobody's done anything about that. Yet for us who is in the same environment, we can't build.

Page 243

Q. I'm focusing on the building inspector.
A. That's what I'm --
Q. What decisions --
A. -- talking about.
Q. -- have the building inspectors, Mr. Corsano --
A. Corsano.
MR. REVERE: Corsano.
Q. -- Corsano specifically made that you believe are inconsistent concerning your property versus somebody else's?
A. That our house does not meet the -- the standards for a dune, that we're in a dune and can't build out on there.
Q. And who's other -- who else has he made a decision on that you believe is inconsistent with that decision he's made on your property?
A. Well, Brooke Newman. Nobody -- I know that a letter was sent to the building inspector. I'm not sure when he left. So there may have been -- I don't know. It may have also been the new one. But a letter was sent about objecting to Ms. Newman's permits, that they -- that they're not all in order; and her house isn't in the correct position, et cetera, et

Page 244

cetera. And the building inspector did not respond. They dragged it out intentionally.
Q. What's your evidence that the building inspector dragged it out intentionally?
A. The time delay, extensive time delay.
Q. Okay. Other than the time period, any -- any evidence that he did that intentionally, the building inspector?
A. Well, the Town is now saying or trying to use that and saying that we did not get a response in time to file an objection.
Q. Do you have any evidence that the building inspector has any -- holds any malice towards you or any ill will?
A. He does what he's directed to do.
Q. And who directs him?
A. The selectmen, town manager.
Q. Do you have any evidence that any of the selectmen have any -- hold any malice or ill will towards you?
A. Again, there are inconsistencies, there are lies about our property to the Town.
Q. Who specifically had lied? Which selectman has specifically lied to the Town about your

Page 245

property?
A. Oh, I'd have to look at the newspaper articles. And that would tell.
Q. You can't think of any individual selectman from the Town of Truro, as we sit here today, who has lied about your property to the Town?
A. I -- I -- I -- I have read in the paper and talked with people who were aware of what was going on down there, that there was a meeting and -- about taking our property by eminent domain, that -- and the -- the town counsel had even said this, that they need to stop us from our dock for the yacht club. They needed to take our -- our properties for the yacht club. And --
Q. Let me stop you. The town counsel being Ms. Turano-Flores has said that they need to take --
A. Her --
Q. -- your property by eminent domain for the yacht club?
A. Who's the -- what firm is she with?
Q. Zisson & Veara.
A. Yes. It was Veara.

Page 246

Q. So is it your testimony that Mr. Veara stated that the Town needed to take the Cordi-Allens' property for the use by the yacht club?
A. It's what I read in the paper, and people have told me.
Q. Who told you that Mr. Veara said that?
A. People that were at the meeting. I -- I believe it was the Perrys.
Q. Which meeting?
A. The one to take our property.
Q. And did you attend the meeting?
A. No. I did not.
Q. Okay. Why not?
A. Because we couldn't speak at it.
Q. Who told you you couldn't speak at it?
A. The lawyer that we had, Greg McGregor.
Q. Okay. Did anyone from the Town of Truro or associated with the Town of Truro tell you that you would not be able to me- -- speak at the meeting concerning the taking of the tidal flats?
A. When you have a lawyer, you can't contact your lawyer. So there was no communication. It was through my lawyer. So I don't know what they

Page 247

said to my lawyer. But that's what I was told.
Q. Were you aware prior to taking -- the taking of the tidal flats that the Town wou- -- intended to take that property?
A. No.
Q. Okay. So is it your contention you never received notice that the Town intended to take the property by eminent domain?
A. Going back to when?
Q. When's the --
A. That's what I want --
Q. When's the first time you received notice that the Town intended to take the tidal flats?
A. Maybe in 1999. I don't know. Somewhere around there.
Q. Had you received a letter from the Town?
A. Excuse me. It was, I think, in 2000. I believe it was 2000.
Q. And you belie- -- received a letter from the Town. Correct?
A. Pardon?
Q. You received a letter from the Town concerning the taking of the --
A. Yes.

Page 248

Q. -- tidal flats?
A. Yes.
Q. Okay. And you're aware that other property owners also received letters to take the tidal flats. Correct?
A. Yes.
Q. And did it state in that letter the reason why the tidal flats were being taken?
A. They must have had some reason.
Q. Do you recall what the reason was?
A. No.
Q. Do you know why the tidal flats were taken?
A. So the yacht club could put more of their boats there --
Q. Who told --
A. -- and --
Q. Who told you that?
A. The harbormaster.
Q. And who was the harbormaster at the time?
A. Warren Roderick. And, also, the one that just left told me that Brooke Newman, she now has a mooring. The Town has said that we can't put our floats where we were permitted for, which does not interfere with navigation. And -- but

Page 249

we were charged $2,100 to char- -- the Town has said that we cannot use that because it's the town-owned land.

But Brooke Newman does not have a permit from DEP, has no permit for her float which is at the end of our pier which is exactly where our dock was going. But he's -- he said to me, he said, Well, you know, I don't know how it got there. And he -- I said, Give me an application so I can put floats out there. He said, I can't. They won't let me.
Q. Who told you that?
A. The harbormasters.
Q. Mr. Roderick?
A. And the one that left this year or last year.
Q. Do you know why Mr. Roderick left the Town?
A. I know he was getting threats from the Town. He told us. It was in the paper.
Q. What type of threats was he getting from the Town?
A. If he didn't do what -- go -- if he didn't sign a paper going against our dock, he would not get a $5,000 raise.
Q. Do you know who said that to him or allegedly

Page 250

said that to Mr. Roderick?
A. The town manager.
Q. Which was who at the time?
A. Bud Breault.
Q. Okay. Other than Mr. Roderick telling you that, do you have any evidence that Mr. Breault said that?
A. It's been a -- it's been documented in the newspaper.
Q. The newspaper articles that I have all say that that comes from Mr. Roderick. Correct? Anybody else you know ever heard that?
A. Mr. Roderick, I believe, in that article, said that he was given a prewritten letter by the town manager; and I think the Harbor Commission was there also and told that.
Q. Okay. So other than Mr. Roderick saying this --
A. And the newspaper.
Q. Well, the newspaper quoting Mr. Roderick. Any other statements?
A. They had pictures of the letter in the paper.
Q. Any other statements or any evidence that you have that Mr. Roderick was forced to sign that

Page 251

letter or threatened if he did not?
A. What he told us and what he has publicly said.
Q. And do you know why Mr. Roderick is no longer employed by the Town?
A. I -- I think there were a lot of -- a lot of reasons probably that haven't come out. And I think the -- the excuse in the paper was something about he put down that he worked some hours that he didn't. Yeah. In all honesty, I -- I don't -- I really don't know. But that's what I think I read in the paper. But . . .
Q. Do you keep in touch with Mr. Roderick?
A. No. I do not.
Q. Do you know where he is?
A. No.
Q. Did you ever talk to Mr. Roderick about his termination from his employment with the Town?
A. No.
Q. Do you believe that Nick Brown made any misrepresentations to you about the property at the time of the sale?
A. Yes.
Q. Okay. And what misrepresentations did Mr. Brown

make?
A. He said, again, about the dock, you're grandfathered for your dock. The floats are here. Just apply for it, and you'll get your permit to use the floats. And that was advertised in the newspaper.
Q. Any other misrepresentations you believe that Mr. Brown made at the time of the sale?
A. About the ad- -- addition. We could add on with a septic that was there, you know, up to 5,000 square foot if we wanted a one-bedroom structure with the septic that was there. And --
Q. Did you ever file a lawsuit against Mr. Brown because of these misrepresentations?
A. No.
Q. Why not?
A. My lawyers --
Q. I don't want to know what your lawyer said. Okay. I'm going to show you a -- a document and ask if you rec- --
MS. ECKER: Let me have her mark it first as Exhibit 11.
(Advertisement marked as Cordi-Allen

Exhibit No. 11.)
Q. If you could take a look at what's marked as Exhibit 11 and tell me if you recognize it.
A. It looks like one of -- an ad that I -- it was probably in one of those magazines, the real estate magazine.
Q. Okay. Is the third one down an advertisement for your property?
A. Yes.
Q. And is that the advertisement you saw prior to purchasing your home?
A. I believe so.
Q. And that advertisement says "Waterfront boathouse renovated with loft bedroom." Correct?
A. Yes.
Q. "Existing dock and addition possible for one bedroom." Correct?
A. "With an addition possible."
Q. "For one bedroom"?
A. "For one bedroom." Yes.
Q. And the purchase price as advertised was $195,000. Correct?
A. Yes.

Q. And how much did you purchase the property for?
A. I think, 145.
Q. And do you -- was there a negotiation as to the purchase price?
A. Yes.
Q. Okay. And why was the prop- -- the property price reduced by $50,000?
A. Well, there were others that were 95,000 right above it. So . . .
Q. Well, was there any specific reason why you purchased -- it was determined that you would purchase the property for 145, $50,000 below the asking price?
A. Well, houses --
Q. I'm just asking.
A. Yeah. I'm just -- I'm trying to answer you. You know, this house here is a two-bedroom on the beach for 195. This one here isn't even a one-bedroom; there's no bedroom. The loft is not a bedroom. So --
Q. Did you --
A. -- it was maybe overpriced. I know --
Q. Did you negotiate with Mr. Brown for the purchase price?

A. Well, you do the paperwork. You put in a offering price.
Q. Do you know how long the house was on the market prior to your purchase of it?
A. No. I think it was on and off. I don't . . .
Q. Had you spoken with anybody else who had looked at the pro- -- at the property and decided not to purchase it?
A. No.
Q. And the house that you purchased had a dock. Correct? Had an existing dock. Correct?
A. Well, no.
Q. Okay. I'm going to show you what's been marked as Exhibit 5 at your prior deposition.
A. Uh-huh.
Q. Okay. And if you look at -- there's red marker --
A. Uh-huh.
Q. -- on -- on the exhibit. Correct?
A. Right.
Q. And that shows an extension of a dock that you were requesting. Correct?
A. Yes. This here, they call a pier.
Q. Oh, I'm sorry.

Page 256

A. Okay?
Q. Okay.
A. Yeah. And these are the floats there, the ones that he said we were grandfathered and put back out.
Q. So it's your testimony that what existed at the time of your purchase of the property was a pier and not a dock?
A. This is called -- well, now I'm finding out the terminologies. This is called a pier. Okay. And to make it a dock, you need to put in your floats and a T. Like, see this? That -- that makes that a dock. So you can -- you know, here, you -- you're going to fall into the harbor.
Q. Okay. So when you say "See this," you're pointing to the dock that's at the yacht club. Correct?
A. Right.
Q. Okay. And when you went to purchase the property, you observed that there was a pier located there. Correct?
A. Yes.
Q. Okay. And so when Mr. Brown said to you,

Page 257

There's a dock, did you understand him to mean that portion that you now refer to as a pier existed?
A. That that existed and the floats to con- -- to make it one. And you see like that I was showing -- I'll show you again -- right -- right here is -- that's all owned by the Town, supposedly. But --
Q. And you're circling the area at the --
A. The area --
Q. -- yacht club?
A. -- of the yacht club. Right. There, this, this, their floats, okay, and their -- their ramp there. That's all on town-owned land. We can't put ours on town-owned land, but they can. Okay. And --
Q. Ms. -- Ms. --
A. -- Brooke Newman's -- wait a minute -- Newman has put her boat right here. Now, if this is going to interfere with navigation, her boat would interfere with navigation. And I only point -- point that out to you 'cause now you have the diagram where you could see it.
Q. Okay.

Page 258

A. And, again, that's on town-owned land.
Q. When you went to look at the property prior to your purchase of it --
A. Yes.
Q. -- you saw that there was an existing what you now call a pier. Correct?
A. Yes.
Q. And did you believe that what you now call a pier was the dock that the advertisement was referring to?
A. With --
Q. The floats.
A. With the floats --
Q. Okay.
A. -- it would have been complete.
Q. Okay. And the floats that you're pointing to still exist. Correct?
A. Yes.
Q. Okay.
A. Some of them are there.
Q. Okay. So when you say he misrepresented to you that there was a dock, did Mr. Brown ever represent to you that you'd be able to extend your pier?

Page 259

A. Yes.
Q. Okay. What did he specifically say to you?
A. He said to us that we're grandfathered. And he left the floats there to grandfather us.
Q. Well, the floats are still there. My question to you is, did Mr. Brown ever say to you that you would be able to extend the pier as appears in this red line, your proposal for the extension?
A. Yes.
Q. Okay. And how far out did Mr. Brown tell you you'd be able to extend the pier? How many feet?
A. What the license -- there was a license that was in existence. And we were going by -- he said, to get -- to reinstate the license, he left the floats on the property. And I -- there were -- there's like -- I think it was seven floats, and they were 10 feet. So 70. And then there was a T. So somewhere about 80 feet, I think.
Q. And did you ever check to make sure Mr. Brown's representation was accurate?
A. In fact, we applied to DEP. And my lawyer at

Page 260

the time and us got a call from DEP that our permit was coming in the mail, that it had been approved. And two weeks later, we got a denial. And then like, what is going on?
Q. A denial from DEP. Correct?
A. Right.
Q. And are you claiming that the DEP's decision was inconsistent or discriminatory in some manner?
A. Somebody, something got to DEP to make them flip.
Q. Do you have any evidence of that?
A. Do I? Only that I was called from DEP that my permit was coming in the mail.
Q. Who did you speak with?
A. Jim Mahala. And Liz Kouloheras spoke with my lawyer and told him that it had been approved. And that's what he told me.
Q. And, at some point in time, they changed their decision. Correct?
A. Yeah.
Q. Because DEP did not approve the extension of your --
A. No.

Page 261

Q. -- pier?
A. DEP did approve it.
Q. When?
A. And --
Q. You just told me that they flipped.
A. Right. They had called and said that they approved it.
Q. Do you have any documentation that it was ever approved by DEP?
A. Yes. Actually, it was approved through Wetlands. I --
Q. I'm just asking --
MR. REVERE: She's -- she's answering --
MS. ECKER: I don't want you -- I don't --
MR. REVERE: -- what -- it was my problem. Explain.
A. I think there was a -- there are two parts to DEP. One's Waterways, and one's Wetlands.
Q. Uh-huh.
A. And Wetlands approved it.
Q. Uh-huh.
A. And Waterways --
Q. Did not.
A. -- did not. However, we had a site visit.

Page 262

Yes. But I was getting it through -- everything, I was getting my permit --
Q. Let's focus on the questions, Ms. Cordi-Allen --
A. Yeah.
Q. -- and we'll move along much quicker. Okay?
A. But we had a site visit.
Q. I --
A. And it had been agreed on by DEP to shorten it, to change this here, to shorten it. And it was agreed with DEP, everybody, the Town, the yacht club, everybody, Army Corps of Engineers that they -- we all agreed to having this shortened and . . .
Q. And then what happened?
A. After we agreed, we had the plans drawn up by Felco to what we were told to do. And then they rejected us again.
Q. Did the Army Corps -- Corps reject your plans?
A. No. They did not.
Q. They approved your plans --
A. They did. Uh-huh.
Q. -- for the dock extension?
A. Yeah.

Page 263

Q. Had the Army Corps ever rejected any of your applications?
A. Has the Army Corps? No.
Q. Did you ever accuse the Army Corps of discriminating against you? And the Army Corps, I mean the Army Corps of Engineers.
A. Yeah. Not to my knowledge.
Q. Have you ever accused the Army Corps of Engineers of being inconsistent in their decisions concerning your property?
A. I don't remember.
Q. Okay. The same --
A. I don't. I don't even recall any of that.
Q. The same questions for the Department of Environmental Protection, have you ever accused any branch of the Department of Environmental Protection of discriminating against you?
A. I don't know.
Q. Okay. Have you ever accused any part of the Department of Environmental Protection or any person of making inconsistent decisions concerning your property?
A. Yeah. Oh. Oh, I'll tell anybody that. Definitely.

Page 264

Q. Okay. And who specifically at the Department of Environmental Protection do you believe has made inconsistent decisions concerning your property?
A. Liz Kouloheras.
Q. Anybody else?
A. Jim Mahala.
Q. And why do you believe they have been inconsistent?
A. Well, Liz Kouloheras twice has said that our property is not a dune. And that's in the documents. And somehow, now, all of a sudden, she's flipped and said it is a dune now that we own it.
Q. Do you believe --
A. She said --
Q. -- she'd done --
A. She said that we were getting our permits for the dock, the original dock. And then she issued a denial, you know.
Q. Do you believe that she holds any malice or ill will towards you?
A. Well, my only concern is, why did she flip? And we all know how the Government works.

Page 265

So . . .
Q. Well, how does the Government work?
A. People, certain people can make a phone call to any state agency and get whatever people want.
Q. Do you have any evidence that anyone from the Town of Truro called anyone at the DEP outside of the hearings and the -- the evidence that has been introduced regarding your property to tell them to flip their decision?
A. I -- I don't know who made what or why they -- they flipped. But she totally flipped. And she flipped on her own decisions twice.
Q. And do you know if that's based on additional evidence that she received to make her -- to change her decision?
A. Nothing down there has changed. So . . .
Q. Do you have any evidence that she or the other gentleman at the Department of Environmental Protection that you have testified made inconsistent decisions holds any malice or ill will towards you personally?
A. They close their eyes for what is going on down there, and they only do what the Town of Truro wants.

Page 266

Q. Going back to the eminent domain for a minute, do -- were you aware that there was a meeting held with other property owners and between the other property owners in the town concerning the taking of the tidal flats prior to it going forward?
A. I don't know.
Q. Well, you testified you didn't attend because you wouldn't be able to speak. Correct?
A. Well, that was at the town meeting?
Q. Yes.
A. Is that what you're talking about?
Q. Yes.
A. Okay. I thought you meant a private meeting.
Q. No. Town meeting. There was a town meeting held. Correct?
A. Yes.
Q. And you were aware that the town meeting was going to be held. Correct?
A. Yes.
Q. Okay. And other property owners had their tidal flats taken. Correct?
A. Yes.
Q. Okay. Do you know how many other property

Page 267

owners?
A. Well --
Q. Yes or no?
A. Let's see. I don't know how many in total.
Q. Okay. And each property owner was offered a sum of money for their tidal flats. Correct?
A. Yes.
Q. Okay. And do you know if there was negotiation between the property owners and the Towns concerning the amount that was to be given?
A. I don't know.
Q. Did you know if you were allowed to negotiate the price?
A. We wanted our dock. We bought that property for a dock. There was no town pier when we bought the property. It was -- I am disabled. Wait a minute. I'm disabled. My daughter's disabled. That's why we bought the property with a dock.
The yacht club got whatever monies they got, quite a large amount. And they got to keep their dock and the town land. And us, it was -- and this is, the -- the town lawyer said, to stop us from our dock, they are doing

this.
Q. That was --
A. The other --
Q. -- Mr. Veara, just so I'm clear --
A. Yeah.
Q. -- who said that?
A. And the other two people could not put a dock in. So it would not affect them in any way. So it's not -- and they were offered, at least, tenfold of what we were offered.
Q. Were you represented at the time of the eminent domain taking of the tidal flats?
A. Yes.
Q. And so did you approach the Town in any way, you or a representative, to negotiate the price for taking of the tidal flats --
A. I --
Q. -- your tidal flats?
A. I don't know if my attorney did. I don't think he did.
Q. And so you were given a sum of money. Correct?
A. No. We did not get a penny.
Q. So it's your testimony you were never offered any amount of money and never given an amount

of money?
A. We were never given anything. We never took anything.
Q. You weren't given $2,500?
A. No. We weren't given anything.
Q. Were you offered $2,500?
A. There was an offering for about that, somewhere around there.
Q. Did you accept the offer?
A. No.
Q. And you never tried to negotiate the price. Correct?
A. We have an eminent domain lawyer handling that.
Q. Still?
A. Yes.
Q. And is there a lawsuit?
A. Yes.
Q. Okay. Where's that lawsuit?
A. I have no idea.
MR. REVERE: Off the record or on the record.
MS. ECKER: You can go off or on. But there better not be another one.
MR. REVERE: Huh?

MS. ECKER: Is there another eminent domain lawsuit?
MR. REVERE: Let's go off the record.
(A brief discussion was held off the record.)
MS. ECKER: On the record.
Q. The dock that appears at the yacht club was already built at the time that the eminent domain taking occurred. Correct?
A. I'm not su- -- I don't -- I'm not sure. I know that they were not licensed for their dock and their configuration. I've noticed some new floats being added continually. So I -- I really can't tell you, you know, exactly what was in place at what date.
Q. Do you know when the eminent domain taking occurred? About 2000?
A. It started in 2000, and I think it ended in what, 2002.
Q. Okay.
MR. REVERE: Go off -- go off the record very --
(A brief discussion was held off the record.)

Q. I'll represent to you -- and you can see that this photograph that's in Exhibit 5 was taken, at least, at some time in the '90s prior to the eminent domain taking. Correct? But I don't have a -- the final number on it.
A. Yeah.
Q. But it says '90. And as appears in this photograph that's Exhibit 5, there is a dock that has already been constructed o- -- off the yacht club.
A. Yes.
Q. Correct? And so that dock was present and constructed at the time the eminent domain taking occurred. Correct?
A. That dock, I don't know that -- I don't think that's the dock that's there now.
Q. Okay. So it's your te- --
A. That's what I'm saying.
Q. Okay. So it's your testimony there's another dock that's there?
A. Yes.
Q. Is it your testimony that they replaced the dock that is depicted in Exhibit 5?
A. They have added -- yes. They've added.

Page 272

Whoops.
Q. Okay. And the eminent domain taking that occurred did not affect the pier on your property. Correct? You still own that pier?
A. I think they gave an easement for the pier --
Q. Okay. So you stopped --
A. -- which -- which they call now a walkway.
Q. So that's still your right. That's still your pier. Correct?
A. I guess.
Q. Do you have any evidence that it's not your pier, that you don't own it anymore?
A. Well, there's an easement. So I don't --
Q. Was your title changed?
A. I don't know what they recorded.
Q. Is it your understanding that anyone from the public can use that pier?
A. From the public? I don't think anybody can use it.
Q. Other than --
A. It's not --
Q. -- you?
A. No. We can't use it. We're not allowed to use it.

Page 273

Q. You're not allowed to walk on it?
A. We can walk on it, but we can't tie a boat up to it.
Q. But the actual pier itself is yours. And you could walk on it, and you own it. Correct?
A. Currently. Yes.
Q. And what about the floats that you pointed to that were there when you purchased the property, those are still there. Correct?
A. Some of them.
Q. And this photograph that's in Exhibit 5 depicts the harbor at low tide. Correct?
A. Yeah. Yes.
Q. And, at high tide, the water comes up to the end of your pier. Correct?
A. About. It depends on what kind of a high tide.
Q. And, actually, in some cases, the water has come up further than your pier to around your house. Correct?
A. It depends on the -- on the moon and all that.
Q. Now, you have opposed other dredging in the Pamet Harbor. Correct?
A. Yes.
Q. And are you aware that the harbor had been

Page 274

dredged prior to your purchase of the property on occasion?
A. I believe so.
Q. And do you believe that the Town's desire to dredge the harbor has anything to do with you or your property?
A. It's going to have an impact on our property.
Q. How so?
A. Well, if, in fact, we're on a dune, it's going to erode our property.
Q. Do you believe that the Town decided to redredge the harbor because of you or your property or that they just decided to redredge it?
A. I don't -- I don't know why they're -- what their intentions are.
Q. Well, do you have any evidence that the -- that the Town's decision to dredge the property (sic) had -- was because of you or your property?
A. We can't use the harbor. So what would it have a...
Q. I'm just asking 'cause you -- now, it's the question. That's the answer. Right?

Page 275

A. Would you repeat the question?
Q. Sure. Did the Town make the decision to dredge the harbor based on anything to do with you or your property?
A. I don't know.
Q. Do you have any evidence that they did, that the dredging had anything to do with you and their desire to dredge?
A. I don't know what their intent is.
Q. Are you alleging that the Town decided to dredge the harbor to discriminate against you?
A. Yeah.
Q. Why?
A. So they can add more boats in front of our property that won't be ours.
Q. Okay. And you believe that's intentionally done to discriminate against --
A. Yeah.
Q. -- you?
A. Definitely.
Q. What evidence do you have that you -- that was the intent of the Town when they dredged the harbor?
A. That was their intent of the taking.

Page 276

Q. To allow more boats to be in the harbor?
A. For the yacht club. So . . .
Q. Why do you think it's for the yacht club and not the Town in general?
A. There -- it's the yacht club people that have their boats there. They've told people -- we've owned, okay, to mean low tide. The Town -- which, if we own it, we are entitled to rent these moorings out. However, this here property is ours. These boats are on our property. Yet the Town has collected rent from them.
Q. How do you --
A. Yeah.
Q. And did anyone tell you you're entitled to rent your moorings out?
A. They're not ours.
Q. Well --
A. They're on our property. It's our land. If -- they can't put things on your land. Okay. So --
Q. Is it your testimony today that you still own the property that's depicted in Exhibit 5 where the boats are -- are moored?

Page 277

A. We owned it for six years until they did the taking.
Q. Okay. When they took the tidal flats. Correct?
A. Uh-huh.
Q. Okay. And did anyone tell you during those six years that you can rent out those moorings?
A. We -- we -- no. We -- well, I believe my attorney had written correspondence with the Town about the boats being placed on our property and that the Town should not be collecting rent for boats on our property.
Q. And the Town disagreed with you. Correct?
A. They ignored it, I believe.
Q. Do you know if there was any correspondence back that you were, in fact, incorrect?
A. I don't recall getting any correspondence from them.
Q. Have you used Mr. LaJoie as your engineer?
A. Yes.
Q. And are you aware that Mr. LaJoie was the prior property owners' engineer when the initial septic system was put in?
A. I'm not sure.

Page 278

Q. Do you know if Mr. LaJoie was present at the meetings when the one-bedroom restriction was placed on your property prior to your owning it?
A. I don't. I don't know.
Q. Have you ever spoken with Mr. LaJoie about that one-bedroom restriction?
A. Only that we were told that we could put a three-bedroom septic in by the Court and to draw up the plans accordingly.
Q. Did Mr. LaJoie -- or have you ever had a conversation with Mr. LaJoie about the subdivision of the property prior to your purchasing it?
A. I -- I don't think so. That's -- I don't recall.
Q. And did you ever talk to Mr. LaJoie prior to your pur- -- purchasing of the property?
A. Prior? I don't -- about this? No. I don't believe so.
Q. When's the first time you spoke with Mr. LaJoie after you purchased the property?
A. About drawing up the plans.
Q. Okay. How -- how soon after the purchase of

Page 279

the property did you speak with him?
A. After our purchase?
Q. Yes. Well, you didn't speak with him before. Correct?
A. Right. That --
Q. So after the purchase.
A. I was wondering what date you were looking for --
Q. When's the first --
A. -- from which --
Q. -- time --
A. -- point. We drew up a tentative plan, I think, in July or August of '96. But then we needed formal plans after that. And he drew that up and the dock. So it was somewhere in '96.
Q. That you first spoke with Mr. LaJoie about --
A. Yes.
Q. -- drawing up plans? And, at that time, did Mr. LaJoie tell you that he was involved with the prior property owner when the property was subdivided?
A. I don't recall him saying anything about that.
Q. Do you have any knowledge that Mr. LaJoie was

actually present at the hearings for the prior property owner when the --
A. No.
Q. -- property was being subdivided?
A. No.
Q. When you first spoke with Mr. LaJoie about drawing up plans, did he tell you there was a one-bedroom restriction on the property? Or did you al- -- had you already learned that?
A. No. I -- Bill Thomas had -- once Bill Thomas had won in court, that's when we knew that we could build a three-bedroom septic. So it was after Mr. Thomas went to court that we --
MR. REVERE: Focus on the time she's asking you.
Q. When -- did you contact Mr. LaJoie prior to your finding out the court decision?
A. I believe I had him draw up the dock component. Yeah. In '96, I -- I believe that was so we could get that out in the mail.
Q. And that's --
A. Because we no -- yeah. It's because I had notified the Town that we -- our intent was to put out our floats in '96. And they sent me a

letter that it was costing me $2,100; and the yacht club was $300 for -- both were the same amount of floats. And they had no license. And we were going through the proper channels. And I believe then I had him draw up whatever it was needed for DEP or whatever for the plans.
I -- I'm pretty sure that was -- because in '97 is when I learned that they started trying to stop me from my dock for the yacht club and -- you know, so the yacht club could get out. And I was like, my property has nothing to do with the yacht club getting out at all.
Q. When's the first time you had Mr. LaJoie draw any plans for the septic system on your property?
A. For the septic system? He did -- he would have done that after Bill Thomas went to court. And I don't know the date.
Q. Prior to Mr. Thomas going to court, did you have any engineers draw up any plans for a septic system?
A. I used Felco. That's the only one I use.
Q. Okay. And when Felco drew up the plans, is

Felco -- is -- is now Mr. LaJoie?
A. Yes.
Q. It is. Okay. So prior to going to court --
A. He might be a son, you know, of -- I don't know that he --
Q. Prior to going to court, Mr. Thomas going to a court to appeal a decision by the Town denying your septic plan, you had to have the plan drawn up, correct, to submit to the Town?
MR. REVERE: Yeah.
A. But we, through -- we just sketched one out, I believe, at that time.
Q. You didn't have an engineer do it?
A. No.
MR. REVERE: Can we go off the record for a second? Let -- let me talk to you.
(Brief recess taken.)
BY MS. ECKER:
Q. Ms. Cordi-Allen, in October of 1996, did you go to the Board of Health with plans that had been drawn up by Mr. LaJoie for the septic system, approximately at that time frame? You know what?
A. I -- I don't -- I really don't remember if --

Q. All right. Forget the time frame. I don't care. All I want to know is, the first time you approached Mr. LaJoie to draw up plans for you for the septic plan, did you discuss with him a one-bedroom restriction that had been placed on the property?
A. I don't believe so, 'cause it was a three-bedroom I had him draw up. So . . .
Q. Did Mr. LaJoie ever tell you he was present when the one-bedroom restriction was placed on the property?
A. I don't recall him saying anything about that.
Q. When's the first time you learned of the one-bedroom restriction?
A. When did I learn? I -- I learned that there was a -- a one-bedroom septic in place. Let me shut this off. His mother's not well at all. So it's day to day.
MR. REVERE: We're off the record.
(Off the record due to incoming cell phone call.)
Q. Okay. I -- I understand you've told me that you knew about the -- the one-bedroom septic when you purchased it. But when did you learn

Page 284

of the one-bedroom restriction that had been voted on by the Board of Selectmen?
A. I don't remember.
Q. Do you remember if it was before you filed your application with the Town for your septic system?
A. I -- I don't remember.
Q. And do you believe that the Board of Health inspector discriminated against you in any manner in denying your septic permit?
A. You mean, Steve Williams? That was the building inspector and the health inspector.
MR. REVERE: Can we go off the record for just a second?
MS. ECKER: No. Let's just finish this.
MR. REVERE: You know, the septic was denied not by --
MS. ECKER: Put it on the record.
MR. REVERE: Not by -- it was denied by the selectmen at a meeting, not by a person of the Board of Health. Okay? That's all. So --
MS. ECKER: I think, at some point, it was also denied by the Board. But whatever.
MR. REVERE: Okay. In any event, that --

Page 285

that's just the . . .
A. At that time, the Board of Health person was the building inspector. Same guy; two hats.
Q. Okay. And, as your attorney just stated, it was the Board of Selectmen who denied your permit for the septic, correct, initially? Do you know?
A. I don't recall.
Q. Do you know if any -- do you believe that anyone discriminated against you in denying that septic permit?
A. It was said in court -- the judge said that the Town was being arbitrary and capricious. So based on that -- and the Town did not appeal the judge's decision either. They went along -- they agreed with him, evidently.
Q. So it's your belief that the Town agreed with the judge's decision that they were arbitrary and capricious. And did it appeal --
A. No.
Q. -- that decision even with the DEP?
A. Well, if they didn't agree, then they missed the deadline.
Q. All right. Let me go back --

Page 286

A. And --
Q. -- to the -- let me go back to the Board of Selectmen.
A. Okay.
Q. The Board of Selectmen denied your -- your permit for a septic system. Correct?
MR. REVERE: Wait -- wait a second. I was wrong. It -- the selectmen did the '92.
MS. ECKER: Yes.
MR. REVERE: Okay. You're -- so I'm sorry. I -- I apologize. Then the Board of Health did the '96.
MS. ECKER: That's correct.
MR. REVERE: So I apologize.
MS. ECKER: That's all right.
MR. REVERE: Okay.
Q. At some point in time in '96, the Board of Health denied your septic permit. Correct?
A. I don't -- I don't remember. But I know --
Q. It wasn't allowed.
A. -- it went --
Q. Right?
A. -- to court.
Q. Okay.

Page 287

A. Yeah. But I don't -- I don't remember like time frames or who --
Q. Are you aware that --
A. It was something.
Q. Are you aware that town counsel was asked her opinion as to whether they -- they should approve the septic system?
A. No. I don't know what they did.
Q. Do you believe that the Board of Health, in reviewing your septic permit, followed the advice of town counsel in any way?
A. I don't know who they conferred with.
Q. And do you believe that the Board of Health discriminated against you in denying the septic permit?
A. Yes.
Q. Okay. And why is that?
A. Everybody else down there had two or three or -- I believe Russ Zawaduk, in that area, I think his is a four-bedroom. Russ Zawaduk, Z-a-w-a-d-u-k, I think his is a four-bedroom. And the two Worthington homes are two-bedroom. And yet they're all in the same area, dune area. So, you know, I don't --

Page 288

Q. Are you aware of anyone else in the town of Truro who had a one-bedroom restriction placed on their property that was allowed to increase the size --
A. No.
Q. -- of their property?
A. I don't know anybody.
Q. And I believe that you wrote several of your congressmen and state representatives concerning the concerns you had with the Town of Truro. Correct?
A. At some point, I did.
Q. And did they --
A. We went to get documents.
Q. Well, did you write to Senator Kennedy to -- complaining about the Town of Truro?
A. I don't remember. I may have. But I don't -- I'd have to see something 'cause I don't remember.
Q. Did any of the elected government officials that you wrote to -- the congressmen and the senators -- outside of the Town of Truro respond to you, saying that they supported your position that the Town of Truro was

Page 289

discriminating or acting improperly concerning your property?
A. I know that there was communication like with the Army Corps, and they approved us. And that's the federal agency.
Q. No. I -- I'm focusing on elected officials that you corresponded with --
A. Yeah.
Q. -- for --
A. That's what I'm saying. I think like maybe if it was Kennedy I spoke with or Rolph (phonetic), because he's on the Cape, so I may have. And we have our own -- in our own area. And if they called anybody, it would be -- they would have called the Army Corps. And the Army Corps had agreed to our dock anyways. My concern was -- and it still is -- state politics. And we all know what's going on there.
Q. What's going on in state politics that affecting -- that's affecting your property?
A. That's affecting? Somebody, somehow, convinced DEP to flip. When they made a decision three times to give us a permit, twice that we're

Page 290

not in a dune, and then, oh, you -- we're issuing you your dock permit. They made that decision. They made a commitment to myself and to my attorney. And then they flipped.
And in reading the newspaper and hearing go- -- what's going on specifically in Worcester, Mass., with certain politicians, you can get anything you want for -- by making the right contacts or doing whatever. And some of them are in jail now or on their way.
Q. But specifically focusing on Truro and your property, do you have any evidence that state politics has played a role?
A. Again, like I said, DEP flipped. And --
Q. Do you have any evidence --
A. -- numerous people have said -- you know, they -- they know that calls get made quite often to DEP. And, all of a sudden, things change. I mean -- and that happens in the courts even up here, all over. I mean . . .
Q. Do you have any evidence of any specific phone calls that were made to DEP causing them to flip their decisions? No?
A. Not that -- on this here, right now? None that

Page 291

I know of. But, again, our concern is, why did they flip?
Q. Did you write to the attorney general, Thomas Reilly, to investigate the Town of Truro?
A. I believe I did.
Q. Am what was -- what did you want Mr. -- Mr. Reilly to investigate?
A. Why Brooke Newman has her permits and she doesn't comply with DEP regulations and what's going on in Truro. And I know that he had called -- I was told by the building inspector that he wanted to review the file. And I --
Q. And do you know --
A. -- I don't know what happened after that.
Q. Okay. Do you know if the attorney general ever reviewed the file?
A. I don't know.
Q. Did you ever --
A. I have not heard from --
Q. Do you --
A. -- either one of them about it.
Q. Have you ever spoken with anyone from the attorney general's office?
A. I haven't heard from them.

Page 292

Q. And did you receive any correspondence back from a Mr. Milkey, who is the chief of the Environmental Protection Division at the attorney general's office? Or who was. I think he still is.
A. I don't remember his -- I don't remember.
Q. Do you remember receiving any correspondence back from the attorney general's office concerning your complaints and request for investigation?
A. The only thing I remember is that they had requested the file on Brooke Newman. And, actually, the building inspector had said that. And they were supposed to get together about reviewing it, and I don't know what happened.
Q. Did you ever --
A. I don't know if they came in or what.
Q. But, as far as you're aware, the attorney general didn't find any wrongdoing.
A. Right.
Q. Correct?
A. I don't know what they've done with the case.
Q. All right. You have no evidence that the attorney general found any wrongdoing.

Page 293

Correct?
A. Last I -- like I said, I don't know what they've done with the case. I don't know if they've reviewed it.
Q. You have nothing in writing from the attorney general's or any document, telephone conversation from anyone who works for the attorney general's telling you that they found any wrongdoing in the Town of Truro. Correct?
A. Not -- not to my recollection.
Q. Did you file a complaint with the Ethics Commission concerning --
A. Yes.
Q. -- the Town of Truro? And was that investigated, as far as you know?
A. Yes.
Q. And is it your understanding that the Ethics Commission found nothing wrong with the -- the actions taken by individuals in the Town of Truro?
A. They, most certainly, did find problems.
Q. Okay. What did the Ethics Commission find?
A. They weren't really seeing public information, and they were ordered to.

Page 294

Q. By the Ethics Commission?
A. Yes. Yes.
Q. And who specifically at the Ethics Commission?
A. I don't remember. It was a man.
Q. Do you have any documentation that that's the Ethics Commission's finding?
A. Yes.
Q. Okay. And you've --
A. I'm sure --
Q. -- given that to your attorney?
A. Well, he's got my file. So whatever.
MR. REVERE: I've given you everything.
A. Whatever I have, he's got.
Q. Anything else that you believe --
A. And also -- yes. Nick Brown, who was, as I said, president of the Harbor Commission, plunked his boat in the harbor. There's a hundred-year wait list for a boat to be there. And he is not on the wait list. And he was told some -- to remove his boat.
Q. By the Ethics Commission?
A. By the Ethics Commission.
Q. Who specifically?
A. Whoever was at -- in charge of the area.

Page 295

Q. And how do you know that it was the Ethics Commission that told Mr. Brown to remove his boat?
A. I think it was the harbormaster told me that.
Q. And that's Mr. Breault?
A. No. Roderick.
Q. Roderick. I'm sorry.
A. Yes. And then he put it back in. And they -- somehow, they found out about it. And they told him, if you put it back in, they were going to arrest him. So he's not been able to put his boat back in.
Q. That's the Ethics Commission --
A. Yes.
Q. -- you claim? Do you have any documentation that the Ethics Commission ever made any finding against the Town of Truro or its employees?
A. Nick Brown was on -- like I said, the chairman of the Harbor Commission. So . . .
Q. What evidence do you have? Do you have any documentation that the Ethics Commission found against Mr. Brown?
A. Only what I was told.

Page 296

Q. Okay. No documents?
A. I don't remember. But I know what I wa- -- you know, that's what I was told.
Q. And other --
A. So I know that for a fact, and that the boat was there. It's been removed. And then it went back in, and then it was -- it's out now. So . . .
Q. Other than Mr. Roderick telling you this is what occurred, have you spoken with anybody from the Ethics Commission?
A. There was some man there I -- I was in contact with.
Q. And did that man tell you that they found against Mr. Brown?
A. I believe he did.
Q. And who was that man?
A. I don't know. I don't know his name.
Q. A lawyer?
A. Huh?
Q. Was he a lawyer for the Ethics Commission?
A. I don't know people's background. No.
Q. Okay. You have no documentation that the Ethics Commission found against anyone in the

Page 297

Town of Truro. Correct?
A. Yes. I do.
Q. What's the documentation?
A. My documents. It's in with my documents.
Q. Well, I will represent to you that I have looked at them; and there is nothing in there from the Ethics Commission saying that they found against the Town. In fact, just the opposite is true. They wrote you, saying that they weren't going to pursue an investigation. So if you have anything else, I'd recommend that you give it to your attorney, who will then give it to me.
A. Well, I gave him what I had unless something was lost. But they told them they had to release information under the public information act or something. And they weren't doing that. And then they started giving me what I requested. And, again, they -- they haven't -- I requested information a couple of months ago, and I still haven't received it.
Q. The public records, do -- do you recall that you wrote to a separate state agency requesting they assist you in obtaining public records,

Page 298

not the Ethics Commission?
A. That is the Ethics Commission.
Q. It's, actually, not. I'll represent to you there's a separate board that you appeal to to obtain public records, not the Ethics Commission.
A. I thought that I -- the man in the Ethics Commission is the one who told me about getting public documents.
Q. No. That -- that's another board. The name escapes me at the moment.
A. Then I'm confused. Because that's who I --
Q. And you --
A. -- I remember talking with that person about getting public records.
Q. And you've made numerous demands upon the Town for public records. Correct?
A. Yes.
Q. And in your demands -- well, let me put it this way: Your demands began in 1996 for public records from the Town. Correct?
A. I don't remember.
Q. Okay. And, in your request, you always insisted that they swear under oath that these

Page 299

were public records. Correct?
A. I don't remember.
Q. And, in fact, the Town has provided you with records; but they've requested that you put your request in writing. Correct?
A. Even when I have, I don't get public records. And I still, like I said, months ago, I put in writing; I have not received public records.
Q. The Town has responded and requested that you pay for the records, correct --
A. Yes.
Q. -- the copying?
A. Uh-huh.
Q. Okay. And have you paid on every occasion?
A. Yes.
Q. And you say there's an outstanding public records request?
A. Yes.
Q. And who's that to?
A. The Board of Health.
Q. Okay. And what are you seeking?
A. The records for the yacht club's so-called septic system and well that they have now on their property.

Q. And who did you address the --
A. As --
Q. -- letter to? The Board of Health?
A. Yes.
Q. Okay. And did the Board of Health tell you how much it would cost to copy and --
A. I have not heard from them.
Q. Any other public records request out there?
A. Also regarding the propane gas tanks at the yacht club. I think that -- that letter was also sent to Conservation Commission. They have propane gas tanks right outside, right close to our property line, within a foot of our property line. Did not go through Conservation Commission. They appeared, I believe, last year.

And they told -- they said to the Conservation Commission, oh, they've a- -- they -- that we replaced them. And like, they didn't replace anything. Because I've got pictures, and they're right here. There's no propane gas tanks. I mean -- and we have pictures from every year. But they don't go through Conservation Commission. Conservation

Commission closes their eyes.

They have a so-called septic system. Our documentation shows that they have a cesspool. We -- we've got pictures of excavation going on there. DEP's done nothing about it. In fact, they were standing -- they're in one of the pictures. They've done nothing about it. They do what they want.
Q. Do you believe that Mr. Breault discriminated against you?
A. Definitely.
Q. Okay. What did he do to discriminate you when he was town manager?
A. He did what boards told him to do. And one of them was stopping me from my dock.
Q. And what did Mr. Breault specifically do to discriminate against you?
A. Prepared a letter to stop me from my dock, that it would interfere with navigation and blah-blah-blah.
Q. Do you know if he did that on advice of counsel?
A. He did it on advice of the Harbor Commission. I believe they composed it themselves. It

wasn't through town counsel.
Q. Anything else that Mr. Breault did to discriminate against you?
A. Tell people not to talk to us, issued permits, did not enforce regulations of violations going on with the abutters. Only for us.
Q. You understand that Mr. Breault doesn't issue permits, correct, or did not when he was town manager? Correct?
A. He's in charge of -- he was in charge of running the Town and the departments. They all fell under his control.
Q. Do you have any evidence that Mr. Breault held any malice or ill will towards you?
A. In his treatment of us.
Q. How?
A. How?
Q. What evidence?
A. Again, our dock, stopping us from our dock, allowing the Town to charge us seven times the yacht club.
Q. Do you have any evidence that Mr. Breault ever made any discriminatory statements against you?
A. Statements?

Q. Yes.
A. Actions. Statements, no; actions, the actions are there.
Q. The actions are what? Other than denying you your permits, anything else?
A. Treating people inconsistently.
Q. Okay. How did Mr. Breault himself treat you inconsistently? Not what the other boards did. You've told me about the other boards.
A. Well, the yacht club did not have a permit. They didn't have a license for their dock. They were -- everything was fine with them. Ignore them. They did not -- they're not supposed to be serving liquor there. They're not supposed to have more than 25 people there at a time.

They're only supposed to be open so many days a year. Last year -- last year or the year before, get the -- last year, get a printout of the dates that they told Conservation Commission through the state mandate of the dates that they can be open. With -- a couple of days after they gave that to the Town, they were open for a party.

Page 304

I called the police department. I said, I just want you to put it on record that you're seeing a party there and that there's, you know, whatever people there, numerous people there. I said, But it's not on this calendar, which is -- it's not that things change --
Q. I'm -- I'm --
A. -- in a couple of days.
Q. Let me -- let me stop you, not -- not to cut you off. I'm focusing specifically on Mr. Breault. What has Mr. Breault done that you believe evidences that he holds some malice or ill will towards you?
A. He's treating me -- treated me differently than other people.
Q. Other than the yacht club and Ms. Newman, who else?
A. Right.
Q. Anyone else?
A. Those are my only concerns right now.
Q. What about the current town manager, do you think she's treated you differently or discriminated against you in any way?
A. I have not been in communication with her. The

Page 305

actions, I think, were all done before she came on board.
Q. When -- you purchased the property in 1996. Correct?
A. Yes.
Q. When's the first time you filed a complaint against the Town?
A. Probably when they charged me seven times the price of the yacht club for my floats.
Q. So that was several months after your purchase?
A. I would say.
Q. When's the first time after your purchase of the property that you began to complain to the Town about the yacht club?
A. Well, it would be when I was charged $2,100; and they were charged $300 for the same amount of floats.
Q. How many complaints have you filed with the Town, any department of the Town, concerning the yacht club and actions there?
A. I have no idea.
Q. A lot? Would you characterize it as numerous complaints about the yacht club?
A. If there was a violation, I would notify them.

Page 306

Q. When you purchased the property in '96, did you immediately begin to rent it out?
A. No.
Q. Okay. When did you first begin to rent out the property?
A. I don't remember. I know people had begged us to buy it from us.
Q. Who offered to buy it from you?
A. Yes.
Q. Who?
A. I don't know.
Q. How much did they offer to pay?
A. Oh, there was no discussion. We just said we're not selling this.
Q. How much income did you earn from the rental of the property in 1996?
A. I don't remember.
Q. Do you have any documentation of income you've earned from the property since the time you purchased it?
A. I might have some records.
Q. Do you enter into rental agreements with people who rent the property from you?
A. Like contracts?

Page 307

Q. Yeah.
A. No.
Q. Okay. Do you claim it on your taxes as rental income?
A. (Witness indicates).
Q. So if I were to look at your taxes or your attorney were to look at them, he'd be able to tell me how much you've earned from the rental of the cottage?
A. He should.
Q. Do you recall how much you earned last year from the rental of the property?
A. No.
Q. How much do you charge per week?
A. It depends.
Q. When you purchased the property, did Mr. Brown tell you how much you could charge or how much you might be expected to earn from the rental of the property?
A. I don't -- I don't believe so.
Q. When you purchased the property, did you plan to rent it out?
A. No.
Q. Have you had the property assessed for resale

Page 308

at all?
A. We're not selling it yet. It's our -- our -- our intent was just to keep it for us. And then I got seriously injured in '97 and was bedridden. And I can't be alone. And my husband works. So we go down there when we can. But it -- you know, my life has changed drastically.
Q. So that's when you began to rent it out --
A. That was the reason.
Q. -- after your injury?
A. Yeah.
Q. Okay.
A. Well, we may have rented it in '96 just as a transition time. I don't even remember. But I know, in '97, when I went down there, I -- I had to be carried. You know, they carried me in my wheelchair. So it was pretty difficult.
Q. I'm almost done. If you could take a look at -- and let's see what I did with it -- Exhibit No. 7 and, specifically, your answer to Interrogatory No. 6. I hope they're in the right order.
A. That's what I'm wondering.

Page 309

Q. I'm not a good administrative --
A. Can I --
Q. -- assistant. Do you want me to find it for you?
A. I found 5. It should come after 5. Here's something here. You'd better find it. I'm sorry.
(A brief discussion was held off the record.)
A. Oh, okay.
Q. Take a look. I asked -- well, the interrogatory asks if you would specify the damages you claim you have suffered.
A. Uh-huh.
Q. Okay. And here you say, about two sentence- -- three sentences in, "A waterfront home of the size proposed by the Plaintiffs with a pier in an exclusive area of Cape Cod rents for $10,000 per week during the summer." When you purchased your home, it was not the -- the -- the construction hadn't been approved. Correct?
A. Right.
Q. So you had no expectation that you would be

Page 310

able to get that construction approved at the time. No one told you you would be able to. Correct?
A. In '96?
Q. Yes.
A. It was -- we were still in the process. So nothing had been decided.
Q. Has ever -- anyone ever told you that you can rent your property out for $10,000 a week as it is currently situated?
A. As it is now?
Q. Yeah.
A. No.
Q. Okay. And how do you get the figure that your property would be, if we -- the construction were allowed, the renovation were allowed, be able to rent it out for $10,000 per week?
A. Being told by people what rents are going for on the water, especially with a dock, you know.
Q. Any realtor told you that?
A. I have not spoken with one.
Q. Okay. Has your -- the property of your value -- the value of your property from the time you purchased it been diminished in any

Page 311

way by the Town's decision or decisions?
A. Yes.
Q. How?
A. How?
Q. Yeah.
A. The dock alone is extremely valuable. So that's diminished the -- if I were to sell my house, that has diminished the value of the property in itself. Having that cottage there, a 20-by-20 with no bedroom in it, and not a livable house has diminished the property value immensely.
Q. The property as it exists today is in the same condition, correct, as when you purchased it?
A. Yeah. Uh-huh.
Q. Okay. So has the property value, in your opinion, changed at all if it's in the same condition?
A. Well, the -- we were told that we could use our floats. So that stopped us from our dock. And that was what we were told when we bought the house. And that guy happened to be president of the Harbor Commission. So . . .
Q. Okay. And you were told that by Nick Brown.

Page 312

Correct?
A. Uh-huh. President of the Harbor Commission.
Q. And you haven't had your property assessed to see if, in fact, the property value has been diminished over the years?
A. It's diminished from what -- if I were -- how do I say it -- if I were to put my plans up -- you know, build my plans and my dock, that --
Q. I'm talking, without the construction. As your property currently stands today, do you believe that it is worth less than at the time you purchased it?
A. Well, because I had the dock then, yes.
Q. And who has told you that? Any -- any realtor?
A. Well, I just know that the value of that dock is priceless.
Q. Okay. And the dock is the dock extension. Correct?
A. Yes.
Q. Okay. But the pier, as existed at the time you purchased it, still exists. Correct?
A. Yes.
Q. If you would flip the page, you go on in your answers to interrogatories to state,

Page 313

"Furthermore, the Allens have suffered damages to reputation and emotional distress due to over nine years of fighting with the Town to obtain permits. This distress has caused physical and mental injury to the Plaintiffs, which they value at 1.7 million dollars."
A. Uh-huh.
Q. Do you read that?
A. Yes.
Q. What physical injury has you -- have you suffered as a result of the Town's actions?
A. With my physical health, stress aggravates it immensely. And my problems, not having a comfortable place to -- to stay in, not getting use of my dock -- I can't use it; I can't get on a boat if I wanted to -- having people talk about you, you know --
Q. Has any --
A. -- like we're the bad guys. I mean, I know like there was just an article in the newspaper that we're stopping the Town from dredging. But nobody explains what's going on down there, that, you know, they -- they -- they -- the reporter said -- and I'm sure the town lawyers,

Page 314

when they told him or the Town Hall told him what to say, that we're the ones bringing all these lawsuits when we are not.
In fact, we're responding to the Town's actions. I mean, we've gotten to the point where, you know what, guys? We're not going to sit back.
Q. Have any of your treating physicians told you that any actions of the Town has caused you physical injury?
A. I have been told that stress aggravates the condition.
Q. Who has told you that?
A. Every doctor I've gone to.
Q. I need a specific doc- -- name of the doctor who has told you that the Town's actions has aggravated or caused any of your physical injuries.
A. They've told me about the stress fac- -- the stress factor impacting the dystrophy.
Q. Who?
A. Every doctor I've gone to. Dr. Rubin, Dr. Steinberg, Dr. McKee.
Q. And they have specifically related the

Page 315

exacerbation of your injury or the stress to the actions taken by the Town?
A. That's the stress I'm under.
Q. You're under no other stress?
A. I've got a beautiful family. We have no problems. So I mean, believe me. I -- you know, when I go down there now, I can feel the pain getting worse myself. And when I'm down there, I don't even leave the house. They -- they'll go to the beach, and I'm in the house alone. And, you know --
Q. If I were to get your medical records, there would be an indication in your treatment notes that a doctor told you that you have suffered an exacerbation of your physical injuries because of the actions of the Town?
A. I don't know what's in my medical records. I don't. Well, I -- I know that stress aggravates the situation, you know. So . . .
Q. Have you treated with any mental health care providers for your alleged emotional distress caused by the Town?
A. No.
Q. You've not treated with a psychologist?

Page 316

A. For the Town?
Q. Are you -- are you treating with a psychologist?
A. No.
Q. Psychiatrist?
A. No.
Q. Social worker?
A. No.
Q. No mental health counseling whatsoever?
A. I see a pain doctor in Boston. I see a pain doctor in Enfield, Connecticut. And --
Q. Just no men- -- no mental health care?
A. None.
Q. Do you take any prescriptions for mental health or for stress?
A. I -- no. I don't. I just -- I'm afraid of medicine. So -- but I'm on a lot of narcotics. And when I'm under stress, I take more. But I do know that.
Q. Okay.
A. And I'll be honest with you. Since -- in February, when this -- these articles -- around February when these articles -- it was this one when the article came in the newspaper about

Page 317

us, you know, with the dredging and all that, up with the pain; and the doctor had to increase my pain medicine. And I'm like --
Q. And you believe -- you believe that's related to the Town's action?
A. It's as soon as -- as soon as the stress comes in, it gets worse.
Q. And which doctor is that that increased your pain medication?
A. Dr. Pierangelo. That's what happened to me two weeks ago.
Q. And where is he located?
A. Connecticut.
Q. Where in Connecticut?
A. Enfield.
Q. What type of doctor is he?
A. Arthritis, rheumatologist, pain. I try not to -- I'm scared of the medication. I'm very scared of it. So I just -- John can tell you; I spend most of my time in bed or on the couch. And I get up like to cook and, you know, putter around a little bit. But I try to keep myself as relaxed as possible. Because if I can do that, then I can, you know, take less, which,

Page 318

you know -- because this medicine, it's going to kill me eventually.
Q. How many revisions of your renovation plans have you filed with the Town of Truro?
A. Every time -- every time they told us to revise it, we've revised it. So I don't know.
Q. Have you ever changed the size of the structure that you were proposing on your plans? Or has it always been what's depicted in --
A. Well, we went to like a mediation or something. So we were trying to. But, you know, that went nowhere. So we're sticking with our plans as they are.
Q. Okay. So when you first proposed renovation to your home, is the plan that appears in Exhibit 10 the size of the structure you proposed?
A. Well, I think we sketched something out, as I told you before, just to go through the Rivers Act, to apply before the Rivers Act. And then, after that, we had formal plans drawn up by Felco. And I don't remember the dates.
MS. ECKER: Okay. I don't have any further questions.

Page 319

(Whereupon the deposition was suspended at 12:31 p.m.)

*****

Page 320

SIGNATURE PAGE

I, BARBARA CORDI-ALLEN, do hereby certify that I have read the foregoing transcript of my testimony, and I further certify that said transcript is a true and accurate record of said testimony.

Dated at , this day of , 2006.

BARBARA CORDI-ALLEN

Page 321

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF NORFOLK, ss.

I, Jo Anne M. Shields, a Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that BARBARA CORDI-ALLEN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true and accurate record, to the best of my knowledge, skills and ability, of the testimony given by such witness.

I further certify that I am not related to any of the parties in this matter by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 21st day of April, 2006.

Notary Public

My Commission expires:
September 29, 2006.

Page 322

ERRATA SHEET

CHANGES TO THE DEPOSITION OF JOHN E. ALLEN

INSTRUCTIONS TO WITNESS: 1) Please note any desired corrections to your testimony by page and line number. 2) Enter text as it appears in the transcript. 3) Enter text as it should appear.

| PAGE | LINE | CORRECTION |
|---|---|---|

Office of Town Clerk
Treasurer – Tax Collector
NO FEE PAID
OCT 27 2004
2004-014 ZBA
Received TOWN OF TRURO
By

**LAW OFFICES OF PAUL REVERE, III**
226 River View Lane
Centerville, Massachusetts 02632
(508) 778-7126

**Via Federal Express**

October 26, 2004

Town Clerk
Town of Truro
24 Town Hall Road
Truro, Massachusetts 02666

Zoning Board of Appeals
Town of Truro
24 Town Hall Road
Truro, Massachusetts 02666

RE: Appeal of Denial of Request For Enforcement
3 Yacht Club Road -- Brooke Newman

Dear Town Clerk and Zoning Board of Appeals:

This letter is written on behalf of Barbara and John Allen (collectively the "Allens") who own property located at 5 Yacht Club Road and who are aggrieved by the decision of the Building Commissioner discussed below.

In particular, by letter dated July 26, 2004, I on behalf of the Allens requested pursuant to M.G.L. ch. 40A, Sec. 7 and Section X-3 of the Truro Zoning Bylaw that the Building Commissioner, Thomas J. Wingard, Jr., to enforce your zoning bylaw against Brooke Newman at 3 Yacht Club Road by revoking the building permit issued to Ms. Newman on October 28, 1998, and/or requiring her to apply for a Special Permit or variance from the Truro Zoning Board of Appeals for the additions allowed under the building permit.[1] I have attached a copy of this letter as Exhibit One.

On October 19, 2004, the Building Commissioner responded upholding the issuance of the building permit and concluding that a Special Permit or variance was not required to be issued for the property. I have attached a copy as Exhibit Two.

Please consider this letter a notice of appeal required by Section X-G of your bylaw and M.G.L. ch. 40A, Sec. 8. The basis for the appeal are set forth my letter attached as Exhibit One which are:

1. A special permit or variance was required to move the building and

[1] It is also my understanding that the building ultimately constructed on the property was raised from the top of foundation elevation of 12.3 feet to a top of foundation elevation of 14.0 feet at some time after the building permit was issued as Ms. Newman obtained approval in February, 1999, to construct and did construct a septic system which required a top of foundation elevation of 14.0 feet. It is unclear as to whether the building department ever modified the building permit to adopt such changes.

**LAW OFFICES OF PAUL REVERE, III**
226 River View Lane
Centerville, Massachusetts 02632
(508) 778-7126

**Via Federal Express**

October 26, 2004

Town Clerk
Town of Truro
24 Town Hall Road
Truro, Massachusetts 02666

Zoning Board of Appeals
Town of Truro
24 Town Hall Road
Truro, Massachusetts 02666

RE: Appeal of Denial of Request For Enforcement
3 Yacht Club Road -- Brooke Newman

Dear Town Clerk and Zoning Board of Appeals:

This letter is written on behalf of Barbara and John Allen (collectively the "Allens") who own property located at 5 Yacht Club Road and who are aggrieved by the decision of the Building Commissioner discussed below.

In particular, by letter dated July 26, 2004, I on behalf of the Allens requested pursuant to M.G.L. ch. 40A, Sec. 7 and Section X-3 of the Truro Zoning Bylaw that the Building Commissioner, Thomas J. Wingard, Jr., to enforce your zoning bylaw against Brooke Newman at 3 Yacht Club Road by revoking the building permit issued to Ms. Newman on October 28, 1998, and/or requiring her to apply for a Special Permit or variance from the Truro Zoning Board of Appeals for the additions allowed under the building permit.[1] I have attached a copy of this letter as Exhibit One.

On October 19, 2004, the Building Commissioner responded upholding the issuance of the building permit and concluding that a Special Permit or variance was not required to be issued for the property. I have attached a copy as Exhibit Two.

Please consider this letter a notice of appeal required by Section X-G of your bylaw and M.G.L. ch. 40A, Sec. 8. The basis for the appeal are set forth my letter attached as Exhibit One which are:

1. A special permit or variance was required to move the building and

[1] It is also my understanding that the building ultimately constructed on the property was raised from the top of foundation elevation of 12.3 feet to a top of foundation elevation of 14.0 feet at some time after the building permit was issued as Ms. Newman obtained approval in February, 1999, to construct and did construct a septic system which required a top of foundation elevation of 14.0 feet. It is unclear as to whether the building department ever modified the building permit to adopt such changes.

construct the addition as the lot on which the property was located was less than 33,750 square feet.

2. The Building Commissioner did not have authority under Section VIII-B.2 of the Bylaw to issue building permit.

Additionally, given that the Building Commissioner states in his response that the permit was issued pursuant to Section VIII-B.2, but cites no record to support it, the Allens also appeal on the basis that there is no "determin[ation]" or "find[ing]" by the Building Commissioner that the movement of the building and addition "will not be substantially more detrimental to its neighborhood. Therefore, the issuance of the building permit was procedurally defective.

I have enclosed three copies of this letter to be certified by you as to the date and time which this appeal has been filed. Please forward one copy to the Building Commissioner and the Zoning Board of Appeals. Please return the remaining copy to me in the enclosed envelope.

Please contact me at (508)778-7126 if you have any questions.

Very truly yours,

Paul Revere, III

cc: Barbara Cordi-Allen
Michael Leon (Attorney for Brooke Newman)

EXHIBIT ONE

LAW OFFICES OF PAUL REVERE, III
226 River View Lane
Centerville, Massachusetts 02632
(508) 778-7126

July 26, 2004

Building Commissioner
Town of Truro
P.O. Box 2030
Truro, Massachusetts 02666

**Certified Mail**
**Return Receipt Requested**

RE: Request For Enforcement -- Brooke Newman
3 Yacht Club Road

Dear Mr. Commissioner:

This letter is written on behalf of Barbara and John Allen who own property located at 5 Yacht Club Road. In October, 1998, your office issued a building permit to Brooke Newman for an immediately adjacent property located at 3 Yacht Club Road. A copy of the application for the building permit and a plan of the land is attached as Exhibit One. I have been engaged by the Allens to review various matters relating to their property at 5 Yacht Club Road and have written this letter to request that you revoke the building permit issued in October, 1998, for the reason that Ms. Newman has never obtained a special permit or variance from the Truro Zoning Board of Appeals for the additions allowed under the building permit. This request is made pursuant to M.G.L. ch. 40A, Sec. 7 and Section X-3 of the Truro Zoning Bylaw, both of which require a response within 14 days.

In particular, the lot upon which Brooke Newman's house is located is approximately 23,500 square feet. Currently and at the time of the building permit application, the Truro Zoning Bylaw requires a minimum lot size of 33,750 square feet. Section VII.B.1 provides:

> Lawful preexisting, non-conforming structures and uses may, when a variance would otherwise be required, be altered, **or extended** with a special permit if the Board of Appeals finds that the alteration or extension will not be substantially more detrimental to the neighborhood than the existing nonconforming structure or use and that the alteration or extension will exist in harmony with the general purpose and intent of the bylaw.

Here, Ms. Newman has moved the location and increased the foot print of and added

a second story to her building on a non-conforming lot. These changes to the building trigger the need to obtain a special permit under Truro's Zoning Bylaw.[1] However, Ms. Newman did not obtain a special permit prior to obtaining the building permit. Therefore, I hereby request that you revoke the building permit for this structure.

To assist you in rendering your decision, I have attached copies of various correspondence from Zisson and Veara relative to lots in this area and the special permit issued by the Zoning Board of Appeals for the property immediately adjacent to the north as Exhibit Two.

As I see, you simply have no choice, but to revoke the building permit if the Town of Truro intends to apply its Zoning Bylaws equally to all property owners and have the Allens apply for a special permit or variance when they build on their property. However, if you conclude that a special permit is not required for Ms. Newman, then the Allens should also need not obtain a permit if they substantially increase the square footage of their house and its footprint.

Please contact me at (508)778-7126 if you have any questions.

Very truly yours,

/s/

Paul Revere, III

cc: Barbara Cordi-Allen

[1] Section VIII-B.2 only allows the Building Commissioner to act when the applicant proposes "repair, reconstruction, alteration, or structural changes." Here, Ms. Newman proposed an "extension of the structure and use by the addition of the second story and the increase to the footprint.

# EXHIBIT ONE

BP # 98-186
SHEET 50
Parcel 20

KLUO

THE COMMONWEALTH OF MASSACHUSETTS

# TOWN OF TRURO

APPLICATION FOR BUILDING PERMIT

Date 10/28/98 Board of Health Permit No. 98-108 Paid 220.20

BROOKE NEWMAN OWNER'S NAME ROARING FORKS DR ASPEN CO NON RESIDENT ADDRESS

3 Yacht Club Road LOCATION OF PROPERTY ADJACENT TO:

MICHAEL McGUIRE BOX 555 No Truro MA 02652 BUILDER'S NAME AND ADDRESS

Explain in detail work being done NEW FOUNDATION, ADD SECOND STORY RELOCATE DWELLING AS PER PLAN

Is there any change of use No

Estimated Cost 45000 Type Chimney BRICK Firestops

If this is a public building with over 35,000 cubic feet a Registered Architect's plan must accompany this application.

Number of stories (exclusive of attic, basement, cellar) 2 Is there an attic NO

basement cellar Height from mean ground level to: Coping of flat roof , deckline of mansard roof 20 Mean height level between eaves and ridge of gable, hip, or gambrel roof (max all 23 feet.) Height from mean ground level to highest point gable, hip, or gambrel roof max 30 23

Draw a diagram showing—1. Shape and dimensions of lot and area (in square feet). 2. Streets. 3. Existing buildings—if any and any new building or addition. 4. Distance of new or existing building to all lines of lot.

0.54

CON COM REVIEW / DEP SUPERCEDED / May 22-98 REGISTERED!

MOVE HOUSE / add / add 2ND Fl.
NEW FOUND X FEMA CRAWL-ONLY

Quiet Harbor

Main Fl. 718 @ 16¢ 114.88
TOP Fl. 452 @ 15¢ 67.80
DECK 268 @ 14¢ 37.52
220.20

PORCH SFR ADD

Yacht Club Rd

MOVED STRUCTURE MUST COMPLY w/ all 6th ED MSBC REQUIREMENTS for NEW Const.

CERTIFICATION REQUIRED FOR TOP of FOUNDATION ALSO ALL SETBACKS

I certify that the above statements are correct and that all work done will comply with all By-Laws, Board of Health Regulations, and Fire Engineers Regulations of the Town of Truro. The Applicant agrees to give the Building Inspector notice before enclosing the studding on this building.

This permit is issued by the Town of Truro in accordance with the Truro By-Laws. However if property is within the boundaries of the Cape Cod National Seashore Park, the applicant is advised to clear this permit with the National Park Service, Eastham, Massachusetts before starting construction.

x [signature] 072958 Signature of Applicant or Agent

Signature Planning Board

Stephen Williams Signature Building Inspector

0-28-98
DATE

Accepted ✓ Refused Reason

FORM 21325 HOBBS & WARREN, INC. · BOSTON

SERVES LOCUS DWELLING
MIN. FROM ALL SEWAGE
LOT B
23,446± SF.
0.54± AC.
200'±
100' BUFFER ZONE
TOP OF BANK
80.00'
107.00'
PCL. 21
PCL. 19
DWELL.
APPROX. LOCATION
PROPOSED SEE C.N.#7
EXISTING LEACH AREA (REMOVE)
100.00'
31'
WORK LIMIT
PORCH
RELOCATED DWELLING
DECK
PROPOSED ADDITION
EXISTING DWELLING
DIRT PARKING AREA
RESERVE
44.00'
80.37'
43.60'
R=1868.83'
A=73.00'
PROPOSED LEACH AREA (SEE DETAIL)
TO LOCUS WELL SEE C.N.#7
100' FROM LOCUS WELL
LEACH FIELD
1.7' TYP.
LEACH AREA DETAIL
NO SCALE
APPROX. LOCATION
BENCHMARK
TOP OF CONCRETE BOUND
EL. 11.8' NGVD
100' FROM WELL
YACHT CLUB ROAD
WAY
SITE
LOCUS:
PREPARED FOR:
REFERENCE
8-25-98
US SEWAGE
FELCO, INC.
ENGINEERING - LAND SURVEYING

# EXHIBIT TWO

ZISSON AND VEARA
ATTORNEYS AT LAW

865 PROVIDENCE HIGHWAY
DEDHAM, MASSACHUSETTS 02026-6825
TEL (781) 329-1110
FAX (781) 329-5119

828 MAIN STREET-BOX 2031
OLD KINGS HIGHWAY
DENNIS, MASSACHUSETTS 02638-0043
TEL (508) 385-6031
FAX (508) 385-6914

RICHARD L. ZISSON
EDWARD E. VEARA
JILL J. BROFSKY
E. JAMES VEARA
PAUL V. BENATTI
SARAH A. TURANO-FLORES
JOHN R. COSTELLO
BENJAMIN E. ZEHNDER
LORI CURTIS KRUSELL
ALANNA D. BRAVMAN
LISA M. WESTERVELT*

*ALSO ADMITTED IN NEW YORK

April 5, 2002

William W. Thomas
Thomas & Bailey, P.C.
100 West Main Street; P.O. Box 978
Hyannis, Massachusetts 02601

Re: **Town of Truro, et al. v. Department of Environmental Protection and John Allen and Barbara Cordi-Allen; Barnstable Superior Court C.A. No. 2001-347**

Dear Attorney Thomas:

In connection with our conference the other day regarding potential settlement of the above-referenced case, I have researched the Town of Truro's Zoning Code and can report to you the following. In determining the zoning requirements, I utilized the Site and Sewage Plan prepared for John Allen, dated September 11, 1996, and last revised through December 20, 1999. A true and accurate copy of this site plan is enclosed for your ease of reference. I also reviewed the JP Kelley floor plans drawn for the Allens, as indicated below. Please be advised that this is my own analysis, based on what little information I have, and prepared solely for purposes of settlement. Obviously, the Truro Building Inspector and Zoning Board of Appeals have the ultimate authority in making the final determination in this instance.

The Allen proposal includes renovating the existing 20' x 20' dwelling on the property by turning it sideways, raising it on pilings, and adding a 12' x 17', two story addition. From what I can gather from the floor plans drawn by J.P. Kelley, dated July 12, 1999, as revised through October 14, 1999, the footprint for the new structure, including sun deck and porch, is 888, with a total new living area of 1,044 square feet. The proposal includes the removal of an existing kitchen, apparently in effort to avoid classifying this structure as a second dwelling unit. The final floor plan purports to include only a great room and bath on the first floor, and a single bedroom on the second floor.

The Allen proposal then calls for the construction of an entirely new, two-story, second structure on locus. The footprint for this second structure is 2,648 square feet. The JP Kelley

ZISSON AND VEARA

Floor Plans, dated November, 1999, indicate that this second structure purportedly contains only two more bedrooms, however, it also indicates *3,300* square feet of living area, with a room called a "hall" that is actually 14' x 14', a "foyer"that is 10.6' x 18', a family and game room, a whirlpool room, a laundry room, two downstairs bathrooms, a great room, a breakfast nook, a kitchen, a master bedroom, a master bath, two walk in closets, a two car garage, and an elevated utility room. This dwelling is proposed on a solid concrete foundation with a concrete slab for the garage and utility room.

The proposal also includes an above ground pool with decking, but I understand the Allens have agreed to eliminate this from consideration. Presently, the proposal also includes a proposed septic system for a three bedroom dwelling with the use of a modified septic tank with a FAST™ insert, a pump chamber, and a leaching field with no reserve area. As I indicated to you in previous conversations, the FAST™ system is a problem because, as of September 15, 2001 and pursuant to a Consent Agreement with the Department of Environmental Protection, Smith & Loveless, the company that produces the FAST™ technology, will no longer accept any orders for provisional use units under Title 5. Unless the Allens have already purchased their septic system from this company, they will be unable to use this alternative technology and some other nitrogen enhanced system will have to be employed.

In addition to the fact that the FAST™ technology cannot be utilized, and in addition to the fact that the Allen proposal does not meet state Title 5 requirements for a three bedroom home (see the allegations contained in the Complaint filed in the Barnstable Superior Court in Case No. 01-347), or the requirements under the state Wetlands Protection Act for construction in a dune (see the allegations contained in the appeal filed with the Department of Environmental Protection, Case No. 75-371), I am also of the opinion it does not meet Truro zoning requirements.

Section IX of the Truro Zoning Bylaw contains the Area and Height Regulations for the town. Section IX(A)(1) states that no building shall be constructed on a lot with an area of less than 33,750 square feet. The Allens are proposing to construct a new building on a lot with an area of only 24,437 square feet. As such, they would require a variance from Section IX(A)(1) of the Zoning Bylaw. As there are no topography, soil conditions or shape issues that would justify a variance from this square footage requirement, I am of the opinion the Allens could not obtain a variance from this provision. In the matter of <u>Tsagronis v. Board of Appeals of Wareham</u>, 613 N.E.2d 893 (1993), the Massachusetts Supreme Judicial Court unequivocally held that hardship from failure to construct a house on undersized lot before statutory protections against zoning changes expired did not justify the granting of variance. As the subdivision plan creating their lot was put on record in November of 1972, and this provision of the zoning bylaw creating the 33,750 square foot requirement passed on August 7, 1972, the Allens are not entitled to any

ZISSON AND VEARA

grand fathering from this provision[1]. Accordingly, the Allens are prohibited from building a second structure on this parcel.

As I indicated to you during our conversations, the Allens would be best served if they were to eliminate from their proposal the second structure altogether and simply renovate the existing structure by moving it back from the beach, raising it on pilings, making it comparable in size to the neighboring dwellings, and utilizing some form of nitrogen enhanced septic system. This would address the majority of the problems which currently plague the Allens' proposal, including state Title 5 and wetlands issues.

Such a proposal would, however, still require a Special Permit from the Zoning Board of Appeals under Section VIII(A) of the Zoning Bylaw and Massachusetts General Laws, Chapter 40A, Section 6. A Special Permit would be necessary because the Allens would be proposing the alteration and extension of a pre-existing, non-conforming structure (their structure is pre-existing, non-conforming because it presently sits on a parcel with less than 33,750 square feet in area). In order to obtain a Special Permit, the Zoning Board of Appeals would have to determine that the proposed renovated structure "will not be substantially more detrimental to the neighborhood than the existing nonconforming structure" and that "the alteration or extension will exist in harmony with the general purpose and intent of the bylaw." This is why the size of the proposed renovated structure (in comparison with the neighboring properties) is very important. The footprint of the Allens' existing structure is only 400 square feet in area. The footprint of the existing Landis structure is only approximately 420 square feet in area. The footprint of the newly renovated Newman structure is approximately 600 square feet in area. In contrast, the combined footprint of the current Allen proposal is *3,536* square feet in area. In my opinion, there are no circumstances under which even the proposed second structure (footprint of 2,648 square feet) would receive a Special Permit from the Zoning Board of Appeals. Its size of 5 times larger than any surrounding structure is just too large for a finding of "not substantially more detrimental to the neighborhood" and " in harmony with the general purpose and intent of the bylaw."

This does not necessarily mean that the Allens' proposal must involve a footprint of no greater than 600 square feet. The 600 square foot Newman structure only includes two bedrooms. The DEP approved the Allens for a three bedroom home. While the Town is contesting that approval, I am not averse to recommending to the Town that they settle that Superior Court case and the DEP wetlands proceeding pertaining to the house construction if the Allens come up with a moderately sized, realistically designed three bedroom floor plan. Obviously, such a proposal

---

[1] The first deed for this parcel was December 10, 1973, recorded in the Barnstable County Registry of Deeds in Book 1984, Page 313, which also post-dates the zoning amendment requiring 33,750 square feet of area. Prior to December of 1973, the Allen parcel was part of a larger, 3 acre parcel owned by the Worthingtons.

ZISSON AND VEARA

would still require a Special Permit from the Zoning Board of Appeals. A Special Permit would be much more likely to issue from the Zoning Board of Appeals if the Allens were to greatly scale down their proposal to a size more in keeping with the size of the neighboring structures, and perhaps slightly larger in order to accommodate the third bedroom.

As we discussed, if your clients devise a proposal with a single, more moderately sized structure located further back on the property, on pilings and with a nitrogen enhanced septic system, all currently pending litigation relating to the construction of the house could be settled. Provided the Allens keep the size of the single, three bedroom structure to a minimum, they would also be much more likely to obtain a Special Permit from the Zoning Board of Appeals and proceed with construction of their home.

Please carefully discuss these issues with your clients and report to me your progress. Thank you again for your time and consideration of these matters. I look forward to hearing from you in the near future.

Sincerely,

Sarah A. Turano-Flores

STF/
enc.
VIA FACSIMILE TRANSMISSION & 1ST CLASS MAIL
cc: Mr. Breault
Board of Selectmen
Truro Building Inspector, Mr. Vincent Corsano

**THOMAS & BAILEY, P.C.**
Attorneys At Law
100 West Main Street
Post Office Box 978
Hyannis, Massachusetts 02601

William W. Thomas
Bradley J. Bailey

Telephone (508) 771-4644
Facsimile (508) 790-1334

May 16, 2002

MAY 17 2002

Zisson & Veara
828 Main Street, Box 2031
Dennis, Massachusetts 02638
Attn: Sarah A. Turano-Flores

Re: Town of Truro et al v. Department of Environmental Protection and John Allen and Barbara Cordi-Allen
Barnstable Superior Court Civil Action No. 2001-347

Dear Attorney Turano-Flores:

I have completed my initial inquiry into the legal status of the Allen lot. I met with the Planning Board secretary several days ago and we reviewed the Planning Board's records for 1972. I had previously been in touch with Slade & Associates, the firm that performed the engineering for John Worthington when he re-subdivided his land in 1972. Slade & associates checked their records and told me that they had a preliminary plan which had been submitted to the Planning Board in their file and they sent me a copy of it. The plan is entitled "Sketch of Re-Subdivision of Land in Truro Proposed by John C. Worthington, scale 40' = 1", May 1972, W.G. Slade, Surveyor, Truro, MA."

The Planning Board secretary had a file in which various plans for the Depot Road area were located. She produced from that file, two copies of the exact same plan that Slade & Associates had sent to me. I believe that there was also a copy of the definitive plan in that file as well. None of the plans that were shown to me had time stamps on them and there was no record anywhere in the minutes as to when any preliminary plans were received by the Planning Board. The actual minutes for 1972 are sparse, however, there was a certificate of approval showing that following a public hearing at the Truro Town Hall, the definitive plan for the John Worthington subdivision was approved. Enclosed is a copy of the certificate of approval. This apparently is the approval of our plan since the recorded plan at the Registry of Deeds shows that it was approved by the Truro Planning Board on September 28, 1972. The appeal period ran out on October 27, 1972 and the plan was recorded at the Barnstable County Registry of Deeds on November 29, 1972 in Book 264, Page 18.

The plan that was approved created Lots A, B and C, all of which were slightly over half an acre with the largest lot being the Allen lot at .561 acres, not including the area of the flats. The Town of Truro voted on August 7, 1972 to increase the lot size from 22,500 sq. ft with 150' of frontage, to 33,750 sq. ft. with 150' of frontage. The preliminary plan was apparently filed by Slade to protect the lot size and allow Mr. Worthington to get three lots out of this property.

COPY FOR YOUR INFORMATION

When one views the plan that was approved, it is clear that each of the lots was built upon at the time of approval and one of these pre-existing buildings makes up part of the Allen engineering plan. The Planning Board must have be cognizant of the fact that they were approving lots in September of 1972, which would be undersized had a preliminary plan not been filed. As you know, in the law there is a presumption of regularity. I presume that the Planning Board back in September of 1972 took an educated vote and they were well aware that this subdivision was controlled by the pre-August 7 zoning bylaw.

Under the typical subdivision case dealing with the filing of preliminary plans in face of a zoning change, the developer is trying to get the statutory protection so that he can build on smaller lots. In this instance, since the houses were already in existence, there was no need to get building permits within that 7 year period. In other words, the Worthington lots were legal in size because they were governed by the earlier bylaw and the buildings were legal as they met the required set backs and had been on the lots the date that they were created. Under the Truro bylaw that is presently in effect, VII (d) provides that "so long as buildings were constructed, uses were begun and lots were created lawfully, they may continue to be used in the same manner and for the same purposes despite contrary provisions of this bylaw. Lawful pre-existing, nonconforming structures and uses may when a variance would otherwise be required be altered or extended with a special permit if the Board of Appeals finds that the alteration or extension will not be substantially more detrimental to the neighborhood than the existing nonconforming structure or use and that the alteration or extension will exist in harmony with the general purpose and intent of the bylaw." The use of the Allen property for residential purposes clearly is in conformity for this zoning district. The question is whether the structure that's on the property is nonconforming. Structures fall into nonconformity when they are built too close to property lines or they are not set back far enough from the street, etc. This is not the case with the Allen property. To my knowledge, the present structure on the property meets all of the lot line set backs and has done so ever since the lot was created. The building sits on a lawfully created lot. It is not a nonconforming structure for which one needs to get a special permit. Under VIII it can be altered or improved like any other house that sits on a lot that was lawfully created. This was apparently the interpretation used by the previous building inspector when the plans were submitted for the renovations and alterations to Brooke Newman's structure. I do not believe that she was required to seek a special permit or a variance.

In light of the above, I am of the opinion that the Allens would be able to alter and improve their cottage provided they had permission from the Conservation Commission and the Board of Health regarding their septic system and provided that their improvements did not encroach in sideline set backs, without the need for a variance or special permit. The real question, I believe, is whether their design amounts to an alteration of the existing structure or the creation of a new structure. I have not completed my legal research in this area. Your

THOMAS & BAILEY, P.C.

Zisson & Veara
May 16, 2002
Page 3

thoughts on my interpretation of this problem and my legal evaluation, would be appreciated. Thank you for your consideration.

Yours very truly,

William W. Thomas

WWT/js

cc: Mr. & Mrs. Allen

Z&V-Sara-5-16-02.let

ZISSON AND VEARA
ATTORNEYS AT LAW

RICHARD L. ZISSON
EDWARD E. VEARA
JILL J. BROFSKY
E. JAMES VEARA
PAUL V. BENATTI
SARAH A. TURANO-FLORES
JOHN R. COSTELLO**
BENJAMIN E. ZEHNDER
LORI CURTIS KRUSELL
ALANNA D. BRAVMAN
LISA M. WESTERVELT*
MICHAEL I. FLORES

*ALSO ADMITTED IN NEW YORK
** OF COUNSEL

865 PROVIDENCE HIGHWAY
DEDHAM, MASSACHUSETTS 02026-6825
TEL (781) 329-1110
FAX (781) 329-5119

828 MAIN STREET-BOX 2031
OLD KINGS HIGHWAY
DENNIS, MASSACHUSETTS 02638-0043
TEL (508) 385-6031
FAX (508) 385-6914

RECEIVED
MAY 21 2002
THOMAS & BAILEY, P.C.

May 20, 2002

William W. Thomas
Thomas & Bailey, P.C.
100 West Main Street; P.O. Box 978
Hyannis, Massachusetts 02601

Re: **Town of Truro, et al. v. Department of Environmental Protection and John Allen and Barbara Cordi-Allen; Barnstable Superior Court C.A. No. 2001-347**

Dear Attorney Thomas:

Thank you for your letter of May 16, 2002. If I understand it correctly, you are asserting that a preliminary subdivision plan dated May 1972 was most likely filed with the Town sometime before the zoning amendment change which took place in August 1972 and changed the area requirements from 22,500 to 33,750. Although you did not cite the statute specifically, I assume you are applying G.L. c. 40A, §6 in order to reach your conclusion that the lots are grandfathered from the zoning change by virtue of the May 1972 preliminary plan.

Assuming evidence exists demonstrating that the May 1972 plan was filed prior to August 1972, I am still of the opinion that the Allens' lot is not grandfathered from the 33,750 square foot area requirements. In my opinion, neither the local zoning bylaw or the state Zoning Act afford the Allen lot any protections from the current area requirements.

The Allens are proposing to alter, reconstruct, extend and structurally change the existing structure by turning it sideways, raising it on pilings, and adding a 12' x 17', two-story addition. They are also proposing to construct an entirely new additional two-story structure, with a 2,648 square foot footprint. They propose to do all of this on a lot that is only 24,437 square feet in area. As noted above, a preliminary plan exists dated May 1972. The zoning change was adopted in August of 1972. The plan was endorsed in September of 1972. It was recorded in November of 1972. The Allens parcel was not deeded out until December 10, 1973. Prior to that date, it was in common ownership as part of a larger, three (3) acre parcel owned by John Worthington.

Section 6 of Chapter 40A protects:

1. Structures lawfully in existence or lawfully begun prior to the first publication of the zoning change;
2. Building permits or special permits issued before first publication of the zoning change; and
3. Any alteration, reconstruction, extension or structural change to a structure lawfully in existence or begun prior to the first publication of the zoning change, provided that alteration, reconstruction, extension or structural change does not increase the nonconforming nature of said structure.

The Allens' proposal is not afforded protection under any of these provisions because it involves the construction of an entirely new structure *in addition* to the alteration, reconstruction, extension and structural change to the cottage that existed as of 1972. If the Allens were simply renovating the existing cottage, then I believe the third provision quoted above might apply. However, they are constructing an entirely new structure in addition to the existing structure. As such, none of the first three protections contained in G.L. c. 40A, §6 apply.

Section 6 goes on to provide that increases in area are inapplicable to lots for single family use which *at the time of recording or endorsement* were not held in common ownership with adjoining land, conformed to then existing requirements and had less than the proposed requirement but at least five thousand square feet of area and fifty feet of frontage. As stated above, the plan creating the Allen lot was not endorsed until September 29, 1972. The Allens' lot was held in common ownership until December of 1973. Thus, the Allens cannot avail themselves of this fourth protection under G.L. c. 40A, §6.

Section 6 also states that any increase in area shall not apply for a period of five years from its effective date, or five years after January 1, 1976, whichever is later, to a lot for single family residential use, even if the lot was held in common ownership at the time of recording or endorsement, provided certain additional requirements are also met. As we are now well beyond five years after January 1, 1976, the Allens cannot rely on this exemption to qualify for grandfathering from the current area requirements.

Finally, Section 6 states that if a definitive plan, or a preliminary plan, followed within seven months by a definitive plan, is submitted to a planning board for approval under the subdivision control law, and written notice of such submission has been given to the town clerk before the effective date of the bylaw, the land shown on the plan shall be governed by the bylaw in effect at the time of the first submission *for eight years from the date of the endorsement of such approval* or, for plans submitted and approved before January 1, 1976, *for seven years from the date of the endorsement of such approval*. Thus, even assuming there was evidence the preliminary plan was filed prior to August, and notice was properly filed with the Town Clerk,

the Allens' lot was only protected for seven years from the date it was endorsed, or seven years from September 28, 1972. We are well beyond 1979 at this point.

Accordingly, I must conclude that G.L. c. 40A, §6 affords your clients no protection from the current area requirements under Truro's zoning bylaw. You also cite, however, the Truro Zoning Bylaw for the proposition that the Allens' lot is protected. Specifically, you assert that the Allens' design is in conformity with the zoning district and doesn't even require a special permit.

The section of the local bylaw upon which you rely is similar to the first paragraph of G.L. c. 40A, §6. You correctly quote Section VIII(B)(1) of the Bylaw - although you use a different citation- as stating:

> "Lawful, pre-existing, nonconforming structures and uses may, when a variance would otherwise be required, be altered or extended with a special permit if the Board of Appeals finds that the alteration or extension will not be substantially more detrimental to the neighborhood than the existing nonconforming structure or use and that the alteration or extension will exist in harmony with the general purpose and intent of the bylaw."

You state that the lot is being used for residential purposes and this is a lawful use in the district. You also state that the structure is not non-conforming because it meets all lot line setbacks. Thus, you conclude a Special Permit is not necessary because neither the use nor the structure are non-conforming. However, the non-conformity of the pre-existing structure is that it sits on a lot that is undersized. As such, any reconstruction of that pre-existing structure would require a Special Permit under Section VIII(B)(1).

In any event, and more importantly for this inquiry, it is Section IX(A)(1) of the Truro Zoning Bylaw, not VIII(B)(1), that specifically precludes the Allens' proposal from being lawful. This section states that ***no building*** shall be constructed on a lot with an area of less than 33,750 square feet. The Allens, in addition to renovating their existing structure, are also proposing to construct a building. Section IX(A)(1) prohibits such construction on a lot of the Allens' size. Section IX(A)(2) does provide grandfathering protection from this area requirement, however, it states that only lots "shown on a subdivision plan, or described by deed ***duly recorded or registered in the Barnstable County Registry of Deeds prior to the adoption of this Bylaw***," are considered conforming. As the plan creating the Allens lot was not recorded until November of 1972, and the zoning amendment was adopted August of 1972, the Allens are not grandfathered from the area requirements of the zoning bylaw.

Thus, I must conclude that the Allens are not protected from current area requirements under either the local zoning bylaw or the state Zoning Act. You end your letter by stating: "The real question, I believe, is whether their design amounts to an alteration of the existing structure

ZISSON AND VEARA

or the creation of a new structure." The Allens are doing both. If they were simply taking their existing structure, and reconstructing it, then I believe they would be entitled to the third protection defined on the prior page provided the Zoning Board of Appeals found that the alteration, reconstruction, extension or structural change does not increase the nonconforming nature of said structure. However, the Allens are doing more than reconstructing the existing structure. They are also constructing an entirely new structure.

Accordingly, I am unable to agree with your opinion that the Allens are entitled to proceed with their current proposal as a matter of right, and without the need for any Special Permit or Variance. I must remain firm in my opinion that they are unable to proceed at all unless they revise their design entirely by omitting the second structure and re-designing and configuring the existing structure in such a manner that all wetlands, Title 5 and zoning issues are addressed. By zoning issues, I mean that their design may include only the reconstruction, alteration, extension, or structural change of the existing structure and that such reconstruction, alteration, extension or structural change is found by the Zoning Board of Appeals to not be substantially more detrimental to the neighborhood than the existing structure and to exist in harmony with the general purpose and intent of the bylaw.

This concludes my analysis to date. I appreciate your patience as we muddle through this complicated matter. Kindly review and contact me to discuss at your earliest convenience. Thank you.

Sincerely,

Sarah A Turano Flores

Sarah A. Turano-Flores

STF/
VIA FACSIMILE TRANSMISSION & 1ST CLASS MAIL
cc: Mr. Breault
Board of Selectmen
Truro Building Inspector, Mr. Vincent Corsano

# DECISION OF THE BOARD OF APPEALS OF TRURO, MASSACHUSETTS

Property Owner(s) and/or Applicant(s): Sara Landis, by bldr/agt William VonThaden

Property Location: 80 Depot Road

Atlas Sheet: 50 Parcel: 19 Hearing Date: Monday, December 8, 2003

| | | | | | |
|---|---|---|---|---|---|
| Special Permit | [X] | Vote: | 5 | Approve | [X] |
| Variance | [ ] | | 0 | Disapprove | [ ] |
| Building Commissioner Decision | [ ] | | | Abstain | [ ] |
| Other | [ ] | | | | |

**Motion (Althaus; 2nd Matricardi):** To grant a Special Permit to Sara Landis (by bldr/agt William Von Thaden), for property located at 80 Depot Rd. (Atlas Sheet 50, Parcel 19) for an addition and renovation to an existing dwelling on a pre-existing, non-conforming lot, as per plans filed with the ZBA, and drawn by Krueger Associates Inc., dated April 26, 2001 and revised 22 October 2003; said Special Permit is granted under Sec. VIII.B.1. of the Zoning Bylaw. The Board Conditions the Permit as follows: the Special Permit shall be granted conditionally on the issuance of the Order of Conditions from the Conservation Commission. The Board Finds said proposal conforms with setback and height requirements of the Truro Zoning Bylaws. The Board Finds said proposal is not more detrimental to the neighborhood, and is in keeping with the spirit and intent of the bylaw.

I hereby certify this as a true and accurate record of the Board of Appeals.

Signature [signature] Date 12/16/03

Received, Office of the Town Clerk

Signature [signature] Date December 16, 2003

I hereby certify that this decision was filed with the Office of the Town Clerk on ______________ and 20 (twenty) days have elapsed since the date of filing, and no appeal has been filed.

Signature ______________ Date ______________

NOTE: Any person aggrieved by a decision of the Zoning Board of Appeals may appeal to the Superior or Land Court by bringing action within twenty days after the decision has been filed with the Town Clerk of Truro. (Massachusetts General Laws, Chapter 40A, Section 17.)

**EXHIBIT TWO**

**TOWN OF TRURO**
**BUILDING DEPARTMENT**
**BOX 2030**
**TRURO, MA 02666**

Delivery Address
24 Town Hall Rd..
Truro MA.

Phone: 508 349-7004 ext. 31
Fax: 508 349-5508

October 19, 2004

Law Offices of Paul Revere, III
226 River View Lane
Centerville, MA. 02632

Dear Mr. Revere,

I apologize for the delay of a response to your request for action.

I'm acting on the facts, exhibit one of your July 26,2004 letter (the building permit application) that you have presented to me.

I conclude that building permit, 98-186, issued on Brooke Newman's property by then Building Commissioner, Stephen Williams, was issued legally and lawfully according to section VIII-B 2) of the Town of Truro Zoning Bylaws:.

> 2. If the Building Commissioner determines and finds that the proposed repair, reconstruction, alteration, or structural change of a preexisting, nonconforming, single family or two-family residential structure will not be substantially more detrimental to its neighborhood than the existing nonconforming structure and will not increase the nature or extent of the nonconformity, then the Building Commissioner may approve and issue a building permit for the proposed repair, reconstruction, alteration, or structural change.

Mr. Williams determined, as is deduced by the issuance of the building permit, that Ms. Newmans' proposal was not "substantially more detrimental to its neighborhood" and "will not increase the nature or extent of the nonconformity."

Mr. Williams was acting within his authority under the bylaw and, therefore, the permit was issued lawfully.

Sincerely,

Thomas J. Wingard Jr. Building Commissioner Town of Truro

# DECISION OF THE BOARD OF APPEALS OF TRURO, MASSACHUSETTS

Property Owner(s) and/or **Applicant(s):** Barbara Cordi-Allen, (by agt/atty Paul Revere, III)

Property Location: 3 Yacht Club Rd.

Atlas Sheet: 50 Parcel: 20 (Ref. 2004-014ZBA) Hearing Date: Monday, January 10, 2005 (as continued from the Meeting of Monday, December 6, 2004.)

| | | | |
|---|---|---|---|
| Special Permit | ☐ | Vote: 5 | Approve ☒ |
| Variance | ☐ | 0 | Disapprove ☐ |
| Building Commissioner Decision | ☐ | ____ | Abstain ☐ |
| Other | ☒ | (Unanimous vote on Motion to Deny the application) | |

**Motion (Conlon; 2nd Pope):** I hereby Move to Deny the application of Barbara Cordi-Allen, appealing the decision of the Building Commissioner dated October 19, 2004 upholding the issuance of a building permit on October 28, 1998 for property owned by Brooke Newman, Located at 3 Yacht Club Rd (Atlas Sheet 50, Parcel 20)[2004-014/ZBA], on the following grounds:

1) The Building Commissioner was fully authorized to issue the building permit to Ms. Newman pursuant to the provisions of Section VIII-B.2 of the former Truro Zoning Bylaws because Ms. Newman's project involved the alteration of a pre-existing, non-conforming structure and Section VIII-B.2 authorized the Building Inspector to approve and issue a building permit for a proposed repair, reconstruction, alteration or structural change of a pre-existing, non-conforming single-family structure if the Building Commissioner determines that the proposal will not be "substantially more detrimental to its neighborhood than the existing nonconforming structure and will not increase the nature or extent of the nonconformity;"

2) The appeal is untimely pursuant to the provisions of General Laws, Chapter 40A, Section 7 because the subject building permit was issued and the land improved over six (6) years ago, and therefore, the issue presently on appeal, namely whether the Building Commissioner acted within his authority on October 28, 1998, is now time-barred and moot.

I hereby certify this as a true and accurate record of the Board of Appeals.

[signature] January 19, 2005

Signature Date

Received, Office of the Town Clerk:

[signature] January 19, 2005

Signature Date

---

I hereby certify that this decision was filed with the Office of the Town Clerk on ____________ and 20 (twenty) days have elapsed since the date of filing, and no appeal has been filed.

____________ ____________

Signature Date

NOTE: Any person aggrieved by a decision of the Zoning Board of Appeals may appeal to the Superior or Land Court by bringing action within twenty days after the decision has been filed with the Town Clerk of Truro. (Massachusetts General Laws, Chapter 40A, Section 17.)

**A COPY OF THIS DECISION MUST BE FILED WITH THE REGISTER OF DEEDS OF BARNSTABLE COUNTY BY THE APPLICANT**

CORDI-ALLEN
EXHIBIT NO. 7
3/17/06 J.M. SHIELDS

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-10370PBS

BARBARA CORDI-ALLEN AND JOHN ALLEN,
Plaintiffs,

VS.

JOSEPH R. CONLON, ARTHUR F. HUTLIN, NORMAN H. POPE, KEITH S. ALTHAUS, And MARINNA MATRICARDI as they are Members and collectively the TRURO ZONING BOARD OF APPEALS AND THE TOWN OF TRURO, MASSACHUSETTS, AND BROOKE NEWMAN,
Defendants

**PLAINTIFFS' ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

The Defendants, Joseph R. Conlon, Arthur F. Hutlin, Norman H. Pope, Keith S. Althaus, and Marinna Matricardi as they are Members and collectively the Truro Zoning Board of Appeals and the Town of Truro, Massachusetts (hereinafter "Defendants") directed interrogatories to the "Plaintiff," but did not specify whether they intended the interrogatories to be directed to Plaintiff Barbara Cordi-Allen or Plaintiff John Allen (collectively the "Allens"). Because the Allens own the property addressed in the complaint together and are husband and wife, these answers are submitted on behalf of both Barbara Cordi-Allen and John Allen.

**INTERROGATORY NO. 1:**

Please state the name, business address and occupation of each person whom you expect to call as an expert witness in the above-entitled matter, including as to each person the nature of his or her specialization, and, specifying separately as to each such expert, the following: the subject matter on which each expert is expected to testify, the substance of the facts to which each such expert is expected to testify; the substance of the opinions to which such expert is expected to testify; and a summary of the grounds for each such opinion.

**RESPONSE TO INTERROGATORY NO. 1:**

1. Peter Rosen, Ph.D., Geo-Plan Associates, 30 Mann Street, Hingham, Massachusetts 02043.

Dr. Rosen is a coastal geologist by education and training with over 30 years experience in coastal landform evolution and processes along the New England coast. He is a Professional Geologist licensed in the states of North Carolina, Virginia, and Florida and Associate Professor and Chairman of the Department of Earth and Environmental Science at Northeastern University. He has worked with engineers to evaluate, plan, and manage projects on the coast throughout New England, including erosion evaluations, sediment budgets, wetlands delineations, dune and bank construction and/or stabilization, and dredging and served for thirteen years on the Town of Hingham's Conservation Commission and has knowledge and an extensive background in the implementation of the Wetlands Protection Act ("WPA") and its regulations, location of septic systems in coastal areas under Title 5 of the State Environmental Code ("Title 5"), and permitting of coastal structures under M.G.L. ch. 91 ("Chapter 91").

Dr. Rosen will offer expert testimony on the permitting of various properties in Truro including properties in the area surrounding the Allens' property on Yacht Club Road under the WPA, Title 5, and Chapter 91, and will provide his opinion that the Town of Truro through its boards, commissions and agencies has applied different standards to the permitting of the Allens' property than it has applied to like situated properties. More particularly, Dr. Rosen will testify that the Truro Conservation Commission has permitted properties including those of the Pamat Harboe Yacht Club and defendant Brooke Newman to be developed without compliance with performance standards for "coastal dunes" under the WPA while at the same time insisting that the Allens' property which is part of the same geological formation is a coastal dune. Further that the Town of Truro through its various agencies opposed the Allens' proposal to reconstruct a pier and float on their property while at the same time promoting the permitting of a pier proposal by the Pamet Harbor Yacht Club which had similar navigation impacts. Further, even though the Town of Truro has taken the waterfront lands in front of the Yacht Club by eminent domain, Newman's and the Allens' property, the Town has allowed the Yacht Club to place floats and allowed Newman to maintain a moored boat in the taken property, but has steadfastly refused to allow the Allens to use any of the land including sufficient land to moor a boat to the existing pier. Dr. Rosen has prepared no report at this time.

2.    Plaintiffs reserve the right to add additional expert witnesses and will seasonable supplement this response as necessary. In this regard, Plaintiffs intend to name an expert witness to testify as to damages suffered by the Plaintiffs.

**INTERROGATORY NO. 2**

Identify each individual likely to have discoverable information that you may use to support your claims, identifying the subject to of the information known by each such person.

**RESPONSE TO INTERROGATORY NO. 2**

1. Barbara Cordi-Allen, 143 Ardsley Road, Longmeadow, Massachusetts 01106. Ms. Cord-Allen is a Plaintiff in this matter and likely to have documents in her possession and knowledge regarding the permitting of her property and the Town of Truro'sa ctions relating to it and like situated properties.

2. John Allen,143 Ardsley Road, Longmeadow, Massachusetts 01106. Mr. Allen is a Plaintiff in this matter and likely to have documents in her possession and knowledge regarding the permitting of her property and the Town of Truro's actions relating to it and like situated properties..

3. Employees and Agents of the Town of Truro, Town Hall Road, Truro, Massachusetts. The Town of Truro is a defendant in this matter and listed below are individuals who the Plaintiffs believe have discoverable information. Notwithstanding, there may be other individual employees and agents of the Town who have information regarding the claims set forth in this complaint.

4. Joseph R. Conlon, Arthur F. Hultin, Norman H. Pope, Keith S. Althaus, and Marianna

Matricardi, Town Hall Road, Truro, Massachusetts. These individuals are members of the Truro Zoning Board of Appeals and may have information regarding the permitting of Plaintiffs' property and like situated properties.

5. Robert Bednarek, Secretary and other Members of the Truro Conservation Commission. The Conservation Commission and its members may have information regarding the permitting of Plaintiffs' property including both proposed home and pier, and information on the permitting of like situated properties.

6. Pamet Harbor Commission, Address Unknown. The current and past members of the Commission may have information on the concerted effort of the Town of Truro to prohibit the Plaintiffs from constructing a pier on their property, to silence complaints of the Harbormaster, to take the Plaintiffs' land below mean high water for use of others, and to allow the Pamet Harbor Yacht Club to use its land below mean high water even though it was taken by the Town of Truro..

7. Gary Palmer, Raymond LeDuc, Mark Peters, and Herbert Stranger, Jr., as they constituted the Board of Health for the Plaintiffs' request for a variance to construct a septic system to serve a proposed residence on their property.

8. R.W. Bud Breault, former town administrator, Town of Truro, Address Unknown, Mr. Breault may have information regarding the permitting of the Plaintiffs' property.

9. Vincent Corsano, Former Building Commissioner, Town of Truro, Address Unknown. Mr. Corsano may have information regarding the permitting of similar properties in Truro.

10. Stephen Williams, Former Building Commissioner, Town of Truro, Address Unknown. Mr. Williams may have information regarding the permitting of Defendant Brooke Newman's property and similar properties in Truro.

11. Thomas Winguard, Building Commissioner, Town of Truro, Town Hall, Truro, Massachusetts. Mr. Winguard may have information regarding the permitting of like situated properties within the Town of Truro.

12. Brooke Newman, 3 Yacht Club Road, Truro, Massachusetts. Ms. Newman may have information regarding the construction and permitting of her house adjacent to Plaintiffs' property, her appeal of the Plaintiffs' permits, and how she obtained a permit without meeting the regulatory standards that the Town of Truro attempts to apply to Plaintiffs including construction and placement of fill in an area alleged to be a "coastal dune" by the Town and installation of a well without obtaining appropriate permits.

13. Sarah Turano-Flores and the law firm of Zisson and Veara, Main Street, Dennis, Massachusetts. Ms. Turano-Flores and other lawyers including James Veara have provided legal advise to the Town of Truro and its various boards regarding the permitting of Plaintiffs' property.

14. Department of Environmental Protection's Southeast Regional Office including in

particular, James Mahala, Elizabeth Kouloheras, Ronald Potter, and Brian Dudley, 20 Riverside Drive, Lakeville, Massachusetts 02347. This agency and these individuals may have information explaining how they issued permits for the Plaintiffs' property on at least four different occasions concluding that the property does not contain a coastal dune under the Wetlands Protection Act and then, without explanation, reversed that position under pressure from the Town of Truro. In addition, they may have information on the Plaintiffs' permit application to construct a pier on their property.

15. New England District, U.S. Army Corps of Engineers, 696 Virginia Road, Concord, Massachusetts 01742. This agency and individuals within it may have information regarding the Plaintiffs' attempt to obtain a permit to construct a pier on their property.

16. Town of Truro Harbormaster's Office, Address Unknown, this office and Warren Roderick, now or formerly of that office may have information regarding the use of Pamet Harbor, the organized opposition by Town agencies to the Plaintiffs' development proposals, permitting of moorings and structures in the Pamet Harbor area, and the use of land taken by the Town from the Plaintiffs below mean high water for the mooring of boats owned by other individuals.

17. Pamet Harbor Yacht Club, P.O. Box 555, off Yacht Club Road, Truro, Massachusetts including its officers, directors and members. These individuals may have information explaining how the Yacht Club can construct additions, install wells, and serve food without obtaining permits from the Town of Truro, and as to the reason that a "marina" property with permitted piers, floats, and tennis courts and including more than three acres is valued at only slightly

higher than adjacent residential properties of smaller size and lesser buildings and accessory structures.

18. Town of Truro Assessors Department, Town Hall, Truro, Massachusetts. This department has information regarding the valuation of various properties near or similarly situated to the Plaintiffs.

19. Truro Board of Selectman (current and former members), Town Hall, Truro, Massachusetts. These individuals have had communications with the Plaintiffs over the years regarding the Plaintiffs' development proposals and the permitting of similarly situated properties.

20. Mr. David Lajoie, Felco Engineering, P.O. Box 1366, Orleans, Massachusetts 02653. Mr. LaJoie prepared the development plans for the Plaintiffs, their predecessors in title, and their neighbors.

21. Sarah Landis, 1 Yacht Club Road, Truro, Massachusetts. Ms. Landis owns property in the vicinity of the Plaintiffs and received permitting from the various agencies of Truro for her property.

22. Stanley Humphries, Coastal Scientist. Mr. Humphries is an expert witness for the Town of Truro in its challenge to the Department of Environmental Protection's issuance of an order of conditions for the Plaintiffs' pier and house.

23. Peter Rosen, Ph.D., 30 Mann Street, Hingham, Massachusetts. Dr. Rosen is the Plaintiffs' witness in the Town of Truro's challenge to the Department of Environmental Protection's issuance of an order of conditions for the Plaintiffs' pier and house.

24. Paul Kalill of Kalill, Glasser, and Senecal, 135 State Street, Springfield, Massachusetts 01103-1905, 413-781-1200. Mr. Kalill represented the Allens in their purchase of the subject property.

**INTERROGATORY NO. 3**

Please describe in detail all representations made to you by any and all individuals, including but not limited to any real estate broker, any employee or representative of the Town of Truro or by the prior property owner regarding the allowed use and/or expansion of the subject property prior to your purchasing the property. Please include in your answer, the specific representations made, the individual(s) who made the representations, when such representations were made and whether or not the representations were made in writing.

**RESPONSE TO INTERROGATORY NO. 3**

The subject property was purchased from Financial Enterprises Corporation ("FEC"). The Allens had no direct contact with FEC regarding the "allowed use and/or expansion of the subject property." All communications and representations were made by Nicholas Brown and Claire Carroll of Thomas D. Brown Associates, real estate brokerage, who represented FEC. More specifically, the Brown office represented in advertisements regarding the property as follows: "On the beach, waterfront boathouse renovated with loft bedroom, and addition possible for one

bedroom." No statement was ever made to the Allens limiting this representation. The Brown office also provided pictures of the property showing it with the pier and floats approved under Chapter 91 license No. 4304. Except with respect to the bottom anchored floats as discussed in Interrogatory #4 below, no representations were made by any employee or representative of the Town of Truro to the Allens prior to the Allens' purchase of the subject property.

**INTERROGATORY NO. 4**

Please describe in detail all due diligence that you performed prior to purchasing the property to determine the allowed use of the property and whether or not there were restrictions on the expansion of the structure located on the property and/or restrictions as to the construction of any new structure on the property.

**RESPONSE TO INTERROGATORY NO. 4**

The Allens hired attorney Paul Kalill of Kalill, Glasser, and Senecal, 135 State Street, Springfield, Massachusetts 01103-1905, 413-781-1200, to represent them in the transaction. Mr. Kalill obtained a title search of the subject property and concluded that it had no restrictions on it and that appropriate easements and government approvals had been obtained for the use of wells on nearby property to supply water and for the septic system.

The offer was made in late July, 1995, but the sale was not consummated until March, 1996. The septic system which was installed under a permit issued in January, 1994, was determined to not comply with Title 5 as the septic tank and pump chamber were not constructed from water tight

components nor had an appropriate pump assembly and electric service been installed. These components were replaced by FEC with the approval of the Town of Truro.

The Allens also obtained a copy of the Chapter 91 license #4304 for the subject property and through their engineer obtained a copy of a letter to FEC from the Department of Environmental Protection ("DEP"), dated July 28, 1995. This letter stated which stated that the pier could be reconstructed, but that any ramp and floats would require a DEP issued Chapter 91 license. Based upon an inquiry by the Allens, the DEP sent a clarifying letter which stated that only the replacement of the "pile-held floats" would require a Chapter 91 permit from DEP and that bottom anchored floats could be installed pursuant to "an annual Chapter 91, section 10A permit from the local Harbormaster. You will need to contact the Truro Harbormaster to see if the town will issue mooring permits for floats." Having received that advise, the Allens contacted the Truro harbormaster who informed them that the Pamet Harbor Yacht Club obtained annual permits for its floats and that the Allens should be able to obtain similar approvals. Ms. Cordi-Allen was particularly interested in purchasing a property which has a pier as she is disabled both from a bone condition and an elevator accident.

**INTERROGATORY NO. 5**

Please state in detail the basis for your claim that the Town of Truro discriminated against you due to your national origin including in your answer, which specific Town of Truro employee(s) or representative(s) discriminated against you, how those employee(s) or representative(s) were made aware of your national origin, any comments made by those employee(s) or representative(s) regarding your national origin and the basis for your claim that your national origin was a factor in the Town of Truro's decisions concerning the property.

**RESPONSE TO INTERROGATORY NO. 5**

The basis for Ms. Cordi-Allen's claim that the Town of Truro has discriminated against her is as follows. Ms. Cordi-Allen is a Lebanese American who is proud of her national origin and has made such ancestry known to many within the Truro community of which she has been a land owner for twenty years. The middle eastern states of Lebanon and Israel have had significant disputes over the last 30 years with the Israeli army occupying parts of Lebanon for years. Politics in Israel are dominated by members of the Jewish faith. It is Ms. Cordi-Allens contention that, within the Town of Truro, a significant if not controlling number of members of the Conservation Commission, Zoning Board of Appeals and town government are members of the Jewish religion and that they apply different standards for non-jews than for jews. In particular, as a Lebanese American, Ms. Cordi-Allen believes that she has been treated differently than like situated persons due to her Lebanese background.

More specifically, it is Ms. Cordi-Allens' contention that decisions regarding her property and

surrounding properties by Town boards follow a distinct pattern wherein members of the Jewish faith are allowed to build whereas she who is Lebanese is not. For example, Bernard Stoller, a member of the Jewish faith owned the subject property prior to Ms. Allen. In 1992, the Truro selectman approved a septic system for the current cottage by a decision dated December 11, 1992. The Truro Conservation Commission denied an order of conditions for the project on the basis that the property contained a "coastal dune." In May, 1993, the Southeast Regional Office of DEP, approved the site plan and delineations of wetlands in the plan submitted by FEC and explained the resource areas present at the subject property as follows:

> The project proposes construction of a septic system and well supply line for an existing cottage. The nature and location of the present septic system is unknown. Review of the United States Geological Survey geologic map for the Wellfleet Quadrangle (1968) indicates that the sediments are predominately sand and gravel valley deposits. Based upon this information, the Flood Insurance Rate Map for the Town of Truro, **and observations made at the site, the Department has determined that the resource area in which the site is located is Land Subject to Coastal Storm Flowage (Zone A4, el. 12).** The Department has determined that the site is significant to the statutory interests of storm damage prevention and flood control.

Thus, the DEP specifically rejected the notion that the property contained a "coastal dune. No appeal was taken of this decision by the Truro Conservation Commission.

In March, 1996, the Allens purchased the Property from FEC (Barnstable County Registry of Deeds Book 1011, Page 256) and later filed a notice of intent under the WPA and a request for a variance from Title 5 to construct a house and septic system. In reviewing the application, the Truro Board of Health requested the opinion of Town Counsel who by letter dated September 27, 1996, informed the Board that it was free to consider the application without regard to the 1992 letter which the Town has argued restricts the Allens' property.

In April, 1997, the Allens revised their plan and again requested variances from the Truro Board of Health for a new three bedroom septic system on the property. The plan submitted by the Allens contained the same wetland resource areas (coastal bank and land subject to coastal storm flowage) in the same locations as the DEP approved in 1993. The proposed system replaced the current septic system with a system that incorporated the "FAST" technology that reduced nitrogen concentration in the effluent. Furthermore, the leaching field for the proposed system was located at the far western edge of the property more than 100 feet from the edge of the coastal bank. The location exceeded the state mandated 50 foot setback from the coastal bank by more than 50 feet, obviated the need for any variances from Truro's requirement to maintain 100 feet of separation between the leaching field and the shores of Pamet Harbor.

Notwithstanding, Truro belatedly attempted to deny the requested variances in 1997, and the Allens appealed to Superior Court. On April 15, 1999, the Superior Court ordered the variances granted. Truro did not appeal the judgment, but rather nearly immediately on May 13, 1999, sent a letter to DEP requesting that DEP disapprove any request to approve the variances. A month later, in June, 1999, the Allens applied for DEP approval of the variance to construct a system without a "reserve area." While a septic system in full compliance with Title 5, including a "reserve area" could be constructed on the Allens' property, they requested a variance from state Title 5 so that all of the components of the system would be located more than 100 feet from Pamet Harbor, to meet the requirements of the Town of Truro.

As this matter was proceeding, the Allens requested that the Board of Health take enforcement against the Pamet Harbor Yacht Club in 1998, as the club's septic needs were solely serviced by

cesspools. Rather, than make the Yacht Club upgrade their system, the Board quite interestingly found that cesspools, which are simply a pit into which sewage flows without treatment were perfectly appropriate for the adjacent Yacht Club while at the same time litigating with the Allens over the installation of compliant system that included a nitrogen removing treatment system.

Similarly in 1998, Defendant Brooke Newman, who is also of the Jewish faith, applied to the Conservation Commission for an order of conditions to move her house at 3 Yacht Club Road and to construct a septic system. The only order of conditions for the property was issued on May 22, 1998, and references a plan dated April 6, 1998, which was relatively rudimentary, although multiple changes were made to the plan after that date. In particular, a June 17, 1998, plan was prepared which included a new septic system consisting of a septic tank, pump chamber, and leach area which was approved on August 2, 1998, by the Conservation Commission. Newman's plan was again revised on August 25, 1998 and apparently approved by the Commission. Finally, the Commission approved further revisions dated February 1999, at its March, 1999, meeting. While each of these plans shows construction adjacent to the subject property and wetland resources on the subject property, not a single version of the plan shows a "coastal dune" on the subject property. While this would make some sense with respect to the subject property as DEP had already concluded that it contained only a "coastal bank", the Truro Conservation Commission was simultaneously taking the position that the subject property contained a "coastal dune" when examining proposals for it by the Allens and the construction activities were within 100 feet of the alleged "coastal dune" making the Newman property subject to Commission jurisdiction and WPA performance standards for a "coastal dune."

The on the Newman property was not even completed in compliance with the plans approved by the Commission regardless of the "coastal dune" issue as: (i) the foundation did not have breakaway panels; (ii) fill was brought on to the property to at least elevation 13.5 to cover the outlet to the septic tank from the home; (iii) large rocks were brought onto the property which were not shown on any plan; (iv) a fence was constructed; (v) an overhanging roof was constructed; and (vi) while Newman had informed the Conservation Commission that she would only plant "native grasses", Ms. Newman planted numerous trees and shrubbery.

In May, 2004, the Allens requested that the Conservation Commission initiate enforcement against Brooke Newman for failure to comply with the terms of her order of conditions and failing to comply with "coastal dune" performance standards which the Commission and Ms. Newman wish to have applied to the adjacent Allen Property. The Commission, however, simply ignored these issues and concluded that Newman had constructed in accordance with the approved plan. This was done notwithstanding that the Commission was opposing any placement of fill or planting on the subject property and, in direct contradiction of the Commission's approval of the February 1999 Plan that stated:

> The proposed change to the plans and work **does not affect the contour of the land around the house** or the leach field. (emphasis supplied).

Recognizing the Conservation Commission and Board of Health acted nearly immediately on any application of Ms. Newman, but such boards simply failed to act when the Allens submitted applications, the Allens requested that the DEP issue Superseding Orders of Conditions for the Allens proposed house, septiç system, and pier in November, 1998. The Southeast Regional

Office of DEP accepted the Allens request to consider the issuance of a Superseding Order of Conditions in January, 1999. The plan submitted by the Allens to DEP contained the same wetland resource areas (coastal bank and land subject to coastal storm flowage) in the same locations as were found by DEP in 1993 when it rejected a contention by the Truro Conservation Commission that the Property contained a "coastal dune." These were the same delineations submitted by Ms. Newman.

An on-site meeting was held by DEP in early, 1999 to evaluate the Allens project in 1999. At the on-site meeting, DEP and members of the Truro Conservation Commission observed individuals excavating and repairing the septic system for the adjacent Pamet Harbor Yacht Club. No permits were obtained for such work, but no enforcement action was initiated against the Yacht Club. Furthermore, the members of the Truro Conservation Commission in attendance argued that the subject property contained a "coastal dune" while, at their recent meeting, they had approved Ms. Newman's revised plan which showed the subject property without a "coastal dune."

On January 18, 2000, DEP issued a variance from 310 C.M.R. 15.248: Reserve Area to the Allens (the "DEP Variance"). The DEP Variance approved the use of nitrogen removing FAST system and further expressly noted that a system without a variance could be constructed, but that it benefitted the environment to grant the variance as it ensured a maximum separation from the Pamet Harbor. Truro did not appeal the DEP Variance.

On June 8, 2000, by letter from Elizabeth Kouloheras, the Southeast Regional Office of DEP

issued two superseding orders of conditions authorizing the Allens' house, septic system and pier. The DEP concluded that the Property did not contain a "coastal dune" and authorized the construction of septic system on it. In June, 2000, the Town of Truro and the Pamet Harbor Yacht Club requested an adjudicatory hearing on the two Superseding Order of Conditions issued by DEP alleging that the Allens' property contains a "coastal dune." In November, 2000, a prehearing conference was scheduled for the appeals of the superseding orders of conditions, and Ms. Newman filed a motion to intervene in the proceeding which was ultimately granted and alleged that there existed a "coastal dune" on both the Property and her adjacent property. The allegation was somewhat perplexing as Ms. Newman never showed a coastal dune on any of her filings with the Truro Conservation nor does the development of her property comply with the performance standards for "coastal dunes"

In February, 2001, Truro's Health Agent attempted to create an appeal right for the Town on the DEP Variance by writing a letter to the Allens' attorney stating that the order of conditions and the DEP Variance referenced different plans and that the DEP Variance needed to be modified for the Town to issue a septic system construction permit. The Allens' attorney then requested that the DEP Variance be modified to reflect the new plan. A review of the plan reveals that there is a single change to the septic system in that piping from a portion of the building to the septic tank has been moved a few feet to the east.

Truro and Brooke Newman then filed Superior Court actions (Barnstable County No. 01-347, Suffolk County No. 01-2419F) challenging the Amended DEP Variance.

In March, 2001, Sarah Landis, a person of the Jewish Faith, applied to the Truro Conservation Commission for an order of conditions under the WPA to expand her house which is located adjacent to the Newman and Allens' properties. The expansion increase the footprint of the home to in excess of 2,500 square feet. On May 25, 2001, the Truro Conservation Commission issued an order of conditions authorizing construction. Even though the Conservation Commission was vigorously arguing that the Allens' property was "coastal dune", the Commission approved Ms. Landis' expansion as simply being in the flood plain.

The Allens also applied to the DEP for a Chapter 91 license to maintain and extend a pier at the Property in 1996. The notice of the application was published in November, 1996, and letters were sent by the Town administrator and the Harbormaster of Pamet Harbor requesting that the M.G.L. ch. 91 license be denied and/or that a public hearing be held. Within a month, the harbormaster "blew the whistle" on Chairman of the Pamet Harbor Commission who was also a member of the Pamet Harbor Yacht Club alleging that : (i) the Chairman pressured the Town Administrator to write the letter after the harbormaster originally refused to do so; and (ii) the harbormaster signed a similar letter in "a moment of weakness" when he believed that he would not obtain a raise if he refused to write a letter in opposition. When these allegations were revealed, the Town of Truro selectman refused to accept the resignations of Pamet Harbor Commission members and went so far as to criticize the harbormaster for his actions.

From 1996 to this time period, numerous meetings were held with DEP and the U.S. Army Corps of Engineers regarding the M.G.L. ch. 91 license application and a related permit application for the Allens' proposed pier extension. At these meetings, DEP informed the Army Corps that it

intended to issue the M.G.L. ch. 91 permit to the Allens. Notwithstanding these statements, the DEP issued a notice of denial of the M.G.L. ch. 91 license to the Allens on November 30, 2000, for which the Allens requested an adjudicatory hearing before DEP.

In October, 2001, the Allens wrote to the Truro Harbormaster with a copy to Town Counsel, which complained that boats were being moored on town authorized moorings on the Allens tidal flats (*i.e.*, land owned by the Allens between mean high and mean low water). In late January, 2002, the Allens learned that the Town of Truro intended to take the tidal flats on their property and adjacent land owners by eminent domain. The purpose of this action was to prevent the Allens from constructing their proposed pier and to eliminate their complaints regarding the Town using the flats for moorings and was done to benefit the Pamet Harbor Yacht Club and other users of Pamet Harbor to the exclusion of the Allens. The Order of Taking was recorded in the Barnstable Registry of Deeds on February 15, 2002.

The Allens were offered a payment of $2,500 for the land which was the lowest of any property owners and approximately ten percent of the amounts paid to their residential neighbors including Ms. Newman. The purported reason for the lesser payment was that the Allens retained an easement in the location of an existing dilapidated pier which only reaches the water during less than one quarter of the tidal cycle and serves no purpose other than as a viewing platform.

As an alternative, the Allens applied for a permit to extend anchored floats from the existing pier in 1996. That request was tentatively approved by the Harbormaster so long as the Allens paid a $2100 annual fee. The Allens objected to this fee as the neighboring Pamet Harbor Yacht Club

was required to only pay a $300 annual fee for similar floats.

In this regard, the Truro Harbormaster has attempted to prevent the Allens and their guests from tieing any boat to the pier. In July, 2004, the Allens again requested authority to install floats off of the "viewing platform." Town counsel nearly immediately responded that such licenses would not be issued as the Town now owned the tidelands in which they would be located. However, the Town of Truro has licensed for at least two years floats of the Pamet Harbor Yacht Club which extend beyond their easement. Similarly, Ms. Newman has been allowed to maintain an unpermitted mooring in front of her property which cause her boat to rest on land taken from the Allens.

In October, 1997, the Town Administrator issued a memorandum to all town boards warning the Boards to be cautious in dealing with the Allens. The letter stated that he would not speak with the Allens without witnesses present and stated that the Boards should act similarly. The letter also directed the Boards and Commissions in contravention to public records laws to not release information to the Allens or their attorneys and required that any request from the Allens for documents be handled by the Town's attorneys.

On or about October 28, 1998, the Building Department of the Town of Truro issued a building permit for construction on Brooke Newman's property at 3 Yacht Club Road without requiring Ms. Newman to obtain a special permit or a variance.

In April and May of 2002, Town Counsel in the Town's continuing assault on the Allens wrote to

the Allens attorney and stated that the Allens required a variance from the zoning bylaw to expand their home or, at a minimum, a special permit, even though their neighbor, Brooke Newman, had not been required to do so for her expansions.

By letter dated July 26, 2004, Barbara Cordi-Allen requested that the Building Commissioner revoke the building permit issued to Brooke Newman as she had not obtained a special permit or variance. The request cited letters to the Allens' counsel from town counsel stating that the Allens required a variance or special permit and that Sarah Landis had applied apply for a special permit. The Building Commissioner failed to respond within the statutorily required 14 day period.

Finally, after numerous telephone calls to town counsel, the Building Commissioner issued a letter on October 19, 2004, denying the request and essentially stating that his predecessor must have found that a special permit or variance was not required. On October 27, 2004, Barbara Cordi-Allen filed an appeal of that decision with the Truro Zoning Board of Appeals and filed a notice with the Barnstable County Registry of Deeds on the following day. Even though the Building Commissioner waited nearly three months to respond instead of the 14 days required by statute, town counsel quickly informed the Truro Zoning Board of Appeals that the appeal was untimely because the appeal had not been filed in Superior Court by October 28, 2004, citing a case that does not even address the issue of whether a timely filed administrative proceeding may continue.

The Truro Zoning Board of Appeals held a public hearing in December, 2004, and again on January 10, 2005. On January 19, 2005, a decision was filed with the Truro Town Clerk denying

Ms. Cordi-Allen's appeal.  The decision simply holds without findings that the Building Commissioner acted properly in issuing the building permit and that the appeal was untimely.

In May, 2005, the Allens requested that the Town take action against the Pamet Harbor Yacht Club for renting out the Yacht Club to non-members for private functions including weddings. Notwithstanding that the Yacht Club property is residentially zoned and such parties have not been held during previous years, the Town simply refuses to take any action to prevent this violation of its zoning bylaw.

In July, 2005, the Allens requested that the Truro Board of Health and Conservation Commission take enforcement action against Newman for installing a well and water line within the flood plain and on adjacent property for which the Commission and Board of Health took no action.  Further, in that same month, the Allens requested that the Board of Health and Building Department take enforcement action within their respective authorities as the Pamet Harbor Yacht Club was being rented regularly as a wedding hall even though it had no public water supply.  Again, no action was taken.

Finally, the Board of Health of the Town has taken the position that certain "hallways" in the Allens' proposed residence are actually bedrooms for purposes of Title 5 and local regulations. However, the Town does not require Ms. Newman to consider her "Music Alcove" as a "bedroom" even though it is functionally closer to a bedroom.

It is Ms. Cordi-Allens' position that these actions were discriminatory and were taken in part due

to her Lebanese and/or non-Jewish ancestry.

**INTERROGATORY NO. 6:**

Please specify with particularity any and all damages which you claim to have suffered as a result of the acts and/or omissions of the Defendants, and provide an itemized description of such damages.

**RESPONSE INTERROGATORY NO. 6**

The damages of the Plaintiffs consist of many kinds. For over nine years, the Town has acted to prevent the Plaintiffs from fully utilizing their property in a manner authorized by law. Thus, the Plaintiffs have lost the use and enjoyment of their proposed home which can be measured by the fair rental value of their property over that period. A waterfront home of the size proposed by the Plaintiffs with a pier in an exclusive area of Cape Cod rents for approximately $10,000 per week during the summer ($80,000/year) and approximately 2/3 of that amount during the months of June and September ($56,000/year). In addition, the house would have significant value to the Plaintiffs in the other months and certainly in excess of $50,000 more annually for a value of $186,000 per year. For purposes of this disclosure, the Plaintiffs have assumed seven years of use which corresponds to a value of about $1.4 million.

The costs of construction have substantially increased over this period and the Plaintiffs estimate that their costs will be at least 50 percent higher than nine years ago and, in the range of $300,000 greater. The Plaintiffs expect that any construction will be financed and, with higher interest rates,

the actual costs to the Allens will be doubled to at least $600,000.

The Plaintiffs have also been required to incur approximately $300,000 in unnecessary legal and consultant fees to defend the Town and Newman's appeals.

Furthermore, the Allens have suffered damages to reputation and emotional distress due to over nine years of fighting with the Town to obtain permits. This distress has caused physical and mental injury to the Plaintiffs which they value at $1.7 million dollars.

The Allens have also lost the use an enjoyment of the pier and float system and the land under mean high water. This can be valued on the basis of the fair rental value of a slip at a marina which in the lower-Cape area would be extremely high due to the lack of available slips and in excess of $10,000 per year per slip. Given that the pier and float system would have at least two slips, the damages are $20,000 per year over nine years or approximately $180,000.

Finally, they expect that, when a fact finder learns the full history of the Plaintiffs' permitting travails, the fact finder will award punitive damages of at least three times the underlying claim.

**INTERROGATORY NO. 7:**

Please state the basis for the allegation contained in paragraph 16 of your complaint that the "harbormaster blew the whistle on the Chairman of the Pamet Habor Commission who was also a member of the Pamet Harbor Yacht Club alleging (1) that the Chairman pressured the Town Administrator to write the letter after the harbormaster originally refused to do so; and (2) the harbormaster signed a similar letter in a 'moment of weakness' when he believed that he would not obtain a raise if he refused to write a letter in opposition" , including in your answer any documentation evidencing your allegation as well as any and all conversations between you and any employee or representative of the Town of Truro regarding this allegation.

**RESPONSE TO INTERROGATORY NO. 7**

The allegations in this paragraph are based upon statements reported in the Cape Codder Newspaper of January 24, 1997, and related articles on January 27, 1997, which have been provided in response to the Defendants' document request.

**INTERROGATORY NO. 8:**

Please state the basis for your allegation contained in paragraph 99 of your Complaint that, "the Town of Truro intentionally discriminated against you with the intention of protecting the interest of the Pamet Harbor Yacht Club and its members who include many of the most influential citizens of Truro" including in your answer, the specific facts you claim evidence the Town of Truro's intentional discrimination, any and all conversations or comments you had or overheard evidencing such discrimination, any and all actions taken by the Town of Truro that you claim evidence the intentional discrimination as well as the identity of the "influential citizens" referenced in this paragraph along with any actions taken by those citizens to influence the Town of Truro's actions concerning your property.

**RESPONSE TO INTERROGATORY NO.8**

See Response to Interrogatories 6 and 7.

**INTERROGATORY NO. 9:**

Please describe in detail any and all actions taken by the Town of Truro and its employees and/or representatives that you allege amount to threats, intimidation and coercion in violation of your equal protection and due process rights, including in your answer the specific action taken, and the individual Town of Truro employee or representative who took the action alleged.

**RESPONSE TO INTERROGATORY NO. 9**

As explained in detail in the response to Interrogatory No. 6, the members of various boards and commissions have used their position of authority to coerce the Plaintiffs to no longer exercise their constitutionally protected right to develop the subject property to the extent allowed by law. The Town through the individuals on its Board of Health and Conservation Commission has applied wholly arbitrary and capricious standards for compliance with applicable laws between the Plaintiffs and like situated land owners on adjacent properties. This has been done to prevent the Allens from lawfully using their property and is being done, not for environmental protection purposes, but rather to limit the Allens' use of their property for the benefit of others. As part of the scheme of coercion, every permit issued to the Allens has been appealed, except for one variance for which the Health agent then concocted a scheme to create an appeal opportunity. Further, the scheme has been implemented by the taking of the Allens' tidelands to prevent development of a pier from their property. The natural and expected effect of these action would be that the Allens would not develop their property.

Signed under pains and penalties of perjury this __ day of February, 2006.

Barbara Cordi-Allen

John Allen

INTERROGATORY NO. 9:
Please describe in detail any and all actions taken by the Town of Truro and its employees and/or representatives that you allege amount to threats, intimidation and coercion in violation of your equal protection and due process rights, including in your answer the specific action taken, and the individual Town of Truro employee or representative who took the action alleged.

RESPONSE TO INTERROGATORY NO. 9

As explained in detail in the response to Interrogatory No. 6, the members of various boards and commissions have used their position of authority to coerce the Plaintiffs to no longer exercise their constitutionally protected right to develop the subject property to the extent allowed by law. The Town through the individuals on its Board of Health and Conservation Commission has applied wholly arbitrary and capricious standards for compliance with applicable laws between the Plaintiffs and like situated land owners on adjacent properties. This has been done to prevent the Allens from lawfully using their property and is being done, not for environmental protection purposes, but rather to limit the Allens' use of their property for the benefit of others. As part of the scheme of coercion, every permit issued to the Allens has been appealed, except for one variance for which the Health agent then concocted a scheme to create an appeal opportunity. Further, the scheme has been implemented by the taking of the Allens' tidelands to prevent development of a pier from their property. The natural and expected effect of these action would be that the Allens would not develop their property.

Signed under pains and penalties of perjury this 9 day of February, 2006.

[signature]
Barbara Cordi-Allen

[signature]
John Allen

Original Signature to Follow By Mail



DEPOT ROAD TOWN WAY UNDEFINED
TOWN OF TRURO
RIGHT OF WAY
JOHN C. WORTHINGTON
A.
AREA = .932 ACRES ±
B.
AREA = .527 ACRES ±
C.
AREA = .561 ACRES ±
PAMET
HARBOR
TURN
WAY
GERALD L. CADORETTE
PAMET YACHT CLUB, INC.
RAILROAD MER.
SUBDIVISION PLAN OF LAND IN TRURO
MADE FOR
JOHN C. WORTHINGTON
SCALE: 1 IN. = 40 FT.
W. G. SLADE,
TRURO, AND MAIN STREET, WELLFLEET, MASSACHUSETTS
AUGUST, 1972
SURVEYOR
02667
APPROVED:
FOR THE TRURO PLANNING BOARD
DATE: Sept 28, 1972
I, Thomas A. Kane, Clerk of the Town of Truro, hereby certify that the notice of approval of this plan by the Truro Planning Board has been received and recorded at this office and no appeal was received during the twenty days after such receipt and recording of said notice.
Town Clerk
Plan Book 264 Page 18
264-18

EXHIBIT NO. 9
J.M. SHIELDS





Case 1:05-cv-10370-PBS Document 21-11 Filed 05/26/2006 Page 1 of 1

THOMAS D. BROWN
ASSOCIATES REAL ESTATE

Route 6
Truro, MA 02666

(508) 349-2734

SERVING THE OUTER CAPE FOR THIRTY YEARS

**ON THE BEACH,** affordable Truro cottage condo, at Pilgrim Beach Village, One bedroom seasonal use, the perfect get a way! A Brown Assoc. Best Buy at $95,000.

**ON THE BEACH,** affordable 2 bedroom cottage on the bay, the beach is your front yard, can be used for the extended season! A Brown Assoc. Best Buy at $195,000.

**ON THE BEACH,** waterfront boathouse renovated with loft bedroom, existing dock, and addition possible for one bedroom. A Brown Assoc. Best Buy at $195,000.

**ON THE BEACH,** waterfront Cape Codder cottage, in A plus location, with two bedrooms, and master suite on second level. A Brown Assoc. Best Buy at $265,000.



BOARD OF SELECTMEN & ASSESSORS
P.O. Box U
Truro, Massachusetts 02666
(508) 349-3635

December 11, 1992

Mr. David B. Lajoie
Felco, Incorporated
P. O. Box 1366
Orleans, Massachusetts 02653

Re: Financial Enterprises Corp., Lot C, Sheet 50, Parcel 21

Dear Mr. Lajoie:

Please be advised that your request of three (3) waivers of Title V regulations reference the above captioned matter, is hereby approved with the following conditions:

1. Regardless of the capabilities of the Title V system, the dwelling will be restricted to a one (1) bedroom residence.

2. That a Certificate of Occupancy will not be issued until such time as this office is in receipt of a copy of the recorded easement for water supply.

Sincerely,

Robert J. Martin, Chairman

Bruce T. Tarvers

John H. Snow

Board of Health
Town of Truro
RJM/can

cc: Steve Williams, Health Agent
Conservation Commission

# TOWN OF TRURO
# BOARD OF HEALTH MINUTES
# WEDNESDAY, JUNE 4, 1997

The Truro Board of Health conducted a duly posted meeting on Wednesday, June 4, 1997 at 6:30 p.m., at the Town Hall Annex, 19 Town Hall Road, Truro. Present: Chairman Gary Palmer, Vice Chairman Maria Kuliopulos, Clerk Mark N. Peters (arrived late), Alternate Samuel Armstrong, Attorney Jay Murphy, Mrs. Alice Onbashian, Richard Bashian, Representing Mr. and Mrs. Allen were Attorney William Thomas, Stenographer Diane L. Kelly, and David Lajoie. Also present were Diana Worthington, Robert Spillane representing the Pamet Harbor Yacht Club, Claire Carroll, and Michael McGuire.

Motion to approve the minutes of May 14, 1997 by Maria Kuliopulos, second by Gary Palmer. 2-0, unanimous.

First hearing was for approval of a Condominium Conversion for Coral Sands, Inc. Chairman Palmer explained that Mr. Bashian had met with Health Agent Jane Crowley, who had approved the plan for the Condo Conversion purposes only. The Title V system was approved for an 18-bedroom ten-unit design. Said system must be installed prior to construction. Additionally the parking plan is for (20) cars. Mrs. Kuliopulos moved to approve and Mr. Armstrong gave the motion a second with the understanding that proponents must return to the Board of Health for final review of physical change of use.

Next a Public Hearing was held on a request by Felco Engineering representing Barbara and John Allen, 5 Yacht Club Road, Sheet 50, Parcel 21, Truro, for five waivers from the requirements of Title V to permit the construction of a 4-bedroom home. The proposed system was a slight modification of one presented to the Board in October 1996. At that time the request was denied on the grounds that a condition was imposed in December, 1992, when the previous owner, Financial Enterprises, Corp. was granted three waivers for the installation of a Title V system by the Board of Health. The relevant condition states: **"Regardless of the capabilities of the Title V system the dwelling will be restricted to a one bedroom residence."**

Attorney Thomas noted that (1.) that none of the requested waivers were specifically "undeniable" ones, and that (2.) at the time there was no requirement that a conditioned variance be recorded at the Registry of Deeds.

The waiver requests were reviewed and the meeting was opened to additional comments from the floor. Mr. Spillane, Commodore of the Yacht Club, noted that there is a Title V system adequate for the existing building. He also pointed out that at the October 1996 Board of Health meeting, Nick Brown, representing the Thomas Brown Agency, had told the Board that the Allen's were informed by his real estate office that the condition existed. Mr. Spillant also stated that a large two-story building would do great esthetic harm to the area. Diana Worthington, an abutter, concurred in that opinion. Mr. Peters said that the Board cannot take matters such as

esthetics into account when reviewing health issues. Claire Carroll, who was present on another matter, but who had represented the Brown agency in the sale to the Allen's said that not only had the Allen's been informed of the limiting condition, but that she had given them a copy of the Board of Health order. The Chairman stated that whether the Allens had been informed of the condition at the time of purchase or not, this was an issue between the seller and the Allens and not an issue for the Board of Health. "The condition exists and the condition is valid," he said. Mr. Peters moved to take the matter under advisement. Mrs. Kuliopulos gave the motion a second. 3-0, unanimous.

The next item on the agenda was a continuance of a hearing involving a waiver of three months for Salley and Susan Areson pending determination as to whether the property in question represented a new division of property in a cottage colony or was an existing free standing lot. A quitclaim deed indicated that the land was an existent lot and Mr. Peters so moved to grant a 3-month waiver on the Title V installation. Mrs. Kuliopulos gave a second, 3-0, unanimous.

Next the Board conducted a Public Hearing on a Change of Manager for the Braemar Condominiums, 132 Shore Road, N. T. All documentation being in order and the hearing duly advertised, Mrs. Kuliopulos moved to approve the change from Howard Wagner to Carrie S. Stephens and Junie Maslowski. Mr. Peters gave a second, 3-0, unanimous.

The Board then reviewed a request from David Johnson for a water service hookup for the family dwelling located at 30 Shore Road, N. T. Mrs. Kuliopulos moved to recommend approval. Mr. Peters gave a second, 3-0, unanimous.

Finally the Board acted on a request from Michael McGuire to expand his property at 10 South Hollow Road, in N. Truro. The situation is unique in that Mr. McGuire's septic is part of a three-cesspool system installed and maintained by the Town of Provincetown. An abutter attached to the same system had undertaken a similar expansion in 1987 and a Board of Health waiver was granted in May of that year.

The current Board had asked to meet with Provincetown representatives but no meeting is possible until late fall of 1997. That being the case, and given the circumstance that there would be no additional usage of the property, and that a delay would cause an undue hardship for Mr. McGuire, Mr. Peters moved to grant a waiver from the need to install a Title V. Mrs. Kuliopulos gave a second, 3-0, unanimous.

Board of Health Minutes
Wednesday, June 4, 1997
Page 3

At 7:45 p.m., there being no further business, Mr. Peters moved to adjourn with Mrs. Kuliopulos giving a second. 3-0, unanimous.

Gary Palmer, Chairman

Maria Kuliopulos, Vice Chairman

Mark N. Peters, Clerk

Board of Health
Town of Truro

/sa/gp

# AFFIDAVIT

June 11, 1997

I, NICHOLAS L. BROWN, am President of Pamet Valley Real Estate Corporation d/b/a Thomas D. Brown Real Estate Associates, and have been in that position since February 1994.

On June 26, 1995 JOHN E. ALLEN and BARBARA M. ALLEN made an offer of $150,000 to purchase the land and cottage consisting of .561 acres more or less, and further known as 5 Yacht Club Road, Truro, Massachusetts.

Mrs. Claire Carroll of this office handled the showing and subsequent preparation of the "Offer to Purchase Real Estate".

In my presence Barbara M. Allen was told, and given a copy of, a letter dated December 11, 1992 from the Board of Selectmen to the then engineer, Mr. David Lajoie. This letter was signed by the Town of Truro Selectmen and stipulated that the property would always remain a one-bedroom dwelling. A copy of this letter is attached.

Further, in our advertising and representations to all potential buyers, we pointedly expressed one belief that some "footprint" expansion could occur, but only as a one-bedroom dwelling. For example, a master bedroom suite might be added, but the dwelling would only be a one-bedroom structure.

Witness:

[signature]

Sworn to this date,

[signature]
Nicholas L. Brown

Sworn to in my presence, this 11 day of June, 1997

[signature]



October 20, 1996

MR. JOHN E. ALLEN
MRS. BARBARA M. CORDI-ALLEN
146 PLEASANTVIEW AVE.
LONGMEADOW, MA 01106

TOWN MANAGER
TRURO TOWN HALL
TRURO, MA

DEAR SIR:

WE ARE WRITING YOU THIS LETTER REGARDING THE MEETING HELD WITH THE BOARD OF HEALTH REGARDING THE ORDER OF INTENT OF OUR BUILDING ON OUR PROPERTY AT 5 YACHT CLUB RD. THE MEETING WAS HELD AT 6:30 WEDNESDAY, OCTOBER 16, 1996. YOU HAD SAID THAT YOU WOULD BE AT THAT MEETING, BUT YOU NEVER CAME.

WE REQUESTED FROM YOU THE COPY OF THE LETTER FROM YOUR TOWN COUNSEL REGARDING A LETTER OF RESTRICTION OF OUR PROPERTY BEING A ONE BEDROOM. YOU STILL HAVE NOT SENT US THIS LETTER. WE WANTED IT PRIOR TO OUR HEARING WITH THE BOARD OF HEALTH. WE ARE REQUESTING IT AGAIN, AND ANY CORRESPONDENCE REGARDING US IN THE FUTURE. AFTER SPEAKING WITH YOU OVER THE PAST FEW MONTHS, YOU EVEN BROUGHT TO OUR ATTENTION THAT IF A SOMETHING IS NOT ON THE DEED THEN IT DOESN'T EXIST.

DUE TO THE POLITICS THAT OCCUR IN TRURO, ANYTHING CAN PASS HANDS WITHOUT LEGALITIES. IN THE TITLE SEARCH OF OUR PROPERTY AND ON THE DEED, THERE ARE NO RESTRICTIONS. NOT ONLY ARE THERE NO RESTRICTIONS, BUT THERE IS NO ZONING FOR A 1 BEDROOM. WE DO HAVE THE ZONING BYLAWS. CONCERN CAME OF THE DEVELOPMENT OF THE HARBOR. DISCRIMINATION OCCURRED WHEN THE ZAWADUCK'S WERE ALLOWED TO BUILD THEIR 4 BEDROOM HOME IN THE HARBOR AREA. NEXT DOOR TO US IS THE YACHT CLUB WHICH ENTERTAINS HUNDREDS OF PEOPLE AT A TIME AND IS A HUGE BUILDING. THE YACHT CLUB WAS CONCERNED ABOUT BACTERIA IN THE HARBOR. ISN'T IT FUNNY THAT A FAMILY OF FOUR WOULD USE THE TITLE V SEPTIC SYSTEM AND RISK THE BACTERIA OF THE HARBOR, YET THE YACHT CLUB, WHO DOESN'T HAVE A TITLE V NOR DO OUR ABUTTERS, WOULDN'T. ALSO, THE FACT THE OUR ABUTTERS HAVE MORE BEDROOMS THAN WE DO (WE DON'T HAVE ANY) IS ALSO DISCRIMINATORY. THE "BOATHOUSE" WAS FOR SALE FOR 5 YEARS AND ANYBODY COULD HAVE PURCHASED IT IF THEY SO DESIRED. NOW, IT SEEMS THAT PEOPLE ARE CRYING OVER SPILLED MILK.

IF BACTERIA IS SUCH A CONCERN, PERHAPS YOU SHOULD BE CONCERNED OF THE SANITARY CASTLES SPILLING OVER DURING THE HURRICANE. WE WARNED YOU OF THE DANGEROUS SITUATION, BUT YOU TOOK NO STEPS TO PREVENT THIS FROM OCCURING. ALSO, WHEN THE DEP PASSES A SEPTIC SYSTEM, THE STATE'S STANDARDS AND TESTING ARE BEHIND IT. WE FIND IT CONFLICTING FOR THE BOARD OF HEALTH NOT TO APPROVE THE STATE RECOMMENDED PLAN. AS BARBARA PUBLICLY ANNOUNCED AT THE MEETING, IF BACTERIA WAS A CONCERN, THEN WHY DID THE BOARD OF HEALTH PASS A SYSTEM THAT HAD NO PUMP, NO ALARM, AND NO ELECTRICITY? AGAIN, THE POLITICS OF TRURO.

WHILE WE ARE TALKING SEPTIC SYSTEMS, OURS IS A TITLE V AND IS UP TO DATE. IF THERE WERE FLOODING, THE DEP WOULD NOT HAVE ALLOWED THE PRESENT SYSTEM IN PLACE. YET, THE YACHT CLUB AND THE COTTAGES BEHIND US ARE NOT TITLE V SYSTEMS AND DEFINATELY ARE A RISK!! WE BROUGHT UP THE HOUSE BUILT IN THE WETLANDS ON CASTLE ROAD. IF WE FLOOD SO DO THEY. THEY WEREN'T STOPPED FROM BUILDING, WERE THEY?

NOW, REGARDING THE HORSE FARM ON DEPOT ROAD. WHEN THAT FLOODED, WHERE

DID THE HORSE MANURE GO? LET'S TALK BACTERIA!! IT IS OBVIOUS THAT WE ARE BEING GIVEN THE RUN AROUND, THE SAME RUN AROUND REGARDING OUR DOCK. THE STATE POLICE HAVE CONTACTED TRURO OFFICES ABOUT THE SAME GAMES BEING PLAYED NOW.

IT IS NOT THE BOARD OF HEALTH'S RESPONSIBILITY TO DISCUSS INTERNAL LETTERS SENT AND NEVER RECORDED ON ONE'S DEED. THERE IS A LAW, THERE ARE PROCEDURES AND A DEED IS BINDING. HOPEFULLY YOU WILL STRAIGHTEN OUT THIS MESS AND WE CAN GO ON FROM HERE. CONFLICT OF INTERESTS ARE PRESENT IN TRURO AND AT TOWN MEETINGS. WE ARE NOT, REPEAT, ARE NOT AFFECTED BY THE "RIVER'S ACT". OUR LETTER OF INTENT WAS SENT IN PRIOR TO THE ACT BEING SIGNED. WE HAVE A COPY OF THE LAW AS WELL AS OUR DATED AND STAMPED ORDER OF INTENT (STAMPED BY TRURO TOWN HALL AS RECEIVED).

THE YACHT CLUB DOES NOT HAVE RUNNING DRINKING WATER, AND THEIR WATER SUPPLY IS ANYTHING BUT SANITARY. THEY SHOULD BE THE LAST TO TALK OF BACTERIA ESPECIALLY WHEN THEY SERVE FOOD THERE. IT IS ABOUT TIME THAT STONES STOP BEING THROWN. IF PEOPLE ARE CONCERNED ABOUT AN ABUTTING PROPERTY, THEN PERHAPS THEY SHOULD BUY IT TO PROTECT THEIR OWN INTERESTS AND STOP CRYING LATER. WE HAVE EVERY LEGAL RIGHT TO BUILD ON THIS PROPERTY. WHEN WE DO BUILD, THE STATE STANDARDS WILL BE MET. WE BOUGHT IN THE LOCATION WE WANTED AND WE DO NOT WANT THE HARBOR DESTROYED. FOR THE SAME REASON, THE SYSTEM DESIGNED IS EVEN BETTER THAN A TITLE V. TO OUR UNDERSTANDING, IT PURIFIES THE SYSTEM. WE ANTICIPATE OUR ABUTTERS WILL ONE DAY WANT TO REPLACE THEIR SYSTEMS AND UPDATE THEIR COTTAGES. OUR FAMILY SIZE IS FOUR AND WILL REMAIN FOUR WHEN WE BUILD. WE ARE IMPROVING OUR PROPERTY AND INCREASING THE TAX BASE FOR THE TOWN. THIS NEW SYSTEM WILL BE MAINTAINED, JUST AS A REGULAR SEPTIC SYSTEM NEEDS TO BE MAINTAINED. MAINTAINANCE SHOULD NOT BE AN ISSUE. WE WOULD NEVER WANT TO RISK OUR HEALTH OR THAT OF OTHERS. THAT IS EXACTLY WHY WE TOLD YOU OF THE POTENTIAL HAZARD OF THE SANITARY FACILITIES AS WELL AS THE RECEPTACLE FOR HUMAN WASTE BEING ON THE RAMP. YET, WASN'T IT THE HARBOR COMMISSION THE ONE'S WHO TOLD THE HARBORMASTER TO CLEAN THE WASTE STATION AND WASH HIS HANDS IN THE HARBOR? CONCERN FOR OUR ABUTTERS ALSO WAS A REASON FOR US TO ASK THAT THE FACILITIES BE MOVED FROM THEIR PROPERTY LINE. PEOPLE NEED TO WORK WITH THEIR NEIGHBORS AND WORK TOGETHER. OUR ABUTTERS DO NOT STAY IN THEIR COTTAGES. THIS IS OUR HOME THAT WE ARE PLANNING TO BUILD. AS OUR STUDIO EXISTS, WE DO NOT HAVE A LIVING ROOM, A KITCHEN, A BATHROOM AND A BEDROOM. IT IS A 20X20 BUILDING, MUCH SMALLER THAN WHAT CONSTITUTES A ROOM. THIS PROPERTY WILL BE BUILT ON SO IT IS A COMFORTABLE PLACE FOR US. SO, PLEASE YACHT CLUB OFFICERS, DON'T INSULT OUR INTELLIGENCE AND SUGGEST WE WILL USE MORE SEPTIC, WATER ETC. THE JEALOUSY MUST STOP AND MATURITY MUST BE IN PLACE. IF YOU WERE MORE CONCERNED ABOUT BEACH EROSION AND THE HARBOR, YOU WOULD NOT HAVE INSTALLED A SEA WALL. REMEMBER, WE ARE NOT THE NEW KIDS ON THE BLOCK. WE ARE IN OUR 12TH YEAR IN TRURO, HAVE PAID OUR TAXES, HAVE IMPROVED OUR PROPERTY AND MAINTAINED OUR SEPTIC SYSTEM. IT IS THE TOWN WHERE WE WANT TO BE AND WE HOPE THAT YOU CLEAN UP TRURO AND THE CONFLICTS THAT EXIST. REMEMBER, CONFLICT OF INTEREST IS ILLEGAL AND EXISTS IN TRURO. PLEASE SEND US THE LETTER FROM YOUR COUNSEL AND RESPOND TO US REGARDING OUR CONCERNS.

THANK YOU

John & Barbara C. Allen

JOHN E. ALLEN

BARBARA M. CORDI-ALLEN

NOVEMBER 4, 1996

MR. JOHN E. ALLEN
MRS. BARBARA M. CORDI-ALLEN
146 PLEASANTVIEW AVE.
LONGMEADOW, MA 01106

TOWN MANAGER
TRURO TOWN HALL
TOWN HALL RD.
TRURO, MA

RECEIVED
SELECTMENS OFFICE
NOV 7 1996
TOWN OF TRURO
MASSACHUSETTS
11/13/96

DEAR BUD:

FOLLOWING OUR TALK LAST WEEK, I FELT IT BEST TO PUT IN WRITING SOME OF OUR CONCERNS. IT SEEMS VERY DISCRIMINATORY THAT ONLY THE "BOATHOUSE" HAS ANY SO CALLED RESTRICTIONS. WHEN THE PROPERTY WAS LOST BY THE WORTHINGTON FAMILY, A SO CALLED RESTRICTION WAS PLACED ON THE PROPERTY BUT NOT ON THE PROPERTIES BEHIND THE "BOATHOUSE" WHICH ARE OWNED BY THE WORTHINGTON FAMILY. ALSO, THERE ARE OTHER PROPERTIES THAT ARE IN THE WETLANDS AND HAVE BEEN BUILT ON THIS YEAR. OBVIOUSLY, THERE SEEMS TO BE AN INCONSISTENCY WITH THIS AND I AM SURE YOU DO NOT WANT ANY FAVORITISM PLAYED IN TRURO. WHEN AND IF THERE ARE RESTRICTIONS TO A PROPERTY, IF YOU READ THE ZONING BYLAW ON PAGE 27, IT STATES THAT ANY VARIANCES MUST BE RECORDED. THIS WAS NOT DONE TO OUR PROPERTY AND THEREFORE IS NOT VALID. I AM ENCLOSING A COPY FOR YOU IN CASE YOU DON'T HAVE ONE. I EXPECT TO HEAR FROM YOU SOON.

THANK YOU,

John E. Allen
Barbara M Cordi Allen

JOHN E. ALLEN
BARBARA M. CORDI-ALLEN

**FELCO, INC.**
Engineering / Land Surveying
P.O. Box 1366
Orleans, Massachusetts 02653
(508) 255-8141
FAX (508)-255-2954

April 7, 1997

Truro Board of Health
Truro Town Hall
Box 2030
Truro, MA 02666

Re: Map #50, Parcel #21, #5 Yacht Club Rd., Truro, MA
John & Barbara Allen requesting variances
Deed Reference: Book: 10111 Page: 256

Dear Board Members:

Due to constraints such as lot size, lot configuration, topography, structure location(s), water supplies, and/or existing septic system locations, etc., FELCO requests the following variances to install a new subsurface septic system. These variances, if approved, shall provide to the best degree possible, the same environmental protection as required by the State Sanitary Code #310 CMR 15.000.

1. 7' from leach area to property line (pcl. 20) - 310 CMR 15.211

2. 8' from leach area to property line (street)

3. modify excavation for construction in fill - 310 CMR 15.255

4. no reserve - 310 CMR 15.248

Please notify FELCO of the date and time when the hearing can be scheduled.

Sincerely,

David B. Lajoie
Registered Sanitarian

DBL:jmw
Encls.
cc: Abutters

NOTE: THIS PLAN REQUIRES CONSERVATION COMMISSION APPROVAL
FLOOD ZONE A4 EL 12
D-BOX
CONCRETE RETAINING WALL
30.7'
40.5'
4' TYP.
DISTRIBUTION LINES
2'
LEACH FIELD
FLOW BARRIER SEE C.N. #5
LEACH AREA DETAIL
NO SCALE
PAMET
HARBOR
PCL. 20
80.00'
80.00'
LOT C
24,437± S.F.
.56± AC.
100' REF.
107.00'
PROPOSED DWELLING T.O.FDN.= EL 12.0'
WORK LIMIT
RETROFIT WITH "FAST" UNIT
APPROX. MEAN HIGH WATER
COASTAL BEACH
BOTTOM OF BANK
TOP OF BANK
EXISTING DWELLING
SHED
EXISTING DWELLING TO BECOME AN ACCESSORY BUILDING
A=141.37'
R=30.00'
EXISTING LEACH AREA TO BE REMOVED
WAY
APPROX. DRIVE AREA
44.00'
8.63'
TO DEPOT ROAD
100'± TO LOCUS WELL
60.00'
54.94'
PCL. 37
BENCHMARK
TOP OF CONCRETE BOUND
EL. 9.55' N.G.V.D.
VARIANCE REQUESTS
1. 7' FROM LEACH AREA TO PROPERTY LINE (PCL. 20) 310 CMR 15.211
2. 8' FROM LEACH AREA TO PROPERTY LINE (STREET)
3. MODIFY EXCAVATION FOR CONSTRUCTION IN FILL 310 CMR 15.255
4. 9' FROM LEACH AREA TO RETAINING WALL. 310 CMR 15.255(2g)
5. NO RESERVE 310 CMR 15.248
COMMONWEALTH OF MASSACHUSETTS
DAVID B. LAJOIE
No. 1038
REGISTERED SANITARIAN
ALL WELLS NOT SHOWN EXCEED 200' FROM LOCUS SEWAGE.
VERIFY ZONING AND UTILITY SETBACK DIMENSIONS PRIOR TO CONSTRUCTION.
THIS PLAN IS FOR SEWAGE DESIGN ONLY AND IS NOT INTENDED TO BE A SURVEY PLOT PLAN.
FELCO, INC.
ENGINEERING – LAND SURVEYING
P.O.BOX 1366 ORLEANS, MA 02653
(508) 255-8141 (FAX) 255-2954
EL. 13.0'
TOP OF WALL EL. 13.0'
FINAL GRADE 1'- 0" COVER (MIN)
#5 REBAR 12" O.C. (HORIZONTAL)
#5 REBAR 18" O.C. (VERTICAL)
4 MIL POLY
3'-10"
FINAL GRADE : EL. 10.7'
EL. 8.17'
2' 6"
CONCRETE WALL DETAIL
NO SCALE
NOTES: COAT BOTH SIDES OF CONCRETE WALL WITH WATERPROOF SEALANT EXCEPT WHERE EXPOSED.
LINE INTERIOR WALL WITH 4 MIL POLY.
USE 3000 PSI CONCRETE THROUGHOUT
BACKFILL CONCRETE WALL AS NECESSARY TO INSURE 30" MIN. COVER FROM BOTTOM OF FOOTING
LOCUS
(NO SCALE)
PAMET HARBOR
LOCUS
DEPOT ROAD
MILL HILL ROAD
OLD COUNTY ROAD
LEGEND
EXISTING SEPTIC
EXISTING WELL
PROPOSED WELL
EXISTING CONTOUR
PROPOSED CONTOUR
WATER LINE
TEST HOLE
SEPTIC TANK (EXISTING)
"D" BOX
PUMP CHAMBER (EXISTING)
SITE & SEWAGE PLAN
LOCUS: 5 YACHT CLUB ROAD
TRURO, MA
PREPARED FOR: JOHN ALLEN
146 PLEASANTVIEW AVENUE
LONGMEADOW, MA 01106
REFERENCE: ASSR'S MAP 50 PARCEL 21
5-1-97
3-31-97
REVISIONS
SCALE : 1" = 30'
DATE : 9-11-96
SHEET No. 1 OF 2
JOB No. 96378

## SECTION VIEW – SEPTIC SYSTEM COMPONENTS ( N. T. S. )

### DEEP OBSERVATION HOLE LOG

1. EL 8.7' DATE: 5-1-97 TEST BY: JASON ELLIS WITNESS: TRURO BOH

| DEPTH | LOWEST ELEVATION | HORIZON | TEXTURE | STRUCTURE | MOTTLING | CONSISTENCE |
|---|---|---|---|---|---|---|
| 0.0' – 1.0' | 7.7' | A | LOAMY SAND | NO | NO | LOOSE |
| WATER @ 4.3' – 6.5' | 4.4' – 2.2' | C | PERC @ 1.5' <2 MIN/IN MEDIUM SAND | NO | NO | LOOSE |

2. EL 9.15 DATE: 5-1-97 TEST BY: JASON ELLIS WITNESS: TRURO BOH

| DEPTH | LOWEST ELEVATION | HORIZON | TEXTURE | STRUCTURE | MOTTLING | CONSISTENCE |
|---|---|---|---|---|---|---|
| 0.0' – 1.0' | 8.15' | A | LOAMY SAND | NO | NO | LOOSE |
| WATER @ 4.75' – 6.0' | 4.4' – 3.15' | C | PERC RATE <2 MIN/IN MEDIUM SAND | NO | NO | LOOSE |

### GENERAL NOTES

1. ALL CONTRACTORS AND/OR INSTALLERS ARE RESPONSIBLE FOR PROVIDING AND MAINTAINING A SAFE WORK AREA.
2. CONTRACTORS AND/OR INSTALLERS: VERIFY ALL UTILITY LOCATIONS PRIOR TO CONSTRUCTION.
3. CONTRACTORS AND/OR INSTALLERS: VERIFY ALL WASTE LINE LOCATIONS PRIOR TO CONSTRUCTION.
4. CONSTRUCTION DETAILS TO BE IN ACCORDANCE WITH STATE SANITARY CODE 310 CMR 15.000 AND TOWN BOARD OF HEALTH REQUIREMENTS.
5. ELEVATION DATUM IS FROM ☐ U.S.G.S. QUAD. MAP. ☒ N.G.V.D.
6. MUNICIPAL WATER IS AVAILABLE ☐ YES ☒ NO
7. ANY ALTERATIONS TO DESIGN MUST BE APPROVED BY FELCO, INC. AND TOWN BOARD OF HEALTH.
8. ALL EXISTING SEWAGE TO BE PUMPED AND FILLED WITH CLEAN MEDIUM SAND.
9. SEPTIC TANKS, DOSING CHAMBERS, GREASE TRAPS, AND DISTRIBUTION BOXES SHALL BE INSTALLED WATERTIGHT.
10. WHEN SEPTIC TANK, DOSING CHAMBERS, GREASE TRAPS, AND DISTRIBUTION BOXES ARE PLACED IN FILL, PROVIDE A LEVEL STABLE BASE WHICH HAS BEEN MECHANICALLY COMPACTED. VIRGIN GROUND WITH A 6" CRUSHED STONE BASE IS OTHERWISE ADEQUATE.
11. GROUND COVER OVER SEPTIC SYSTEM COMPONENTS SHALL NOT EXCEED 36".

### DESIGN

FLOW DETERMINATION [4] BEDROOM DWELLING

GARBAGE GRINDER ☒ NO ☐ YES

FLOW RATE = [440] GAL/DAY

SEPTIC TANK SIZING:

[440] x 2.0 = [880] GAL/DAY

USE: 1,500 GAL (EXISTING)

LEACHING FACILITY CALCULATIONS:

PERCOLATION RATE IS < [5] MIN/INCH [I] CLASS

BOTTOM (S.F.) = [614] x [0.74] = [454] GAL/DAY

USE: 40.5' LONG X 30.7' WIDE LEACH FIELD

AS SHOWN = 614± S.F.

W/ 0.5' EFFECTIVE DEPTH

### CONSTRUCTION NOTES

1. WORK LIMIT TO BE STAKED SILT FENCE.
2. EXCAVATE ALL UNSUITABLE SOIL 2' AROUND LEACH DOWN TO MEDIUM SAND AND REPLACE WITH CLEAN MEDIUM SAND.
3. EXCAVATE EXISTING SEWAGE AND UNSUITABLE SOIL AND REPLACE WITH CLEAN MEDIUM SAND.
4. FELCO TO STAKE LEACH AREA FOR INSTALLATION
5. INSTALL 40 MIL POLYVINYL FLASHING OR EQUIV. AS FLOW BARRIER AROUND ENTIRE LEACH AREA. FROM EL 12.0' DOWN TO EL 9.0'
6. ALL DISTURBED AREAS TO BE REVEGETATED WITH NATIVE GRASSES UPON WORK COMPLETION.

FELCO, INC.
ENGINEERING – LAND SURVEYING

| JOB No : 96378 | NAME : ALLEN |
|---|---|
| DATE : 9-10-96 | SHEET 2 OF 2 |
| REVISIONS : 3-31-97 5-1-97 | |



SUBDIVISION PLAN OF LAND IN TRURO

MADE FOR

JOHN C. WORTHINGTON

SCALE: 1 IN. = 40 FT.
W. G. SLADE,
TRURO, AND MAIN STREET, WELLFLEET, MASSACHUSETTS

AUGUST, 1972
SURVEYOR

APPROVED:

FOR THE TOWN PLANNING BOARD

DATE: Sept 26, 1972

I, Thomas A. Kane, Clerk of the Town of Truro, hereby certify that the notice of approval of this plan by the Truro Planning Board has been received and recorded at this office and no appeal was received during the twenty days after such receipt and recording of said notice.

Date Oct 27/72 Thomas A. Kane
Town Clerk

Bud

# TOWN OF TRURO
# BOARD OF HEALTH MINUTES
# WEDNESDAY, JUNE 11, 1997

The Truro Board of Health conducted a duly posted meeting on Wednesday, June 11, 1997 at 6:30 p.m., at the Town Hall Annex, 19 Town Hall Road, Truro. Present: Chairman Gary Palmer, Vice Chairman Maria Kuliopulos, Clerk Mark N. Peters, Alternate Samuel Armstrong, Administrative Secretary Carol A. Nickerson.

Mr. Palmer called the meeting to order at 6:30 p.m.

Mr. Peters moved to accept the minutes of the meeting from June 4, 1997. Mrs. Kuliopulos gave the motion a second. (Since Mr. Peters arrived late for the June 4th meeting, Mr. Armstrong served as alternate and as such, signed the minutes).

Mr. Palmer apprised the Board on the letter written to Mr. Garrett who questioned having to upgrade to Title V since a property transfer was within a family trust and felt they were exempt from the Title V regulations. In accordance with the law, it was deemed that an upgrade must take place.

After having received a "check list" from the Local Comprehensive Planning Committee on items they felt the Board of Health had not followed through on, Chairman Palmer wrote a letter to the LCPSC responding to each item, for the Board of Health to sign and forward to said committee. The Board approved this.

The Board received a letter from the DEP informing them that the Truro Fire Department had been given permission to use a structure at 4 Highland Road, N. Truro, for a fire training exercise which will include fire departments from Provincetown and Wellfleet.

On June 4, 1997, the Board had taken under advisement, a vote on the variance request for John and Barbara Allen, Yacht Club Road, Truro. After further discussion and a review of documents, Mr. Peters moved that the request for (5) variances be denied Mr. and Mrs. Allen based upon prior action by the Board of Health in 1992. Mrs. Kuliopulos gave the motion a second. 3-0, unanimous.

The Board was informed that the Summer Sanitarian is now inspecting businesses in Truro as part of the summer program offered by the County Health Department. Every two weeks she meets with Mrs. Nickerson and they work out a schedule for inspecting swimming pools, restaurants, food service locations, and others as requested. Ms Crowley will assist in this program as needed.

The Board briefly discussed the upcoming Special Town Meeting to be held on June 18, 1997 and asked those members that can, to be present.

The next meeting of the Board of Health is scheduled for Wednesday, July 2, 1997.

There being no further business, Mr. Peters moved to adjourn the meeting at 7:40 p.m. Mrs. Kuliopulos gave the motion a second. 3-0, unanimous.

Gary Palmer, Chairman

Maria Kuliopulos, Vice Chairman

Mark N. Peters, Clerk

Samuel Armstrong, Alternate

/can

COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
20 RIVERSIDE DRIVE, LAKEVILLE, MA 02347 508-946-2700

ARGEO PAUL CELLUCCI
Governor

JANE SWIFT
Lieutenant Governor

BOB DURAND
Secretary

LAUREN A. LISS
Commissioner

RECEIVED JUL 27 1999

July 26, 1999

Ms. Jane Crowley, Health Agent
Board of Health
P.O. Box 2030
Truro, Massachusetts 02666

And

Mr. John Allen and Ms. Barbara Cordi-Allen
146 Pleasantview Avenue
Longmeadow, Massachusetts 01106

RE: TRURO—Subsurface Sewage Disposal-Proposed Variances to 310 CMR 15.000 of Title 5 of The State Environmental Code for John Allen and Barbara Cordi-Allen, 5 Yacht Club Road

Transmittal No. P24485

Dear Ms. Crowley, Mr. Allen and Ms. Cordi-Allen:

The Department of Environmental Protection has conducted a Technical Review of the above-referenced application requesting variances to Title 5 and has determined that it cannot be approved as submitted for reasons which are specified below. For the purpose of this Department's comment on the proposed variance pursuant to 310 CMR 15.410 through 15.415, Title 5 of the State Environmental Code, this letter constitutes a denial in that the Department has determined that approval of the proposed variance(s) will not provide the same degree of environmental protection as required under Title 5. However, in accordance with 310 CMR 4.04(2)(b)2.a.iii and 310 CMR 4.10(7)(a)(3) (Category BRPWP59c) of the Timely Action and Fee Provisions, the application may be supplemented by the applicant to address the following deficiencies:

1. It is the Department's understanding that potable water is provided to this property by a private water supply well located on another lot by means of an easement. The plans must be revised to show the location of this well and the layout of the easement.

2. Means of water supply to the proposed dwelling must be shown on the plan.

3. The plan proposes four (4) bedrooms for a total sewage flow of 440 gallons per day (gpd) on a 24,437 square foot lot; however, the property is subject to nitrogen loading limitations pursuant to 310 CMR 15.214(2). Based on these limitations, the lot can only support a total sewage flow of 330 gpd.

4. The applicant must explore alternate soil absorption system locations or designs to provide the required excavation in fill pursuant to 310 CMR 15.255.

As 310 CMR 4.10(7)(a)(3)3b states, the applicant has sixty (60) days from the date of this letter (*see below) to address the listed deficiencies. Within the sixty (60) day time frame, the applicant is advised to allow for appropriate Board of Health action on the revised submittal since the Department of Environmental Protection's action may be its final action and, therefore, any further filing in this matter would be considered a NEW application. If the applicant cannot accommodate the schedule of the Board of Health within the sixty (60) day period, or for any other reason requires additional time, the applicant may, by written agreement with this Department, extend this schedule in accordance with 310 CMR 4.04 (2) (f).

The applicant is also advised that if he elects to proceed on the record as it now stands, this letter constitutes a denial of the variance. *This variance determination is an action of the Department. If the applicant is aggrieved by this determination, s/he may request an Adjudicatory Hearing in accordance with 310 CMR 1.00 and M.G.L. C.30A. A request for an Adjudicatory Hearing must be made in writing and postmarked within 30 days of the date of issuance of this determination.*

The enclosed Supplemental Transmittal Form should be completed and included as a cover sheet with any future submittal to this Department relating to the above matter. You need now only correspond to the Southeast Regional office of the Department of Environmental Protection, 20 Riverside Drive, Lakeville, Massachusetts 02347. THREE copies of engineering plans are required for Department review.

If you have any questions, please contact Brian Dudley at (508)946-2753.

Very truly yours,

Brian Dudley for
Elizabeth Kouloheras
Cape Cod Watershed

**Deadline Date: September 24, 1999**
enclosure

K/BAD/

cc: Felco, Inc.
P.O. Box 1366
Orleans, MA 02653
Enclosure

E. James Veara, Esq.
Zisson and Veara
828 Main Street
Box 2031
Dennis, MA 02638-0043

DEP Watershed Permitting Program, Title 5 Section, Boston



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
SOUTHEAST REGIONAL OFFICE

RECEIVED TRURO CONSERV COMM JUNE 12, 2000

ARGEO PAUL CELLUCCI
Governor

JANE SWIFT
Lieutenant Governor

COPY

JUN - 8 2000

BOB DURAND
Secretary

LAUREN A. LISS
Commissioner

John Allen & Barbara Cordi-Allen
146 Pleasantview Ave.
Longmeadow, Massachusetts 01106

RE: TRURO—Wetlands
File No. SE 75-371
Superseding Order
of Conditions

Dear Mr. Allen & Mrs. Cordi-Allen:

Following an in-depth review of the above-referenced file and in accordance with Massachusetts General Laws, Chapter 131, Section 40, the Department of Environmental Protection has issued the enclosed Superseding Order of Conditions. This Order approves the proposed project subject to certain conditions. The Department has determined that the project area is significant to the statutory interests of flood control and storm damage prevention.

The project proposes the construction of a single family dwelling, septic system with a FAST unit, deck, pool, garage, driveway and related appurtenances. The existing one bedroom dwelling is proposed to be elevated and slightly relocated. The proposed construction would occur within the 100 foot buffer zone to a Coastal Bank (310 CMR 10.30) and within Land Subject to Coastal Storm Flowage (310 CMR 10.04). The Federal Emergency Management Agency (FEMA) has mapped this area as subject to coastal storm inundation up to elevation 12 (Zone A4).

The enclosed Superseding Order of Conditions contains requirements to protect the interests of the Act. It is the opinion of the Department that, as conditioned herein, the proposed project adequately protects the interests of the Act.

In the opinion of the Department, the reasons given here are sufficient to justify this Superseding Order of Conditions. However, the Department reserves the right, should there be further proceedings in this matter, to raise additional issues and present further evidence as may be appropriate.

Rec'd from Bob Bednarek

RECEIVED
SELECTMENS OFFICE
JUN 13 2000
TOWN OF TRURO
MASSACHUSETTS

6/13/2000

20 Riverside Drive • Lakeville, Massachusetts 02347 • FAX (508) 947-6557 • Telephone (508) 946-2700
This information is available in alternate format by calling our ADA Coordinator at (617) 574-6872.
DEP on the World Wide Web: http://www.magnet.state.ma.us/dep
Printed on Recycled Paper

ZISSON AND VEARA
ATTORNEYS AT LAW

RICHARD L. ZISSON
EDWARD E. VEARA
JILL J. BROFSKY
E. JAMES VEARA
PAUL V. BENATTI
SARAH A. TURANO-FLORES
JOHN R. COSTELLO
BENJAMIN E. ZEHNDER
ROXANNE E. SAMII
LORI CURTIS KRUSELL

865 PROVIDENCE HIGHWAY
DEDHAM, MASSACHUSETTS 02026-6825
TEL (781) 329-1110
FAX (781) 329-5119

828 MAIN STREET-BOX 2031
OLD KINGS HIGHWAY
DENNIS, MASSACHUSETTS 02638-0043
TEL (508) 385-6031
FAX (508) 385-6914

June 19, 2000

Docket Clerk
Office of the General Counsel
Department of Environmental Protection
One Winter Street
Boston, Massachusetts 02108

Re: **Request for Adjudicatory Hearing**
**DEP File No. SE 75-459**
**John E. Allen and Barbara Cordi-Allen, Applicants**
**Property: 5 Yacht Club Road, Truro, Massachusetts**

Dear Sir or Madam:

This office serves as Town Counsel to the Town of Truro, Massachusetts. The Town of Truro owns property abutting the property owned by John Allen and Barbara Cordi-Allen on 5 Yacht Club Road, Truro, Massachusetts. On June 8, 2000, the Department of Environmental Protection issued Mr. and Mrs. Allen a Superseding Order of Conditions, approving with certain conditions the Allen's proposal to construct a 54-foot long extension to an existing pier with a 26-foot long ramp and two (2) 6 x 20 foot long floats in and over the waters of Pamet Harbor. This letter shall serve as a formal request by the Town of Truro, pursuant to the provisions of 310 C.M.R. 10.05(7)(j), for an Adjudicatory Hearing. Enclosed herewith are copies of the Request for Departmental Action Fee Transmittal Form and the filing fee check for One Hundred ($100.00) Dollars, both of which were forwarded to the DEP Lock Box on today's date.

The Allens filed their Notice of Intent for the proposed pier with the Truro Conservation Commission on May 27, 1999. With the filing, the Allens submitted a "Preliminary Plan to Accompany Petition of John E. Allen & Barbara Cordi-Allen to Amend License #4304 for an existing Pier, Ramp and Float Assembly In and Over the Waters of Pamet Harbor, Truro, MA," dated with revisions through February 11, 1999. The plan depicted a 4' x 54' permanent pier extension to an already existing 4' x 80' permanent pier, a 4' x 26' ramp, and two (2) 6' x 20' floats

JUN 2 0 2000
6/20/2000

extending horizontally at the end of the pier, for a total length of 170'. As proposed, the finished product would extend beyond the mean high water mark, over a salt marsh, beyond the mean low water mark, to the boundary of the extreme low water mark. Public hearings were held on the project on June 7, 1999 and June 16, 1999. At its final hearing on June 16, 1999, the Truro Conservation Commission voted to deny the project because the information submitted by the applicant was not sufficient to describe the site, the work or the effect of the work on the interests identified in the Wetlands Protection Act. Specifically, the application did not contain, among other items, the following documentation:

1. Complete description of proposed construction including plans (the plan submitted was stamped "Preliminary"), details, profile, specifications, and construction materials, including preservatives and chemical finishes;
2. The exact size and locations of the proposed pilings;
3. Overall footage and area of bottom to be shaded;
4. Area of float to rest on bottom at low water;
5. Method of placement of piles, whether dug or driven, from barge or otherwise;
6. Relation of floats to property line;
7. Relation of proposed construction to sidelines of property; and
8. Information relative to which parts of proposed construction would be permanent and which will be removed in winter and how removal will take place.

The Commission issued its Order of Conditions on June 29, 1999, denying the project and citing the above-referenced missing documentation as being necessary to decide the effect of the proposed project on the following interests of the Wetlands Protection Act (hereinafter, "the Act"): flood control, land containing shellfish, fisheries, storm damage protection and prevention of pollution. The Allens appealed the Commission's decision on June 30, 1999, requesting a Superseding Order of Conditions. A DEP on-site inspection was conducted at the site on Friday, October 29, 1999. At the on-site inspection, Mr. Jim Mahala of the DEP asked the Allens to submit the information lacking on the "preliminary" plan submitted with their original Notice of Intent, including a cross-section of the proposed pier and all construction details, including specifications and construction materials.

After the DEP on-site visit, the Truro Conservation Commission received no further information relative to the proposed project from either the applicant or the DEP until June 12, 2000, when it received a copy of a DEP Superseding Order of Conditions approving the project in accordance with a revised plan dated April 3, 2000. No further details regarding construction details, specifications, or possible effects on the interests identified under the Act were ever forwarded or received by the Truro Conservation Commission. The Commission never received a copy of the plan until after the Superseding Order of Conditions was issued.

As depicted on the final plan, last revised on April 3, 2000, the project still extends beyond the mean low water line, to extreme low water. Therefore, it continues to span the entire salt marsh and all of the tidal flats (which constitute a coastal beach under the Act). Moreover, the new plans confirm that the entire project would fall within Land Subject to Coastal Storm Flowage (flood zone

A4, located at elevation 12). The new materials depicting a cross section of the project reveal that the end of the proposed ramp and proposed floats will rest on the bottom of the flats during low tide.

As the Truro Conservation Commission determined, the DEP found that the proposed project area is significant to the statutory interests of flood control, storm damage prevention, prevention of pollution and the protection of land containing shellfish and marine fisheries. It is the Town of Truro's position that the proposed project does not adequately protect these interests under the Act. Fourteen additional permanent 8" pilings will be driven into an existing salt marsh, land containing shellfish and land under the ocean. The volume (quantity) of sediments, their form, and their ability to respond to wave action will all be compromised by these permanent structures. Water circulation and the distribution of sediments will also be disrupted by the existence of these permanent structures. The adverse impact of these permanent structures on water quality and shellfish habitat is not adequately addressed by the Superseding Order of Conditions (hereinafter, "SOC") which primarily addresses impacts during construction. The SOC likewise does not address the adverse impacts this permanent structure will have on the adjacent properties as a result of the alterations in natural drainage which will occur as a result of the permanent structure. Nor does the SOC address the fact that these structures will adversely effect the tidal flats by increasing erosion and decreasing the volume of the adjacent coastal beach. The permanent aspects of this structure will also completely traverse the widest part of the salt marsh existing in front of this property, a distance of approximately 120', thus disturbing the growth, composition and distribution of salt marsh vegetation, and the flow and level of tidal and fresh water. As a result, the proposed structure will adversely impact the ability of the marsh to protect marine fisheries and prevent pollution and storm damage. Moreover, the entire project falls within the coastal flood zone and will likely harm the protected resource areas and prevent them from performing their natural functions during storm events.

Accordingly, for the foregoing reasons, the Town of Truro objects to the issuance of the SOC. The SOC is inconsistent with the Wetlands Protection Act and the regulations issued by the Department and does not contribute to the protection of the interests identified in the Act. Therefore, the Town of Truro requests that the Department rescind the Superseding Order of Conditions and deny the Allens permission to construct the proposed pier. A copy of this request has been forwarded to the applicants and their attorney per the provisions of 310 C.M.R. 10.05(7)(j).

Should you have any questions, I can be contacted at my firm's Dennis office. Thank you for your time and attention to this matter.

JUN-19-00 MON 1:05 PM 1:05-cv-10370-PBS ZISSON AND VEARA Document 21-20 FAX NO. Filed 05/26/2006 Page 4 of 4 P. 10

ZISSON AND VEARA

Department of Environmental Protection
June 19, 2000
Page 4

Sincerely,

Sarah A. Turano-Flores

STF/
enclosures
VIA OVERNIGHT DELIVERY
cc: Mr. and Mrs. Allen
Attorney Henchy
Mr. Jim Mahala - DEP/SERO
Truro Conservation Commission
Mr. Roland W. Breault, Jr.

COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT DEPARTMENT
SUPERIOR COURT

Barnstable, ss. Civil Action No. 03-404

JOHN ALLEN and BARBARA CORDI-ALLEN,
Plaintiffs

v.

TOWN OF TRURO-BOARD OF SELECTMEN OF THE TOWN OF TRURO,
Defendant

**AFFIDAVIT OF ROLAND W. BREAULT, JR., TRURO TOWN ADMINISTRATOR**

I, Roland W. Breault, Jr., first having been duly sworn, upon oath do depose and say the following:

1. I am an adult; I reside in Sandwich, Massachusetts; I am currently the Town Administrator for the Town of Truro, Barnstable County, Massachusetts, and have served in this same capacity since February 5, 1996;

2. In 1994, after 7 years of public hearings, the Town of Truro and the Massachusetts Office of Coastal Zone Management formally adopted the "Pamet Harbor Management Plan, Truro, Massachusetts." *See a true and accurate copy of the introductory section of the Plan, which is entitled "Purpose and Introduction," attached hereto and incorporated herein as Exhibit A.*

3. According to the Plan, Pamet Harbor is Truro's only boating harbor and has its only boat launching facility. The town's major shellfishing beds and saltwater wetland system is found here. It also has great historical significance, exemplified by the fact that

Truro's first English settlers colonized the river mouth, where they were, according to the Plan, attracted by its ready access to Cape Cod Bay, its natural bounty and its sturdy, surrounding hills. *See Exhibit A.*

4. The Plan states that its primary purpose is to restore the usefulness of Pamet Harbor, while protecting its various natural resources, water quality and visual appeal. *See Exhibit A.*

5. The Plan explicitly identified as its primary goals and objectives navigation, water quality, shellfishing, public access, moorings, commercial fishing and natural resource protection. *See true and accurate copies of Pages 44-45 and all of Section 6 of said Plan, attached hereto and incorporated herein as Exhibit B.*

6. Upon adoption, the plan became the Town of Truro's official position on issues related to the "Harbor Planning Area." *See Page 3 of Exhibit A.*

7. The "Harbor Planning Area" includes all of the properties surrounding the basin and the channel out to the Bay. *See true and accurate copies of Pages 6 and 7 of the Plan, describing the Harbor Planning Area, and a Map depicting said Area, attached hereto and incorporated herein as Exhibit C.*

8. In the Fall of 1999, implications related to the fact that the Town of Truro did not own all of the tidelands in the Pamet Harbor "basin" where the Town maintains its mooring basin or in the channel areas leading to Cape Cod Bay, where the Town conducts its annual dredging, became clear to the Board of Selectmen.

9. A true and accurate aerial photograph of the Pamet Harbor Basin and Channel taken in the year 2000 is attached hereto, incorporated herein, and labeled Exhibit D.

10. These implications were made evident during several high profile public hearings held in connection with the Plaintiffs' proposal to add a ninety (90') foot extension to an already existing eighty (80') foot permanent pier on their property. As proposed, the finished product would extend beyond the mean high water mark, over a salt marsh, beyond the mean low water mark, to the boundary of the extreme low water mark.

11. The proposed pier would extend so far into the channel and the established mooring basin of Pamet Harbor that it would have displaced several established moorings. In fact, it would extended beyond the mid-line thereby creating a major navigational hazard.

12. Given the implications of the pier proposed by the Plaintiffs, the Selectmen determined that ownership of the area within the harbor's mooring basin and channel was vital to the proper management and preservation of the harbor. Thus, the Board of Selectmen authorized an investigation into a possible taking of the privately held tidelands within the Harbor Planning Area, and requested that the necessary surveys, appraisals and title searches be performed.

13. In August of 2000, the investigation was completed and the Board of Selectmen voted to pursue an eminent domain taking.

14. In September of 2000, certified mailing went out to each of the affected property owners. This mailing included a copy of the survey, showing the area of taking for each parcel and a specific request that each party contact Town Counsel to set up an appointment to meet with a subcommittee of the Board of Selectmen and Town Counsel to negotiate the takings process.

15. With the exception of the Plaintiffs, every property owner contacted the Town and began negotiating agreements for the takings of the tidelands portions of their property.

16. The Plaintiffs refused to accept the certified mailings.

17. As a result, in October of 2000, the Hampden County Sheriffs served the Plaintiffs with the notice and copy of the takings plan.

18. In November of 2000, the Massachusetts Department of Environmental Protection denied the Plaintiffs a General Laws, Chapter 91 Waterways License for their proposed pier extension. *A true and accurate copy of the Denial is attached hereto, incorporated herein and labeled Exhibit E.*

19. The Denial of the Waterways License was based on the primary justification that the project, as proposed, would significantly interfere with the public rights of navigation in Pamet Harbor. *See Page 4 of Exhibit E.*

20. Upon information and belief, no subsequent appeal was taken from this Denial.

21. Believing that public ownership of the tidelands within Pamet Harbor was the only way to adequately preserve and manage the Town's only Harbor, the Selectmen decided to continue to pursue the taking.

22. In March of 2001, certified letters were again sent to each of the property owners, including the Plaintiffs, asking that they finalize negotiations.

23. All the property owners, including the Plaintiffs, responded to this March mailing.

24. The Plaintiffs response was forwarded by their attorney, who succinctly conveyed to Town Counsel that the Allens were adamantly opposed to the taking and would not agree to the offered damage award.

25. All other property owners responded favorably to the mailing and, by late 2001, the Town had reached agreement with all of those owners relative to the taking.

26. At a Special Town Meeting held on January 29, 2002, by a vote of 238 to 2, the Truro Town Meeting approved Article 2 on the Warrant for said Meeting, authorizing the Board of Selectmen to conduct the eminent domain taking of the privately held tideland areas. An Order of Taking then was recorded in the Barnstable County Registry of Deeds for four of the privately held parcels of tidelands on February 15, 2002, including the Plaintiff's tidelands. *True and accurate copies of said Town Meeting Vote and Order are attached hereto, incorporated herein, and labeled Exhibit F. A true and accurate copy of the takings Plan of Land is attached hereto, incorporated herein, and labeled Exhibit G.*

27. The taking explicitly excluded the rights of the Plaintiffs and the Yacht Club to maintain their existing piers in their existing locations.

28. Because the Plaintiffs and the Yacht Club already had existing piers within the tidelands area, which piers they were permitted to maintain after the taking, and because the other two private property owners did not have existing piers, the damage awards for the other two private owners were larger than the damage awards for the Plaintiffs and the Yacht Club.

29. All damage awards were based upon appraisals of the fair market value of the tidelands, as appraised by a Massachusetts Licensed Real Estate Appraiser.

30.    In a separate negotiation with the Truro Conservation Trust, which owned the greatest portion of the tidelands area in question, the Trust donated an easement to the Town for various harbor management and preservation purposes, including but not limited to, the right to maintain up to 45 moorings in the basin, the right to promote the growth of the shellfish population, the right to promote shellfishing, the right to promote navigation and harbor safety, and the right to protect water quality, shellfish and other natural resources within the easement area. *A true and accurate copy of the as-recorded Deed of Easement is attached hereto, incorporated herein, and labeled Exhibit H.*

31.    After the Order of Taking was put on record, Notices of Taking were sent to each of the affected property owners by certified mail pursuant to the provisions of General Laws, Chapter 79.

32.    Three of the four private property owners named in the Order of Taking accepted their damage awards as settlement in full of their claims against the Town for the Taking, pursuant to the provisions of General Laws, Chapter 79, Section 39. *True and accurate copies of the fully executed Release and Request for Payment forms are attached hereto, incorporated herein, and labeled Exhibits I, J and K.*

33.    The Plaintiffs are the only parties who failed to accept the offered damages as settlement in full of their claims. In fact, the Plaintiffs have even failed to accept the proffered damage award as payment pro tanto of their claims, and the money presently remains in an interest-bearing escrow account.

Signed under the pains and penalties of perjury, this 13th Day of August, 2003.

Roland W. Breault, Jr.
Truro Town Administrator

CERTIFICATE OF SERVICE AND OF
COMPLIANCE WITH CIVIL TIME STANDARDS

I, Sarah A. Turano-Flores of the law firm of Zisson & Veara, hereby certify that I have notified Burton F. Berg, attorney for the Plaintiffs, of the within **AFFIDAVIT OF ROLAND W. BREAULT, JR.** by mailing, postage prepaid, a copy of it to him at his office address: Burton F. Berg, P.C., 34 Mechanic Street, Worcester, MA 01608. I hereby further certify that I have served this motion in accordance with the provisions of Superior Court Rule 9A and Mass.R.Civ.P. 12(b)(2).

Dated at Dennis, Massachusetts this 14th day of August, 2003.

SARAH A. TURANO-FLORES

# Final Report

# PAMET HARBOR MANAGEMENT PLAN
## Truro, Massachusetts

June 1994

Prepared for:

Harbor Management Planning Committee
Town of Truro
Truro, MA 02666

Funding Assistance Provided By:

Massachusetts Coastal Zone Management
Harbor Planning Grants Program

EXHIBIT
tabbies
A

# 1. PURPOSE and INTRODUCTION

## EXECUTIVE SUMMARY

This Pamet Harbor Management Plan represents a planning effort begun in 1987 and completed in 1994. The intent of the Plan, agreed upon by town and state officials, and citizens at public hearing, is to restore the usefulness of Pamet Harbor, while protecting its varied natural resources, water quality and visual appeal. Maintenance dredging is recommended to enhance navigation, water quality and beach nourishment. Other recommendations promote compatible public access, scenic qualities, shellfish and appropriate land use policies. A Harbor Management Planning Committee, composed of town officials, harbor users and local interest groups, guided the plan's development with consultant expertise and technical assistance and grant funding from the Massachusetts Coastal Zone Management Office (MCZM). The Plan is intended to be consistent with the 1988 Harbor Planning Guidelines of MCZM.

## 1. PURPOSE AND INTRODUCTION

Pamet Harbor in Truro, Massachusetts is locally unique in many respects. The Pamet is Truro's only boating harbor and has its only boat launching facility. The town's major shellfish beds and saltwater wetland system is found here. The first English settlers of Truro colonized the river mouth, attracted by its ready access to Cape Cod Bay, its natural bounty and its sturdy, surrounding hills.

Today, the Pamet is a magnet for residents and tourists alike who want to enjoy the ever-changing variety offered by the nine-foot tidal range influencing the harbor. In the morning, the low tide bares the expansive tidal flats where gulls and terns sit musing about their next meal, while shellfishermen begin work for theirs. The afternoon will gather enough seawater to lift the moored fleet high off the mud and encourage visions of maritime grandeur for the little seaport. Fishermen and daysailers will hustle back in, seizing the opportunity afforded by the window of high tide navigability. At dusk, the sun will set directly behind the channel mouth out in the broad bay, luring other citizens down to the basin to salute the remains of the day. In 1987, the Pamet was designated by the

Massachusetts Department of Environmental Management as a "local scenic river," the only one on Cape Cod recognized for its recreational assets and aesthetic qualities.

The intent of the Pamet Harbor Management Plan is to restore the usefulness of the harbor, while protecting its natural resources and scenic beauty. As a small harbor subject to extreme tidal change (nine-foot rise and fall), the Pamet nevertheless hosts many varied resources and activities. This diversity of natural and human components has sometimes produced competition and conflicts. This Harbor Plan examines these resources, identifies issues relating to their use, and recommends strategies to harmonize conflicts, thereby maximizing enjoyment of the area. Through implementation of the policies and actions recommended in this plan, Truro can help to ensure that the concentrated diversity now offered by the tiny Pamet Harbor can persist and even be enhanced.

Truro exhibits some characteristics which set it apart from other Cape Cod towns and which mandate special consideration. These characteristics include lack of industry, small tax base, and orientation to water-dependent uses. Development pressures in Truro take on a different guise than in many other Cape towns, which are fighting marina development and condominiums on the waterfront. Because of the small scale of the Pamet, even minor changes can seem significant. Through development of a pending Local Comprehensive Plan and this Harbor Management Plan, Truro residents will chart the course for future land development and water uses in Pamet Harbor. Project team members will coordinate their efforts with the ongoing Local Comprehensive Plan (LCP) to ensure that the two resulting plans provide a coherent framework for future land and water-use decision-making.

The Pamet Harbor Management Planning Committee (HMPC) was formed by Truro Selectmen in 1987 at the request of the Harbor Commission. In 1988, the Committee drafted a request for proposals to hire a consultant to advise on the Harbor Plan. In 1989, the Town was awarded a $14,000 matching grant for the Harbor Plan from the

Massachusetts Coastal Zone Management Office (MCZM). In 1990, the request for bids was issued, but owing to complications of the then-new state Uniform Procurement Act, no consulting contract was awarded. In 1991, the Committee worked with MCZM to issue a new proposal request based on the 1988 (reprinted 1990) harbor planning guidelines of MCZM. In February, 1992, the Committee issued the request, screened four applicants, and, in July, 1992, signed a contract with Horsley & Witten, Inc., an environmental consulting firm in Barnstable.

In January, 1993, the environmental consultant's contract was extended, by mutual consent, in order to accommodate results from a separate study by the Massachusetts Department of Environmental Management of the harbor's bathymetry, in anticipation of dredging the harbor channel. Horsley & Witten, Inc. submitted a draft Harbor Plan to the Town in September 1993. A revised draft was submitted in January 1994, after review of town officials' and MCZM's comments on the draft plan and a public hearing held in September 1993, which focused on the Goals and Objectives. A public hearing on the revised draft was held in March 1994, which focused on the Action Plan. The final plan was delivered to the Town in June 1994.

Under the provisions of the Harbor Planning Grants Program of MCZM, the Town of Truro established a work program consistent with MCZM Harbor Planning Guidelines and accepted MCZM's grant condition that the plan's objectives, standards and policies should be consistent with those of the Executive Office of Environmental Affairs and its agencies. The HMPC believes that this plan meets those criteria and further believes that implementation of this plan will be consistent with MCZM policies.

Upon adoption by the Truro Board of Selectmen and MCZM, this plan should be considered the Town of Truro's official position on issues related to the harbor planning area. An implementation committee, designated by the Selectmen of the Town, will be given the responsibility of ensuring that the recommended actions of this plan are implemented by the Town. It will no longer be merely the opinions of the HMPC or its consultants.

HMPC's concerns are amplified by the LCP, they are noted in the Harbor Plan (4.III.)

B. Water Resources

The LCP identifies bacterial pollution of the Pamet as a major surface water quality issue. Its understanding of this issue conforms with that of HMPC. The LCP also confirms the HMPC's concern about stormwater and non-point sources of contamination.

C. Capital Facilities

The LCP does not include maintenance dredging and other harbor capital improvements in its analysis for future financial planning and perhaps should include them in both the narrative and infrastructure map for this section.

D. Wetlands, Wildlife and Plant Habitat

The LCP identifies the Pamet River as meriting a state designation as an Area of Critical Environmental Concern or county designation as a District of Critical Planning Concern. The HMPC takes no position on this issue, but believes that a strong, locally-adopted wetlands protection bylaw may accomplish the same end, while keeping primary regulatory control local. The HMPC and LCP both endorse the idea of a local wetlands bylaw.

## V. Priority Issue: Enhancing Navigability

On October 12, 1993 the Harbor Management Planning Committee deliberated on the emphasis and priority of issues identified in the draft harbor plan. The list agreed upon by the Committee, in descending order of importance, is as follows:

- Navigability and Harbor Safety
- Water Quality
- Shellfishing

EXHIBIT
tabbies
B

- Public Access
- Moorings
- Facilities for Some Commercial Fishing
- Fiscal Management
- Land Use - Landscape and Visual Quality*
- Natural Resource Protection*

*The last two goals were seen not so much as lower priority issues, but as themes that should be considered throughout the recommendations pertaining to the other issues.

The priority of the Navigability and Harbor Safety issue is clearly related to the fact that boating is severely hampered in Truro's only harbor owing to shoaling problems in the channel and boat basin. The Harbor Plan examines this issue and the options to correct this perceived deficiency in Chapter 7 (Navigation Alternatives Analysis).

# 6. GOALS, OBJECTIVES, and POLICIES

# 6.0 GOALS, OBJECTIVES, AND POLICIES

Based on the findings and analysis, priorities and options discussed above, the HMPC has adopted the following goals, objectives and policies outlined below.

## I. Navigation and Harbor Safety

**Goal: To restore the usefulness of the Pamet Harbor system as a tidal harbor through enhancing the navigability of the harbor system while ensuring public safety.**

Objectives:

1. Provide for safe and adequate access to and from Cape Cod Bay by recreational and commercial boats typically used in the Pamet Harbor system at all periods over an average tidal cycle.

2. Minimize potential conflicts between use of the water for navigation versus other recreational uses.

Policies:

1. Work with state and federal officials to ensure periodic maintenance dredging of channel and mooring basin in Pamet Harbor.

2. Ensure navigational safety through clearly marking and patrolling all navigational channels and mooring areas.

3. Restrict the location of moorings and docks/piers so as to prevent encroachment into navigational channels and open water recreational areas.

4. Establish an emergency response plan which adequately addresses typical harbor safety emergencies.

5. Establish safety regulations for harbor use through town waterway regulations.

6. Promote safe navigational practices through public education and enforcement of safety regulations.

## II. Water Quality

**Goal: To restore and maintain the Pamet Harbor system's water quality to meet state standards for water-related activities and recreation.**

Objectives:

1. Maintain the water quality of the Pamet Harbor system in areas which could support water-contact sports (swimming) and recreation.

2. Improve water quality in Pamet Harbor in areas currently closed to shellfishing due to high bacteria counts.

3. Improve the town's ability to detect changes in water quality in the Pamet Harbor system and to identify trends.

4. Minimize release of contaminants associated with typical land and water activities.

5. Prohibit development in critical areas and minimize disruption of natural systems, such as wetlands, which aid in maintaining water quality.

6. Minimize potential degradation of water quality due to accidents or spills involving contaminants.

7. Minimize degradation of water quality due to waterfowl.

Policies:

1.  The level of key chemical and bacteriological contaminants shall be monitored on at least an annual basis.

2.  Deterioration of water quality shall be minimized through eliminating all direct discharges of untreated stormwater throughout the Pamet watershed, particularly Route 6, Snows Landing, and runoff from the harbor parking lot.

3.  Public feeding of wildlife shall be prohibited throughout the Pamet Harbor system.

4.  Release of nutrients to the Pamet Harbor system shall be minimized through use of best management practices for agricultural practices, such as proper manure storage.

5.  The discharge of sanitary wastes from boats shall be prohibited unless discharged into an approved sanitary waste disposal site.

6.  Educate residents about the connection between typical land use activities and degradation of water quality (for example: use of lawn fertilizers and improper disposal of household hazardous wastes).

7.  Land zoned for commercial, institutional or office uses shall meet environmental performance standards aimed at protecting water quality and shall be sited in a way which minimizes impact to sensitive resources.

8.  Establish an emergency contingency plan for hazardous materials spills and ensure that all local emergency spill response personnel are trained and are knowledgeable of proper response procedures. Prohibit fueling of boats from shoreside facilities.

## III. Shellfishing

Goal: To restore the usefulness of the Pamet as a safe and productive shellfishery, symbolic of the health and quality of the Town's major wetland system.

Objectives:

1. To restore and maintain shellfishing waters which meet or exceed state surface water quality standards, including anti-degradation standards, particularly for bacterial contamination, for significant portions of downstream sections of the Pamet and its tidal tributaries, to enable the shellfishery to be opened and sustained.

2. Restore and maintain shellfish stocks, particularly quahogs, soft shell clams and blue mussels.

3. Investigate the feasibility of private aquaculture in areas that do not conflict with navigation, public recreation, and recreational shellfishing, as a way to promote jobs and income based on renewable natural resources and as a means to enhance natural shellfish recruitment. (Refer to Map 3.)

Policies:

1. Re-establish a shellfish propagation program.

2. Investigate standards which allow for private aquaculture through the town's shellfishing regulations.

3. Prohibit any water and land activities, such as moorings, which would interfere with shellfishing in designated areas.

4. Improve water quality such that shellfishing would be permitted in the Pamet Harbor system.

## IV. Public Access

**Goal: Maintain and improve public access to the harbor area for residents and visitors alike in order to provide for a quality outdoor experience offering a range of water-related activities and experiences while also ensuring the protection of the harbor's sensitive areas and marine resources.**

Objectives:

1. Provide public access to the Pamet Harbor system for a range of uses both in and along the water including water-contact sports (swimming), finfishing, shellfishing, recreational boating, hiking, and environmental education.

2. Maximize public access to the waterfront from town-owned land. (Example: canoe landing on town-owned land.)

3. Provide handicapped access to the waterfront from public lands. (Example: proposed pier.)

4. Minimize negative impacts from public access to sensitive areas and marine resources.

5. Establish hiking trails on town-owned parcels located along the waterfront in order to encourage their use for exercise, appreciation of resources, and as an alternative to motorized transportation.

6. Encourage development of interpretive programs in order to educate and enlighten recreational users and visitors about the magnificent and dynamic features of the Pamet Harbor system's natural and cultural history, and the impact of land activities on this system.

7. Provide visiting boaters with transient moorings available to the general public on a short-term basis.

Policies:

1. All town lands located along the waterfront shall provide public access which together provide for a range of recreational experiences.

2. Provide handicapped access to any public hiking trails and/or swimming areas established within Pamet Harbor.

3. Preserve and protect water-dependent uses and facilities along the waterfront.

4. Encourage provision of public access to Pamet Harbor by existing private uses/establishments built along the waterfront, such as the Yacht Club. (Example: canoe livery.) This policy is not meant to encourage private development for commercial uses.

5. Site public access areas away from sensitive areas and adopt environmental design standards aimed at minimizing potential impacts to water quality and marine resources.

6. Designate areas not needed for general boating navigation for non-motorized craft and other forms of user access.

7. Designate publicly-owned areas for off-road vehicle (ORV) enjoyment that do not interfere with private property, rare and endangered species habitat, land susceptible to erosion, and sensitive resources.

8 Ensure that the Harbormaster has moorings available for short term transient use.

## V. Moorings

Goal: To restore the usefulness of the harbor as a safe, efficient anchorage for a diverse mix of small craft, while also guarding against unnecessary encroachment into navigational channels, commercial fishing anchorage, shellfishing areas, and other areas used for water-related recreation.

Objectives:

1. Provide secure moorings for a specified number of boats in order to provide public access to Pamet Harbor and Cape Cod Bay.

2. Establish a mooring plan related to the carrying capacity of the harbor system and which considers the need to prevent encroachment on navigational channels, to identify sensitive resources, and to protect areas used for water-related recreation, commercial fishing and shellfishing.

3. Establish funding for harbor improvements to maintain moorings.

Policies:

1. Develop a mooring plan which defines the dimensional limits for a Pamet Harbor mooring basin, maximum number of boats of varying shape, size and type, while also minimizing the total amount of space which must be devoted to moorings. (Refer to Figure 2.)

2. Assign mooring locations based on size and type of boat, instead of owner preferences.

3. Use town-owned mooring floats to the maximum extent possible in order to provide for the most efficient use of space in the mooring basin.

4. Establish mooring fees, and other harbor fees, which would be dedicated for harbor projects.

5. Encourage a launch service as an alternative to beach storage of individual boat tenders.

6. Prohibit moorings in designated shellfish beds. (Refer to Map 3.)

## VI. Commercial Fishing

**Goal: To sustain a limited presence of commercial fishing boats in the Pamet Harbor so as to diversify the town's economy.**

Objectives:

1. Provide modest facilities and services for commercial fishing which do not diminish the harbor's natural and aesthetic resources.

2. Improve the Town's ability to detect changes in fish landings in the Pamet Harbor system and nearby Cape Cod Bay and to identify the harbor's contribution to Truro's economy.

Policies:

1. Establish a navigational channel and reserve a safe anchorage to facilitate boat loading and offloading procedures for commercial fishing.

2. Reserve limited deep water mooring space for larger commercial fishing vessels (up to 35 feet in total length) owned and operated by persons who hold a valid commercial fishing license. (See Figure 2.)

3. An unlimited number of moorings shall be permitted for small commercial fishing vessels (under 30 feet), subject to availability on the general mooring waiting list.

## VII. Fiscal Management

**Goal: To maintain, and where possible enhance, the Pamet Harbor system's economic value to Truro residents, including its ability to support tourism, local recreation, commercial fishing and potentially shellfishing, thereby providing jobs and income for local residents.**

Objectives:

1. Provide a consistent source of funding for water quality remediation, monitoring and research necessary for restoration of the Pamet Harbor ecosystem.

2. Provide a consistent source of funding for periodic evaluation of harbor and waterfront facilities and services, as well as construction and operation of public facilities and services, where appropriate.

3. To identify and acquire non-essential harbor facilities, operations and amenities, to the greatest extent possible, through alternative means such as harbor user fees, donations, volunteerism, or private fund raising.

4. To reduce the local financial burden associated with harbor restoration and use, where possible, through seeking available sources of public funding.

5. Promote public support for harbor-related expenditures through enhanced public education.

Policies:

1. Utilize local authority to appropriate funds and/or bonds for harbor restoration and development consistent with policies expressed in this plan.

2. Establish mooring and launching fees necessary to provide funding for harbor and waterfront maintenance and enhancement, and dedicate these monies solely for harbor and waterfront use through an enterprise fund.

3. Seek donations and volunteer services.

4. Identify and pursue appropriate subsidies, such as state and federal grants, reimbursements and low-interest loans, foundation grants and charitable donations.

5. Educate residents about the economic benefits associated with restoration and enhancement of the Pamet Harbor system.

## VIII. Land Use, Landscape and Visual Character

**Goal: To preserve or enhance the natural sights, sounds and smells of the Pamet harborscape which contribute to Truro's rural seaside character.**

Objectives:

1. Retain the seaside character of Pamet Harbor.

2. Enhance public views of the harbor from town roads.

3. Encourage use of house designs in keeping with the harbor's rural seaside character.

4. Limit noxious odors and noises in the vicinity of the harbor.

Policies:

1. Establish a Pamet River viewshed overlay district within the zoning bylaw, which protects vistas of land areas visible from the waterways and which enhances views of the harbor from public roads located around the harbor.

2. In the proposed overlay district (see #1 above), encourage architectural designs which are compatible with the landscape and which enhance views from the water, perhaps through encouraging the orientation of facades towards the harbor rather than towards the street, or else which

either impose design controls for rear facades or require screening from public view through vegetative plantings and height restrictions.

3. Either prohibit or require adequate screening for any uses/activities causing noxious odors and/or noise, or which are visually unattractive (i.e., fish cleaning stations, trash dumpsters, loud generators or machinery, etc.).

4. Utilize selective pruning in order to provide periodic public vistas along town roads of the harbor area.

5. Limit overhead lamps, spotlights, large reflective surfaces and other intrusions into ambient lighting at the harbor.

6. Acquire as much land as possible adjacent to the river and harbor, as appropriate, to preserve natural conditions.

## IX. Natural Resource Protection

**Goal: To protect and where possible enhance the quality and productivity of natural resources of the Pamet Harbor system, including its waters, wetlands, flora and fauna and their habitat for their own sake, as well as for sustainable human recreational and commercial use.**

Objectives:

1. Establish an undisturbed vegetated buffer zone along wetlands associated with the Pamet Harbor system.

2. Limit impacts from human-related activities to wetland systems, flora and fauna, and flora and fauna habitat.

3. Preserve the ability of the Pamet Harbor system's natural resources to support recreational activities such as swimming, fishing and shellfishing, boating, and operation of off-road vehicles.

4.  Improve the town's ability to detect changes in the Pamet Harbor ecosystem and to identify trends.

5.  Encourage investigation of benefits (boating, shellfish, siltation and water quality) resulting from manipulation of existing culverts or dikes to allow more natural patterns of tidal flow in harbor and improved upstream drainage.

Policies:

1.  Investigate benefits of adoption of a town wetlands bylaw.

2.  Monitor and enforce boat speed limits in the harbor and throughout the estuary system in order to minimize erosion of beach and marsh areas.

3.  Prohibit all dredging not related to maintaining a safe navigation channel and public mooring basin, unless dredging is necessary for natural resources enhancement.

4.  Establish a monitoring program aimed at evaluating impacts to natural resources in Pamet Harbor, with special attention being devoted to assessment of impacts to vegetation and shellfish.

5.  Encourage public acquisition and/or dedication of wetland areas for conservation in the Pamet system, particularly along its salt marsh and dunes.

6.  Develop an open space management plan for all town-owned lands located along Pamet Harbor.

7.  Educate harbor users and residents about the relationship and impact of boating and other upland recreational uses on natural resources in the harbor.

8.    Support natural resource agencies studying upstream drainage
improvements.

# 3. BOUNDARIES OF HARBOR PLANNING AREA

EXHIBIT
tabbies
MSJ
C

## 3. BOUNDARIES OF HARBOR PLANNING AREA

Pamet Harbor is located at the mouth of the four-mile long Pamet River estuary and its tributaries: Little Pamet River to the north and Mill Creek/Eagles Neck Creek to the south. A detailed physiography of the river is given in the 1987 Pamet River Greenway Management Plan (Greenway Plan) of the Truro Conservation Trust (pp. 9 - 13.)

The primary study area (Figure 1) for this Harbor Plan was selected by the Harbor Management Planning Committee in 1991 and confirmed by the consultants and a Planning Committee report of September 8, 1992:

> "Beginning at a point ten (10') feet below mean low tide from the shores of Cape Cod Bay, a line going east and touching the southern edge of the Corn Hill parking lot (Sheet 45, Parcel 50), thence following said lot line to Corn Hill Road, and then going southerly and easterly along the southern side of Corn Hill Road to a parcel of land, owned by the Town of Truro, known as the "Railroad Right of Way" (Sheet 49, Parcels 17 and 18; Sheet 50, Parcels 38 and 175). Thence, southerly along the east edge of said "Railroad Right of Way" including the parcel known as the Pamet Harbor parking lot, to a point at the southeast corner of the Aubin property (Sheet 50, Parcel 175 on said "Railroad Right of Way". From said point, westerly along the southern boundary of said Aubin property to the "Toe of Great Hills" at the northeast corner of a parcel of land owned by Paul R. Waldman (Sheet 49, Parcel 25) and thence around the "Toe of Great Hills" to Great Hills Road; thence southerly along the eastern edge of Great Hills Road to the southeast corner of the Dalsheimer property (Sheet 49, Parcel 20) and westerly along the common east - west boundary of the said Dalsheimer property and the Town of Truro property (Sheet 59, Parcel 19) to the shores of Cape Cod Bay, and thence westerly to a point ten (10') feet below mean low tide; thence northerly following the ten (10') feet below low tide line to the beginning point. Sheet and

parcel numbers refer to the FY 1991 Truro Map and Ownership
Volume and ownership is as stated in that volume.

The rationale for choosing these boundaries include: (1) easily identifiable; (2)
they bound the area which has the greatest effect on the harbor and
surrounding estuaries; (3) they bound the area that is consistent with the
traditional uses of the harbor."

The planning area consists of approximately 150 acres. About 75 percent of
that total consists of intertidal areas; the remainder is all within the 100-year
coastal floodplain. Dune, beach, salt marsh and tidal flats comprise the
majority of the sediment, with the exception of artificial fill creating the
railroad bed, parking lot and boulder jetties.



**FIGURE 1.**
**Map Showing Boundaries of Harbor Planning Area**
*Pamet Harbor Management Plan*

  Boundary of Harbor Planning Area

North
Not to Scale

Source: Town of Truro, MA, Pamet Harbor Planning Committee, 1992

*H&W, Inc.*



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION
ONE WINTER STREET, BOSTON, MA 02108 617-292-5500

ARGEO PAUL CELLUCCI
Governor

JANE SWIFT
Lieutenant Governor

BOB DURAND
Secretary

LAUREN A. LISS
Commissioner

November 30, 2000

John E. Allen & Barbara Cordi-Allen
C/o William Henchy, Esquire
165 Cranberry Highway, Route 6A
Orleans, MA 02653

RE: Waterways Application No. W96-5259
Pamet Harbor, Truro, Barnstable County

Dear Sir/Madam:

Following a comprehensive review of the referenced file, the Department of Environmental Protection has denied the proposed project as detailed in the enclosed Written Determination issued pursuant to 310 CMR 9.14(2). This water-dependent project proposed the construction and maintenance of a pile-supported pier, ramp and float.

This Written Determination has a twenty-one (21) day appeal period from the date of issuance, pursuant to 310 CMR 9.17(1)(a) and 9.17(2). The process for filing an appeal is summarized in Section VI of the Written Determination.

If you have any questions on this matter, please do not hesitate to contact Mitch Ziencina at (508) 946-2734.

Sincerely,

Elizabeth A. Kouloheras

Elizabeth A. Kouloheras, Chief
Wetlands & Waterways Program

Enc.

Cc: John Allen & Barbara Cordi-Allen, 146 Pleasantview Avenue, Longmeadow, MA 01106
Sharon Pelosi, Waterways Chief, DEP, Boston
Dorothy Montouris, Esq., DEP, OGC, Boston
Dan d'Hedouville, Esq., DEP, SERO
Office of Massachusetts Coastal Zone Management, 251 Causeway Street, Suite 900, Boston, MA 02114
Town of Truro, Board of Selectmen, P.O. Box 2030, Truro, MA 02666
Town of Truro, Harbormaster, P.O. Box 2030, Truro, MA 02666
Robert Spillane, 5 Great Hills Road, Box 1215, Truro, MA 02666
Greg Penta, ACOE, 696 Virginia Road, Concord, MA 01742-2751
Elaine E. Dee, Pamet Yacht Club, Inc., P.O. Box 555, Truro, MA 02666
Sarah A. Turano-Flores, Esq., Zisson and Veara, 828 Main Street, Box 2031, Dennis, MA 02638
Brooke Newman, 273 Roaring Fork Drive, Aspen, CO 81611

This information is available in alternate format by calling our ADA Coordinator at (617) 574-6872.
DEP on the World Wide Web: http://www.magnet.state.ma.us/dep
Printed on Recycled Paper

EXHIBIT
E



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION
20 RIVERSIDE DRIVE, LAKEVILLE, MA 02347 508-946-2700

ARGEO PAUL CELLUCCI
Governor

JANE SWIFT
Lieutenant Governor

BOB DURAND
Secretary

LAUREN A. LISS
Commissioner

**DIVISION OF WETLANDS AND WATERWAYS**
**WATERWAYS REGULATION PROGRAM**

DETERMINATION FOR DENIAL OF A WATERWAYS LICENSE
FOR A WATER-DEPENDENT USE OF TIDELANDS
PURSUANT TO M.G.L. C. 91 AND 310 C.M.R. 9.00

**I. PROJECT REFERENCE:** **John E. Allen and Barbara M. Cordi-Allen**
on Flowed Tidelands
of Pamet Harbor, Truro
**Waterways Application No. W96-5259**

**II. PROJECT DESCRIPTION:** John E. Allen and Barbara M. Cordi-Allen (hereinafter the "Applicants") request authorization pursuant to M.G.L. Chapter 91 of 310 CMR 9.00 to construct and maintain a 4 foot by 134 foot pile supported pier, a 4 foot by 26 foot ramp and a 6 foot by 40 foot pile supported float system.

The Department of Environmental Protection Waterways Regulation Program (hereinafter "the Department") has jurisdiction over the proposed project because it constitutes new construction on flowed private and Commonwealth tidelands of Pamet Harbor.

**III. DEPARTMENT'S DETERMINATION OF WATER DEPENDENCY:** The Department determined that the use of flowed private and Commonwealth tidelands within Pamet Harbor for the non-commercial berthing of recreational vessels is a water-dependent use pursuant to 310 CMR 9.12(2). Therefore, the application was processed as a water-dependent use project.

**IV. DEPARTMENT'S SUMMARY**

A) Chapter 91 Licensing History

The Department's historical plans and Chapter 91 Waterways licensing records show that the site consists of flowed private and Commonwealth tidelands on which one license was previously issued. Authorization for the construction and maintenance of a 4 foot by 80 foot pile supported pier with ramp and float system was granted by the Department of Public Works (DPW) License Number 4304 on April 18, 1960. The Applicants originally requested authorization to rebuild the pier authorized by License No. 4304. The Department required a revised application since the present proposal is a modification of the pier authorized by License No. 4304 and the licensed structure was abandoned for greater than five years.[1] The proposed pier is for private use associated with a single residential unit.

Other permits within Pamet Harbor are identified because of their relevance to this project. Two other piers are located within Pamet Harbor; community piers located at the public boat ramp and at the Pamet Harbor Yacht Club. The boat

[1] See affadavit(s) attached to a letter from the Town of Truro to the Army Corps of Engineers dated April 26, 1997.

This information is available in alternate format by calling our ADA Coordinator at (617) 574-6872.

DEP on the World Wide Web: http://www.magnet.state.ma.us/dep
Printed on Recycled Paper

ramp pier license (DEP No. 5014) authorized the Town of Truro to construct a 145-foot long pier with 91-foot ramp and float system. The Pamet Harbor Yacht Club License (DEP No. 4748) authorized maintenance of a 30 foot fixed pier, 14 foot ramp and 48 foot long float system, of which 48 feet are beyond the mean high water shoreline. The Department of Environmental Management has managed three dredge contracts in Pamet Harbor since 1965 to maintain the entrance channel and mooring basin. The most recent dredging activity was authorized by DEM Contract No. 3275 in 1996 and DEP Permit No. 285 issued in 1994. Pre and post dredge surveys are included in the application file for reference. The location of the mooring basin is identified on the plans for this application.

B) MEPA Review

The proposed project does not meet the threshold for review under the Massachusetts Environmental Policy Act (MEPA).

C) Public Notice and Hearing

The Department sent notice to the Applicants in accordance with 9.13(1)(a). The first notice was published in The Cape Codder, on November 15, 1996. In a letter dated November 26, 1996, the Town of Truro requested the Department conduct a public hearing on the application pursuant to 9.13(3)(a). At the request of the Applicants, the public hearing was postponed until a notice was published on August 12, 1998 in the Cape Cod Times for a hearing scheduled for August 12, 1998 at the Truro Central School. At the start of the public hearing, representatives of the Town of Truro and Pamet Harbor Yacht Club objected to what they considered an insufficient notification period. It was mutually agreed upon to postpone the pubic hearing until August 26, 1998. The August 26th meeting was noticed in the Cape Codder on August 17, 1998 and held at 6:00 P.M. in the Public Safety Building on Route 6 in Truro.

The August 26th public hearing was attended by at least 80 persons including the Applicants, members of the Truro Board of Selectmen, Harbormaster, Conservation Commission, Planning Board, Pamet Harbor Commission, Town Counsel, Town Administrator, abutters, mooring permitees, members of the public, and representatives of the Army Corps of Engineers and the Department. After a brief introduction by the Department, Attorney William Henchy made a short presentation describing the proposed pier as 30 feet longer than what existed at the site in the 1972 according to an aerial photo of the Harbor provided by the US Army Corps of Engineers (see Exhibit). In the photo, an orange buoy delineated the approximate location of the previously authorized structure. The additional length is requested for handicapped access in all tide conditions given the shallow harbor conditions. No lights are proposed on the pier. In his presentation, Mr. Henchy stated there are no buoys marking an established course of vessels and the crowded harbor conditions are due to the excessive number of mooring permits (130) issued by the Harbormaster. He questioned whether the right of access to a waterbody belongs to the littoral property owner or the mooring holders.

At the close of the presentation, the Department received oral testimony from those present who wished to speak. Oral comments were received from the Town Counsel (representing the Board of Selectmen and Town Administrator), the Planning Board, members of the Pamet Harbor Commission including those that authored the Harbor Management Plan, affected mooring holders, both direct abutters, and a relative of the former licensee, Diana Worthington. All spoke in opposition of the project as proposed because of it's "excessive length" and associated impacts to navigational safety, displacement of moorings (some of which are held by commercial fisherman) and rerouting of the established routes to and from the Pamet Harbor Yacht Club pier and some moorings. A few stated that they would support a pier that was no longer than that previously authorized as illustrated by the orange buoy. Aesthetic concerns and the private pier being out of character with the harbor were also common themes. The Pamet Harbor Yacht Club stated that for over 35 years their members have never had full access to the Harbor in all tides in order to accommodate navigation needs of the other harbor users. Various mooring holders and Diana Worthington iterated that the harbor conditions limit full tidal access.

The Harbormaster provided clarification on the number of moorings in this section of the harbor and the number of boats that would have to be moved to accommodate the proposed project. As Mr. Henchy stated there are 130 vessels permitted at moorings in Pamet Harbor as well as a waiting list of 83. However, only 68 boats on 34 moorings are placed in this section of the Harbor. Of those, 16 can't use their permitted moorings because they are on tidal flats. So effectively 52 boats are moored on 26 moorings in this section of the Harbor. The proposed project would physically displace 2 moorings (4 boats) that could be moved north of the public boat ramp, on tidal flats at the mouth of the Pamet River. As many as 5 moorings (10 boats) might need to be displaced to provide safe access to and from the pier, which the Harbormaster notes is about 20% of the boats in this section of the harbor. It is noteworthy, that there has not been

an increase in the number of moorings over time and the Harbor Management Plan specifically permits the same number of moorings be maintained so no commercial fisherman or other long-term permit holders be displaced.

During the comment periods a total of 56 letters were received from town officials, abutters, mooring permitees, and interested citizens, see Attachment 1. The comments are categorized by the following nine potential impacts of the proposed pier on the use or natural resources of Pamet Harbor. The potential impacts identified in public comments include the following: 1) hazard to navigation; 2) alters established course of vessels; 3) interferes with access to abutting properties; 4) interferes with public's right to navigation; 5) interferes with public's right of access; 6) displaces moorings, an existing water-dependent use; 7) impacts saltmarsh and shellfish; 8) requests for alternative use of community pier at boat ramp; 9) intended use of pier for commercial purposes. Petitions to Intervene in this application were received from the Town of Truro represented by Town Counsel Edward Veara, Pamet Harbor Yacht Club, an informal citizen group and 15 persons with moorings in Pamet Harbor.

In partial response to the public comment, the applicant submitted revised plans. The modifications are described in a letter from Attorney W. Henchy dated May 25, 1999 in the following manner. The length of the pier was shortened so the seaward edge of the float extends no farther than Extreme Low Water, the "Tee" float system was reduced in length from 80 feet to 40 feet, and the pier does not encroach within 25 feet of the property line extensions. The Department's summary response to the comments is described in Section V below.

A full record of the public hearing as well as the exhibits and written comments are in the application file.

D) Other Approvals

The Truro Conservation Commission issued an Order of Conditions for the proposed project that was appealed to the Department. The Department issued a Superceding Order of Conditions on June 8, 2000. **(DEP File Number SE75-459)**. The Superceding Order of Conditions was subsequently appealed to the Department's Office of Administrative Appeals.

## V. DEPARTMENT'S DETERMINATION PURSUANT TO CHAPTER 91

The Department has determined that this project does not serve a proper public purpose which provides greater benefit than detriment to the public's rights in tidelands as specified in 310 CMR 9.31 because it does not meet the standards for preserving water-dependent public rights as required by 310 CMR 9.35; does not meet the standards for protecting water dependent uses as required by 310 CMR 9.36; and does not conform to the standards for private recreational boating facilities as required by 310 CMR 9.38(2). Therefore, the project is denied pursuant to the specified sections of 310 CMR 9.00.

Pursuant to 310 CMR 9.31(2), no license or permit shall be issued by the Department for any project on tidelands except for water-dependent use projects located entirely on private tidelands, unless the project serves a proper public purpose which provides greater benefit than detriment to the rights of the public in said lands. Water-dependent projects are presumed to meet the proper public purpose requirement, however, the presumption may be rebutted if the project does not conform to the basic licensing requirements listed at 310 CMR 9.31(1).

310 CMR 9.31(1)(d) requires compliance with the standards governing water-related public rights enumerated at 310 CMR 9.35. Specifically, pursuant to 310 CMR 9.35(2)(a), - the project shall not significantly interfere with the public rights of navigation which exist in all waterways. Such rights include the right to conduct any activity which entails the movement of boats, vessel, floats, or other watercraft; the right to conduct any activity involving the transport or the loading/unloading of persons or objects to or from any such watercraft; and the natural derivatives thereof.

Pursuant to 310 CMR 9.35(2)(a) 1, the Department shall find that the standard is not met in the event the project will:

- extend into or over any existing channel such as to impede free passage;
- require the alteration of an established course of vessels;
- interfere with access to adjoining areas by extending substantially beyond the projection of existing structures adjacent to the site;
- generate water-borne traffic that would substantially interfere with other water-borne traffic in the area at present, or in the future as may be evidenced by documented projections;

- adversely affect the depth or width of an existing channel;
- or impair in any other substantial manner the ability of the public to pass freely upon the waterways and to
- engage in transport or loading or unloading activities.

Based on the Department's review of the application material and the site, the testimony provided at public hearing, and the public comments received, the Department finds that the project as proposed would significantly interfere with public rights of navigation in Pamet Harbor. The project site is located in Pamet Harbor, the only saltwater access in Truro. It is a small, congested harbor that silts in regularly. The entrance and mooring basin have been dredged three times since 1965. Although last dredged in 1996, several boats at the moorings and the Pamet Harbor Yacht Club floats are dry at low water. Some previously designated mooring locations are no longer useable because of the siltation. The Town supports a public boat ramp and provides over 130 moorings for commercial fisherman and recreational boaters in a defined mooring basin with a waiting list of 83. In this section of the Harbor there are effectively 52 boats at 26 moorings. At least 2 and possibly as many as 6 vessels would have to be moved to accommodate the pier's physical presence as well as safe access to and from the proposed pier, and the yacht club's pier. The Applicant's property is one of 3 residential lots located between the public access ramp and the yacht club. The remainder of the Harbor's shoreline is undeveloped, with the principal landowner being the Truro Conservation Trust (see their letter in the public record). A channel or regular course of vessels is not marked, presumably because of the shifting sands, but has been identified by the Harbormaster and others familiar with the Harbor as along the edge of the mooring basin limit described in DEM Contract No. 3275 and located on the applicants plan. Specifically, the project as designed will impede or otherwise impair free passage and alter an established course of vessels within this channel, and may interfere with access to adjoining properties.

Pursuant to 310 CMR 9.36(3), - the project shall not significantly disrupt any water-dependent use in operation, as of the date of license application, at an off-site location within the proximate vicinity of the project site. If significant disruption occurs, the project shall include such mitigation and/or compensation measures as the Department deems appropriate to avoid such disruption. The project as proposed is as long or longer than the two other piers in the Harbor, both of which are community piers, and, as discussed above, will require between 2 and 5 moorings to be moved to tidal flats that have limited access. Accordingly, the Department finds that the project as proposed disrupts navigational access to water-dependent uses in operation prior to the date of the license application, in the immediate vicinity of the project.

Pursuant to 310 CMR 9.38(2)(b), no project shall include a private recreational boating facility with fewer than ten berths on Commonwealth tidelands or a Great Pond, if the Department receives written certification from the municipal official or planning board of the municipality in which the project is located that such facility does not conform to a formal, areawide policy or plan which establishes municipal priorities among competing uses of the waterways, unless the Department determines that such certification:

- is arbitrary and capricious, or an abuse of discretion; or
- conflicts with an overriding state, regional, or federal interest.

As a pier designed for private use associated with a single-family residential unit, the project constitutes a private recreational boating facility as defined at 310 CMR 9.02. The Town of Truro has adopted a Harbor Management Plan for Pamet Harbor, with assistance from MCZM which addresses impacts associated with docks and piers. The Plan was prepared by Horsley & Witten Inc. on behalf of the Harbor Management Committee, was finalized in June 1994 and was unanimously adopted by the Board of Selectmen on July 12, 1994. The Plan was developed in a public forum with public meetings and public comment throughout its development. The Plan applies to the entire geographic area of Pamet Harbor, encompassing approximately 150 acres, of which approximately 75% consist of intertidal areas. The Plan identifies several competing uses of Pamet Harbor including commercial and recreational vessels, improvements to navigation, establishment and maintenance of mooring areas, public access, shell fishing and natural resource protection and has established priorities among them. The Town has certified to the Department that the project as proposed does not conform to the Plan. The plan restricts the locations of moorings and docks/piers to prevent encroachment into navigational channels, establishes a navigational channel and reserves areas for safe anchorage to facilitate loading/offloading for commercial fishing vessels, and provides anchorage for a diverse mix of small craft. The Department finds that the Harbor Management Plan constitutes a formal area wide policy or plan establishing Town priorities among the competing uses of Pamet Harbor, and, furthermore, finds no evidence that the Plan is arbitrary, capricious or an abuse of discretion, or conflicts with any overriding state, regional or federal interest. Based on this

evaluation, the Department is required to deny the project pursuant to 310 CMR 9.38(2)(b) because the project does not conform to the Town's Harbor Management Plan.

In summary, this project as proposed will detrimentally impact navigational safety, public rights of navigation, public access and competing water-dependent uses within Pamet Harbor.

On the basis of the foregoing analysis, the Department denies granting of a Waterways license for the uses and structure described above and delineated on the application plans. This denial is made without prejudice, therefore, the Applicant may resubmit a new application in accordance with 310 CMR 9.00.

## VI. NOTICE OF APPEAL RIGHTS:

A) Appeal Rights and Time Limits

The following persons shall have the right to an adjudicatory hearing concerning this decision by the Department to grant or deny a license or permit: (a) an applicant who has demonstrated property rights in the lands in question, or which is a public agency; (b) any person aggrieved by the decision of the Department to grant a license or permit who has submitted written comments within the public comment period; (c) ten (10) residents of the Commonwealth, pursuant to M.G.L.c.30A, s.10A, who has submitted written comments within the public comment period; (e) CZM, for any project in the coastal zone, if it has filed a notice of participation within the public comment period; and (f) DEM, for any project in an Ocean Sanctuary, if it has filed a notice of participation within the public comment period. To request an adjudicatory hearing, a Notice of Claim must be made in writing and sent by certified mail or hand delivery to the Department with the appropriate filing fee specified within 310 CMR 4.10 along with a DEP Fee Transmittal Form, within twenty-one (21) days of the date of issuance of this decision and addressed to:

Docket Clerk
Office of Administrative Appeals
Department of Environmental Protection
One Winter Street, 3rd Floor
Boston, MA 02108

A copy of the Notice of Claim must be sent at the same time by certified mail or hand delivery to the applicant, (where applicable) the municipal official of the city or town where the project is located, and the issuing office of DEP at:

Department of Environmental Protection
Wetlands and Waterways Program
20 Riverside Drive
Lakeville, MA 02347

B) Contents of Hearing Request

Under 310 CMR 1.01(6)(b), the Notice of Claim must state clearly the facts that are the ground for the request, and relief sought. Additionally, the request must state why the decision is not consistent with applicable laws and regulations.

Pursuant to 310 CMR 9.17(3), any notice of claim for an adjudicatory hearing must include the following information:

(a) the DEP Waterways Application File Number;
(b) the complete name, address, fax number, and telephone number of the applicant;
(c) the address of the project;
(d) the complete name, address, fax number and telephone number of the party filing the request and, if represented by counsel, the name, address, fax number and telephone number of the attorney;
(e) if claiming to be a person aggrieved, the specific facts that demonstrate that the party satisfies the definition of "aggrieved person" found in section 9.02;
(f) a clear statement that a formal adjudicatory hearing is being requested;
(g) a clear statement of the facts which are the grounds for the proceedings, the specific objections to the Department's written decision, and the relief sought through the adjudicatory hearing, including specifically the changes desired in the final written decision; and

(h) a statement that a copy of the request has been sent to: the applicant and the municipal official of the city or town where the project is located.

C) Filing Fee and Address

A copy of the Notice of Claim along with a DEP Fee Transmittal Form and a valid check payable to the Commonwealth of Massachusetts in the amount of one hundred dollars ($100) must be mailed to:

**Commonwealth of Massachusetts**
**Department of Environmental Protection**
**PO Box 4062**
**Boston, Mass. 02211**

The Request will be dismissed if the filing fee is not paid, unless the appellant is exempt or is granted a wavier. The filing fee is not required if the appellant is a city or town (or municipal agency), county, or district of the Commonwealth, or a municipal housing authority. The Department may waive the adjudicatory hearing filing fee pursuant to 310 CMR 4.06(2) for a who shows that paying a fee will create an undue financial hardship. A person seeking a wavier must file an affidavit setting forth the facts believed to support the claim of undue financial hardship together with the hearing request as provide above.

THIS DETERMINATION IS ISSUED BY THE DEPARTMENT OF ENVIRONMENTAL PROTECTION ON THE 30th DAY OF November, 2000.

Elizabeth A. Kouloheras

Elizabeth A. Kouloheras, Chief
Wetlands and Waterways Programs

Bk 14827 Pg226 #15076
02-15-2002 @ 01:30p

COMMONWEALTH OF MASSACHUSETTS

Barnstable, ss.

Office of the Board of Selectmen
For the Town of Truro

**ORDER OF TAKING BY EMINENT DOMAIN OF LAND IN TRURO, BARNSTABLE COUNTY**

**BY**

**THE BOARD OF SELECTMEN OF THE TOWN OF TRURO**

**FOR**

**THE PRESERVATION OF CERTAIN LAND IN TRURO FOR HARBOR MANAGEMENT AND OTHER PUBLIC PURPOSES**

We, Sally Sears-Mack, Suzanne Grout-Thomas, Lloyd Rose, Robert Martin, and Harold Eastman, the duly elected and qualified Selectmen of the Town of Truro, a municipal corporation duly situated in the County of Barnstable and Commonwealth of Massachusetts, acting under the authority of the Vote taken at the Special Town Meeting, held on January 29, 2002, which vote was taken pursuant to Article 2 of the Warrant for said Town Meeting and, further, under the authority conferred on us by General Laws, Chapter 79 and Acts in amendment thereof and in addition thereto, and by virtue of every other power conferred on us by law, having duly complied with all the preliminary requirements prescribed by law, do hereby **ADOPT AND DECREE** this Order of Taking and do hereby TAKE by Eminent Domain as set forth above, on behalf of said Town of Truro, a FEE SIMPLE interest, for the purpose of OPEN SPACE and HARBOR PRESERVATION AND MANAGEMENT and for OTHER PUBLIC PURPOSES, in parcels of land depicted a plan of land entitled "Plan of Land at Pamet Harbor, Truro, Made for the Town of Truro, Scale 1" = 100', May 22, 2000, Slade Associates, Inc., Registered Land Surveyors, Rte 6 & Pine Point Road, Wellfleet,

EXHIBIT

F

Massachusetts, 02667," which plan is recorded in the Barnstable County Registry of Deeds in Plan Book 571, Page 66, and more particularly described in **Schedules "A" through "D,"** which Schedules are attached hereto and incorporated herein by reference, and which set forth the descriptions of the parcels, the owners of record, all title references, the approximate acreages, and the amounts of the awards.

This fee simple interest in the parcels of land described in **Schedules "A" and "B,"** taken by the Town via this instrument of taking shall not include the rights of the owners of the upland parcels abutting the parcels described in **Schedules "A" and "B,"** and their successors and assigns, to continue to maintain, repair and utilize the existing piers located on these parcels to their existing extent and in their existing locations for all purposes for which the piers have been used from the time of their installation until the date of this instrument of taking. The easement rights retained herein shall be perpetual and shall be considered appurtenant rights that run respectively with the title to the upland parcels directly abutting the parcels described in **Schedules "A" and "B,"** which upland parcels are not the subject of this taking and are further described on the Plan of Land referenced in the Schedules as, "Sh. 50, Pcl. 37, Pamet Harbor Yacht Club, Inc., Book 1,100, Pg. 148," and "Sh. 50, Pcl. 21, John E. Allen and Barbara Cordi-Allen, Bk. 10,111, Pg. 256," respectively. The locations of the land area over which these easement rights are retained are depicted on the Plan of Land referenced in the Schedules and each labeled "Pier Easement" on said plan. The easement rights retained herein do not include the right to alter the existing piers in any manner that would extend the piers beyond their footprints, as those footprints exist on the

ground as of the date of this taking and are shown to exist on the Plan of Land referenced in the Schedules.

With the exception of the above-described piers, there are no other trees, buildings, or structures located on the land described in each of said Schedules that are included in this Order of Taking. No betterments are to be assessed in connection with this Order of Taking. The owners of record of the land described in said Schedules shall retain no rights or interest in this property, save for the easement rights expressly reserved herein.

All awards shall be reduced by amounts necessary to pay any and all outstanding real estate taxes payable to the Town of Truro as of the date of the recording of this instrument of taking, including interest, demand fees, and other costs of collection.

See the certified copy of the Vote of the Town of Truro authorizing this taking attached hereto.

IN WITNESS WHEREOF, we the undersigned, duly authorized Selectmen of the Town of Truro, have adopted and decreed this Order of Taking, this 6th Day of February 2002

BOARD OF SELECTMEN,
TOWN OF TRURO,

By: Sally Sears-Mack
Sally Sears-Mack
Chair, Board of Selectmen

COMMONWEALTH OF MASSACHUSETTS

Barnstable, ss. Feb. 6, 2002

Then personally appeared before me the above-named Sally Sears-Mack, and acknowledged the foregoing instrument to be the free act and deed of the Board of Selectmen for the Town of Truro.

Benjamin E. Zehnder, Esq.
My Commission Expires
October 31, 2004

Notary Public
My Commission Expires:

BENJAMIN E. ZEHNDER NOTARY PUBLIC COMMONWEALTH MASSACHUSETTS

By: Lloyd F. Rose
Lloyd Rose

By: Suzanne Grout-Thomas
Suzanne Grout-Thomas

By:
Robert Martin

By:
Harold Eastman

Bk 14827 Pg230 #15076

**Schedule "A"**

**Description:** A certain parcel of real property in the Town of Truro, Barnstable County, Massachusetts, consisting of the tidelands portion of the parcel shown on Truro Assessor's Map 50 as Lot 37, and shown as **Parcel 3** on the plan of land first referenced in the Order of Taking, the title to which is duly recorded in the Barnstable County Registry of Deeds in Book 1100, Page 148.

**Record Owner:** Pamet Harbor Yacht Club, Inc.

**Acreage:** 1.08 acres, more or less

**Award:** Five Thousand ($5,000.00) Dollars

Bk 14827 Pg231 #15076

**Schedule "B"**

**Description:** A certain parcel of real property in the Town of Truro, Barnstable County, Massachusetts, consisting of the tidelands portion of the parcel shown on Truro Assessor's Map 50 as Lot 21, which property is also shown as **Parcel 4** on the plan of land first referenced in the Order of Taking, the title to which is duly recorded in the Barnstable County Registry of Deeds in Book 10,111, Page 256.

**Record Owner:** John Allen and Barbara Cordi-Allen

**Acreage:** .56 acres, more or less

**Award:** Two Thousand, Five Hundred ($2,500.00) Dollars

**Schedule "C"**

**Description:** A certain parcel of real property in the Town of Truro, Barnstable County, Massachusetts, consisting of the tidelands portion of the parcel shown on Truro Assessor's Map 50 as Lot 20, which property is also shown as **Parcel 5** on the plan of land first referenced in the Order of Taking, the title to which is duly recorded in the Barnstable County Registry of Deeds in Book 11,175, Page 326.

**Record Owner:** Brooke Newman

**Acreage:** .18 acres, more or less

**Award:** Twenty-Nine Thousand ($29,000.00) Dollars

Bk 14827 Pg232 A #15076

Schedule "D"

**Description:** A certain parcel of real property in the Town of Truro, Barnstable County, Massachusetts, consisting of the tidelands portion of the parcel shown on Truro Assessor's Map 50 as Lot 19, which property is also shown as **Parcel 6** on the plan of land first referenced in the Order of Taking, the title to which is duly recorded in the Barnstable County Registry of Deeds in Book 12,802, Page 320.

**Record Owner:** Sarah Landis

**Acreage:** .24 acres, more or less

**Award:** Twenty Thousand ($20,000.00) Dollars

BARNSTABLE COUNTY
REGISTRY OF DEEDS
A TRUE COPY, ATTEST
JOHN F. MEADE, REGISTER

BARNSTABLE REGISTRY OF DEEDS

Bk 15076 Pg 48 #32596
04-10-2002 @ 01:54p

M.R. BOOK 14827 PAGE 226

OFFICE OF
TOWN CLERK
TREASURER - COLLECTOR OF TAXES
TOWN OF TRURO, MA 02666-2012

**SPECIAL TOWN MEETING, JANUARY 29, 2002**

**ARTICLE 2. PAMET HARBOR EMINENT DOMAIN TAKING** Voted: (as moved) to authorize the Board of Selectmen to acquire by gift an easement interest in the so-called "tidelands" or "flats" portions of the following parcels of property, being the area lying between the mean high tide line and the extreme low tide line of said parcels, which parcels are designated on the Truro Assessor's Map 49 as Lots 21, 32, and 37, and which are also identified as Lots 1a, 2a and 2b on a plan of land entitled "Plan of Land at Pamet Harbor, Truro, Made for the Town of Truro," dated March 22, 2001, as revised through January 10, 2002, and prepared by Slade Associates, Inc., Registered Land Surveyors, a copy of which is available for inspection at the office of the Truro Town Clerk; which tidelands consist of approximately 3.76 acres, more or less; to see if the Town will vote to authorize the Board of Selectmen to acquire by the exercise of eminent domain powers under Massachusetts General Laws, Chapter 79, or any other enabling authority, fee simple interests in the so-called "tidelands" or "flats" portions of the following parcels of property, being the area lying between the mean high tide line and the extreme low tide line of said parcels, which parcels are designated on the Truro Assessor's Map 50 as Lots 19, 20, 21 and 37, and which are also identified as Lots 3, 4, 5 and 6 on the afore-mentioned plan, which tidelands consist of approximately 2.06 acres, more or less; to acquire this land for the purpose of harbor management and preservation; to commit this land to the care, custody, control and management of the Board of Selectmen; to appropriate Sixty-Six Thousand, Five Hundred ($66,500.00) Dollars for the purpose of acquiring the fee simple interests in said Lots 3, 4, 5 and 6 and other costs incidental and related thereto, including the payment of damage awards arising from the eminent domain taking, payment of tax awards, and legal fees; in order to meet this appropriation, to transfer Seven Thousand Five Hundred ($7,500.00) Dollars from the Pamet Harbor Receipts reserved for appropriation for purposes of paying the damage awards; and to expend Forty-Nine Thousand ($49,000.00) Dollars from the Land Bank Fund containing monies collected in accordance with Chapter No. 293 of the Acts of 1998, also known as an Act Relative to the Establishment of the Cape Cod Open Space Land Acquisition Program for purposes of paying damage awards; and to expend Ten Thousand ($10,000.00) Dollars from said Land Bank Fund for the payment of tax awards, legal fees and other costs incidental and related thereto; to authorize the Board of Selectmen to apply for, accept and expend any funds which may be provided by the Commonwealth or some other source to defray a portion or all of the costs of acquiring this property.

So voted: standing vote 238 YES, 2 NO.

So certified:

Cynthia A. Slade
Town Clerk, Town of Truro
March 10, 2002

Pamet Harbor

BARNSTABLE REGISTRY OF DEEDS

Bk 15338 Pg143 #58685
07-05-2002 @ 11:19a

**DEED OF EASEMENT**

Robert Bednarek, Judith Benedict, Betsey A. Brown, Ansel B. Chaplin, Carol P. Green, David Kuechle, John Marksbury, John H. Snow, Richard Whalen, and Pamela Wolff, Trustees of the TRURO CONSERVATION TRUST, established under an Agreement and Declaration of Trust dated 30 November 1981 and recorded in the Barnstable County Registry of Deeds in Book 3428, Page 196, as amended, with offices located at One Pine Ridge Road East, North Truro, Massachusetts, and having a mailing address of Post Office Box 327, North Truro, Massachusetts 02652, their successors and permitted assigns ("Grantor")

for nominal consideration and as a gift,

grant to the TOWN OF TRURO, a municipal corporation duly organized under the laws of the Commonwealth of Massachusetts, with offices at 24 Town Hall Road, Truro, Massachusetts and having a mailing address of Post Office Box 2030, Truro, Massachusetts, 02666, acting by and through its Board of Selectmen, its successors and permitted assigns ("Grantee"),

This property has no street address Truro, MA

IN PERPETUITY, the following described EASEMENT IN GROSS in and over the so-called "tidelands" or "flats" portions of certain parcels of land abutting the waters of Pamet Harbor in Truro, Barnstable County, Massachusetts, which portions are identified as Parcels 1A, 2A and 2B on a plan of land entitled "Plan of Land at Pamet Harbor, Truro, Made for the Town of Truro," dated March 22, 2001 and last revised June 24, 2002, and prepared by Slade Associates, Inc., Registered Land Surveyors, which plan is recorded at the Barnstable County Registry of Deeds in Plan Book 574, Page 75, and which consist of approximately 3.76 acres, more or less. For Grantor's title in Parcel 1A, see Deeds recorded in said Registry in Deed Book 4070, Page 3, Book 4038, Page 289, Book 4036, Page 21, Book 4442, Page 223; for Grantor's title in Parcel 2A, see Deed recorded in said Registry in Deed Book 3553, Page 223; for Grantor's title in Parcel 2B, see Deed recorded in said Registry in Deed Book 9729, Page 26. For Grantee's Authority to accept this gift of Easement, see the Certified copy of the Vote of the Town recorded in said Registry in Deed Book 15036, Page 146.

Said EASEMENT shall include the following rights and interests in and over said parcels of land:

i) the right to install, maintain, regulate and license a total of no more than forty-five (45) moorings at any given time for use and rental by members of the public in and over the Easement area in substantially the locations shown on the Plan of Land first referenced above;

ii) the right to promote the growth of the shellfish population in and over the Easement area through seeding and other growth propagation programs;

iii) the right to promote shellfishing through the issuance of licenses for fishing in and over the Easement area in accordance with the Town of Truro shellfishing regulations, as may be amended from time to time; and

EXHIBIT H

3

Bk 15338 Pg144 #58685

iv) all other rights necessary to promote the goals, objectives and policies of the Pamet Harbor Management Plan, which goals and objectives include, but are not limited to, the promotion of navigation and harbor safety and the protection of water quality, shellfish and other natural resources.

This Easement is not to be construed as representing the existence or nonexistence of any pre-existing rights of the public, if any, in and to the Easement area, and any such preexisting rights of the public, including the rights of the public to fish, fowl and navigate over the Easement area in accordance with the so-called "Public Trust Doctrine," the common law doctrine codified in the Commonwealth of Massachusetts by the Colonial Ordinances of 1641 through 1647, including the right of the Grantee or any public agency, to conduct dredging for navigation purposes in and over the Easement area in accordance with all local, county, state and federal approvals, licenses and permits issued for that purpose, are not affected by the granting of this Easement.

The limitation as to the location and number of moorings are both of the essence, and the location of said moorings shall not be substantially changed, nor their number increased, under any circumstances without the express written consent of the Grantor duly recorded in said Registry, which consent may be withheld for any reason deemed sufficient by the Grantor. Any substantial change of location or increase in the number of moorings without said consent shall constitute a violation of this Easement, enforceable by the Grantor through any available remedy at law or in equity.

Witness our hands and seal this 25th Day of June, 2002.

Robert Bednarek

David Keuchle

~~Judith Benedict~~

~~John Marksbury~~

Betsey A. Brown

John H. Snow

Ansel B. Chaplin

Richard Whalen

Carol P. Green

~~Pamela Wolff~~

Bk 15338 Pg145 #58685

COMMONWEALTH OF MASSACHUSETTS

Barnstable, ss. June 28 2002

Then personally appeared before me the above-named Ansel B. Chaplin, acting as Secretary of the Truro Conservation Trust, and acknowledged the foregoing instrument to be the free act and deed of the Trustees of the Truro Conservation Trust, before me,

Robert P. Kelley
Notary Public ROBERT P. KELLEY
My Commission Expires:
4.18.08

BARNSTABLE COUNTY
REGISTRY OF DEEDS
A TRUE COPY, ATTEST
John F. Meade
JOHN F. MEADE, REGISTER

RELEASE/REQUEST FOR PAYMENT OF DAMAGES

TO: Board of Selectmen of the Town of Truro
c/o Edward E. Veara, Esquire
Zisson and Veara
828 Main Street; P.O. Box 2031
Dennis, Massachusetts 02638

FROM: Pamet Harbor Yacht Club, Inc.
P.O. Box 555
Truro, Massachusetts 02666

RE: Land in Truro, Barnstable County, Massachusetts
Parcel 3 on a plan of land entitled "Plan of Land at Pamet Harbor, Truro, Made for the Town of Truro, Scale 1" = 100', May 22, 2000, Slade Associates, Inc., Registered Land Surveyors, Rte 6 & Pine Point Road, Wellfleet, Massachusetts, 02667," which plan is recorded in the Barnstable County Registry of Deeds in Plan Book 571, Page 66, and more particularly described in **Schedule "A"** of the Order of Taking for the above-referenced parcel, which Order was recorded with the Barnstable County Registry of Deeds on February 15, 2002 at Book 14827, Page 266.

Ladies and Gentlemen:

I hereby accept, pursuant to Massachusetts General Laws, Chapter 79, Section 39, on behalf of the Pamet Harbor Yacht Club, Inc., the offer of payment in the amount of **Five Thousand ($5,000.00) Dollars,** as adopted by the Board of Selectmen in the Order of Taking on February 6, 2002, as **settlement in full** of Pamet Harbor Yacht Club Inc.'s claims for damages resulting from the eminent domain taking of the above-referenced parcel, hereby waive the corporation's right to seek further damages from the Town, which right could be exercised by filing a civil action in the Superior Court within three years from the date of the recording of Order of Taking, and hereby certify that I am authorized to sign this Release on behalf of said corporation, as indicated in the attached attested copy of the vote of the directors of the corporation.

[signature]
Witness
Name: GEORGE POULOS

[signature]
Print Name: BERTRAM PERKEL
President of Pamet Harbor Yacht Club, Inc.

Dated: 7/20/02

Article 2, Special Town Meeting, January 29, 2002

EXHIBIT
I

RELEASE/REQUEST FOR PAYMENT OF DAMAGES

TO: Board of Selectmen of the Town of Truro
c/o Edward E. Veara, Esquire
Zisson and Veara
828 Main Street; P.O. Box 2031
Dennis, Massachusetts 02638

FROM: Brooke Newman
273 Roaring Fork Drive
Aspen, Colorado 81611

RE: Land in Truro, Barnstable County, Massachusetts
Parcel 5 on a plan of land entitled "Plan of Land at Pamet Harbor, Truro, Made for the Town of Truro, Scale 1" = 100', May 22, 2000, Slade Associates, Inc., Registered Land Surveyors, Rte 6 & Pine Point Road, Wellfleet, Massachusetts, 02667," which plan is recorded in the Barnstable County Registry of Deeds in Plan Book 571, Page 66, and more particularly described in **Schedule "C"** of the Order of Taking for the above-referenced parcel, which Order was recorded with the Barnstable County Registry of Deeds on February 15, 2002 at Book 14827, Page 226.

Ladies and Gentlemen:

I hereby accept, pursuant to Massachusetts General Laws, Chapter 79, Section 39, the offer of payment in the amount of **Twenty-Nine Thousand ($29,000.00) Dollars,** as adopted by the Board of Selectmen in the Order of Taking on February 6, 2002, as **settlement in full** of my claims for damages resulting from the eminent domain taking of the above-referenced parcel and hereby waive my right to seek further damages from the Town, which right could be exercised by filing a civil action in the Superior Court within three years from the date of the recording of Order of Taking.

Witness
Name: MARK LEROSE

Brooke Newman

Dated: 3/5/02

Article 2, Special Town Meeting, January 29, 2002

EXHIBIT J

RELEASE/REQUEST FOR PAYMENT OF DAMAGES

TO: Board of Selectmen of the Town of Truro
c/o Edward E. Veara, Esquire
Zisson and Veara
828 Main Street; P.O. Box 2031
Dennis, Massachusetts 02638

FROM: Sarah Landis
9 Story Street
Cambridge MA 02138

RE: Land in Truro, Barnstable County, Massachusetts
Parcel 6 on a plan of land entitled "Plan of Land at Pamet Harbor, Truro, Made for the Town of Truro, Scale 1" = 100', May 22, 2000, Slade Associates, Inc., Registered Land Surveyors, Rte 6 & Pine Point Road, Wellfleet, Massachusetts, 02667," which plan is recorded in the Barnstable County Registry of Deeds in Plan Book 571, Page 66, and more particularly described in **Schedule "D"** of the Order of Taking for the above-referenced parcel, which Order was recorded with the Barnstable County Registry of Deeds on February 15, 2002 at Book 14827, Page 266.

Ladies and Gentlemen:

I hereby accept, the offer of payment in the amount of **Twenty Thousand ($20,000.00) Dollars,** as adopted by the Board of Selectmen in the Order of Taking on February 6, 2002,

pursuant to Massachusetts General Laws, Chapter 79, Section 39, as **settlement in full** of my claims for damages resulting from the eminent domain taking of the above-referenced parcel and hereby waive my right to seek further damages from the Town, which right could be exercised by filing a civil action in the Superior Court within three years from the date of the recording of Order of Taking.

pursuant to Massachusetts General Laws, Chapter 79, Section 8A, as **settlement pro tanto** of my claim for damages resulting from the eminent domain taking of the above-referenced parcel and hereby reserve my right to seek further damages from the Town by filing a civil action in the Superior Court within three years from the date of the recording of the Order of Taking.

Catherine J. Zeyns [signature]
Witness
Name:

Dated: 8/9/02

Sarah Landis [signature]
Sarah Landis
Social Security Number: 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

Article 2, Special Town Meeting, January 29, 2002

EXHIBIT
K

A true copy, attest: Cynthia A. Slade, Town Clerk, Town of Truro/ May 24, 2006

# TOWN OF TRURO

# ZONING BYLAW
# SUBDIVISION REGULATIONS
# SIGN CODE

Published by the Truro Planning Board

with amendments to:

Zoning Bylaw through Annual Town Meeting April 2005

Subdivision Regulations through May 2002

Sign Code through Annual Town Meeting April 1992

**Price: $7.00**

*[The (month/year) are for reference purposes only]*

and detailed listing of annual maintenance expenses.

§ 30.7. Nonconforming Uses

A. Continuance. So long as structures or uses were lawfully constructed or begun, and lots were created lawfully, such structures or uses may continue to be used in the same manner and for the same purposes despite contrary provisions of this bylaw. Lawful, pre-existing, nonconforming uses and structures may, when a variance would otherwise be required, be altered or extended with a special permit if the Board of Appeals finds that the alteration or extension will not be substantially more detrimental to the neighborhood than the existing nonconforming use or structure and that the alteration or extension will exist in harmony with the general purpose and intent of this bylaw.

B. Repairs, alterations. If the Building Commissioner determines and finds that the proposed repair, reconstruction, alteration, or structural change of a pre-existing, nonconforming, single-family or two-family residential structure will not increase the nature or extent of the nonconformity, then the Building Commissioner may approve and issue a building permit for the proposed repair, reconstruction, alteration, or structural change.

C. Abandonment. Nonconforming uses which have been abandoned for a period of 2 years or more shall not be re-established, and any future use shall conform to the then current bylaw.

D. In the event that a non-conforming structure, which was lawful when built, is so damaged by fire or other natural causes that it can no longer be used for the purpose for which it was being used at the time such damage was inflicted, such structure may be rebuilt as of right within two years of sustaining such damage provided that any non-conformity is not increased in the course of such reconstruction. This right of reconstruction shall not foreclose recourse to the Board of Appeals for such further relief as may be available by special permit or variance. *(4/05)*

§ 30.8. Special Permits.

A. Construction or operation under a building or special permit shall conform to any subsequent amendment of this bylaw unless the use or construction is commenced within a period of six months after the issuance of the permit and in cases involving construction, unless such construction is continued through to completion as continuously and expeditiously as is reasonable.

B. A special permit shall lapse after one year if a substantial use thereof has not sooner commenced except for good cause or, in the case of permit for construction, if construction has not begun by such date except for good cause.

C. Special permits may be approved only after a finding by the Board of Appeals or Planning Board (as applicable, see use table) that the proposed use is in the opinion of the Board in harmony with the general public good and intent of this bylaw. The approval shall be subject to any other applicable provision of this bylaw and the Board may impose conditions, safeguards, and limitations on time and use, which in the Board's opinion are necessary to comply with the intent and purpose of this bylaw.

D. The Board of Appeals or Planning Board (as applicable) shall adopt and from time to time amend rules relative to the issuance of such permits, and shall file a copy of those rules in the office of the Town Clerk. Said rules shall describe the size, form, contents, style and number of copies of plans and specifications and the procedure for submission and approval of the permits.

E. Special permits may only be acted upon following public hearings conducted in accordance with the provisions of Massachusetts General Law, Chapter 40A or amendments thereto, within 65 days after filing with the Board the application for the permit. The Board shall act on the application for

# SECTION VIII — GENERAL REGULATIONS

## VIII-A  Non conforming uses

No premises in the Town of Truro shall be used under the following conditions:

1. For any purpose of a junk yard, or storage of used motor vehicles or other equipment used as junk.
2. For the purpose of a commercial tenting camping area, or a trailer park.

## VIII-B  Continuation of non conforming uses

1. So long as buildings were constructed, uses were begun, and lots were created lawfully, they may continue to be used in the same manner and for the same purposes despite contrary provisions of this bylaw. Lawful, preexisting, nonconforming structures and uses may, when a variance would otherwise be required, be altered, or extended with a special permit if the Board of Appeals finds that the alteration or extension will not be substantially more detrimental to the neighborhood than the existing nonconforming structure or use and that the alteration or extension will exist in harmony with the general purpose and intent of the bylaw.                                *(2/60,6/78,4/92)*

2. If the Building Commissioner determines and finds that the proposed repair, reconstruction, alteration, or structural change of a preexisting, nonconforming, single-family or two-family residential structure will not be substantially more detrimental to its neighborhood than the existing nonconforming structure and will not increase the nature or extent of the nonconformity, then the Building Commissioner may approve and issue a building permit for the proposed repair, reconstruction, alteration, or structual change.
                                                                                            *(12/88)*

3. A nonconforming use which has been abandoned for the period of two years, shall not be re-established, and any future use shall conform to the then current by-law.
                                                                                            *(2/60,6/78)*

## VIII-C  Special Permits

1. Construction or operation under a building or special permit shall conform to any subsequent amendment of this By-law unless the use or construction is commenced within a period of six months after the issuance of the permit and in cases involving construction, unless such construction is continued through to completion as continuously and expeditiously as is reasonable.

2. A special permit shall lapse after one year, if a substantial use thereof has not sooner commenced except for good cause or, in the case of permit for construction, if construction has not begun by such date except for good cause.

3. Special permits may be approved only after a finding by the Board of Appeals or Planning Board (as applicable) that the proposed use is in the opinion of the Board in harmony with the general public good and intent of this Bylaw.
   The approval shall be subject to any other applicable provision of this By-law and the Board may impose conditions, safeguards, and limitations on time and use which in the Board's opinion are necessary to comply with the intent and purpose of this By-law.
                                                                                            *(6/78,4/92)*

4. The Board of Appeals or Planning Board (as applicable) shall adopt and from time to time amend rules relative to the issuance of such permits, and shall file a copy of those rules in the office of the Town Clerk.
   Said rules shall describe the size, form, contents, style and number of copies of plans and specifications and the procedure for submission and approval of the permits.
                                                                                            *(6/78,4/92)*