UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10370PBS

| | |
|---|---|
| BARBARA CORDI-ALLEN and JOHN ALLEN | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| JOSEPH R. CONLON, ARTHUR F. HULTIN, | ) |
| NORMAN H. POPE, KEITH S. ALTHAUS, and | ) |
| MARINNA MATRICARDI as they are members | ) |
| and are collectively the TRURO ZONING | ) |
| BOARD OF APPEALS, BROOKE NEWMAN, | ) |
| and the TOWN OF TRURO, MASSACHUSETTS | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF JULIE PRUITT BARRY

I, Julie Pruitt Barry, depose and say:

1.      I am an attorney with Nutter McClennen & Fish LLP, World Trade Center West, 155 Seaport Boulevard, Boston, Massachusetts and represent defendant Brooke Newman in this action. I submit this affidavit for matters of form and public record only, and expect no evidence to be offered in contradiction to this affidavit.

2.      Attached as Exhibit A is a true copy of the building permit issued to Ms. Newman, dated 10-28-98.

3.      Attached as Exhibit B is a true copy of the copy of Order of Conditions issued on May 18, 1998 to Ms. Newman by the Truro Conservation Commission.

4.      Attached as Exhibit C is a true copy of Ms. Newman's Answers to Plaintiffs' First Set of Interrogatories.

5.     Attached as Exhibit D is a true copy of a letter dated September 20, 1998 from plaintiffs to Mr. Steve Williams, Truro Building Inspector. I offer this letter not for its truth but for the limited purpose of showing what statements plaintiffs made to the building commissioner concerning Ms. Newman's application for a building permit, and that there are no statements or allegations by plaintiffs that they are aggrieved.

6.     Attached as Exhibit E is a true copy of plaintiffs' letter to the building commissioner dated July 26, 2004, requesting enforcement and revocation of Ms. Newman's building permit. I offer this letter not for its truth but for the limited purpose of showing what statements plaintiffs made to the building inspector in support of their enforcement request.

7.     Attached as Exhibit F is a certified copy of the current Zoning Bylaw for the Town of Truro obtained from the Truro Town Clerk.

8.     Attached as Exhibit G is a true copy of the Section VIII of the Zoning Bylaw in effect at the time of issuance of Ms. Newman's building permit.

9.     Attached as Exhibit H is a true copy of the building commissioner's letter to plaintiffs dated October 19, 2004 denying their request that Ms. Newman's building permit be revoked.

10.     Attached as Exhibit I is a true copy of plaintiffs' letter to the Board of Appeals dated October 26, 2004 appealing the denial of their enforcement request. I offer this letter not for its truth but for the limited purpose of showing what statements plaintiffs made to the Board in support of and as grounds for their appeal.

11.     Attached as Exhibit J is a true copy of the Statement of Notice Under M.G.L. ch. 40A, Sec. 7, filed by plaintiffs on October 27, 2004 in the Barnstable Registry of Deeds, Book 19182, Page 105.

- 2 -

12.    Attached as Exhibit K is a true copy of the following pages from the deposition of plaintiff Barbara Cordi-Allen: cover page, page numbers 21-80, and reporters certification page.

13.    Attached as Exhibit L is a true copy of the following pages from the deposition of plaintiff John Allen: cover page, page numbers 4-25, and reporters certification page.

14.    Attached as Exhibit M is a true copy of the decision of the Board of Appeals dated July 19, 2005, upholding the building commissioner's denial of plaintiffs' enforcement request.

15.    Attached as Exhibit N is a true copy of a trespass notice from Truro Police Department to Ms. Newman dated July 14, 2005.  I offer this notice not for the truth of the matter asserted but for the limited purpose of showing that plaintiff Barbara Cordi Allen filed the notice against Ms. Newman.

16.    Attached as Exhibit O is a true copy of plaintiffs' Response to Defendant Newman Document Request.

Signed under the pains and penalties of perjury this 26th day of May, 2006.

Julie Pruitt Barry

1533245.1

CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon the Plaintiff Counsel attorneys of record for each party by mail/by hand.
Date: 5/26/05    Barry

**EXHIBIT A**

EXHIBIT B

BK11471 PG215    39533
1998-19-08-13:14

310 CMR 10.99

DEP File No.     SE 75-434
(To be provided by DEP)

**Form 5**

City/Town _____ Truro _____

Applicant _____ Brooke Newman _____

*Commonwealth
of Massachusetts*

# Order of Conditions
## Massachuetts Wetlands Protection Act
### G.L. c. 131, §40

From _____ Truro Conservation Commission _____ **Issuing Authority**

To _____ Brooke Newman _____ | _____ Brooke Newman _____

    (Name of Applicant) | (Name of property owner)

Address _____ 0273 Roaring Fork Drive _____ Address _____ 0273 Roaring Fork Drive _____

Aspen, CO 81611 | Aspen, CO 81611

**This Order is issued and delivered as follows:**

☐ by hand delivery to applicant or representative on _____ (date)

☒ by certified mail, return receipt requested on _MAY 22, 1998_ (date)

This project is located at _____ 3 Yacht Club Road, Truro _____

The property is recorded at the Registry of _____ Barnstable County _____

Book _____ 11175 _____ Page _____ 326 _____

Certificate (if registered) _____

The Notice of Intent for this project was filed on _April 22, 1998_ (date)

The public hearing was closed on _____ May 4, 1998 _____ (date)

**Findings**

The _Commission_ has reviewed the above-referenced Notice of Intent and plans and has held a public hearing on the project. Based on the information available to the _Commission_ at this time, the _Commission_ has determined that the area on which the proposed work is to be done is significant to the following interests in accordance with the Presumptions of Significance set forth in the regulations for each Area Subject to Protection Under the Act (check as appropriate):

☐ Public water supply    ☒ Flood Control    ☒ Land containing shellfish
☒ Private water supply    ☒ Storm damage prevention    ☒ Fisheries
☒ Ground water supply    ☒ Prevention of pollution    Protection of Wildlife Habitat

Total Filing Fee Submitted _____ $55.00 _____ State Share _____ $15.00 _____
(1/2 fee in excess of $25)

City/Town Share _____ $40.00 _____

Total Refund Due $ _____ City/Town Portion $ _____ State Portion $ _____
(1/2 total)      (1/2 total)

Effective 11/10/89      5-1

Therefore, the ___Commission___ hereby finds that the following conditions are necessary, in accordance with the Performance Standards set forth in the regulations, to protect those interests checked above. The ___Commission___ orders that all work shall be performed in accordance with said conditions and with the Notice of Intent referenced above. To the extent that the following conditions modify or differ from the plans, specifications or other proposals submitted with the Notice of Intent, the conditions shall control.

**General Conditions**

1.  Failure to comply with all conditions stated herein, and with all related statutes and other regulatory measures, shall be deemed cause to revoke or modify this Order.

2.  The Order does not grant any property rights or any exclusive privileges; it does not authorize any injury to private property or invasion of private rights.

3.  This Order does not relieve the permittee or any other person of the necessity of complying with all other applicable federal, state or local statutes, ordinances, by-laws or regulations.

4.  The work authorized hereunder shall be completed within three years from the date of this Order unless either of the following apply:
    (a) the work is a maintenance dredging project as provided for in the Act; or
    (b) the time for completion has been extended to a specified date more than three years, but less than five years, from the date of issuance and both that date and the special circumstances warranting the extended time period are set forth in this Order.

5.  This Order may be extended by the issuing authority for one or more periods of up to three years each upon application to the issuing authority at least 30 days prior to the expiration date of the Order.

6.  Any fill used in connection with this project shall be clean fill, containing no trash, refuse, rubbish or debris, including but not limited to lumber, bricks, plaster, wire, lath, paper, cardboard, pipe, tires, ashes, refrigerators, motor vehicles or parts of any of the foregoing.

7.  No work shall be undertaken until all administrative appeal periods from this Order have elapsed or, if such an appeal has been filed, until all proceedings before the Department have been completed.

8.  No work shall be undertaken until the Final Order has been recorded in the Registry of Deeds or the Land Court for the district in which the land is located, within the chain of title of the affected property. In the case of recorded land, the Final Order shall also be noted in the Registry's Grantor Index under the name of the owner of the land upon which the proposed work is to be done. In the case of registered land, the Final Order shall also be noted on the Land Court Certificate of Title of the owner of the land upon which the proposed work is to be done. The recording information shall be submitted to the ___Commission___ on the form at the end of this Order prior to commencement of the work.

9.  A sign shall be displayed at the site not less than two square feet or more than three square feet in size bearing the words, "Massachusetts Department of Environmental Protection, File Number___ 5E 75-434 ___"

10. Where the Department of Environmental Protection is requested to make a determination and to issue a Superseding Order, the Conservation Commission shall be a party to all agency proceedings and hearings before the Department.

BK11471 PG218     39539

11. Upon completion of the work described herein, the applicant shall forthwith request in writing that a Certificate of Compliance be issued stating that the work has been satisfactorily completed.

12. The work shall conform to the following plans and special conditions:

**Plans:**

| Title | Dated | Signed and stamped by: | on File with: |
|-------|-------|------------------------|----------------|
| 97062 | 4-6-98 | SITE PLAN/3 YACHT CLUB ROAD/PREPARED FOR | |
| | | BROOKE NEWMAN/FELCO, INC./DAVID B LAJOIE, R.S. | |
| | | | |
| | | | |

**Special Conditions (Use additional paper if necessary)**

12a. No work shall be done until condition 8 above is complied with.

12b. For any change made or intended in the plans or work, the applicant shall file a new Notice of Intent or inquire in writing to the Commission whether the change is significant enough to the interests of the Act to require a new Notice.

12c. The applicant shall give written notice to the Commission 48 HOURS IN ADVANCE that the work is to be begun and all work shall be under supervision of the Commission. Members of the Commission or its agent shall have the right to enter upon and inspect the site to ensure compliance with this Order. The applicant shall maintain on the site a copy of the Notice of Intent and this Order, for inspection by the Commission and the workers.

12d. The Commission finds the site of the proposed work on an existing dwelling is on land subject to coastal storm flowage and is within 200 feet of the bank of the Pamet river. The proposed relocation of the building would place it as far as possible from the river.

12e. No earth or other material shall be placed in the river or harbor,

(continued on 5-3B)          **(Leave Space Blank)**

................................................................

5-3A

**Plans:**

| Title | Dated | Signed and Stamped by: | On File with: |
|-------|-------|------------------------|---------------|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

**Special Conditions (Use additional paper if necessary)**

or in a position where it could be eroded by wind or water into the
river or harbor. Bare areas and areas disturbed by construction shall
be resurfaced or revegetated to hold the soil against erosion by
wind or water. Where possible, indigenous plants shall be used,
such as beach grass, native grasses, beach pea, beach plum, bearberry
seaside goldenrod, or rosa rugosa. If growth is insufficient to hold
the soil, replanting is required.

12f. When the work is completed, the applicant shall apply in writing
to the Commission for a Certificate of Compliance, to be recorded
as in section 8 above, and shall include a written statement that
the work was done according to the Notice of Intent and this Order,
or describing any deviation.  The Commission will inspect the site
before issuing a Certificate.

12g.  The Commission expects the relocation of the existing dwelling
further from the river bank will likely provide greater protection
to the following interests of the Act: flood control, and storm damage
prevention.

12h. The Commission accepts the above described work subject to the
above Conditions.

**(Leave Space Blank)**

..............................................................................

5-3B

BK11471 PG219 39539

Issued By _____ Town of Truro _____ Conservation Commission

Signature(s) _Albert Silva_ _Howard S. I____

_____ _Ruth Hollander_

_M. S. Nickerson_

_John Morales_

**This Order must be signed by a majority of the Conservation Commission.**

On this _18TH_ day of _MAY_ 19 _90_, before me

personally appeared _Howard S. Irwin_, to me known to be the

person described in and who executed the foregoing instrument and acknowledged

that he/she executed the same as his/her free act and deed.

_____ _October 28, 1999_

Notary Public          My commission expires

The applicant, the owner, any person agrrieved by this Order, any owner of land abutting the land upon which
the proposed work is to be done, or any ten residents of the city or town in which such land is located, are
hereby notified of their right to request the Department of Environmental Protection to issue a Superseding
Order providing the request is made by certified mail or hand delivery to the Department, with the
appropriate filing fee and Fee Transmittal Form as provided in 310 CMR 10.03(7), within ten days from the
date of issuance of this determination. A copy of the request shall at the same time be sent by certified
mail or hand delivery to the Conservation Commission and the applicant.

.................................................................................

Detach on dotted line and submit to the _Commission_ _____ prior to commencement of work.

.................................................................................

To _____ Truro Conservation Commission _____ Issuing Authority

Please be advised that the Order of Conditions for the project at _3 Yacht Club Rd., Newman_

File Number _SE 75- 434_ has been recorded at the Registry of _____ and

has been noted in the chain of title of the affected property in accordance with General Condition 8 on

_____, 19 _____.

If recorded land, the instrument number which identifies this transaction is _____

If registered land, the document number which identifies this transaction is _____

Signature _David Lajoie_ _____ Applicant

_agent for applicant Brooke Newman_

5-4A

Leslee Eng.
Box 1366
Orleans, Ma. 02653

**EXHIBIT C**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10370PBS

BARBARA CORDI-ALLEN and JOHN ALLEN )
                                  )
     Plaintiffs,                  )
                                    )
v.                                  )
                                  )
JOSEPH R. CONLON, ARTHUR F. HULTIN, )
NORMAN H. POPE, KEITH S. ALTHAUS, and )
MARINNA MATRICARDI as they are members )
and are collectively the TRURO ZONING   )
BOARD OF APPEALS, BROOKE NEWMAN, )
and the TOWN OF TRURO, MASSACHUSETTS )
                                  )
     Defendants.                  )

DEFENDANT BROOKE NEWMAN'S
ANSWERS TO PLAINTIFFS' FIRST
SET OF INTERROGATORIES

Defendant Brooke Newman submits the following answers and objections to plaintiffs' first set of interrogatories.

## General Objections

Ms. Newman objects to plaintiffs' interrogatories to the extent that they seek information protected by the attorney-client privilege, the work product doctrine, the joint defense privilege or any other applicable privilege or protection, or seek to extend Ms. Newman's discovery obligations beyond what is required by the Federal Rules of Civil Procedure.

## Objections to Definitions and Instructions

1.    Ms. Newman objects to the definition of "Defendant Brooke Newman" insofar as it includes "employees, officers, agents, and all persons and/or business entities acting and/or purporting to act for or on [her] behalf," and shall construe the term "Defendant" as it pertains to Ms. Newman to mean Brooke Newman.

2.    Ms. Newman objects to the definition of "Building Permit," and shall construe the term to mean the building permit issued in or about October 1998 for the property at 3 Yacht Club Road, Truro.

### Definition

As used herein, the term "non-privileged" shall mean: (1) not protected by the attorney-client privilege; (2) not subject to immunity from disclosure under the work product doctrine or Fed.R.Civ.P. Rule 26(b)(3) or as joint defense material; (3) not protected from discovery in the manner sought under Fed.R.Civ.P. Rule 26(b)(4); (4) not protected from discovery as a confidential settlement communication; and (5) not protected from discovery by any other privilege or immunity.

### Specific Answers and Objections

### INTERROGATORY NO. 1

Identify all persons with any knowledge of the facts, claims and/or allegations contained in the Complaint and for each such person, describe the knowledge and/or discoverable information he, she, or it has.

### ANSWER NO. 1

Ms. Newman objects to this interrogatory on grounds that it is overbroad and unduly burdensome insofar as it is not confined to the sole count in the Complaint expressly concerning Ms. Newman and to which plaintiffs have expressly agreed is the only count in the Complaint concerning Ms. Newman, seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence, and calls for information containing or reflecting communications subject to the attorney-client privilege and/or work product immunity. Subject to this objection and without waiver thereof, Ms. Newman states that this information was provided in the Rule 26 disclosure, and is provided again as follows:

**Rule 26(a)(1)(A)** - Individuals likely to have discoverable information that Ms. Newman may use to support her defenses.

- Brooke Newman, 273 Roaring Fork Drive, Aspen CO; 4 Yacht Club Road, Truro, MA: information and knowledge concerning the building permit issued to Ms. Newman in or about October 1998 for the property at 4 Yacht Club Road, Truro ("the Building Permit");

- Building Inspector, Town of Truro: information and knowledge concerning the building permit issued to Ms. Newman in or about October 1998 and the denial of plaintiffs' request to revoke the Building Permit enforce the Town of Truro's Zoning Bylaw ("the Bylaw") against Ms. Newman;

- Defendant members of the Zoning Board of Appeals of the Town of Truro ("the Board"): information and knowledge concerning the appeal of Building Inspector's denial of plaintiffs' request to revoke the Building Permit and enforce the Bylaw against Ms. Newman;

- Plaintiffs Barbara Cordi-Allen and John Allen, 143 Ardsley Road, Longmeadow, MA; 5 Yacht Club Road, Truro MA: information and knowledge concerning the request to the Building Inspector to revoke the Building Permit and enforce the Bylaw against Ms. Newman, and the subsequent appeal to the Board of the Building Inspector's denial.

Ms. Newman reserves the right to supplement this list.

## INTERROGATORY NO. 2

Please list and identify completely each person that you expect to call as an expert witness at trial, stating as to each such expert witness:

(a) full name, address, occupation, business address and relationship to the plaintiff or defendant, if any;

(b) educational background;

(c) experience in the subject matter at issue in this lawsuit;

(d) the subject matter or area on which each person expects to testify;

(e) the substance of the facts and opinions to which each such person is to testify;

(f) a summary of the grounds for each opinion; and

(g) a list of books, treatises, articles and other works relief upon or considered by each such person regarding the subject matter on which the expert witness is expected to testify.

ANSWER NO. 2

Ms. Newman objects to this interrogatory on grounds that it as premature at this stage of the litigation as she has not completed preparations for trial, and to the extent it seeks discovery of what would necessarily be expert opinion in a manner inconsistent with F.R.C.P. 26. Subject to this objection and without waiver thereof, Ms. Newman will identify her expert witness(es) and provide disclosures thereof in accordance with F.R.C.P. 26 and applicable pre-trial order entered by the Court. Ms. Newman reserves the right to supplement this answer.

INTERROGATORY NO. 3

If you claim that Defendant has made any admissions with respect to the subject matter of this case:

(a) Identify all witnesses to the admissions;

(b) Set forth the date, place and manner in which the admissions were made;

(c) Set forth copies of each written admission and the details each oral admission.

ANSWER NO. 3

Ms. Newman is not claiming that Defendant has made any admissions with respect to the subject matter of this case.

INTERROGATORY NO. 4

Please identify each individual employed by the Town of Truro or on Truro

-4-

Conservation Commission with whom you have had communications regarding the DEP Action.

## ANSWER NO. 4

Ms. Newman objects to this interrogatory on grounds that it seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence, seeks information subject to the joint defense privilege, and seeks confidential settlement communications. Subject to this objection and without waiver thereof, Ms. Newman states that to the best of her knowledge she is not aware of any such communications, and further states that the Rule 26 Disclosure identifies those persons who may have discoverable information that Ms. Newman may use in defense of this matter. See Answer No. 1, above.

## INTERROGATORY NO. 5

For each and every communication identified in Interrogatory No. 4, please state:

(a) the date, time and place of each communication;

(b) the identity of any and all partners, associates, employees, agents or representatives of the Defendants involved in the communication; and

(c) the contents of each communication, including what the Defendants said to you and what you said to the Defendants.

## ANSWER NO. 5

See Answer No. 4, above.

## INTERROGATORY NO. 6

Please identify each individual employed by the Town of Truro or on the Truro Conservation Commission or the Truro Zoning Board of Appeals with whom you have had communications regarding this case.

ANSWER NO. 6

Ms. Newman objects to this interrogatory on grounds that it seeks information subject to the joint defense privilege, and confidential settlement communications. Subject to this objection and without waiver thereof, Ms. Newman states that to the best of her knowledge and recollection she is not aware of any such communications, and further states that the Rule 26 Disclosure identifies those persons who may have discoverable information that Ms. Newman may use in defense of this matter. See Answer No. 1, above.

INTERROGATORY NO. 7

For each and every communication identified in Interrogatory No. 6, please state:

(a) the date, time and place of each communication;

(b) the identity of any and all partners, associates, employees, agents or representatives of the Defendants involved in the communication; and

(c) the contents of each communication, including what the Defendants said to you and what you said to the Defendants.

ANSWER NO. 7

See Answer No. 6, above.

INTERROGATORY NO. 8

Please identify each individual employed by the Town of Truro or on any Board, Commission or other body of the Town of Truro with whom you have had communications regarding the Plaintiffs [sic]

ANSWER NO. 8

Ms. Newman objects to this interrogatory on grounds that it is overbroad and unduly burdensome in that it is unlimited as to time, and seeks information that is not likely to lead to the discovery of admissible evidence, subject to the joint defense privilege, and confidential settlement communications. Subject to this objection, and without waiver thereof, Ms.

Newman states that to the best of her knowledge and recollection, she had the following communications: (1) in or about July 2005, she called and spoke to an employee of the Truro Police Department to discuss a Notice of Trespass that was served by the police on her at plaintiffs' request; (2) in or about July 2005 Ms. Newman had a conversation with the Conservation Commission concerning plaintiffs' complaint about the waterline replacement and well repair on her Property during which she was informed by the Conservation Commission that the complaint was outside the Commission's jurisdiction; and (3) in or about July 2005 the Town's Harbormaster told Ms. Newman that he had received complaints from plaintiffs concerning Ms. Newman's mooring.

INTERROGATORY NO. 9

For each and every communication identified in Interrogatory No. 8, please state:

(a) the date, time and place of each communication;

(b) the identity of any and all partners, associates, employees, agents or representatives of the Defendants involved in the communication; and

(c) the contents of each communication, including what the Defendants said to you and what you said to the Defendants.

ANSWER NO. 9

See Answer No. 9, above.

INTERROGATORY NO. 10

Please identify the date of the following with relationship to the Building Permit:

(a)     the date construction was commenced on the activities authorized by the Building Permit;

(b)     the date construction was completed on the activities authorized by the Building Permit; and

(c)     the date a certificate of occupancy was issued for the activities authorized by the Building Permit.

## ANSWER NO. 10

Ms. Newman objects to this request on grounds that it seeks information that is not relevant or likely to lead to the discovery of admissible evidence, is unduly burdensome insofar as it seeks information that is a matter of public record, and is vague and ambiguous insofar as it seeks identification of the "date a certificate of occupancy was issued for the activities authorized." Subject to this objection, and without waiver thereof, and answering as though subsection (c) the request seeks the date of certificate of occupancy for the premises rather than "the activities," Ms. Newman states that she does not recall the exact dates that construction was commenced and/or completed on the activities authorized by the Building Permit except that the activities were commenced sometime after the issuance of the Building Permit and within the time permitted under the Building Permit, and further states that she cannot recall the date that a certificate of occupancy was issued for the premises, and further states that documents located in the files of the Building Inspector and/or Zoning Board, as identified in her previous Rule 26 disclosure, may contain this information.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 17 DAY OF NOVEMBER, 2005.

Brooke Newman

Signed as to objections:

Julie Pruitt Barry (BBO #563018)
Nutter, McClennen & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
617-439-2000

1477968.1

-8-

**EXHIBIT D**

*certified mail / receipt*

September 20, 1998


Mr. and Mrs. John E. Allen
146 Pleasantview Ave.
Longmeadow, MA 01106


Mr. Steve Williams
Building Inspector
Truro Town Hall
Truro, MA 02666


Dear Steve:

We understand that Brooke Newman has applied for building permits. Having attended the recent Board of Health meeting in August, the Board sited a ruling from you stating that any lifting, adding to, enlarging that house would be considered new construction and that in your 1983 ruling, you state that any new construction in the flood zone must have it's well on it's property and pass as potable water. If that is the case, then we are concerned as to how, without meeting this requirement, one could ask for a building permit. The board of health said that you gave them this ruling and therefore, we believe you know about this. We would like to know if this ruling has been overlooked for the Newman property and if that is the case, we want to make sure that it is not brought up with our intent to build in the near future. We also would like it in writing a reply, in writing, to this letter. As you know, we are out for consistency in decisions. We don't want to be treated any differently as others. We also bought our property, as it was marketed, to build on it. In closure, we would like to know, if you have lifted the ruling you wrote in 1983 that any new construction in the flood zone would require a well on the property that passes the water usage requirements.


We request that NO building permits be issued for the Newman property located at 3 Yacht Club Road. This would be a contradiction to the ruling the board of health read.


Thank you for addressing this letter.


Sincerely,

Mr. and Mrs. John E. Allen


Cc:  Attorney William Thomas

**EXHIBIT E**

## LAW OFFICES OF PAUL REVERE, III
### 226 River View Lane
#### Centerville, Massachusetts  02632
#### (508) 778-7126

July 26, 2004

Building Commissioner
Town of Truro
P.O. Box 2030
Truro, Massachusetts  02666

**Certified Mail**
**Return Receipt Requested**

RE:    Request For Enforcement -- Brooke Newman
3 Yacht Club Road

Dear Mr. Commissioner:

This letter is written on behalf of Barbara and John Allen who own property located at 5 Yacht Club Road.  In October, 1998, your office issued a building permit to Brooke Newman for an immediately adjacent property located at 3 Yacht Club Road.  A copy of the application for the building permit and a plan of the land is attached as Exhibit One.  I have been engaged by the Allens to review various matters relating  to their property at 5 Yacht Club Road and have written this letter to request that you revoke the building permit issued in October, 1998, for the reason that Ms. Newman has never obtained a special permit or variance from the Truro Zoning Board of Appeals for the additions allowed under the building permit.  This request is made pursuant to M.G.L. ch. 40A, Sec. 7 and Section X-3 of the Truro Zoning Bylaw, both of which require a response within 14 days.

In particular, the lot upon which Brooke Newman's house is located is approximately 23,500 square feet.  Currently and at the time of the building permit application, the Truro Zoning Bylaw requires a minimum lot size of 33,750 square feet.  Section VII.B.1 provides:

Lawful preexisting, non-conforming structures and uses may, when a variance would otherwise be required, be altered, **or extended** with a special permit if the Board of Appeals finds that the alteration or extension will not be substantially more detrimental to the neighborhood than the existing nonconforming structure or use and that the alteration or extension will exist in harmony with the general purpose and intent of the bylaw.

Here, Ms. Newman has moved the location and increased the foot print of and added

1

a second story to her building on a non-conforming lot. These changes to the building trigger the need to obtain a special permit under Truro's Zoning Bylaw.[1] However, Ms. Newman did not obtain a special permit prior to obtaining the building permit. Therefore, I hereby request that you revoke the building permit for this structure.

To assist you in rendering your decision, I have attached copies of various correspondence from Zisson and Veara relative to lots in this area and the special permit issued by the Zoning Board of Appeals for the property immediately adjacent to the north as Exhibit Two.

As I see, you simply have no choice, but to revoke the building permit if the Town of Truro intends to apply its Zoning Bylaws equally to all property owners and have the Allens apply for a special permit or variance when they build on their property. However, if you conclude that a special permit is not required for Ms. Newman, then the Allens should also need not obtain a permit if they substantially increase the square footage of their house and its footprint.

Please contact me at (508)778-7126 if you have any questions.

Very truly yours,

/s/

Paul Revere, III

cc:    Barbara Cordi-Allen

---

[1] Section VIII-B.2 only allows the Building Commissioner to act when the applicant proposes "repair, reconstruction, alteration, or structural changes." Here, Ms. Newman proposed an "extension of the structure and use by the addition of the second story and the increase to the footprint.

2

**EXHIBIT F**

# TOWN OF TRURO



# ZONING BYLAW
# SUBDIVISION REGULATIONS
# SIGN CODE

Published by the Truro Planning Board

with amendments to:

Zoning Bylaw through Annual Town Meeting April 2005

Subdivision Regulations through May 2002

Sign Code through Annual Town Meeting April 1992

**Price: $7.00**

*[The (month/year) are for reference purposes only]*

Cynthia A. Slade, Town Clerk, Town of Truro/ May 24, 2006

A true copy, attest:

# TABLE OF CONTENTS

## ZONING BYLAW

### SECTION 10
#### General Provisions

§ 10.1.   Authority ................................................................................................ 1
§ 10.2.   Purpose ................................................................................................ 1
§ 10.3.   Applicability ........................................................................................ 1
§ 10.4.   Definitions .......................................................................................... 1

### SECTION 20
#### Establishment of Districts

§ 20.1.   Districts enumerated ........................................................................... 8
§ 20.2.   Purposes of Districts ........................................................................... 8
§ 20.3    Location of districts ............................................................................ 9
§ 20.4    Boundaries of Districts ....................................................................... 9
§ 20.5    Lots in Two Districts .......................................................................... 9

### SECTION 30
#### Use Regulations

§ 30.1    General Requirements .......................................................................... 10
§ 30.2    Use Table ............................................................................................ 10
§ 30.3    Seashore District ................................................................................. 14
§ 30.4    Water Resources Protection District .................................................... 15
§ 30.5    Flood Plain District ............................................................................. 16
§ 30.6    Affordable Rental Housing Overlay District ........................................ 17
§ 30.7    Nonconforming uses ............................................................................ 18
§ 30.8    Special Permits .................................................................................... 18
§ 30.9    Parking ................................................................................................ 19
§ 30.10   Signs .................................................................................................... 19

### SECTION 40
#### Special Regulations

§ 40.1    Duplex Houses and Apartments ........................................................... 20
§ 40.2    Affordable Housing Apartments .......................................................... 20
§ 40.3    Conversion of Cottage or Cabin Colony, Motor Court, Motel or Hotel ............ 21
§ 40.4    Wind Generators .................................................................................. 22
§ 40.5    Communication Structures ................................................................... 30

### SECTION 50
#### Area and Height Regulations

§ 50.1    Regulations ......................................................................................... 37

### SECTION 60
#### Administration

§ 60.1    Enforcement ........................................................................................ 39
§ 60.2    Board of Appeals ................................................................................. 39
§ 60.3    Amendment .......................................................................................... 39
§ 60.4    Notice Requirement ............................................................................. 39
§ 60.5    Recording Variances and Special Permits ............................................ 39
§ 60.6    Appeals and Judicial Review ................................................................ 40

## SECTION 70
### Site Plan Review

§ 70.1     Purpose .................................................................................................... 41
§ 70.2     Developments which require Site Plan Review ..................................... 41
§ 70.3     Site Alteration – Violation of the Bylaw .............................................. 42
§ 70.4     Procedures .............................................................................................. 42
§ 70.5     Information Required .............................................................................. 42
§ 70.6     Review Criteria/Design Guidelines ....................................................... 45
§ 70.7     Findings of the Planning Board .............................................................. 46
§ 70.8     Special Permits ....................................................................................... 47
§ 70.9     Revision to Approved Site Plans ............................................................ 47
§ 70.10    Performance Guarantee .......................................................................... 47
§ 70.11    Assignment ............................................................................................. 47
§ 70.12    Appeals ................................................................................................... 48
§ 70.13    Waivers ................................................................................................... 48

## SECTION 80
### Open Space Development

§ 80.1     Open Space Development ........................................................................ 49

## SECTION 90
### Bounds of Zoning Districts

§ 90.1     General Business Districts ...................................................................... 52
§ 90.2     Limited Business Districts ...................................................................... 52
§ 90.3     Seashore District .................................................................................... 53
§ 90.4     Residential District ................................................................................. 55
§ 90.5     Overlay Districts ..................................................................................... 55

### APPENDIX A

Zoning Map .................................................................................................... 56
Water Resource Protection Districts ............................................................... 57

## SUBDIVISION REGULATIONS

| Section | Title | Page |
|---|---|---|
| I | Authority ............................................................................................. | 58 |
| II | General ................................................................................................ | 58 |
| III | Procedure for the Submission and Approval of Plans ......................... | 59 |
| IV | Design Standards ................................................................................ | 61 |
| V | Administration ..................................................................................... | 66 |

## SIGN CODE

| Section | Title | Page |
|---|---|---|
|  | Purpose ................................................................................................ | 68 |
| 1. | Definitions ........................................................................................... | 68 |
| 2. | Regulations for General and Limited Business Zones ......................... | 68 |
| 3. | Regulations for Residential Zones ...................................................... | 70 |
| 4. | Roadside Signs .................................................................................... | 70 |
| 5. | Prohibited Signs .................................................................................. | 71 |
| 7. | Maintenance of Signs .......................................................................... | 71 |
| 8. | Permits ................................................................................................. | 72 |
| 9. | Appeal .................................................................................................. | 72 |
| 10. | Exceptions ........................................................................................... | 72 |
| 11. | Temporary Signs, etc. .......................................................................... | 72 |
| 12. | Enforcement ........................................................................................ | 72 |
| 14. | Validity ................................................................................................ | 73 |
| 15. | Repeal of Conflicting By-Laws ........................................................... | 73 |

# SECTION 10
## General provisions

### § 10.1.  Authority
This zoning bylaw is adopted in accordance with the provision of Chapter 40A of the Massachusetts General Laws and Article 89 of the Amendments to the Constitution.

### § 10.2.  Purpose
The purpose of this bylaw is to promote the health, safety, convenience and welfare of the inhabitants of Truro, prevent the overcrowding of land, conserve the value of land and buildings, enable the protection of clean and adequate water supply, conserve natural resources, prevent blight of the environment, encourage the most appropriate use of land in Truro, and to promote the implementation of the goals and policies of the Truro Local Comprehensive Plan.

### § 10.3.  Uniformity and Validity

A.  Uniformity. This bylaw shall not interfere or annul any bylaw, rule, regulation or permit, provided that unless specifically excepted or where a conflict exists within the bylaw itself, where this bylaw is more stringent, it shall control.

B.  Validity. The invalidity of any section or provision of this bylaw shall not invalidate any other section or provision thereof.

### § 10.4.  Definitions
For the purpose of the bylaw, certain terms and words shall have the following meaning unless a contrary meaning is required by the context or is specifically prescribed. Terms and words not defined herein but defined in the Zoning Act, Massachusetts General Laws, Chapter 40A, as amended, shall have the meaning given therein unless a contrary intention clearly appears. Words not defined in either place shall have the meaning given in Webster's Third New International Dictionary of the English Language, Unabridged.

Abandonment. The visible or otherwise apparent intention of an owner to discontinue a nonconforming use of a building or premises; or the removal of the characteristic equipment or furnishing used in the performance of the nonconforming use, without its replacement by similar equipment or furnishing; or the replacement of the nonconforming use or building by a conforming use or building.

Affordable Households. Households earning no more than 80% of the current median income, as determined by the State Department of Housing and Community Development (DHCD).

Affordable Housing. Housing certified as affordable by the Truro Housing Authority and registered as

such with the Truro Housing Authority. The Housing Authority will provide applicants with current affordable housing standards, require assurances of compliance in writing, and provide copies to the Building Commissioner prior to the issuance of a building permit.

Alteration. Any construction, reconstruction or related action resulting in a change in the structural parts, height, number of stories, exits, size, use or location of a building or other structure or any other related change.

Animal Husbandry.  The raising of livestock, fur bearing animals, or fowl.

Applicant. Individuals, partnerships, corporations, trusts and other legal entities seeking building permits. For the purposes of this bylaw, the owner/equitable owner of the property is to be considered the applicant, not the builder, unless the builder is also the owner.

Attic. An area under a gable, hip, or gambrel roof, the rafter plates of which on at least two exterior walls are not more than three (3) feet above the floor of such area; except that any attic used for residence purposes, other than for a janitor or caretaker or his family or by a family occupying the floor immediately below it, shall be deemed a full story.

Barn. An accessory building used exclusively for the storage of grain, hay, and other farm products, and/or the sheltering of livestock or farm equipment.

Base Flood Elevation. The 100 year flood elevation designated on the Truro Flood Insurance Rate Maps (FIRM).

Basement. An area which may have its full height above ground level on not more than one side, and which may have not more than one-half of its height above mean ground level on any other side. A basement shall not be counted as a story.

Bathroom Facility. A space which contains a wash basin and toilet, and which may also include a bathtub, a shower, or both.

Beach. Also known as "coastal beach" means unconsolidated sediment, subject to wave, tidal, and coastal storm action, that forms the variably sloping shore of a body of salt water. Coastal beaches extend from the mean low water line landward to the dune line, or coastal bank line, whichever is closest to the ocean, or to the seaward edge of existing man-made structures, when these structures replace one of the above lines.

Bed and Breakfast, Establishment. A private, owner-occupied house where four or more rooms are let or rented to the transient public and a breakfast is included in the occupancy charge. The only meal provided is breakfast, there shall be no cooking in rooms, and rooms for rent shall be part of the primary residential structure. The land involved shall meet the current minimum lot area requirements. Parking shall conform to § 30.9(B), Parking. This use is permitted only in General and Limited Business Districts.

Bed and Breakfast, Home. A private owner-occupied home where three or fewer rooms are let or rented to the transient public, and a breakfast is included in the occupancy charge. The only meal provided is breakfast which may be served between the hours of 5 AM and 11:30 AM, there shall be no cooking in occupied rooms, and the occupied rooms shall be part of the primary residential structure. The land involved shall meet the current minimum lot area requirements. Parking shall conform to § 30.9(B), Parking.

Boarding House, Home. A private owner-occupied home where three (3) or fewer rooms are let or rented to live-in boarders for stays of four months or more, and board is provided. There shall be no cooking in rented rooms, and rooms for rent shall be part of the primary residential structure. The land involved shall meet the current minimum lot area requirements. Parking shall conform to § 30.9, Parking.

Bog, Marsh, Swamp, Wet Meadows. As defined in the Wetlands Protection Act, Massachusetts General Laws, Chapter 131, Section 40, as amended through the Statutes of 1996, Chapter 258, Sections 17 through 20.

Build. The word build shall include the words "erect," "construct," "alter," "enlarge," "move," and any others of like significance.

Building. The word building shall be any three-dimensional enclosure, portable or fixed, temporary or permanent, which is composed of building materials and which encloses any space for use or occupancy; building shall include "structure" unless the context unequivocally indicates otherwise; and with the

exception of fences, field or garden walls, cold frames, stairways for beach access, and embankment retaining walls, building shall include foundations in the ground and any part of any kind of structure above ground.

Building, Accessory. A building devoted exclusively to a use(s) ancillary to and in support of the principal use of the lot on which it is located.

Building Height. The vertical distance from mean ground level to the highest point of the coping of flat roof, or to the deck line of a mansard roof, or, subject to the limitation imposed elsewhere in this bylaw, to the mean height level between eaves and ridge for gable, hip, and gambrel roofs.

Casino-style Gambling. Gaming activities, including Indian casinos, riverboats, barges, "cruises to nowhere" and those other activities specifically authorized by the Great and General Court. This definition shall not include the promotion or playing of the game commonly called Bingo or like games, or the like promotion of "Las Vegas" nights, as authorized by law, or the sale of lottery tickets or shares by the State Lottery Commission, as authorized by law.

Cellar. An area having more than one-half of its height below ground level on all sides. A cellar shall not be counted as a story.

Clear area.  Area surrounding a wind turbine to be kept free of habitable structures.          *(4/05)*

Communications Appurtenance. Any antenna, device, wiring or equipment utilized in connection with the reception or transmission of electromagnetic radiation (excluding the visible light spectrum) and which is attached to a pre-existing structure. A communication appurtenance shall not include an antenna utilized by a federally licensed amateur radio operator or a home television antenna or satellite dish.

Communications Building. Any building utilized primarily for the installation and operation of equipment for the generating and/or detection of electromagnetic radiation (excluding the visible light spectrum) and which is accessory to a communications structure.

Communications Structure. Any structure, tower or antenna that supports equipment (including antennas) for the transmission or reception of electromagnetic radiation (excluding the visible light spectrum). A communications structure shall not include an antenna utilized by a federally licensed amateur radio operator or a home television antenna or satellite dish.

Cooperative. Any real property owned by a corporation, association, society or company where, by virtue of membership in such association, society or company or, by virtue of the ownership of stock in such corporation, an organization becomes entitled to a lease or occupancy agreement for a specified unit or apartment owned by such corporation, association, society, or company.

Cottage or Cabin Colonies, or Motor Courts. A group of three or more detached dwellings under one ownership located on a single lot, which are customarily rented to the transient public by the day, week, month, or season. Each dwelling shall be limited to one and one-half stories in height.

Distributed Generation. Energy generation that is located at or near the end-user.          *(4/05)*

Dune. Also known as coastal dune means any natural hill, mound or ridge of sand immediately landward of a coastal beach including such features when deposited by wind action or storm overwash. Coastal dune shall also mean sediment deposited by artificial means and serving the purpose of storm damage protection or flood control.

Dwelling, Single family. A separate dwelling unit consisting of one or more buildings designed for occupancy by one family only.

Dwelling, Two Family, Duplex. A detached building containing two dwelling units whether side by side, over each other or in any other combination.

Dwelling Unit. One or more rooms containing both cooking and bathroom facilities and designed for human habitation by one family independent of other facilities. Each accessory building or portion thereof, studio or guesthouse, which has both cooking and bathroom facilities, is considered to be a separate dwelling unit.

Educational Institution. A public, parochial, or private institution that provides educational instruction to students.

Established Roads. Street(s), with reference to the Town of Truro Subdivision Regulations.

Family. A single, non-profit housekeeping unit whether consisting of an individual, two or more persons related by blood, adoption or marriage, or maintaining a domestic partnership, or a group of persons who need not be so related and do not exceed five in number.

Fence. A barrier, solid or otherwise, which is used as a means of delineation, protection, confinement, or concealment.

Garage. A structure used primarily for storage of motor vehicles.

Grade, existing. The vertical elevation of the ground surface that exists prior to any excavating or filling as defined by the most recent USGS topographical maps, except in the case where, by Planning Board approval, excavating or filling has occurred in the construction of a road. In these cases, finished grades, according to the approved plan, shall be used.

Grade, finished. The vertical elevation of the ground surface as denoted on an approved Planning Board 'as-built' plan.

Ground Level. The finished level of the ground to be built upon.

Habitable Studio. A habitable studio shall consist of one or more bedrooms, with or without bathroom facilities, in a building detached from the principal residence, which is incidental and accessory to the principal residence and which does not include residential kitchen facilities. A room identified as a bedroom will be included in considerations under the State Environmental Code, Title 5..

Height, Wind Turbine. The height of a turbine measured to the tip of the blade at its highest point. *(4/05)*

Home Occupation. Any business which has been by custom carried on by a resident of a dwelling unit with a limited number of nonresident employees, and which does not change the residential character of the building. Home occupations shall include carpenters, plumbers, electricians, and similar tradesmen; home and yard maintenance providers; sale of art produced on premises; the sale of fish or shellfish; electronic repairs and services, telecommuting, and internet-based services; nursery school; furniture repair, refinishing, and upholstering; dressmaking; home hand crafts; home cooking; bicycle repairs; real estate; insurance; the practice of any recognized profession. Any other activity of a similar nature may be allowed on application for a Special Permit from the Zoning Board of Appeals in accordance with Section 30.2 of this Bylaw. Home occupation shall not include the operation of a store or food service serving the passing public, or the display or sale to the passing public of goods not grown or manufactured on the premises, or in the case of fish or shellfish, not caught by the resident.

Hotel. A building consisting of a room, rooms, or units customarily rented to the transient public by the day, week, or month which room or rooms contain their own bathroom facilities. Such room or rooms may also provide kitchen area for the storage, preparation and cooking of food provided that the room, rooms, or unit's gross floor area exceeds four hundred (400) square feet. Those units having kitchens prior to this date shall not be prohibited from conversion under § 40.3.

<u>Lot</u>. A parcel of land, undivided by a street, with definite boundaries, title to which is held in undivided ownership.

<u>Lot Area</u>. The area of a lot when used for building purposes shall not be less than the minimum required by this bylaw for the district in which it is located. Such an area shall not be interpreted to include any portion of a lot below mean water level on fresh water, below mean high water on tidal water or within the limits of any defined way, exclusive of driveways serving only the lot itself. No less than 100% of the minimum lot area required shall consist of contiguous upland exclusive of marsh, bog, swamp, beach, dune or wet meadow. This definition shall apply only to lots created after April 30, 1987.

<u>Lot Coverage</u>. The portion of a lot which is covered by impervious structures and improvements. Impervious structures and improvements shall include but not be limited to paved driveways and parking areas, principal and accessory structures, swimming pools and other on-site amenities which render any portion of the lot impervious.

<u>Lot Frontage</u>. That portion of a lot fronting upon and having access to a street. Lot frontage shall be measured continuously along the front lot line along one street between side lot lines or, in the case of corner lots, between one side lot line and the mid-point of the corner radius.                    *(4/05)*

<u>Lot Line, Front</u>. A line dividing a lot from a street or road right-of-way. On any lot bounded on more than one side by a street, the street boundary that is to be the lot front shall be so designated in any application for a permit to build on such lot.

<u>Lot, Nonconforming</u>. A lot lawfully existing at the effective date of this bylaw or any subsequent amendments thereto, which is not in accordance with all provisions of this bylaw.

<u>Lowest Floor</u>. The lowest floor of the lowest enclosed area (including basement). An unfinished or flood resistant enclosure, usable solely for parking of vehicles, building access or storage, in an area other than a basement area, is not considered a building's lowest floor, provided that such enclosure is not built so as to render the structure in violation of the applicable non-elevation design of this bylaw.

<u>Manufactured Home</u>. A structure, transportable in one or more sections, which is built on a permanent chassis and is designed for use with or without a permanent foundation when connected to the required utilities. For flood plain management purposes the term manufactured home also includes park trailers, travel trailers, and other similar vehicles placed on a site for greater than 180 consecutive days. For insurance purposes the term manufactured home does not include park trailers, travel trailers, and other similar vehicles.

<u>Manufactured Home Park or Subdivision</u>. A parcel of land (or contiguous parcels) divided into two or more manufactured home sites for rent or sale.

<u>Mean Ground Level</u>. Where the finished ground level varies in elevation on different sides of a building, the average of the various elevations at the centers of the four main sides. In the case where fill has been used to raise the finished ground level on a side(s) of the building to an elevation higher than the preconstruction ground level, on those sides the measurement shall be taken from center of that side ten (10) feet out from the side of the building. Further, the finished grade of the fill, within one hundred (100) feet of the building shall not have a grade steeper than ten per cent (10%) (one foot of drop for every ten foot run).

<u>Motel</u>. One or more buildings consisting of furnished habitable units customarily licensed for occupancy by and rented to the transient public on a daily, weekly, monthly, or seasonal basis, containing two or more units under one roof, each unit having its own bathroom facilities and outside entrance.

Motel units shall consist of not more than one room exclusive of bathroom facilities and may also provide kitchen facilities for the storage, preparation and cooking of food provided that the unit's gross floor area

exceeds four hundred (400) square feet. Two units may have a single connecting door that may be locked from either side.

Nacelle. The framing and housing at the top of the tower that encloses the gearbox and generation and protects them from the weather.                                                                                    *(4/05)*

Professional Offices. A building or rooms used as the place of business for any of the following professions: Accountants, Architects, Appraisers, Computer related services, Consultants, Contractors, Doctors, Dentists, Engineers, Insurance Agents, Lawyers, Real Estate Brokers, Surveyors and Travel Agents, and any other professions of a similar nature which may be approved by the Zoning Board of Appeals.

Public Accommodations. Cottage or cabin colonies, motor courts, motels, or hotels.

Religious Institution. A church or place of worship or religious assembly with related facilities.

Residential Kitchen Facility. Any room or part of a room used or intended to be used for food storage and preparation, but not including a bar, a pantry, or similar room adjacent to or connected with a kitchen. This definition shall not apply to commercial establishments that provide lodging to the transient public.

Retaining and Sustaining Walls. Retaining walls shall be distinguished from sustaining walls by the fact that they retain cuts made into the natural grade of earth while sustaining walls are to be considered as "structures" used to create artificially elevated grades above natural grade. Sustaining walls erected for the specific purpose of raising maximum-permissible heights for any building are expressly prohibited.

Rooming House/Home: A private owner-occupied home where three (3) or fewer rooms are rented to live-in residents for stays of four months or more, and no board is provided. There shall be no cooking in rented rooms, and rooms for rent shall be part of the primary residential structure. The land involved shall meet the current minimum lot area requirements. Parking shall conform to § 30.9, Parking.

Rotor. The blades and hubs of the wind turbine that rotate during turbine operation.                            *(4/05)*

Saltbox Roof. The minimal gabled-roof in which one side shall not be less than one-quarter (1/4) the length, nor less in pitch, of the major rake of the principal roof.

Shed. An accessory building or structure, no greater than nine feet in height, used primarily for agricultural, horticultural or storage purposes.

Street. A public or private way which affords access to abutting property. For the purposes of this bylaw, the terms "street", "road", "way", and "road right-of-way" bear the same meaning. When a street(s) is to be used for lot frontage, the street(s) shall conform to the requirements of the Town of Truro Subdivision Regulations, Section IV, Design Standards, (b), (c), & (d) as they existed on January 1, 1989. Street(s) shall have a center line length in excess of 100 feet. For dead-end street(s), this distance shall be measured from the sideline of the layout of the road to be intersected to the opposite end of the layout of the turnaround cul-de-sac. Town of Truro paved street(s) that: (1) have a minimum layout width of 20 feet, (2) were created prior to January 1, 1989 and (3) were accepted by Truro Town Meeting, are exempt from the width requirements of the Town of Truro Subdivision Regulations, Section IV, Design Standards. These accepted public paved ways shall be deemed adequate as lot frontage for the issuance of building permits. The list of accepted Truro public paved ways is available from the Town of Truro Town Clerk upon request.

Story. That portion of a building other than a basement, cellar, or attic included between the surface of any floor and the surface of the floor next above it, or, if there be no floor above it, then the space between the floor and the ceiling next above it.

<u>Trailer Home or Mobile Home</u>. A dwelling unit which at any time was a portable or mobile vehicle, or was designed to be portable and used for living purposes, whether standing on wheels or at a later date transferred to rigid supports.

<u>Transient Public</u>. Individuals who rent furnished public accommodations by the day, week, month, or season and whose principal residence remains elsewhere.

<u>Truro Resident</u>. A person who has lived in or worked in Truro for six (6) months prior to submitting an application for consideration under the Affordable Rental Housing Bylaw, or who has immediate family (specifically, mother, father, brother, sister, daughter, son, spouse or domestic partner) resident in the Town of Truro. This definition is for the sole purpose of establishing residency for unit distribution under the Affordable Rental Housing Bylaw.

<u>Use</u>. The purpose for which a structure or lot is arranged, designed or intended, or for which it may be used, occupied or maintained.

<u>Use, Accessory</u>. A use incidental and ancillary to the principal use of a structure or lot.

<u>Use, Nonconforming</u>. A use lawfully existing at the time of adoption of this bylaw, or any subsequent amendments thereto, which does not conform to one or more provisions of this bylaw.

<u>Wind Energy Conversion Facility</u>. All equipment, machinery and structures utilized in the connection with the conversion of wind to electricity. This includes, but is not limited to all transmission, storage, collection and supply equipment, substations, transformers, site access, service roads, and machinery associated with the use. A wind energy conversion facility may consist of one or more wind turbines. *(4/05)*

<u>Wind Monitoring or Meteorological Tower</u>. Tower used for supporting anemometer, wind vane and other equipment to assess the wind resource at a predetermined height above the ground. Also known as "test" or "met" tower. *(4/05)*

<u>Wind Turbine</u>. A device that converts kinetic energy of the wind into rotational energy to turn an electrical generator shaft. A wind turbine typically consists of a rotor, nacelle and supporting tower. *(4/05)*

<u>Working Studio</u>. A working studio shall consist of a room(s), in a building detached from the principal residence, which is incidental and accessory to the principal residence whose use is primarily for work. A working studio may include a toilet and work-related sinks but shall not include a shower or bathtub or residential kitchen facilities or sleeping accommodations.

# SECTION 20

Establishment of Districts

§ 20.1.   Districts enumerated

For the purposes of this bylaw, the Town of Truro is divided into Zoning Districts designated as follows:

Residential
Beach Point Limited Business
Route 6A, North Truro, Limited Business
Truro Center Limited Business
North Truro Center General Business
Route 6 General Business
Seashore

For the purposes of this bylaw, the following Overlay Districts are established:

Flood Plain
Water Resource Protection
Affordable Rental Housing

§ 20.2.   Purposes of Districts

Residential. Residential Districts are intended to provide appropriate space for housing and associated uses for the people of the town. They should provide safety, good access, and the opportunity to enjoy the peace and beauty of the property and the Town.

Beach Point Limited Business. The Beach Point Limited Business District is intended to enable, define, and control the traditional vacation cottages and other activities in this area, together with any conversions to condominiums.

Route 6A, North Truro, Limited Business. This bridge district is intended to provide space for professional offices in an otherwise residential district.

Truro Center Limited Business. The Truro Center district is intended to enable and foster the mix of retail businesses and restaurants together with single family homes historically characteristic of this village.

North Truro Center General Business. The North Truro Center district is intended to foster larger businesses as well as hotels and restaurants together with residences, while protecting the small-town flavor of this historic center.

Route 6 General Business. The Route 6 district is intended to enable, define, and control the establishment of larger businesses as well as residential housing, in this high-visibility part of Truro.

Seashore. The Seashore District is intended to further the preservation and development of the Cape Cod National Seashore in accordance with the purposes of the Act of Congress of August 7, 1961 (75 Stat. 284, 291); to prohibit commercial and industrial uses therein; to preserve and increase the amenities of the Town; and to conserve natural conditions, wildlife and open spaces for the education, recreation, and general welfare of the public.

Flood Plain. The purpose of the Flood Plain Overlay District is to provide that the land in the Town of Truro subject to seasonal or periodic flooding, tidal surges, and wave wash shall be used in such a manner as to promote the health, safety and welfare of the residents thereof and of the public generally, to protect property and so as to not burden the Town with costs resulting from unwise land use.

Water Resource Protection. The purpose of the Water Resource Protection Overlay District is to protect public health by preventing the degradation of surface water and ground water utilized for public water supply.

Affordable Rental Housing. The purpose of this Affordable Rental Housing Overlay District is to allow for the development of clustered affordable rental housing units. The district will make it possible for families with low and moderate income to reside in Truro, encourage the protection of open space on large tracts of land, and preserve the wooded areas within the developed parcel.

## § 20.3.  Location of Districts
The location and boundaries of the Zoning Districts and Overlay Districts are enumerated in § 90 of this bylaw and are shown on the map entitled "Zoning District Map of the Town of Truro, Massachusetts," dated May 18, 1978 which accompanies the bylaw as Appendix A and is declared to be a part of this bylaw.

## § 20.4.  Establishment of District Boundaries
Where any uncertainty exists with respect to the boundary of any district as shown on the Zoning District Map, the following rules apply:

A.  Where a boundary is indicated as a street, railroad, water course or other body of water, it shall be construed to be the center line or middle thereof, or where such boundary approximates a Town boundary, then to the limits of the Town boundary.

B.  Where a boundary is indicated as following approximately or parallel to a street, railroad, water course or other body of water it shall be construed to be parallel thereto and at such distance therefrom as shown on the Zoning District Map. If no dimension is given, such distance shall be determined by the use of the scale shown on the Zoning District Map.

C.  Where a boundary coincides within 10 feet or less with a lot line, the boundary shall be construed to be the lot line.

D.  Where a boundary is indicated as intersecting the center line of a street, railroad, water course or other body of water and unless it is otherwise indicated, it shall be construed to intersect at right angles to the tangent to the curve at the point of intersection.

## § 20.5.  Lots in Two Districts
When a District boundary line, at the time such line is adopted, divides any lot in one ownership and the distance between the boundary line and the lot line is more than 10 feet, a use that is permitted on the portion of a lot containing the required frontage may be extended into the other portion, provided a special permit is granted by the Board of Appeals.

## SECTION 30
### Use Regulations

§ 30.1.  General Requirements

A.    There shall be no site preparation work done in connection with development of any use of land other than single family dwelling or single family dwelling with accessory apartment use and no such work in connection with development of any subdivision until all necessary permits and approvals have been obtained. This section shall not prohibit site work reasonably necessary to the conduct of a land survey or any tests required as a condition precedent to the issuance of any permit or approval.

If after obtaining all necessary permits and approvals such work is commenced and later abandoned, any areas of the site which have been disturbed during construction shall be revegetated in a manner sufficient to prevent erosion. To secure revegetation in the case of abandonment of a project, the Building Commissioner, or in the case of a subdivision of land, the Planning Board, may require the owner to post a bond or other satisfactory security in an amount reasonably estimated as sufficient to perform the work, and to act fully thereon.

B.    Trailer Homes. Not more than one trailer home may be kept on any parcel of land within the Town of Truro. No trailer home may be occupied while so located, nor shall land be leased for trailer homes. An exception to this rule may be made where, following fire or other natural catastrophic loss of property, the owner may utilize and/or reside in a trailer home on the affected property for a period not to exceed 12 months while the affected structure is rebuilt. Such trailer or mobile home shall be subject to the provisions of the state sanitary code.

§ 30.2.  Use Table

The following uses are permitted by district as indicated below, and consistent with the purposes for which the district was established. Uses not expressly permitted are deemed prohibited.

KEY

| | |
|---|---|
| P | Permitted |
| SP | May be allowed by special permit granted by the Board of Appeals, or the Planning Board, where noted |
| N | Not Permitted |
| R | Residential |
| BP | Beach Point Limited Business |
| NT6A | Route 6A, North Truro Limited Business |
| TC | Truro Center Limited Business |
| NTC | North Truro Center General Business |
| Rt6 | Route 6 General Business |
| S | Seashore |

**PRINCIPAL USES**

|  | R | BP | NT6A | TC | NTC | Rt6 | S |
|---|---|---|---|---|---|---|---|
| **AGRICULTURAL** | | | | | | | |
| Agricultural (except Animal Husbandry); horticultural, floricultural | P | P | P | P | P | P | P |
| Animal husbandry, parcels of more than 5 acres | P | P | P | --- | P | P | P |
| Animal husbandry, parcels of 5 acres or less | SP | SP | SP | N | SP | SP | SP |
| **COMMERCIAL** | | | | | | | |
| Automobile service, repair, storage, or salesrooms | N | N | N | N | P | P | N |
| Barber shop | N | N | N | P | P | P | N |
| Commercial fishing activity (1, 11) | P | P | P | P | P | P | P |
| Professional office (2) | N | P | P | P | P | P | N |
| Restaurant | N | N | N | P | P | P | N |
| Retail or wholesale business service | N | N | N | N | P | P | N |
| Retail sales (3) | N | N | N | P | P | P | N |
| **INDUSTRIAL** | | | | | | | |
| Communication structure | N | N | N | N | N | SP (4) | N |
| Industrial or manufacturing use (5) | N | N | N | N | SP | SP | N |
| Marine installation | SP | SP | SP | N | SP | SP | N |
| Public utility | N | N | N | N | P | P | P |

**PRINCIPAL USES**

| | R | BP | NT6A | TC | NTC | Rt6 | S |
|---|---|---|---|---|---|---|---|
| Research or experimental lab (6) | SP | SP | SP | N | SP | SP | N |
| Small engine repair | SP | SP | SP | N | SP | SP | N |
| Trade, repair shop, etc. (7) | N | N | N | P | P | P | N |
| **INSTITUTIONAL** | | | | | | | |
| Educational institution | P | P | P | P | P | P | P |
| Hospital, nursing and/or convalescent home | P | P | P | N | P | P | N |
| Municipal use | P | P | P | N | P | P | N |
| Private club not conducted for profit | SP | SP | SP | N | SP | SP | N |
| National Seashore administration facilities, public facilities | N | N | N | N | N | N | P (11) |
| Religious institution | P | P | P | P | P | P | P |
| **RECREATIONAL** | | | | | | | |
| Children's camp | SP | SP | SP | N | SP | SP | N |
| Park, playground, non-commercial recreation | P | P | P | N | P | P | N |
| **RESIDENTIAL** | | | | | | | |
| Cottage or cabin colony, motor court | N | P | N | N | P | P | N |
| Duplex new (8) | N | SP | SP | SP | SP | SP | N |
| Duplex, conversion of existing single family dwelling (8) | SP | SP | SP | SP | SP | SP | N |
| Hotel | N | N | N | N | P | P | N |
| Motel | N | P | N | N | P | P | N |

| PRINCIPAL USES | | | | | | | |
|---|---|---|---|---|---|---|---|
| | R | BP | NT6A | TC | NTC | Rt6 | S |
| Single family dwelling (10) | P | P | P | P | P | P | P (11) |
| **ACCESSORY USES** | | | | | | | |
| Apartment, affordable housing (10) | SP | SP | SP | SP | SP | SP | N |
| Bed and breakfast, home; as defined; Boarding House, Home, as defined | P | P | P | N | P | P | P (11) |
| Home occupation, as defined | P | P | P | P | P | P | P (11) |
| Other home occupation (5) | SP | SP | SP | N | SP | SP | N |
| Accessory use to a permitted main use on the same premises | P | P | P | N | P | P | P (11) |

NOTES

1.   To include traditional fishing activities, opening of shellfish, storage and use of fishing equipment.

2.   No more than four (4) offices per lot; 20% lot coverage permitted, exclusive of parking; storage of equipment or materials where they are visible from neighboring properties or public or private ways is prohibited; the Board of Appeals shall find that the proposed use does not produce any injurious or offensive dirt, odor, fumes, gas, noise, or danger from explosion or fire.

3.   May include arts and crafts created on the premises.

4.   Includes buildings and appurtenances; Special Permit Granting Authority is the Planning Board.

5.   The Board of Appeals shall find that a proposed use is not injurious or offensive or tends to reduce values in the same district by reason of dirt, odor, fumes, gas, sewage, noise, or danger from explosion or fire.

6.   The Board of Appeals may approve activities which are necessary in connection with scientific research or scientific development or related production, and which are accessory to a permitted use, if the Board finds the proposed accessory use does not substantially derogate from the public good; the proposed accessory use need not be located on the same parcel as the primary use.

7.   Includes shops of carpenters, plumbers, electricians, dressmakers and similar tradespeople, repairs to radio-TV-computers and related electronic services, bicycle repairs, furniture repairs and upholstering, barbers shops, nursery schools.

8.   Uses in this category are further subject to the special regulations set forth in § 40.1, Duplex Houses and Apartments.

9.   Except trailers, mobile homes, Quonset huts or portable buildings.  One tent for non-commercial use is allowed per lot, for a specified period of time and with the written consent of the owner and the Board of Health. The Board of Health may limit the period of time the tent is erected and used.

10.   Uses in this category are further subject to the special regulations set forth in § 40.2, Affordable Housing Apartments.

11.   Uses in this category are further subject to the special regulations set forth in § 30.3, Seashore District.

## § 30.3.   Seashore District

A.   Purpose. The Seashore District is intended to further preservation and development of the Cape Cod National Seashore in accordance with the purposes of the Act of Congress of August 7, 1961 (75 Stat. 284, 291); to prohibit commercial and industrial uses therein; to preserve and increase the amenities of the Town; and to conserve natural conditions, wildlife, and open spaces for the education, recreation and general welfare of the public.

B.   Permitted Uses

1.   Conservation of land, water, wildlife, vegetation, and other natural features and values.

2.   Facilities deemed by the Secretary of the Interior to be necessary for the administration and public use and enjoyment of the Cape Cod National Seashore.

3.   Recreation, including but not limited to hunting, fishing, swimming and boating.

4.   Agricultural, horticultural, floricultural

5.   Traditional commercial fishing activities, the opening of shellfish, and storage and use of fishing equipment.

6.   Uses of existing dwellings as residences and accessory uses customarily incidental to the principal residential use on the same premises, providing such uses are not detrimental to a residential neighborhood and do not alter the essential character of the dwelling as a residence. Residential uses of dwellings may include the renting of rooms and furnishings of board by residents of the premises to overnight guests, if such uses do not alter the essential character of the dwelling as a residence.

7.   Customary or self home occupations as defined in § 10.4, but this shall not include the use of accessory structures as stores or for the display of goods to the passing public.

8.   Moving, alteration, enlargement, maintenance, or repairs of existing one-family residential dwellings or the erection of customary structures which will be accessory to the existing principal residential use provided that such improvements to existing  dwellings and the erection of accessory structures will afford not less than a 50-foot setback from all streets measured at a right angle with the street line and 25-foot distance from the abutters' property lines and further provided that the Building Commissioner determines that the improvements do not alter the essential character of the dwelling as a residence.  In appropriate cases, the Board of Appeals may approve lesser set back of side line requirements for improvements to existing dwellings or for the erection of accessory structures, provided they do not alter the residential character of the premises.

9.   Public Utilities.

10.  Religious and Educational use.

11.  Detached one-family dwellings and accessory structures, provided that no lot may be used for their construction which has a frontage of less than 150 feet, and an area of less than three acres, and no dwelling or building may be located in such manner as to provide less than a 50-foot

setback from all streets measured at a right angle with the street line and 25-foot distance from abuttors' property lines.

C.   General regulations. Except as provided above and in the use table, the following activities or uses are prohibited in the Seashore District:

1.   Burning of cover unless determined by the Board of Fire Engineers to be necessary for the welfare and safety of the Town of Truro, and then such burning shall be in accordance with the requirements of Section 13, Chapter 48 of the General Laws.

2.   Filling of land, dumping, or removal of soil, loam, sand, or gravel.

3.   Cutting of timber except; a) by an owner for the purpose of reasonably controlling brush or trees; b) maintenance cutting in pastures; or c) cutting for clearance or maintenance on rights-of-way including those pertaining to public utilities or public highways.

4.   Buildings or structures.

5.   Commercial or industrial ventures or activities.

6.   Drainage, damming or relocation of any water course except by a publicly authorized agency for the purpose of pest control.

7.   Continuous storage of materials or equipment.

D.   Signs. The use of signs shall comply with the Truro Sign Code provided, however, that double-faced signs on residential property which advertise the occupancy, sale, or rental of such property shall not exceed two square feet and shall not be of a type or style employing or using neon, fluorescent, or other direct illumination.  The foregoing limitations shall not apply to facilities deemed by the Secretary of the Interior to be necessary on federally owned property for administration and public use and enjoyment of the Cape Cod National Seashore.

E.   Variances or Exceptions. Applicants for variances or exceptions shall be promptly notified by the Board of Appeals that the Secretary of the Interior is authorized to withdraw the suspension of his/her authority to acquire, by condemnation, property which is made the subject of a variance or exception that in the Secretary's opinion, fails to conform or is in any manner opposed to or inconsistent with the purposes of the Cape Cod National Seashore. The Secretary of the Interior shall be given notice by the Board of Appeals of all applications or petitions made for variances or exceptions to the bylaws for the Seashore District and the Secretary shall be provided notice by the Planning Board of all applications for building permits involving the Seashore District within seven (7) days of receipt of the applications or petitions. Subsequently, the Secretary shall be given notice by the appropriate board of any variance, or exception, or building permit, granted or denied for the area within the Seashore District.

§ 30.4.   Water Resource Protection District

A.   Purpose. The purpose of the Water Resource Protection District is to protect public health by preventing the degradation of surface water and ground water utilized for public water supply.

B.   Use Restrictions. The following uses are prohibited: junkyard, solid waste disposal, public sewage treatment facilities with on-site disposal of effluent unless tertiary treated, car washes, coin-op or commercial laundries, trucking or bus terminals, or airports. Subsurface hazardous chemical gasoline and oil storage in corrodible containers are prohibited.

C.   Site Design Requirements

1.   Runoff shall be directed toward vegetated swales or basins for surface infiltration. Catch basins and piped storm sewers shall be used only where other methods are infeasible.

2.   Where the premises are partially outside the Water Resource Protection District, site design shall maximize protection of groundwater through siting potential pollution sources such as on-site disposal systems outside of the District, to the extent feasible.

D.  Exemptions. The Board of Appeals may grant a special permit to exempt a use from the requirements of this section, provided that the applicant demonstrates that the proposed use at that location cannot adversely affect any developed or planned public water supply. Applications for such a special permit shall be referred to the Conservation Commission, Planning Board, and Board of Health for their review and comment prior to the conclusion of the Board of Appeals' hearing on the proposal.

§ 30.5.   Flood Plain District

A.  Purpose. To provide that the land in the Town of Truro subject to seasonal or periodic flooding, tidal surges, and wave wash shall be used in such a manner as to promote the health, safety and welfare of the residents thereof and of the public generally, to protect property and so as to not burden the Town with costs resulting from unwise land use.

B.  Regulations. The following requirements apply in the Flood Plain District.

1.   Within Zones Al-30 substantial improvement means all new construction, any reconstruction, rehabilitation, addition, or other improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure before the "start of construction" of the improvement. This includes structures which have incurred "substantial damage", regardless of the value or of the actual cost of repair work performed. It does not, however, include either 1) any project for improvement of a structure to correct existing violations of state or local health, sanitary, or safety code specifications which have been identified by the local code enforcement official and which are the minimum necessary to assure safe living conditions, or 2) any alteration of a "historic structure" provided that the alteration will not preclude the structure's continued designation as a "historic structure."

2.   Within Zone A, where the base flood elevation is not provided on the FIRM, the Building Commissioner shall determine the base flood elevation from the best available other federal, state, municipal or private studies, if any. All subdivision proposals greater than 5 acres shall include base flood elevation data. If the data is not available from either the FIRM or other studies, the minimum requirements of the State Building Code, shall apply.

6.   Located within the Flood Plain District are areas designated as coastal high hazard areas (Zones V and V1-30). Since these areas are extremely hazardous due to high velocity water surges and hurricane wave wash, the following provisions shall apply:

a.   All new construction shall be located landward of the reach of the mean high tide.

c.   Man-made alteration of sand dunes, which in the opinion of the Building Commissioner may increase potential flood damage, is prohibited. The building of a structure on a dune may in itself constitute alteration if the dune's growth and development is inhibited or changed so as to decrease the dune's present and future value as a natural deterrent to, and protection from, water surges and wave wash.

g.   The Building Commissioner shall a) obtain the elevation above mean sea level of the lowest habitable floor (including basement) of all new or substantially improved structures and whether or not such structures contain a basement b) if the structure has been floodproofed, obtain the elevation (in relation to mean sea level) to which the structure was floodproofed, and c) maintain a record of all such information.

C. In the event it is the applicant's opinion that the land or structure in question is not, in fact, located within a special flood hazard area, or that any other data upon which the Building Commissioner is relying, is erroneous, the applicant shall furnish at his expense sufficient technical information to support his opinion.

## § 30.6.  Affordable Rental Housing Overlay District

A.  Purpose. The purpose of this Affordable Rental Housing Overlay District is to allow for the development of clustered affordable rental housing units. The district will make it possible for families with low and moderate income to reside in Truro, encourage the protection of open space on large tracts of land, and preserve the wooded areas within the developed parcel.

B.  Requirements. No Affordable Rental Housing shall be constructed under this section of the bylaw unless the applicant first receives a special permit issued by the Board of Appeals and unless the development satisfies the following requirements:

    1.  Overlay: The Affordable Rental Housing Overlay District is superimposed over a portion of the Residential District established by the Town of Truro Zoning Bylaws and the provisions related to the Affordable Rental Housing Overlay District are in addition to all other provisions set forth in the Truro Zoning Bylaws. In a conflict between the underlying district and the Overlay District, the provisions in the Overlay District shall prevail.

    2.  Coverage. To qualify for inclusion in the Affordable Rental Housing Overlay District, the proposed buildings and pavement may not cover more than 25% of the area of the entire parcel.

    3.  Parking. Parking design shall comply with § 30.9, Parking, herein. Driveways shall have a minimum width of fourteen (14) feet, and shall be maintained free of vegetation to that width and to a height of fourteen (14) feet at all times. Driveways are to be permeable and shall be maintained with a level surface of at least four (4) inches of blue stone or T-base equivalent at all times.

    4.  Setbacks. Each residential building within the Affordable Rental Housing Overlay District shall be set back at least fifty (50) feet from the nearest existing established road and at least fifty (50) feet from any other residential building in the district. Non-residential structures, such as maintenance sheds, shall be set back at least seventy-five (75) feet from the nearest existing established road and at least seventy-five (75) feet from the nearest residential structure within the district.

    5.  Density:  To qualify for inclusion in the Affordable Rental Housing Overlay District, a development may have no more than twelve (12) dwelling units; however the Board of Appeals may grant a special permit which will allow no more than four (4) additional dwelling units. Single-unit buildings are not allowed.                                                                           *(4/05)*

C.  Residency Requirement. Units within an Affordable Rental Housing Overlay District shall be made available only for year-round occupancy as prescribed in leases of one-year minimum duration.

D.  Permitting. An Affordable Rental Housing Overlay District special permit shall be granted only if all of the proposed development has been designated as available to affordable households. To qualify for inclusion in the Affordable Rental Housing Overlay District, up to 70% of the residential units must be reserved for Truro residents.

E.  Monitoring. The owner or manager of the buildings within an Affordable Rental Housing Overlay District shall provide the Truro Housing Authority annually, on or before April 1st of each year, a report naming all occupants, the yearly income of each household, rent per unit, maintenance schedule,

and detailed listing of annual maintenance expenses.

## § 30.7. Nonconforming Uses

A. Continuance. So long as structures or uses were lawfully constructed or begun, and lots were created lawfully, such structures or uses may continue to be used in the same manner and for the same purposes despite contrary provisions of this bylaw. Lawful, pre-existing, nonconforming uses and structures may, when a variance would otherwise be required, be altered or extended with a special permit if the Board of Appeals finds that the alteration or extension will not be substantially more detrimental to the neighborhood than the existing nonconforming use or structure and that the alteration or extension will exist in harmony with the general purpose and intent of this bylaw.

B. Repairs, alterations. If the Building Commissioner determines and finds that the proposed repair, reconstruction, alteration, or structural change of a pre-existing, nonconforming, single-family or two-family residential structure will not increase the nature or extent of the nonconformity, then the Building Commissioner may approve and issue a building permit for the proposed repair, reconstruction, alteration, or structural change.

C. Abandonment. Nonconforming uses which have been abandoned for a period of 2 years or more shall not be re-established, and any future use shall conform to the then current bylaw.

D. In the event that a non-conforming structure, which was lawful when built, is so damaged by fire or other natural causes that it can no longer be used for the purpose for which it was being used at the time such damage was inflicted, such structure may be rebuilt as of right within two years of sustaining such damage provided that any non-conformity is not increased in the course of such reconstruction. This right of reconstruction shall not foreclose recourse to the Board of Appeals for such further relief as may be available by special permit or variance.                    *(4/05)*

## § 30.8. Special Permits

A. Construction or operation under a building or special permit shall conform to any subsequent amendment of this bylaw unless the use or construction is commenced within a period of six months after the issuance of the permit and in cases involving construction, unless such construction is continued through to completion as continuously and expeditiously as is reasonable.

B. A special permit shall lapse after one year if a substantial use thereof has not sooner commenced except for good cause or, in the case of permit for construction, if construction has not begun by such date except for good cause.

C. Special permits may be approved only after a finding by the Board of Appeals or Planning Board (as applicable, see use table) that the proposed use is in the opinion of the Board in harmony with the general public good and intent of this bylaw. The approval shall be subject to any other applicable provision of this bylaw and the Board may impose conditions, safeguards, and limitations on time and use, which in the Board's opinion are necessary to comply with the intent and purpose of this bylaw.

D. The Board of Appeals or Planning Board (as applicable) shall adopt and from time to time amend rules relative to the issuance of such permits, and shall file a copy of those rules in the office of the Town Clerk. Said rules shall describe the size, form, contents, style and number of copies of plans and specifications and the procedure for submission and approval of the permits.

E. Special permits may only be acted upon following public hearings conducted in accordance with the provisions of Massachusetts General Law, Chapter 40A or amendments thereto, within 65 days after filing with the Board the application for the permit. The Board shall act on the application for

special permits within 90 days following the public hearing.

## § 30.9.  Parking.

A.  Adequate off-street parking and loading requirements shall be provided for any new or expanded building or use on land in the Town of Truro according to the following requirements.

1.  Required off-street parking facilities shall be provided on the same lot as the principal use they are designed to serve, except as provided in § 40.3 B.

2.  Parking shall be provided according to the schedule in the Table below based on the use or total square footage (as appropriate) of the finished structure or use, including any additions or expansions.

3.  Where one building houses more than one use, total parking provided shall meet the requirements for each use.

4.  Required parking spaces shall not be less than nine (9) feet in width by twenty (20) feet in length, delineated on the ground, exclusive of travel lanes and maneuvering space.

5.  Where the computation of required parking spaces results in a fractional number, only the fraction of one half (1/2) or more shall be counted as one (1).

6.  Property owners shall comply with the requirements of the Town of Truro General Bylaws for handicapped parking.

B.  Table.

| Principal Use | Parking Requirement |
| --- | --- |
| Single family dwelling | Two spaces |
| Duplex and Apartments | Two spaces per unit |
| Affordable Rental Housing | Two spaces per unit |
| Motels, cottage or cabin colonies, hotels, motor courts | Two spaces for owner or manager, plus 1.25 spaces for each rental unit, plus 1.5 spaces for each 20 sq ft of floor area available for meetings or functions |
| Permitted offices in a residence | Two spaces for residence, plus Three spaces for office, plus One space for each non-resident employee |
| Retail stores and services | One space for each one hundred fifty (150) sq ft of gross floor space. |
| Restaurants, clubs, theatres, and other places of assembly | One space for each four seats |
| Offices | One space for each one hundred fifty (150) sq ft of gross floor space. |
| Bed and Breakfast, Boarding Houses, Rooming Houses | Two spaces for residence, plus One space for each rental unit |
| Home occupation | Two spaces for residence, plus One space for each employee |

## §30.10  Signs.

The complete Sign Code for the Town of Truro, adopted February 20, 1967, and its subsequent amendments, is incorporated in this zoning bylaw.

# SECTION 40

## Special Regulations

### § 40.1.  Duplex Houses and Apartments

A.  Purpose. For the purpose of promoting the more efficient use of land, in keeping with the protection of the quality of life and ecology, and at the same time giving relief to those with problems of obtaining adequate housing, the Board of Appeals may approve a special permit authorizing the new construction of duplex houses or the conversion of single family dwellings to apartments, consistent with the following conditions.

B.  New Construction. lots of one acre or more are required for new construction; the duplex shall not exceed 3,000 sq ft; the requirements of paragraph D shall be met.

C.  Conversion. Conversion of single family dwellings in any zoning district except the Seashore District and the Water Resource Protection District may be approved by special permit from the Board of Appeals. Lots shall meet current minimum lot area requirements; no more than one apartment in addition to the primary dwelling unit may be created from any one single family dwelling; the floor area of the secondary dwelling unit shall not exceed 50% of that of the primary dwelling unit; the floor area of the secondary dwelling unit shall not exceed 600 sq ft.

D.  Requirements. All new construction or conversions shall comply with the following.

  1.  All applicable provisions of the building, health and safety codes, as determined by the Building Commissioner and Board of Health shall be met.

  2.  One unit shall be owner occupied.

  3.  The applicant shall demonstrate that the new construction or conversion is essential to provide needed housing.

  4.  The new construction or conversion is compatible with and will not derogate from or be detrimental to the neighborhood.

  5.  Section 50, Area and Height regulations of this bylaw.

  6.  The use is in harmony with the general purpose and intent of the bylaw.

### § 40.2.  Affordable Housing Apartments

A.  Purpose. For the purpose of promoting the more efficient use of land, in keeping with the protection of the quality of life and ecology, and at the same time giving relief to those with problems obtaining adequate housing, the Board of Appeals may approve a special permit authorizing the new construction of, or conversion of existing single family dwellings to accommodate, accessory apartments, provided that the following provisions of this section are met.

B.  Applicability. Affordable housing apartments may be approved in all districts except the Seashore District, the Water Protection Districts, and the Pamet River Protection District as recognized and adopted by the Board of Health.

C.  Area Requirements. The land involved shall meet current minimum lot area requirements; the affordable housing apartment shall not exceed 750 sq ft in floor area.

D.  General Requirements.

  1.  The apartment is essential to provide needed affordable housing as determined by the Truro Housing Authority.

2. The apartment is compatible with and will not be detrimental to the neighborhood.

3. Both the principal dwelling and the accessory apartment shall comply with applicable provisions of the building, health and safety codes, as determined by the Building Commissioner and Board of Health.

E. Covenant. The Board of Appeals may grant a special permit on the condition that the current owner of the affordable housing apartment shall execute a deed restriction to be recorded at the Registry of Deeds covenanting with the Town of Truro that the following conditions are met:

1. One unit of the dwelling complex shall be owner-occupied.

2. Unit(s) not occupied by the owner shall be rented at no more than the maximum rate determined to be affordable on a yearly review by the Truro Housing Authority. Such unit(s) shall be occupied by a renter who has registered with and been approved eligible for affordable housing on a yearly review by the Truro Housing Authority.

3. Rental of the unit(s) shall be available on a year-round basis only.

F. Revocation. It shall be a condition of the Special Permit that the owner shall sign a covenant that contains the conditions of this section, which covenant shall be recorded at the Barnstable County Registry of Deeds. If such a covenant is not signed by the current owner, the Special Permit shall be revoked and the apartment shall no longer be an approved rental unit under this Zoning Code, seasonal or otherwise.

## § 40.3.   Conversion of Cottage or Cabin Colony, Motor Court, Motel or Hotel

A. Purpose. The Board of Appeals may grant a special permit for the conversion of a cottage colony, cabin colony, motor court, motel, or hotel to single family or multi-family use under any type of ownership, provided that the provisions of this section are met.

B. Requirements.

1. The converted premises shall comply with applicable provisions of the zoning, building, health and safety codes, as determined by the Building Commissioner and Board of Health.

2. Each converted unit shall comply with the parking requirements for single family dwellings as established in § 30.9, Parking, except that, where pre-existing structures under this section are unable to meet the current parking standards on their existing lots, the parking requirement may be met on a contiguous lot or on a lot directly across the street provided the following conditions are met:

a. The two lots must be in and remain in common ownership and not be further divided.

b. The two lots shall not be used for the purpose of increasing the size or the use of the pre-existing structure or property.

c. Other than parking, pre-existing structures, and septic systems allowed by the Truro Board of Health, the adjacent lot shall remain open space.

d. All conditions must be recorded at the Barnstable Registry of Deeds.

3. The density of units permitted on a lot shall be one unit per 3,000 sq ft, or one unit per 2,100 sq ft in the Beach Point Limited Business District; however, notwithstanding the restrictions of this section, no cottage colony, cabin colony, motor court, motel, or hotel which existed on January 1, 1987 shall be required to reduce its then existing number of units if or when it converts to multi-unit dwelling or non-dwelling use so long as it complies with all other requirements of this bylaw.

4.  Units rented to the transient public must remain licensed as parts of a cottage colony, cabin colony, motor court, motel or hotel. Owners of the management unit shall be responsible for meeting all the licensing requirements of the Town of Truro.

C.  Covenant. The owner of the premises shall execute a restrictive covenant with the Town of Truro to be recorded at the Barnstable Registry of Deeds, covenanting that other than one management unit, no units shall be occupied or otherwise used during each calendar period commencing December 1 and ending March 31 of the following calendar year.


§ 40.4  Wind Generators

A.  Purpose and Intent

It is the express purpose of this bylaw to regulate wind energy conversion facilities, including meteorological towers, ensuring that they are placed in appropriate locations, while minimizing any adverse visual, safety and environmental impacts of those facilities.  This bylaw is intended to be used by the Truro Planning Board and other relevant boards in conjunction with other regulations adopted by the town.

B.  Basic Regulations

1.  Use Regulations

The erection of a wind energy conversion facility or wind monitoring tower shall require a building permit.  A permit shall be issued only as follows, whether the use is a principal or accessory use:

1.1 Wind Energy Conversion Facility

No wind energy conversion facility shall be constructed or emplaced (a) unless it complies with the wind generator sections of the zoning bylaws and (b) unless the Planning Board issues an enabling special permit which may, through the conditions of that special permit, excuse or mitigate full compliance with the zoning by-laws' wind generator requirements.

1.2 Wind Monitoring or Meteorological Towers

Before wind monitoring or meteorological towers are constructed or installed, the tower proponent must obtain a special permit from the Planning Board.  The proponent, however, may request a pre-application hearing, which will be advertised, and, thereafter, the Planning Board may issue a decision that a special permit is not needed because the tower' height, location, duration, state or federal ownership, or other characteristics do not warrant review through a special permit process and because the tower os in harmony with the general purpose and intent of the zoning bylaws. References hereafter to "tower" shall mean "wind-monitoring or meteorological tower."

2.  Site Control

The applicant shall possess control over the site, as required in Section G 5.1 d) and the applicant must furnish reasonable assurance that this control will endure though the term of the special permit.  Control shall mean authority to install and use the proposed facility and to prevent the use of any structure within the setback or clear area for human habitation or other use permitting human occupancy.

3.  Dimensional Requirements

3.1  Height

Wind energy conversion facilities shall be no higher than 100 feet above the natural grade. The Planning Board may allow this height to be exceeded as part of the special permit process if the project proponent can demonstrate that the additional height is needed and that the additional benefits of the higher tower outweigh any increased adverse impacts. Monopole towers are the preferred type of support for wind turbines.

### 3.2 Setback or Clear Area

Each wind energy conversion facility and its associated equipment shall comply with the building setback provisions of the zoning district in which the facility is located. In addition, the following setbacks shall be observed:

a) In order to ensure public safety and to protect the interests of neighboring property owners, the minimum distance from the base of any wind turbine tower to any property line, dwelling, business or institutional use shall be equal to the total height of structure to the highest point plus an additional six feet. This setback is considered a "clear area."

b) The setback or clear areas should be kept free of all habitable structures so long as the facility is in place; however, this area need not be cleared of trees or other vegetation. Setbacks shall be measured from the outside surface at the base of the turbine tower. The Planning Board may reduce the clear area as appropriate based on site specific considerations.

## C. Special Permit Regulations

The Planning Board shall grant a special permit only if it finds that the proposal complies with the provisions of this bylaw and complies with the applicable criteria for granting special permits, as detailed in Section H below.

### 1. General

Proposed wind energy conversion facilities shall comply with all applicable local, state and federal requirements, including but not limited to all applicable electrical, construction, noise, safety, environmental and communications requirements.

### 2. Design Standards

#### 2.1 Visual Impact

The proponent shall demonstrate through project siting and proposed mitigation that the wind energy conversion facility minimizes any impact on the visual character of surrounding neighborhoods and the community. Relevant criteria may include, but not be limited to, information regarding site selection, turbine design, buffering, lighting and cable layout.

#### 2.2 Color

Wind energy conversion facilities shall be painted a non-reflective color that blends with the sky, unless FAA regulations require a specific color.

#### 2.3 Equipment Shelters

Equipment necessary for monitoring and operation of the wind energy conversion facilities should be contained within the turbine tower. If this is not feasible, ancillary equipment may be located outside the tower, provided this equipment is contained either within an underground vault, or enclosed within a separate structure or behind a year-round landscape or vegetated buffer.

2.4 Lighting and Signage

a)  Wind turbines shall be lighted only to the extent required by the Federal Aviation Administration (FAA).

b)  Lighting of equipment structures and any other facilities on site (except lighting required by the FAA) shall, at a minimum, comply with the Town's restrictions for exterior lighting

c)  Signs on the facility shall be limited to:

   i)   those needed to identify the property, and the owner and warn of any danger; and,

   ii)  educational signs providing information on the technology and renewable energy usage.

d)  All signs shall comply with the requirements of the Town's sign code.

3   Environmental Standards

3.1   Wetlands

Wetland buffer areas may be used for the purposes of providing a clear area.

3.2   Land Clearing/Open Space/Avian and Protected Species

Wind energy conversion facilities shall be designed to minimize land clearing and fragmentation of open space areas and shall avoid permanently protected open space. Wind turbines should be sited to make use of previously developed areas wherever possible. Wind energy conversion facilities shall also be located in a manner that does not have significant negative impacts on avian and protected species in the vicinity.

3.3   Stormwater

Stormwater run-off and erosion control shall be managed in a manner consistent with all applicable state and local regulations.

3.4   Noise

The wind energy conversion facility and associated equipment shall conform with Massachusetts noise regulations (310 CMR 7.10).

3.5   Shadowing and Flicker

Wind energy conversion facilities shall be sited in a manner that does not result in significant shadowing or flicker impacts. The proponent has the burden of proving that this effect does not have significant adverse impact on neighboring or adjacent uses either through siting or mitigation.

4.   Safety Standards

No hazardous materials or waste shall be discharged on the site of any wind energy conversion facility. If any hazardous materials or wastes are to be used on site, there shall be provisions for full containment of such materials or waste. An enclosed containment area, designed to contain at least 110 percent of the volume of the hazardous materials or waste stored or used on the site may be required to meet this requirement.

The wind energy conversion towers shall also be designed to prevent unauthorized access (for example, by construction of a fenced enclosure or locked access).

5. Use by Telecommunications Carriers

Wind energy conversion facilities may be used to locate telecommunications antennas, subject to applicable regulations governing such uses, and subject to the following additional requirements:

5.1. All ground-mounted telecommunications equipment shall be located in either a shelter, within the wind turbine tower or otherwise screened in all seasons from public view either through effective landscaping or existing natural vegetated buffers;

5.2. Antennas shall be flush-mounted to be in keeping with the design of the wind turbine tower.

5.3 All cabling associated with the wireless facility shall be contained within the tower structure or enclosed within a conduit painted to match the turbine mount.

D. Modifications

All modifications to a wind energy conversion facility made after issuance of the special permit shall require approval by the Planning Board in accordance with the existing process for modifications to special permits.

E. Monitoring and Maintenance

1. After the wind energy conversion facility is operational, the applicant shall submit to the town at annual intervals from the date of issuance of the special permit, a report detailing operating data for the facility, including, but not limited to, days of operation, energy production, and so forth.

2. The applicant shall maintain the wind energy conversion facility in good condition. Such maintenance shall include, but not be limited to, painting, structural integrity of the foundation and support structure and security barrier (if applicable), and maintenance of the buffer areas and landscaping if present.

3. The holder of a special permit shall promptly provide written notice to the Planning Board of any change in ownership of the facility.

F. Abandonment or Discontinuation of Use

1. At such time as the holder of a special permit issued under this section elects to abandon or discontinue the facility or tower, the holder shall notify the Planning Board by certified mail, return receipt requested, of the proposed date of abandonment or discontinuance. In the event that a holder fails to give such notice, the facility or tower shall be considered abandoned or discontinued if the facility or tower has not been operational for 180 days. In the case of a multi-turbine facility, the Planning Board shall determine in its decision what proportion of the facility has been inoperable for that period of time.

2. Upon abandonment or discontinuation of use, the owner shall physically remove the wind energy conversion facility or tower within 90 days from the date of abandonment or discontinuation of use. For good cause shown this period may be extended at the request of the holder of the special permit at the discretion of the Planning Board. "Physically remove" shall include, but not be limited to:

2.1 Removal of the wind turbine and tower, all machinery, equipment, equipment shelters, security barriers and all appurtenant structures from the subject property,

2.2 Proper disposal of all solid or hazardous materials and wastes from the site in accordance with local and state solid waste disposal regulations,

2.3   Restoration of the location of the wind energy conversion facility to its natural condition, except that any landscaping, grading or below-grade foundation may remain, unless the Building Commissioner determines that this results in a hazardous situation.

3.   If an applicant fails to remove a wind energy conversion facility or tower the Department of Public Works may enter upon the subject property and physically remove the facility or tower at the expense of the landowner.

G.   Application Procedures

1.   Pre-Application Conference

Prior to the submission of an application for a special permit under this bylaw, the applicant is strongly encouraged to meet with the Planning Board at a scheduled public meeting to discuss the proposed wind energy conversion facility or tower in general terms and to clarify the filing requirements.  The Planning Board shall meet with an applicant under this regulation within 21 days following a written request submitted to the Planning Board with a copy to the Town Clerk.  If the Planning Board fails to meet with an applicant who has requested such a meeting within 21 days of said request and said meeting has not been postponed due to mutual agreement, the applicant may proceed with a special permit application under this regulation without need for a pre-application conference.

2.   Pre-Application Filing Requirements

The purpose of the conference is to inform the Planning Board about the characteristics and scope, however preliminary, of the proposed wind energy conversion facility or tower.  As such, no formal filings are required for the pre-application conference; however, the applicant must prepare sufficient preliminary architectural and/or engineering drawings to inform the Planning Board of the location of the proposed facility, as well as its scale and overall design.

3.   Professional Fees

If the nature of the applicant's project is such that it cannot be adequately reviewed without expertise unavailable to the Planning Board, the Board may retain experts and consultants, and the applicant's payment of their fees and charges shall be a prerequisite of the special permit.

4.   Additional Requirements

Within 30 days of holding the pre-application conference, or, if no conference is held, within 21 days of filing an application for a special permit, the applicant shall arrange for a balloon or crane test at the proposed site to illustrate the height of the proposed facility.  The date, time and location of such test shall be advertised in a newspaper of general circulation in the town at least 14 days, but not more than 21 days prior to the test.  In addition, within such time period written notice shall be provided to the Planning Board and the Historic Commission by certified mail, return receipt requested, and an identical courtesy notice shall be sent to the Town Clerks of Provincetown and Wellfleet and the Superintendent of the Cape Cod National Seashore.

5.   Application Filing Requirements

5.1  The following plans and data shall be included with an application for a special permit for each wind energy conversion facility:

a)  Name, address, telephone number and original signature (photo-reproductions of signatures will not be accepted) of applicant and any co-applicants.  Co-applicants may include the landowner of the subject property or the operator of the wind energy conversion facility.  If telecommunications antenna are proposed, a telecommunications

carrier should be a co-applicant.

b) If the applicant or co-applicant files a written authorization, bearing an original signature and providing the name, address, and telephone number of each agent, the applicant or co-applicant may be represented by that agent or agents.

c) The name and affiliation of the electrical engineers or electricians who will design the connection to the grid or load.

d) Documentation of the right to install and use the proposed facility and proof of control over the clear area, per Section B.2. of these regulations.

e) Proposed schedule for the meteorological data acquisition and analysis. Proposed schedule for erection and commissioning of the generator.

f) Identification of the subject property including the name of the nearest road or roads, and street address, if any

g) Assessor's map and parcel number of subject property

h) Relevant zoning map with subject parcel identified.

i)  A scaled elevation of the proposed tower.

j) A vicinity plan drawn at a scale of one-inch-equals-40 feet, signed and sealed by a Registered Professional Engineer or Licensed Surveyor showing the following:

   i) Property lines for the subject property and all properties adjacent to the subject property within 300 feet.

   ii) Outline of all existing buildings, including description of existing use, if known (e.g., residence, garage, accessory structure and so forth) located on the on subject property and on all adjacent properties located within 300 feet of the proposed wind energy facility or tower.  Distances, at grade, from the proposed wind energy conversion facility or tower to each structure shown on the vicinity plan shall be shown.

   iii) Proposed location of wind energy conversion facility or tower, including all turbines, fencing, associated ground equipment, transmission infrastructure and access roads. Including:

   • Location of all roads, public and private, on the subject property and on all adjacent properties within 300 feet including driveways proposed to serve the wind energy conversion facility,

   • All proposed changes to the existing property, including grading, vegetation removal and temporary or permanent roads and driveways,

   • Representations, dimensioned and to scale, of the proposed facility, including cable locations, parking areas and any other construction or development attendant to the wind energy conversion facility.

   iv) Tree cover and average height of trees on the subject property and adjacent properties within 300 feet.

   v) Contours at each two feet AMSL (Above Mean Sea Level) for the subject property and adjacent properties within 300 feet.

   vi) Representation of location of viewpoint for the sight-line diagram referenced below.

k) A map or plan, as required, showing the connection to the grid or load, as applicable.

l) A map or plan of the route to be used to deliver the components of the equipment to the site.

5.2  Sight lines and photographs as described below:

a) Sight-line representation. A sight-line representation shall be drawn from representative locations that show the lowest point of the turbine tower visible from each location. Each sight line shall be depicted in profile, drawn at a scale of one inch equals 40 feet. The profiles shall show all intervening trees and buildings. There shall be at least two sight line representations illustrating the visibility of the facility from surrounding areas such as the closest habitable structures or nearby public roads or areas.

b) Existing (before condition) photographs. A color photograph of the current view shall be submitted from at least two locations to show the existing situation.

c) Proposed (after condition). Each of the existing-condition photographs shall have the proposed wind energy conversion facility or tower superimposed on it to accurately simulate the proposed wind energy conversion facility when built and illustrate its total height, width and breadth.

5.3  Siting elevations, or views at-grade from the north, south, east and west for a 50-foot radius around the proposed wind energy conversion facility or tower, showing the following:

a) Wind energy conversion facility or tower and, if applicable, the security barrier and associated equipment, with total elevation dimensions for all parts of the facility or tower.

b) Security barrier. If the security barrier will block views of the wind energy conversion facility or tower, the barrier drawing shall be cut away to show the view behind the barrier.

c) Existing trees and shrubs at current height and proposed trees and shrubs at proposed height at time of installation, with approximate elevations shown.

d) Grade changes, or cuts and fills, to be shown as original grade and new grade line, with two-foot contours AMSL.

5.4  Specifications

a) Specifications for any proposed wind energy conversion facility or tower shall be provided for all equipment and attendant facilities.

b) Materials for any proposed wind energy conversion facility or tower specified by type and specific treatment. This information shall be provided for the wind turbine tower and all other proposed equipment/facilities.

c) Colors of the proposed wind energy conversion facility represented by a color board showing actual colors proposed.

5.5  Landscape plan

A landscape plan including existing trees and shrubs and those proposed to be added or removed, identified by size of specimen at installation and species.

5.6  Lighting Plan

The applicant shall provide the Planning Board with a copy of the FAA's determination as to the required markings and/or lights for the structure. If lighting of the site (other than FAA lights) is proposed, the applicant shall submit a manufacturer's computer-generated point-to-point printout, indicating the horizontal foot-candle levels at grade, within the property to be

developed and 25 feet beyond the property lines. The printout shall indicate the locations and types of luminaries proposed.

### 5.7  Environmental Requirements

The applicant shall provide a statement listing the existing noise levels and the maximum future projected noise levels from the proposed wind energy conversion facility. Such statement shall be certified and signed by a qualified sound engineer, and state that noise projections are accurate and meet applicable state requirements.

### 5.8 Removal

The applicant shall submit a fully inclusive estimate of the costs associated with removal and prepared by a qualified engineer. This cost estimate shall include cost inflation of the removal projected throughout the term of the special permit

## H.  Review Guidelines

The Planning Board shall evaluate the information submitted by the applicant based upon the following review criteria and design guidelines:

1.  Thoroughness of the application.

2.  Compliance with Sections C 2 (Design Standards), C 3 (Environmental Standards) and C 4 (Safety Standards) of this Bylaw.

## I.  Findings of the Planning Board

The Planning Board may permit, permit with conditions, or refuse to permit a wind energy facility.

1.  The Planning Board shall have the authority to permit a facility when all the following conditions are met:

   a.  The application has been submitted in accordance with the regulations and procedures as outlined in this section, and substantially meets the requirements of §40.4 H, Review Guidelines.

   b.  The application complies with all current bylaw requirements of the Town.

2.  The Planning Board shall conditionally endorse an application for a special permit for a wind energy conversion facility or tower when the following conditions are met:

   a.  The application has been submitted in accordance with the regulations and procedures as outlined in this section, and substantially complies with §40.4 H, Review Criteria.

   b.  The project conforms to all requirements of the Zoning Bylaw, with deviations permissible only by a special permit or a variance.

   c.  The application needs further approvals from any other Town Board, Department or Commission, or requires approvals by any state, and/or federal agency.

3.  The Planning Board may deny the application for a special permit for any lawful reason, including:

   a.   The application does not include all the materials or information required in this section, or has failed to adhere to the procedures for Special Permit Application as outlined in this section.

   b.  The application as presented is not in compliance with one or more Town Bylaws.

   c.  The application does not substantially comply with the Review Guidelines.

d   The plan has been drawn incorrectly or in such form that the Planning Board is unable to determine whether sufficient information is being presented for review.

e.   The applicant has failed to incorporate and adhere to any condition(s) for endorsement imposed by any other Town Board, Department or Commission, or the requirements of any state or federal agency, which has proper authority to place conditions on a matter before the Planning Board.

4.   The Planning Board may require the applicant to provide a form of surety (i.e. post a bond, letter of credit or establish an escrow account or other) at the Planning Board's option at the time of construction to cover projected costs of the removal of a facility or tower in the event the town must remove the same. The amount of such surety shall be equal to 150 percent of the cost of compliance with this section.

5.   The Planning Board shall render a decision within ninety (90) days of the conclusion of the public hearing, and shall file its written decision with the Town Clerk's office and other appropriate parties in accordance with the provisions of M.G.L. Chapter 40A.

J.   Term of Special Permit for Wind Energy Conversion Facility

No special permit for a wind energy conversion facility shall be valid for more than twenty-five (25) years, unless it is extended or renewed. At the expiration of the special permit the wind energy conversion facility shall be removed by the applicant.

K.   Term of Special Permit for a Wind-Monitoring or Meteorological Tower

A special permit for a wind-monitoring or meteorological tower shall be valid for two years, and is subject to renewal for good cause shown.                                        *(4/05)*

## § 40.5   Communication Structures, Buildings and Appurtenances

A.   Purpose. The purpose of § 40.5 of this bylaw is to accommodate the communication needs of residents and businesses while protecting the public health, safety and general welfare of the community; to establish guidelines, standards and procedures to regulate the permitting and installation of communication structures, buildings and appurtenances in order to:

1.   Facilitate the provision of wireless telecommunications services to the residents and businesses of the town;

2.   Minimize adverse visual effects of towers through careful design and siting standards;

3.   Avoid potential damage to adjacent properties from tower failure through structural standards and setback requirements, and,

4.   Maximize the use of existing and approved towers and buildings to accommodate new wireless telecommunication antennas in order to reduce the number of towers needed to serve the community.

B.   Requirements:

1.   All building permits for a communications structure, building or appurtenance shall require a special permit from the Planning Board.

2.   The minimum distance from the perimeter of the communications structure to any property line shall be the height of the structure including any antennas or appurtenances, plus ten (10) feet. The minimum distance from any guy wire, anchor or brace to any property line shall be the length of the guy wire or brace plus ten (10) feet.  The setbacks for a communications building shall comply with the setback requirements of the zoning district.

3.  The communications structure, building or appurtenance shall be installed, maintained and operated in accordance with all applicable federal, state, county and local codes, standards and regulations and shall be designed to withstand sustained winds and gusts of a category 5 hurricane. If Federal Aviation Administration (FAA) or Federal Communications Commission (FCC) regulations are changed, then the owner or operator shall bring the structure, building and appurtenances into compliance with the new regulations within six (6) months of the effective date of such regulations or earlier if a more stringent compliance schedule is included in the regulation. Failure to comply with any new regulations shall be grounds for the removal of non-complying structures, buildings and appurtenances at the owner's expense.

4.  The height of the communications structure (tower) shall be no greater than one hundred and fifty (150 feet) above ground level.

5.  Communication antennas shall be located on pre-existing structures unless the applicant demonstrates that there are no feasible pre-existing structures. The installation shall preserve the character of such pre-existing structures.

6.  If the applicant has demonstrated that there are no feasible pre-existing structures to support antennas and appurtenances for the intended use, then any communications structure, building or appurtenance may be sited on public land.

7.  To the extent lawful and feasible, all service providers shall co-locate on a single tower. Towers shall be designed to structurally accommodate the maximum number of foreseeable users (within a ten-year period) technically practicable. The applicant is required to document all co-location tenants and provide a tower design indicating types and location of all facilities.

8.  New facilities or structures shall be considered only upon a finding by the Planning Board that existing or approved facilities or structures cannot accommodate the wireless communications equipment planned for the proposed tower.

9.  The installation of a communications structure, building or appurtenance shall be designed to minimize visual impact; the maximum amount of natural vegetation shall be preserved; details of construction and finish shall blend with the surroundings; additional vegetative screening shall be employed where practical and particularly to screen abutting residential property whether developed or not. A detailed landscape plan will be required with the application.

10. Location and siting of facilities and structures shall be consistent with any regional location and siting criteria established by the Cape Cod Commission.

11. Under normal operating conditions, noise emanating from the communications structure, building or appurtenance shall not be greater at the boundary of the lot on which it is sited than would otherwise exist in the absence of these facilities.

12. No hazardous waste shall be discharged on the site. Any storage of fuel shall be in compliance with the Board of Health regulations. Documentation shall be provided for the contents of all communications buildings and/or cabinets.

13. All run-off of storm water from communications structures, buildings, and appurtenances, driveways and parking areas shall be contained on site; the amount of impervious surface on the site shall be minimized.

14. Lighting, when required and permitted by the FAA or the Planning Board, shall be directed inward so as not to project onto surrounding properties.

15. All structures, buildings or appurtenances must be secured to control access. Fencing materials shall be consistent with the character of abutting properties, with a locked gate and proper warning signals. A sign must be displayed indicating the name of the owner(s) and a 24 hour contact number. Only signs limited to safety will be allowed. Fencing is not required for antennas or other appurtenances mounted on a pre-existing structure.

16. As a condition of approval of the application the applicant shall agree, by execution of a covenant, to remove within six months any communications structure and building which has not operated for four consecutive months unless the cause is major damage which prohibits operation. In the event that major damage has rendered the facility inoperative, repair or removal of the facility shall begin within six months and be completed within an additional six months. Failure to comply with the conditions of the covenant shall be grounds for the removal of structures, buildings and appurtenances. Complete restoration of the site shall be at the owner(s) expense, secured by a bond from a recognized financial institution. The covenant shall include, also at the owner(s) expense, provision for liability insurance for any damage to any abutting property whether developed or not.

17. At least forty-five (45) days before submitting an application for a special permit for the installation of a communications structure, building or appurtenance the applicant shall consult with the Planning Board. The purpose of the consultation is to facilitate the permitting process by the exchange of information between the applicant and the Planning Board, and for the applicant to obtain a detailed description of the information and documentation required, in writing, by the Planning Board, in order to clarify and resolve concerns of the Board and minimize potential problems with the application.

18. The Planning Board shall hold a public hearing within sixty-five (65) days of the filing of an application and shall issue a decision within ninety (90) days following the date of the public hearing.

19. The applicant shall submit the following written information to the Planning Board:

a. A survey of all sites for the installation of communications structures, buildings or appurtenances which are feasible for providing the intended services. The survey shall include a rationale for the selection of a prime and at least one alternative site. All sites in Truro shall be located on the appropriate sheet(s) of the Truro Assessor's Atlas;

b. A survey of all pre-existing structures which are capable of supporting the equipment necessary to provide the intended service and a technical report which demonstrates why any such structure cannot be used by the applicant;

c. The radiation pattern of all proposed antennas showing the frequency and intensity of radiation at ground level and at 30 feet above ground level. At the expense of the applicant, Electro Magnetic Field (EMF) readings shall be provided to the Board of Health yearly and immediately after any addition to the facility;

d. The sound level in decibels at ground level, at 30 feet above ground level and at the top of the facility and 10, 50, 100 and 500 feet from the communications structure, building or appurtenances for wind velocities between calm and 100 miles per hour with all equipment operating at normal levels, including before condition measured, after condition prediction and cumulative condition (with co-location) prediction;

e. A delineation of the Assessor's Atlas of all areas in Truro which will not be served by the proposed installation for the prime and an alternative site;

f.   A statement of the services to be supported by the proposed communications structure, building or appurtenance;

g.   Plans of special design features and materials, including landscaping, to minimize the visual impact of proposed communications structures, buildings and appurtenances.  Site plans, elevations and fall zone should be included;

h.   A certification that the applicant has complied with all federal (including FAA), state and regional requirements to provide the proposed service and demonstration of compliance with the FCC guidelines for EMF's under National Environmental Policy Act (NEPA), including copies of the FCC Form 600, plus Environmental Assessment/Environmental Impact Statements as applicable;

i.   Within thirty (30) days after the application filing, the applicant shall arrange to fly a three-foot-diameter balloon at the primary and an alternate site at the maximum height of the proposed installation.  The date and location of the flights shall be advertised at least 14 days, but not more than 21 days before the flights, in a newspaper with a general circulation in Truro.  Photos shall be provided from all strategic viewing points, per agreement with the Planning Board prior to flight.

20. If a communications structure, building or appurtenance is to be installed on a pre-existing private structure or on land or a structure owned, prior to the effective date of the bylaw, by the Commonwealth of Massachusetts, or on land or a structure owned by the Town of Truro, the applicant shall submit the following written information to the Planning Board:

a.   A draft contract, including requirements for removal of all structures and for complete site restoration in the case of discontinued use, between the applicant and the owner (if different from the applicant).

b.   A description of the proposed facility at the proposed prime and alternate sites including:

    i.   Height of the facility and its associated equipment and antennas;

    ii.  Access roads and power supplies;

    iii. Type, size and number of transmitters.

    iv.  A list of all fuels to be used on the site and a detailed description of how each shall be contained.

c.   A site plan (scale not less than 1 inch=40 feet), showing the proposed facility, fall zones, existing and proposed contour elevations, 100-year flood zones, water resources, Zones of Contribution, waterways, wetlands and all associated equipment and structures on the site, including elevations of all equipment and structures with sufficient detail to delineate the external finish of all structures and equipment; and

d.   A landscape plan showing the proposed site before and after development, including topography and screening proposed to protect abutters.

21. For all applications other than those set forth in § 40.5 B 20 above, the applicant shall submit the following written information to the Planning Board:

a.   A statement of the purpose for which the application is made.

b.   The exact legal name of each person seeking a special permit and the address and telephone number or principal place of business of each such person.

c.   The name, title, address and telephone number of the attorney or other person to whom

correspondence or communications in regard to the application are to be addressed. Notice, orders, and other papers may be served upon the person so named, and such service shall be deemed to be service upon the applicant;

d.  A statement of the need for the proposed facility with as much specific information as is practicable to demonstrate the need, including description of the proposed system and how the proposed facility would eliminate or alleviate any existing deficiency or limitation, including all co-location facilities;

e.  A statement of the benefits expected from the proposed facility with as much information as is practicable;

f.  A description of the proposed facility at the proposed prime and alternate sites including:

    i.  Height of the facility and its associated equipment and antennas;

    ii.  Access roads and power supplies;

    iii.  Special design features and materials, including landscape plans;

    iv.  Type, size and number of transmitters and receivers, as well as the signal frequency, power output, and power density at the tower base, site boundary, and building where people might be exposed to the maximum power densities from the facility;

    v.  A map showing any fixed facilities with which the proposed facility would interact;

    vi.  The coverage signal strength, and integration of the proposed facility with any adjacent fixed facility, to be accompanied by a network plan showing interfaces with any adjacent service areas;

    vii.  A forecast of when maximum capability would be reached for the proposed facility and for facilities that would be integrated with the proposed facility;

    viii  Documentation of contents of communications buildings and/or cabinets.

g.  A description of the proposed prime and alternative site, including:

    i.  The most recent U.S.G.S. topographic quadrangle map (scale 1 inch = 2,000 feet) marked to show the site of the facility and any significant changes within a one-mile-radius of the site;

    ii.  A map (scale not less than 1 inch = 200 feet) of the lot or tract on which the facility is proposed to be located, showing the acreage and dimensions of such site, the name and location of adjacent public and private roads or the nearest public road, and the names of abutting owners and portions of their lands abutting the site;

    iii.  A site plan (scale not less than 1 inch = 40 feet), showing the proposed facility, fall zones, existing and proposed contour elevations, 100-year flood zones, water resources, Zones of Contribution, waterways, wetlands and all associated equipment and structures on the site, including elevations of all equipment and structures with sufficient detail to delineate the external finish of all structures and equipment;

    iv.  Where relevant, a terrain profile showing the proposed facility and access road and existing and proposed grades; and

    v.  The most recent aerial photograph (scale not less than 1 inch = 1,000 feet) showing the proposed site, access roads and all abutting properties.

    h.  A statement explaining mitigation measures for the proposed facility including:

       i.   Construction techniques designed specifically to minimize adverse effects on natural areas and sensitive areas;

       ii.  Special design features made specifically to avoid or minimize adverse effects on natural areas and sensitive areas;

       iii. Establishment of vegetation proposed near residential, recreation, and scenic areas;

       iv.  Special design features made specifically so that the proposed structures, buildings and appurtenances shall blend with pre-existing structures and buildings; and,

       v.   Methods for preservation of vegetation for wildlife habitat and screening;

       vi.  A list of all fuels to be used on the site and a detailed description of how each shall be contained.

       vii. A statement describing any hazardous materials or wastes (including quantities) to be used or generated on the site.

i.  A description of the existing and planned land uses of the proposed prime and alternative sites and surrounding areas;

j.  A description of the scenic, natural, historic, and recreational characteristics of the proposed prime and alternative sites and surrounding areas;

k.   Sight-line graphs to the proposed prime and alternative sites from visually impacted areas (a site from which the facility can be seen) such as residential developments, recreational areas, and historic sites;

l.   A list describing the type and height of all existing and proposed communication structures, buildings and appurtenances within a ten-mile radius within the search area, or within any other area from which use of the proposed prime or alterative structure might be feasible from a location standpoint for purposes of the application;

m.  A description of efforts to share existing and proposed structures, or consolidate telecommunications antennas of public and private services onto the proposed facility;

n.  A description of the technical alternatives and a statement containing justification for the proposed facility;

o.  A description of rejected sites with a U.S.G.S. topographic quadrangle map (scale 1 inch = 2,000 feet) marked to show the location of rejected sites;

p.  A detailed description and justification for the site selected, including a description of siting criteria and the process by which other possible sites were considered and eliminated including but not limited to, environmental effects, cost differential, coverages lost or gained, potential interference with other facilities, and signal loss due to topographical features compared to the proposed prime and alternate sites;

q.  A statement describing hazards to human health, if any, with supporting data and references to regulatory standards;

r.   A statement of the estimated costs for site acquisition and construction of a facility at the prime and alternative sites;

s.  A schedule showing the proposed program of site acquisition, construction, completion, operation and relocation or removal of the existing facilities for the prime and alternative sits;

t.    A copy of any filing or application that the applicant has been required to make together with any decision with regard to such filing or application;

u.    A landscape plan showing the proposed site and location before and after development, including topography screening proposed to protect abutters;

v.    Plans which show location and siting at a prime and at an alternate site; and

w.    A technical report which demonstrates that the maximum height of the installation is the minimum feasible to provide the intended service.

21. All written information submitted in accordance with the requirements listed in any previous section of this bylaw shall be certified by an appropriate licensed professional.

22. The Planning Board may also refer applications to the Board of Health, the Zoning Board of Appeals, and the Conservation Commission for review.

23. The Planning Board shall not approve any application that does not comply with all the requirements of this bylaw. The Board does, however, have the right to waive any part of this bylaw, when in its opinion, such a waiver would not be detrimental to the public interest, cause the Town any expense, or be inconsistent with the intent and purpose of this bylaw.

24. Any permit issued by the Planning Board for a communications facility shall be valid for the applicant only; it may not be reassigned, leased or sold.

25. Municipal and private, non-commercial uses are exempted from this bylaw.

26. The Planning Board shall act in accordance with the standards and requirements set forth herein and in accordance with the Massachusetts General Laws.

27. The invalidity of any section of this bylaw shall not invalidate any other section.

# SECTION 50

## Area and Height Regulations

§ 50.1.   Regulations

A.   Table

| DIMENSIONAL REQUIREMENT | ALL DISTRICTS |
|---|---|
| Minimum lot size | 33,750 sq ft (1)(2)(8) |
| Minimum lot frontage | 150 ft (1)(2) |
| Minimum frontyard setback | 25 ft (3) |
| Minimum sideyard setback | 25 ft (3)(4) |
| Maximum building height | 2 stories; 30 feet (5)(5a)(6)(7) |
| Minimum backyard setback | 25 ft (3)(4) |

*(4/05)*

NOTES

1.   Except buildings for accessory use and cottage colonies.

2.   Except lots or parcels lawfully in existence and shown on a subdivision plan or described in a deed recorded at the Barnstable County Registry of Deeds prior to the adoption of the bylaw by Truro Town Meeting on February 15, 1960, having at least five thousand (5,000) square feet of area and at least fifty (50) feet of lot frontage.

3.   Except in the Seashore District where the minimum setback from all streets is 50 ft. measured at a right angle from the street line.

4.   Except in those portions of the Beach Point Limited Business district served by the Town of Provincetown Water System, where the minimum sideyard and backyard setbacks shall be equivalent to five (5) ft per story of the building or structure in question. Structures less than a full story shall meet the minimum 5 ft setback.

5.   The 2 story limitation shall be measured from above mean ground level.

5a.   Except buildings which do not have gable, hip, or gambrel roofs; for these buildings, the maximum building height shall not exceed twenty-three (23) ft as measured to the highest point of the roof.

6.   Free standing flagpoles and private noncommercial radio and television antennae shall not exceed fifty (50) ft above mean ground level.

7.   Windmills shall not exceed sixty (60) ft from mean ground level to the center of the rotor.

8.   Except in the Seashore District where the minimum lot size is 3 acres.          *(4/05)*

B.   Exceptions to height limitations may be authorized by Board of Appeals by special permit.

C.   Notwithstanding the provisions of this section, the Board of Appeals may grant a special permit for proposed changes in building or roof height to buildings not exceeding 30 ft in height that were also in existence thus prior to April 1, 1986.

D.   Units in cottage colonies or motor courts shall be a minimum thirty (30) ft apart.

E.   In those portions of the Beach Point Limited Business district served by the Town of Provincetown Water System, buildings, including buildings for accessory use or cottages, on the same lot shall comply with the following minimum separations:

| BUILDING CONFIGURATION | SEPARATION |
|---|---|
| Two 1-story buildings | 10 ft |
| One 1- story buildings and one 1.5- story buildings | 12.5 ft |
| Two 1.5-story buildings | 15 ft |
| Two 2- story buildings | 20 ft |

F.   The Building Commissioner may require the filing of a certified site plan prepared by a land surveyor registered with the Commonwealth of Massachusetts, showing the location of all structures and top of foundation elevation, and structures' respective distances from all lot lines.

G.  Public accommodations and new units of existing public accommodations constructed after April 4, 1988 shall not exceed a ratio of one (1) unit per three thousand (3,000) sq ft of lot area, except that in the Beach Point Limited Business District the ratio shall not exceed one (1) unit per twenty-one hundred (2,100) sq ft.

H.  Public accommodations shall not exceed two (2) habitable stories.

## SECTION 60

Administration

§ 60.1.   Enforcement.

A.   This bylaw shall be enforced by the Building Commissioner. No building shall be erected or altered and no use of land or building shall commence or change except upon issuance of a permit by the Building Commissioner. Such permit shall be posted in a conspicuous place on the premises.

B.   Violations and Penalties. Any person, association, firm or corporation violating any of the provisions of this bylaw may be fined not more than $300 for each offense. Each day that such a violation continues shall constitute a separate offense.

C.   Noncriminal Disposition process. Violations of the zoning bylaw provisions may be sanctioned through the noncriminal disposition process authorized by Massachusetts General Laws Chapter 40, Section 21D, as amended. Resort to this noncriminal disposition method shall lie within the discretion of the Building Commissioner, or his or her designee. The option of noncriminal disposition shall exist in addition to all other available enforcement alternatives.

The enforcement officer who takes cognizance of a violation of the bylaw subject to this noncriminal disposition process and who elects, as an alternative to criminal process, to proceed with noncriminal enforcement, shall give the offender a written notice to appear before the clerk of the Orleans Division of the District Court Department at any time during office hours, but not later than twenty-one (21) days after the date of such notice.

Each day during which a violation of a zoning bylaw provision continues shall be deemed to be a separate offense subject to the noncriminal disposition process.

For the purposes of noncriminal disposition, any violation of the zoning bylaw shall be subject to a $25 fine.

D.   If the Building Commissioner is requested in writing to enforce this bylaw against any person allegedly in violation of it, and the Building Commissioner declines to act, he shall notify in writing the party requesting such enforcement of any action or refusal to act and the reasons therefore within 14 days of receipt of such request.

§ 60.2.   Board of Appeals. A Board of Appeals consisting of five members and two associated members shall have the power conferred on it under Chapter 40A of the General Laws of Massachusetts and under this zoning bylaw, which powers shall include the review of Special Permit and Variance applications, except for Variances as to use, and the appeal of decisions of the Building Commissioner.

§ 60.3.   Amendment. This bylaw may be amended from time to time at an annual or special Town Meeting in accordance with the provisions of Chapter 40A of the General Laws of Massachusetts.

§ 60.4.   Notice requirements. In all cases where notice of a public hearing is required by the General Laws of Massachusetts, Chapter 40A, or by this bylaw, notice shall be in accordance with the provisions of the General Laws of Massachusetts, Chapter 40A.

§ 60.5.   Recording Variances and Special Permits. No variance or special permit, or any extension, modification, or renewal thereof shall take effect until a copy of the decision bearing the certification of the Town Clerk demonstrates that 20 days have elapsed and no appeal has been filed, or that if such appeal has been filed, that it has been dismissed or denied, and is recorded in the Barnstable County Registry of

Deeds and indexed in the grantor index under the name of the owner of record or is recorded and noted on the owner's certificate of title. The fee for recording or registering shall be paid by the owner or applicant.

§ 60.6.   Appeals and Judicial Review.

A.   Appeal of Administrative Actions.

1.   Any person aggrieved by reason of his inability to obtain a permit or an enforcement action from the Building Commissioner or other administrative official, whether or not such person was previously a party to the proceeding, may appeal to the Board of Appeals.

2.   Any person, including an officer or a board of the Town of Truro, or of an abutting town, aggrieved by an order of decision of the Building Commissioner or other administrative official, in violation of the General Laws of Massachusetts, Chapter 40A, and amendments thereto, and this bylaw, may appeal to the Board of Appeals.

B.   Procedure. Any appeal under this section shall be taken within 30 days from the date of the order or decision which is being appealed by filing a notice of appeal, specifying the grounds thereof, with the Town Clerk. The Clerk shall immediately transmit copies of the appeal to the officer or board whose order or decision is being appealed. The appeal shall be conducted in accordance with the provisions of the General Laws of Massachusetts, Chapter 40A, Section 15, and amendments thereto.

C.   Appeals of actions by Board of Appeals. Any person aggrieved by a decision of the Board of Appeals, whether or not previously a party to the proceeding, may appeal to the Superior Court or to the Land Court, in accordance with the General Laws of Massachusetts, Chapter 40A, Section 17, and amendments thereto, by bringing an action within 20 days after the decision has been filed in the office of the Town Clerk. Notice of the action with a copy of the complaint shall be given to the Town Clerk so as to be received within such 20 days. The form, contents and filing of the complaint shall be as prescribed by the General Laws of Massachusetts, Chapter 40A, Section 17, and amendments thereto.

# SECTION 70

Site Plan Review

§ 70.1  Purpose

A.  The purpose of Site Plan Review is to protect the health, safety, convenience and general welfare of the inhabitants of the Town.  It provides a review of plans for uses and structures which may have significant impacts, both within the site and in relation to adjacent properties and streets; including the potential impact on public services and infrastructure; pedestrian and vehicular traffic; unique environmental and historic resources; abutting properties; and community character and ambiance.

B.  Sites and developments to which this section applies shall comply with the regulations of this section as well as all other applicable Town Bylaws and the requirements of the Commonwealth of Massachusetts prior to any construction being undertaken in the Town of Truro.

§ 70.2  Developments Which Require Site Plan Review

A.  Site Plan Review is required for:

1.  Construction, alteration, or modification of any commercial or industrial properties which contain more than three thousand (3,000) square feet of gross floor area (the aggregate gross floor area of all structures on the project lot); or requires twenty (20) or more parking spaces.

2.  Construction, alteration or modification of any existing commercial or industrial properties which results in the addition of more than one thousand five hundred (1,500) square feet of gross floor area (the aggregate gross floor area of all structures on the project lot) to an existing structure(s); or requires ten (10) or more parking spaces.

3.  Any construction, site improvements, new uses in existing structures, or developments which contain new processes not normally associated with the existing use and which result in changes in traffic circulation and or storm water drainage; significant detrimental impact on adjacent property, or which trigger the need for five (5) or more additional parking spaces under the standards of § 30.9 of this Zoning Bylaw.

4.  Any residential development having five or more buildable lots.

5.  Construction, alteration or modification of any property inside the Seashore District which results in the addition of more than one thousand (1,000) square feet of gross floor area (the aggregate gross floor area of all structures on the project lot) to an existing structure(s) or which adds an additional story to an existing structure.

6.  All other projects specifically requiring site plan approval or review as stated in other sections of this Zoning Bylaw.

B.  Waiver of Site Plan Review

The Planning Board may determine at its discretion without a public hearing that submission of a site plan review application is not required when the alteration or reconstruction of an existing structure or new use or change in use will not have a significant impact: within the site or in relation to adjacent properties and streets; on pedestrian and vehicular traffic; on public services and infrastructure, or on unique environmental and historic resources, abutting properties; or community needs.

The applicant must request a waiver from Site Plan Review in writing and may be required to submit supporting documentation to establish that such review is not required. A waiver request will be considered at a regular session of the Planning Board.

§ 70.3   Site Alteration - Violation of the Bylaw

A. No building permit, site clearing, filling, grading, material deliveries or construction shall be initiated on any site to which this section applies until any required Site Plan endorsement is obtained from the Planning Board.

B..Nothing herein shall be construed to prohibit such site clearing or altering as may be necessary to conduct such pre-development studies as geotechnical tests, soil borings, wetlands determination, percolation tests for septic systems as required by the Board of Health, or other similar tests required by any Town Bylaw or regulation of the Commonwealth.

§ 70.4   Procedures

A.    A site plan endorsed by the Planning Board becomes the official development plan for a site within the Town of Truro. Town permits are issued or withheld based upon compliance with the endorsed site plan. The endorsed site plan is legally binding upon the holder and can only be changed or adjusted in compliance with the provisions contained in Section XIII-8 hereof ( Revisions to Endorsed Site Plans). The Board's endorsement shall mean that all pertinent aspects of this by-law have been reviewed by the Board, unless specifically waived by the Board. Endorsement does not constitute approval.

B.    An applicant for site plan review shall file with the Planning Board secretary an application form; filing fee (in effect at the time); fifteen (15) copies of the proposed site plan, and any additional information as may be required with the Planning Board. Once the application is deemed complete, the Board will forward the application to the Town Clerk. An application will not be deemed complete until all required information and fees are submitted. The time periods set forth in this Zoning Bylaw and M.G.L. Ch.40A will not start until the application has been deemed complete and submitted to the Town Clerk.

C.    The Planning Board shall have the authority to require that the applicant pay for necessary professional services reasonably required to review and analyze adequately the contents of any site plan or related impact study requested by the Board.

§ 70.5   Information Required. All site plans shall include all the following information or documentation:

A.    The Special Permit Application Form, along with any fees as may be set by the Board.

B.    Drawings prepared at a scale of one inch equals forty feet (1"=40') or larger, or at another scale as approved in advance by the Planning Board.

C.    All site plans and building elevations shall be prepared by a certified architect, and/or a civil engineer registered in the Commonwealth of Massachusetts. All landscape plans shall be prepared by a landscape professional acceptable to the Planning Board. All plans shall be signed and stamped by the architect and/or engineer and/or landscape professional.

D.    The following information must be submitted together with the application form:

1.  NORTH ARROW/LOCATION MAP: A north arrow and a location map showing surrounding roadways and land uses adjacent to the site on a scale of one inch equals 1500 feet (1"=1500').

2.  SURVEY OF LOT/PARCEL: A boundary survey conforming to the requirements of the Barnstable County Registry of Deeds. The survey shall be dated and indicate any revision made to the survey or site plan. Any revision in the survey shall be recorded before site plan endorsement becomes final.

3.  NAME/DESCRIPTION OF PROJECT: The name of the project and the names, addresses, and telephone numbers of the project developers; a project description listing land uses, project phases, or other pertinent information necessary to evaluate the proposed project plan.

4.  LIST OF ABUTTERS: A list of abutters and their addresses, including any abutters separated from the proposed project by a street or other way. The Board shall notify abutters and hold an advertised public hearing within sixty-five (65) days of receipt of a complete plan application.

5.  EASEMENTS/LEGAL CONDITIONS: Identification of easement(s) or legal encumbrances(s) that are related to the site's physical development, and a listing of any condition(s) placed upon the site by the Board of Appeals, Planning Board, Conservation Commission, or any other public body or agency with the authority to place conditions on the site's development.

6  TOPOGRAPHY: The present and proposed topography of the site, utilizing two foot (2') contour intervals. The contours shall extend at least fifty (50') feet beyond the site boundaries as estimated by the professional preparing the plan.

7.  ZONING INFORMATION: All applicable Zoning Bylaw information regarding the site's development. This information shall be placed in a tabular format which must list all parking; setbacks; percent of lot coverage; number of dwelling units; total amount of square feet; size of signs, and any other applicable zoning information necessary for the proper review of the site plan.

8.  STORMWATER DRAINAGE: All storm water drainage facilities utilized by the site shall be shown on the site plan. Storm water drainage calculations which support the design of the control facilities shown on the plan shall be submitted to the Department of Public Works for review and approval. Calculations shall show a mitigation of runoff to zero of the 2, 10, and 100 year storm events.

9.  BUILDING LOCATION: Identification of all existing and proposed structure(s) located on the site. The number of stories, overall height in feet and gross floor area in square feet of all existing and proposed structures shall be indicated.

10.  BUILDING ELEVATION: A drawing of the exterior of the proposed building, as viewed from all sides.  This drawing must be at least 8" x 11" in size.

11.  LOCATION OF PARKING/WALKWAYS: Identification of the location of all existing and proposed parking and walkways, including curb cuts that will be used for site access from adjacent roadways or access points.

12  LOCATION OF WETLANDS/NOTICE OF INTENT: All resource areas as defined in M.G.L. Chapter 131, Section 40 shall be shown on the site plan. The applicant shall file a Notice of Intent with the Truro Conservation Commission concurrently with the application to the Planning Board for Site Plan Review.

13.  LOCATION OF WALLS/SIGNS: Identification of the location, height and materials to be used for all retaining walls and signs located on the site. Signs will be reviewed using the Town of Truro Sign Code section of the zoning bylaw.

14.   LOCATION OF ROADWAYS/DRIVES: Identification of all right-of-ways and driveways including the type and dimensions of curbs and gutters. Distances to all the nearest roadways and/or curb cuts shall be shown for both sides of any street which is adjacent to the site.

15.   OUTDOOR STORAGE/DISPLAY AREAS: Identification of the location and type of outdoor storage and display areas on the site.

16.   LANDSCAPING PLAN: Identification of the location and landscape schedule of all perimeter and interior landscaping, including but not limited to; proposed paving materials for walkways; fences; stonewalls; and all planting materials to be placed on the site. In addition, all existing trees over 6 inches diameter at breast height (DBH) to be saved or removed shall be shown on the site plan. Any landscaping required shall be indicated on the site plan in tabular form showing the amount required by the Zoning Bylaw and the amount provided.

17  REFUSE AREAS: Identification of the location of each outdoor refuse storage area, including the method of storage and screening. All refuse areas must be fully enclosed.

18.   LIGHTING FACILITIES: Identification of all proposed illumination, indicating the direction and the degree of illumination offered by the proposed lighting facilities and including specifications of the light fixture(s) to be used.

19.   DRAINAGE BASIN STUDY: A detailed hydrology study for the site which indicate the proposed storm water run-off rate(s) and their potential downstream impact.

20.   TRAFFIC IMPACT STUDY: Identification of existing traffic levels, along with the expected traffic impacts based upon the proposed project. The plan shall describe estimated average daily and peak hour vehicle trips to be generated by the project.

21.   COMMONWEALTH REVIEW: Any relevant information submitted to any agency of the Commonwealth shall be filed with the Planning Board upon the initial submission of the project for Board review.

22.   LOCATION AND DESCRIPTION OF UTILITIES.  Identification of all utilities, including sewer line locations and profiles and storm drainage systems.

23.   FISCAL IMPACT: Projections of municipal costs rising from increased demand for public services and infrastructure; provisions of benefits from increased tax revenues, employment and infrastructure improvements.  Site plan documentation shall estimate new service requirements for police and fire, waste disposal, road maintenance and snow removal, and indicate what steps, if any, the applicant is proposing to minimize impact.

24.   COMMUNITY IMPACT: Analysis of the project's impact on the surrounding neighborhood in terms of architectural consistency, pedestrian movement and overall character, including temporary and permanent increases in noise, dust, smoke, and vibrations; impacts on nearby historic structures or site; and an evaluation of the proposed project's consistency and compatibility with existing local and regional plans.

25.   PROJECT ESTIMATE: The estimated date of initiation and the time required to complete the proposed project and any and all phases thereof; together with a written cost estimate including all planned site improvements.

E.     Waiver of Information Requirements

Upon written request of the applicant the Planning Board may waive any requirements of this sub-section.

§ 70.6  Review Criteria/Design Guidelines

The Planning Board will evaluate submitted site plans and their supporting information based on the following review criteria and design guidelines:

A. General

1.  Conformity with all applicable provisions of the zoning bylaw.

2.  Protection of abutting properties from detrimental site characteristics.

B. Environmental

1.  Protection of unique or important natural, historic, or scenic features. Building sites shall minimize obstruction of scenic views from publicly accessible locations; minimize tree, vegetation, soil removal and grade changes; and maximize open space retention.

2.  Adequacy of proposed methods of refuse disposal.

3.  Capacity of proposed sewage disposal and water supply systems within and adjacent to the site to serve the proposed use.

4.  Adequacy of the proposed drainage system within, and existing system adjacent to, the site to handle the predicted runoff resulting from the development. Drainage run-off from the project shall not: damage any existing wellfield(s) or public water supply; damage adjoining property, overload, silt up or contaminate any marsh, swamp, bog, pond, stream, or other body of water; or interfere with the functioning of any vernal pool.

5.  Adequacy of planned landscaping, including screening of adjacent residential uses; landscaping of proposed parking areas, and buffering along street frontage.

6.  Adequacy of the soil erosion plan, including protection of any and all steep slopes both during and after construction.

7   Protection of adjacent properties from intrusive lighting, including parking lot and building exterior lighting.

8.  Protection of the surrounding area from adverse impact from excessive noise, dust, smoke, or vibration higher than levels previously experienced from permitted uses.

C. Design

1.  Buildings shall relate harmoniously to each other in architectural style, site location, and building exits and entrances. Building scale, massing, materials, and detailing should be compatible with what is prevalent in the surrounding area.

2.  Screening shall be provided for storage areas, loading docks, dumpsters, rooftop or other exposed equipment, parking areas, utility buildings and similar features viewed from public ways and residentially used or zoned premises.

3.  Electric, telephone, cable, and other such utility lines and equipment must be placed underground.

4.  The project shall not place excessive demands on Town services.

D. Traffic/Parking/Pedestrian Movement

1   The location and number of curb cuts shall be minimized to reduce turning movements and hazardous exits and entrances. Driveways shall be located opposite each other wherever feasible.

2.    Provision for access to adjoining properties shall be provided as appropriate. Joint access driveways between adjoining properties shall be encouraged.

3.    Convenience and safety of vehicular and pedestrian movement within the site and in relation to adjacent and other ways serving the project shall be maximized. Traffic patterns for vehicles and pedestrians must show safe and adequate circulation within and access to and from the site.

§ 70.7  Findings of the Planning Board

A.    The concurring vote of four members of the Planning Board shall either endorse, endorse with conditions or waivers, or deny endorsement of a site plan submitted for review.

1.    The Planning Board shall endorse a site plan when all the following conditions are met:

a.    The site plan has been submitted in accordance with the regulations and procedures as outlined in this section, and substantially complies with § 70.6, Review Criteria and Design Guidelines.

b.    The site plan complies with all current bylaw requirements of the Town.

2.    The Planning Board shall conditionally endorse a site plan when both the following conditions are met:

a.    The project conforms to all requirements of the Zoning Bylaw, with deviations permissible only through the Planning Board's approving a sub-division or a special permit being granted by the Board of Appeals.

b.    The application needs further approvals from any Town Board, Department or Commission, or requires approvals by any state, and/or federal agency.

3.    The Planning Board may deny endorsement of a site plan for any of the following reasons:

a.    The plan does not include all the materials or information required in this section, or has failed to adhere to the procedures for Site Plan Review as outlined in this section.

b.    The plan as presented is not in compliance with one or more Town Bylaws.

c.    The plan does not substantially comply with the Review Criteria and Design Guidelines.

d.    The plan has been drawn incorrectly or in such form that the Planning Board is unable to determine whether sufficient information is being presented for review.

e.    The applicant has failed to incorporate and adhere to any condition(s) for endorsement imposed by any Town Board, Department or Commission, or the requirements of any state or federal agency, which has proper authority to place conditions on a matter before the Planning Board.

B.    The Planning Board shall render a decision within ninety (90) days of the public hearing, and shall file its written decision with the Town Clerk's office and other appropriate parties in accordance with the provisions of M.G.L. Chapter 40A.

C..    The applicant shall be responsible for filing the endorsed site plan and a copy of any accompanying Planning Board decision at the Barnstable Registry of Deeds. Prior to the issuance of a building permit, the applicant shall present evidence of such recording to the Building Inspector.

§ 70.8    Special Permits

A.    For those projects which require a special permit(s) from the Board of Appeals, the Planning Board shall forward its findings and recommendations to the Board of Appeals.

§ 70.9    Revisions to Approved Site Plan

A.    Any revisions to a project that has received site plan endorsement -- except for a change of egress and ingress in compliance with Town Bylaws and the requirements of the Commonwealth -- shall be submitted to the Planning Board for further review. No revisions shall be approved until the Board receives fifteen (15) copies of the revised plan. If the revisions are or may be substantial and materially different from the endorsed plan, the Board shall direct the applicant to resubmit the site plan to the Board for review in accordance with the provisions of this section.

§70.10    Performance Guarantee

A    For the purpose of securing the performance of all proposed work, including landscaping and off-site improvements, the Planning Board will require security in the form of good funds submitted to the Town of Truro in the amount of up to ten (10) percent of the estimated project cost as determined by the Board. The funds will be released upon completion of the project.

1.    Prior to the final release of security and issuance of Certificate of Occupancy:

a.    A final as-built plan showing final topography, the location of all on-site utilities, structures, curb cuts, parking spaces and drainage facilities must be submitted to and reviewed by the Planning Board and the Department of Public Works.

b.    The applicant must submit to the Planning Board a letter from the project engineer stating that the building(s), signs, landscaping, lighting and site layout substantially comply with the plans as endorsed by the Planning Board.

c    Upon receipt of the as-built plans and project engineer's letter of compliance, the Planning Board shall review the site. Any additional screening as may be reasonably required by the Board will be added at the applicant's expense.

d.    An applicant may request a temporary Certificate of Occupancy. The Planning Board may recommend that a temporary Certificate of Occupancy be issued by the Building Commissioner if, in the Board's opinion, the project substantially complies with the endorsed plan in all respects deemed by the Board material for occupancy, and the structure complies with applicable state fire and building codes. A temporary Certificate of Occupancy shall expire eight (8) months from the date of issue and may not be renewed.

B.    Site Plan endorsement shall expire two (2) years from the date of endorsement unless substantial construction has occurred. Substantial construction will be determined by a majority vote of the Planning Board. At the discretion of the Board, a time extension for project completion may be granted.

§ 70.11    Assignment

A.    An endorsed site plan may not be assigned to another person(s) or entity without the written assent of the Planning Board.

B.    The Planning Board may require such information as it deems relevant before assenting to the assignment of an endorsed or conditionally endorsed site plan.

C.  The Planning Board shall act in a timely manner upon a written request to assign an endorsed, or conditionally endorsed, plan to another person(s) or entity(ies) and shall not unreasonably withhold such written assent.

## § 70.12  Appeals

A.  The appeal of any decision of the Planning Board hereunder shall be made in accordance with the provisions of MGL Chapter 40A, Section. 17.

## § 70.13  Waivers

A.  The Planning Board shall not approve any application that does not comply with all the requirements of this Bylaw.  The Board does, however, have the right to waive any provision of this Bylaw when, in its opinion, such a waiver would not be detrimental to the public interest, cause the Town any expense, or be inconsistent with the intent and purpose of this Bylaw.

# SECTION 80

## Open Space Development

§ 80.1   Open Space Development

A.  Purpose. The purposes of Open Space Development are to protect and preserve the natural features, visual character and open space of the town of Truro, to encourage development that conforms to existing topography, allow for greater flexibility and creativity in the design of residential subdivisions provided that the overall density of the development is no greater than what is normally allowed in the district, and to encourage economical and efficient provision of public services.

B.  Applicability and Description. An Open Space Development is a residential development in which the buildings and accessory uses are clustered together with reduced lot sizes into one or more groups. The land not included in the building lots shall be permanently preserved as open space. The Planning Board may approve a special permit for a site plan for an Open Space Development of five or more single family detached dwellings subject to the requirements and conditions of this section, § 30.8 Special Permits, and § 70 Site Plan Review.  Applicants for subdivisions of five or more lots within the Town of Truro may submit a development plan in accordance with this section.

C.  Pre-Application Review. Applicants for Open Space Developments are encouraged to discuss their projects with the Planning Board prior to formal application in order to avoid unnecessary delays.

D.  Application/Site Plan Requirements. Applicants shall submit to the Planning Board the required documentation for a Site Plan Review as listed in § 70.6 and a conceptual site plan for Open Space Development illustrating the location and area of common land.

The application should also indicate the proposed owner of the open space, its intended use, and proposed open space easements/restrictions.

E.  Requirements.

1.   The maximum number of dwelling units shall not exceed the number that would be permitted by these bylaws under a standard conventional subdivision. The maximum number of dwelling units shall be calculated based upon the minimum residential lot size normally required in the district divided into the total acreage once the following areas are subtracted: 10% of the total acreage (for roads, detention basins, and other utilities); land areas below mean water on tidal water, areas of exposed ground water, and wetlands (marsh, bog, swamp, beach, dune or wet meadow) and all land precluded from residential development by current applicable local, state or federal regulations. The Planning Board shall consider the recommendations of other town boards, including the Board of Health and Conservation Commission, in determining the number of dwelling units.

2.   For the purpose of Open Space Developments, dimensional requirements may be modified as follows:

| Average minimum lot area | 17,050 sq. ft. |
|---|---|
| Minimum lot area | 14,000 sq. ft. |
| Average lot frontage | 80 feet |
| Minimum lot frontage | 60 feet |
| Minimum front, side and rear setbacks | 15 feet |

3.   All applications for open space development shall meet the requirements of Site Plan Review specified in Section 70 of the Zoning bylaw.

4. All land not designated for roads, dwellings or other structures within the Open Space Development shall be designated permanent common land for one of the uses specified below. Common land shall comprise not less than 40% of the upland area of the site.

5. Common land shall be permanently owned and maintained by an incorporated homeowners association, nonprofit organization, or the town for conservation and recreation use pursuant to MGL Chapter. 40A, Section 9 and as approved by the Planning Board. Legal documents guaranteeing maintenance of the common land, and giving a lien to the Town in the event of lack of such maintenance, shall be subject to the review and approval of the Planning Board and Town Counsel. Further subdivision of the common land or its use for purposes other than specified above shall be prohibited.

6. The permanence and maintenance of the common land shall be secured through a conservation restriction enforceable by the town conforming to standards of the Massachusetts Executive Office of Environmental Affairs, Division of Conservation Services and approved by the Planning Board.

7. The common land shall be used only for recreation, conservation, outdoor education and agriculture. Developed recreation facilities such as tennis courts, swimming pools, etc. may comprise no more than 40% of the total common land. No more than 5% of the common land may be developed for structures or pavement accessory to the proposed use of the common land. The Planning Board shall review and approve the proposed use(s) of the common land.

F. Open Space Development Design Criteria

1. Where the proposed development abuts a body of water, a portion of the shoreline, as well as reasonable access to it shall be a part of the common land.

2. To the greatest extent feasible house lots shall be laid out within woodlands or along the edges of open fields in order to maintain views.

3. Common land shall be arranged to protect valuable natural environments such as stream valleys, wildlife habitat, and scenic views and shall be planned as large, contiguous parcels whenever possible.

4. Common lands shall be provided with adequate access from one or more streets.

G. Special Permit Findings. The Planning Board shall grant a special permit for Open Space Development if it finds that the development:

1. is consistent with the purposes and requirements of this Section;

2. is in harmony with the existing and probable future uses of the area and with the character of the surrounding area and neighborhood;

3. will better serve the Town and neighborhood surrounding the development than the development likely without such approval; and

4. complies with the requirements of § 30.4 Water Resources Protection District, of this bylaw.

I. Incentives. In order to encourage the use of Open Space Development within the town, the Planning Board is encouraged to make use of the following incentives:

1. In appropriate cases, the Planning Board may waive provisions of the Subdivision Rules and Regulations related to road width and surfacing, cul-de-sac diameter, etc. in the interests of good design if it determines that adequate access will be provided to all lots in the development by ways that will be safe and convenient for travel.

2.  Up to 50% of the land area proposed to be set aside as common land may be located on a different parcel of land, but only if the Planning Board determines, after consultation with the Conservation Commission, that such other parcel of land is exceptionally valuable to the town and its residents for open space and/or recreation and that such value more than offsets the presumed benefits of having such common open space adjacent to the proposed residential development. Nonadjacent open space is to be conveyed only to the Town or a nonprofit organization for park or open space use.

J.  Relationship to Subdivision Plan. Planning Board approval of a special permit shall not substitute for approval of a Definitive Subdivision Plan where required. Following approval of the special permit, a Definitive Plan shall be submitted to the Planning Board consistent with its subdivision regulations and in substantial conformity to the Open Space Development site plan.

## SECTION 90

Bounds of Zoning Districts

The bounds of zoning districts shown on the zoning map are as follows:

### § 90.1.   General Business Districts

A.   Route 6. All the land contained in the area bounded as follows: Beginning at a point on the westerly side-line of the State Highway, 1951 layout (Route 6) at the northerly side of Castle Road (a Town Way) and running thence westerly by said side of Castle Road to a point which is five hundred (500) feet distant from the said State Highway side-line and measured radially thereto;

Thence running in a general northerly direction, parallel and concentric with the said westerly side-line of the State Highway, and five hundred (500) feet distant therefrom, to a point opposite station 294 plus 63.37 of the 1925 State Highway base-line (Route 6A) and five hundred (500) feet westerly from the side-line thereof;

Thence easterly on a line perpendicular to said Highway, 1925 layout (Route 6A), five hundred (500) feet to a point on said State Highway (Route 6A) side-line opposite said station 294 plus 63.37 of said baseline;

Thence in a general southerly direction by the westerly side-line of the State Highway (Route 6) to the point of beginning by Castle Road.

B.   North Truro Center. All the area contained in a strip of land on the southeasterly side of the Highland Road in the Village of North Truro three hundred (300) feet in width throughout bounded on the West by the State Highway 1925 layout, (Route 6A), on the North by said Highland Road as laid out by the Commonwealth of Massachusetts for the Town of Truro in 1955; and on the East by the State Highway 1953 layout. All the area contained in a strip of land three hundred (300) feet wide on the Northerly side of the Highland Road in the Village of North Truro and bounded on the West by the State Highway 1925 layout (Route 6A); on the South by said Highland Road as laid out by the Commonwealth of Massachusetts for the Town of Truro in 1953 and on the East by the State Highway 1953 layout.

### § 90.2.   Limited Business Districts

A.   Route 6A, North Truro. All the area contained in a strip of land one hundred fifty (150) feet wide along the easterly and northeasterly side of the State Highway, Route 6A (1925 and 1915 layouts) (also known as Shore Road), beginning at the northerly terminus of the North Truro Center General Business District in the Village of North Truro to the northerly sideline of High Head Road and the extension thereof; and

All the area contained in a strip of land one hundred fifty (150) feet wide along the westerly and southwesterly side of the State Highway, Route 6A (1925 and 1915 layouts) (also known as Shore Road), beginning at the northerly side of Pond Road in the Village of North Truro at the westerly side of said State Highway, Route 6A (also known as Shore Road), and following the said sideline of the said State Highway, to the intersection of said State Highway and the easterly sideline of Knowles Heights Road.

B.   Truro Center. All the land contained in the following area which is bounded and described as follows:

Beginning at a point on the southwesterly side-line of the old State Highway, 1925 layout which point of beginning is located from the hereinafter reference point on a bearing of North 53'14'36" West at a

distance of one hundred seven (107) feet. Said reference point is a Massachusetts Highway Bound at the intersection of the westerly sideline of the State Highway, 1950 layout and said old State Highway, 1925 layout and bears South 89°40'24" West from station 117 plus 82.28 of the main

base-line of said 1950 State Highway lay-out and one hundred eighteen and 56/100 (118.56) feet therefrom; From said point of beginning the area runs in a general northerly direction, following the westerly side-line of said old State Highway and three hundred (300) feet in width throughout, measured perpendicular thereto and three hundred (300) feet therefrom, ending opposite station 138 plus 78.44 of the said 1925 State Highway base-line.

All the land contained in the area bounded on the East by the State Highway, 1950 layout;

On the North by South Pamet Road as laid out by the Commonwealth of Massachusetts for the Town in 1951; Said area is nearly triangular in shape and is less than three hundred (300) feet at its widest point.

All the land contained in the area bounded as follows: beginning at the intersection of the easterly side-line of the old State Highway, 1925 layout and the northerly side-line of South Pamet Rd. and runs thence northerly by the said easterly side-line of said State Highway 1925 layout, to a point where said highway side-line intersects the location of the old North Pamet Road, a Town Way; Thence easterly by the location of said old North Pamet Road to a point which is three hundred (300) feet distant from the said easterly side-line of the State Highway 1925 layout, as measured perpendicular thereto; Thence southerly on a line, parallel with said State Highway (1925) layout side-line, to a point where it intersects the westerly side-line of the State Highway (1951 layout) Route 6; Thence southerly, southwesterly and westerly by said State Highway (1951 layout) and by said South Pamet Road, side-line to the point of beginning.

C.  Beach Point. Beginning at the intersection of the southerly sideline of the State Highway, Route 6A (1915 layout) (also known as Shore Road) and the westerly sideline of Knowles Heights Road (1956 layout), thence running southeasterly by the westerly sideline of Knowles Heights Road, a distance of 245.15 feet to the point of intersection with the southerly line of lot 2 as shown on a plan recorded with the Barnstable County Registry of Deeds in Plan Book 300, page 4; thence running southwesterly by the southerly line of said lot 2 and by the southerly line of lot 1 as shown on the aforementioned plan, a distance of 526 feet, more or less, to the mean high tide line of the waters of Cape Cod Bay; thence northwesterly by the mean high tide line of the waters of Cape Cod Bay to the Truro-Provincetown line; thence northerly by said town line to the aforementioned State Highway, Route 6A; thence southeasterly and easterly by the southerly side line of the aforementioned Route 6A to the point of beginning; and

Beginning at the point of intersection of the westerly sideline of High Head Road and the northerly sideline of Route 6A (also known as Shore Road); thence northwesterly by the sideline of Route 6A to the Truro-Provincetown line; thence northerly and northeasterly along the Truro-Provincetown line to the State Highway, Route 6 (1953 alteration-layout); and thence southeasterly by the southerly sideline of the aforementioned Route 6 to the point of intersection with the extension of the westerly sideline of High Head Road; thence southwesterly by the westerly sideline of High Head Road and its extension to the point of intersection.

§ 90.3.  Seashore District

Being that area established by vote taken at the Town Meeting held February 18, 1963, the Seashore District consists of all the land contained in the area which is bounded and described as follows:

Commencing at a point on the Atlantic Ocean and on the Town line between the towns of Truro and Provincetown and running thence southeasterly and southerly by said Town line to a point where said

Town line intersects the northerly boundary line of the State Highway, Route 6;

Thence running in a general southeasterly direction by said State Highway side line to a point about three hundred feet (300') northwesterly of South Hollow Road, which point has a position on the Mass. Geodetic Survey Grid System, hereinafter known as the Grid System of X-986, 431.12' & Y-378, 721.69';

Thence due East on Grid bearing of N 89°02'40"E for a distance of two thousand six hundred ninety and 39/100 (2690.39) feet to a point having a position on said Grid System of X-989, 121.13' & Y-378,766.56';

Thence S 26°27' 24" E for a distance of two thousand eight hundred and five and 53/100 (2805.53) feet to a point;

Thence S 11°33' 31" E for a distance of two thousand nine hundred twenty-six and 96/100 (2926.96) feet to a point;

Thence S 46°04' 35" E for a distance of one thousand four hundred eleven and 36/100 (1411.36) feet to a point;

Thence S 49°19' 08" W, one thousand six hundred seventy-eight and 86/100 (1678.86) feet to a point;

Thence S 61°22' 22" E, one thousand eight hundred (1800) feet to a point;

Thence N 78°14' 52" E, one thousand seven hundred forty-five and 71/100 (1745.71) feet to a point;

Thence N 60°03' 30" E, six hundred seventy-eight and 88/100 (678.88) feet to a point;

Thence S 47°09' 29" E, one thousand eight hundred fourteen and 61/100 (1814.61) feet to a point;

Thence S 27°18' 29" E, one thousand eight hundred fifty (1850) feet to a point;

Thence S 42°55' 46" W, one thousand one hundred eighty-five and 64/100 (1185.64) feet to a point;

Thence S 61°11' 21" W, six hundred sixty-two and 04/100 (662.04) feet to a point;

Thence S 6°28' 22" E, one thousand seven hundred eighty-four and 73/100 (1784.73) feet to a point by the south side of South Pamet Road;

Thence S 22°56' 00" E, one thousand five hundred eighty-four (1584) feet to a point;

Thence S 75°38' 02" W, crossing said State Highway for a distance of six thousand eight hundred thirty-six and 79/100 (6836.79) feet to a point on the easterly side of Old County Road, which point has a position on said Grid System of X-989, 565.32' & Y-362, 152.47';

Thence in a general southerly direction by and following the easterly side line of Old County Road to a point opposite Ryder Beach Road, which point has a position on said Grid System of X-989, 312.21' & Y-356, 460.56';

Thence N 55°20' 26" E, three hundred (300) feet to a point;

Thence S 34°39' 34" E, four hundred seventy-three and 44/100 (473.44) feet to a point;

Thence S 24°46' 09" E, two hundred forty-six and 32/100 (246.32) feet to a point;

Thence S 15°43' 01" E, four hundred fifty-five and 29/100 (455.29) feet to a point;

Thence S 37°23' 49" E, four hundred twenty-seven and 91/100 (427.91) feet to a point;

Thence S 68°18' 06" W, crossing said Old County Road to the waters of Cape Cod Bay;

Thence southerly by said waters of Cape Cod Bay to the Truro-Wellfleet Town line;

Thence in an easterly direction by said Truro-Wellfleet Town line to the Atlantic Ocean;

Thence in a general northerly and northwesterly direction by said Atlantic Ocean to the point beginning at the Truro-Provincetown Town line.

Said Area is shown on the Official Zoning Map of the Town of Truro, revised at the Town Meeting held February 18, 1963, and drawn by Wilfred G. Slade, Reg. Land Surveyor, which map is recorded with Barnstable Registry of Deeds.

## § 90.4.   Residential District

The Residential District is the land area of the Town of Truro not included in the General Business, Limited Business (including Beach Point) and Seashore Districts.

## § 90.5.   Overlay Districts

A.   Water Resource Protection District. The Water Resource Protection Districts for the Town of Truro shall be determined from the following atlas which is on file with the Truro Town Clerk: "Zones of Contribution to public supply wells and water table contours, December 1990." Land in a Water Resource Protection District may be used for any purpose otherwise permitted in the underlying district, subject to the restrictions in § 30.4 of this bylaw..

B.   Flood Plain District. The Flood Plain District includes all special flood hazard areas, designated as Zone A, AE, AH, A1-30, and V1-30, on the Town Flood Insurance Rate Maps, hereinafter "FIRM", dated July 3, 1985 and on file with the Town Clerk, Planning Board and Building Commissioner. These maps as well as the accompanying Truro Flood Insurance Study, dated Jan. 3, 1985, shall be and are part of this bylaw and are incorporated herein by reference, and they are all available for study and inspection at the Truro Town Hall.

C.   Affordable Rental Housing District. The Affordable Rental Housing Overlay District is the area that is described and bound as follows:

The land shown on a plan entitled "Consolidation and Division Plan of Land in Truro, made for the Town of Truro" by Slade Associates, Inc. Registered Land Surveyors, dated January 30, 2002 and recorded with the Barnstable County Registry of Deeds in Plan Book 571, Page 84 and shown more specifically as an unnumbered parcel with an area of 10.660 acres.

Commencing at a point on Standish Way, a town established way with a forty (40) foot layout, and at the sideline of Massachusetts Route 6, and running thence southwesterly along the edge of said town-established road, Standish Way, bearing N 34°29' 49" E for a distance of 427.83'

Thence southeasterly bearing N 50°12' 55" W for a distance of 355.84'

Thence N 36°03' 57" W for a distance of 59.72'

Thence N 53°56' 34" E for a distance of 99.05'

Thence N 36°03' 57" W for a distance of 200.04'

Thence S 55°41' 54" W for a distance of 200.00'

Thence N 35°36' 04" W for a distance of 353.10'

Thence N 34°18' 06" W for a distance of 100.00'

Thence N 34°04' 39" W for a distance of 43.81'

Thence S 27°39' 58" W for a distance of 213.35'

Thence N 30°5 '36" W for a distance of 212.28'

Thence N 76°7' 25" W for a distance of 242.07'

Thence S 44°59' 36" E for a distance of 79.55'

Thence S 02°56' 44" E for a distance of 33.93'

Thence S 49°25' 40" E for a distance of 954.86'

## APPENDIX A





# TRURO PLANNING BOARD
## TRURO, MASSACHUSETTS
## SUBDIVISION REGULATIONS

### Section I. Authority

Under the authority vested in the Planning Board of the Town of Truro by Section 81-Q of Chapter 41 of the General Laws, said Board hereby adopts these regulations governing the subdivision of land in the Town of Truro. Such regulations shall be effective October 18, 1978 as amended on December 20, 1983.

*(12/55,9/71,6/78,12/83,3/88)*

### Section II. General

#### A. Definitions:

For the purpose of these regulations terms and words shall have the meaning as defined in the Truro Zoning By-Law. Terms and words not defined therein but defined in the General Laws, Chapter 41, "The Subdivision Control Law," and amendments thereto, shall have the meaning given therein, unless a contrary intention clearly appears. Words not defined in either place shall have the meaning given in Webster's Unabridged Dictionary, Third Edition.

*(12/55,9/71,6/78)*

"Board" shall mean the Planning Board of the Town of Truro.

*(9/71)*

#### B. Plan Believed Not to Require Approval:

Any person who wishes to cause to be recorded in the Registry of Deeds or to be filed with the Land Court a plan of land and who believes that his plan does not require approval under the Subdivision Control Law may submit his plan to the Planning Board accompanied by the necessary evidence to show that the plan does not require approval.

If the Board determines that the plan does not require approval, it shall without a public hearing and within twenty-one days of submission endorse on the plan the words "Planning Board Approval Under Subdivision Control Law Not Required." Said plan shall be returned to the applicant, and the Board shall notify the Town Clerk of its action.

*(9/71,3/88)*

If the Board determines that the Plan does require approval under the Subdivision Control Law, it shall within twenty-one days of submission of said plan so inform the applicant and return the plan. The Board shall also notify the Town Clerk of its determination. The fee for plans not requiring approval under the subdivision law shall be fifty (50) dollars for the first lot and twenty-five (25) for each additional lot.

*(9/71,8/72,6/78,3/82,3/88)*

#### C. Subdivision:

No person shall make a subdivision within the meaning of the Subdivision Control Law of any land within this Town, or proceed with the improvement or sale of lots in a subdivision, or the construction of ways, or the installation of municipal services therein, unless and until a Definitive Plan of such subdivision has been submitted to and approved by the Board as hereinafter provided.

#### D. Acceptance of private roads:

*(9/71,3/88)*

(a) Existing unimproved private way:

An existing unimproved private way shall be a way established prior to the adoption of this amendment which is not cleared, graded, drained, hardened or surfaced. Before the Board of

Selectmen shall act on a petition for the acceptance by the Town of such a way, the petitioners shall have prepared by a registered engineer or a registered land surveyor, a clear and legibly drawn plan, to a suitable scale, in black India ink on tracing cloth. This plan shall contain the following information:

> Location of road in respect to all adjacent or intersecting roads, public and private.
> Layout of road showing all necessary dimensions to reproduce the road on the ground.
> Drainage facilities and/or drainage easements.
> Names and addresses of all abutters.

The petitioners shall install sufficient permanent concrete bounds to define the road. The petitioners shall also be required to post a performance bond with the Town of Truro assuring that if the road should be accepted by the voters of the Town of Truro, all the requirements specified by the design standards would be met. All costs of preparing plans, procurement of bonds and construction of road or way to meet the design standards shall be borne by the petitioners.

Design standards shall be those shown under Subdivision Regulations, Section IV. Design Standards.

(b) Existing improved private way:
An existing improved private way shall be a way established prior to the adoption of this amendment which has been constructed in accordance with Town of Truro standards existing at the time of construction including grading, clearing, hardening, black-topping and drainage. The Board of Selectmen may act on petition for the acceptance of such a way without requiring any or all of the requirements listed in paragraph (a) if the petition is approved by the Planning Board.

(c) New, improved private way shall be a way which was established after the adoption of (b) above and which was constructed in accordance with all contemporaneous Town of Truro standards for such matters as grading, clearing hardening, black-topping, and drainage. If the petition for public takeover is the first approved by the Planning Board, then the Board of Selectmen may act on the petition for acceptance without requiring satisfaction of any or all of the requirements listed in paragraph (a).

*(3/88)*

(d) Approval and acceptance:
Upon approval by the Board of Selectmen of a petition for Town acceptance of a private way under the conditions stated in either (b) or (c), the Selectmen shall submit an article to the next annual Town Meeting to the voters of the Town for their action on the petition.     *(9/71,3/88)*

(e) Waiver:
The Board of Selectmen may waive any requirements of the Design Standards listed in paragraph (a) or any deviation from Town Standards listed in paragraph (b) or (c) which, in their opinion, would not be detrimental to the Town of Truro, excepting requirements specified by by-law. If any such waiver will result in an expenditure of public monies to accomplish the requirements waived, the Board of Selectmen must present this cost to Town Meeting acting on the petition for acceptance of the private way.     *(9/71,12/83,3/88)*

## Section III.  Procedure for the Submission and Approval of Plans:

## A.  Preliminary Plan:

1) <u>General</u>:  A preliminary plan of a subdivision shall be submitted by the subdivider for the discussion and tentative approval by the Board.

Submission of the preliminary plan will enable the subdivider, the Board, other municipal agencies and owners of properties abutting the subdivision to discuss and clarify the problems of such subdivision before a Definitive Plan is prepared.

2) <u>Contents</u>: The Preliminary Plan shall be drawn on tracing paper at suitable scale. Five prints shall be filed at the office of the Board. The Preliminary Plan should show sufficient information about the subdivision to form a clear basis for discussion of the problems and for the preparation of the Definitive Plan. Such information will include major site features such as existing stone walls, fences, buildings, large trees, rock ridges, and outcroppings, swamps and water bodies and existing topography as required, together with the information required for the Definitive Plan (Section III, B, 2, items (a) to (d) inclusive). During discussion of the Preliminary Plan, complete information required for the Definitive Plan (Section III, B, 2, Contents) will be developed.    *(9/71,12/83)*

3) <u>Tentative Approval</u>: The Board may give the Preliminary Plan its tentative approval, with or without modification. Such tentative approval does not constitute approval of a subdivision, but does facilitate the procedure for review of the Definitive Plan.

4) <u>Fee</u>: The fee for submission of preliminary subdivision plans shall be $25.00, payable on filing of the preliminary subdivision plan with the Planning Board.    *(7/90)*

## B. Definitive Plan:

1) <u>General</u>: Any person who submits a Definitive Plan of a subdivision to the Board for approval shall file with the Board the following:

    (a)    An original drawing of the Definitive Plan and five contact prints thereof, dark line on white background. The original drawing will be returned after approval or disapproval.    *(9/71,12/83)*

    (b)    A properly executed Application Form to be secured from the Town Clerk.

    (c)    A deposit of $50.00 plus $25.00 for each additional lot, to cover the cost of advertising and legal notices for all subdivision plans requiring a public hearing.    *(12/55,9/71,11/77,6/78,3/88)*

The applicant shall file by Certified Mail, a notice with the Town Clerk stating the date of submission for such approval and accompanied by a copy of the completed Application Form.    *(9/71,12/83)*

2) <u>Contents</u>: The Definitive Plan shall be prepared by an engineer or surveyor and shall be clearly and legibly drawn in black India ink upon tracing cloth. The plan shall be a scale of one inch equals forty feet or other such scale as the Board may accept, to show details clearly and adequately. Sheet size shall preferably not exceed 24" by 36". If multiple sheets are used, they shall be accompanied by an index sheet showing the entire subdivision. The Definitive Plan shall contain the following information:

    (a)    Subdivision name, boundaries, north point, date and scale.

    (b)    Name and address of record owner, subdivider and engineer or surveyor.

    (c)    Names and addresses of all abutters as they appear in the most recent tax list.

    (d)    The applicant shall furnish the Board with a separate plan showing profiles of the proposed ways or streets. This plan shall be in such form as to provide full information satisfactory to the Board, but need not be in the same form as the Definitive Plan. It should include proposed street names. Such names should not be more than two words (in addition to "road, street, etc.") and not create confusion with other names previously approved.    *(9/71,2/93)*

(e)     Sufficient data to determine the location, direction and length of every street and way line, lot line and boundary line, and to establish these lines on the ground. All bearings shall refer to Massachusetts prime meridian.

(f)     Location of all permanent monuments properly identified as to whether existing or proposed.

(g)     Location, names and present widths of streets bounding, or approaching or within reasonable proximity of the subdivision.

(h)     Suitable space to record the action of the Board and the signatures of the members of the Board (or officially authorized person).

(i)     Existing and proposed topography at a suitable contour interval as required by the Board.

(j)     All surveys to be made with accuracy resulting in a minimum error of closure 1 to 10,000.

3)  <u>Review by Board of Health as to Suitability of Land</u>:  The Board shall within ten days after submission of a plan consult with the Board of Health. If the Board of Health is in doubt as to whether any of the land in the subdivision can be used as building sites without injury to the public health, it shall so notify the Planning Board in writing within forty-five days. Any approval of the plan by the Board shall then only be given on condition that the lots of land as to which such doubt exists shall not be built upon without the prior consent of the Board of Health, and shall endorse on the plan such conditions, specifying the lots of land to which said condition applies.    *(9/71,3/88)*

4)  <u>Public Hearings</u>:  Before approval, modifications and approval, or disapproval of the Definitive Plan is given, a public hearing shall be held by the Board. Notice of the time and place of such hearing and of the subject matter, sufficient for identification, shall be given by the Board at the expense of the applicant by advertisement in a newspaper of general circulation in the Town once in each of two successive weeks, the first publication being not less than fourteen days before the day of such hearing. A copy of said notice shall be mailed by certified mail to the applicant and to all owners of land abutting upon the subdivision as appearing in the most recent tax list.

*(9/71,12/83)*

5)  <u>Certificate of Approval</u>:  The action of the Board in respect to such plan shall be by vote, copies of which shall be certified and filed with the Town Clerk and sent by certified mail to the applicant. If the Board modifies or disapproves such plan, it shall state in its vote the reasons for its action. Final approval, if granted, shall be endorsed on the original drawing of the Definitive Plan by the signature of the majority of the Board (or by the signature of the person officially authorized by the Board), but not until the statutory, twenty-day appeal period has elapsed following the filing of the Certificate of the Action of the Board with the Town Clerk and said Clerk has notified the Board that no appeal has been filed. After the Definitive Plan has been approved and endorsed, the applicant shall furnish the Board with two prints thereof. Final approval of the Definitive Plan does not constitute the laying out or acceptance by the Town of streets within a subdivision.

*(9/71,12/83,3/88)*

## Section IV. Design Standards.
*(As amended by the Planning Board on November 12, 1986 by adoption of Sections (h) through (m))*

(a)     The Board shall require a minimum lot size of 33,750 square feet, minimum frontage of 150 feet on a way and a 25 foot setback from all lot lines.    *(12/55,8/72)*

The area of a lot when used for building purposes shall not be less than the minimum required herein.  Said lot shall not be interpreted to include any areas below mean water on tidal water, areas of exposed ground water, or within the limits of any defined way.  No less than 100% of the

minimum area required shall consist of contiguous upland exclusive of marsh, bog, swamp, beach, dune or wet meadows. *(6/78,3/88)*

The lot frontage shall be the distance along a straight line connecting the points of intersection of the side lot lines with the front lot line. *(6/78,12/83,11/86)*

(b)　　The minimum width of street right-of-ways shall be 40 feet. *(12/55,9/71)*

(c)　　Property lines at street intersections shall be rounded to provide for a curb radius of not less than 20 feet. *(9/71)*

(d)　　Dead-end streets shall be provided at the closed end with a turnaround having a property line diameter of at least 80 feet. When ways requiring turnarounds may be extended in future subdivision, the Board may require only an area equal to the above requirement to be shown and marked "Reserved For Turning." Upon extension of the way through this turning area, the portions not included in the way shall revert to their respective lots. *(12/55,9/71)*

(e)　　All streets in the subdivision shall be continuous wherever practicable. *(12/55,9/71)*

(f)　　1.　Provisions satisfactory to the Board shall be made for the proper projection of streets, or for access to adjoining property not yet subdivided. *(12/55,9/71,6/78)*
At least one street in the new subdivision will connect with a road which will provide access to the new subdivision, and said road shall in the opinion of the Board be adequate to reduce the danger to persons and property and to secure safety in the case of emergency. *(9/91,3/88)*

2.　The Board may disapprove a plan if it determines the access road to the subdivision is inadequate. *(6/78,12/83,11/86)*

3.　Subdivisions of 30 or more lots will be required to have more than one access from an existing major street.  This requirement for more than one access may be waived by the Board when in its opinion it is in the public interest and not inconsistent with the intent and purpose of the Subdivision Control Law. *(6/78,3/88)*

(g)　　On land of single ownership where the intent is to subdivide into no more than two lots of legal area and a way is required for one lot, this may be exempt from any or all of the requirements of the design standards, excepting for those requirements specified in the by-laws.  It shall be at the discretion of the Board to grant these waivers and to set requirements for the way. Any such way established shall not be used to provide access to any lot other than the lot established by approval of the way. There shall be no further subdivision of the lot serviced by the way established. Any way established under this provision of waiver of design standards shall not be subject to acceptance by the Town as a public way. *(9/71,12/83,11/86)*

(h)　　No street shall intersect any other street at less than sixty (60) degrees. *(11/86)*

(i)　　Street construction
1.　The width of the pavement and the shoulders (four (4) feet from each side of the pavement) shall be cleared of all stumps, brush, roots, boulders, trees and like material. All such material shall be disposed of outside the subdivision unless authorized by the Planning Board.

2.　All materials not suitable for foundation shall be removed from an area eight (8) feet wider

than the paved width (four (4) feet from each side of the pavement) and to a depth of at least six (6) inches below finished grade. Peat, silt, loam or similar yielding materials shall be removed to a firm foundation for the same width.

3. Grades of streets shall be a reasonable minimum, but not less than five tenths (0.5) of a percent nor more than ten (10) percent except that the Planning Board may grant approval of grades up to twelve (12) percent for a distance of less than one hundred (100) feet. The roadway is to be constructed in true cross section with a crown of one quarter (1/4) inch per foot from the center line.

4. No side slopes resulting from grading of the street shall exceed one (1) foot vertical to two (2) feet horizontal in fill and in cut. Land between the outside of the layout and the pavement shall be graded so as to prevent surface water on the street from draining on to private land except into designated areas.

5. Traveled ways and shoulders shall be provided with a foundation consisting either of at least six (6) inches compacted thickness of good binding gravel satisfactory to the Project Engineer, clean, free of organic matter, and without stones over three (3) inches in diameter, or of six (6) inches of clay hardening or the equivalent. Any depressions that occur, either during or after rolling, must be filled with additional gravel or hardening and rolled until the surface is true and even.

6. The wearing surface of the roadways within the right of ways shall be two (2) course Type I bituminous concrete pavement (native stone aggregate allowed), applied with a two (2) inch (after compaction) base course and a one (1) inch finished course, in accordance with Massachusetts Department of Public Works Standard Specification 460. Pavement shall be centered in the roadway layout, unless the Planning Board approves a variation.

7. The minimum pavement width, exclusive of curbing or berms, shall be as follows: for roads that will never be able to serve more than ten (10) lots: eighteen (18) feet; more than fifteen (15) lots: twenty (20) feet; all other roads: twenty-two (22) feet.

8. Molded bituminous berms, sixteen (16) inches in width, or paved gutters shall be installed wherever pavement grades exceed three (3) percent, and shall be installed over the same bituminous base as the paved surface.

9. Road drainage, including lines and structures, shall be constructed to meet storm characteristics acceptable to current engineering standards. Grates and frames shall be of Massachusetts Standard grate type and shall conform with Massachusetts Department of Public Works specifications. Catch basins, leaching basins or leaching fields shall be adequate for the conditions encountered.
Catch basins shall be of a solid construction (masonry or precast concrete) with sump, overflow and grate located in the road to receive surface water. Leaching basins shall be of a masonry or pre-cast concrete construction, located off the road a minimum of two (2) feet and connected to catch basins with concrete, asphalt-coated, corrugated aluminum or steel pipe with a minimum diameter of ten (10) inches. All leaching basins shall have a two (2) foot minimum width of one and a half (1 and 1/2) inch stone around the circumference and for the full depth of the leaching portion of the basin. Covers shall be precast concrete.

Swales shall be constructed of the same material and specifications as the road surface and shall direct surface water away from the road pavement a minimum distance of five (5) feet to an area of suitable drainage so as not to cause erosion or puddling.

10.  All telephone, cable television and similar lines and cables shall be underground.

*(11/86,2/93)*

11.  Topsoil removed during the course of construction shall be redistributed so as to provide at least four (4) inches of cover to all areas of the subdivision and shall be stabilized by seeding and planting.  At no time shall topsoil be removed from the site or tract without obtaining the required permit.

12.  The subdivider shall clean up all debris caused by street construction and installation of utilities, drainage or other services; prior to release of security, the street right of way shall be similarly cleaned.

13.  Street signs of a design and material approved by the Planning Board shall be furnished and installed to identify each street at each intersection.

14.  Guard rails of a design and material approved by the Planning Board shall be required at points along the roads where necessary for safety in the opinion of the Board.

*(11/86)*

(j)  Monuments shall be installed at all angle points and points of curvature of all lot lines and all ways, and at other points, where, in the opinion of the Board, permanent monuments are necessary.  Such monuments shall be at least five (5) inches by five (5) inches by thirty (30) inches of concrete or granite.  No permanent monuments shall be installed until all construction which would disturb the monuments is completed.  This rule shall not apply to any corner, as herein defined, which is permanently marked as a result of proceedings in the Land Court.

*(9/71,11/86)*

(k)  As-Built Plans: The project engineer shall inspect each step in the construction of the road(s) and drainage, in the installation of utilities and monuments.  Upon completion of road construction, installation of the drainage, utilities and monuments, an "as-built" plan shall be prepared, certified, and submitted to the Planning Board by the project engineer for approval by the Planning Board.  This plan shall include the position of monuments, drainage, and underground utilities, and shall highlight any deviations from the approved plan.  With the as-built plan, the developer shall also furnish proof of compliance with the Truro Selectmen's Memorandum #28 (Curb Cuts) and, if applicable, compliance with Massachusetts State Highway requirements and curb cut permits.

*(11/86, 5/02)*

(l)  Road construction and drainage shall be completed within two (2) years of plan approval or shall be required to meet the standards in place at the time of completion.    *(11/86)*

(m)  Prior to the issuance by the Building Commissioner of an occupancy certificate for any structure in any subdivision approved subsequent to the adoption of this By-law, streets serving the lot, or lots, for which the permit is desired must meet all requirements of subdivision design standards.*(11/86)*

(n)  1.  Performance guarantee:  Before endorsement of the Board's approval of a Definitive Plan of a subdivision the applicant shall secure the completion of the required improvements specified in

Section IV for all of the lots in the subdivision by one, or in part by one and in part by the other, of the methods described in a. and b. below, which method may be selected by the applicant.

a. Approval with bonds or surety: The applicant shall either file a surety company performance bond or a deposit of money or negotiable securities in an amount determined by the Board to be sufficient to cover the cost of all or any part of the improvements specified in Section IV. In case of negotiable securities, the value required shall be 100 percent greater than a bond. Such bond or security shall be approved as to form and manner of execution by the Town Counsel and sureties approved by the Town Treasurer, and shall be contingent upon completion of such improvements within two years of the date of endorsement of the plan.

b. Approval with covenant: The applicant shall file with the Planning Board, and properly record along with the plan, a properly executed covenant running with the land whereby such ways and services shall be provided to serve any lot before such lot may be built upon or conveyed other than by mortgage deed. Such covenant shall be executed in the form provided by the Planning Board and approved by Town Counsel, and shall be contingent upon the completion of all required improvements within two years of the date of endorsement of the plan. At the discretion of the Board a time extension may be granted.

2. Later alternate method of guaranteeing performance: After sufficient improvements have been made by the applicant to give the Board reason to release one or more lots from a performance guarantee and following the recording of a mortgage or mortgages on a lot or lots in the subdivision given as security for advances to the subdivider by a lender, the Board may, at its option, release lots from the operation guarantee without receipt of a bond or deposit of money upon delivery to the Board of an agreement with the Board, which agreement shall be executed by the applicant and the lender and shall provide for the retention by the lender of sufficient funds otherwise due the applicant to secure the construction of ways and installation of utilities. Said agreement shall provide for a schedule of disbursements which may be made to the applicant upon completion of various stages of the work and shall further provide that in the event the work is not completed within the time set forth by the applicant, any funds remaining undisbursed shall be available for completion.

3. Release of performance guarantee: Upon the completion of improvements required under Section IV, security for the performance of which was given by bond, deposit, or upon the performance guarantee with respect to any lot, the applicant shall send by registered or certified mail to the Town Clerk and to the Board a written statement in duplicate that the said construction or installation in connection with which such bond, or deposit has been given has been completed in accordance with requirements contained under Section IV, such statement to contain the address of the applicant. If the Board determines that said construction or installation has not been completed, it shall specify to the applicant in writing the details wherein said construction and installation fails to comply with the requirements contained under Section IV. Upon failure of the Board to act on such application within 45 days after the receipt of the application by the Town Clerk, all obligations under the bond shall cease and terminate by operation of law, and any deposit shall be returned. In the event that said 45 day period expires without such specifications, or without the release and return of the bond or return of the deposit as aforesaid, the Town Clerk shall issue a certificate to such effect, duly

acknowledged, which may be recorded.                                    *(9/71,6/78,11/86)*

In the event the developer fails to perform satisfactorily, the requirements set forth in the bond within the specified period of time, if any, the then outstanding principal amount (penal sum) of the bond shall be payable to the Town as provided by law, to the extent of the reasonable cost to the Town of the completion of the improvements required under the bond.*(9/71,11/86)*

In such case the approval of the Board of the Definitive Plan of the subdivision may be rescinded.                                                            *(9/71,11/86)*

(o)     No permit will be issued for building on any lot for which a plan is required until such plan has been recorded at the Registry of Deeds (Plan Book and page numbers are evidence of recording). In the case of registered land evidence must be presented to the Board that such plan has been duly recorded with the Massachusetts Land Court and approved.
                                                            *(9/71,6/78,11/86)*

(p)     All lots established under the provisions of the Subdivision Code must be of sufficient depth to permit the erection of a building thereon. This requirement shall not apply to a lot which, after approval of the subdivision plan, will be conveyed to the owner of an adjoining lot and thence become an integral part of said adjoining lot. This intention of conveyance shall be noted on the Definitive Plan.                                             *(9/71,12/83,11/86)*

(q)     Protection of natural features. Due regard shall be shown for all natural features such as large trees, water courses, scenic points, historic points and similar community assets which, if preserved, will add attractiveness and value to the subdivision.

To the fullest extent possible, existing trees shall be preserved by the developer. Special consideration shall be given to the layout of lots and the position of dwellings on the lots to insure that existing trees shall be preserved during the process of grading. Where there is a question as to the desirability of removing trees or a group of trees which serve to add interest and variety to the proposed subdivision, in order to allow for use of the land for a lot or lots, the Planning Board may impose such conditions and terms which in the opinion of the Board are necessary to insure compliance herewith.                                  *(6/78,12/83,11/86,3/88)*

(r)     Homeowners Association: Prior to the release of any of the lots of subdivision, the developer shall present to the Planning Board a declaration of trust creating a Homeowner's Association. The responsibility for the maintenance, repair, improvement and public safety clearing of the newly created road will reside with this trust. The Homeowner's Association shall include all those persons who have rights over and/or a fee in the road. The method of sharing of the road expenses shall be determined by the terms of the declaration of trust.                    *(5/02)*

## Section V. Administration:

A. <u>Waiver</u>:

Strict compliance with the requirements of these rules and regulations may be waived, when in the judgment of the Board, such action is in the public interest and not inconsistent with the Subdivision Control Law.

B.  <u>Notice of Waiver</u>:

Notice of waiver of any of these laws or regulations by the Board shall be made in writing to the Board of Selectmen and to the Board of Appeals.

C.  <u>Reference</u>:

For matters not covered by these rules and regulations, reference is made to Section 81K to 81GG inclusive of Chapter 41 of the General Laws.                              *(12/55,9/71,6/78)*

# TOWN OF TRURO
# SIGN CODE

## Purpose

A By-Law providing for the regulation of Signs, Signboards and Advertising Signs or Attention Getting Devices and providing for the licensing therefor in the Town of Truro. By enactment of this ordinance it is further desired that the quaintness and the Cape Cod colonial atmosphere of the Town be preserved insofar as possible without undue conflict with the necessity of engaging in lawful enterprise.

## Section 1. Definitions

A sign shall mean any material or any structure or part thereof or device attached thereto on which is painted, represented, displayed or included a letter, word or figure which attracts or intends to attract attention to itself. Signs herein shall also mean all advertising devices or insignia whether lettered or not, designed to promote a business, the sale of a product or of a service. The word Sign as used in this By-Law shall also include any lettered or worded advertisement not outdoors which is visible and is intended to be read from the outdoors. Sign Face shall mean the side of the sign intended to be read, including the frame. Multiple business shall mean more than one commercial enterprise or activity, regardless of ownership, on a single lot registered in the registry of deeds, or served by a common or interconnecting driveway, access road or parking area. A multiple business shall include but not be limited to shopping centers or plazas and combinations of commercial enterprises such as motel, restaurant, bar, snack shop, gift shop and other appurtenances. A single business shall mean one commercial enterprise or activity on a single lot registered in the registry of deeds.

## Section 2. Regulations for General and Limited Business Zones

The following signs may be erected in the General and Limited Business areas.

**A.     Wall Signs**

One wall sign per established business for each street frontage not exceeding a total of 10% of that building face including the window area, but not to exceed three (3) feet in height, advertising only the business carried on and/or the services and products made or sold on the premises.

**B.     Window Signs**

Window signs comprising posters, placards or signs printed or otherwise displayed on the inside of windows close to and approximately parallel to the window panes and visible from the street shall not exceed 25% of the individual window area or 10% of the glass area of any required exit door.

**C.     Ground Signs (except Shopping Centers or Plazas)**

In addition to the wall sign specified in Section 2(A) each single or multiple business may have one single faced sign of not over 20 (twenty) square feet total face area or one double faced sign of not over 40 (forty) square feet total face area except that one additional sign not to exceed 1-3/4 (one and three-quarters) square feet may be attached thereto. The upper and lower edge of the sign may be determined by the contour of the ground but in no case shall the height exceed 12 (twelve) feet above the original mean ground level. In the case of a multiple business the ground sign may include in addition as an integral part one ladder type sign each component of which may designate one of the individual businesses or activities and shall be limited to an area of six (6) square feet.

**D.    Roof Signs**

In lieu of, but not in addition to a wall sign, a sign may be affixed to the roof edge of a building front which shall not exceed a height of two (2) feet, the length not to exceed one-third (1/3) the length of the building. No sign shall project over the ridgepole of a pitched roof or over the top of a flat roof.

**E.    Roadside traffic-directional signs**

Two (2) traffic-directional signs reading: "ENTER" and/or "EXIT ONLY" may be installed at each vehicular entrance and/or exit. Such signs shall be limited to a maximum face area of three (3) square feet with a maximum height of three (3) feet above existing grade but shall not be subject to any setback requirements.                                                                  *(4/90)*

**F.    "OPEN" Signs**

In Business and Limited Business Zones, any business may set up a single, portable, roadside "OPEN" informational-type ground sign which shall not exceed five (5) feet in height and which shall be limited to two (2) faces of not more than twelve (12) square feet per face. Such signs shall be (a) constructed as a hinged lean-to sign, a self-supporting sign, or a sign on wheels; (b) exempt from frontline setback requirements; (c) shall not be fluorescent or "day glow" colors; and (d) restricted to 8 or less words (per side) inclusive of any logo with the exception of gasoline/service stations which may display a "brand name" sign without hours in lieu of an "OPEN" sign.   *(4/90)*

**G.    Gasoline Stations and Garages**

Gasoline stations and garages shall be allowed one standard permanent oil company sign not to exceed forty (40) square feet of total sign face area in addition to name sign, plus the customary lubrication, washing and service signs with lettering not to exceed twelve (12) inches in height displayed in the positions to which they apply and one "A-frame" or easel type sign at the property frontage, the size of which shall not exceed three (3) feet by three and one-half (3-1/2) feet. So-called special signs will be permitted on the sides or head of gasoline pumps only. One promotional sign, not exceeding twenty (20) square feet of total sign area, with the exception of "Whirligigs" and "Banners", to promote a product or sales may be displayed for a period of thirty days in any six month period after notice, in writing, to the Planning Board.

**H.    Leased Town Owned Property**

The Selectmen shall have sole discretion as to the suitability of all signs erected, or to be erected on Town owned property under lease to private enterprise, or otherwise as to size, type, composition, placement and otherwise, but not to exceed the specifications set forth in this By-Law.

**I.    Shopping Centers or Plazas**

In Shopping Centers or plazas consisting of multiple and adjacent business establishments, each business establishment will constitute a separate building for the purpose of sign control enforcement. The entire Shopping Plaza area shall be permitted one ground name sign only, of a size not exceeding thirty-six (36) square feet in conjunction with a group listing on one ladder type sign wholly inside the front property line, at right angles thereto and not to exceed a height of twenty (20) feet and a width of six (6) feet, in addition to signs permitted in (A) above. Each component in the ladder sign shall be limited to an area of six (6) square feet per sign face.

**J.    Theaters**

Motion Picture Theaters shall conform to the provisions of Section 2(A) except that a vertical

projecting sign above the theater marquee will be permitted in lieu of a wall sign. In addition, there will also be permitted the usual conventional type marquee sign and/or bulletin areas on either side of the Main entrance. Stage and Summer Theaters shall be permitted one sign wholly inside the front property line, at right angles thereto and not to exceed forty (40) square feet in area. In addition, there shall be allowed one wall or one roof sign. The latter must conform to the provisions of Sections 2(A) and 2(D).

**K.**     **Setbacks**

Any ground sign may be on the front property line but otherwise must conform to the Zoning By-Law with respect to buildings as regards side line and rear line setbacks.

## Section 3. Regulations for Residential Zones

No signs shall be erected in the Residential Zones except the following:

A.     One sign not to exceed two (2) square feet.

B.     In the Residential Zone signs advertising an allowed home occupation or profession shall not exceed six (6) square feet.

C.     Ladder type signs for property owner's group listings in remote residential area. Such signs shall not be attached to trees and each name listing shall not exceed one (1) square foot total sign face area.

D.     One wall or ground sign, single or double faced, not exceeding eighteen (18) square feet total sign face area, on the premises of a church, library, school or other public building, giving only the name and nature of the occupancy and information as to the schedule of use or occupancy. In addition wall or ground signs not exceeding one (1) square foot face area may be used for a driveway entrance, exit, or for warning purposes.

E.     Sale or rent: one (1) double-faced sign placed only on the property to be sold or rented, but not placed on trees, rocks, or utility poles and not exceeding five (5) square feet of sign face area per side.                                                                                                          *(2/67,12/88)*

F.     Builders, Architects, Developers and Engineers shall be permitted one temporary, single face, group sign per multiple or single unit construction site which shall not exceed twenty-four (24) square feet in sign face area.

G.     Real Estate Developers with subdivisions of four (4) or more lots shall be permitted one sign, single or double faced, not to exceed twenty-four (24) square feet total in sign face area. Such sign may be located at each appropriate road junction in the project, but not nearer to one another than one thousand (1,000) linear feet, and not in a direct line of sight, or be visible, from each sign as erected. Such signs shall not be attached to trees, rocks or fences.

## Section 4. Roadside Signs

The following signs may be erected in any zone.

A.     Public Information Signs

Public information signs including service club, church, public building, charitable or civic organization or hospital signs, not exceeding three (3) square feet total sign face area at roadside.

## Section 5. Prohibited Signs

Signs of the following type, or types closely related to them, are specifically prohibited in all zones of the Town of Truro.

A.  No person, firm, association or corporation shall post, erect, display, or maintain within public view from a highway within the Town Limits of Truro any "Off Premises" billboard signs or other advertising device except as provided for in the rules and regulations for the control and restriction of billboards, signs and other advertising devices promulgated by the Commonwealth of Massachusetts. (Sections 29-33, Chapter 93, General Laws, as amended).

B.  Pylon signs or special ground signs supported by tall mast-like members, or pyramidal tower supports.

C.  Fence signs, except those necessary for safety, such as "High Voltage", etc.

D.  Advertising signs tacked, posted, painted or otherwise attached to poles, posts, trees, fences, sidewalks or curbs.

E.  Banners, streamers, and advertising flags except as provided for in Section 11.

F.  Awning signs except on the valance with lettering not to exceed six (6) inches in height.

G.  Marquee signs attached to or hung from a marquee or canopy or other covered structure extending from and supported by the building except as provided for in Section 2(H).

H.  Signs advertising "off premises" products, services, entertainment or anything detracting from the appearance of the neighborhood shall not be painted or affixed to a rock or tree.

I.  Neon or exposed gas-filled tube type signs within any zone of the Town.

J.  Illuminated signs of the flashing or animated type and flashing or activated lights or beacons used to attract attention. In no case shall illuminated signs or any type tend to interfere with traffic or traffic signals.

K.  Signs producing glare.

L.  "Sold" signs usually erected to indicate a sale of property.

M.  Signs of the commercial type usually referred to as "Privileged" unless at least 80% of the sign area is reserved for and does indicate the name and/or nature of the local business establishment.

## Section 7. Maintenance of Signs

A.  Any sign which is or shall become dangerous or unsafe in any manner whatsoever or any sign erected hereafter contrary to the provisions of this By-Law shall be repaired, made safe, and conform with this By-Law or shall be taken down and removed by the owner, lessor, agent or occupant of the building, property, or land upon which it is placed or to which it is attached.

B.  The Selectmen shall have the power to order the repair or removal of any sign which in their opinion is, or is likely to become dangerous or unsafe, or is erected, or maintained contrary to the

By-Law, after notice shall have been given as herein provided. The Selectmen shall serve written notice upon the owner, agent or person having control of said sign, directing him to repair or remove the same as the case may be within a time not to exceed fifteen (15) days after receipt of such notice. In case of failure of such owner or agent or other person having control as aforesaid, to comply with such notice, the Selectmen shall have the power, under due process of law, to enter upon or into the lands, house or property upon which the said sign is erected and to remove or cause the same to be removed.

C.    The expense and disbursements incurred in carrying out the provisions of this By-Law shall be recoverable by the Town from the owner, agent, or the person having control of such sign, in action at Law in any court or competent jurisdiction upon his, hers, or their neglect or refusal to pay the same within ten (10) days after service of a statement thereof.

## Section 8.  Permits

Upon enactment of this By-Law a permit shall be required for each newly erected individual exterior sign on any premises except signs as defined in Section 3(A), 3(C), 3(D), and 3(E).  Permits shall also be required for moving signs to a new location on existing premises. Sign permits shall be issued by the Building Commissioner.
*(2/67,4/92)*

## Section 9.  Appeal

If any person, company, firm or corporation shall be aggrieved by the action of the Selectmen, or their legally appointed representative, in their capacity as administrators and enforcers of this By-Law, an appeal may be made to the Board of Appeals, Town of Truro, for adjustment in accordance with procedures of that Board within thirty (30) days of the aggrieved action.  Appeal may be made on the basis of sign vision, obstruction, architectural necessity or topography.

## Section 10.  Exceptions

A.    Signs erected by the Municipal, County, State or Federal Government as may be deemed necessary for their respective functions are exempt from the provisions of this By-Law.

B.    Special purpose signs such as "No Hunting", "Posted", or warning signs of a similar type shall not be considered signs within the meaning or intent of this By-Law.

C.    Any sign which may be required under unusual or extraordinary circumstances and which shall not violate any specific provisions of this By-Law may be allowed by Special Permit from the Zoning Board of Appeals under provisions of Section VIII. C of the Zoning By-Law.
*(2/67,4/92)*

## Section 11.  Temporary Signs, etc.

Temporary signs and banners and posters in these categories except posters intended for window display shall be referred to the Planning Board for approval and issuance of a permit.  Temporary signs and banners covering special and holiday events must be firmly attached to a supporting device and present no undue hazard to the public.  The time allowed this advertising shall not exceed thirty (30) days.

## Section 12.  Enforcement

Enforcement of the provisions of this By-Law shall be the authority of the Selectmen or their legally appointed representative.

*(Note: Section 13 deleted 4/92)*

**Section 14.  Validity**

Every section of this By-Law and every subdivision or separate part thereof shall be considered as a separate regulation to the extent that if any such section, subdivision or separate part thereof shall be declared ineffective, invalid or unconstitutional it shall not affect the remaining parts of this By-Law.

**Section 15.  Repeal of Conflicting By-Laws**

All previously enacted By-Laws, or sections thereof, inconsistent with the provisions of this By-Law are hereby repealed.

**EXHIBIT G**

# TOWN OF TRURO



# ZONING BYLAW
# SUBDIVISION REGULATIONS
# SIGN CODE

Published by the Truro Planning Board

with amendments to:

Zoning Bylaw through Annual Town Meeting April 1999

Subdivision Regulations through February 1993

Sign Code through Annual Town Meeting April 1992

**Price: $7.00**

*[The (month/year) are for reference purposes only]*

# SECTION VIII — GENERAL REGULATIONS

## VIII-A Non conforming uses

No premises in the Town of Truro shall be used under the following conditions:

1. For any purpose of a junk yard, or storage of used motor vehicles or other equipment used as junk.
2. For the purpose of a commercial tenting camping area, or a trailer park.

## VIII-B Continuation of non conforming uses

1. So long as buildings were constructed, uses were begun, and lots were created lawfully, they may continue to be used in the same manner and for the same purposes despite contrary provisions of this bylaw. Lawful, preexisting, nonconforming structures and uses may, when a variance would otherwise be required, be altered, or extended with a special permit if the Board of Appeals finds that the alteration or extension will not be substantially more detrimental to the neighborhood than the existing nonconforming structure or use and that the alteration or extension will exist in harmony with the general purpose and intent of the bylaw.                    *(2/60,6/78,4/92)*

2. If the Building Commissioner determines and finds that the proposed repair, reconstruction, alteration, or structural change of a preexisting, nonconforming, single-family or two-family residential structure will not be substantially more detrimental to its neighborhood than the existing nonconforming structure and will not increase the nature or extent of the nonconformity, then the Building Commissioner may approve and issue a building permit for the proposed repair, reconstruction, alteration, or structual change.
                                                                                   *(12/88)*

3. A nonconforming use which has been abandoned for the period of two years, shall not be re-established, and any future use shall conform to the then current by-law.
                                                                                   *(2/60,6/78)*

## VIII-C Special Permits

1. Construction or operation under a building or special permit shall conform to any subsequent amendment of this By-law unless the use or construction is commenced within a period of six months after the issuance of the permit and in cases involving construction, unless such construction is continued through to completion as continuously and expeditiously as is reasonable.

2. A special permit shall lapse after one year, if a substantial use thereof has not sooner commenced except for good cause or, in the case of permit for construction, if construction has not begun by such date except for good cause.

3. Special permits may be approved only after a finding by the Board of Appeals or Planning Board (as applicable) that the proposed use is in the opinion of the Board in harmony with the general public good and intent of this Bylaw.
   The approval shall be subject to any other applicable provision of this By-law and the Board may impose conditions, safeguards, and limitations on time and use which in the Board's opinion are necessary to comply with the intent and purpose of this By-law.
                                                                                   *(6/78,4/92)*

4. The Board of Appeals or Planning Board (as applicable) shall adopt and from time to time amend rules relative to the issuance of such permits, and shall file a copy of those rules in the office of the Town Clerk.
   Said rules shall describe the size, form, contents, style and number of copies of plans and specifications and the procedure for submission and approval of the permits.
                                                                                   *(6/78,4/92)*

**EXHIBIT H**

# TOWN OF TRURO
## BUILDING DEPARTMENT
### BOX 2030
### TRURO, MA 02666

Delivery Address
24 Town Hall Rd..
Truro MA.

Phone: 508 349-7004 ext. 31
Fax: 508 349-5508

October 19, 2004

Law Offices of Paul Revere, III
226 River View Lane
Centerville, MA. 02632

Dear Mr. Revere,

I apologize for the delay of a response to your request for action.

I'm acting on the facts, exhibit one of your July 26,2004 letter (the building permit application) that you have presented to me.

I conclude that building permit, 98-186, issued on Brooke Newman's property by then Building Commissioner, Stephen Williams, was issued legally and lawfully according to section VIII-B 2) of the Town of Truro Zoning Bylaws:.

> 2. If the Building Commissioner determines and finds that the proposed repair, reconstruction, alteration, or structural change of a preexisting, nonconforming, single family or two-family residential structure will not be substantially more detrimental to its neighborhood than the existing nonconforming structure and will not increase the nature or extent of the nonconformity, then the Building Commissioner may approve and issue a building permit for the proposed repair, reconstruction, alteration, or structural change.

Mr. Williams determined, as is deduced by the issuance of the building permit, that Ms. Newmans' proposal was not "substantially more detrimental to its neighborhood" and "will not increase the nature or extent of the nonconformity."

Mr. Williams was acting within his authority under the bylaw and, therefore, the permit was issued lawfully.

Sincerely,

Thomas J. Wingard Jr. Building Commissioner Town of Truro

**EXHIBIT I**

# LAW OFFICES OF PAUL REVERE, III
### 226 River View Lane
### Centerville, Massachusetts  02632
### (508) 778-7126

## Via Federal Express

October 26, 2004

Town Clerk
Town of Truro
24 Town Hall Road
Truro, Massachusetts  02666

Zoning Board of Appeals
Town of Truro
24 Town Hall Road
Truro, Massachusetts  02666

RE:    Appeal of Denial of Request For Enforcement
3 Yacht Club Road -- Brooke Newman

Dear Town Clerk and Zoning Board of Appeals:

This letter is written on behalf of Barbara and John Allen (collectively the "Allens") who own property located at 5 Yacht Club Road and who are aggrieved by the decision of the Building Commissioner discussed below.

In particular, by letter dated July 26, 2004, I on behalf of the Allens requested pursuant to M.G.L. ch. 40A, Sec. 7 and Section X-3 of the Truro Zoning Bylaw that the Building Commissioner, Thomas J. Wingard, Jr., to enforce your zoning bylaw against Brooke Newman at 3 Yacht Club Road by revoking the building permit issued to Ms. Newman on October 28, 1998, and/or requiring her to apply for a Special Permit or variance from the Truro Zoning Board of Appeals for the additions allowed under the building permit.[1] I have attached a copy of this letter as Exhibit One.

On October 19, 2004, the Building Commissioner responded upholding the issuance of the building permit and concluding that a Special Permit or variance was not required to be issued for the property. I have attached a copy as Exhibit Two.

Please consider this letter a notice of appeal required by Section X-G of your bylaw and M.G.L. ch. 40A, Sec. 8. The basis for the appeal are set forth my letter attached as Exhibit One which are:

1.    A special permit or variance was required to move the building and

---

[1] It is also my understanding that the building ultimately constructed on the property was raised from the top of foundation elevation of 12.3 feet to a top of foundation elevation of 14.0 feet at some time after the building permit was issued  as Ms. Newman obtained approval in February, 1999, to construct and did construct a septic system which required a top of foundation elevation of 14.0 feet.  It is unclear as to whether the building department ever modified the building permit to adopt such changes.

1

construct the addition as the lot on which the property was located was less than 33,750 square feet.

2.    The Building Commissioner did not have authority under Section VIII-B.2 of the Bylaw to issue building permit.

Additionally, given that the Building Commissioner states in his response that the permit was issued pursuant to Section VIII-B.2, but cites no record to support it, the Allens also appeal on the basis that there is no "determin[ation]" or "find[ing]" by the Building Commissioner that the movement of the building and addition "will not be substantially more detrimental to its neighborhood. Therefore, the issuance of the building permit was procedurally defective.

I have enclosed three copies of this letter to be certified by you as to the date and time which this appeal has been filed. Please forward one copy to the Building Commissioner and the Zoning Board of Appeals. Please return the remaining copy to me in the enclosed envelope.

Please contact me at (508)778-7126 if you have any questions.

Very truly yours,

Paul Revere, III

cc:    Barbara Cordi-Allen
Michael Leon (Attorney for Brooke Newman)

2

**EXHIBIT J**

Bk 19182 Pg105  #83916
10-28-2004 a 09:33a

## STATEMENT OF NOTICE
## UNDER M.G.L. ch. 40A, Sec. 7

Notice is hereby given that an appeal to the Truro Zoning Board of Appeals pursuant to Section X-G of the Truro Zoning Bylaw and M.G.L. ch. 40A, Sec. 8, has been filed with the Town Clerk of Truro to compel the abandonment, limitation or modification of the use allowed by a building permit issued for the below referenced property on October 28, 1998, and/or for the removal, alteration or relocation of any structure erected in reliance upon said permit because the permit was issued without the owner obtaining a Special Permit or variance as required by the Truro Zoning Bylaw. The property and property owner subject to this notice are:

Brooke Newman
*Locus*     3 Yacht Club Road
Truro, Massachusetts 02666

The property is more particularly described as in a deed recorded in the Barnstable County Registry of Deeds at Book 11175, Page 326, and shown as parcel "B" on a plan prepared W.G. Slade which plan is recorded in the Barnstable Registry of Deeds Plan Book 264, Page 18.

Paul Revere, III
Law Offices of Paul Revere, III
226 River View Lane
Centerville, MA 02632

Barnstable, SS

Then personally appeared the above named Paul Revere, III, and acknowledged the foregoing instrument to be his free act and deed before me.

Notary Public *Benjamin E. Zehnder*
My Commission expires on
*10/31/04*

**EXHIBIT K**

Barbara Cordi-Allen
Case 1:05-cv-10370-PBS     Document 30-6     Filed 05/26/2006     Page 12 of 28
March 17, 2006     Cordi Allen, et al., vs. Conlon, et al.

VOLUME I - 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10370PBS

* * * * * * * * * * * * * * *
BARBARA CORDI-ALLEN AND JOHN ALLEN, )
          Plaintiffs,               )
vs.                                 )
                                    )
JOSEPH R. CONLON, ARTHUR F. HUTLIN, )
NORMAN H. POPE, KEITH S. ALTHAUS,   )
And MARINNA MATRICARDI as they are  )
Members and collectively the TRURO  )
ZONING BOARD OF APPEALS AND THE     )
TOWN OF TRURO, MASSACHUSETTS, AND   )
BROOKE NEWMAN,                      )
          Defendants.               )
* * * * * * * * * * * * * * *

DEPOSITION OF BARBARA CORDI-ALLEN, a

witness called on behalf of the Defendants

pursuant to the Massachusetts Rules of Civil

Procedure before Jo Anne M. Shields,

Professional Shorthand Reporter and Notary

Public in and for the Commonwealth of

Massachusetts, at the offices of Brody,

Hardoon, Perkins & Kesten, LLP, One Exeter

Plaza, Boston, Massachusetts, on Friday,

March 17, 2006, commencing at 10:40 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
Telephone (617) 742-6900

---

**APPEARANCES:**

PAUL REVERE, III, ESQUIRE
LAW OFFICES OF PAUL REVERE, III
226 River View Lane
Centerville, Massachusetts 02632
(508) 778-7126
for the Plaintiffs

DEBORAH I. ECKER, ESQUIRE
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, Massachusetts 02116
(617) 880-7100
for the Defendants, Joseph R. Conlon,
Arthur F. Hutlin, Norman H. Pope, Keith
S. Althaus, and Marinna Matricardi as
they are Members and collectively the
Truro Zoning Board of Appeals and the
Town of Truro, Massachusetts

JULIE PRUITT BARRY, ESQUIRE
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210-2831
(617) 439-2831
for the Defendant, Brooke Newman

ALSO PRESENT:

Sarah A. Turano-Flores, Attorney At Law
Town Counsel for the Town of Truro

---

I N D E X    3

Deposition of:          Direct    Cross

BARBARA CORDI-ALLEN

  By Ms. Barry             4

  By Ms. Ecker                      81


E X H I B I T S

No.                                        Page

1   Notice of deposition                    4

2   Document entitled "Defendant Brooke
    Newman's First Request to Barbara
    Cordi-Allen for Production of
    Documents"                             11

3   Document entitled "Plaintiffs John
    Allen and Barbara Cordi-Allen's
    Response to Defendant Newman's
    Document Request"                       12

4   Letter to Steve Williams from Mr.
    and Mrs. John Allen dated 9/20/98      18

5   Aerial photograph                      23

6   Letter to Paul Revere from Thomas
    J. Wingard Jr. dated 10/19/04          58

7   Plaintiffs' Answers to Defendants'
    First Set of Interrogatories          145

---

P R O C E E D I N G S     4

   **BARBARA M. CORDI-ALLEN**, a

witness called for examination by counsel for

the Defendants, having been satisfactorily

identified by the production of her driver's

license and having been duly sworn, testified

as follows:

                * * *

DIRECT EXAMINATION

BY MS. BARRY:

Q.   Good morning, Ms. Cordi-Allen.  My name is

     Julie Barry.  I'm an attorney for Brooke Newman

     in this case.

A.   Uh-huh.

     MS. BARRY:  I'd like to have this marked as

     Exhibit I, please.

     (Notice of deposition marked as Cordi-Allen

     Exhibit No. 1.)

Q.   Just before we get started, I'd like to give

     you a few guidelines about your deposition

     today.  I'll be asking questions, you'll be

     answering them, and the court reporter will be

     taking down your answers.  So I would ask that

     you wait until I finish the question --

Barbara Cordi-Allen
March 17, 2006

Case 1:05-cv-10370-PBS    Document 30-6    Filed 05/26/2006    Page 13 of 28
Cordi-Allen, et al. vs. Conron, et al.

21

1  in or about 1998?  Did you file an appeal in
2  1998 of the building permit?
3  A.  No.
4  Q.  Why not?
5  A.  We waited for a response for -- from the
6     building inspector and my attorney, Bill
7     Thomas, who -- God rest his soul -- has passed
8     away.  And he was dealing with the matter.
9     Maybe he did.  I don't remember.
10 Q.  Okay.
11 A.  He may have.  I -- I know there was something
12    in court.  But . . .
13 Q.  It's fair to say you didn't appeal the issuance
14    of the building permit to the Board of Appeals
15    in 1998; is that correct?
16 A.  If -- if it was done, it was done through my
17    attorney.  And I don't remember.
18 Q.  Okay.
19 A.  But I -- I personally didn't file any --
20 Q.  Okay.
21 A.  -- that I know of.
22 Q.  Okay.  Do you recall getting a response from
23    the building inspector to your letter?
24 A.  No.

22

1  Q.  You don't recall?  Or you didn't get one?
2  A.  I don't believe I got one.
3  Q.  You're seeking to expand your existing cottage
4     at 5 Yacht Club Road, as well as build a -- a
5     two-story addition on the property; is that
6     correct?
7  A.  Yes.
8  Q.  Okay.  And -- and your property is adjacent to
9     Ms. Newman's; is that correct?
10 A.  Yes.
11 Q.  Okay.  Have you sought a building permit yet
12    for the proposed expansion --
13 A.  Yes.
14 Q.  -- and the new structure?  You have sought a
15    building permit?
16 A.  Uh-huh.
17 Q.  When did you file for a building permit?
18 A.  1996.
19 Q.  Have you sought for zo- -- have you sought
20    zoning relief from the Board of Appeals for the
21    proposed expansion and new structure?
22 A.  Don't need to.
23 Q.  My question is, have you sought zoning relief
24    from the Board of Appeals for the proposed

23

1  project on your property?
2  A.  Have we?  Not to my knowledge.
3  Q.  Okay.
4     MS. BARRY:  Can you mark that as the next
5     exhibit.
6     (Aerial photograph marked as Cordi-Allen
7     Exhibit No. 5.)
8  Q.  Now, in the letter that's Exhibit 4 to the
9     building inspector dated September 20th, 1998,
10    can you just look at that and let me know if
11    you've alleged that there's any impact to your
12    property as a result of the building permit
13    being issued to Ms. Newman?
14 A.  Yes.
15 Q.  What have you alleged in that letter that says
16    there's an impact to your property?
17 A.  That it's in the flood zone and that her
18    property's in the flood zone and that the well
19    is supposed to be on site.  And according to
20    what's been said by Brooke Newman, any water
21    that we use, which is hundreds and hundreds of
22    yards away from her well, would affect the
23    water sup- -- her water supply.
24 Q.  But what I'm asking you -- I -- I understand

24

1  you have those issues -- but what I'm asking --
2  A.  Uh-huh.
3  Q.  -- you specifically is, concerning that letter,
4     what impacts to your property at 5 Yacht Club
5     Road result from the issuance of a building
6     permit to Ms. Newman?  A building permit.
7  A.  The violations of the Board of Health.
8  Q.  How -- but this -- we're talking about the
9     building permit.  Is it your understanding the
10    building permit is issued by the building
11    commissioner?
12 A.  No, not solely.
13 Q.  Okay.  Let me go back to my question then,
14    because it's really very narrow.  I'm talking
15    about the letter that is in front of you at
16    Exhibit 4, and I'm asking that you confine your
17    response to that.  Based -- is there anything
18    in that letter that alleges that there is an
19    impact to your property at 5 Yacht Club Road as
20    a result of the building permit requested by
21    Brooke Newman or to be issued by the Board --
22    by the building inspector?
23 A.  The impact here is --
24 Q.  Is it in the letter, please?

25

1  A. Yes. Yes. The consistency.
2  Q. And when you say "consistency," what are you
3     re- --
4  A. In decisions.
5  Q. Okay. Let's -- let's not talk over each other.
6     When you say "consistency," you mean, the
7     consistency in the decisions of the town
8     officials? Is that what you're referring to?
9  A. Yeah.
10 Q. Okay. All right. And so, again, I'm going to
11    ask you, what is the impact to your physical
12    property as a result of the building permit
13    being issued to Brooke Newman as alleged in
14    that letter? Please show me where.
15       (Pause.)
16 A. I -- I don't know if I'm really targeting what
17    you're saying. But it's here that she's in a
18    flood zone. That's an impact on our property.
19 Q. Okay. Let's take that then. How is that an
20    impact on your property?
21 A. Being in a flood zone?
22 Q. How is it an impact on your property that her
23    property is -- if -- if -- is, as you've --
24 A. 'Cause it --

26

1  Q. -- alleged -- please let me finish -- in a
2     flood zone?
3  A. According to what has been said by Brooke
4     Newman, the water cannot flow properly because,
5     in her case, it's supposed to be up on pilings.
6  Q. Okay.
7  A. It is not. It's a --
8  Q. I'm going to stop you there --
9  A. -- full foundation.
10 Q. -- because that's going way far afield. I'm
11    going to give you an opportunity to tell me --
12    let you tell me all of your objections to
13    Ms. Newman's modifications that were allowed by
14    that building permit. But that's not what I'm
15    after right now. All I'm really trying to get
16    at is that you don't allege any specific
17    impacts to your property as a result of the
18    building permit in that letter, Exhibit 4,
19    dated Septemeber 1998; is that correct?
20 A. I wouldn't say that's correct.
21 Q. Okay.
22 A. I think there's some.
23 Q. All right. Then we'll agree to disagree.
24       MR. REVERE: Can we just have a second?

27

1     Focus on the question. She's only asking you
2     about the letter. If it's not in the letter --
3     just focus on the question. Okay.
4  Q. That's fine. I'm not trying to --
5       MR. REVERE: Yeah.
6  -- trip you up.
7       MR. REVERE: No. Yeah. She -- just focus
8     on what she's saying.
9       THE WITNESS: Uh-huh.
10      MR. REVERE: Okay?
11 Q. I'm going to show you what has been marked as
12    Exhibit 5. I can represent to you that this
13    was a document that was produced in the
14    documents to the Town from your attorney --
15 A. Uh-huh.
16 Q. -- and ask if you can look at that and tell me
17    if you recognize it.
18 A. Yes.
19 Q. What do you recognize that to be?
20 A. That was something the Army Corps of Engineers
21    did.
22 Q. Is it an aerial photograph done by the Army
23    Corps of Engineers?
24 A. Yes.

28

1  Q. Okay. Now, if you look at this aerial, can --
2     is your property and the structure thereon
3     depicted in this photograph?
4  A. Yes.
5  Q. Can you point to me where that is?
6  A. Okay.
7       (The witness complies.)
8  Q. So you're indicating just to the left of the
9     red line that appears to be drawn adjacent to a
10    dock structure --
11 A. Yes.
12 Q. -- is that correct? And can you also identify
13    for me, what is the structure immediately
14    across? This looks like a small path from your
15    structure.
16 A. The yacht club.
17 Q. That's the yacht club.
18 A. Excuse me one second. I want to see something.
19      MR. REVERE: Talk to her.
20      THE WITNESS: No. I know. But I wanted
21    you to see something.
22      MR. REVERE: Yeah.
23      THE WITNESS: Okay.
24 Q. Do you have something you want to add to

Barbara Corcoran-Allen
March 17, 2006

Case 1:05-cv-40370-PBS    Document 30-6    Filed 05/26/2006    Page 15 of 28

Coral Allen, et al., vs. Conlon, et al.

**29**

```
1       that --
2          MR. REVERE:  No.
3   Q.  -- answer?
4          MR. REVERE:  Just . . .
5   Q.  Okay.  If you would please show me on this
6       Exhibit 5 where Brooke Newman's house is
7       located.
8   A.  This is it.
9   Q.  Okay.  And you've pointed --
10         MR. REVERE:  Could we -- I can get you
11      another copy of that if you've got a problem.
12      I -- 'cause I think it would be better if she
13      marked it, you know, circled, you know, put a
14      letter --
15         THE WITNESS:  Oh --
16         MR. REVERE:  -- you know, pointing.
17         THE WITNESS:  -- he's saying for me to
18      label it, I guess.
19         MS. BARRY:  Yeah.  No.  That's fine.  I
20      understand.
21         MR. REVERE:  Okay.
22         MS. BARRY:  I mean, my questions are
23      really, in this --
24         MR. REVERE:  Okay.
```

**30**

```
1          MS. BARRY:  -- for -- for purposes of this,
2       so general that I don't really think that's --
3          MR. REVERE:  Okay.
4          MS. BARRY:  -- even necessary.  If -- if it
5       appear -- if you think that it is -- and I
6       don't -- I mean --
7          MR. REVERE:  Okay.  If you can understand.
8          MS. BARRY:  You don't need to be taking all
9       this down.  Let's go off the record.
10         (A brief discussion was held off the
11         record.)
12         MS. BARRY:  Now, please go back on.
13  Q.  All right.  So on Exhibit 5, you have drawn a
14      red circle around your structure.  And if you
15      would put a CA next to it.
16         (The witness complies.)
17  Q.  And you have also drawn a red circle around the
18      structure that you have identified as Brooke
19      Newman's house --
20  A.  Yes.
21  Q.  -- at 3 Yacht Club Road.
22  A.  Yes.
23  Q.  And you have drawn a -- or written "BN" next to
24      that circle; is that correct?
```

**31**

```
1   A.  Yes.
2   Q.  Okay.  Now, it's fair to say, isn't it, that
3       your property is closer to the water than
4       Ms. Newman's?
5   A.  Yes.
6   Q.  Okay.  And your property has a dock.  It looks
7       like an existing dock structure extending from
8       some point on your property out to -- it looks
9       like a tidal flat; is that correct?
10  A.  Yes.
11  Q.  And can you tell me, what is the red line
12      that's drawn at the end of the dock and then
13      extending out to the water depicted on this
14      photo?
15  A.  That was the previous permitted dock and -- by
16      the DEP and also permitted by the Town of Truro
17      for -- for us --
18  Q.  So --
19  A.  -- in 1996.
20  Q.  Okay.  So this -- this depicts what would have
21      been a proposed dock extension; is that
22      correct?
23  A.  Not proposed.  It was approved.
24  Q.  I understand.  But this -- there's not,
```

**32**

```
1       actuall,y a dock --
2   A.  Well --
3   Q.  -- extension --
4   A.  -- there are --
5   Q.  -- there?
6   A.  -- floats.  There are floats.
7   Q.  Okay.
8   A.  So you . . .
9   Q.  Okay.
10  A.  And . . .
11  Q.  Okay.  Now, this is the question I told you
12      that I -- that I intended to ask you.  What are
13      your objections to the building permit that was
14      granted to Ms. Newman for the modifications to
15      her dwelling at 3 Yacht Club Drive?
16  A.  What are they?
17  Q.  Uh-huh.
18  A.  She does not have proper permits --
19  Q.  Let me --
20  A.  -- for what she built.
21  Q.  Let me stop --
22  A.  They're not --
23  Q.  -- you there.  And we'll --
24  A.  Okay.
```

33

1  Q. -- take it one by one. She doesn't have proper
2     permits.
3  A. Right.
4  Q. What permits do you allege that she needs?
5  A. Proper location. The house is supposed to be
6     on pilings. She's brought in fill, which will
7     definitely cause problems for flooding. She's
8     brought in plantings. None of this was on her
9     order of intent.
10 Q. Let me just -- let me stop you there, 'cause I
11    just want to make sure that you're
12    understanding my question.
13 A. Uh-huh.
14 Q. I'm talking about the building permit.
15 A. It's all part of getting a building permit.
16 Q. Okay.
17 A. You have to get those approvals first.
18 Q. Okay. So what permits are you suggesting that
19    she needed that she didn't get?
20 A. She didn't get proper building permits as, like
21    I said, site location. She altered her plans.
22    And the Conservation approvals are missing for
23    what she has. They don't coincide. What she
24    has is different than what she was issued.

34

1  Q. Can you clarify what you just said?
2  A. Yeah.
3  Q. What she has is --
4  A. She --
5  Q. -- different --
6  A. Right.
7  Q. -- from what?
8  A. She has -- from Conservation Commission, she
9     has no approval for trees or fill. And you
10    cannot bring in either in that area. She does
11    not have her house, which is, according to her,
12    in a flood zone, in an environment that would
13    require her house be put on pilings. And she
14    has a full basement. You can't have a full
15    basement from what we've been told. So . . .
16 Q. And when you say "from what we've been told,"
17    told by who?
18 A. By Brooke Newman, her attorneys, and town
19    officials.
20 Q. In connection with her house or your
21    proposed --
22 A. Oh, with our --
23 Q. -- structure?
24 A. -- with ours. But, also, that hers, in looking

35

1     at her permits, they're not -- they're not
2     accurate for what she has.
3  Q. What permits are you referring to again? Are
4     you referring to the building permit,
5     Ms. Cordi-Allen?
6  A. Bo- -- both the building permits and the
7     Conservation Commission permits. She's put a
8     fence up on property that's not hers.
9  Q. Now, regarding the fence, are you talking about
10    a Conservation Commission permit or the
11    building permit?
12 A. Both.
13 Q. Was the fence a part of the building permit
14    that was issued to Ms. Newman that you are
15    objecting to?
16 A. The location.
17 Q. I'm -- let me -- let me backtrack and make sure
18    you understand. I'm trying to confine my
19    questions here to this lawsuit.
20 A. Uh-huh.
21 Q. Do you understand that you have appealed the
22    Zoning Board's upholding of the building
23    commissioner's issuance of a building permit to
24    Ms. Newman in 1998?

36

1  A. Yes.
2  Q. Okay. I'm talking about the building permit.
3     So I would like to know what objections you
4     have to the building permit issued to
5     Ms. Newman for modifications to her property.
6  A. You have to go --
7  Q. The building permit.
8  A. Yeah. But to go through -- to get a building
9     permit, you have to have other permits. It's
10    not one permit. It's --
11 Q. What do you base that on?
12 A. What do I base it on?
13 Q. Uh-huh.
14 A. Truro's regulations that they've told us. So I
15    would assume that they're for everybody.
16 Q. So you're basing your analogy of the
17    requirements for Ms. Newman's property and the
18    modifications to the structure thereon based on
19    the requirements for the structure that you
20    proposed to develop at 5 Yacht Club Road?
21 A. Yes. And the -- the town regulations.
22 Q. The town regulations pertaining to the
23    development of your property?
24 A. No. Of any property supposedly down there and

Barbara Cordi-Allen

Case 1:05-cv-10370-PBS    Document 30-6    Filed 05/26/2006    Page 17 of 28

Cordi-Allen, et al., vs. Conlon, et al.

March 17, 2006

---

**37**

1    also DEP regulations.
2  Q. Okay.  You understand this is not a lawsuit
3     concerning DEP.
4  A. You have to have the proper permits.  And
5     Conservation Commission's supposed to grant
6     proper permits according to DEP regulations,
7     and they're missing.
8  Q. Okay.  Anything else?
9  A. Board of Health regulations.
10 Q. What -- and what specifically about the Board
11    of Health regulations?
12 A. She has no permit for her well either from
13    Conservation Commission nor from the Board of
14    Health.
15 Q. What do you base that statement on?
16 A. The Board of Health, my discussions with the
17    Board of Health.
18 Q. Is it your understanding that the building
19    inspector has to confirm with other town
20    officials that any necessary permits have been
21    obtained before he issues a building permit?
22 A. That they're supposed to?  Is that --
23       MS. BARRY:  Read back --
24 A. -- what you're asking?

---

**38**

1       MS. BARRY:  -- the question.
2  A. Yeah.
3       (Question read back.)
4  A. I can't answer that.  I -- I would assume that,
5     but I can't say that that's what they do do.
6  Q. So you don't know?
7  A. Right.
8  Q. Do you have any other objections to the
9     building permit that was granted to Ms. Newman
10    for the modifications to her dwelling at 3
11    Yacht Club Road?
12 A. The setbacks.
13 Q. What about --
14 A. I --
15 Q. -- the setbacks?
16 A. Property lines.
17 Q. What -- could you please --
18 A. I don't --
19 Q. -- tell me in more detail what you're saying?
20    Because I don't --
21 A. If her --
22 Q. -- understand.
23 A. -- house is properly located, it meets the
24    regulations for setbacks for her house, her

---

**39**

1     septic.  Her well is now off-property.
2  Q. What do you base that on?
3  A. I saw it.
4  Q. You saw what?
5  A. Her well off-property.  And the location of the
6     house in terms of property lines, it looks very
7     close.
8  Q. It looks very close.  Do you have a survey or
9     something else upon which you based your --
10 A. We've had --
11 Q. -- statement?
12 A. -- the property surveyed, and people down there
13    have removed the stakes umpteen times.  So . . .
14 Q. Excuse me.  Let me make sure that I understand
15    you.  You've had Ms. Newman's property
16    surveyed?
17 A. My property.
18 Q. Do you have any basis for your statement, other
19    than your belief that it looks pretty close,
20    that Ms. Newman's structure does not comply
21    with the setbacks?
22 A. I have not measured her property.  But her
23    placing her fence in the middle of Yacht Club
24    Road shows that she wants people to see or

---

**40**

1     think she owns more property.  And --
2  Q. That's not really what I've asked you though.
3     What I've asked is whether you have a basis for
4     your statement that Ms. Newman's structure does
5     not comply with the setback other than your
6     belief.
7  A. Well, I have not measured it.  But . . .
8  Q. So have you --
9  A. I have not.
10 Q. -- hired -- have you hired a surveyor or any
11    other expert to measure Ms. Newman's property?
12 A. Not yet.  Not yet.
13 Q. Are you intending to hire someone in connection
14    with this lawsuit?
15 A. We may.  We may.
16 Q. Now, I need to know.  The purpose of this
17    deposition --
18 A. I have not --
19 Q. -- Ms. Cordi-Allen --
20 A. -- discussed that with my attorney.
21 Q. Well, I -- if you -- I need to know.  The
22    question is, do you have an intent to retain
23    a -- a surveyor or other expert to survey the
24    structure at 3 Yacht Club Road to determine

---

**41**

```
 1        whether it complies with setbacks?
 2   A.   We may.
 3   Q.   Do --
 4        MR. REVERE:  Can we go off the record?
 5        MS. BARRY:  Yes, please.
 6        (A brief discussion was held off the
 7        record.)
 8        MR. REVERE:  Back on the record.
 9        MS. BARRY:  Okay.  Thank you.
10        MR. REVERE:  If you want that on the
11   record, we can put that on the record.
12        MS. BARRY:  We'd like to note for the
13   record that Ms. -- Mr. Revere has confirmed
14   that there is no intent to hire a surveyor to
15   survey Ms. Newman's property, which is in
16   accordance with not only the Rule 26 disclosure
17   that was previously made by the plaintiffs in
18   this matter, but also with the interrogatory
19   answers that were provided to the Town.
20   Q.   Okay.  Do you have any other objections to the
21        building permit that was granted to Ms. Newman
22        for modifications of the dwelling at 3 Yacht
23        Club Road?
24   A.   Okay.  Consistent treatment.
```

**42**

```
 1   Q.   When you say "consistent treatment," what do
 2        you mean?
 3   A.   The way one gets their building permits for one
 4        person should be consistent for everybody.
 5   Q.   And you're specifically speaking about the way
 6        that Ms. Newman got her building permits
 7        com- -- and the treatment compared to the
 8        treatment that you claim that you have
 9        received?
10   A.   Exactly.  Uh-huh.
11   Q.   Okay.  Anything else?
12   A.   The only other thing is the encroachment on my
13        property.
14   Q.   What encroachment are you referring to?
15   A.   She's been trespassing on my property.
16   Q.   Okay.  That's a different issue.  Do you
17        understand that there is a le- -- that the term
18        "encroachment" has legal significance?
19   A.   No.  I thought that just meant coming, you
20        know, on people's property.
21   Q.   Okay.  That's -- that's an issue that I'm going
22        to get to later.
23   A.   Okay.
24   Q.   Right now, I'm just trying to determine --
```

**43**

```
 1        you're not -- you're not suggesting right now,
 2        are you, that Ms. Newman's structure encroaches
 3        on your property?  And I'm talking
 4        specifically --
 5   A.   The house?
 6   Q.   -- about the house.
 7   A.   No.  No.
 8   Q.   It's fair to say, isn't it, that Ms. Newman's
 9        house, prior to the modifications, did not
10        block your view of the water; is that correct?
11   A.   The water in front of me?
12   Q.   Uh-huh.
13   A.   No.
14   Q.   Okay.  And is it fair to say that after the
15        house was -- the modifications were made to the
16        house under the building permit that it doesn't
17        block your view to the water?
18   A.   Well, there's water back there.  But I never
19        even considered that.  That's not part of my
20        concern.
21   Q.   Okay.  So you don't --
22   A.   But there's water all the way around.
23   Q.   Okay.  So -- but your -- your problem with the
24        modifications made to Ms. Newman's structure
```

**44**

```
 1        are not based on any interference with your
 2        view from your property?
 3   A.   Exactly.
 4   Q.   Okay.  This question is slightly different.
 5   A.   Uh-huh.
 6   Q.   It still goes to the building permit and the
 7        upholding of that permit by the Board of Appeal
 8        decision.  And I would like to know, how have
 9        your property rights or legal interest been
10        harmed as a result of that decision by the
11        Board of Appeals to uphold the issuance of the
12        building inspector's building permit to
13        Ms. Newman for the modifications to the
14        structure at 3 Yacht Club Road?
15   A.   I believe the Town dragged it out.
16   Q.   When you say that, what do you mean?  The Town
17        dragged what out?
18   A.   Responding to my attorney, they took ex- --
19        extensive time to review her lack of proper
20        permits.
21   Q.   And when you say "extensive time to review,"
22        who -- who are you talking about particularly
23        in the town?  And what are you specifically
24        referring to?
```

Barbara Gordin Allen, et al., vs. Conlon, et al.
Case 1:05-cv-40370-PBS    Document 30-6    Filed 05/26/2006    Page 19 of 28
March 17, 2006

45

1  A. I know my attorney wrote a letter to the Town
2     of Truro; and he wrote about the problems with
3     her not having proper permits and bringing in
4     fill, et cetera, trees, the -- her fence not on
5     her property, house not sited where it was
6     supposed to be, not elevated.
7  Q. Okay.
8  A. And he did not get a response in a timely
9     manner.
10 Q. What else? How else have your property rights
11    or legal interest been impacted by the decision
12    of the Board of Appeals upholding the building
13    inspector's issuance of a building permit to
14    Ms. Newman?
15 A. I sure as heck can't get away with what she's
16    gotten away with.
17 Q. What do you mean by that?
18 A. It's taken 11 years so far or ten years so far.
19    She just went in, built; and that was it.
20    And . . .
21 Q. How is that an impact from the Board of
22    Appeals' decision upholding the building
23    inspector's issuance of a building permit to
24    Ms. Newman?

46

1  A. They still had -- they are fighting us. The
2     Town of Truro's fighting us. Yet when people
3     have violated regulations, they've done nothing
4     in terms of the enforcement.
5  Q. Let me see if I can be more clear because I'm
6     afraid you -- do you --
7  A. You know, I'm on a lot of medication too. So
8     that's why I kind of go off, just so you know.
9  Q. Are you on --
10 A. So sometimes, you have to --
11 Q. -- medication today?
12 A. Yeah. I didn't know if you knew that.
13 Q. No.
14 A. So sometimes, you have to make sure I focus
15    because --
16 Q. Okay.
17 A. -- I do, you know, go off, obviously.
18 Q. Let me just give you a little explanation --
19 A. Uh-huh.
20 Q. -- that may help you. This --
21    MS. ECKER: Excuse me. Could I just
22    interrupt you?
23    MS. BARRY: Yes, please.
24    MS. ECKER: I'm very sorry. Are you on any

47

1     medication today that would affect your ability
2     to testify?
3        THE WITNESS: No.
4        MS. ECKER: Okay.
5        THE WITNESS: I can -- I just go off. So
6     if I do, like, she's been patient. But if I
7     don't answer exactly, she's brought -- had to
8     bring me back.
9        MS. ECKER: Does the medication --
10       THE WITNESS: So . . .
11       MS. ECKER: -- affect your ability to tell
12    the truth?
13       THE WITNESS: No, not at all.
14       MS. ECKER: Does the medication affect your
15    ability to recall facts that occurred as
16    regards to this lawsuit and your property?
17       THE WITNESS: No.
18       MS. ECKER: Okay.
19       MS. BARRY: Okay. Thank you.
20       THE WITNESS: It's just that, sometimes,
21    my -- I think, you know, too wide.
22       MS. BARRY: I understand.
23    BY MS. BARRY:
24 Q. So let me -- let me ask you something -- or let

48

1     me give you some information that may help you
2     focus. You understand that the Complaint that
3     you filed is against the Board of Appeals and
4     Ms. Newman, but that only one count of your
5     Complaint, specifically your zoning appeal
6     against the Zoning Board of Appeals' decision,
7     actually concerns my questioning here today and
8     that this -- the deposition will later move to
9     questions by Ms. Ecker concerning the other
10    counts in the Complaint that you have alleged
11    against the Town.
12       So by way of helping you focus --
13 A. Right.
14 Q. -- I'm specifically interested in your zoning
15    appeal, your appeal of the Board of Appeals'
16    decision.
17 A. Uh-huh.
18 Q. And there will be time for you to, at -- at
19    some point later, testify as to the treatment
20    that you believe that you've received from the
21    Town in other areas. Okay? And if that just
22    helps you to focus a little bit.
23       So right now, I'm really trying to focus on
24    how it is that Ms. Newman's modifications to

Barbara Cordi-Allen
March 13, 2006
Case 1:05-cv-10370-PBS    Document 30-6    Filed 05/26/2006    Page 20 of 29
Gordon, et al.

49

1   her property and the Zoning Board of Appeals
2   upholding the building permit allowing those,
3   how has that affected your property or your
4   legal rights other than the -- the disparate
5   treatment that you're alleging?  Take that out
6   of the equation altogether.
7       Is there any other impact?
8  A. There's been a financial impact.  It's
9   depreciated the value of our property
10  immensely.
11 Q. Okay.  Let me stop you right there.  What's the
12  basis for your statement that it's depreciated
13  the value of your property?
14 A. Well, if the hou-- -- if that property is built
15  upon, it's quite more valuable.
16 Q. Okay.  So again, I'm -- I'm concerned that
17  we're -- we're confusing things.  The va-- --
18  you're saying that if your property is built
19  on, it's much more valuable?
20 A. Exactly.
21 Q. Okay.
22 A. Uh-huh.
23 Q. Are you alleging that the modifications made to
24  Ms. Newman under the building per- -- permit

50

1   have impacted the value of your property?
2  A. Has her enlarging her house impacted the value
3   of my property?  Only that the elevation, her
4   having a full foundation -- a full basement;
5   the trees will cause erosion to my property.
6  Q. Okay.  Well, I'm specifically asking you about
7   allegations of an impact to the value of your
8   property.  Do you have any basis for your --
9   for believing that there will -- that there
10  will be an impact to the value of your property
11  as a result of the modifications made to the
12  structure at 3 --
13 A. Yes.
14 Q. -- Yacht Club Road?  What is the basis for
15  that?
16 A. The erosion --
17 Q. I understand --
18 A. -- problem.
19 Q. -- that you believe that there may be an
20  erosion --
21 A. Right.
22 Q. -- problem.  What is that based on?
23 A. Speaking with my geologist, we've spoken about
24  it.

51

1  Q. You've spoken with your geologist --
2  A. Uh-huh.
3  Q. -- who is?
4  A. Peter Rosen.
5  Q. And you've spoken to him specifically about an
6   erosion problem resulting from the
7   modifications to Ms. Newman's property at 3
8   Yacht Club Road?
9  A. Yes.
10 Q. And what has he told you in that regard?
11 A. In that environment, she should have had the
12  house on pilings.
13 Q. Okay.  Let me stop you there.  I don't want to
14  go back through that.  I understand.
15 A. Okay.
16 Q. I understand what you're thinking in that
17  regard.  You've already given me that answer.
18  I'm specifically concerned with the impact to
19  the value, the dollar value, of your property.
20  Is Mr. Rosen a real estate appraiser?
21 A. No.
22 Q. Do you -- have you hired a real estate
23  appraiser?
24 A. No.

52

1  Q. Have you had your property appraised to
2   determine whether there has been a before and
3   after impact to the value of your property from
4   1998 to the present?
5  A. No.
6  Q. Do you intend to hire an appraiser?
7  A. I have not discussed that, made plans for it.
8  Q. You have not made plans --
9  A. No.
10 Q. -- for hiring an appraiser?  Okay.  Have you
11  spoken --
12 A. For -- for -- for this part.  For your part.
13  Right?
14 Q. Specifically -- yes.  Specifically as pertains
15  to --
16 A. To you.
17 Q. -- an impact in the -- to the value of your
18  property from Ms. --
19 A. From hers.
20 Q. -- Newman's modifications.
21 A. That's what I thought.  For your part.  Okay.
22 Q. Have you spoken to any other person or obtained
23  knowledge from anyone else concerning whether
24  there is an impact to the dollar value of your

53

```
1    property as a result of the modifications made
2    to Ms. Newman's structure at 3 Yacht Club Road?
3  A. I've spoken with Jim Mahala previously, DEP.
4  Q. Okay.  Is Jim Mahala an appraiser?
5  A. No.  He works at DEP.
6  Q. Okay.  So he doesn't have any expertise in
7     appraising property?
8  A. No.  But there's a risk of my house flooding.
9  Q. Okay.  I understand that you -- you have
10    expressed concerns about the structure and
11    the -- the flood zone and your concerns about
12    erosion.  I understand that.  I'm specifically
13    targeting the impact to the property value.
14    Okay.
15       What other impacts to your property rights
16    or legal interest are you claiming have
17    resulted from the Board of Appeals' decision
18    upholding the building inspector's issuance of
19    a building permit for the modifications to the
20    structure at 3 Yacht Club Road?
21  A. I think I covered ev- -- mo- -- there may be
22    more, but I think I covered most of them.  The
23    on- -- there's only one more regarding her --
24    about her mooring.
```

54

```
1  Q. Okay.  Is the mooring connected to the building
2     permit for the structure -- modifications to
3     the structure at 3 Yacht Club Road?  In other
4     words, the building commissioner didn't
5     issue --
6  A. No.
7  Q. -- Ms. Newman --
8  A. No.
9  Q. -- a mooring.
10  A. No.
11  Q. Correct?
12  A. Nobody did.
13       MR. REVERE:  Can we go off the record for a
14    second?
15       MS. BARRY:  Uh-huh.
16       (A brief discussion was held off the
17        record.)
18       MS. ECKER:  Why don't we take a quick
19    break.
20       MS. BARRY:  Okay.
21       (Brief recess taken.)
22    BY MS. BARRY:
23  Q. Ms. Cordi-Allen, can you -- have you told me
24    all of your claims as to how your property
```

55

```
1    rights or legal interests have been harmed by
2    the Board of Appeals' decision upholding the
3    issuance of a building permit to Ms. Newman to
4    modify the residence at 3 Yacht Club Road?
5  A. Are you waiting?  Are you just waiting for me
6     to say something?
7  Q. I'm waiting for you to answer the question.
8  A. Oh.  I -- I thought you were just summarizing.
9  Q. No.
10       MS. BARRY:  Would you read the question
11    back, please.
12       (Portion of question read back.)
13  A. There may be more.  But to the -- right now,
14    that's the most I can recall.
15  Q. Okay.  Have you told me all of your objections
16    to the Board of Appeals' decision upholding the
17    building permit issued to Brooke Newman for the
18    modifications to the structure at 3 Yacht Club
19    Road?
20  A. I don't think we discussed everything.
21  Q. I need -- this is as much for your benefit and
22    convenience more than mine.  But this
23    deposition is the time for you to state for the
24    record what those objections are and what your
```

56

```
1    allegations are concerning any harm to your
2    legal or property interest as a result of the
3    Board of Appeals' decision.  So take a moment
4    to think about it if you wish.  But I need to
5    know at this time.
6  A. At this time, I believe the Board of Appeals
7     dragged out -- well, it was dragged out by --
8     town officials did not send in a response to my
9     attorney in a timely manner so that the Board
10    of Appeals -- I believe it was them that said
11    it wasn't -- that my attorney didn't file in
12    the right time frame, whereas, since he did, it
13    was the Town that intentionally dragged it out
14    so that a date would be missed that they
15    arbitrarily picked.
16       And it wasn't necessarily -- their decision
17    is not necessarily true.  It's what they want
18    people to believe as -- in reference to the
19    time frame.  I understand there's a dispute as
20    to if it was when she applied versus when she
21    started building.  But our paperwork was filed.
22    It was Truro that dragged it out.  But . . .
23  Q. Do you understand that the Board of Appeals'
24    decision is upholding the building inspector --
```

Barbara Cordi-Allen
March 17, 2006

Case 1:05-cv-10370-PBS    Document 30-6    Filed 05/26/2006    Page 22 of 28
et al. vs. Conron, et al.

**57**

1  inspector's decision regarding your request
2  that the building permit issued to Ms. Newman
3  be revoked?
4  A.  Yes.
5  Q.  Okay.  And do you understand that the Board of
6  Appeals upheld the building inspector's
7  decision that the building permit issued to
8  Ms. Newman was lawfully issued and that he
9  declined your request --
10  A.  Because of --
11  Q.  -- to revoke it?
12  A.  I believe that was because of the time frame.
13  Q.  Is that your only -- is -- do you believe
14  that's the only reason why he upheld the
15  building permit was because of alleged
16  statut- -- missing of a statutory deadline for
17  filing an appeal?
18  A.  Again, there are issues with different
19  standards for different people.  And the
20  standards of getting appropriate permits or
21  approvals through various boards is
22  inconsistent with the way people are treated in
23  Truro.  And the documents are -- obviously, are
24  not lined up where they should be.  And that's

**58**

1  why we have a case.
2      MS. BARRY:  Can you mark that as the next
3  exhibit.
4      (Letter to Paul Revere from Thomas J.
5      Wingard Jr. dated 10/19/04 marked as
6      Cordi-Allen Exhibit No. 6.)
7  Q.  I'm going to hand you what's been marked as
8  Exhibit 6 and ask if you can look at it and let
9  me know if you recognize it.  Do you recognize
10  that?
11  A.  No.
12  Q.  Okay.  I can represent to you that Exhibit 6 is
13  a letter from the building commissioner to your
14  attorney regarding the request for enforcement
15  and a revocation of Ms. Newman's building
16  permit.  And I would direct your attention to
17  the last two paragraphs of that letter and ask
18  if you would read those for the record, please.
19  A.  "Mr. Williams determined, as is deduced by the
20  issuance of the building permit, that
21  Ms. Newman's proposal was not 'substantially
22  more detrimental to its neighborhood' and 'will
23  not increase the nature or extent of the
24  nonconformity.'

**59**

1      "Mr. Williams was acting within his
2  authority under the bylaw and, therefore, the
3  permit was issued lawfully."
4  Q.  Okay.  It doesn't indicate in those last two
5  paragraphs or, indeed, the letter, if you want
6  to read it, that you had -- that your filing
7  was -- or request for enforcement was late,
8  does it?
9  A.  Not in this specific letter.
10  Q.  Okay.  Thank you.  What letter are you
11  remembering that that --
12  A.  It was discussions that my attorney and I had
13  spoken about.
14  Q.  Okay.  And I don't --
15  A.  And I --
16  Q.  Stop.  I don't want to know any --
17  A.  Right.
18  Q.  -- communications between you and your counsel.
19  A.  Well, that's what I was going to say.
20  Q.  Okay.
21  A.  I don't think I can say anything.
22  Q.  Okay.  All right.
23  A.  But I think there were letters.  I don't know.
24  Q.  Okay.  Have you told me today all of your

**60**

1  concerns or objections to the Board of Appeals'
2  decision concerning the building permit and its
3  upholding the building permit issued to
4  Ms. Newman for the modifications to the
5  structure of 3 Yacht Club Road?
6  A.  Yeah.  No.  No.  I haven't.
7  Q.  Okay.
8  A.  I have --
9  Q.  What other concerns do you have --
10  A.  Mr. --
11  Q.  -- or objections?
12  A.  I have concerns regarding Mr. Williams issuing
13  building permits to Ms. Newman and his
14  qualifications.  And --
15  Q.  Okay.  And Mr. Williams is who?
16  A.  He was the building inspector at the time.
17  Q.  Okay.  And can you relate for me, please, how
18  those objections about Mr. Williams'
19  qualifications are related to the decision of
20  the Board of Appeals upholding the issuance of
21  a building permit to Ms. Newman?
22  A.  Mr. Williams has proven that he's very lax in
23  terms of his doing his job, specifically in
24  buying our property.  He approved our septic

Barbara Cordis Alvez
March 17, 2006

Case 1:05-cv-10370-PBS   Document 30-6   Filed 05/26/2006 et al., vs. Conlon, et al.   Page 23 of 28

**Page 61**

```
 1      system, signed off on it that it was done and
 2      la-da-da.  It was never done.  And we went to
 3      closing, and we had it tested or inspected.
 4      There was no pump; there was no electricity.
 5      Yet it was approved.
 6          So I can't say that I res-- I can -- I
 7      can't say that he operates within the
 8      regulations.  And I think he was booted out by
 9      the Town because of problems with the Town.
10      And I think he and Ms. Newman were personal
11      friends, from what I've been told.
12   Q. Who told you that Mr. Williams and Ms. Newman
13      were personal --
14   A. Various town- --
15   Q. -- friends?
16   A. Various townspeople.
17   Q. Uh-huh.  Can you tell me who they are?
18   A. No.  I can't.  I -- you know, just people
19      talking.
20   Q. Can you tell me where they said that?
21   A. No.  I don't remember.
22   Q. Can you tell me when they said that?
23   A. Over the years.  I mean, people say things; and
24      you just hear things here and there.  And I'm
```

**Page 62**

```
 1      like, Hm.
 2   Q. Can you tell me what the context was of the
 3      conversation in which this would have -- this
 4      topic would have come up as to the friendship
 5      between or alleged friendship between
 6      Ms. Newman and Mr. Williams?
 7   A. I know people in town were concerned on how she
 8      built, the way she built and got her permits
 9      rather quickly; and we're struggling getting
10      ours.  And not everybody in Truro is pleased
11      with the way that they're treating us.  In
12      fact, people throughout the state wonder what's
13      going on, you know.
14   Q. Who are the people throughout the state that
15      you're referring to?
16   A. People that go down there.  They'll say, How
17      did they build, and you can't build?  And how
18      did they get this, and you can't?  Even people
19      who have done work in prepar- -- that have
20      worked on Brooke Newman's house as well as
21      ours.
22   Q. Who are you speaking of specifically?
23   A. The man that drew up the plans for her house as
24      well as for our proposed house.
```

**Page 63**

```
 1   Q. Who is that?
 2   A. Oh, gosh.  The last name is, it's Mr. Kelly.
 3      And I believe, Felco Engineering; they were
 4      concerned, you know, why we're going through
 5      all that we're going through.
 6   Q. Okay.
 7   A. And --
 8   Q. Again, I want to redirect your --
 9   A. Uh-huh.
10   Q. -- attention back to the Complaint concerning
11      the Board of Appeals' decision concerning the
12      building permit -- upholding of the building
13      permit issued to Ms. Newman and not concerning
14      your property.  Do you have any other
15      objections to that decision by the Board of
16      Appeals upholding the building permit?
17   A. I don't feel that they're treating us equally.
18      And I don't feel that they are following
19      Truro's regulations the way they should be, as
20      well as the State's requirements.
21   Q. What State requirements are you --
22   A. DEP.
23   Q. I'm confused.  Are you saying that DEP is
24      treating you differently?
```

**Page 64**

```
 1   A. No.  The -- yeah.  Well, DEP is.  Yes.  They
 2      are, definitely.  But what I'm saying is that
 3      she had regulations that she had to have in
 4      place to meet DEP regulations, and she did
 5      not --
 6   Q. Okay.
 7   A. -- either, through --
 8   Q. So this is --
 9   A. -- Conservation.
10   Q. -- going back to the objections that --
11   A. But all of that --
12   Q. -- you've told me about.
13   A. -- would have been part of the appeals.
14   Q. Okay.
15   A. Yes.
16   Q. Let me ask you -- I just need to remind you
17      that we want to not talk over one another,
18      'cause her fingers are going to fall off.  So
19      you're -- the -- you're -- what you're
20      referring to in your last answer was the
21      objections you've discussed previously in
22      today's deposition concerning Conservation
23      Commission approvals and DEP approvals --
24   A. Right.
```

Barbara Cordie-Allen
March 27, 2008
Case 1:05-cv-10370-PBS   Document 30-6   Filed 05/26/2006   Page 24 of 28
Schooner et al. Boston, et al.

65

1  Q. -- is that correct? And have you told me
2     everything today about how the decision of the
3     Board of Appeals upholding Ms. Newman's
4     building permit to modify the structure at 3
5     Yacht Club Road impacts your property rights or
6     your legal interests?
7  A. I think it's basically in conclusion. If they
8     could approve hers, then the -- there's
9     absolutely no reason that we shouldn't have
10    built in 1997.
11 Q. Okay.
12 A. And I don't know if this is part of it. But
13    you mentioned views. And I understand that
14    from DEP that views cannot be part of this.
15    Yet when she bought the property after we
16    did -- we were the original owners down
17    there -- she was told that we were building; we
18    had plans on building.
19       And she was also told -- and she made plans
20    for her -- the location of her house, knowing
21    we were building. And that was through the man
22    that designed her house. He told us that. He
23    told me that.
24 Q. And she made plans for the no- -- location.

66

1     When you say "she made plans for the location,"
2     are you talking about the change in the
3     location, the turning of the --
4  A. Yes.
5  Q. -- building?
6  A. Exactly.
7  Q. And it was her plan to orient the house away
8     from your structure?
9  A. No. I wouldn't say that.
10 Q. How would you --
11 A. Just to --
12 Q. -- describe it?
13 A. -- see -- to see about views. I think there
14    was lo- -- you know, located. I don't know
15    how --
16 Q. Views from?
17 A. -- it was specifically, you know. But she just
18    knew that her view was not going to be what it
19    is when she bought the property. So she moved
20    the house.
21 Q. I understand. So her view would be
22    obstructed --
23 A. Right.
24 Q. -- by your proposed dwelling --

67

1  A. Exactly.
2  Q. -- and the modifications and the new structure
3     that you wanted to develop on your property?
4  A. Exactly.
5  Q. And so, as -- as you understand it from the
6     person who designed her building --
7  A. Right.
8  Q. -- she re-oriented the --
9  A. And -- and Felco also.
10 Q. That she -- let me finish -- re-oriented the
11    location of her building --
12 A. Right.
13 Q. -- so that her property -- the view from her
14    property would not be impacted as a result of
15    the proposed structure to be developed on your
16    property. Right?
17 A. That there would be the possibility of her
18    getting a view.
19 Q. Okay.
20 A. I mean, it's not going to be the same view.
21 Q. Okay.
22 A. We know that. A full view.
23 Q. And how does that impact your property rights
24    or your legal interest that Ms. Newman wanted

68

1     to turn the structure so that she would still
2     have a view in the event that your property was
3     allowed to be developed as you proposed?
4  A. Well, obviously, this is all about views. And
5     views cannot be part of . . .
6  Q. Well, we're not talking a- -- no. I'm
7     talking --
8  A. So that's my legal right. She's bringing a
9     lawsuit and trying to stop us from building
10    because of her view.
11 Q. Okay. But we're talking about the lawsuit here
12    today. And what I'm trying -- I'm trying to
13    determine from your answers what impacts you're
14    claiming to your property as a result of the
15    Board of Appeals' decision.
16       If I understand correctly, you have just
17    testified that Ms. Newman wanted to change the
18    orientation of her structure because she was
19    concerned that your proposed expansion and new
20    development at your property would obstruct her
21    view; is that correct?
22 A. Yes.
23 Q. Is that what you've just testified?
24 A. Uh-huh.

Barbara Cordi-Allen
March ... 2006
Case 1:05-cv-10370-PBS    Document 30-6    Filed 05/26/2006    Page 25 of 28
Cordi-Allen ... et al. ... on, et al.

**69**

1  Q. Okay. So how would her wanting to orient her
2     structure so that she might still have a view,
3     assuming your structure were allowed, how does
4     that impact your property rights or your legal
5     interest?
6  A. She is objecting to us building to protect her
7     views.
8  Q. I understand that that's your position.
9        MS. REVERE: All right. But she's asking
10       you, what about the building permit hurt your
11       property? That's all you need to care about.
12       Is that -- that a fair --
13       MS. BARRY: Yes.
14 A. Yeah. Still don't -- we don't have a building
15    permit.
16 Q. No. Ms. Newman's building permit, how did
17    that --
18       MR. REVERE: What about --
19 Q. -- impact you?
20       MR. REVERE: -- the building permit?
21 Q. What I'm saying is, if -- if she turned her
22    house --
23 A. Right.
24 Q. -- from where it was, how does that impact your

**70**

1     property?
2  A. Only if she's met proper setbacks and
3     elevations and all that.
4  Q. Okay. But it doesn't specifically impact your
5     property in particular. Correct?
6  A. The foundation, et cetera, that we've already
7     talked about, from what I've been told, will
8     affect our property.
9  Q. Oh, you're referring now --
10 A. From D- -- DEP has said that also.
11 Q. Okay.
12 A. Actually, Brooke Newman's even said that.
13 Q. Okay. So you're referring now to the erosion
14    issue?
15 A. Exactly.
16 Q. Okay.
17 A. Uh-huh.
18 Q. But other than the erosion issue, is there any
19    other impact from the turning of her house to
20    your property?
21 A. Not that I could think of right now.
22 Q. Okay. You mentioned earlier about a trespass.
23 A. Uh-huh.
24 Q. And is it correct that you filed notice of

**71**

1     trespass against Ms. Newman last summer?
2  A. Yes. I did.
3  Q. And what was that in connection with?
4  A. Taking my barrels, my trash.
5  Q. Okay. Can you elaborate a bit? Because I'm --
6     I'm not familiar with your property. And so I
7     don't really understand what you're talking
8     about.
9  A. She was moving my barrels, removing them,
10    moving them. We'd find them -- once, somebody
11    brought my husband over to the woods by the
12    yacht club and said, Is this your barrel? And
13    we got told -- we were told by people staying
14    at our house that the barrels were being moved,
15    and she was moving them. And we were told by
16    the trash removal people as well. And not only
17    that, she's walking on our property; and it's
18    private property.
19 Q. What is your basis for --
20 A. We've seen her.
21 Q. -- saying that she's walking on your property?
22 A. We've seen her.
23 Q. And where specifically on your property is she
24    walking?

**72**

1  A. From her house, to get to the water.
2  Q. Can you show me on this Exhibit 5 -- and you
3     can use this pen, please, to draw where
4     Ms. Newman is allegedly walking over your
5     property.
6  A. You can see it right here, the path. The --
7     our property goes in front of here; it goes out
8     this way --
9  Q. Uh-huh.
10 A. -- and then down.
11 Q. Uh-huh.
12 A. And she's cutting through.
13 Q. So you're alleging that this path right here --
14    this line -- thin --
15 A. Uh-huh.
16 Q. -- thin line here --
17 A. Yes.
18 Q. -- down to the beach is where Ms. Newman is
19    walking --
20 A. Yes.
21 Q. -- to --
22 A. Uh-huh. Well, it's not -- yes. Yes. The
23    house is moved. Or is this the addition now?
24 Q. I don't know. It's your document.

Barbara Cordi-Allen
March 17, 2006

Case 1:05-cv-10370-PBS    Document 30-6    Filed 05/26/2006 et al Coiton, et al.    Page 26 of 28

```
                                                      73
1   A.  What's the date on this?
2   Q.  I don't believe there is one.
3   A.  It's here.
4   Q.  Oh.
5   A.  '90.  But it's cut off.  I think that was
6       before --
7   Q.  Okay.
8   A.  -- I think.  So -- but, still, there -- she's
9       walking to -- on the path.  You could see the
10      path.  She's also planting trees on our
11      property --
12  Q.  Okay.
13  A.  -- down here.
14  Q.  Let me just -- let me just redirect you now.
15  A.  Okay.
16  Q.  Are you, when -- I'm still talking about the
17      trespassing notice that you filed.
18  A.  That's trespassing when you're planting on --
19  Q.  I understand.  I'm just trying to determine the
20      notice of trespass that you filed against
21      Ms. --
22  A.  Right.
23  Q.  -- Newman last year.  So right now, that was
24      based on her alleged moving of trash barrels --
```

```
                                                      74
1   A.  Trash barrels.
2   Q.  -- her --
3   A.  She's walking on our property.
4   Q.  Right.  Let me just summarize for you.  This'll
5       make it easier.  She's cross- -- you're
6       alleging she's crossing over your property to
7       reach the beach and has planted trees on your
8       property?
9   A.  Yes.
10  Q.  Okay.  Can you draw a line for me that,
11      roughly, approximates where your property line
12      goes to on Exhibit 5?
13  A.  Oh, okay.  It's something like this.
14  Q.  Okay.  Is that -- marking your pen might be
15      better, actually.
16  A.  I don't -- as I say, I --
17  Q.  Here's -- let me --
18  A.  You don't have the plot plan?
19  Q.  I'm sure that I do at some point.
20  A.  Okay.
21  Q.  But I'm just interested in where you believe
22      your property line is.
23  A.  It goes in front of here.  So -- and then it
24      angles down.  And then, I think she has like 25
```

```
                                                      75
1       or so -- so feet somewhere around here.
2   Q.  Ms. Newman --
3   A.  She has --
4   Q.  -- has some --
5   A.  Yeah.
6   Q.  -- some property on the beach?
7   A.  Yeah.
8   Q.  Okay.
9   A.  But we have 172-feet frontage; and she has just
10      maybe 25, 30 feet.  I don't -- it's small --
11  Q.  Okay.
12  A.  -- in comparison to ours.  And there are trees
13      all -- evergreens that are being planted and
14      dying and on our property, and they're not
15      mine.
16  Q.  Okay.  Is there any other basis for your
17      trespassing complaint against Ms. Newman that
18      was filed last summer?
19  A.  Those are the three.
20  Q.  Okay.  You've asserted in your answers to the
21      Town's interrogatories that Mrs. -- Ms. Newman
22      is Jewish.  What's the basis for your
23      understanding or belief that Ms. Newman is
24      Jewish?
```

```
                                                      76
1   A.  We were told that.
2   Q.  By who?
3   A.  Townspeople.
4   Q.  Can you be more specific?
5   A.  Just, we know a lot of people in the town.
6       People are talking.
7   Q.  Uh-huh.
8   A.  People that are staying at our house.
9   Q.  How would people staying at your house know
10      whether Ms. Newman is Jewish?
11  A.  Talking with her.  Actually, even our -- the
12      kids are talking.  Her son met my daughter at
13      the beach.  I know they were hanging out, as
14      the kids say.  Even my -- my previous lawyer
15      had said something about it.
16  Q.  Your previous lawyer --
17  A.  Uh-huh.
18  Q.  -- being?
19  A.  Bill Henchy.
20  Q.  Do you rent your house in the summers?
21  A.  Yes.  Somewhat.
22  Q.  Did you rent it last summer?
23  A.  Part of the summer.
24  Q.  What about the summer of 2004?
```

Barbara Cordi Allen
March 17, 2006

Case 1:05-cv-10370-PBS    Document 30-6    Filed 05/26/2006 et al. vs. Conlon, et al.    Page 27 of 28

77

```
 1   A.  Yes.  Part of it.
 2   Q.  What about the summer of 2003?
 3   A.  Yes.  Uh-huh.
 4   Q.  What about the summer of 2002?
 5   A.  Yes.
 6   Q.  What about the summer of 2001?
 7   A.  Yes.
 8   Q.  What about the summer of 2000, did you rent
 9       your house then?
10   A.  2000.  I believe so.
11   Q.  And what about the summer of 1999?
12   A.  I-- that's going back too far.  I may have,
13       for, you know -- I mean, we use it somewhat.
14       I'm disabled.  I can't be alone.  So I don't
15       stay there that much now --
16   Q.  When did --
17   A.  -- alone.
18   Q.  -- you purchase your house?
19   A.  '96.
20   Q.  Is it fair to say that you've rented the
21       property during the summer for -- for part or
22       all of the summer for most of the time since
23       you've owned the property?
24   A.  In the summer?
```

78

```
 1   Q.  Yeah.
 2   A.  Yeah.
 3   Q.  Yes.
 4   A.  Yes.
 5   Q.  Ms. Cordi-Allen, I can represent to you that
 6       you did not file an appeal to the Board of
 7       Appeals in 1998 when the building permit was
 8       issued to Ms. Newman to make the modifications
 9       to her property.  Why didn't you appeal in
10       1998?
11   A.  That was -- my attorney, Bill Thomas, was
12       handling it then.  I --
13   Q.  Okay.  I just --
14   A.  I don't -- he's gone.  I -- he's passed away.
15       So you'd have a -- I don't know what or why he
16       did or didn't do what he did do.
17   Q.  Why did you file the appeal of the building
18       permit issued to Ms. Newman and the Board --
19       strike that.  Why did you file the Board of
20       Appeals' decision upholding Ms. Newman's permit
21       in 2004?
22   A.  Because there were inconsistencies we found.
23   Q.  Is it fair to say you filed the appeal of
24       Ms. Newman's building permit, sought
```

79

```
 1       enforcement of that building permit, requested
 2       that the building permit be rescinded, and then
 3       appealed the Board of Appeals' decision because
 4       Ms. Newman had appealed the variances that were
 5       granted to you by DEP?
 6   A.  I would say that it was because we were being
 7       told we had to have certain things done, and it
 8       was okay for her to do things a different way.
 9       And there was no consistency in the way we were
10       being treated.
11   Q.  And how far back has that inconsistent
12       treatment been going on, are you claiming?
13   A.  Well, it's obvious from Conser- -- when she
14       went to Conservation Commission or Board of
15       Health or whatever.  Like I said, she has --
16       now she put in her third well; and she's
17       complaining about, if we build, we're going to
18       use more water.  Our well's no- -- nowhere near
19       her well, but she's had three wells that have
20       failed within the past few years.
21   Q.  Okay.
22   A.  And . . .
23   Q.  So it's fair to say that you're claiming that
24       you've received inconsistent treatment since,
```

80

```
 1       at least, 1998?
 2   A.  Yes.
 3         MS. BARRY:  Okay.  Let me just look through
 4       my notes quickly, and I think I'm done.  All
 5       right.  At this point, I'm going to suspend
 6       Ms. Cordi-Allen's deposition pending receipt of
 7       the few things that I requested earlier
 8       concerning what was done to search e-mail and
 9       as well as a designation of the documents that
10       were produced so that I can have an
11       understanding of what documents are responsive
12       to each particular document request.
13         And I would also request and reiterate the
14       request in the request for production of
15       documents that a privilege log be produced.  I
16       understand that certain documents have not been
17       produced claiming a privilege.  And I think
18       it's quite clear that a privilege log is
19       allowed -- under the Federal Rules of Civil
20       Procedure that a request for a privilege log is
21       allowed.  And I would request that that be
22       produced as well.
23         I don't know if anybody else has any
24       questions.
```

Barbara Cordi-Allen
March 17, 2006                                                    Cordi-Allen et al. v. ...son, et al.
Case 1:05-cv-10370-PBS     Document 30-6     Filed 05/26/2006     Page 28 of 28

161

1

2              SIGNATURE PAGE

3

4        I, BARBARA CORDI-ALLEN, do hereby certify

5    that I have read the foregoing transcript of my

6    testimony, and I further certify that said

7    transcript is a true and accurate record of

8    said testimony.

9        Dated at _____, this ____

10    day of _____, 2006.

11

12

13        _____

              BARBARA CORDI-ALLEN

14

15

16

17

18

19

20

21

22

23

24

---

162

1                C E R T I F I C A T E

2    COMMONWEALTH OF MASSACHUSETTS
     COUNTY OF NORFOLK, ss.

3

4        I, Jo Anne M. Shields, a Professional

5    Shorthand Reporter and Notary Public in and for

6    the Commonwealth of Massachusetts, do hereby

7    certify that BARBARA CORDI-ALLEN, the witness

8    whose deposition is hereinbefore set forth, was

9    duly sworn by me and that such deposition is a

10    true and accurate record, to the best of my

11    knowledge, skills and ability, of the testimony

12    given by such witness.

13        I further certify that I am not

14    related to any of the parties in this matter by

15    blood or marriage and that I am in no way

16    interested in the outcome of this matter.

17        IN WITNESS WHEREOF, I have hereunto set

18    my hand and affixed my seal of office this 28th

19    day of March, 2006.

20

21        _____

              Notary Public

22

     My Commission expires:

---

163

1                ERRATA SHEET

2    CHANGES TO THE DEPOSITION OF
     BARBARA CORDI-ALLEN

3

4    INSTRUCTIONS TO WITNESS:  1) Please note any
     desired corrections to your testimony by page

5    and line number.  2) Enter text as it appears
     in the transcript.  3) Enter text as it should

6    appear.
     PAGE      LINE              CORRECTION

7    _____

8    _____

9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

**EXHIBIT L**

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 05-10370PBS
* * * * * * * * * * * * * * * *
BARBARA CORDI-ALLEN AND JOHN ALLEN, )
            Plaintiffs,              )
                                     )
vs.                                  )
                                     )
JOSEPH R. CONLON, ARTHUR F. HUTLIN,  )
NORMAN H. POPE, KEITH S. ALTHAUS,    )
And MARINNA MATRICARDI as they are   )
Members and collectively the TRURO   )
ZONING BOARD OF APPEALS AND THE      )
TOWN OF TRURO, MASSACHUSETTS, AND    )
BROOKE NEWMAN,                       )
            Defendants.              )
* * * * * * * * * * * * * * * *

DEPOSITION OF JOHN E. ALLEN, a witness
called on behalf of the Defendants pursuant
to the Massachusetts Rules of Civil Procedure
before Jo Anne M. Shields, Professional
Shorthand Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the offices
of Brody, Hardoon, Perkins & Kesten, LLP, One
Exeter Plaza, Boston, Massachusetts, on Friday,
March 31, 2006, commencing at 1:45 p.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
Telephone (617) 742-6900

---

Page 2

1  APPEARANCES:
2
   PAUL REVERE, III, ESQUIRE
3    LAW OFFICES OF PAUL REVERE, III
     226 River View Lane
4    Centerville, Massachusetts 02632
     (508) 778-7126
5    for the Plaintiffs
6
   DEBORAH I. ECKER, ESQUIRE
7    BRODY, HARDOON, PERKINS & KESTEN, LLP
     One Exeter Plaza
8    Boston, Massachusetts 02116
     (617) 880-7100
9    for the Defendants, Joseph R. Conlon,
     Arthur F. Hutlin, Norman H. Pope, Keith
10   S. Althaus, and Marinna Matricardi as
     they are Members and collectively the
11   Truro Zoning Board of Appeals and the
     Town of Truro, Massachusetts
12
13 JULIE PRUITT BARRY, ESQUIRE
     NUTTER, McCLENNEN & FISH, LLP
14   World Trade Center West
     155 Seaport Boulevard
15   Boston, Massachusetts 02210-2831
     (617) 439-2831
16   for the Defendant, Brooke Newman
17
18
19
20 ALSO PRESENT:
21   Barbara Cordi-Allen
22
23
24

---

Page 3

INDEX

1   INDEX
2   Deposition of:          Direct      Cross
3   JOHN E. ALLEN
4     By Ms. Barry          4
5     By Ms. Ecker                      25
6
7
8               EXHIBITS
9
    No.                     Page
10
11  12 Re-notice of Deposition          4
12  13 Defendant Brooke Newman's Request
       for Production of Documents      9
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 4

1          PROCEEDINGS
2   (Re-notice of Deposition marked as Allen
3   Exhibit No. 12.)
4          STIPULATIONS
5      It is stipulated by and between
6   counsel for the respective parties that the
7   deposition transcript is to be read and signed
8   by the deponent under the pains and penalties
9   of perjury; and that the sealing and filing
10  thereof are waived; and that all objections,
11  except as to form, and motions to strike are
12  reserved to the time of trial.
13          * * *
14      JOHN E. ALLEN, a witness called for
15  examination by counsel for the Defendants,
16  having been satisfactorily identified by the
17  production of his driver's license and having
18  been duly sworn, testified as follows:
19          * * *
20      DIRECT EXAMINATION
21  BY MS. BARRY:
22  Q.  Good afternoon, Mr. Allen.
23  A.  Hi.
24  Q.  My name is Julie Barry.  I represent the

---

1 (Pages 1 to 4)

Page 5

1  defendant Brooke Newman in this matter. I
2  would like to just ask -- to give you some
3  instructions concerning your deposition today
4  that might help you get through it. I would
5  ask that you listen to the question, answer the
6  question. If you will wait till I'm done
7  asking before you speak, that will help the
8  stenographer. She's taking down both the
9  question and the answer.
10      If you would -- if you need to take a break
11  for any reason or need to speak to your
12  attorney, feel free to ask. I would ask that
13  if there's a question pending that you answer
14  the pending question before we take a break.
15  And if you have any difficulty understanding
16  the question, please let me know. If I ask a
17  question and you answer it, I'll assume that
18  you understand it.
19      MS. BARRY: I assume we'll use the same
20  stipulations as --
21      MR. REVERE: The same stipulations and
22  just -- I haven't gotten a copy of it. But
23  they -- we're going to try to get it signed
24  by --

Page 6

1      MS. ECKER: Well, we have to wait for the
2  second copy as well.
3      MR. REVERE: Okay.
4      MS. ECKER: So after you get that, if you
5  could get it signed by the 14th. And,
6  actually, off the record.
7      (A brief discussion was held off the
8  record.)
9      MS. BARRY: Okay. So then we'll stipulate
10  that, the deposition transcript, you will read.
11  You'll have an opportunity to read and make
12  changes if necessary and sign by April 14th.
13      MR. REVERE: Okay.
14      MS. BARRY: I've marked as Exhibit 1, just
15  for recordkeeping purposes -- sorry -- Allen
16  Exhibit 12 -- your re-notice of deposition.
17  Q.  Can you state your name and address for the
18      record, Mr. Allen?
19  A.  It's John Allen, 143 Ardsley Road, Longmeadow.
20  Q.  And are you employed, Mr. Allen?
21  A.  Yes.
22  Q.  And where are you employed?
23  A.  U.S. Postal Service.
24  Q.  And how long have you been with the U.S. Postal

Page 7

1      Service?
2  A.  Twenty-two years.
3  Q.  Okay. And did you graduate high school,
4      Mr. Allen?
5  A.  Yes.
6  Q.  And where was that?
7  A.  Chicopee High.
8  Q.  Okay. And did you go on to any education after
9      high school?
10  A.  Yes.
11  Q.  And where was that?
12  A.  I got my bachelor's degree from Western New
13      England College.
14  Q.  Western New England?
15  A.  Uh-huh.
16      MS. ECKER: You're going to have to speak
17      up.
18  Q.  And what was your bachelor's in?
19  A.  Business administration.
20  Q.  And what is your position at the Postal
21      Service?
22  A.  Mail processor, clerk.
23  Q.  And what office do you work at?
24  A.  Pardon?

Page 8

1  Q.  What office or where is your --
2  A.  It's --
3  Q.  -- work located? Where is it --
4  A.  Oh, it's --
5  Q.  -- the location where you work?
6  A.  Let's see. It's in Springfield, Mass. It's on
7      Fiberloid Street.
8  Q.  Okay. Did you do anything to prepare for
9      today's deposition other than meet with your
10      attorney?
11  A.  No, not really.
12  Q.  Did you read any documents or look at anything?
13  A.  No.
14  Q.  Okay. Other than your attorney, did you speak
15      with anyone about your deposition today?
16  A.  No. Just -- no, not really.
17  Q.  Okay. Have you been deposed before, Mr. Allen?
18  A.  Yes.
19  Q.  And do you remember how many times?
20  A.  Just once before.
21  Q.  Okay. And what was that in connection with?
22  A.  That was in connection with a lawsuit against
23      an elevator company.
24  Q.  Was that the personal injury lawsuit concerning

2 (Pages 5 to 8)

Page 9

1    your wife's injuries?

2  A.  Yes.

3  Q.  Okay.  Do you have an engineering license, a

4    surveying license, or an appraiser's license,

5    Mr. Allen?

6  A.  Do I?

7  Q.  Uh-huh.

8  A.  No.

9  Q.  Now, you filed a Su- -- a Complaint in Superior

10    Court which has since been moved to Federal

11    District Court, appealing, among other things,

12    the decision of the Zoning Board of Appeals'

13    decision to uphold the decision of the

14    building commissioner to uphold the issuance of

15    a building permit to pro- -- for property owned

16    by the defendant Brooke Newman at 3 Yacht Club

17    Road.  Is that correct?  Do you understand

18    that?

19  A.  Yes.

20  Q.  Okay.  Did you do anything to assist your --

21    strike that.

22    MS. BARRY:  Okay.  Mark this as the next

23    exhibit.

24    (Defendant Brooke Newman's Request for

Page 10

1    Production of Documents marked as Allen

2    Exhibit No. 13.)

3    (A brief discussion was held off the

4    record.)

5  Q.  I'm handing you what's been marked as Exhibit

6    13 and ask you if you would just look at that

7    and tell me if you've seen it before.

8  A.  I don't recall this.

9  Q.  You don't recall seeing that?

10  A.  No.

11  Q.  Okay.  Just let me ask you a couple of

12    questions concerning that document.  What it

13    is, it's defendant Brooke Newman's first

14    request for production of documents.  Did you

15    do anything to assist your attorney or -- or

16    Ms. Cordi-Allen in pulling together any

17    documents that might have been responsive to

18    those requests?

19  A.  Any documents?  No.

20  Q.  Okay.  Did you -- would you have any documents

21    in your possession, custody, or control

22    concerning this lawsuit or Ms. Newman's

23    property that you would not have already turned

24    over to your attorney or -- or to

Page 11

1    Ms. Cordi-Allen?

2  A.  I don't -- I don't have any.  No.

3  Q.  Do you use e-mail, Mr. Allen?

4  A.  I don't.

5  Q.  Okay.  So you don't use e-mail at your home or

6    office?

7  A.  No.

8  Q.  Okay.  I'm going to show you another exhibit,

9    Mr. Allen -- this is marked Cordi-Allen

10    Exhibit 4 -- and ask if you would look at that

11    and tell me if you recognize it.

12    (Pause.)

13  A.  I vaguely, you know, might have seen it before.

14  Q.  Okay.  Do you recall if you wrote that

15    document, Mr. Allen?

16  A.  I might have done this with my wife.

17  Q.  Okay.  Do you -- can you explain to me what was

18    the basis of your complaint -- strike that.

19    This letter dated September 20th, 1998 that is

20    Exhibit -- Cordi-Allen Exhibit 4 is a letter to

21    the building in- -- inspector of the Town of

22    Truro in which you have requested that a

23    building permit not be issued to Ms. Newman for

24    certain modifications to her property at 3

Page 12

1    Yacht Club Road.  Is that correct?

2  A.  Yes.

3  Q.  Do you, as you sit here today, recall or have

4    an understanding of the basis of your complaint

5    to the building inspector concerning the

6    building permit being sought by Ms. Newman?

7  A.  We just wanted to make sure that -- that the

8    right procedures were taking place.

9  Q.  And when you say "the right procedures," are

10    you talking about the Town's procedures in

11    issuing building permits?

12  A.  Yes.

13  Q.  Do you recall whether you received a response

14    from the building inspector to your letter?

15  A.  I don't remember.

16  Q.  I'm sorry.  You don't recall?

17  A.  I don't recall.

18  Q.  I can represent to you, Mr. Allen, that you did

19    not appeal or take any further action at that

20    time concerning the building inspector's

21    issuance of a building permit to Ms. Newman for

22    the proposed modifications to 3 Yacht Club

23    Road.  Why is that?

24    (Pause.)

3 (Pages 9 to 12)

## Page 13

1   A.  I'm not really sure.
2   Q.  You're not sure why you took no further action
3       at the time?
4   A.  Right.
5   Q.  Do you recall whether you were represented by
6       counsel at the time?
7   A.  I believe we weren't.
8   Q.  At the time you wrote this letter in 1998,
9       Mr. Allen, did you have concerns that the
10      proposed modifications to Ms. Newman's
11      structure at 3 Yacht Club Road would somehow
12      impact your property?
13  A.  I think we were just, basically, concerned
14      that -- that procedures were put in place that
15      were fair to all, that if any construction was
16      done that the law -- you know, that it was --
17      it would follow the legal means.
18  Q.  Did you have a concern at the time, Mr. Allen,
19      that the proposed modifications would harm your
20      property or the structure located on your
21      property?
22  A.  Not that it would harm our property.
23  Q.  Now, let me draw your attention to the
24      Complaint at issue, this laws- -- this

## Page 14

1       particular lawsuit.  And part of this lawsuit,
2       you understand, concerns your appeal of the
3       Zoning Board of Appeals' decision upholding the
4       issuance of -- of that building permit back in
5       1998.  Correct?
6   A.  (Witness indicates).
7   Q.  You have to answer --
8   A.  Oh.
9   Q.  -- verbally.
10  A.  Yes.
11  Q.  Okay.  What are your objections to the building
12      permit that was granted to Ms. Newman in 1998
13      for the modifications to the structure at 3
14      Yacht Club Drive (sic)?
15  A.  What are our objections?
16  Q.  What are your objections?  I've already asked
17      Ms. Cordi-Allen.  And I'd like to know, what
18      are your objections?
19      (Pause.)
20  A.  Well, I would say, for one thing, the -- she
21      was able to get a full basement.
22  Q.  Okay.  Do you have an understanding of
23      wheth- --
24      MR. REVERE:  Can we go off the record for a

## Page 15

1       second here?  Yeah.
2       (A brief discussion was held off the
3       record.)
4   Q.  Okay.  So you had an objection that she was
5       able to get a full basement?
6   A.  Or concrete foundation.
7   Q.  Okay.  As opposed to pilings?  Is that -- is
8       that my --
9   A.  Right.
10  Q.  -- understanding?  What other objections do you
11      have?
12  A.  Well, I don't think she has a permit for a
13      well.
14  Q.  And what do you base that on?  Why -- why do
15      you think that she doesn't have a permit for
16      her well?
17  A.  We've researched it.
18  Q.  And what research have you done?
19  A.  Resear- -- researched with the Town.
20  Q.  Researched town records?
21  A.  Right.
22  Q.  Okay.  Anything else?
23  A.  The -- the plantings that were brought in and
24      the amount of fill.

## Page 16

1   Q.  And what was your objection to the plantings
2       that were brought in and the amount of fill?
3   A.  I don't think she received any kind of okay to
4       do that.
5   Q.  And by "okay," you mean permits?
6   A.  Right.
7   Q.  Okay.  Anything else?
8   A.  That's all I can recall.
9   Q.  Now, you testified earlier that it wasn't your
10      concern or you weren't concerned when you wrote
11      the letter to the building inspector in 1998
12      that -- that the modifications to Ms. Newman's
13      property would harm your property or the
14      structure located on the pro- -- on your
15      property.
16      Moving forward to today, do you have any
17      concerns that the modifications made to
18      Ms. Newman's structure on her property have
19      somehow harmed your property or your structure
20      on your property?
21  A.  No.  I don't think they've harmed the property.
22  Q.  They have not harmed your property?
23  A.  Right.
24  Q.  Can you tell me why you waited six years to

4 (Pages 13 to 16)

Page 17

1　bring an enforcement action with the building
2　inspector asking to have Ms. Newman's building
3　permit revoked?
4　　　(Pause.)
5　A.　I would say that we've been through so much,
6　that things come up and it's ongoing.  There's
7　always something.
8　Q.　Let me see if I can understand what you're
9　saying.  When you say you've been through so
10　much, are you talking about your experiences in
11　seeking permits for your property?
12　A.　(Witness indicates).
13　Q.　You have to --
14　A.　Yes.
15　Q.　-- answer.
16　A.　Yes.
17　Q.　What else do you mean by the "been through so
18　much, that things come up and it's ongoing"?
19　A.　Well, if we're -- if we're going to be held to
20　a certain -- where we have to abide by certain
21　regulations, we just think that it should be
22　the same for everyone.  So -- so it's an
23　ongoing . . .
24　Q.　Did you believe, back in 1998 when you wrote or

Page 18

1　corresponded with the building inspector
2　concerning Ms. Newman's building permit, that
3　you were, at that time, being treated
4　differently in connection with permitting for
5　your own property?
6　A.　I think we've been treated differently right
7　from -- right from the start.
8　Q.　And when you say "right from the start," can
9　you just tell me, are you talking about since
10　1996 when you purchased the property?
11　A.　Right.  Right.  I mean, the first thing we
12　found out about was that they were going to
13　charge us $2,100 for our floats, whereas they
14　were going to charge the yacht club like $300.
15　So right from that -- right from that time on,
16　it seemed like ev- -- everything that we
17　attempted to do was being objected to.
18　Q.　Do you have any other objections to the Board
19　of Appeals' decision upholding the building
20　permit granted to Ms. Newman for the
21　modifications to the structure at 3 Yacht Club
22　Road?
23　A.　Do I have any objections?
24　Q.　Any other objections other than what you've

Page 19

1　already told me today.
2　A.　I don't know if the fence is on her property.
3　It just seems to go along the road.
4　Q.　Anything else?
5　A.　I guess that's it.
6　Q.　I'm going to show you Ex- -- what is Exhibit --
7　Cordi-Allen Exhibit 7 and ask you to just
8　quickly look at it, please.  You don't have to
9　read it.  But if you would turn to the last
10　page and let me know if that's your signature
11　there.
12　A.　Yes.  Yes.
13　Q.　Okay.  And do you recall seeing that document
14　and si- -- previously and signing it then?
15　A.　Possibly.  Yes.
16　Q.　Okay.  That is your signature though?
17　A.　Yeah.
18　Q.　Okay.  And we're going to have you sign it now
19　so that we have an original.  Because it
20　appears as though the signature that's attached
21　to the exhibit now is -- is a facsimile copy,
22　and we'd like to have --
23　A.　Okay.
24　Q.　-- the original.

Page 20

1　A.　Sign it here?
2　　　MS. ECKER:  On the --
3　　　THE WITNESS:  What's that?
4　　　MS. ECKER:  -- page before is the
5　signature, a place for your signature.
6　　　MS. BARRY:  This is off the record, please.
7　　　(A brief discussion was held off the
8　record.)
9　Q.　Now, in -- I'm not going to have you read this
10　to save time, Mr. -- Mr. Allen.  But I -- I can
11　represent to you that, in the response to
12　Question No. 5 of those interrogatories, you
13　allege that Ms. Newman is of the Jewish faith;
14　and this is in connection with the claims that
15　you have received disparate treatment.  What's
16　the basis for your understanding or belief that
17　Ms. Newman is of the Jewish faith?
18　A.　I don't really know if she is of the Jewish
19　faith.
20　Q.　Do you know or recall if you have had an
21　appraisal, a real estate appraisal, done of
22　your property since the time that you've bought
23　it and now?
24　　　MS. BARRY:  Sorry.  I need to stop.

Page 21

1    (Off the record due to incoming cell phone
2    call.)
3    MS. BARRY: Back on. Yeah. Can you read
4    it back.
5    (Question read back.)
6  Q. And let --
7  A. Yes.
8    MS. BARRY: Thank you.
9  Q. And let me clarify. When I say "property," I
10   mean your Truro property at 5 Yacht Club Road.
11 A. Yes. I believe we have.
12 Q. Do you recall when that was done?
13 A. Let's see. Sometime in 200- -- sometime in
14   2005.
15 Q. 2005. Do you recall who did -- who did the
16   appraisal?
17 A. No. I don't. I don't remember.
18 Q. And do you recall what the outcome of the
19   appraisal was?
20 A. No.
21   MS. BARRY: That's not me.
22   MR. REVERE: Yes. Off the record.
23   (Off the record due to incoming cell phone
24   call.)

Page 22

1  A. I -- I don't recall what it was. No, not
2    exactly.
3    (A brief discussion was held off the
4    record.)
5    MS. BARRY: You know what? I just want to
6    clarify -- on the record, please. I want to
7    clarify something with you, Paul. Because,
8    last week, you had indicated -- or on the 17th
9    when we had Ms. Cordi-Allen's deposition --
10   that there was not going to be an appraisal
11   done in this case or there wasn't an appraisal
12   done. Now, the appraisal that Mr. Allen has
13   referred to today, I know it's not listed in
14   your disclosure.
15   MR. REVERE: I --
16   MS. BARRY: Are you intending --
17   MR. REVERE: I was not even aware --
18   MS. BARRY: -- on using that?
19   MR. REVERE: -- of any appraisal until a
20   minute ago --
21   MS. BARRY: Okay. All right.
22   MR. REVERE: -- okay, from my standpoint.
23   MS. BARRY: All right. So you're not
24   intending on using this as evidence in this

Page 23

1    case?
2    MR. REVERE: We're still off the record.
3    Right?
4    MS. BARRY: No. We're on the record.
5    MS. ECKER: No. We're on the record.
6    MR. REVERE: We're on the record. Okay.
7    Let's go off the record for a second just
8    relevant to that.
9    (A brief discussion was held off the
10   record.)
11   MS. BARRY: So I -- I -- I understand then,
12   after a dis- -- off-the-record discussion, that
13   the appraisal that was performed was not in
14   connection with or related to this litigation
15   and may have been requested for other
16   litigation ongoing in Barnstable Superior Court
17   or may have been used for purposes of
18   refinancing.
19   But, otherwise, it's my understanding,
20   based on testimony today and the dis- -- and
21   Ms. Cordi-Allen's previous testimony as well as
22   your Rule 26 disclosure, that you are not
23   relying on an expert appraisal or an expert
24   appraiser as a -- an expert witness in this

Page 24

1    case.
2    MR. REVERE: That is correct.
3    MS. BARRY: Okay.
4    MR. REVERE: I have not retained one at
5    this time, reserving all appropriate rights if
6    I was to do so in the future.
7  Q. Okay. And I believe that you just testified,
8    Mr. Allen, that you didn't recall what the
9    outcome of that appraisal was; is that correct?
10 A. That's correct.
11 Q. Okay. Do you still have a copy of that
12   appraisal in your possession?
13 A. I don't know.
14 Q. Do you recall yourself what the purpose of the
15   appraisal was -- was for?
16 A. Possibly, for a refinance.
17 Q. Okay. Now, just to finish up then, have you
18   told me all of your objections to the Board of
19   Appeals' decision upholding the building permit
20   of Ms. Newman 's?
21 A. Uh-huh.
22 Q. Is that yes?
23 A. I -- would you repeat that?
24 Q. Have you told me all of your objections to the

6 (Pages 21 to 24)

Page 25

1  Board of Ap- -- Appeals' decision upholding the
2  building permit issued to Ms. Newman for the
3  modifications to the property at 3 Yacht Club
4  Road?
5  A.  I believe so.
6      MS. BARRY:  Okay.  Then, pending receipt of
7  the items we discussed earlier and other
8  discovery that we discussed at Ms. Cordi-Allen's
9  deposition --
10     MR. REVERE:  Right.
11     MS. BARRY:  I am going to suspend.
12         CROSS-EXAMINATION
13 BY MS. ECKER:
14 Q.  Good afternoon.
15     MS. ECKER:  Are you going to leave?
16     MS. BARRY:  I'm going to leave.
17     (A brief discussion was held off the
18     record.)
19     (Brief recess taken.)
20 BY MS. ECKER:
21 Q.  Good afternoon, Mr. Allen.  My name's Deborah
22     Ecker, as you know.  You were here this morning
23     at your wife's deposition.  Correct?
24 A.  Yes.

Page 26

1  Q.  Okay.  You have filed a Complaint against the
2      Town of Truro and the members of the Zoning
3      Board of Appeals, alleging that they have
4      discriminated against you and your wife because
5      your wife is Lebanese.  Correct?
6  A.  Yes.
7  Q.  Do you have any evidence of any of the Zoning
8      Board members that you have named as defendants
9      in this case have said anything or written
10     anything concerning your wife's being Lebanese?
11 A.  Do I have any evidence?
12 Q.  Yes.
13 A.  No.
14 Q.  And you are not Lebanese yourself.  Correct?
15 A.  Right.
16 Q.  Why do you believe that the decisions that have
17     been made by the Town and the Zoning Board of
18     Appeals are based on the fact that your wife is
19     Lebanese?
20 A.  I think that we feel as though we're being
21     treated differently as far as -- as far as when
22     we go for permits and as far as whatever is
23     done in the Pamet.  We seem to be held to a
24     different --

Page 27

1  Q.  I'm sorry.  Are you done your answer?  Yeah.
2      Just --
3  A.  A different interpretation of the law, I guess.
4  Q.  Okay.  And why do you believe that's because
5      your wife is Lebanese?
6  A.  I'm not really sure if that's the case or not.
7  Q.  Are you aware of whether any of the Zoning
8      Board of Appeals members that are listed as
9      defendants in this case -- and they appear in
10     the caption of -- of Exhibit 7 -- are you aware
11     if any of them are Jewish?
12 A.  I wouldn't know.
13 Q.  And taking a look at what is marked as
14     Exhibit 7, the answers to interrogatories, did
15     you assist in the preparation of those answers?
16     Or were those answered by your wife?
17 A.  It's been a while since I've seen these.
18 Q.  What is the basis for the statement or the
19     answer that's contained in Answer 5 that you
20     believe the ma- -- majority of the board
21     members in the town of Truro are Jewish?
22 A.  What was the question again?
23 Q.  What's the basis for your statement in Answer
24     No. 5 that the majority of the board members in

Page 28

1  the town of Truro -- the Conservation
2  Commission, the Zoning Board of Appeals, the
3  Harbor Commission; and I believe the Board of
4  Selectmen are listed -- what's your basis for
5  saying that the majority of the members are
6  Jewish?
7  A.  I think that just -- I'm not really sure that
8      they -- that they are Jewish.
9  Q.  Do you have any evidence that any of the
10     members of the Board of Selectmen, over the
11     years, the Conservation Commission, Harbor
12     Commission, and the Zon- -- I think I asked you
13     already about the Zoning Board of Appeals and
14     the Board of Health -- that any of them took
15     into account your wife's national origin when
16     they made decisions concerning your property?
17 A.  It's something we don't really know for sure.
18 Q.  Do you have any evidence or any circumstantial
19     evidence of any type that any of those board
20     members in the Town of Truro took into account
21     your wife's ethnicity or national origin in --
22     when they made their decisions concerning the
23     applications for construction on your property?
24 A.  Only that they seem to have acted

7  (Pages 25 to 28)

Page 65

```
 1          C E R T I F I C A T E
 2    COMMONWEALTH OF MASSACHUSETTS
      COUNTY OF NORFOLK, ss.
 3
 4          I, Jo Anne M. Shields, a Professional
 5    Shorthand Reporter and Notary Public in and for
 6    the Commonwealth of Massachusetts, do hereby
 7    certify that JOHN E. ALLEN, the witness whose
 8    deposition is hereinbefore set forth, was duly
 9    sworn by me and that such deposition is a true
10    and accurate record, to the best of my
11    knowledge, skills and ability, of the testimony
12    given by such witness.
13          I further certify that I am not
14    related to any of the parties in this matter by
15    blood or marriage and that I am in no way
16    interested in the outcome of this matter.
17          IN WITNESS WHEREOF, I have hereunto set
18    my hand and affixed my seal of office this 21st
19    day of April, 2006.
20
21
            Notary Public
22
      My Commission expires:
23    September 29, 2006.
24
```

Page 66

```
 1          ERRATA SHEET
 2    CHANGES TO THE DEPOSITION OF JOHN E. ALLEN
 3    INSTRUCTIONS TO WITNESS:  1) Please note any
      desired corrections to your testimony by page
 4    and line number.  2) Enter text as it appears
      in the transcript.  3) Enter text as it should
 5    appear.
 6    PAGE     LINE        CORRECTION
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**EXHIBIT M**

02/18/2005  14:45    505-349   505                    TOWN OF TRURO                              PAGE  29

## DECISION OF THE BOARD OF APPEALS OF TRURO, MASSACHUSETTS

Property Owner(s) and/or Applicant(s):  Barbara Cordi-Allen, (by ag'/atty Paul Revere, III)

Property Location:___3 Yacht Club Rd.

Atlas Sheet:__50__  Parcel:__20__  (Ref. 2004-014ZBA) Hearing Date: Monday, January 10, 2005 (as continued

from the Meeting of Monday, December 6, 2004.)

|  | | Vote: | | |
|---|---|---|---|---|
| Special Permit | ☐ | _5_ | Approve | ☒ |
| Variance | ☐ | _0_ | Disapprove | ☐ |
| Building Commissioner Decision | ☐ | | Abstain | ☐ |
| Other | ☒ | | (Unanimous vote on Motion to Deny the application) |

**Motion (Conlon; 2nd Pope):** I hereby Move to Deny the application of Barbara Cordi-Allen, appealing the decision of the Building Commissioner dated October 19, 2004 upholding the issuance of a building permit on October 28, 1998 for property owned by Brooke Newman, Located at 3 Yacht Club Rd (Atlas Sheet 50, Parcel 20)[2004-014/ZBA], on the following grounds:

1)  The Building Commissioner was fully authorized to issue the building permit to Ms. Newman pursuant to the provisions of Section VIII-B.2 of the former Truro Zoning Bylaws because Ms. Newman's project involved the alteration of a pre-existing, non-conforming structure and Section VIII-B.2 authorized the Building Inspector to approve and issue a building permit for a proposed repair, reconstruction, alteration or structural change of a pre-existing, non-conforming single-family structure if the Building Commissioner determines that the proposal will not be "substantially more detrimental to its neighborhood than the existing nonconforming structure and will not increase the nature or extent of the nonconformity;"

2)  The appeal is untimely pursuant to the provisions of General Laws, Chapter 40A, Section 7 because the subject building permit was issued and the land improved over six (6) years ago, and therefore, the issue presently on appeal, namely whether the Building Commissioner acted within his authority on October 28, 1998, is now time-barred and moot.

I hereby certify this as a true and accurate record of the Board of Appeals.

_____          _____ 19  2005
Signature                                              Date

Received, Office of the Town Clerk:

_____          January 19, 2005
Signature                                              Date

_____

I hereby certify that this decision was filed with the Office of the Town Clerk on _____ and 20 (twenty) days have elapsed since the date of filing, and no appeal has been filed.

_____          _____
Signature                                              Date

NOTE: Any person aggrieved by a decision of the Zoning Board of Appeals may appeal to the Superior or Land Court by bringing action within twenty days after the decision has been filed with the Town Clerk of Truro. (Massachusetts General Laws, Chapter 40A, Section 17.)

A COPY OF THIS DECISION MUST BE FILED WITH THE REGISTER OF DEEDS
OF BARNSTABLE COUNTY BY THE APPLICANT

**EXHIBIT N**

FROM :BN                                           FAX NO. :5083496034                    Jul. 15 2005 04:15PM P2



# Truro Police Department
*"...dedicated to public service..."*

To: _BROOKE NEWMAN_/Date: _07/14/05_

As a person who has lawful control of the premises, I hereby forbid you to enter or remain in or upon the improved land or building at:
(property location) _5 YACHT CLUB RD._
known as (name of property) _CORDI-ALLEN RESIDENCE AND LAND_

This notice is given as official notice as required in Chapter 266 Section 120 of the Massachusetts General Laws. After receiving this notification, your presence in or upon the improved land, building or property mentioned above, will result in your being arrested and/or charged with trespassing.

For your information, a copy of Chapter 266 Section 120 is on the reverse side of this notice.

_BARBARA CORDI-ALLEN_
Signature, (person in control of premises)

_PER OFFICER ALLEN_
Printed Name (MRA)

_Meredith P Allen_
Signature, Police Officer/Witness

_ALLEN, POLICE OFFICER_
Printed Name & Title

---

344 Route 6 • Post Office Box 995 • Truro, MA 02666
Telephone (508) 487-8730 • Facsimile (508) 487-8736

FROM :BN                    FAX NO. :5083496034                Jul. 15 2005 04:16PM  P1

# MASSACHUSETTS GENERAL LAWS
## Chapter 266 Section 120

Entry upon private property after being forbidden as trespass; prima facie evidence; penalties; arrest;

Whoever, without right enters or remains in or upon the dwelling house, buildings, boats or improved or enclosed land, wharf, or pier of another, after having been forbidden so to do by the person who has lawful control of said premises, whether directly or by notice posted thereon, or in violation of a court order pursuant to section thirty-four B of chapter two hundred and eight or section three or four of chapter two hundred and nine A, shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than thirty days or both such fine and imprisonment. Proof that a court has given notice of such a court order to the alleged offender shall be prima facie evidence that the notice requirement of this section has been met. A person who is found committing such trespass may be arrested by a sheriff, deputy sheriff, constable or police officer and kept in custody in a convenient place, not more than twenty-four hours, Sunday excepted, until a complaint can be made against him for the offense, and he be taken upon a warrant issued upon such complaint.

This section shall not apply to tenants or occupants of residential premises who, having rightfully entered said premises at the commencement of the tenancy or occupancy, remain therein after such tenancy or occupancy has been or is alleged to have been terminated. The owner or landlord of said premises may recover possession thereof only through appropriate civil proceedings.

**EXHIBIT O**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-10370PBS

BARBARA CORDI-ALLEN AND            )
JOHN ALLEN,                        )
        Plaintiffs,             )
                                )
                                )
VS.                                )
                                )
JOSEPH R. CONLON, ARTHUR F. HUTLIN,)
NORMAN H. POPE, KEITH S. ALTHAUS,  )
And MARINNA MATRICARDI as they are )
Members and collectively the TRURO )
ZONING BOARD OF APPEALS AND THE    )
TOWN OF TRURO, MASSACHUSETTS,      )
AND BROOKE NEWMAN,                 )
        Defendants              )

## PLAINTIFFS JOHN ALLEN AND BARBARA CORDI-ALLEN'S RESPONSE TO DEFENDANT NEWMAN DOCUMENT REQUEST

### REQUEST FOR PRIVILEGE LOG

Plaintiffs John Allen and Barbara Cordi-Allen object to this request as being beyond the scope of

discovery as requests information protected by the attorney-client privilege and work product

protection. Notwithstanding same, Plaintiffs state that they have withheld only documents that

are communications either between the Plaintiffs and their attorneys McGregor Law Offices,

William Henchy, William Thomas, John Maciolek, and Paul Revere, III, and including

communications between said lawyers or offices.

### REQUEST NO. 1:

All documents concerning Mas. Newman's property at 3 Yacht Club Road, Truro,

Massachusetts.

## RESPONSE NO. 1

Copies of all documents responsive to this request will be delivered to the offices of Nutter,

McClennan on Friday, February 10, 2006. Excepted from this response will be any documents

which are protected by the Attorney-Client communication privilege.


## REQUEST NO. 2:

All documents concerning the Building Inspector's issuance in or about October 1998 of

a building permit ("the Building Permit") to Ms. Newman, pursuant to Section VIII.*.b of the

former Truro Zoning Bylaw, to make alterations to the pre-existing nonconforming single family

structure on her property.


## RESPONSE NO. 2

Without admitting the legal conclusions contained in this request, copies of all documents

responsive to this request will be delivered to the offices of Nutter, McClennan on Friday,

February 10, 2006. Excepted from this response will be any documents which are protected by

the Attorney-Client communication privilege.

### REQUEST NO. 3:

All documents concerning your allegation that Ms. Newman obtained the Building Permit without meeting regulatory standards.

### RESPONSE NO. 3

Copies of all documents responsive to this request will be delivered to the offices of Nutter, McClennan on Friday, February 10, 2006. Excepted from this response will be any documents which are protected by the Attorney-Client communication privilege.

### REQUEST NO. 4:

All documents concerning your request to the Building Inspector to revoke the Building Permit issued to MS. Newman.

.

### RESPONSE NO. 4

Copies of all documents responsive to this request will be delivered to the offices of Nutter, McClennan on Friday, February 10, 2006. Excepted from this response will be any documents which are protected by the Attorney-Client communication privilege.

### REQUEST NO. 5:

All documents concerning your appeal to the Zoning Board of Appeals of the Town of Truro ("the Board") of the Building Inspector's denial of your request to revoke the Building Permit.

### RESPONSE NO. 5

Copies of all documents responsive to this request will be delivered to the offices of Nutter,

McClennan on Friday, February 10, 2006. Excepted from this response will be any documents

which are protected by the Attorney-Client communication privilege.

**REQUEST NO. 6:**

All documents concerning the allegations in paragraphs 90-92 of the complaint that the

Board's decision upholding the Building Inspector's decision was not supported by facts or law,

was arbitrary and capricious, constituted an error of law, constituted an abuse of discretion,

exceeded the authority of the Board, was aginst the weight of evidence presented at the public

hearing, and was otherwise unlawful.

**RESPONSE NO. 6**

Copies of all documents responsive to this request will be delivered to the offices of Nutter,

McClennan on Friday, February 10, 2006. Excepted from this response will be any documents

which are protected by the Attorney-Client communication privilege.

**REQUEST NO. 7:**

All documents concerning the effect upon your private property or other legally protected

interests resulting from the Building Inspector's denial of your request to revoke the Building

Permit issued to Ms. Newman.

**RESPONSE NO. 7**

Copies of all documents responsive to this request will be delivered to the offices of Nutter,

McClennan on Friday, February 10, 2006. Excepted from this response will be any documents

which are protected by the Attorney-Client communication privilege.

**REQUEST NO. 8:**

All documents concerning the effect upon your private property or other legally protected

interests resulting from the decision of the Board to uphold the Building Inspector's denial of

your request to revoke the Building Permit issued to Ms. Newman

**RESPONSE NO. 8**

Copies of all documents responsive to this request will be delivered to the offices of Nutter,

McClennan on Friday, February 10, 2006. Excepted from this response will be any documents

which are protected by the Attorney-Client communication privilege.

**REQUEST NO. 9:**

All documents concerning any applications you have made to the Building Inspector, the Zoning

Board of Appeals or any other zoning officials of the Town of Truro pursuant to the Zoning

Bylaw requesting zoning relief for your property located at 5 Yacht Club Blvd. (sic), Truro

Massachusetts.

**RESPONSE NO. 9**

Copies of all documents responsive to this request will be delivered to the offices of Nutter,

McClennan on Friday, February 10, 2006. Excepted from this response will be any documents which are protected by the Attorney-Client communication privilege.

**REQUEST NO. 10:**

All documents concerning your request to the Conservation Commission in or about May 2004 to initiate an enforcement action against Ms. Newman "for failure to comply with the terms of her order of conditions" as alleged in paragraph 68 of the Complaint.

**RESPONSE NO. 10**

Copies of all documents responsive to this request will be delivered to the offices of Nutter, McClennan on Friday, February 10, 2006. Excepted from this response will be any documents which are protected by the Attorney-Client communication privilege.

**REQUEST NO. 11:**

All documents concerning the Notice of Trespass you filed against Ms. Newman on July 14, 2005 with the Truro Police Department.

**RESPONSE NO. 11**

Copies of all documents responsive to this request will be delivered to the offices of Nutter, McClennan on Friday, February 10, 2006. Excepted from this response will be any documents which are protected by the Attorney-Client communication privilege.

**REQUEST NO. 12:**

All documents concerning your allegations of trespass against Ms. Newman.


**RESPONSE NO. 12**

Copies of all documents responsive to this request will be delivered to the offices of

Nutter, McClennan on Friday, February 10, 2006.  Excepted from this response will be any

documents which are protected by the Attorney-Client communication privilege.


**REQUEST NO. 13:**

All documents concerning your allegations that Ms. Newman installed a well "without

obtaining the proper permits.".


**RESPONSE NO. 13**

Copies of all documents responsive to this request will be delivered to the offices of

Nutter, McClennan on Friday, February 10, 2006.  Excepted from this response will be any

documents which are protected by the Attorney-Client communication privilege.


**REQUEST NO. 14:**

All documents concerning any other so-called environmental violations at Ms. Newman's

property.


**RESPONSE NO. 14**

Copies of all documents responsive to this request will be delivered to the offices of

Nutter, McClennan on Friday, February 10, 2006. Excepted from this response will be any documents which are protected by the Attorney-Client communication privilege.


### REQUEST NO. 15:

All documents concerning any other actions, administrative or legal, that you intend to institute against Ms. Newman.


### RESPONSE NO. 15

Plaintiffs object to this request as overbroad and beyond the scope of discovery as it requests documents relating attorney client communications and actions which may or may not occur. Notwithstanding Plaintiffs are unaware of any document which would be responsive to this request and have provided all documents in their possession regarding Ms. Newman excepting attorney client communications in response to the prior requests.

Paul Revere, III
(BBO 636200)
Law Offices of Paul Revere, III
226 River View Lane
Centerville, Massachusetts 02632
508-778-7126


Dated: February 10, 2006