UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10370PBS

|  |  |
|---|---|
| BARBARA CORDI-ALLEN, et al. | ) |
| Plaintiffs | ) |
| v. | ) |
| Joseph Conlon, et al. | ) |
| Defendants | ) |

## AFFIDAVIT OF PAUL REVERE, III

I, Paul Revere, III, an attorney for the Plaintiffs hereby depose and state that the following Exhibits are true and accurate copies of the documents stated:

Exhibit No.:

1.    Aerial Photograph in 1999 of Pamet Harbor

2.    1992 Site Plan Prepared for Financial Enterprises Corporation ("FEC") for Plaintiffs property.

3.    Denial Order of Conditions issued by the Truro Conservation Commission in 1993 for Plaintiffs' property.

4.    Superseding Order of Conditions issued by the Department of Environmental Protection ("DEP") to FEC for Plaintiffs' property, in May, 1993.

5.    Letter from Zisson and Veara to Chairman Truro Board of Health, dated September 27, 1996.

6.    1997 Site Plan Prepared for Plaintiffs property.

7.    Memorandum and Order and Judgment in John Allen v. Town of Truro, Barnstable Superior Court No. 97-738

8.    Variance from Title 5 septic requirements issued on January 18, 2000, by DEP to Plaintiffs

9.    Letter from William Thomas, Plaintiffs' attorney, dated February 27, 2001, requesting Amendment to January 18, 2000 DEP Variance.

10.   1999 Site Plan Prepared for Plaintiffs property referenced in January 18, 2000 variance.

11.   Revised 1999 Site Plan Prepared for Plaintiffs property referenced in April 30, 2001 DEP Variance.

12.    Amended Variance from Title 5 septic requirements issued on April 30, 2001, by DEP to Plaintiffs.

13.    March 1, 2005, Notice of Denial of Motion, Barnstable Superior Court Action No. 2001-347

14.    Town of Truro's Motion for Judgment on the Pleadings in Barnstable Superior Court Action No. 2001-347

15.    M.G.L. ch. 91 license issued to John C. Worthington for Plaintiff's property in 1960

16.    Letter from DEP to FEC regarding status of 1960 license in 1995

17.    Articles from the Cape Codder in 1997 regarding Plaintiffs' pier

18.    Memoranda from army Corps of Engineers dated July 23 and 24, 1998, regarding Plaintiffs' pier.

19.    Photographs of foundation of Defendant Newman's house

20.    Superseding Order of Conditions issued by DEP to Plaintiffs' property, in June, 2000

21.    Motion to Intervene of Brooke Newman in DEP Proceeding, dated Nov. 10, 2000

22.    Letter to Truro Conservation Commission (w/o attachments) regarding Brooke
       Newman.

23.    Prefiled Testimony (w/o attachments) of Stanley Humphries on behalf of the
       Town of Truro in DEP Proceeding.

24.    Superseding Order of Conditions for Sexton Property, dated November 6, 2002.

25.    Tax records of various properties in Truro.

Respectfully Submitted,

Paul Revere, III
(BBO #636200)
Law Offices of Paul Revere, III
297 North Street, Suite 336
Hyannis, Massachusetts 02601
(508) 778-7126

Dated: June 16, 2006.

I certify that a copy of this brief was served on all counsel record on June 16, 2006.

Paul Revere, III

4

**EXHIBIT** 1



**EXHIBIT** 2



SITE & SEWAGE PLAN



**EXHIBIT 3**

310 CMR 10.99

Form 5



Commonwealth
of Massachusetts

| DEP File No. | SE 75 – 282 |
|---|---|
| | (To be provided by DEP) |

City/Town _____ Truro _____

Applicant Financial Enterprises Corp.

# Order of Conditions
# Massachusetts Wetlands Protection Act
## G.L. c. 131, §40

From_____ Town of Truro Conservation Commission _____

To_ Financial Enterprises Corp. _____ Financial Enterprises Corp. _____

(Name of Applicant)                              (Name of property owner)
c/o Bernard Shuster                              c/o Bernard Shuster
Address_____ 510 Chapman St.                Address_____ 510 Chapman St.
Canton, MA 02021                            Canton, MA 02021

This Order is issued and delivered as follows:

☐ by hand delivery to applicant or representative on _____ (date)

☒ by certified mail, return receipt requested on _____ February 9, 1993 _____ (date)

This project is located at _off Depot Rd./Truro Assessors Atlas sheet 50 parcel 21_

The property is recorded at the Registry of_____ Deeds, Barnstable County

Book_____ 6748 _____Page_____ 268 _____

Certificate (if registered)_____

The Notice of Intent for this project was filed on _____ August 21, 1992 _____ (date)

The public hearing was closed on _____ February 1, 1993 _____ (date)

Findings

The _____ Commission _____ has reviewed the above-referenced Notice of
Intent and plans and has held a public hearing on the project. Based on the information available to the
_____ Commission _____ at this time, the _Commission_ _____ has determined that
the area on which the proposed work is to be done is significant to the following interests in accordance with
the Presumptions of Significance set forth in the regulations for each Area Subject to Protection Under the
Act (check as appropriate):

☐ Public water supply        ☒ Flood control              ☒ Land containing shellfish
☒ Private water supply       ☒ Storm damage prevention    ☒ Fisheries
☒ Ground water supply        ☒ Prevention of pollution    ☐ Protection of wildlife habitat

Total Filing Fee Submitted _____ $55.00 _____ State Share _____ 15.00 _____
City/Town Share _____ 40.00 _____                         (½ fee in excess of $25)
Total Refund Due $ _____ City/Town Portion $ _____ State Portion $ _____
                              (½ total)                        (½ total)

Therefore. the _____ Commission _____ hereby finds that the following conditions are necessary, in accordance with the Performance Standards set forth in the regulations. to protect those interests checked above. The _____ Commission _____ orders that all work shall be performed in accordance with said conditions and with the Notice of Intent referenced above. To the extent that the following conditions modify or differ from the plans. specifications or other proposals submitted with the Notice of Intent. the conditions shall control.

### General Conditions

1. Failure to comply with all conditions stated herein. and with all related statutes and other regulatory measures. shall be deemed cause to revoke or modify this Order.

2. This Order does not grant any property rights or any exclusive privileges; it does not authorize any injury to private property or invasion of private rights.

3. This Order does not relieve the permittee or any other person of the necessity of complying with all other applicable federal. state or local statutes, ordinances. by-laws or regulations.

4. The work authorized hereunder shall be completed within three years from the date of this Order unless either of the following apply:
   (a) the work is a maintenance dredging project as provided for in the Act; or
   (b) the time for completion has been extended to a specified date more than three years. but less than five years. from the date of issuance and both that date and the special circumstances warranting the extended time period are set forth in this Order.

5. This Order may be extended by the issuing authority for one or more periods of up to three years each upon application to the issuing authority at least 30 days prior to the expiration date of the Order.

6. Any fill used in connection with this project shall be clean fill, containing no trash, refuse, rubbish or debris, including but not limited to lumber. bricks, plaster, wire, lath, paper, cardboard, pipe, tires, ashes, refrigerators. motor vehicles or parts of any of the foregoing.

7. No work shall be undertaken until all administrative appeal periods from this Order have elapsed or. if such an appeal has been filed, until all proceedings before the Department have been completed.

8. No work shall be undertaken until the Final Order has been recorded in the Registry of Deeds or the Land Court for the district in which the land is located, within the chain of title of the affected property. In the case of recorded land. the Final Order shall also be noted in the Registry's Grantor Index under the name of the owner of the land upon which the proposed work is to be done. In the case of registered land. the Final Order shall also be noted on the Land Court Certificate of Title of the owner of the land upon which the proposed work is to be done. The recording information shall be submitted to the _____ Commission _____ on the form at the end of this Order prior to commencement of the work.

9. A sign shall be displayed at the site not less than two square feet or more than three square feet in size bearing the words. "Massachusetts Department of Environmental Protection, File Number _____ SE 75–282 _____

10. Where the Department of Environmental Protection is requested to make a determination and to issue a Superseding Order. the Conservation Commission shall be a party to all agency proceedings and hearings before the Department.

11. Upon completion of the work described herein. the applicant shall forthwith request in writing that a Certificate of Compliance be issued stating that the work has been satisfactorily completed.

12. The work shall conform to the following plans and special conditions:

Plans.

| Title FELCO #92258 SITE & SEWAGE PLAN | Dated 07/13/92 11/27/92 REVISION | Signed and Stamped by: DAVID B LAJOIE RS | On File with TruroConservation Commission |
|---|---|---|---|
| SHEET No. 1&2 OF 2 | | | |
| | | | |
| | | | |
| | | | |

Special Conditions (Use additional paper if necessary)

12a. Order of Conditions number SE 75-142 issued by this Commission February 13, 1987 to Lucinda Worthington remains in force.
12b. No work shall be done until condition 8 above is complied with.
12c. For any change made or intended in the plans or work, the applicant shall file another Notice of Intent or inquire in writing to the Commission whether the change is significant enough to require a new Notice.
12d. Members of the Commission or its agent shall have the right to enter upon and inspect the site to ensure compliance with this Order.
12e. The Commission finds the site of the proposed septic system to be in flood zone A4, and mainly in 100 foot buffer zone of the shore of Pamet harbor, a tidal salt water body. The site is altered coastal dune. The elevation of the bottom of the septic tank at el. 3.5 and the bottom of the pump chamber at el. 3.15 are below the ground water elevation of 4.4 adjusted to 6.0. The proposed discharge at el. 10.6 and leach field at el. 10.6 are below the flood elevation of 12.0. The land around the existing dwelling was flooded December 12, 1992, and in 1987. The Pamet harbor is an important source of clams, oysters, and mussels used for human food, and for fisheries. The existing dwelling and the proposed septic system are at risk of storm damage from wave action and flooding. The proposed leach area is subject to flooding and the dispersal of contaminants into the water containing fish and shellfish, and the pollution of ground water and the harbor.
12f. The Commission denies approval of the septic system as described because it cannot be conditioned for storm damage prevention, prevention of pollution, for protection of land containing shellfish, for fisheries protection, or for ground water protection. The Commission recommends consideration of a tight tank. (Leave Space Blank).

Issued By_____ Town of Truro _____ Conservation Commission

Signature(s)_____ *M. J. Nicolus* _____

_____ *Carol Webelin* _____ *Rita Hollander* _____

_____ *Ann Dunn* _____ *Charh S. Davidson* _____

_____ *Henry Towle* _____

This Order must be signed by a majority of the Conservation Commission.

On this _____ 9th _____ day of _____ February _____ 19 93 ___, before me
personally appeared _____ CHARLES S. DAVIDSON _____, to me known to be the
person described in and who executed the foregoing instrument and acknowledged that he/she executed
the same as his/her free act and deed.

_____ *Jane Q. Mukenn* _____ _____ *October 28, 1999* _____
Notary Public                               My commission expires

The applicant, the owner, any person aggrieved by this Order, any owner of land abutting the land upon which the proposed work is to be
done, or any ten residents of the city or town in which such land is located, are hereby notified of their right to request the Department of
Environmental Protection to issue a Superseding Order, providing the request is made by certified mail or hand delivery to the Department,
with the appropriate filing fee and Fee Transmittal Form as provided in 310 CMR 10.03(7), will in ten days from the date of issuance of this
Determination. A copy of the request shall at the same time be sent by certified mail or hand delivery to the Conservation Commission
and the applicant.

Detach on dotted line and submit to the _____ Truro Conservation Commission _____ prior to commencement of work.
..................................................................................................................................................

To _ Truro Conservation Commission _____ Issuing Authority

Please be advised that the Order of Conditions for the project at _____ Financial Enterprises _____

File Number SE75-282 ____ has been recorded at the Registry of _____ and

has been noted in the chain of title of the affected property in accordance with General Condition 8 on_____, 19_____:

If recorded land, the instrument number which identifies this transaction is_____

If registered land, the document number which identifies this transaction is_____

Signature _____ Applicant

5-4A

**EXHIBIT** $\frac{i}{}$



Commonwealth of Massachusetts
Executive Office of Environmental Affairs

# Department of
# Environmental Protection
Southeast Regional Office

**William F. Weld**
Governor
**Daniel S. Greenbaum**
Commissioner

May 27, 1993

Attorney Matthew Watsky
Shane & Paolillo, P.C.
233 Needham Street
Newton, Massachusetts 02164

RE:  TRURO--Wetlands File No.
SE 75-282 Superseding
Order of Conditions

Dear Attorney Watsky:

Following an in-depth review of the above-referenced file, and in accordance with Massachusetts General Laws, Chapter 131, Section 40, the Department of Environmental Protection has issued the enclosed Superseding Order of Conditions.  This Order approves the proposed project subject to certain conditions.

The project proposes construction of a septic system and well supply line for an existing cottage.  The nature and location of the present septic system is unknown.  Review of the United States Geological Survey geologic map for the Wellfleet Quadrangle (1968) indicates that the sediments are predominantly sand and gravel valley deposits.  Based upon this information, the Flood Insurance Rate Map for the Town of Truro, and observations made at the site, the Department has determined that the resource area in which site is located is Land Subject to Coastal Storm Flowage (Zone A4, el.12).  The Department has determined that the site is significant to the statutory interests of storm damage prevention and flood control.

Review of the proposed project indicates that the proposed septic system complies with the requirements of 310 CMR 15.00, Title 5, the State Environmental Code.  The Department's Division of Water Pollution Control has approved the variances granted by the Board of Health concerning the property line setback and no reserve.  Therefore the septic system enjoys the Presumption Concerning Title 5 of the State Environmental Code at 310 CMR 10.03 (3) of the Wetlands Protection Act Regulations and is presumed to protect the interests identified in the Act.  The septic tank and pump chamber are proposed to be waterproofed.  Fill over the leaching field is proposed in order to comply with the cover requirements of 310 CMR 15.15(9). Special Condition No. 5  requires the revegetation of all disturbed areas.

Please be advised that the Department does not regulate the accessibility, adequacy or reliability of purity and quantity of private water supplies.  Special Condition No. 6 requires that the applicant obtain all other necessary permits prior to commencement of activity.

-2-

        The enclosed Superseding Order of Conditions contains additional
conditions which, in the opinion of the Department adequately protect the
interest of the Act.

        In the opinion of the Department the reasons given here are
sufficient to justify this Superseding Order of Conditions.    However, the
Department reserves the right, should there be further proceedings in this
matter, to raise additional issues and present further evidence as may be
appropriate.

                                Very truly yours,

                                Elizabeth A. Kouloheras, Chief
                                Wetlands Section

K/TJD/bh

Enclosure

cc:    Truro Conservation Commission
       Town Hall
       Town Hall Road
       Truro, MA   02666

       Stephen Williams
       Building Department
       P.O. Box 784
       Truro, MA 02666

       Financial Enterprises Corp.
       c/o Bernard Shuster
       510 Chapman St.
       Canton, MA   02021
       CERTIFIED MAIL #P656 837 339
       RETURN RECEIPT REQUESTED

       Felco Engineering
       P.O. Box 1366
       #82 Route 6A
       Orleans, MA 02653

310 CMR 10.99
Form 5

DEP File No. | SE 75-282

**(To be provided by DEP)**

City/Town TRURO

Applicant FINANCIAL ENTERPRISES
CORP.

### Superseding Order of Conditions
### Massachusetts Wetlands Protection Act
### G.L. c.131, §40

From Department of Environmental Protection

To FINANCIAL ENTERPRISES CORP. _____(Name of Applicant)

Address SAME _____(applicant)

To C/O BERNARD SHUSTER, 510 CHAPMAN ST., CANTON, MA 02021(Name of Property Owner)

Address SAME _____(owner)

This Order is issued and delivered as follows:

☐ by hand delivery to applicant or representative on_____(date)

☒ by certified mail, return receipt requested on May 27, 1993 _____(date)
                                                P656 837 339
This project is located at OFF DEPOT RD./TRURO ASESSORS ATLAS SHEET 50 PARCEL 21

The property is recorded at the Registry of DEEDS, BARNSTABLE _____

Book 6748 _____
Page 268 _____

Certificate (if registered)_____

The Notice of Intent for this project was filed on AUGUST 21, 1992 _____(date)

The public hearing was closed on FEBRUARY 1, 1993 _____(date)

**Findings**

The _Department of Environmental Protection_ has reviewed the above-referenced
Notice of Intent and plans and has held a public hearing on the project. Based on
the information available to the _Department of Environmental Protection_ at
this time, the _Department of Environmental Protection_ has determined that the
area on which the proposed work is to be done is significant to the following
interests in accordance with the Presumptions of Significance set forth in the
regulations for each Area Subject to Protection Under the Act (check as
appropriate):

☐ Public water supply  ☒ Flood control          ☐ Land containing shellfish
☐ Private water supply ☒ Storm damage prevention ☐ Fisheries
☐ Ground water supply  ☐ Prevention of pollution ☐ Protection of wildlife
                                                    habitat

Total Filing Fee Submitted $55 _____ State Share $15 _____

City/Town Share $40 _____ (½ fee in excess of $25)

Total Refund Due $ 0 _____ City/Town Portion $ 0 _____ State Portion $ 0 _____
                              (½ total)                      (½ total)

Therefore, the <u>Department of Environmental Protection</u> hereby finds that the following conditions are necessary, in accordance with the Performance Standards set forth in the regulations, to protect those interests checked above. The <u>Department of Environmental Protection</u> orders that all work shall be performed in accordance with said conditions and with the Notice of Intent referenced above. To the extent that the following conditions modify or differ from the plans, specifications or other proposals submitted with the Notice of Intent, the conditions shall control.

**General Conditions**

1. Failure to comply with all conditions stated herein, and with all related statutes and other regulatory measures, shall be deemed cause to revoke or modify this Order.

2. The Order does not grant any property rights or any exclusive privileges; it does not authorize any injury to private property or invasion of private rights.

3. This Order does not relieve the permittee or any other person of the necessity of complying with all other applicable federal, state or local statutes, ordinances, by-laws or regulations.

4. The work authorized hereunder shall be completed within three years from the date of this Order unless either of the following apply:
   (a) the work is a maintenance dredging project as provided for in the Act; or
   (b) the time for completion has been extended to a specified date more than three years, but less than five years, from the date of issuance and both that date and the special circumstances warranting the extended time period are set forth in this Order.

5. This Order may be extended by the issuing authority for one or more periods of up to three years each upon application to the issuing authority at least 30 days prior to the expiration date of the Order.

6. Any fill used in connection with this project shall be clean fill, containing no trash, refuse, rubbish or debris, including but not limited to lumber, bricks, plaster, wire, lath, paper, cardboard, pipe, tires, ashes, refrigerators, motor vehicles or parts of any of the foregoing.

7. No work shall be undertaken until all administrative appeal periods from this Order have elapsed or, if such an appeal has been filed, until all proceedings before the Department have been completed.

8. No work shall be undertaken until the Final Order has been recorded in the Registry of Deeds or the Land Court for the district in which the land is located, within the chain of title of the affected property. In the case of recorded land, the Final Order shall also be noted in the Registry's Grantor Index under the name of the owner of the land upon which the proposed work is to be done. In the case of registered land, the Final Order shall also be noted on the Land Court Certificate of Title of the owner of the land upon which the proposed work is to be done. The recording information shall be submitted to the <u>Department of Environmental Protection</u> on the form at the end of this Order prior to commencement of the work.

9. A sign shall be displayed at the site not less than two square feet or more than three square feet in size bearing the words, "Massachusetts Department of Environmental Protection, File Number SE 75-282                    ."

10. Where the Department of Environmental Protection is requested to make a determination and to issue a Superseding Order, the Conservation Commission shall be a party to all agency proceedings and hearings before the Department.

11. Upon completion of the work described herein, the applicant shall forthwith request in writing that a Certificate of Compliance be issued stating that the work has been satisfactorily completed.

12. The work shall conform to the following plans and special conditions:

Plans:

Title: <u>SITE & SEWAGE PLAN LOT C OFF DEPOT ROAD</u>

Dated: <u>7/13/92</u>

Signed & Stamped by: <u>DAVID B. LAJOIE, RPE</u>

On File With: <u>DEP</u>


Title: <u>PRELIMINARY SITE PLAN LOT C OFF DEPOT ROAD</u>

Dated: <u>8/4/92</u>

Signed & Stamped by: <u>DAVID B. LAJOIE, RPE</u>

On File With: <u>DEP</u>


Title: _____

Dated: _____

Signed & Stamped by: _____

On File With: _____


Title: _____

Dated: _____

Signed & Stamped by: _____

On File With: _____

Special Conditions (Use additional paper if necessary)

1. Prior to the commencement of construction, General Condition No. 8, above, must be complied with.

2. All construction must comply with the above-referenced plans and the conditions of this Order. For any proposed change in the approved plans or in the work, the applicant shall file a new Notice of Intent or inquire, in writing, of the Department whether the change is substantial enough to require a new Notice of Intent. No change in plan, under this filing, is permissible without prior written approval from the Department allowing this change.

3. It is the responsibility of the applicant, owner and/or successor(s) to ensure that all conditions of this Order are complied with. The project engineer and contractors are to be provided with a copy of this Order and referenced documents before commencement of construction.

4. Members and agents of the local Conservation Commission and the Department shall have the right to enter and inspect the property at all reasonable times to evaluate compliance with the conditions stated in this Superseding Order, and may require the submittal of any data deemed necessary by this Department for that submittal.

See the attached sheet for additional conditions numbered <u>5</u> through <u>7</u>.

Issued by the Department of Environmental Protection

Signature _____

      Elizabeth A. Kouloheras, Chief, Wetlands Section
On this ___27th___ day of _____May_____, 1993 , before me

personally appeared Elizabeth A. Kouloheras _____

to me known to be the person described in and who executed the foregoing
instrument and acknowledged that he/she executed the same as his/her free act and
deed.

Notary Public                               My commission expires

The applicant, the owner, any person aggrieved by the Superseding Order, any
owner of land abutting the land upon which the proposed work is to be done, or
any ten persons pursuant to G.L. c.30A §10A, are hereby notified of their right
to request an adjudicatory hearing pursuant to G.L. c.30A, §10, providing the
request is made by certified mail or hand delivery to the Department, with the
appropriate filing fee and Fee Transmittal Form as provided in 310 CMR 10.03(7),
within ten days from the date of issuance of this Superseding Order, and is
addressed to: Docket Clerk, Office of General Counsel, Department of
Environmental Protection, One Winter Street, Boston, MA  02108.  A copy of the
request shall at the same time be sent by certified mail or hand delivery to the
Conservation Commission, the applicant, and any other party.

A Notice of Claim for an Adjudicatory Hearing shall comply with the Department's
Rules for Adjudicatory Proceedings. 310 CMR 1.01(6), and shall contain the
following information:

(a) the DEP Wetlands File Number, name of the applicant and address of the
    project.
(b) the complete name, address and telephone number of the party filing the
    request, and, if represented by counsel, the name and address of the
    attorney;
(c) the names and addresses of all other parties, if known;
(d) a clear and concise statement of (1) the facts which are grounds for the
    proceedings, (2) the objections to this Superseding Order, including
    specifically the manner in which it is alleged to be inconsistent with the
    Department's Wetlands Regulations (310 CMR 10.00) and does not contribute to
    the protection of the interests identified in the Act, and (3) the relief
    sought through the adjudicatory hearing, including specifically the changes
    desired in the Superseding Order;
(e) a statement that a copy of the request has been sent to the applicant, the
    conservation commission and each other party or representative of such
    party, if known.

Failure to submit all necessary information may result in a dismissal by the
Department of the Notice of Claim for an Adjudicatory Hearing.

Detach on dotted line and submit to the Department of Environmental Protection
prior to commencement of work.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

To Department of Environmental Protection, Issuing Authority.  Please be advised
that the Order of Conditions for the project at OFF DEPOT RD./TUROR ASESSORS
ATLAS SHEET 50 PARCEL 21 , File Number SE 75-282, has been recorded at the
Registry of DEEDS, BARNSTABLE and has been noted in the chain of title of the
affected property in accordance with General Condition 8 on
_____, 19_____.
If recorded land, the instrument number which identifies this transaction is ___.
If registered land, the document number which identifies this transaction is ___.

Signature_____, Applicant
TJD/bh

**Superseding Order of Conditions for File No. SE 75-282**

**Special Conditions Continued**

5.    Any areas disturbed during construction shall be revegetated with appropriate indigenous vegetation.

6.    Prior to commencement of installation of the septic system and the water supply line, it will be necessary for the applicant to obtain any other necessary permit and to comply with any other federal, state or local ordinance, regulation or by-law.

7.    No work shall take place until all administrative appeal periods from the Order have elapsed, or if an appeal has been filed, until all proceedings before the Department have been completed.

NOTICE OF APPEAL RIGHTS/ENFORCEMENT ORDER

APPEAL RIGHTS AND TIME LIMITS

This Order is an action of the Department. If you are aggrieved by this action, you may request an adjudicatory hearing. A request for a hearing must be made in writing within and postmarked within __twenty-one (21)__ days of the date this Order was issued.

CONTENTS OF HEARING REQUEST

Under 310 CMR 1.01(6)(b), the request must state clearly and concisely the facts which are the grounds for the request, and the relief sought. Additionally, the request must state why the Order is not consistent with applicable laws and regulations.

FILING FEE AND ADDRESS

The hearing request along with a valid check payable to Commonwealth of Massachusetts in the amount of $100 must be mailed to:
        Commonwealth of Massachusetts
        Department of Environmental Protection
        P.O. Box 4062
        Boston, MA  02111

The request will be dismissed if the filing fee is not paid, unless the appellant is exempt or granted a waiver as described below.

EXEMPTIONS

The filing fee is not required if the appellant is a city or town (or municipal agency), county, or district of the Commonwealth of Massachusetts, or a municipal housing authority.

WAIVER

The Department may waive the adjudicatory hearing filing fee for a person who shows that paying the fee will create an undue financial hardship. A person seeking a waiver must file, together with the hearing request as provided above, an affidavit setting forth the facts believed to support the claim of undue financial hardship.

**EXHIBIT** 5



## ZISSON AND VEARA
ATTORNEYS AT-LAW

RICHARD L. ZISSON
EDWARD E. VEARA
PAUL V. BENATTI
JILL J. BROFSKY
E. JAMES VEARA
SARAH A. TURANO-FLORES
TANNAZ NOURAFCHAN
MICHELE S. BELMONT

865 THE PROVIDENCE HIGHWAY
DEDHAM, MASSACHUSETTS 02026-6825
TEL (617) 329-1110
FAX (617) 329-5119

828 MAIN STREET-BOX 2031
OLD KINGS HIGHWAY
DENNIS, MASSACHUSETTS 02638-1530
TEL (508) 385-6031
FAX (508) 385-6914

SEP 3 0 1996

September 27, 1996

Mark Peters, Chairman
Board of Health
P. O. Box 2030
Truro, Massachusetts  02666

Re:  Recording Variances.

Dear Mr. Peters:

On behalf of the Board of Health of the Town of Truro, you wrote recently to inquire whether "Title V variances [can] be placed in the deed as a condition for the variances."  After I received your letter, I researched this matter, and I am writing now to convey my response.  In my opinion, the variance cannot be placed in the deed, but the Board can accomplish the equivalent result.

If I understand the situation correctly, the Board of Health acted earlier in a matter concerning a one-bedroom cottage on Pamet Harbor.  On December 11, 1992, the Board "granted waivers" subject to a "condition attached."  Because of the tenor of the balance of your letter, I will <u>assume</u> that the Board of Health granted a qualified variance from strict compliance with the standards imposed by Title 5 of the State Environmental Code.

The condition inserted into the 1992 variance limited the cottage to a one-bedroom dwelling.  The Board's decision was not appealed, and of course, the time to institute an appeal passed years ago.  Therefore, the variance became final, but it was not recorded in the Registry of Deeds of the County of Barnstable.  For this reason, the owner contests its validity.  I must assume, once again, that the present, disgruntled owner acquired the property after 1992 and was unaware at the time of purchase that the property was subject to a variance which limited the lot's development potential. At least as I understand the thrust of your letter, the Board wishes to know whether its existing variance

ZISSON AND VEARA

Mr. Peters
September 27, 1996
Page 2

applies to the new owner and, regardless of the answer, whether the Board can require future variances to be recorded so that no one will be surprised again.

The Massachusetts Environmental Code was promulgated under the authority of Massachusetts General Laws Chapter 21A, Section 13, amended by St.1990, c. 177, §41. This enabling legislation is very general in its terms, and it does not address any of the issues involved in this response. Therefore, the answers must be found within the Code itself. See Rosenfeld v. Board of Health of Chilmark, 27 Mass. App. Ct. 621, 541 N.E.2d 375 (1989). The fifth division of the Code - Title 5, 310 CMR 15.001 et sequitur - was revised substantially in 1994. Because the initial validity of the 1992 variance must be assessed in accordance with the Title 5 provisions in effect at the time, I must begin this review with the "old" Title 5, the 1986 version.

The old Title 5 addressed variances in only two of its sections, but the second paragraph of the first of these two sections is crucial. It reads thus:

> Any variance granted by the Board of Health shall be in writing. Any denial of a variance shall also be in writing and shall contain a brief statement of the reasons for the denial. A copy of each variance shall be conspicuously posted for thirty days following its issuance; and shall be available to the public at all reasonable hours in the office of the city or town clerk or the office of the Board of Health while it is in effect. Notice of the grant of each variance shall be filed with the Department of Environmental Quality Engineering, which shall approve, disapprove, or modify the variance within thirty days from receipt thereof. If the Department fails to comment within thirty days, its approval will be presumed. No work shall be done under any variance until the Department approves it or thirty days elapse without its comment, unless the Board of Health or the Department certifies in writing that an emergency exists. 310 CMR 15.20.

Consequently, if the Board of Health determined that the variance criteria in the first paragraph of 310 CMR 15.20 had been satisfied and if it voted to grant a variance, the Board needed to issue a written decision which would in turn be forwarded to and reviewed by the Department of Environmental Protection. For purposes of

ZISSON AND VEARA                              Mr. Peters
                                             September 27, 1996
                                             Page 3

public notice, the Board (a) had to post its decision conspicuously
for at least thirty (30) days (the Town Hall bulletin board would
suffice) and (b) had to maintain a publicly accessible copy of the
variance in either the Town Clerk's office or the Board of Health's
office.   The old Title 5 contained no requirement for or
prohibition against registry recordation.

     What was lodged in the old Title 5 provisions was the next
section reading as follows:

              Any   variance   or   other   modification
         authorized to be made by this Title may be
         subject  to  such  qualification,  revocation,
         suspension,  or  expiration  as  the  Board  of
         Health or Department of Environmental Quality
         Engineering  expresses  in  its  grant.       A
         variance or other modification authorized to
         be  made  by  this  Title  may  otherwise  be
         revoked, modified, or suspended, in whole or
         in part, only after the holder thereof has
         been notified in writing and has been given an
         opportunity to be heard, in conformity with
         the requirements of Title 1 (310 CMR 11.00)
         for orders and hearings.  310 CMR 15.21.

This Section explicitly empowered either the Board of Health
initially or the Department of Environmental Quality Engineering
(now, the Department of Environmental Protection) subsequently to
qualify or revoke any Title 5 variance.  Furthermore, appeals from
a variance denial or from an unacceptable variance limitation had
to be pursued within thirty days thereafter.   310 CMR 15.25;
Rosenfeld v. Board of Health of Chilmark, supra at 541 N.E.2d 378.

     The "new" Title 5 - the 1994 version - is considerably more
detailed in its provisions, but its requirements for affording
notice to the public are virtually identical.

              Any   variance   allowed   by   the   local
         approving authority shall be in writing.  Any
         denial of a variance shall also be in writing
         and shall contain a brief statement of the
         reasons for the denial.   A copy of each
         variance shall be conspicuously posted for 30
         days following its issuance; and shall be
         available to the public at all reasonable
         hours in the office of the city or town clerk
         or the office of the Board of Health while it
         is in effect.  310 CMR 15.411(3).

ZISSON AND VEARA

Mr. Peters
September 27, 1996
Page 4

Again, there is no mention of recording notice of a Title 5
variance at the local registry of deeds, but the new Title 5 is
even clearer about the Board of Health's ability to impose variance
conditions.

> The local approving authority or the
> Department may issue variances subject to such
> conditions, including, but not limited to,
> monitoring and reporting requirements, deed
> recordation requirements, financial assurances
> or other qualifications on the use of the
> system, as it deems necessary to protect
> public health and safety and the environment.
> Any conditions shall be expressed in writing
> in allowing the variance.  310 CMR 15.413(1).

The "deed recordation requirements" - unless it is an oblique
reference to what I shall recommend - is somewhat perplexing.
Ordinarily, the landowner's deed is very much a matter of public
record.  At times, however, a prospective buyer may possess a
purchase and sale agreement including terms enabling the buyer to
withdraw if a series of governmental approvals are not obtained.
The absence of such approvals can defeat development objectives and
cause the purchase to become undesirable.  In such a situation, a
board may issue a Title 5 variance only to have the buyer withdraw
from the sale transaction.  To avoid this eventuality, the Board of
Health can, under this Section, condition the effectiveness of a
variance upon the buyer's recording a deed.  If the buyer should
withdraw from the purchase, the deed will not be recorded, and the
Board will not be saddled with a variance which it may regret
issuing when conditions or proposals change.

In any event, it is apparent that the Board of Health could
condition and may still condition its issuance of a Title 5
variance.  Public notice must be given in the form of a thirty-day
public posting and a public filing in the Town Clerk's office or in
the Board's office.  Nothing more is required by law.

Because, in most instances, a deed will already be drafted and
recorded and because there are so many complications involved in
affecting a person's title, I do not believe it is possible to
include a Title 5 variance in someone's deed, but this is largely
inconsequential.  By recording a copy of the variance - attested
first by the Town Clerk - and by obtaining a marginal reference on
the latest deed in the owner's chain of title (information
available at the Assessor's office), the same result will be
achieved.  A marginal reference is simply a notation on the already
recorded deed, and it informs anyone checking title to the property
that he or she should consult the document recorded at the book and

ZISSON AND VEARA

Mr. Peters
September 27, 1996
Page 5

page specified by the marginal reference. A failure to do so will
not exonerate someone from learning the information cross-
referenced in the margin - in this illustration, the recorded copy
of the Title 5 variance. By utilizing this method, the Board will
ensure that a valid, but qualified, Title 5 variance will be
discovered by any potential buyer. The prospective buyer will
become informed of any restrictions on the property and will
acquire it - if the conveyance proceeds - subject to and with full
knowledge of the pertinent variance restrictions.

If this is the Board's objective, it may select one of two
implementing alternatives. The Board of Health may record the
variance itself. Should the Board choose this option, it must be
aware that there is both a recording fee and an additional charge
for the marginal reference. Moreover, in the years ahead, should
the Board ever overlook a recording, the onus will fall upon the
Board. The other alternative is the imposition upon the applicant
of the obligation to record the variance, to obtain the marginal
reference, and to provide proof of both to the Board. Such proof
could consist of an attested copy of the recorded variance and of
the prior deed with the marginal reference stamped on it. This
requirement can be one of the variance's conditions, and the
variance itself can state that it will lapse and be of no effect if
attested copies of these recorded documents are not received by a
certain date. This latter alternative is somewhat more cumbersome,
but it does have the advantage of placing the recording obligations
and expenses upon the applicant.

I believe the preceding paragraphs respond (satisfactorily, I
hope) to the Board's concerns about recording Title 5 variances,
but the Board's inquiry whether the new and uninformed owner of the
Pamet Harbor property became bound by the conditions of the
unrecorded 1992 variance is both more troublesome and less certain.
There is, after all, a strong disinclination in the law to hold
persons to repellent conditions they did not create and about which
they knew nothing. Nonetheless, in my opinion, the new owner is
bound by the restrictions in the variance.

When the Board of Health was requested to issue a variance,
the Board, presumably, observed every statutory and regulatory
requirement. Notice of the hearing was published; the variance
grant was posted publicly for thirty days at the Town Hall; the
decision was forwarded to the Department of Environmental
Protection; the variance's conditions were legitimate and
unappealed; and the variance decision remained and remains a matter
of public record at the Town Hall. All specified notices,
publications, and filings were observed. Although it is the case
that the variance was not recorded at the Registry of Deeds, there

ZISSON AND VEARA

Mr. Peters
September 27, 1996
Page 6

is no Title 5 requirement, old or new, that the variance be so recorded.

Not all recording requirements, however, are found in Title 5 or its enabling legislation.  For example, a deed - except for the grantor and the grantee and persons with actual knowledge of the conveyance - is ineffectual unless it is recorded. Mass. Gen. Laws ch. 183, §4.  Similarly, notice of judicial proceedings affecting "the use and occupancy" of real estate must be recorded, or else unknowing purchasers will not be subject to them.  Mass. Gen. Laws ch.  184,  §15.    Conservation,  agricultural,  and  watershed restrictions must be recorded in order to apply to third parties and so, too, must any restriction "executed by or on behalf of the owner." Mass. Gen. Laws ch. 184, §26.  Title 5 variances, however, are not deeds, judicial proceedings, or restrictive covenants, and they do not fall within the purview of any of these statutes.

I have been unable to unearth any statute which, even in general terms, requires the recording of a Title 5 variance.  Of course,  the  General  Laws  are  numerous,  byzantine,  and, occasionally, not well indexed, and therefore, I cannot be positive that no such statute exists.  Nonetheless, there is reason to conclude it does not. Whenever local administrative decisions are likely to affect land, the pertinent legislation prescribes - sometimes in great detail - the procedures to be adopted and the notices to be given.  In the realm of zoning, decisions (or notices of them) granting variances or special permits must be recorded, but decisions reviewing orders of the Building Commissioner need not be recorded.  Mass. Gen. Laws ch. 40A, §§11, 15.  Under the Wetlands Protection Act, the Conservation Commission's orders of conditions must be recorded before any work proceeds, and evidence that work was completed lawfully is given by a recorded certificate of compliance.  Mass. Gen. Laws ch. 131, §40.  In other words, in virtually every instance in which local administrative decisions affect real estate, the immediately relevant statutes proclaim what need or need not be done.

Town  Halls  generally  and  Town  Clerks'  offices  more particularly are repositories for a wealth of information.  Indeed, some of the data filed with Town Clerks either cannot be found elsewhere  or  else  can  be  found  elsewhere  only  with  great difficulty.  Most matters of local government decision making are reflected by records in the Town Clerk's office.  It is important to stress the obvious. Without this situation being well known and well established, the Board's compliance - without more - with the applicable  statutes  and  regulations  could  be  deemed constitutionally deficient to diminish the property rights of unknowledgeable third parties.  Whether a person is actually aware of a regulation or decision is not as critical as whether he or she

ZISSON AND VEARA

Mr. Peters
September 27, 1996
Page 7

had a fair opportunity to learn about matters affecting that
person's interests.    In this context, the term "constructive
notice" is frequently employed, and it bears this general meaning:

> Constructive notice is information or
> knowledge of a fact imputed by law to a person
> (although he may not actually have it),
> because he could have discovered the fact by
> proper diligence, and his situation was such
> as to cast upon him the duty of inquiry into
> it.    Black's Law Dictionary 1062 (6th ed.
> 1990).

It is not a difficult task to visit the Town Hall in the town
where a party intends to buy property.  Routinely, a buyer will
request a municipal lien certificate from the Town Clerk and will
visit the Assessors office to check the town's maps and title
references.  While in the building, a buyer can easily consult the
Town Clerk and the Building Commissioner to discover whether there
is any information or pending administrative proceeding relevant to
the prospective purchase.  Needless to say, a registry recording of
a variance is far preferable because the registry records are
canvassed much more assiduously than town records, but it cannot be
forcefully argued that the Town Clerk's office does not customarily
and adequately serve as a location for public records and public
notice.

This conclusion does not leave the buyer of the Pamet Harbor
lot without recourse.  She may petition the Board of Health to
amend or revoke the 1992 variances, or if she herself needs to
depart from the strictures of Title 5, she may request a new
decision which will, by its own terms, displace the earlier
variance and bestow different and/or additional relief.  The Board,
of course, is not obligated to grant any or all of the petitioned
relief, but it may certainly entertain the request.

Should the new owner be dissatisfied with administrative
results, she may - assuming she was indeed uninformed about the
variance - seek redress from the seller.    Encumbrances upon
property and matters likely to influence a purchase decision must
be disclosed by the seller.  Mass. Gen. Laws ch. 184, §21; 940 CMR
3.16.   A failure to provide pertinent information is actionable.
Such private remedies, however, do not involve the Town of Truro.

ZISSON AND VEARA

Mr. Peters
September 27, 1996
Page 8


This concludes my response to the Board's inquiries.  If you should have any questions about it or if I can be of any other assistance, please feel free to contact me.

Cordially,

*Edward E Veara*

Edward E. Veara
Town Counsel


PVB/ja

cc:  Board of Selectmen

**EXHIBIT** 6





# DEEP OBSERVATION HOLE LOG

DATE : 5-1-97

TEST BY: JASON ELLIS
WITNESS: TRURO BOH

| DEPTH | | A | B | C | HORIZON | TEXTURE | TEST RATE | STRUCTURE | MOTTLING | CONSISTENCE |
|---|---|---|---|---|---|---|---|---|---|---|
| 0.0' | EL 6.7' | A | | | | LOAMY SAND | | NO | NO | LOOSE |
| 1.0' | | | | C | | MEDIUM SAND | PERC > 3.1' <2 MIN/IN | NO | NO | LOOSE |
| WATER @ 4.3' | | | | | | | | | | |

## 2.

DATE : 5-1-97

TEST BY: JASON ELLIS
WITNESS: TRURO BOH

| DEPTH | | A | B | C | HORIZON | TEXTURE | TEST RATE | STRUCTURE | MOTTLING | CONSISTENCE |
|---|---|---|---|---|---|---|---|---|---|---|
| 0.0' | EL 8.13' | A | | | | LOAMY SAND | | NO | NO | LOOSE |
| 1.0' | | | | C | | MEDIUM SAND | PERC > 3.1' <2 MIN/IN | NO | NO | LOOSE |
| WATER @ 4.3' | | | | | | | | | | |

---

## SECTION VIEW – SEPTIC SYSTEM COMPONENTS (N. T. S.)

### DESIGN

**FLOW DETERMINATION**
☑ BEDROOM DWELLING

**GARBAGE GRINDER** ☒ NO  ☐ YES

**FLOW RATE =** 440 GAL/DAY

**SEPTIC TANK SIZING:**

440 × 2.0 = 880 GAL/DAY

1,500 GAL (EXISTING)

**USE:** 1,500 GAL

**LEACHING FACILITY CALCULATIONS:**

PERCOLATION RATE IS < 5 MIN/INCH   CLASS 1

BOTTOM (S.F.) = 814 × 0.74 = 434 GAL/DAY

**USE:** 40.5' LONG × 30.7' WIDE LEACH FIELD

AS SHOWN = 814± S.F.
W/ 0.5' EFFECTIVE DEPTH

### GENERAL NOTES

1. ALL CONTRACTORS AND/OR INSTALLERS ARE RESPONSIBLE FOR PROVIDING AND MAINTAINING A SAFE WORK AREA.

2. CONTRACTOR AND/OR INSTALLER(S) VERIFY ALL UTILITY LOCATIONS PRIOR TO CONSTRUCTION.

3. CONSTRUCTION DETAILS TO BE IN ACCORDANCE WITH STATE SANITARY CODE 310 CMR 15.000 AND TOWN BOARD OF HEALTH REQUIREMENTS PRIOR TO CONSTRUCTION.

4. CONSTRUCTION DETAILS TO BE IN ACCORDANCE WITH STATE SANITARY CODE 310 CMR 15.000 AND TOWN BOARD OF HEALTH REQUIREMENTS.

5. ELEVATION DATUM IS FROM ☐ U.S.G.S. QUAD. MAP ☒ N.G.V.D.

6. MUNICIPAL WATER IS AVAILABLE ☐ YES ☒ NO

7. ANY ALTERATIONS TO DESIGN MUST BE APPROVED BY FELCO, INC. AND TOWN BOARD OF HEALTH.

8. ALL EXISTING SEWAGE TO BE PUMPED AND FILLED WITH CLEAN MEDIUM SAND.

9. SEPTIC TANKS, DOSING CHAMBERS, GREASE TRAPS, AND DISTRIBUTION BOXES SHALL BE WATERTIGHT.

10. WHEN SEPTIC TANKS, DOSING CHAMBERS, GREASE TRAPS AND DISTRIBUTION BOXES ARE PLACED IN FILL, PROVIDE A LEVEL STABLE BASE WHICH HAS BEEN MECHANICALLY COMPACTED, VIRGIN GROUND WITH A 6" CRUSHED STONE BASE IS OTHERWISE ADEQUATE.

11. GROUND COVER OVER SEPTIC SYSTEM COMPONENTS SHALL NOT EXCEED 36".

### CONSTRUCTION NOTES

1. WORK LIMIT TO BE STAKED BY FENCE.

2. EXCAVATE UNSUITABLE SOIL 2' TO 3' BEYOND LEACH AREA TO MEDIUM SAND AND REPLACE WITH CLEAN MEDIUM SAND.

3. EXCAVATE EXISTING SEWAGE AND UNSUITABLE SOIL AND REPLACE WITH CLEAN MEDIUM SAND.

4. FELCO TO STAKE LEACH AREA FOR INSTALLATION.

5. PROVIDE BARRIER AROUND ENTIRE LEACH AREA AS FLOW FROM EL 12.0' DOWN TO EL 9.0'.

6. ALL DISTURBED AREAS TO BE REVEGETATED WITH NATIVE GRASSES UPON WORK COMPLETION.

FELCO, INC.
ENGINEERING – LAND SURVEYING

| JOB No : 94376 | NAME : ALLEN |
|---|---|
| DATE : 9-10-96 | SHEET 2 OF 2 |
| REVISIONS : 3-31-97   5-1-97 | |

0126

**EXHIBIT** 7

# Commonwealth of Massachusetts

BARNSTABLE, ss.

SUPERIOR COURT
No. 97-738

### JOHN ALLEN et al

### VS.

### TOWN OF TRURO et al



RECEIVED
APR 20 1999

### JUDGMENT ON FINDINGS BY THE COURT

This action came on for trial before the Court, Connon, J., presiding, upon a statement of agreed facts, and findings having been duly rendered,

It is ORDERED and ADJUDGED:

(1) that the decision of the defendant, Town of Truro, Board of Health, dated June 11, 1997, denying the four variances was arbitrary and capricious, and

(2) that the decision of the Town of Truro, Board of Health, dated June 11, 1997, is set aside,

It is DECLARED:

that the four variances are granted.

Dated at Barnstable, Massachusetts, this fifteenth day of April, 1999.

FORM OF JUDGMENT APPROVED:

Justice of the Superior Court

Clerk

A true copy, Attest:

Clerk

0123

## COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 97-738



### JOHN ALLEN and BARBARA CORDI-ALLEN,
**Plaintiffs**

### V.

### THE TOWN OF TRURO, THE TRURO BOARD OF HEALTH, and GARY PALMER, SAMUEL ARMSTRONG, MARK PETERS, and MARIA KULIOPULOS, as they constitute, or did constitute THE TOWN OF TRURO BOARD OF HEALTH,
**Defendants**

## MEMORANDUM OF DECISION

## INTRODUCTION

This is an appeal pursuant to G.L. c. 249, § 4, from a decision of the Truro Board of Health allegedly rendered by said Board on June 11, 1997, denying the plaintiffs' request for four variances for a proposed alteration to an existing on-site subsurface sewage disposal system.

Additionally, the plaintiffs are seeking declaratory judgment under G.L. c. 231A to determine the rights and duties of the parties regarding the provisions of Title V of the state Environmental Code 310 CMR 15 and alleging that the defendants' failure to comply with G.L. c. 111, § 31E by not rendering its decision within 45 days requires that

2

the permit shall be deemed to have been granted.

## BACKGROUND

The matter came before the Court in a jury-waived session and with an "Agreed Statement of Facts and Exhibits," which the Court adopts in their entirety and makes a part of these findings as Exhibit A attached.

## DISCUSSION

The plaintiffs' claims are that because the defendants' failure to comply with the 45-day requirement of § 31E of c. 111 that there is a constructive grant of plaintiffs' application and variances, alternatively, the plaintiffs' claims that the decision of the Board of Health was arbitrary or capricious in that the decision of this Board in relying on a previous board's decision some five years earlier is lacking credible evidence to support its denial other than the prior board declared that "this lot will forever have only a one bedroom structure on it." The defendants urge the Court to uphold the board's decision because the plaintiffs' application did not support the finding required by 310 CMR 15.410 that enforcement of the standards from which a variance would be "Manifestly Unjust" and on the claim that there was a constructive approval of plaintiffs' application because of noncompliance of § 31E of c. 111, the defendants maintain the Board's action fully satisfied the intent and purpose of § 31E.

G.L. c. 111, § 31E, states that:

> "any health officer or board of health for any city, town,
> district, whose authority includes the issuance of permits
> for construction, maintenance or alteration of individual
> sewage disposal systems for residential buildings of not
> more than four dwelling units shall act upon a completed
> application for such permit . . . within forty-five days from

0117

3

> the date upon which such completed application is filed
> with said health officer or board of health. If a determination
> on a completed application is not rendered within forty-five
> days by the appropriate health officer or board of health,
> then said permit shall be deemed to have been granted."

The public hearing on plaintiffs' application was held on June 4, 1997. On June 11, 1997, the Board voted to deny the Title V variance requested by the plaintiffs. In the ordinary course, the Board's administrative secretary would prepare notices of the Board's decision within one to three weeks of the hearing. Unfortunately, the administrative secretary took ill, and it was only after her return to work and upon a request from plaintiffs' attorney that a notice of the Board's decision was sent on August 18, 1997.

Section 31E of c. 111, states that "upon disapproval of said application a written statement of the reasons for disapproval shall be sent to the applicant by first-class mail, postage prepaid, and shall include the information necessary in order to ascertain why the application or the proposed subsurface sewage disposal system, or both, failed to comply with local or state code requirements. . . .

On August 19, 1997, in response to plaintiffs' attorney's letter, the administrative secretary notified plaintiffs' attorney and not the applicant of the following.

> "The Board did comply with the 45 day mandate in that
> after taking the matter under advisement at their duly
> held meeting on June 4, 1997, the Board of Health then
> considered the matter at their meeting on June 11, 1997
> and voted to deny the request for (5) variances based\
> upon the prior action by the Board of Health in 1992."

I conclude that the Board's letter of August 19, 1997, is defective for several reasons: first, that the notice of the Board's decision was not mailed within 45 days of

0118

4

the Board's decision; second, that it was sent to an improper party rather than to the applicant; and third, it lacked sufficient information why the application it failed to comply with local or state code requirements.

In Milton Commons Associates v. Board of Appeals of Milton, 14 Mass. App. Ct. 111 (1982, the defendant board failed to act within the time limits prescribed by G.L. c. 40B, § 21, which states in part: "If said hearing is not convened or a decision is not rendered within the time allowed . . ., the application shall be deemed to have been allowed."

Any decision to the contrary would negate legislative intent or defeat its intended utility. "The intention of the General Court in enacting any statute must be ascertained, not alone from the literal meaning of its words, but from a view of the whole system of which it is but a part, and in the light of the common law and previous statutes." Armburg v. Boston & Maine RR, 276 Mass. 418: Perreira v. New England LNG. Co. Inc., 364 Mass. 109 (115). The legislature inserted a timetable for administrative action to give teeth to the timetable. The legislature provided that a local board's failure to adhere to it would result in approval.

In Gloria A. Uglietta v. City Clerk of Somerville, 32 Mass. App. Ct. 742 (1992), it reaffirmed the General rule that the statutory use of the word "shall" is to be given mandatory meaning. Section 31E of c. 111 states that "the written statement of reasons, in the case of disapproval shall be sent to the applicant by first-class mail, postage prepaid, and shall include the information necessary in order to ascertain why the application failed to comply with local or state code requirements. . . . " The defendant Board in this case neither sent the disapproval within 45 days nor did they

0119

5

include the necessary information.

The mandatory language "shall" is unambiguous. The "written statement of reasons <u>shall</u> be sent to the applicant" within 45 days. To hold otherwise gives the board the right to make a decision and never send notice to the applicant. The notice <u>shall</u> include the information necessary to ascertain why the application was denied; i.e., why the application or the proposed subsurface sewage disposal system, or both, fail to comply with local or state code requirements.

The applicable provision that the board could have relied on is 310 CMR 15.000, that the purpose of Title V is that the environmental code is to provide for the protection of public health, safety, welfare, and the environment by requiring the proper construction, upgrade, and maintenance of on-site sewage disposal systems and appropriate means for the transport and disposal of septage, this section should be read in conjunction with G.L. c. 111, § 31E.

310 CMR 15.410, the standard of review for granting variances, states that:

(1)    Local approving authorities and the department may vary the application of any provision of 310 CMR 15.000 with respect to any particular case except those listed in 310 CMR 15.415 (which does not apply here).

Variances shall be granted only when in the opinion of the Approving Authority:

A.  the person requesting a variance has established that enforcement of the provision of 310 CMR 15.000 from which a variance is sought would be manifestly unjust considering all relevant facts and circumstances of the individual case; and

B.  the person requesting the variance has established that the level of environmental protection that is at least equivalent to that provided under 310 CMR

6

15.000 can be achieved without strict application of the provision of 310 CMR 15.000 from which a variance is sought.

The defendant Board's reliance upon a decision of the Board of Health some five years earlier does not comply with the spirit and intent of the requirements of § 31A of c. 111. The agreement of the plaintiffs' engineers were not considered on the matter of public health issues and any impact the proposal would have on public health issues.

The defendants' agreement that the controlling regulating 310 CMR 15.11 only requires that when acting on an application in the case of denial that it shall be in writing and shall contain a brief statement of the reasons for the denial is misplaced, since a reading of the regulation must be read in conjunction with G.L. c. 111, § 31E, which mandates the notice to be mailed to the applicant within 45 days.

For these reasons, the Court concludes primarily that the Board's failure to comply with the 45-day requirement under § 31E of c. 111, it is deemed that said permit is granted. Accordingly, the Board's decision in denying the permit was arbitrary and capricious, and the decision of the defendant Board is **REVERSED**.

Richard F. Conhon,
Justice of the Superior Court

DATED: March 22, 1999

A true copy, Attest:
Nancy M. Wee
Asst. **Clerk**

0121

**EXHIBIT** $\underline{8}$



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
20 RIVERSIDE DRIVE, LAKEVILLE, MA 02347 508-946-2700

ARGEO PAUL CELLUCCI
Governor

JANE SWIFT
Lieutenant Governor

BOB DURAI
Secreta

LAUREN A. LI:
Commission

January 18, 2000

Ms. Jane Crowley, Health Agent
Board of Health
P.O. Box 2030
Truro, Massachusetts 02666

And

Mr. John Allen and Ms. Barbara Cordi-Allen
146 Pleasantview Avenue
Longmeadow, Massachusetts 01106

RE:     TRURO--Subsurface Sewage Disposal-
Proposed Variance to 310 CMR 15.000
"Title 5 of The State Environmental
Code" for   John Allen and Barbara
Cordi-Allen, 5 Yacht Club Road

Transmittal No. P24485

Dear Ms. Crowley, Mr. Allen and Ms. Cordi-Allen:

Pursuant to Title 5 of the State Environmental Code, 310 CMR 15.412, the Southeast Regional Office of the Department of Environmental Protection has completed its review of the above referenced application for approval of variances granted by the Truro Board of Health.

The application contains a copy of the Board of Health's grant of a variance from the following provisions of Title 5, 310 CMR 15.00

310 CMR 15.248:  Reserve Area

As part of the application, the Department received plans consisting of two (2) sheets, titled as follows:

SITE & SEWAGE PLAN
LOCUS: 5 YACHT CLUB ROAD
TRURO, MA

PREPARED FOR:  JOHN ALLEN
145 PLEASANTVIEW AVENUE
LONGMEADOW, MA  01105

This information is available in alternate format by calling our ADA Coordinator at (617) 574-6872.

DEP on the World Wide Web:  http://www.magnet.state.ma.us/dep
Printed on Recycled Paper

2

REFERENCE: ASSR'S MAP 50  PARCEL 21
SCALE:  1" = 30'     DATE:  9-11-96
SHEET NO.  1 OF 2   JOB NO.  96378

8-9-99
3 BR/VAR
5-14-98
5-1-97
3-31-97
REVISIONS

FELCO, INC.
ENGINEERING – LAND SURVEYING
P.O. BOX 1366  ORLEANS, MA 02653
(508) 255-8141  (FAX) 255-2954

Based upon its review of the application, and in accordance with 310 CMR 15.410, the Department has determined both of the following:

a)  The applicant has established that enforcement of 310 CMR 15.211 would be manifestly unjust, considering all of the relevant facts and circumstances of this case.   Strict adherence would deprive the applicant of beneficial use of the property in that the applicant is entitled to a sewage flow of 330 gallons per day (gpd) pursuant to 310 CMR 15.005, "Transition Rules".

b)  The applicant has established that a level of environmental protection that is at least equivalent to that provided under 310 CMR 15.000 can be achieved without strict application of 310 CMR 15.211. The applicant has established equivalent environmental protection as follows:

While space on the lot exists for a reserve area, restricting the location of a replacement system to the area of the primary soil absorption system (SAS) maximizes separation to a sensitive wetland resource area.

The Department, therefore, approves the Board of Health's grant of a variance from 310 CMR 15.211 subject to the following:

1.  Sewage flow is limited to 330 gallons per day (gpd), and the applicant has provided architectural plans prepared by J. P. Kelley for John and Barbara Cordi-Allen as revised on October 14, 1999 showing the number of bedrooms at the facility limited to a maximum of three (3) bedrooms.

2. A Disposal System Construction Permit must be obtained from the Truro Board of Health prior to the start of construction.

3. Approval of the variance is subject to the applicant receiving a valid Final Order of Conditions under M.G.L. c.131 §40, "The Wetlands Protection Act".

4. The applicant and all subsequent owners shall comply with all the requirements of the Provisional Use Approval of the Single Home FAST® issued by the Department on March 24, 1995 (copy enclosed):

    a. The applicant (or owner) shall maintain the system in with section III of the Approval.

    b. The Company (Smith and Loveless) shall sample and test the effluent to evaluate the effectiveness of the system for nitrogen reduction in accordance with section IV of the Provisional Use Approval.

5. Approval for the proposed system will be dependent upon the recording in the appropriate registry of deeds of a notice that discloses the existence of a variance for the sewage disposal system, the existence of the Provisional Use alternative system and the involvement of the Department of Environmental Protection in said system. An attested copy of this notice showing the book and page number of the recording shall be submitted to the Department and the Board of Health prior to the issuance of the Certificate of Compliance.

    The Department believes that the above referenced location will be a suitable testing facility, for year round operation, to evaluate nitrogen reduction under the Provisional Use Approval. The Department seeks further information regarding the system's ability to meet nitrogen reduction limits when operated on a seasonal basis.

    *This variance determination is an action of the Department. If the applicant is aggrieved by this determination, s/he may request an Adjudicatory Hearing in accordance with 310 CMR 1.00 and M.G.L. C.30A. A request for an Adjudicatory Hearing must be made in writing and postmarked within 30 days of the date of issuance of this determination. Pursuant to 310 CMR 1.01(6), the request must state clearly and concisely the facts that are grounds for the request and the relief sought.*

    *The hearing request, along with a valid check payable to Commonwealth of Massachusetts in the amount of one hundred dollars ($100.00), must be mailed to:*

*Commonwealth of Massachusetts*
*Department of Environmental Protection*
*P.O. Box 4062*
*Boston, MA 02211*

    *The hearing request will be dismissed if the filing fee is not paid, unless the appellant is exempt or granted a waiver, as described below. The filing fee is not required if the appellant is a city or*

4

*town (or municipal agency), county, or district of the Commonwealth of Massachusetts, or a municipal housing authority. The Department may waive the adjudicatory hearing filing fee for a person who shows that paying the fee will create an undue financial hardship. A person seeking a waiver must file, together with the hearing request as provided above, an affidavit setting forth the facts in support of the claim of undue financial hardship.*

Should you have any questions regarding this matter, please contact Brian Dudley at (508) 946-2753.

Very truly yours,

Elizabeth Kouloheras, Chief
Cape Cod Watershed

K/BAD
Enclosures

cc:    Felco, Inc.
       P.O. Box 1366
       Orleans, MA  02653

       DEP Wastewater Management, Title 5 Section, Boston

       DEP Wastewater Management
       Attn:  Steve Corr

       DEP/SERO
       Attn: James Mahala

**EXHIBIT** 1



**THOMAS & BAILEY, P.C.**
Attorneys At Law
100 West Main Street
William W. Thomas          Post Office Box 978         Telephone (508) 771-4644
Bradley J. Bailey        Hyannis, Massachusetts 02601      Facsimile (508) 790-1334

William G. Litchfield

February 27, 2001

Department of Environmental Protection
20 Riverside Drive
Lakeville, Massachusetts 02347
Attn: Brian Dudley

Re:     Truro-subsurface sewage disposal-proposed variance to 310 CMR, 15.000 "Title
         V of the State Environmental Code" for John Allen & Barbara Cordi-Allen, 5
         Yacht Club Road, Truro, Massachusetts

Dear Mr. Dudley:

As you will recall, I met you briefly in Lakeville and picked up a copy of the variance
that had been granted to John Allen & Barbara Cordi-Allen back in January of this year. I have
since recorded that at the Barnstable County Registry of Deeds. I then contacted the Board of
Health in Truro and asked if the septic system installation permit could now issue. I spoke
with Susan Rask, who is acting as the Truro Health Agent. She told me that there were only two
more things that needed to be done before the permit could issue. The first was that the Board
of Health wanted to see a copy of the Notice document that was going to be recorded at the
Registry of Deeds which would put the world on notice that my clients have a variance for the
sewage disposal system, that they will have an alternative system, and that the system must be
specially treated. I believe that what she is referring to appears on page 3 of the Variance, a copy
of which is enclosed. Subparagraph 5, which states "approval for the proposed system will be
dependent upon the recording in the appropriate Registry of Deeds of a Notice that discloses the
existence of a variance for the sewage disposal system, the existence of the Provisional Use
alternative system and the involvement of the Department of Environmental Protection in said
system."

In my conversation with Susan Rask, she indicated to me that the DEP probably had a
boiler plate notice that could be adapted by my clients to meet this Notice requirement. I called
you this morning and left a message, but as of the time of this letter, I have not heard back from
you. Is there a standard form Notice that can be adapted and be used in this instance that will
meet the requirements of the DEP and hopefully, the Truro Board of Health? If there is no such
document, then can you provide me with language which you have seen before on other projects
similar to this and which has proven to be satisfactory?

**0030**

### THOMAS & BAILEY, P.C.

Department of Environmental Protection
February 27, 2001
Page 2

The second point that Susan Rask brought up was that the Plan referred to a January 18, 2000 variance, was a Plan dated August 9, 1999. Apparently, another branch of the DEP has approved the project using a later plan, i.e., one dated December 20, 1999. I am enclosing copies of the August 9, 1999 plan and the December 20, 1999 plan. I am also enclosing a letter from Felco Inc., the engineer on this project, explaining that the December 20 plan dealt with modifications to an existing building and proposed landscaping. The December 20 plan created no additional bedrooms nor did it alter the approved septic system design.

Susan Rask maintains that since one branch of DEP refers to the December 20, 1999 plan and the other branch refers to the August 9, 1999 plan, we have a problem. I can see her point that some confusion does exist, but essentially nothing has changed relative to the septic system in either the August or December plan.

In order to meet Ms. Rask's concerns, would it be possible to have an addendum prepared and attached to the January 18, 2000 variance, which acknowledges that your section of the DEP has reviewed the December 20, 1999 plan and since it creates no new bedrooms and does not alter the approved septic system, the variance of January 18, 2000 is amended to refer to and adopt the December 20, 1999 plan. That addendum could then be recorded at the Registry of Deeds. I do not know why you did not get a copy of the later plan before your decision came out. Please let me have your advice as to how you would handle these matters. Thanks again for your continuing cooperation.

Yours very truly,

William W. Thomas

WWT/js

Enclosures

DEP-2-27-01.let

0031

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

## CLERK'S NOTICE

This document can not be scanned due to its size, or the way in which it was bound.

The original is available for viewing in the Clerk's Office.

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS


## CLERK'S NOTICE


This document can not be scanned due to its size, or the way in which it was bound.

The original is available for viewing in the Clerk's Office.

**EXHIBIT** $12$



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION
20 RIVERSIDE DRIVE, LAKEVILLE, MA 02347 508-946-2700

ARGEO PAUL CELLUCCI
Governor

JANE SWIFT
Lieutenant Governor



BOB DURAND
Secretary

LAUREN A. LISS
Commissioner

April 30, 2001

Ms. Susan Rask, Health Agent
Board of Health
P.O. Box 2030
Truro, Massachusetts 02666

And

Mr. John Allen and Ms. Barbara Cordi-Allen
146 Pleasantview Avenue
Longmeadow, Massachusetts 01106

RE:   TRURO--Subsurface Sewage Disposal-
      Proposed Variance to 310 CMR 15.000
      "Title 5 of The State Environmental
      Code" for   John Allen and Barbara
      Cordi-Allen, 5 Yacht Club Road

      Transmittal No. P24485

Dear Ms. Rask, Mr. Allen and Ms. Cordi-Allen:

On January 18, 2000 the Southeast Regional Office of the Department of Environmental Protection approved variances for a subsurface sewage treatment and disposal system at the above referenced location pursuant to Title 5 of the State Environmental Code, 310 CMR 15.412. Subsequently, modifications were made to the approved plans cited in the approval letter and these revised plans were submitted to the Department for review and approval.

The Department finds that the proposed revisions are consistent with the technical and regulatory issues pursuant to Title 5 that comprised the review and approval of the original application.

Pursuant to Title 5 of the State Environmental Code, 310 CMR 15.412, the Southeast Regional Office of the Department of Environmental Protection has completed its review of revisions to the above referenced application for approval of variances granted by the Truro Board of Health.

The application contains a copy of the Board of Health's grant of a variance from the following provisions of Title 5, 310 CMR 15.00

310 CMR 15.248:  Reserve Area

**0001**

This information is available in alternate format by calling our ADA Coordinator at (617) 574-6872.

DEP on the World Wide Web: http://www.magnet.state.ma.us/dep

2

As part of the application, the Department received plans for the sewage treatment and disposal system consisting of two (2) sheets, titled as follows:

SITE & SEWAGE PLAN
LOCUS: 5 YACHT CLUB ROAD
TRURO, MA

PREPARED FOR: JOHN ALLEN
145 PLEASANTVIEW AVENUE
LONGMEADOW, MA 01105

REFERENCE: ASSR'S MAP 50 PARCEL 21
· SCALE: 1" = 30' DATE: 9-11-96
SHEET NO. 1 OF 2 JOB NO. 96378

12-2-99
BLDG./POOL
8-9-99
3 BR/VAR
5-14-98
5-1-97
3-31-97
REVISIONS

FELCO, INC.
ENGINEERING – LAND SURVEYING
P.O. BOX 1366 ORLEANS, MA 02653
(508) 255-8141 (FAX) 255-2954;

architectural plans for the proposed dwelling consisting of four (4) sheets the first of which is titled:

CUSTOM CONTEMPORARY HOME
JOHN & BARBARA CORDI ALLEN TRURO
ELEVATIONS MILLWORK SCHEDULE
FRAMING SECTION SCALE AS NOTED
NOVEMBER, 1999 LT & JP KELLEY;

and architectural plans for the existing dwelling consisting of one (1) sheet titled:

JOB 1
OCT.14, 99

JOHN & BARBARA CORDI-ALLEN, TRURO
PROPOSED ADDITION FOR GRT. RM + B.R.
SCALE AS NOTED JULY 12,99 J.P. KELLEY

0002

3

Based upon its review of the application, and in accordance with 310 CMR 15.410, the Department has determined both of the following:

a)    The applicant has established that enforcement of 310 CMR 15.211 would be manifestly unjust, considering all of the relevant facts and circumstances of this case. Strict adherence would deprive the applicant of beneficial use of the property in that the applicant is entitled to a sewage flow of 330 gallons per day (gpd) pursuant to 310 CMR 15.005, "Transition Rules".

b)    The applicant has established that a level of environmental protection that is at least equivalent to that provided under 310 CMR 15.000 can be achieved without strict application of 310 CMR 15.211. The applicant has established equivalent environmental protection as follows:

> While space on the lot exists for a reserve area, restricting the location of a replacement system to the area of the primary soil absorption system (SAS) maximizes separation to a sensitive wetland resource area.

The Department, therefore, approves the Board of Health's grant of a variance from 310 CMR 15.211 subject to the following:

1.    Sewage flow is limited to 330 gallons per day (gpd), and the applicant has provided the above referenced architectural plans showing the number of bedrooms at the facility limited to a maximum of three (3) bedrooms.

2.    A Disposal System Construction Permit must be obtained from the Truro Board of Health prior to the start of construction.

3.    Approval of the variance is subject to the applicant receiving a valid Final Order of Conditions under M.G.L. c.131 §40, "The Wetlands Protection Act".

4.    The applicant and all subsequent owners shall comply with all the requirements of the Provisional Use Approval of the Single Home FAST® issued by the Department on April 5, 2000 (copy enclosed) or any successor document.

5.    Approval for the proposed system will be dependent upon the recording in the appropriate registry of deeds of a notice that discloses the existence of a variance for the sewage disposal system, the existence of the Provisional Use alternative system and the involvement of the Department of Environmental Protection in said system. An attested copy of this notice showing the book and page number of the recording shall be submitted to the Department and the Board of Health prior to the issuance of the Certificate of Compliance.

The Department believes that the above referenced location will be a suitable testing facility, for year round operation, to evaluate nitrogen reduction under the Provisional Use Approval. The

4

Department seeks further information regarding the system's ability to meet nitrogen reduction limits when operated on a seasonal basis.

This approval supersedes the Department's approval of January 18, 2000.

*This variance determination is an action of the Department. If the applicant is aggrieved by this determination, s/he may request an Adjudicatory Hearing in accordance with 310 CMR 1.00 and M.G.L. C.30A. A request for an Adjudicatory Hearing must be made in writing and postmarked within 30 days of the date of issuance of this determination. Pursuant to 310 CMR 1.01(6), the request must state clearly and concisely the facts that are grounds for the request and the relief sought.*

*The hearing request, along with a valid check payable to Commonwealth of Massachusetts in the amount of one hundred dollars ($100.00), must be mailed to:*
*Commonwealth of Massachusetts*
*Department of Environmental Protection*
*P.O. Box 4062*
*Boston, MA 02211*

*The hearing request will be dismissed if the filing fee is not paid, unless the appellant is exempt or granted a waiver, as described below. The filing fee is not required if the appellant is a city or town (or municipal agency), county, or district of the Commonwealth of Massachusetts, or a municipal housing authority. The Department may waive the adjudicatory hearing filing fee for a person who shows that paying the fee will create an undue financial hardship. A person seeking a waiver must file, together with the hearing request as provided above, an affidavit setting forth the facts in support of the claim of undue financial hardship.*

Should you have any questions regarding this matter, please contact me at (508) 946-2753.

Very truly yours,

Brian A. Dudley
Bureau of Resource Protection

BAD
Enclosure

cc:    Felco, Inc.
       P.O. Box 1366
       Orleans, MA 02653
       Enclosure

0004

**EXHIBIT** $/3$

# Commonwealth of Massachusetts
## County of Barnstable
## The Superior Court

Civil Docket **BACV2001-00347**

RE:    Truro et al v Department of Environmental Protection et al

TO:    Paul Revere III, Esquire
      226 River View Lane
      Centerville, MA 02630

## CLERK'S NOTICE

This is to notify you that in the above referenced case the Court's action on **03/01/2005**:

*RE: MOTION (Renewed) by Plaintiffs and Deft, Massachusetts*
*Department of Environmental Protection to Remand case to*
*Massachusetts Department of Environmental Protection; opposition*
*of remaining Defendants, John Allen and Barbara Cordi-Allen*
*(Connon, J)*

**is as follows:**

**MOTION (P#17) Remand is not necessary or warranted in light of the issues raised on "The coastal dune" (Richard F. Connon, Justice). Notices mailed March 01, 2005**

Dated at Barnstable, Massachusetts this 1st day of March, 2005.

Scott W. Nickerson,
Clerk of the Courts

BY:

Nancy N. Weir
Assistant Clerk

Telephone: (508) 375-6684

Copies mailed 03/01/2005

cvdresult_2.wpd 427494 mottext bearseli

**EXHIBIT** /4

## COMMONWEALTH OF MASSACHUSETTS

Barnstable, ss

Superior Court
Civil Action No. 01-347

|  |  |
|---|---|
| **TOWN OF TRURO and** \*<br>**GARY PALMER, RAYMOND** \*<br>**LEDUC, MARK PETERS, and** \*<br>**HERBERT W. STRANGER, JR.,** \*<br>**as they constitute the TOWN OF** \*<br>**TRURO BOARD OF HEALTH,** \*<br>**Plaintiffs,** \*<br> \*<br>**v.** \*<br> \*<br>**COMMONWEALTH OF** \*<br>**MASSACHUSETTS DEPARTMENT** \*<br>**OF ENVIRONMENTAL** \*<br>**PROTECTION, JOHN ALLEN, and** \*<br>**BARBARA CORDI-ALLEN,** \*<br>**Defendants** \*<br> \* | **PLAINTIFFS' MOTION FOR**<br>**JUDGMENT ON THE**<br>**PLEADINGS** |

Pursuant to Rule 12(c) of Massachusetts Rules of Civil Procedure, the Town of Truro

and Gary Palmer, Raymond Leduc, Mark Peters, and Herbert W. Stranger, Jr., as they constitute

the Town of Truro Board of Health, plaintiffs in the above-caption civil action, respectfully

move this Court to enter in their favor a judgment on the pleadings.

In support of their motion, the plaintiffs contend that the Department's decision granting

the Allen's variances was in excess of its statutory authority, based upon an error of law, made

upon unlawful evidence, unsupported by substantial evidence, and arbitrary and capricious. The

Department erred in granting the variances because the record does not support a finding that

enforcement of Title 5 would be manifestly unjust, that the variances would provide a level of

environmental protection equivalent to Title 5, or that the Allens would be deprived of

substantially all beneficial use of their property.  The decision was also legally erroneous

because the Department did not determine the number of bedrooms in accordance with the definition 310 CMR 15.002, which would result in a count of at least five bedrooms on the property due to the fact that the plans show a total of a least ten rooms. Finally, the variance approval is now invalid because it was originally conditioned upon compliance with the Wetlands Protection Act, a condition the Department contends cannot now be met. In light of all of the foregoing, therefore, the Department's decision should be reversed.

WHEREFORE, the plaintiff Town of Truro and Truro Board of Health, respectfully request this Court to grant their motion and enter in their favor a judgment on the pleadings. In further support hereof, the Plaintiffs file simultaneously herewith the original of the *Memorandum in Support of Plaintiffs' Motion for Judgment on the Pleadings.*

> Respectfully submitted,
> Plaintiffs,
> By their attorneys,
>
> SARAH A. TURANO-FLORES
> BBO # 565114
> KARA A. LAMB
> BBO # 660503
> Zisson and Veara
> 828 Main Street; P.O. Box 2031
> Dennis MA 02638
> (508) 385-6031

2

## **CERTIFICATE OF SERVICE**

Barnstable, ss.                                                                     March 31, 2005

I, Sarah A. Turano-Flores, of the law firm of Zisson & Veara, hereby certify that I have notified Paul Revere, attorney for the Defendant John Allen and Defendant Barbara Cordi-Allen and Romeo Camba, Assistant Attorney General, Attorney for the Defendant Department of Environmental Protection, of the within **PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS** by delivering a copy of the same to them, postage pre-paid, at their respective offices: Romeo Camba, Assistant Attorney General, One Ashburton Place, Room 2019, Boston MA 02108; and Paul Revere, III, 226 River View Lane, Centerville MA 02632.

SARAH A. TURANO-FLORES

3

**EXHIBIT** $\underline{15}$

Form WD 54
1M — 9-'56 — 621894

1077
598

# The Commonwealth of Massachusetts

No. 4304.



**Whereas.** John C. Worthington,---------------------------------------

of Truro-------------- , in the County of Barnstable----------- and Commonwealth
aforesaid, ha s applied to the Department of Public Works for license to  build and
maintain a timber pier and install floats in Pamet River, at his property in
the town of Truro,-------------------------------------------------------------
and ha s submitted plans of the same; and whereas due notice of said application, and of
the time and place fixed for a hearing thereon, has been given, as required by law, to the
Selectmen---------------- of the   town---------of   Truro------------------;

**Now** said Department, having heard all parties desiring to be heard, and having fully
considered said application, hereby, ~~subject to the approval of the Governor and Council~~,
authorizes and licenses the said-----------------------------------------------

John C. Worthington----------------------------, subject to the provisions of the ninety-
first chapter of the General Laws, and of all laws which are or may be in force applicable
thereto, to  build and maintain a timber pier and install floats in Pamet River,
at his property in the town of Truro, in conformity with the accompanying plan
No. 4304.

A pile and timber pier may be built extending westerly into tidewater a
distance of 47 feet from the mean high water line with a width of 3 feet at
the deck, in the location shown on said plan 55 feet from the southerly prop-

erty line of the licensee and in accordance with the details of
construction there indicated.

A series of six 4-foot by 10-foot floats held by piles may be
placed 10 feet off the end of said pier extending channelward a
further distance of 60 feet with a width of 4 feet and reached by
a ramp from said pier and a seventh float 4 feet by 10 feet may be
placed as a T at the end of said series of floats, in the locations
shown on said plan and in accordance with the details there indicated.

This license is granted subject to all applicable Federal, State,
County and Municipal laws, ordinances and regulations, and upon the
express condition that use by boats or otherwise of the structures
hereby licensed shall involve no discharge of sewage or other polluting
matter into the adjacent tidewaters except in strict conformity with
the requirements of the local and State health departments. ---------

The plan    of said work, numbered ————— 4 3 0 4 , ————— is on file in the office of said Department, and duplicate    of said plan    accompanies this License, and is    to be referred to as a part hereof.

~~The amount of tide-water displaced by the work hereby authorized shall be ascertained~~ by said Department, and compensation therefor shall be made by the said

heirs, successors

~~and assigns, by paying into the treasury of the Commonwealth~~ ————— cents for each cubic yard so displaced, being the amount hereby assessed by said Department.

Nothing in this License shall be so construed as to impair the legal rights of any person.

This License shall be void unless the same and the accompanying plan    are recorded within one year from the date hereof, in the Registry ————— of Deeds for the ————— ~~District of the~~ County of    Barnstable.

In Witness Whereof, said Department of Public Works have hereunto set their hands this ————— eighteenth ————— day of    April, ————— in the year nineteen hundred and    sixty.

Approval recommended,



Department of
Public Works

Director Division
of Waterways.

Barnstable, ss., Received May 23, 1960, and is recorded.

BARNSTABLE COUNTY
REGISTRY OF DEEDS
A TRUE COPY, ATTEST
JOHN F. MEADE REGISTER

1077
599

—————————————

We, Malcolm D. MacLeod and Virginia V. MacLeod, husband and wife, as tenants by the entirety,
30 Fimball Road,
of    Arlington,                    Middlesex        County, Massachusetts,
~~being, xxxxxxxxx~~ for consideration paid, grant to    Lawrence R. Sherman and Eloise B. Sherman, husband and wife, as tenants by the entirety,

of  Lower County Road, Dennisport, Massachusetts,  with quitclaim covenants
the land in Dennis (Dennisport), Barnstable County, Massachusetts, bounded and described as    (Description and encumbrances, if any)    follows:
            Parcel one:
Southerly by the Northerly sideline of First Mate Row, Sixty (60) feet;
Westerly  by Lot 2, One hundred (100) feet;
Northerly by Lot 7 and Lot 6, Sixty (60) feet; and
Easterly  by Lot 4, One hundred (100) feet. Containing an area of 6000 square feet, more or less.
            Parcel two:
Southerly by the Northerly sideline of First Mate Row, Thirty (30) feet;
Westerly by Lot 3, One hundred (100) feet;
Northerly by Lot 6 and Lot 5, Sixty five and 44/100 (65.44) feet;
Easterly  by the Westerly sideline of Lorree Lane, Seventy and 15/100



155-97   F-1

BARNSTABLE
REGISTRY OF DEEDS
MAY 23 1960
8 H — M Q M
RECORDED

PAMET RIVER

BOAT RAMP
CONT.NO.7735
M.O.P.W. WATERWAYS

TOWN OF TRURO
EXTENSION OF DEPOT RD.

JOHN C. WORTHINGTON

RT. OF WAY

R.T. OF LOCATION N.Y.N.H. & H. R.R.

242'

C.B.

DR. FRANK G. MAGUIRE
MONSON, MASS.

PLAN
SCALE-FEET 100
1"=100'

CAPE COD BAY

TOM HILL

RIVER
PAMET

LOCUS

TRURO

N.Y.N.H.&H.R.R.

41°59'

SCALE-FEET 3000
1:31680
SEE U.S. GEOL. SURVEY
WELLFLEET QUADRANGLE

NOTE
ELEVATIONS ARE IN FEET AND
TENTHS ABOVE THE PLANE OF
MEAN LOW WATER.

47'
65'    10'    80'

2"x10" FLOATS FASTENED TOGETHER
WITH CHAINS & EYE BOLTS

GANG PLANK

FLOAT MOORING PILES

PLAN DETAIL A
SCALE-FEET 30

65'    10'    80'

PROFILE
SCALE-FEET 30
1" = 30'

SECTION A-A
SCALE-FEET 5
1"=5'

BARNSTABLE COUNTY
REGISTRY OF DEEDS
A TRUE COPY, ATTEST
JOHN F. MEADE, REGISTER

PLAN ACCOMPANYING PETITION OF
JOHN C. WORTHINGTON
TO BUILD A TIMBER PIER & INSTALL FLOATS
IN
PAMET RIVER
TRURO
- JANUARY 1960

LICENSE PLAN NO. 4304
APPROVED BY DEPARTMENT OF PUBLIC WORKS
APRIL 18, 1960
COMMISSIONER OF
PUBLIC WORKS

ASSOCIATE
COMMISSIONERS

DIRECTOR, DIVISION
OF WATERWAYS.

Plan-Book 155 Page 97    F-1

**EXHIBIT** _16_





Commonwealth of Massachusetts
Executive Office of Environmental Affairs

# Department of Environmental Protection

William F. Weld
Governor
Trudy Coxe
Secretary, EOEA
David B. Struhs
Commissioner

BUREAU OF RESOURCE PROTECTION                    FAX: (617) 292-5696

## FAX TRANSMITTAL SHEET

FROM:    **A. Margaret Finn**

TO:    **David Lajoie**

FAX #:    **(508) 255-2954**

DATE:    **8/1/95**

# PAGES:    **3**

COMMENTS:    Regarding that property in Truro adjacent to the town boat ramp, I sent out the attached jurisdictional determination. Replacement of the floats would require a new license (maybe not new plans). Zoning approval for that will be a problem. I can be reached today (617) 556-1146.



Commonwealth of Massachusetts
Executive Office of Environmental Affairs

# Department of
# Environmental Protection

William F. Weld
Governor
Trudy Coxe
Secretary, EOEA
David B. Struhs
Commissioner

July 28, 1995

Stephen D. Stoller
Financial Enterprises Corp.
510 Chapman Street
Canton, MA 02021

Re:    Waterways License No. 4304 issued April 18, 1960
       5 Yacht Club Road (Parcel C), Pamet River, Truro

Dear Mr. Stoller:

The Waterways Regulation Program has reviewed a copy of your letter
to the Truro Conservation Commission regarding your intent to replace
the handrails and planking on the existing pier at 5 Yacht Club Road
in Truro.    The Town of Truro Building Commissioner called us
requesting to know whether this activity requires a license or other
authorization pursuant to MGL Chapter 91, the Public Water Front Act,
and its regulations, 310 CMR 9.00.    There was a site inspection
conducted on July 27, 1995 to view the structure.  Upon review of the
information provided to us, it has been determined:

____ The information provided by you is not sufficient to make a
     determination and you must provide the following:

____ A Waterways License or other authorization is required.
     Accordingly, please accurately  complete all appropriate forms
     and supporting documentation required in the enclosed application
     package.

_X_ The proposed activity of replacing the handrails and planking of
     the existing 3' X 80' pier does not require a new Waterways
     License or other Chapter 91 authorization (although you may be
     required to obtain other state, local, or federal
     authorizations). Chapter 91 License No. 4304 issued April 18,
     1960 (copy enclosed) and recorded at the Barnstable County
     Registry on May 23, 1960 authorized the construction and
     maintenance of this pier.

The Building Commissioner indicated that the ramp and seven floats
shown on License No. 4304 have not been in place since the late '60s
or early '70s.  Therefore, the portion of the license authorizing
these structures has expired pursuant to 310 CMR 9.25 (1)(c).
Replacement of the ramp and floats would require a new license from

One Winter Street    •    Boston, Massachusetts 02108    •    FAX (617) 556-1049    •    Telephone (617) 292-5500

AUG 02 '94 ___ 03:45 PM

UG. -01' 95(TUE) 10:31  DEP-BRP                    TEL:617-292-5696

Page    2

P. 003

this office.

This jurisdictional determination, however, is subject to change
based on additional information or changed circumstances. Should you
have any questions with regard to this jurisdictional determination,
please feel free to contact me at (617) 556-1146.

Sincerely,

A. Margaret Finn

A. Margaret Finn
Licensing Engineer
Waterways Regulation Program

cc:   Truro Conservation Commission
      Truro Harbormaster
      Truro Building Commissioner, Stephen Williams

**EXHIBIT** $\underline{17}$

# 'Whistleblowing' Harbormaster Called on the Carpet by Board

**By Joyce Johnson**

TRURO—Selectmen Tuesday night said they would not accept resignations of three members of the Pamet Harbor Commission who quit following a stormy meeting last week where they were highly criticized by harbormaster Warren Roderick.

Selectmen have received a written of resignation from chairman Vincent Rennert and alternate David Kelly but as of Tuesday had not received one from secretary Eleanor Fortini, the former chairman, who verbally resigned at last Tuesday afternoon's commission meeting and walked out.

Town Administrator Roland Breault said another member's resignation, that of Reuben Wisotzky, "was pending," depending on the outcome of the selectmen's meeting.

Tuesday night Mr. Roderick, the town's harbormaster for five years, took his allegations one step further, accusing Mr. Breault of being influenced by Mr. Rennert into writing a letter to the state Department of Environmental Protection, "taking paragraphs" from a letter Mr. Rennert had asked Mr. Roderick to send.

"I am blowing the whistle on everyone," Mr. Roderick said.

The letter asks the state not to reinstate a license issued in 1960 for a pier at a cottage next to the Pamet Harbor Yacht & Tennis Club until a public hearing is held.

Mr. Rennert is a longtime member of that club.

(The cottage was formerly owned by the Worthington family and more than 20 years ago had a 75- foot pier/float. The current owner, Barbara M.

(Continued on Page 18)



Truro harbormaster Warren Roderick holds the letter that could play a critical role in the continuing saga of the Pamet Harbor Commission. At a commission meeting this week, he repeated his allegations of misconduct.          Staff Photos by Joyce Johnson

# Harbor Master Reprimanded

TRURO—Harbormaster Warren Roderick will receive a letter of reprimand from Town Administrator Roland Breault following two public meetings during which Mr. Roderick strongly criticized the Pamet Harbor Commission, to which he is a consultant.

Three members of the commission have been on the brink of resigning due to the allegations, which included charges that chairman Vincent Rennert had written a fraudulent letter to the state regarding an unlicensed town mooring field in Pamet Harbor and had acted on harbor concerns without the knowledge or consent of some members of the commission.

The letter of reprimand criticized Mr. Roderick for the way he treated the committee and for overstepping the bounds of his authority.

Mr. Breault, the appointing authority for harbor master, told selectmen Tuesday night that he had spoken with Mr. Roderick for an hour and a half and reviewed with him procedures he would like to see him follow in the future regarding harbor matters. He has asked Mr. Roderick to give him a list of his allegations in writing with backup documents by the end of February, and, by Feb. 11, the date of the next harbor commission meeting, recommendations for his own job description, with laws referenced, as well as his recommendations for the layouts of the mooring fields.

Selectman Robert Martin said yesterday that he had no comment on the letter of reprimand.

"I would like to see it before I comment," he said. "I feel it is in order, but to what degree is another thing. I wish that if it was an ongoing problem for at least seven months that it had been brought to selectmen sooner.

"I cannot believe it happened and especially in the manner that it did." **J.J.**

# Harbormaster forces resignations from Pamet Harbor Commission

Truro Harbormaster Warren Roderick charged members of the Pamet Harbor Commission Tuesday night with holding an illegal meeting on January 8 with the town administrator, an accusation that led Eleanor Fortini, commission secretary, to resign and leave the meeting.

Minutes after she left, Roderick demanded that the commission take a vote of confidence in Vincent Rennert as chairman. The commission then declared Rennert to no longer be chairman. Commissioners Tom Kane and Joe Cook voted no confidence in him. Commissioner Clem Silva cast the only vote of confidence in Rennert.

"That was nicely orchestrated," Rennert said to Roderick as he left the room after the vote.

Roderick, whose voice cracked at times as he shrilly made accusations about Rennert sabotaging the dredging project, acknowledged Rennert's parting comment by saying ,"Thank you, sir. It's all for the best of the town."

Hardly, said Bruce Tarvers, former selectman. He said he was "ashamed" that no one on the commission spoke against Fortini's resignation nor challenged the vote of no confidence.

"We've heard a lot about loose cannons tonight," said Tarvers, a term that Roderick used to describe Rennert.

"We've seen a loose cannon in action," Tarvers said about Roderick. "I'm ashamed that we sat here and let a woman who has given eight years to the Pamet Harbor Commission resign without any member of the commission protesting. To me, that's a damn shame."

Roderick, Tarvers said, is a "well-meaning harbormaster who all of a sudden knows what his job is and feels that nobody else does and that people are ready to take advantage of him. But I for one, don't believe that."

Fortini and Rennert are not "out to

He said he will resign. "The harbor commission will be reconstructed in the image they want. It'll be different and I wish them luck," he said. "We'll hope that things go well." Fortini resigned over the implication that she willingly violated the Open Meeting Law by attending a work session in Town Administrator Bud Breault's office on January 8. The meeting was not posted, Roderick said.

"I apologize if I broke the law by attending that meeting," she said. "I have no intention of doing anything that would harm the integrity of the harbor commission. I thought it was a work session and I did not realize that there was a quorum. Why don't we just put a noose around my neck and hang me," she said.

But Roderick saw no humor in the situation, warning that a complaint could be filed with the district attorney for this violation of the law.

"Put me in jail. I deserve it," Fortini said. "I broke the law inadvertently. This is ridiculous."

"I don't think it is ridiculous," Roderick said. "I think the town administrator was conducting secret meetings in his office," he said. Absent from the meeting were those commissioners who aren't in favor of proposed charter changes that would affect his authority as harbormaster, he said.

On hearing that other commissioners felt this way Fortini said, "I can solve the problem. I'll resign right now. I cannot operate on a commission that has no faith in me, a commission that feels I've subverted the intention of the town. I've spent eight years and I've done all that I can. I feel very badly about this."

"You're losing a very good member," Jeanne Davis told the commission.

"Obviously, everyone doesn't feel that way," Fortini said. "I've never quit a job before, but I've been accused of things



At left is the first page of a letter sent to the state Division of Wetlands and Waterways on Town of Truro stationery and signed by harbormaster Warren Roderick. The letter asks the state not to issue a state a license for a 75-foot-long pier as requested by Pamet Harbor landowner Barbara N. Cordi-Allen unless there is a public hearing first. Mr. Roderick alleges the letter was written by Truro Town Administrator Roland Breault, at the request of Pamet Harbor Commission chairman Vincent Rennert, after Mr. Roderick refused to do so. Mr. Rennert is a member of the Pamet Harbor Yacht Club, which abuts the Cordi-Allen property. Mr. Roderick said he allowed the letter to go out with his signature in a moment of weakness, feeling he would not get a raise if he did not.

"It shows how I was being dragged into the maelstrom here," Mr. Roderick told The Cape Codder Wednesday. "Now I am in too deep. I have to go forward."

The letterhead at top, center, is what Mr. Roderick uses for harbor business. The page at far right indicates that Mr. Roderick was also on the list for a copy of the letter, even though he signed it. The middle page shows Mr. Roderick's signature.

At the selectmen's meeting Tuesday, Mr. Roderick said Mr. Breault put the letter together with paragraphs from a letter composed by Mr. Rennert and asked Mr. Roderick to sign it. Mr. Roderick said that though the pier would impact negatively on several town moorings, it is his duty to watch out for the interests of all citizens. He said th

Mr. Breault did not respond to the charges at the meeting.

get you," Tarvers said. "They said they are willing to work with you. I think what you are doing right now is destroying the harbor commission that, whether you agree with it or not, is well meaning and has nothing but the best interest of Truro in mind."

There was no need for such a "confrontational meeting," Tarvers said. Roderick has the law on his side as to his responsibilities. The harbor commission also has certain authority under the bylaw that created it. Until the charter is changed, conflict will exist, he said.

Roderick said he has been in conflict with the commission for the five years he's served as harbormaster. Now is the time to get the selectmen to change the makeup of the commission to include more than the recreational boaters, he said.

Rennert said after the meeting he will resign from the commission.

The meeting, with 30 people present, obviously was "quite a railroading," he said. "It was very well orchestrated and beautifully done by the harbormaster.

"I listened to his tirade, to his pointing at me and accusing me of being a loose-cannon and tossing all kinds of things on the table and I was literally speechless. I was dumbfounded to find this sort of show going on. Clearly, it was a well-run operation."

He said he felt badly about the way Fortini was treated. "That dear woman put the harbor management plan together and did more to serve the interests of the town regarding the harbor than anybody I know. I don't think she deserved this treatment."

by the harbormaster this week that are not true and I can't abide it."

Roderick continued, charging that Rennert, by writing to the dredging company last year, created a litigious situation that resulted in Truro getting far less money for the project than anticipated.

He said Rennert and Selectman Robert Martin, chairman, faced criminal fraud charges for giving the Army Corps of Engineers a fraudulent document claiming that a mooring field was privately owned when in fact the town owned it.

Rennert and Martin "were going to be charged with criminal fraud but we got out of that because we worked a deal and we sold those moorings to the people who had been using them," Roderick said.

He said he had documents to prove all of his allegations and would gladly share them.

"I'd like you to make all documents available to me, and that's not a request. That's an order," Breault said.

David Ditacchio, a Truro resident and the Provincetown marine superintendent, said the harbor commission, as an advisory board, should let Roderick take over the operation of Truro Harbor. Breault said the proposed charter changes that were the subject of the work session were intended to do that. "That was exactly where we were heading," Breault said. "We weren't looking for an insurrection tonight. We were looking for input from the harbormaster on the draft charter so he would have the power he's supposed to have, but we've gotten completely off track."

**EXHIBIT** _18_

CENAE-CO-R                                          July 23, 1998

MEMORANDUM FOR RECORD

SUBJECT:  Barbara Cordi-Allen - 199602255; Meeting

1.  Karen Adams and I had a meeting at 3:30 yesterday at the DEP in Lakeville with town officials, Mrs. Cordi-Allen's attorney (William Henchey) and the DEP.  The attendance sheet is enclosed.

2.  The following issues were raised and discussed:

   a.  The DEP is willing to allow us to either attend of participate in their joint hearing.  Potential meeting date is August 19th or 20th.  The DEP would like to have the plans by the last day of July so they can get them advertised in time.

   b.  Andrea Langhauser, DEP, stated to Mr. Henchey that she has a problem with floats going into an "established course of vessels".  She stated that an established course of vessels isn't defined in the DEP regs.

   c.  We asked what the Town's concerns were with two plans (Enclosed) labeled "1 GRP" and "2 GRP".

      - The town attorney stated that any interference with navigation is still their concern.  He stated that plan 1 impedes navigation.

      - Nick Brown, Pamet Harbor Commission stated that plan 2 is obviously better than 1.  He stated that 90% access is still too much tidal access when others don't have that.  Mr. Henchey questioned whether property owners should be allowed more frequent tidal access than non property owners.

      - The ConCom representative stated that boats resting on the bottom in this area are generally acceptable.  He stated that he would have to look at the application more closely before stating whether or not he can approve it.

      - Bud Breault stated that he would like to have any extension floating so it could be removed on an annual basis.

      - The harbormaster stated that the previous owner only had a 16' tee, a 40' extension from the existing pier seems more reasonable  and wouldn't interfere with navigation (all the town people concurred), and that plan 1 will affect 2-3 moorings while plan 2 will affect about 2 moorings with a 30' tee or 1 mooring w/ a 16' tee.

3.  Point of contact is the undersigned.

                                            Greg Penta



**DEPARTMENT OF THE ARMY**
NEW ENGLAND DISTRICT, CORPS OF ENGINEERS
696 VIRGINIA ROAD
CONCORD, MASSACHUSETTS 01742-2751

July 24, 1998

REPLY TO
ATTENTION OF

Regulatory Branch
CENAE-CO-R-199602255

Mrs. Barbara Cordi-Allen
146 Pleasantview Avenue
Longmeadow, Massachusetts 01106

Dear Mrs. Cordi-Allen:

This pertains to your pending application to extend floats approximately 106' from your existing pier with an 80' tee as shown on the plan at Enclosure 1. In light of the record which reflects comments to our public notice and a meeting on July 15, 1998 with Truro town officials, abutters, and affected moorings holders, it is unlikely we can issue a permit for the pier as proposed. Issues raised include:

Navigation It would be contrary to the public interest with respect to restricting navigation in this crowded harbor having little water at low tide. A riparian landowner's general right of access to navigable water of the United States is subject to the similar rights of access held by nearby riparian landowners and to the general public's right of navigation on the water surface. The National Park Service (NPS) has expressed concern with the structure extending into the low flow (low tide) channel. The Pamet River (the NPS has indicated this may include Pamet Harbor) is listed on the nationwide rivers inventory as a potential wild and scenic river.

Considerations of property ownership The current proposal would interfere with the northern landowner's right to construct a pier.

Needs and welfare of the people: The current proposal does not conform with the 1994 Truro Comprehensive Plan nor the 1994 Pamet Harbor Management Plan which oppose development that interferes with traditional public rights of way/encroachment into navigational channels, character typical of the area, or causes loss of water dependent use without public benefit.

Land Use The proposed structure is out of character with the existing uses of and structures within the area. In addition, the Pamet River is listed on the nationwide rivers inventory as a potential wild and scenic river.

Economics Abutter believes aesthetic impacts would be adverse and decrease their property values/aesthetics.

-2-

We are prepared to issue a permit for a shorter pier as shown on the plan at Enclosure 2. This pier and float would extend to the mean low water line and be consistent with the adjacent yacht club pier. It would also allow for abutters who may wish to apply for similar facilities in the future. We have provided this modified plan to expedite the approval of a pier permit.

Please let us know if this is acceptable to you. If it is acceptable, we would like to have the opportunity of attending the state public hearing to be sure we fully understand the public comments before issuing our permit.

If you have any questions please write to Mr. Greg Penta of my staff at (978) 318-8862, (800) 343-4789, or (800) 362-4367 if calling within Massachusetts.

Sincerely,

Karen Kirk Adams
Chief, Permits and Enforcement Section
Regulatory Branch

Enclosures

Copies Furnished:

Honorable William D. Delahunt, 146 Main Street, Hyannis, Massachusetts
    02601-3128, ATTN: Mark Forest
Honorable Richard E. Neal, 1550 Federal Building, Springfield,
    Massachusetts 01103, ATTN: David Keaney
U.S. Army Corps of Engineers, Inspector General, 7701 Telegraph Road,
    Kingman Building, Alexandria, Virginia 22315-3863
Honorable Mary S. Rogeness, State Representative, 22 Warren Terrace,
    Longmeadow, Massachusetts 01106
Honorable Shirley Gomes, State Representative, 15 Ridgevale Road, South
    Harwich, Massachusetts, 02661-0372
Ms. Andrea Langhauser, DEP Southeast Regional Office, Wetlands Division,
    20 Riverside Drive, Lakeville, MA 02347, ATTN: Mr. Ron Potter
Mr. Bud Breault, Town of Truro, P.O. Box 2030, Truro, Massachusetts
    02666
Mr. William Henchey, 165 Cranberry Highway, Orleans, Massachusetts
    02653



BROOKE NEWMAN
273 ROARING FORK DRIVE
ASPEN, CO 81611

## LOCATION MAP
### SCALE : 1"= 2000'
WELLFLEET QUADRANGLE
MEAN LOW WATER DATUM

JOHN E. ALLEN &
BARBARA-CORDI ALLEN
146 LONGMEADOW AVE.
LONGMEADOW, MA 01106

PAMET
HARBOR

(4) 6' x 20' FLOATS
(PILE SUPPORTED)

6' x 10' FLOAT

FLOOD
EBB

186' OVERALL

70' PROP. PIER
(PERMANENT)

80' EXIST. PIER
(PERMANENT)

PIER PER LIC. #4304 DATED APRIL 1960

ABOUT
MEAN HIGH
WATER

SALT

MARSH

DECK

EXIST.
DWELL

WAY

A=141.37'
R=30.00'

EXISTING
BUILDING

PATIO        DECK

54.94

RAMP
25'

PAMET HARBOR YACHT CLUB, INC.
7 YACHT CLUB ROAD
TRURO, MA 02666

50'    25'    0              50'

## PLAN
SCALE 1"=50'

MOORING BASIN LIMIT
SEE DEPARTMENT OF
ENVIRONMENTAL
MANAGEMENT
CONTRACT No. 3275

WATERWAYS
LICENSE #4748

## FELCO, INC.
### ENGINEERING    LAND SURVEYING
### ORLEANS, MA

JOB No. 96378          SHEET  1  OF  1

## PLAN TO ACCOMPANY PETITION OF
### JOHN E. ALLEN &
### BARBARA-CORDI ALLEN

TO AMEND LICENSE #4304 FOR AN EXISTING PIER,
RAMP, AND FLOAT ASSEMBLY IN AND OVER THE
WATERS OF PAMET HARBOR, TRURO, MA

REV. JUNE 2, 1998
REV. MAY 20, 1998.
FILE NO. 96378LP.DWG    MAY 5, 1998

## PRELIMINARY COPY

ENCL 1



PROPOSED PIER TO BE PILE SUPPORTED
PIER TO BE ELEVATED 4' MIN. ABOVE
SALT MARSH

BOAT RAMP

BROOKE NEWMAN
273 ROARING FORK DRIVE
ASPEN, CO 81611

ABOUT
MEAN HIGH
WATER

SALT

B6' OVERALL

26'   4' X 70' PROP. PIER
(PERMANENT)
RAMP

(4) 6' X 20' FLOATS
(PILE SUPPORTED)

6' x 10' FLOAT

80' EXIST. PIER
(PERMANENT)
14 APRIL 1960

4' X 70' (Comp. Pier)
6' x 30' Float

MARSH

PAMET
HARBOR

MOORING BASIN LIMIT
SEE DEPARTMENT OF
ENVIRONMENTAL MANAGEMENT
CONTRACT No. 3275

**LOCATION MAP**
SCALE : 1" = 2000'
WELLFLEET QUADRANGLE
MEAN LOW WATER DATUM

JOHN E. ALLEN &
BARBARA-CORDI ALLEN
145 LONGMEADOW AVE.
LONGMEADOW, MA 01106

A=141.37'
R=30.00

DECK

EXIST.
DWELL

WA

54.94

EXISTING
BUILDING

PATIO      DECK

PAMET HARBOR YACHT CLUB, INC.
7 YACHT CLUB ROAD
TRURO, MA 02666

50'      25'      0      50'

**PLAN**
SCALE 1"=50'

WATERWAYS
LICENSE #4748

**FELCO, INC.**
ENGINEERING   LAND SURVEYING
ORLEANS, MA

JOB No. 96378          SHEET  1  OF

**PRELIMINARY**

PLAN TO ACCOMPANY PETITION OF
**JOHN E. ALLEN &
BARBARA-CORDI ALLEN**

TO AMEND LICENSE #4304 FOR AN EXISTING PIER,
RAMP, AND FLOAT ASSEMBLY IN AND OVER THE
WATERS OF PAMET HARBOR, TRURO, MA

ENCL 2

**EXHIBIT** /9





FYF

This is Brooke Newman's property before fill!!

Saul

**EXHIBIT** 20



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
SOUTHEAST REGIONAL OFFICE

*original w/ Jane*
*the made copy for Bd Health*

JUN - 8 2000

**ARGEO PAUL CELLUCCI**
Governor

**JANE SWIFT**
Lieutenant Governor

BOB DURAN
Secreta

LAUREN A. LIS
Commission

John Allen & Barbara Cordi-Allen
146 Pleasantview Ave.
Longmeadow, Massachusetts 01106

RE: TRURO—Wetlands
    File No. SE 75-371
    Superseding Order
    of Conditions

Dear Mr. Allen & Mrs. Cordi-Allen:

Following an in-depth review of the above-referenced file and in accordance with Massachusetts General Laws, Chapter 131, Section 40, the Department of Environmental Protection has issued the enclosed Superseding Order of Conditions. This Order approves the proposed project subject to certain conditions. The Department has determined that the project area is significant to the statutory interests of flood control and storm damage prevention.

The project proposes the construction of a single family dwelling, septic system with a FAST unit, deck, pool, garage, driveway and related appurtenances. The existing one bedroom dwelling is proposed to be elevated and slightly relocated. The proposed construction would occur within the 100 foot buffer zone to a Coastal Bank (310 CMR 10.30) and within Land Subject to Coastal Storm Flowage (310 CMR 10.04). The Federal Emergency Management Agency (FEMA) has mapped this area as subject to coastal storm inundation up to elevation 12 (Zone A4).

The enclosed Superseding Order of Conditions contains requirements to protect the interests of the Act. It is the opinion of the Department that, as conditioned herein, the proposed project adequately protects the interests of the Act.

In the opinion of the Department, the reasons given here are sufficient to justify this Superseding Order of Conditions. However, the Department reserves the right, should there be further proceedings in this matter, to raise additional issues and present further evidence as may be appropriate.

-2-

If you have any questions or need additional information, please contact <u>Jim Mahala</u> at (508) 946-2806.

Very truly yours,

*Elizabeth A. Kouloheras*

Elizabeth A. Kouloheras, Chief
Cape Cod Watershed

K/JM
Enclosure

CERTIFIED MAIL Z 539 133 589
RETURN RECEIPT REQUESTED

cc:    Truro Conservation Commission

. 310 CMR 10.99

**Form 5**

DEP File No. | SE 75-371 |

(To be provided by DEP)

*Commonwealth of*
*Massachusetts*

City/Town Truro

Applicant   John E. Allen & Barbara Cordi-Allen

### Superseding Order of Conditions
### Massachusetts Wetlands Protection Act
### G.L. c.131, §40

From: Department of Environmental Protection

To: John E. Allen & Barbara Cordi-Allen _____(Name of Applicant)

Address: 146 Pleasantview Ave., Longmeadow, MA 01106 _____(applicant)

To: same _____(Name of Property Owner)

Address: same _____(owner)

This Order is issued and delivered as follows:

☐   by hand delivery to applicant or representative on _____(date)

☒   by certified mail, return receipt requested on _____ **JUN - 8 2000** _____(date)
                                                        Z 539 133 589

This project is located at  5 Yacht Club Road

The property is recorded at the Registry of Deeds, Barnstable

Book  7348

Page   86

Certificate (if registered)

The Notice of Intent for this project was filed on   7/23/96 _____(date)

The public hearing was closed on _____(date)

**Findings**

The  Department of Environmental Protection  has reviewed the above-referenced Notice of Intent and plans and has

held a public hearing on the project. Based on the information available to the  Department of Environmental Protection

at this time, the  Department of Environmental Protection  has determined that the area on which the proposed work is to

be done is significant to the following interests in accordance with the Presumptions of Significance set forth in the

regulations for each Area Subject to Protection Under the Act (check as appropriate):

☐  Public water supply      ☒  Flood control              ☐  Land containing shellfish
☐  Private water supply     ☒  Storm damage prevention    ☐  Fisheries
☐  Ground water supply      ☐  Prevention of pollution    ☐  Protection of wildlife habitat

Total Filing Fee Submitted $55.00 _____   State Share $15.00

City/Town Share $40.00 _____              (1/2 fee in excess of $25)

Total Refund Due $ 0 _____City/Town Portion $ 0 _____  State Portion $ 0

                              (1/2 total)                      (1/2 total)

Therefore, the Department of Environmental Protection hereby finds that the following conditions are necessary, in accordance with the Performance Standards set forth in the regulations, to protect those interests checked above. The Department of Environmental Protection orders that all work shall be performed in accordance with said conditions and with the Notice of Intent referenced above. To the extent that the following conditions modify or differ from the plans, specifications or other proposals submitted with the Notice of Intent, the conditions shall control.

**General Conditions**

1. Failure to comply with all conditions stated herein, and with all related statutes and other regulatory measures, shall be deemed cause to revoke or modify this Order.

2. The Order does not grant any property rights or any exclusive privileges; it does not authorize any injury to private property or invasion of private rights.

3. This Order does not relieve the permittee or any other person of the necessity of complying with all other applicable federal, state or local statutes, ordinances, by-laws or regulations.

4. The work authorized hereunder shall be completed within three years from the date of this Order unless either of the following apply:
   (a) the work is a maintenance dredging project as provided for in the Act; or
   (b) the time for completion has been extended to a specified date more than three years, but less than five years, from the date of issuance and both that date and the special circumstances warranting the extended time period are set forth in this Order.

5. This Order may be extended by the issuing authority for one or more periods of up to three years each upon application to the issuing authority at least 30 days prior to the expiration date of the Order.

6. Any fill used in connection with this project shall be clean fill, containing no trash, refuse, rubbish or debris, including but not limited to lumber, bricks, plaster, wire, lath, paper, cardboard, pipe, tires, ashes, refrigerators, motor vehicles or parts of any of the foregoing.

7. No work shall be undertaken until all administrative appeal periods from this Order have elapsed or, if such an appeal has been filed, until all proceedings before the Department have been completed.

8. No work shall be undertaken until the Final Order has been recorded in the Registry of Deeds or the Land Court for the district in which the land is located, within the chain of title of the affected property. In the case of recorded land, the Final Order shall also be noted in the Registry's Grantor Index under the name of the owner of the land upon which the proposed work is to be done. In the case of registered land, the Final Order shall also be noted on the Land Court Certificate of Title of the owner of the land upon which the proposed work is to be done. The recording information shall be submitted to the Department of Environmental Protection on the form at the end of this Order prior to commencement of the work.

9. A sign shall be displayed at the site not less than two square feet or more than three square feet in size bearing the words, "Massachusetts Department of Environmental Protection, File Number SE 75-371."

10. Where the Department of Environmental Protection is requested to make a determination and to issue a Superseding Order, the Conservation Commission shall be a party to all agency proceedings and hearings before the Department.

11. Upon completion of the work described herein, the applicant shall forthwith request in writing that a Certificate of Compliance (WPA Form 8B) be issued stating that the work has been satisfactorily completed.

12.    The work shall conform to the following plans and special conditions:

Plans:

Title: Site & Sewage Plan (2 sheets)

_____

Dated: Rev. 12/20/99

Signed & Stamped by: John McElwee, PLS and David B. Lajoie, RS

On File With: DEP

Title : _____

_____

Dated: _____

Signed & Stamped by: _____

On File With: _____

Title: _____

_____

Dated: _____

Signed & Stamped by: _____

On File With: _____

13.    Any changes to the plans identified in Condition #12 above shall require the applicant to inquire of the Department in writing whether the change is significant enough to require the filing of a new Notice of Intent.

14.    The Agent or members of the Conservation Commission and Department of Environmental Protection shall have the right to enter and inspect the area subject to this Order at reasonable hours to evaluate compliance with the conditions stated in this Order, and may require the submittal of any data deemed necessary by the Department for that evaluation.

15.    This Order of Conditions shall apply to any successor in interest or successor in control of the property subject to this Order and to any contractor or other person performing work conditioned by this Order.

16.    Prior to the start of work, and if the project involves work adjacent to a Bordering Vegetated Wetland, the boundary of the wetland in the vicinity of the proposed work area shall be marked by wooden stakes or flagging. Once in place, the wetland boundary markers shall serve as the limit of work (unless another limit of work line has been noted in the plans of record) and be maintained until a Certificate of Compliance has been issued by the Department.

17.    All sedimentation barriers shall be maintained in good repair until all disturbed areas have been fully stabilized with vegetation or other means. At no time shall sediments be deposited in a wetland or water body. During construction, the applicant or his/her designee shall inspect the erosion controls on a daily basis and shall remove accumulated sediments as needed. The applicant shall immediately control any erosion problems that occur at the site and shall also immediately notify the Department, which reserves the right to require additional erosion and/or damage prevention controls it may deem necessary.

See attached Special Conditions numbered 1 through 7 .

5-3B

Issued by the Department of Environmental Protection

Signature _Elizabeth A. Kouloheras_

Elizabeth A. Kouloheras, Chief, Cape Cod Watershed

On this _8th_ day of _June_, 200 _0_, before me

personally appeared _Elizabeth A. Kouloheras_ _____

to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she executed the same as his/her free act and deed.

_Kaslyn Penman_
Notary Public

_2/1/2002_
My commission expires

The applicant, the owner, any person aggrieved by the Superseding Order, any owner of land abutting the land upon which the proposed work is to be done, or any ten persons pursuant to G.L. c.30A §10A, are hereby notified of their right to request an adjudicatory hearing pursuant to G.L. c.30A, §10, providing the request is made by certified mail or hand delivery to the Department, with the appropriate filing fee and Fee Transmittal Form as provided in 310 CMR 10.03(7), within ten days from the date of issuance of this Superseding Order, and is addressed to: Docket Clerk, Office of General Counsel, Department of Environmental Protection, One Winter Street, Boston, MA 02108. A copy of the request shall at the same time be sent by certified mail or hand delivery to the Conservation Commission, the applicant, and any other party.

A Notice of Claim for an Adjudicatory Hearing shall comply with the Department's Rules for Adjudicatory Proceedings. 310 CMR 1.01(6), and shall contain the following information:

(a)    the DEP Wetlands File Number, name of the applicant and address of the project.
(b)    the complete name, address and telephone number of the party filing the request, and, if represented by counsel, the name and address of the attorney;
(c)    the names and addresses of all other parties, if known;
(d)    a clear and concise statement of (1) the facts which are grounds for the proceedings, (2) the objections to this Superseding Order, including specifically the manner in which it is alleged to be inconsistent with the Department's Wetlands Regulations (310 CMR 10.00) and does not contribute to the protection of the interests identified in the Act, and (3) the relief sought through the adjudicatory hearing, including specifically the changes desired in the Superseding Order;
(e)    a statement that a copy of the request has been sent to the applicant, the conservation commission and each other party or representative of such party, if known.

Failure to submit all necessary information may result in a dismissal by the Department of the Notice of Claim for an Adjudicatory Hearing.

Detach on dotted line and submit to the Department of Environmental Protection prior to commencement of work.

............................................................................................................................................................

To Department of Environmental Protection _____, Issuing Authority.
Please be advised that the Order of Conditions for the project at 5 Yacht Club Road _____,
File Number SE 75-371, has been recorded at the Registry of Deeds, Barnstable and has been noted in the chain of title
of the affected property in accordance with General Condition 8 on _____, 20_____.
If recorded land, the instrument number which identifies this transaction is _____.
If registered land, the document number which identifies this transaction is _____.

Signature_____, Applicant
K/JM

Superseding Order of Conditions for John Allen & Barbara Cordi-Allen, File No. SE 75-371:

Special Conditions Continued:

1.   Prior to any earth moving activity, a staked hay bale filter (end to end) or filter fabric fencing shall be placed along the work limit line as shown on the above-referenced plan. These erosion and siltation controls shall be maintained in proper functioning condition until all disturbed areas have been stabilized, or a determination by the Department that the control measures are no longer necessary.

2.   The line of staked hay bales shall constitute a limit of work line.  No work shall be permitted on the down slope side (wetland side) of this line under this Order.

3.   All final earth gradings shall be permanently stabilized by the planting of indigenous vegetation.

4.   The proposed driveway shall be surfaced with pervious materials such as gravel or crushed shells.

5.   Roof drains shall be channeled into down spouts and then into dry wells or stone drains. Said dry wells or stone drains shall be located at least 25 feet from the proposed soil absorption system.

6.   All construction refuse shall be removed from the site and disposed of in compliance with all local, State, and Federal laws and regulations.

7.   The proposed foundation and dwelling shall be built in compliance with the requirements of the State Building Code and the Federal Emergency Management Agency (FEMA) as they relate to construction within the 100-year coastal floodplain

# REQUEST FOR DEPARTMENTAL ACTION FEE TRANSMITTAL FORM

## Department of Environmental Protection
## Division of Wetlands and Waterways

PERSON/PARTY MAKING REQUEST:
(If appropriate, name the citizen
group's representative)

APPLICANT:
(As shown on Notice of Intent
or Request for Determination)

Name:_____

Name:_____

Street:_____

Street:_____

City/Town:_____

City/Town:_____

State:_____ Zip Code:_____

State:_____ Zip Code:_____

Phone Number:_____

Project Location:_____  DEP File Number:_____
Date Local or Superseding Order/Determination Issued:_____
Amount of Filing Fee Attached: $_____

## INSTRUCTIONS:

WHEN THE DEPARTMENTAL ACTION REQUESTED IS: (check one)
___ Request for Superseding Order of Conditions ($50)
___ Request for Superseding Determination of Applicability ($50)

1. Send this form and a check or money order for $50.00, payable to the Commonwealth of Massachusetts, to the
   DEP Lock Box at:        Dept. of Environmental Protection
                          Box 4062, Boston, MA 02211

2. Send a copy of this form and a copy of the check or money order with the Request for a Superseding Order of
   Conditions or Superseding Determination of Applicability to the appropriate DEP Regional Office:

   DEP/Northeast Regional Office          DEP/Southeast Regional Office
   10 Commerce Way                        20 Riverside Dr., Route 105
   Woburn, MA 01801                       Lakeville, MA 02347

   DEP/Central Regional Office            DEP/Western Regional Office
   75 Grove Street                        436 Dwight Street
   Worcester, MA 01605                    State House West, 4th Floor
                                          Springfield, MA 01103

WHEN THE DEPARTMENTAL ACTION REQUESTED IS: (check one)
___ Request for Adjudicatory Hearing ($100)           ___ Request for "Non-takings" Variance ($4,000)
___ Request to Intervene in Adjudicatory Proceeding ($100)   ___ Request for "Takings" Variance ($100)

1. Send this form and check or money order, payable to the Commonwealth of Massachusetts, in the indicated
   amount to the DEP Lock Box (at the above address) and

2. Send a copy of this form and a copy of the check or money order with the Request for Departmental Action to:
                          Docket Clerk
                          Office of General Counsel
                          1 Winter Street, Boston, MA 02108

**EXHIBIT** $21$



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION

November 10, 2000

| | |
|---|---|
| In the Matter of | Docket Nos. 2000-083 |
| John Allen & Barbara Cordi-Allen | 2000-082 |
| | 2000-084 |
| | 2000-088 |
| | File Nos. SE 75-371 |
| | SE 75-459 |
| | Truro |

### MOTION TO INTERVENE OF BROOKE NEWMAN

1. Brooke Newman, an individual having a permanent address at 273 Roaring Fork Drive, Aspen, Colorado, as owner of the real property located at 3 Yacht Club Road, Truro, Massachusetts hereby moves for Permission to Intervene in the above-referenced adjudicatory proceedings in accordance with the provisions of 310 CMR 1.01(7).

2. Ms. Newman is a direct abutter of the property that is the subject of this action, and is authorized as a matter of right to intervene in these proceedings. See 310 CMR 10.05 (7) (a), and Memorandum in Support hereof.

3. Ms. Newman also will be substantially and specifically affected by the adjudicatory proceedings. If the Applicant is allowed to construct the two dwelling units, a septic system with FAST unit, pool, deck, garage, driveway and related appurtenances and/or the 54-foot long extension to an existing pier with a 26-foot long ramp and two 6 x 20 foot long floats in and over the waters of Pamet Harbor, pursuant to the Superceding Orders of Conditions both issued by the Department on June 8, 2000 (collectively, the "Improvements"), Ms. Newman's interests will be adversely affected by:

(a) the degradation of groundwater beneath the Newman property and adjacent property on which the Newman water supply is located, that will result from the construction and use of the septic system on the coastal dune, and within land subject to flooding and coastal wave action;

(b) the adverse impacts caused by the operation of the proposed septic system on the Newman tidal flat downgradient from the Applicant's property, which tidal flat constitutes a coastal wetland resource serving several coastal wetland resource functions, including but not limited to habitat for aquatic species;

(c) the release of pollutants and contaminants from the proposed septic system during storm events, onto the Newman property and other landward abutting properties, causing damage to the private water supply located across Yacht Club Road from the Applicant's and Ms. Newman's properties;

(d) the degradation of the primary coastal dune located on Ms. Newman's property and the Applicant's property, that will result from the alteration of the landform because of the construction of the house, deck, driveway, pool and appurtenant structures on said dune;

(e) storm damage to Ms. Newman's property because the functions of the coastal dune will have been compromised, aggravating the current condition in which the Applicant's property is already subject to coastal storm flooding;

(f) the alteration of the Newman tidal flat caused by the proposed pier's effect on sediment transport and water flow effects.

4. Ms. Newman seeks relief in the form of a Final Order denying the presently proposed Improvements as not meeting the requirements of MGL C.131 § 40 and 310 CMR 10.00 et seq, or the remand of the Notice of Intent to the Town of Truro Conservation Commission to allow for review of the current plans for the Improvements, which have been substantially modified since the original Notices of Intent were filed with said Commission.

5. A Memorandum in Support of Motion is filed herewith.

6. For the foregoing reasons, Ms. Newman's Motion for Permission to Intervene should be granted.

Respectively Submitted,

Brooke Newman

By her attorneys,

Michael A. Leon, BBO # 293840
Kevin M. Plante, BBO # 630088
Nutter, McClennen & Fish, LLP
One International Place
Boston, MA 02110-2699
(617) 439-2000

-2-

**EXHIBIT** 22

## LAW OFFICES OF PAUL REVERE, III
### 226 River View Lane
### Centerville, Massachusetts   02632
### (508) 778-7126

September 10, 2004

Truro Conservation Commission
7 Standish Way
Truro, Massachusetts 02652

> RE:   Enforcement Brooke Newman
> 3 Yacht Club Road
> SE75-434

Dear Members of the Commission:

At the last Conservation Commission meeting (the "August, 2004 Hearing"), the Commission held a hearing on whether an enforcement order should be issued to Brooke Newman at the above referenced property. Two issues were generally addressed. First, was "fill" brought to the property as part of the construction and, second, did Ms. Newman plant non-indigenous plants? As the representative of an abutter, Barbara Cordi-Allen, I also brought to the Board's attention that the order of conditions references a plan which is different than that which was actually implemented at the property. I have written this letter as a followup to my presentation at the hearing.

### Material Submitted at August, 2004 Hearing

In particular, the only order of conditions for the property was issued on May 22, 1998, and references a plan dated April 6, 1998. (copy of plan (the "April 1998 Plan") and order of conditions are attached as Exhibit One and were presented to Commission at the hearing). The plan is relatively rudimentary and shows the relocated home connecting to an existing septic tank and "leach area." Later, a June 17, 1998, plan was prepared which included a new septic system consisting of a septic tank, pump chamber, and "leach area" (attached as Exhibit Two (the "June 1998 Plan") and presented to the Commission at the hearing). After the August 2004 hearing, I have been informed that the Commission at its August 2, 1998, meeting approved a revised plan. At your August hearing, I presented a copy of an August 11, 1998, plan (attached as Exhibit Three (the "August 11, 1998 Plan") which shows a different location for the house and septic system than the April 1998 Plan and the June 1998 Plan. At the Commission meeting, I also presented an August 18, 1998 letter (Exhibit Four) from the Town's Health Agent requesting that the August 11, 1998 Plan be

*1*

presented to the Conservation Commission for approval. Thus, at the close of the August 2004 hearing, the Conservation Commission requested that further information be submitted by Ms. Newman to address these matters.

## New Information - Later August 1998 Plan And February 1999 Plan

After the August 2004 Hearing, I have obtained a revised plan dated August 25, 1998 (Exhibit Five (the "August 25, 1998 Plan") which seems to differ from the August 11, 1998 Plan only by the addition of a notation that the property is subject to a deed restriction limiting it to two bedrooms.[1]  I was informed by Town counsel at Zisson and Veara that the revisions in the August 1998 plans had also been approved by the Commission, but have not as yet been provided with a copy of meeting minutes or a formal approval.

Based upon my further investigation, an additional plan was submitted to the Commission in February, 1999 (copy attached as Exhibit Six (the "February, 1999 Plan")), and acted favorably upon at the March, 1999, Commission hearing (copy of letter to Felco Engineering, dated March 15, 1999 attached as Exhibit Seven). The February, 1999 Plan differs from the June Plan, the August 11 Plan, and the August 25 Plan.  Most importantly, the cottage has been raised from a "top of foundation" elevation of 12.3 feet in the prior June and August Plans to a "top of foundation" elevation of 14.0 feet (*Compare* Exhibit Five at p. 2 *with* Exhibit Six at p. 2) in the February 1999 Plan. Thus, the top of foundation is more than 20 inches higher in the February, 1999 Plan, than the top of foundation in the prior plans. The increase in "top of foundation" elevation allowed Ms. Newman to eliminate the pump chamber from the septic system because the increased elevation of the cottage allowed septage to flow through the system via gravity.[2]  *See* March 1, 1999, letter from Truro Health Agent (attached as Exhibit Eight).  The February 1999 Plan was ultimately approved by the Board of Health and the system was constructed on the property.

The increase in height of the foundation combined with the gravity flow system required that the septage flow pipe leaving the cottage being elevated. In particular, the earlier plans for the system had the pipe exiting the cottage at elevation of 9.5 feet whereas the February 1999 Plan has the pipe exiting the cottage foundation at an elevation of 12.8 feet. (*Compare* Exhibit Five at p. 2 *with* Exhibit Six at p. 2). Thus, the pipe in the February, 1999 Plan is nearly 40 inches higher than the pipe in the prior

---

[1] The notation was requested by the Health Agent (*see* Exhibit Four).

[2] As you may know, a septic system consists of essentially two components: a septic tank and a leach area. Septage flows from the internal plumbing of the house to inlet of the "septic tank" which is located outside of the house via piping. The piping is required to be straight and sloped downward to prevent backups and allow gravity flow. The septic tank is a water tight chamber where solids settle to the bottom and liquid septage flows via an exit pipe to the "leach area." A separate chamber known as a "pump chamber" may be incorporated in the system to pump liquid waste from the septic tank to the "leach area" if the septic tank is not sufficiently higher than the "leach area" to allow gravity flow. The "leach area" contains a "distribution box" which simply ensures that flow is divided evenly and a leaching field where liquids are returned to the soil.

plans. Similarly, the septic tank mound, inlet pipe, and exit pipe have been raised from 11.5 feet (mound), 8.99 feet (inlet pipe), and 8.99 (exit pipe) in the prior plans to 14.5 feet (mound), 12.60 feet (inlet pipe), and 12.35 (exit pipe) in the February 1999 Plan. The elevation of the "distribution box" and "leach area" mound remains essentially unchanged except that it should be noted the distribution box inlet pipe is at elevation 12.12 feet. In summary, the raising of the cottage's elevation results in the piping components from the building to septic tank and the septic tank to the distribution box being located located at elevations greater than 12.0 feet. This piping would be exposed at least in part unless the property was filled to at least elevation 12.8 feet (elevation of exit pipe from cottage)..

## Impact of Plan Changes and Fill

A review of the plans submitted to and approved by the Conservation Commission demonstrates that the Commission has never approved fill around the home sufficient to cover the piping of the septic system. Since there exist no septic system piping above grade on the Newman property, Ms. Newman has either brought fill material onto the property which has not been authorized by the Commission or has constructed a system different than that approved by the Commission and the Board of Health.

In particular, the April 1998 Plan approved by the Commission in the order of conditions shows an area of fill around the building which brings the grade to elevation 12.0 feet. See Exhibit One. Notably, the plan states that the existing contour around the "leach area" is elevation 12.0 feet, and the next nearest existing contour at elevation 12.0 feet is in Yacht Club Road to the northeast of the Newman property. Thus, the first plan approved by the Commission in the order of conditions did not provide sufficient fill to cover the piping components of the septic system in the February 1999 Plan as all of the piping is found at elevations greater than 12.0 feet in elevation.

As discussed above, the June 1998 Plan (Exhibit Two) no longer uses the existing septic system, but instead proposes a new septic system. The June 1998 Plan no longer has fill to an elevation 12.0 around the cottage, but rather fills an area below the existing "10" foot contour and mounds the new "leach area" with a 12.0 foot contour at the leach area only. Nothing in the June 1998 Plan shows any fill near the cottage to create an elevation greater than 12.0 feet which is necessary to cover the piping in the February 1999 Plan.

The August 1998 Plans (Exhibits Three and Five) are very similar to the June 1998 Plan in that an area below the existing "10" foot contour is filled to the 10 foot elevation and the new "leach area" has a 12.0 foot contour. The major difference is that the August Plans show a greater area filled to the ten foot elevation contour and the septic system proposes to use a new, rather than the existing, septic tank and pump chamber at the property. There was no need to fill higher than the 10.0 foot elevation adjacent

3

to the cottage as the elevation of the exit pipe (elevation 9.5) from the building is below the ten foot contour.

As discussed previously, the February 1999 Plan (Exhibit Six) eliminates the "pump chamber" by raising the cottage and septic tank. The only change to the contours shown on the prior plans is that the "septic tank" is raised with fill shown around it. No changes were shown on the February 1999 Plan to raise the elevation sufficiently to cover the piping located at elevation 12.0 feet and higher near the cottage. This fact was expressly recognized in the Commission's approval of the February 1999 Plan (Exhibit Seven) which states:

> The proposed change to the plans and work **does not affect the contour of the land around the house** or the leach field. (emphasis supplied).

In summary, at no point did Ms. Newman obtain approval from the Conservation Commission to bring in fill which would raise the elevation of the land around the cottage to an elevation above 12.0 feet. However, as discussed previously, the septic system piping from the cottage (exit pipe elevation 12.80 feet) to the septic tank inlet (elevation 12.60 feet) and the septic tank (exit pipe elevation 12.35 feet) to the distribution box (inlet pipe elevation 12.12 feet) are located at elevations greater than 12.0 feet.[3]

Thus, unless unapproved fill was placed upon the Newman property, septic system piping should be visible above grade throughout the northeastern portion of the property with clearly distinguishable mounds for both the septic tank and the "leach area" and the house should be significantly (4 feet) above grade. Instead, a review of the Newman property shows that the piping has been covered, the cottage has fill to nearly the top of the foundation, and the mounds for the septic tank and leach area are barely distinguishable. Therefore, Ms. Newman has brought fill onto the property and the Commission should initiate an enforcement action against her including a requirement that Ms. Newman either remove the fill or file a notice of intent for the property. Additionally, it should be noted that Condition 12e of the order of conditions (Exhibit One) expressly prohibited placing "earth or other material . . . where it could be eroded by wind or water into the river or harbor." The Newman property is located wholly within the flood plain and, therefore, the placement of fill violates that condition.

### February 1999 Plan and Plantings

Significant discussion was undertaken at the August 2004 Hearing on whether certain plants were "indigenous" and authorized under condition 12e of the order of conditions which states as follows:

---

[3] In fact, the February 1999 Plan shows a 12 foot elevation contour around the leach area which the piping travels through and would be above the surface at that point.

*4*

> Bare areas and areas disturbed by construction shall be
> resurfaced or revegetated to hold soil against erosion by
> wind or water. Where possible, indigenous plants shall be
> used, such as beach grass, native grasses, beach pea,
> beach plum, bearberry, seaside goldenrod, or rosa rugosa.

However, Ms. Newman represented in all her plans that "All disturbed areas to be
revegetated with native grasses upon completion of work." (see , Exhibit One, Exhibit
Two, Exhibit Three, Exhibit Five, and Exhibit Six, p. 1, at Construction Note 5). No
plants, trees, or gardens are shown on any of the plans submitted to the Commission.
Thus, neither the order of conditions nor the plans submitted by Newman allow for
planting except in areas disturbed by construction and Ms. Newman affirmatively
informed the Commission that she only intended to plant "native grasses."

Attached to this letter as Exhibit Nine are photographs taken during the construction
authorized by the order of conditions. The photographs show that there are no trees
on the property except for a single tree located on the southwest corner near the
Cordi-Allen's property. A comparison of existing conditions with Exhibit Eight
demonstrates that Ms. Newman has planted numerous trees and plants which are not
"native grasses." Furthermore, some plantings appear to located outside of the area
disturbed by construction. Thus, the plantings currently on the property, violate the
order of conditions, are inconsistent with representations made by Ms. Newman, and
are in violation of the Wetlands Protection Act.

### Construction of Fence

While not discussed at the August 2004 hearing, Ms. Cordi-Allen has brought to my
attention that Ms. Newman has constructed a fence along the southern portion of her.
None of the plans submitted by Ms. Newman show a fence. Further, the pictures in
Exhibit Eight do not show a fence. The construction of the fence violates the Wetlands
Protection Act because an order of conditions has not been obtained for it.

### Impact of Activities

As discussed previously, Ms. Newman has undertaken a number of activities which
violate the order of conditions and the Wetlands Protection Act. The Order of
Conditions expired in May, 2001, on the third anniversary of its issuance and cannot
be amended to incorporate the changes to grade, plantings, or fence on the
property. Furthermore, there are serious questions as to whether a certificate of
compliance can be issued for the already expired order of conditions.

Under these circumstances, the Commission should require Ms. Newman to file a new
order of conditions for all of the work which has been performed on her property. In
doing so, Ms. Newman should be required to delineate the location of the "dune", if
any exists in the area, on her property. Ms. Newman's consultant has asserted that a

dune exists on a portion of Ms. Newman's property and that delineation should be completed throughout Ms. Newman's property.[4] In this regard, the Commission should review the photographs in Exhibit Eight which appear to show fine grain sands surrounding the Newman foundation.

Furthermore, with respect to the foundation, Ms. Newman's consultant was the first to identify this area as a "dune." This action occurred approximately one year after her own home was completed and has caused delays, not only in the construction of Ms. Cordi-Allen's proposed home, but also caused Ms. Sandra Landis to be required to place her cottage and an addition on a pile foundation. In requiring the filing of a new notice of intent or in sending an enforcement order, the Commission should order that Ms. Newman explain the reasons for not designating her property as having a "dune" resource area in her 1998 and 1999 filings when she has so vehemently insisted that one exists in the area, and, absent a compelling explanation, require that her cottage be lifted and placed upon a pile foundation as her actions are forcing the neighboring properties to do so.

## Conclusion

The Commission approved numerous plans for Ms. Newman's property. No plan showed fill to elevations greater than 12.0 feet. However, the February 1999 Plan has septic system piping components which would be exposed unless the property was filled to a higher level. The approval of the February 1999 Plan specifically noted that no additional fill was being placed on the property near the home. However, a review of current conditions at the property shows that the piping components are below grade and, therefore, the current conditions demonstrate that Ms. Newman has brought fill in excess of that authorized by the Commission onto the property. Furthermore, the property has plantings and a fence which have never been authorized by the Commission. The Commission should issue an enforcement order against Ms. Newman which requires her to submit a new notice of intent and to place her cottage upon a pile foundation.

Please contact me at (508)778-7126 if you have any questions regarding this letter.

Very truly yours,

Paul Revere, III

cc:    Barbara Cordi-Allen, Sarah Turano-Flores

---

[4] The existence of a dune in the area was alleged by Ms. Newman in her attempts to block Ms. Cordi-Allen from building a home which would impair Ms. Newman's view of Pamet Harbor. Neither Ms. Cordi-Allen nor her consultant have ever conceded that a dune exists anywhere on either property, but, for purposes of settlement, her consultant and Ms. Newman's consultant have agreed upon a location wherein Ms. Newman's consultant believes the dune is located.

**EXHIBIT** 23

DIRECT TESTIMONY OF STANLEY M. HUMPHRIES
In the Matter of John Allen and Barbara Cordi-Allen
Docket No. 2000-083, -087
File No. 75-371

A.      QUALIFICATIONS.

1. I am currently employed as a Senior Project Manager with Ocean and Coastal Consultants, Inc. (OCC). I am also Director of the Massachusetts branch office located in Plymouth, Massachusetts. My technical expertise is in the areas of coastal geomorphology and flood hazard mitigation.

2. I received a Master's and Bachelor's Degree in Geology from the University of South Carolina in 1977 and 1973, respectively. My major curriculum focused on coastal and fluvial geomorphology, with marine biology as a minor.

3. My responsibilities with OCC include overall direction of the technical and administrative work undertaken by the branch office including, but not limited to, the supervision of coastal studies, impact reports and permit acquisition. I have been employed in my current position for 2 ½ years and have accrued 27 years of technical and project management experience in coastal zone science and planning in the public and private sectors, primarily in Massachusetts.

4. From 1997 to 2003 I was employed by ENSR International, Inc., where I was Senior Coastal Geologist and Senior Manager of the branch in Sagamore Beach, Massachusetts. From 1992 to 1997, I was employed by Fugro East, Inc. and from 1982 to 1992, I was employed by IEP, Inc., located in Sandwich, Massachusetts, where I served in the capacities of Senior Coastal Geologist, Division Manager of Coastal Resources, and as Regional Director of the Cape Cod Office. My duties included, among other things:

> a. performing hydrogeologic investigations within coastal watersheds and conducting beach erosion, dune restoration, salt marsh mitigation, and flood hazard studies;
>
> b. managing environmental impact report investigations;
>
> c. directing and reviewing permit applications, addressing local, state and federal wetland protection laws and regulations; and,
>
> d. providing expert testimony for public agencies and private clients.

5. During my employment with IEP, Inc., I was appointed as a Disaster Assistant Employee with the Federal Management Agency (FEMA) and held this position from 1982 to 1992. My primary responsibilities included post-disaster survey reports and hazard mitigation planning.

6. Prior to joining IEP, Inc. and FEMA, I was employed as a Coastal Geologist with the Massachusetts Department of Environmental Management (DEM). While employed by DEM, I served as the Ocean Sanctuaries Coordinator (1978-1981), Land Use Administrator in the Wetland Restriction Program (1978-1981) and Consulting Geologist in the Flood Hazard Management Project (1981-1982).

7. My professional affiliations include membership in: the American Shore and Beach Preservation Association; the Coastal, Ocean, Ports and Rivers Institute of the American Society of Civil Engineers (ASCE); and, the Boston Society of Civil Engineers Section/ASCE. I have also served as a member (1990-1992) of the Scituate Conservation Commission, Scituate, Massachusetts. From 1992 to 2003, I served on the Board of Directors for the Massachusetts Association of Conservation Commission (MACC). In 2002, I was appointed to the Executive Committee of the Board and served as Vice President of Education.

8. I have provided expert testimony in a variety of cases involving coastal wetland resource area delineations and functional assessments in the Barnstable Superior Court, Barnstable District Court, Hingham District Court and Brockton District Court, as well as numerous adjudicatory proceedings before the Massachusetts Department of Environmental Protection ("DEP") for projects in Plymouth, Barnstable, Truro, Salisbury, Saugus, Scituate, Nahant, Quincy, Chelsea, Newbury and Rockport.

9. In addition, I was an expert witness in an adjudicatory hearing entitled in the Matter of Donald Kline, Docket Nos. 99-021, 99-022, 99-023, 99-024, 99-025, and 99-026 (File No. SE 75-431 – Truro) (Final Decision, October 16, 2000), wherein Department of Environmental Protection ("DEP") decided that fill material adjacent to the former railroad bed in Truro was a "coastal bank' and not a '"coastal dune" under the Wetlands Protection Act, General Laws, c. 131, sec. 40 ("WPA"), and its accompanying regulations because the activity (single-family dwelling construction) was not in an area where sediment landward of a coastal beach was being deposited by wind action or storm overwash.

10. Based on my review of the plans and the Property, I find that the Project is proposed in a coastal dune and in and on land subject to coastal storm flowage and within 100 feet of a coastal beach and salt marsh. I also find that the Project would not comply with the applicable performance standards under the WPA for construction in a coastal dune or, for that matter, in the buffer zone to a coastal bank, if that was determined to be the resource area.

## B.    BASIS OF TESTIMONY

1. I have personally visited the Cordi-Allen property at 5 Yacht Club Road, Truro, Massachusetts (the "Site") three times between the Summer of 2000 and the present. I first viewed the property from the town landing in June of 2000, when the Town filed its original Request for Adjudicatory Hearing. In September of 2001, I was

present during a DEP site visit wherein coastal geologists representing the applicant, the DEP, and Abutter Brooke Newman dug test pits and took soil samples and photographs. I compiled test logs from the soil samples and took various photographs. After the last Status Conference held on March 10, 2005, I went back to the Allen site to further observe and photograph the site.

2. At the site visit in September of 2001, geologists Jim Mahala of the DEP, Lester Smith, Sterling Wall and I established a grid for locating test pits in order to characterize the sediments on the subject and adjacent properties. Using this grid, we then dug test pits on site and analyzed the soil samples we drew from the pits. All the geologists commented on the soil types as they were removed from the pits and I maintained a written log of what we encountered. In addition, photographs were taken to document this process.

3. In compiling this testimony, I relied on my own personal observations, the approved Site & Sewage Plan dated 9/11/96, last revised December 20, 1999, and prepared by Felco, Inc.(hereinafter, "the Approved Plan") (attached hereto as Exhibit A), the Superceding Order of Conditions issued by the Department on June 8, 2000 (attached hereto as Exhibit B), the Grid Sketch prepared during and after the September 2001 site visit (attached hereto as Exhibit C), the soil logs from that site visit (attached hereto as Exhibit D), and the photographs I have taken of the subject property (attached hereto as Exhibits E and F).

4. I also reviewed the Pre-filed Testimony of Peter Rosen submitted for the applicant.

5. The "Project" involves the relocation and expansion of an existing cottage located on the property, a second proposed 36' x 42', dwelling, a 30' x 15' pool lying between the two structures, a wrap around deck, a porch, two car garage, septic system with concrete retaining wall, driveway and related appertances. The total area of disturbance within the limit of work line shown on the plan is approximately 15,000 s.f. of area. The area of permanent loss, including the two dwellings, the garage, pool, deck and driveway constitute over 5,000 s.f. of Coastal Dune and Land Subject to Coastal Storm Flowage.

6. The Approved Plan shows construction within 20' of mean high water ("MHW") and the abutting Coastal Beach and Salt Marsh. The Approved Plan further shows construction within 3' of what the applicant labels as Coastal Bank. All development is shown on the Approved Plan to occur within Land Subject to Coastal Storm Flowage (el. 12') as the entire property is located below elevation 10' National Geodetic Vertical Datum (NGVD).

7. On June 8, 2000, the DEP issued a positive Superceding Order of Conditions ("SOC") approving the Project. The SOC stated "the proposed construction would occur within the 100 foot buffer zone to a Coastal Bank (310 CMR 10.30) and within Land Subject to Coastal Storm Flowage (310 CMR 10.04). The Federal

Emergency Management Agency (FEMA) has mapped this area as subject to coastal storm inundation up to elevation 12 (Zone A4)."

8. Thereafter, abutters Brooke Newman, the Pamet Harbor Yacht Club, and the Town of Truro all filed Requests for Adjudicatory Hearing, claiming they were aggrieved by the DEP's SOC. The Town of Truro raised the issue that the DEP improperly identified the resource areas on site by not identifying a Coastal Dune.

9. On July 26, 2001, Administrative Law Judge Francis X. Nee issued a "Prehearing Conference Report and Scheduling Order identifying the Issues in this proceeding generally, as follows:

1a.    Is there a coastal dune on the site?

1b.    If so, will the project as conditioned by the SOC harm the dune?

1c.    If yes, what, if any, interest of the Wetlands Protection Act will not be protected?

2a.    Will the septic system, including the leaching field, be constructed in a resource area?

2b.    If yes, what resource area?

2c.    If yes, what impact on the interests protected by the Wetlands Protection Act will the septic system have on the resource areas identified in 2b?

3a.    Will any portion of the project, if built in accordance with the SOC, impact any wetland resource area        to the extent that any interest identified in the Wetlands Protection Act is harmed?

3b.    If yes, what are the resource areas?

3c.    What interests of the Wetlands Protection Act are implicated in each resource area identified in 3b and        how does the project harm the interests of the Wetlands Protection Act in each of the resource areas identified in 3b?

10. On March 11. 2005, DALA Issued an Order in response to a status conference held on March 10, 2005. The parties were ordered to file their Pre-Filed Testimony and the Hearing is presently scheduled for September 12-14, 2005.

General Statement of Opinion on Issues Presented for Hearing:

11. In my opinion, based on my observations of the site, the record materials in this proceeding, and my professional experience, there is a Coastal Dune on the Property that extends from a Coastal Beach to at least the Allens' back (Eastern) property line. The Project, as approved, therefore, will take place entirely within the Coastal Dune on site and will permanently destroy over 5,000 s.f. of Coastal Dune, with an additional 10,000 s.f. of disturbance. It is my further opinion that the approved project will, therefore, adversely impact the interests of storm damage prevention and flood control. The protected interest of wildlife habitat will also be adversely impacted by the permanent removal of dune vegetation.

12. In my opinion, based on my observations of the site, the record materials in this proceeding, and my professional experience, the septic system and leaching component will be constructed entirely within Coastal Dune and Land Subject to Coastal Storm Flowage. It is my further opinion, therefore, that said construction will adversely impact the wetland interests of flood control, storm damage prevention and wildlife habitat.

13. In my opinion, based on my observations of the site, the record materials in this proceeding, and my professional experience, the entire Project shown on the Approved Plan will adversely impact the Salt Marsh, Coastal Beach and Coastal Dune on site and, therefore, will harm the interests of flood control, storm damage prevention, wildlife habitat, and the prevention of pollution.

Basis for General Statement of Opinion on Issues Presented for Hearing:

14. It is my opinion that the full extent of Coastal Beach and the presence of Salt Marsh are not shown on the Plan. The Coastal Beach on the subject property extends seaward of the MHW mark shown on the plan. My observations reveal that the surficial beach sediments differ in grain size below and above the approximate MHW. Poorly sorted, coarse sand to pebble size sediments appear to dominate the intertidal beach in contrast to the moderately well-sorted finer quartzose sand located above the MHW to the edge of vegetation. Therefore, in my opinion, the Coastal Beach on the subject property extends from the mean low water (MLW) line to the edge of vegetation. Beyond MHW there exists a Salt Marsh that is not identified on the Approved Plan.

15. Based on my observations of the site, and my analysis of the soil logs attached hereto as Exhibit D, the vegetated area between the Coastal Beach and the East property line where the Approved Project is primarily located, is comprised of Coastal Dune. My conclusion in this regard is supported by the soil logs from the September 2001 site visit (Exhibit D) which reveal dune sediments in all of the test holes, including the test holes at Grid locations B2 and C1(Exhibit C) which are located at the Eastern edge of the proposed garage and at the proposed location for the leaching component.

16. The area above the Coastal Beach is generally comprised of two layers of sediment: a top layer of well-sorted, fine sand underlain by a bottom layer of poorly sorted fine to coarse sand with pebbles. The top layer appears to be windblown material that decreases in thickness landward from the beach. It ranges from the thickest (3.5-5.0 feet) within 10-15 feet of the beach to the thinnest (2.5-3.0 feet) near the property line. The bottom layer appears to be older overwash or dredged material. The depth of investigation was approximately six feet below grade. No buried salt marsh was encountered. Therefore, in my opinion, the vegetated area East of the Coastal Beach is comprised entirely of Coastal Dune and is not buffer zone to Coastal Bank, as Mr. Rosen opines.

17. Based on my observations of the site conditions and the soils in the test pits, the source of windblown sand in the dune is the fine sand from the upper beach between the vegetation and MHW. Predominant northwest and southwest winds during the winter and summer seasons, respectively, provide for the onshore movement of beach sand into the dunes. As the dune erodes, the beach is resupplied with sand and the exchange continues (see Photo 1b attached hereto as Exhibit F). This evidence further supports my opinion that the site is comprised of Coastal Dune and not Bank.

18. Based on my observations of the site and study of the adjacent properties and environs, the topography of the vegetated area on site undulates between approximately 6 to 10 feet in height and not the 8 to 10 feet Mr. Rosen suggests in his Pre-Filed Testimony. The undulating vegetated topography serves to control flooding and prevent storm damage by intercepting storm waves and wind causing dissipation and absorption of energy. This lends further support for the conclusion that the site is comprised of Coastal Dune and is not merely a level surface that consists of Land Subject to Coastal Storm Flowage, as Mr. Rosen contends.

19. Since the 100-year elevation is 12 feet NGVD, yet most of the property is depicted on the Approved Plan as lying at or below elevation 10 feet NGVD, as much as six (6) vertical feet of water could be expected to flow over the property, so it is also considered land subject to coastal storm flowage. Even high frequency storms, with lower flood elevations, this past winter showed evidence of overtopping and outwash into the dunes (see Photos 2a and b in Exhibit F).

The Property Contains Coastal Dune, not Coastal Bank (Rebuttal to Rosen Testimony)

20. To be a coastal bank as defined in 310 CMR 10.30(2), it must be an "elevated landform, other than a coastal dune, which lies at the landward edge of a coastal beach, land subject to tidal action, or other wetland." In other words, if the landform is not a coastal dune it may be a coastal bank.

21. Coastal dune is defined in 310 CMR 10.28(2) as "any natural hill, mound or ridge of sediment landward of a coastal beach deposited by wind action or storm overwash. Coastal dune also means sediment deposited by artificial means and serving the purpose of storm damage prevention and flood control."

22. The sand material on the property, even if artificially deposited as dredged material, has since been reworked by wind and flooding so as to meet the definition of Coastal Dune. Coastal Dune sediments are generally composed of well-sorted sand that is rounded in shape. These are the types of sediments we found to depths of several feet in each of the test holes dug on site during the September 2001 site visit (see Exhibit D).

23. Coastal Bank sediments, on the other hand, are generally comprised of poorly sorted glacial outwash material. These types of bank sediments were present on the Kline property, which was the subject of another adjudicatory hearing in which I was a participant. In Peter Rosen's testimony, he relies on the Kline decision to support his conclusion that the sediments on the subject property are typical of Coastal Bank. I disagree with Mr. Rosen's conclusion in this regard. The sediments on the Kline property were not characteristically dune-like (as we have in the instant proceeding), but were instead comprised of glacial outwash sediments. Also, the FEMA designated 100 year flood plain in Kline was confined to the seaward face of the land form. In contrast, in the instant proceeding, the entire subject property is located within the FEMA flood plain (el. 12').

24. I find Peter Rosen's explanation for the origin of sand deposition on the property (paragraphs #76 through #101) to be speculative as it is not based on any authenticated evidence in the record. Moreover, I find it irrelevant to the issues in dispute in this Hearing as identified by Administrative Law Judge Francis X. Nee because regardless of what transpired over one hundred years ago, the land forms that exist on the property today are the only proper subject of inquiry in this proceeding. Irrespective of whether the landforms that now exist on site were formed from dredge material, or whether they were deposited there naturally, the current functional characteristics of the landforms and how this project will impact those landforms and their functions are the only relevant inquiry in this proceeding.

## The Project Does Not Comply with the WPA and its Accompanying Regulations

25. As noted above, based on my observations of the site and surrounding environs, my analysis of the soil test pits, and my professional experience, the Property contains four wetland resource areas: Coastal Beach, Salt Marsh, Coastal Dune and Land Subject to Coastal Storm Flowage.

26. The proposed project will take place entirely in the Coastal Dune and Land Subject to Coastal Storm Flowage, as well as in the Buffer Zones to the Coastal Beach and Salt Marsh.

27. The project will adversely affect the ability of the Coastal Dune to protect the wetland interests of storm damage prevention, flood control and wildlife habitat. The approved project will permanently destroy over 5,000 s.f. of Coastal Dune and Land Subject to Coastal Storm Flowage; the permanent structures, all of which include solid concrete foundations, will eliminate Dune volume in the areas of construction and will

alter the remaining Coastal Dune adjacent to those structures through wind and wave scour at the base of the foundations; the project will impede the Dune from moving landward or laterally; and, finally, it will destroy and alter a substantial expanse of wildlife habitat. As identified in 310 CMR 10.28(1), these alterations will directly and adversely affect the ability of the dune to protect statutory interests.

28. The performance standards for Coastal Dunes set forth at 310 CMR 10.28(3) apply to the entire area where the project is being proposed. Any alteration on or within 100 feet of a Dune "should not have an adverse affect on the coastal dune by:" (a) affecting the ability of waves to remove sand from the dune (e.g., obstructions to erosion such as the pool, the two house foundations, and the septic system retaining wall when exposed to storms); (b) disturbing the vegetative cover so as to de-stabilize the dune (e.g., the permanent elimination of 5,000 s.f. of Dune cover, the impacts during excavation for the septic system, pool and two dwellings, the elimination of vegetation in the area of the driveway); (c) causing any modification of the dune that would increase the potential for storm or flood damage (e.g., the replacement of the naturally occurring soils with the solid foundations of the two dwellings and septic system, the permanent effects of excavation, lowering the landform and permanently removing sediment in an area of over 5,000 s.f., removing existing sediment and replacing with more loosely compacted material, *all* will result in conditions more prone to erosion; the erosion will adversely impact the ability of the dune to perform its functions of flood control and storm damage control, which will lead to the exposure of the face of the foundation which will be resistant to erosion and divert stormwater and coastal flood waters to other sensitive resource areas); (d) interfering with the landward or lateral movement of the dune (e.g., construction of solid concrete foundations for two dwellings, the garage, and retaining wall for septic system; the compression of the remaining dune form; the changed wind patterns; and the obstructions to the dynamic movement of the dune); and (e) causing artificial removal of sand from the dune (e.g., over 15,000 s.f. of area (including all areas of disturbance within the limit of work line) will be permanently destroyed by the approved project).

29. Based on a comparison of Exhibit 7 in the Rosen testimony, and the Approved Plan (Exhibit A hereto), I calculated that the property has eroded at a rate of 1-3 feet per year. This was derived by overlaying the two plans, adjusting the scales and measuring the area lost between MHW in 1972 and MHW in 1999. The results of my calculations in this regard are shown on the sketch attached hereto as Exhibit G.

30. If the property continues to erode at the rate calculated above, the Coastal Beach on site will continue to move landward such that, within 5-10 years, the proposed dwellings, deck and pool could be located directly on Coastal Beach.

## Why Project Does Not Even Meet Performance Standards for Coastal Bank or Activity Within 100' of Coastal Bank

31. Even assuming Mr. Rosen is correct in his conclusion that the resource areas on site are properly delineated on the Approved Plan, the project does not comply

with the regulations for Coastal Bank set forth in 310 CMR 10.30.

32. The proposed excavation and soil removal violates the applicable Coastal Bank performance standards set forth in 310 CMR 10.30 in several material respects.

33. The project fails to meet the performance standards in 310 CMR 10.30(4) and (6) because the project will "have an adverse effect due to wave action on the movement of sediment from the coastal bank to coastal beaches or land subject to tidal action" and will have an adverse effect "on the stability of the coastal bank."

34. Shoreline change at the rate of erosion described in the previous section, means that the foundation proposed structures, shown as only 3' from the top of Coastal Bank on the Approved Plan, are likely located on the Coastal Beach and Coastal Bank today, as the Approved Plan is already almost six (6) years old. Excavation and installation of the permanent concrete foundations for these structures, therefore, will occur on these resource areas, thereby adversely impacting the function of the bank by interfering with the movement of sediment and adversely impacting the stability of the bank.

35. The Coastal Bank acts as both a sediment source and as a vertical buffer to elevated flood waters. In 310 CMR 10.30(1), it is stated that "The supply of sediment is removed from banks by wave action, and this removal takes place in response to beach and sea conditions". However, sediment that is removed from the system by excavation is lost as sediment supply that could otherwise be removed only by wave action. Since coastal banks only erode and do not accrete, the sediment supply of a coastal bank is stored landward of the face of the coastal bank. Therefore, it is important for a landform faced by a coastal bank to serve as a sediment source in its future, more landward location.

36. Permanent removal of sediment within the entire building footprint (within 18-85 feet of the bank) violates both subsections (4) and (6) of 310 CMR 10.30.

37. Constructing a concrete foundation within the Bank will alter wave action once sediment erodes from the bay side to the foundation, exposing the foundation.

38. The proposed excavation of an unknown amount of sediment is likely to destabilize the landform, in violation of 310 CMR 10.30 (6) (if the landform's face is a coastal bank) and 310 CMR 10.28 (3) (if the landform is a coastal dune) and other provisions of the Wetlands Protection Act and regulations promulgated there under (310 CMR 10.00 et seq.), not only during construction but for many years afterward. This destabilization violation will occur whether or not the face of the landform is a coastal bank or a coastal dune.

CONCLUSION

Based on the foregoing testimony, it is my opinion that the project will take place entirely within Coastal Dune and Land Subject to Coastal Storm Flowage, as well as, the Buffer Zones to Coastal Beach and Salt Marsh. It is my further opinion that the approved project will permanently destroy over 5,000 s.f. of Coastal Dune, with an additional 10,000 s.f. of disturbance within the limit of work line and, therefore, will adversely impact the wetland interests of flood control, storm damage prevention and wildlife habitat. Accordingly, the approved project should not be permitted and a Final Decision should issue, prohibiting the work shown on the Approved Plan.

Signed under the pains and penalties of perjury on this 21st day of July, 2005.

Stanley M. Humphries
Ocean and Coastal Consultants, Inc.

**EXHIBIT** $24$

310 CMR 10.99

**Form 5**

**DEP File No.**    | SE 75-513 |

(To be provided by DEP)

*Commonwealth of*
*Massachusetts*

City/Town Truro

Applicant · Sexton Family Nominee Trust

### Superseding Order of Conditions
### Massachusetts Wetlands Protection Act
G.L. c.131, §40

From: Department of Environmental Protection

To: Sexton Family Nominee Trust _____ (Name of Applicant)

Address: 1515 Cascade Court, Naperville, IL  60565 _____ (applicant)

To: same _____ (Name of Property Owner)

Address: same _____ (owner)

This Order is issued and delivered as follows:

☐  by hand delivery to applicant or representative on _____ (date)

☒  by certified mail, return receipt requested on _____ NOV 0 6 2002 _____ (date)
                                                    7001 0320 0001 4830 4441

This project is located at 41 Ryder Beach Road

The property is recorded at the Registry of Deeds, Barnstable

Book _____

Page _____

Certificate (if registered) 149158

The Notice of Intent for this project was filed on April 23, 2001 _____ (date)

The public hearing was closed on June 25, 2001 _____ (date)

**Findings**

The _Department of Environmental Protection_ has reviewed the above-referenced Notice of Intent and plans and has

held a public hearing on the project. Based on the information available to the _Department of Environmental Protection_

at this time, the _Department of Environmental Protection_ has determined that the area on which the proposed work is to

be done is significant to the following interests in accordance with the Presumptions of Significance set forth in the

regulations for each Area Subject to Protection Under the Act (check as appropriate):

☐  Public water supply           ☒ Flood control                    ☐  Land containing shellfish
☐  Private water supply          ☒ Storm damage prevention          ☐  Fisheries
☐  Ground water supply           ☐ Prevention of pollution          ☒  Protection of wildlife habitat

Total Filing Fee Submitted $55.00 _____    State Share $15.00

City/Town Share $40.00 _____    (1/2 fee in excess of $25)

Total Refund Due $ 0 _____ City/Town Portion $ 0 _____ State Portion $ 0

                                        (1/2 total)                        (1/2 total)

Therefore, the <u>Department of Environmental Protection</u> hereby finds that the following conditions are necessary, in accordance with the Performance Standards set forth in the regulations, to protect those interests checked above. The <u>Department of Environmental Protection</u> orders that all work shall be performed in accordance with said conditions and with the Notice of Intent referenced above. To the extent that the following conditions modify or differ from the plans, specifications or other proposals submitted with the Notice of Intent, the conditions shall control.

**General Conditions**

1. Failure to comply with all conditions stated herein, and with all related statutes and other regulatory measures, shall be deemed cause to revoke or modify this Order.

2. The Order does not grant any property rights or any exclusive privileges; it does not authorize any injury to private property or invasion of private rights.

3. This Order does not relieve the permittee or any other person of the necessity of complying with all other applicable federal, state or local statutes, ordinances, by-laws or regulations.

4. The work authorized hereunder shall be completed within three years from the date of this Order unless either of the following apply:
   (a) the work is a maintenance dredging project as provided for in the Act; or
   (b) the time for completion has been extended to a specified date more than three years, but less than five years, from the date of issuance and both that date and the special circumstances warranting the extended time period are set forth in this Order.

5. This Order may be extended by the issuing authority for one or more periods of up to three years each upon application to the issuing authority at least 30 days prior to the expiration date of the Order.

6. Any fill used in connection with this project shall be clean fill, containing no trash, refuse, rubbish or debris, including but not limited to lumber, bricks, plaster, wire, lath, paper, cardboard, pipe, tires, ashes, refrigerators, motor vehicles or parts of any of the foregoing.

7. No work shall be undertaken until all administrative appeal periods from this Order have elapsed or, if such an appeal has been filed, until all proceedings before the Department have been completed.

8. No work shall be undertaken until the Final Order has been recorded in the Registry of Deeds or the Land Court for the district in which the land is located, within the chain of title of the affected property. In the case of recorded land, the Final Order shall also be noted in the Registry's Grantor Index under the name of the owner of the land upon which the proposed work is to be done. In the case of registered land, the Final Order shall also be noted on the Land Court Certificate of Title of the owner of the land upon which the proposed work is to be done. The recording information shall be submitted to the <u>Department of Environmental Protection</u> on the form at the end of this Order prior to commencement of the work.

9. A sign shall be displayed at the site not less than two square feet or more than three square feet in size bearing the words, "Massachusetts Department of Environmental Protection, File Number <u>SE 75-513</u>."

10. Where the Department of Environmental Protection is requested to make a determination and to issue a Superseding Order, the Conservation Commission shall be a party to all agency proceedings and hearings before the Department.

11. Upon completion of the work described herein, the applicant shall forthwith request in writing that a Certificate of Compliance (WPA Form 8B) be issued stating that the work has been satisfactorily completed.

12.    The work shall conform to the following plans and special conditions:

Plans:

Title: Site Plan SP-1

Dated: May 28, 2002

Signed & Stamped by: Prepared by Polhemus, Savery & DaSilva

On File With: DEP

Title: Modified Foundation Plan with Details

Dated: May 28, 2002

Signed & Stamped by: Michele C. Tudor, P.E.

On File With: DEP

Title: Deck Plan LS-1

Dated: May 28, 2002

Signed & Stamped by: Prepared by Polhemus, Savery & DaSilva

On File With: DEP

13.    Any changes to the plans identified in Condition #12 above shall require the applicant to inquire of the Department in writing whether the change is significant enough to require the filing of a new Notice of Intent.

14.    The Agent or members of the Conservation Commission and Department of Environmental Protection shall have the right to enter and inspect the area subject to this Order at reasonable hours to evaluate compliance with the conditions stated in this Order, and may require the submittal of any data deemed necessary by the Department for that evaluation.

15.    This Order of Conditions shall apply to any successor in interest or successor in control of the property subject to this Order and to any contractor or other person performing work conditioned by this Order.

16.    Prior to the start of work, and if the project involves work adjacent to a Bordering Vegetated Wetland, the boundary of the wetland in the vicinity of the proposed work area shall be marked by wooden stakes or flagging. Once in place, the wetland boundary markers shall serve as the limit of work (unless another limit of work line has been noted in the plans of record) and be maintained until a Certificate of Compliance has been issued by the Department.

17.    All sedimentation barriers shall be maintained in good repair until all disturbed areas have been fully stabilized with vegetation or other means. At no time shall sediments be deposited in a wetland or water body. During construction, the applicant or his/her designee shall inspect the erosion controls on a daily basis and shall remove accumulated sediments as needed. The applicant shall immediately control any erosion problems that occur at the site and shall also immediately notify the Department, which reserves the right to require additional erosion and/or damage prevention controls it may deem necessary.

See attached Special Conditions numbered 1 through 13 .

5-3B

**C)   Filing Fee and Address**

A copy of the Notice of Claim along with a DEP Fee Transmittal Form and a valid check or money order payable to the Commonwealth of Massachusetts in the amount of one hundred dollars ($100) must be mailed to:

> Commonwealth of Massachusetts
> Department of Environmental Protection
> Commonwealth Master Lockbox
> P.O. Box 4062
> Boston, Massachusetts 02211

The request will be dismissed if the filing fee is not paid, unless the appellant is exempt or granted a waiver. The filing fee is not required if the appellant is a city or town (or municipal agency), county, or district of the Commonwealth of Massachusetts, or a municipal housing authority. The Department may waive the adjudicatory hearing filing fee pursuant to 310 CMR 4.06(2) for a person who shows that paying the fee will create an undue financial hardship. A person seeking a waiver must file an affidavit setting forth the facts believed to support the claim of undue financial hardship together with the hearing request as provided above.

Failure to submit all necessary information may result in a dismissal by the Department of the Notice of Claim for an Adjudicatory Hearing.

Detach on dotted line and submit to the Department of Environmental Protection prior to commencement of work.

........................................................................................................................................................

To Department of Environmental Protection _____, Issuing Authority.
Please be advised that the Order of Conditions for the project at 41 Ryder Beach Road _____.
File Number SE 75-513, has been recorded at the Registry of Deeds, Barnstable and has been noted in the chain of title
of the affected property in accordance with General Condition 8 on _____, 200_____.
If recorded land, the instrument number which identifies this transaction is _____.
If registered land, the document number which identifies this transaction is _____.

Signature_____, Applicant
K/JM

Issued by the Department of Environmental Protection.

Signature _Elizabeth A. Kouloheras_

Elizabeth A. Kouloheras, Bureau of Resource Protection

On this _6th_ day of _November_, 200_2_ before me

personally appeared  Elizabeth A. Kouloheras

to me known to be the person described in and who executed the foregoing instrument and acknowledged that he/she executed the same as his/her free act and deed.

_Laura Patrica_        _12-20-02_

Notary Public           My commission expires

Notice of Appeal Rights:

### A)  Appeal Rights and Time Limits

The applicant, the owner, any person aggrieved by the Superseding Order, any owner of land abutting the land upon which the proposed work is to be done, or any ten (10) persons pursuant to M.G.L. c.30A, §10A, are hereby notified of their right to request an adjudicatory hearing pursuant to M.G.L. c.30A, § 10, providing the request is made by certified mail or hand delivery to the Department, with the appropriate filing fee and a DEP Fee Transmittal Form within ten (10) business days from the date of issuance of this Superseding Order, and addressed to:

> Docket Clerk
> Office of Administrative Appeals
> Department of Environmental Protection
> One Winter Street, 3rd Floor
> Boston, MA 02108.

A copy of the request shall at the same time be sent by certified mail or hand delivery to the Conservation Commission, the applicant, and the issuing office of the DEP at:

> DEP Southeast Region
> 20 Riverside Drive
> Lakeville, MA 02347

### B)  Contents of Hearing Request

A Notice of Claim for Adjudicatory Hearing shall comply with the Department's Rules for Adjudicatory Proceedings, 310 CMR 1.01(6), and shall contain the following information:

(a)    the DEP Wetlands File Number, name of the applicant and address of the project;

(b)    the complete name, address, and fax and telephone numbers of the party filing the request, and, if represented by consultant or counsel, the name, fax and telephone numbers, and address of the representative;

(c)    the names, telephone and fax numbers, and addresses of all other parties, if known;

(d)    a clear and concise statement of (1) the facts which are grounds for the proceedings, (2) the objections to this Superseding Order, including specifically the manner in which it is alleged to be inconsistent with the Department's Wetlands Regulations, 310 CMR 10.00, and does not contribute to the protection of the interests identified in the Act, and (3) the relief sought through the adjudicatory hearing, including specifically the changes desired in the Superseding Order;

(e)    a statement that a copy of the request has been sent by certified mail or hand delivery to the applicant and the conservation commission.

Superseding Order of Conditions for Sexton Family Nominee Trust, File No. SE 75-513

Special Conditions:

1.    In addition to the above-referenced plans this Superseding Order of Conditions also incorporates the "Proposed Work and Construction Protocol for Modification to Addition Foundation", dated May 29, 2002 and signed by Peter Polhemus and Michele C. Tudor, P.E..

2.    It is the responsibility of the applicant, owner and/or successor(s) to ensure that all conditions of this Order are complied with. The project engineer and contractors are to be provided with a copy of this Order and referenced documents before commencement of construction.

3.    The Department has determined that the project site is part of Barrier Beach unit Tr-5 as designated by the Massachusetts Office of Coastal Zone Management (CZM). The proposed work would be located entirely within the coastal dune portion of said barrier beach.

4.    Prior to construction a limit of work barrier such as a silt fence or staked haybales shall be erected 7-feet from the existing foundation as depicted on the above-referenced plans.

5.    No work shall be permitted outside of the limit of work barrier under this Order except the planting of indigenous dune vegetation as needed to stabilize disturbed areas. No heavy equipment is permitted outside of the limit of work barrier.

6.    As proposed, the existing concrete grade beam shall be removed except for portions that will serve as pile caps for the existing embedded helical piles. In addition, the dust cover beneath the existing addition and the northwest stone-faced retaining wall shall be removed and disposed of in compliance with all local, State, and Federal laws and regulations.

7.    Prior to the dwelling being lowered and connected to the modified foundation, a structural engineer registered in the Commonwealth of Massachusetts shall certify that the foundation work has been completed in compliance with this Order and the referenced plans. Said certification shall be promptly sent to the Department, the Truro Conservation Commission and the Truro Building Department.

8.    The northeast retaining wall may remain to maintain lateral support for the previously approved garage foundation provided that the area on the seaward side (western side) of the wall is filled with sand to the top of the wall, thereby allowing sand to migrate landward over the wall.

9.    The proposed deck shall be constructed on timber posts and shall be elevated a minimum of two (2) feet above grade.

10.    All construction refuse shall be removed from the site and disposed of in compliance with all local, State, and Federal laws and regulations.

Superseding Order of Conditions for Sexton Family Nominee Trust, File No. SE 75-513

Special Conditions continued:

11.     No new coastal engineering structure, such as a bulkhead, revetment, or seawall shall be permitted at any time in the future to protect the project allowed herein.

12.     The Applicant/Owner, his heirs, successors and assigns shall assume the risk of shoreline erosion on this lot and accept that neither the Town nor the Commonwealth of Massachusetts need consent to any measure which will interfere with natural processes on the property.

13.     Special Conditions Nos. 11 and 12 are continuing conditions. Therefore, these conditions shall remain in perpetuity and shall be recorded as such on the Certificate of Compliance.

**EXHIBIT** $25$









Town of TRURO Fiscal Year 2006